COURT OF CRIMINAL APPEALS NO. _____

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

FROM

## CIRCUIT COURT OF ___HOUSTON___ COUNTY, ALABAMA

CIRCUIT COURT NO.     CC-2002-235 & 236    Volume II

CIRCUIT JUDGE _____Brad Mendheim_____

Type of Conviction / Order Appealed From: __Rape 1 and Attempted Murder__

Sentence Imposed: _99 Years $20,000.00 Fine, $5,000.00 Victime Compensation._

Defendant Indigent:   [X] YES   [ ] NO   99 years, $20,000.00 Fine $5,000.00 Victim Comp

__Freeshone Cornelius McLeod__

__Hon. Clark Parker  PAR 069_____793-9009__          NAME OF APPELLANT
(Appellant's Attorney)                    (Telephone No.)
__401 N. Foster Sr.__
(Address)
__Dothan_____Alabama_____36303__
(City)         (State)        (Zip Code)

V.

## STATE OF ALABAMA

(State represented by Attorney General)          NAME OF APPELLEE
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)

Part 3 of 9

1              PROCEEDINGS
2          THE COURT:  Is this a motion to suppress a
3      statement?
4          MR. BRANTLEY:  Yes, sir.  The Defendant
5      would move to suppress any and all statements that
6      the Prosecution intends to introduce at trial made
7      by the Defendant, Your Honor.
8          THE COURT:  Mr. Valeska, are you ready?
9          MR. VALESKA:  I'm ready for this part, Your
10     Honor, and what we discussed at the bench.
11         THE COURT:  Go ahead.
12              ADAM ROBINSON
13     having first been duly sworn, was examined and
14     testified as follows:
15              DIRECT EXAMINATION
16 BY MR. VALESKA:
17 Q   Tell us your name, please, sir.
18 A   Investigator Adam Robinson.
19 Q   Investigator Robinson, where are you employed?
20 A   Houston County Sheriff's Department.
21 Q   Let me take you back to on or about October 6 of
22     2001 and ask if you had an occasion to be in
23     Gordon, Alabama, in Houston County before Depot
24     Street, Depot area, 62 Depot -- that area?
25 A   Yes, sir, I did.

1    Q    What was the occasion of getting out there?  Tell
2         Judge Mendheim.
3    A    We received a call of a child bleeding from the
4         head.
5    Q    When you -- where did you first arrive on the
6         scene?  What location, if you could tell me?  Was
7         it 62 Depot between 78 and 80?  What was your
8         location?
9    A    62 Depot Street.
10   Q    Was that a house?
11   A    Yes, sir, I believe it was.
12   Q    Brick-type house?
13   A    I believe it was.  I'm not --
14   Q    If I could, the brick-type house, was there a
15        concrete driveway?
16   A    Yes, sir, there was.
17   Q    If I could, looking straight at the brick house,
18        tell Judge Mendheim to the left could you see a
19        trailer in the close proximity to the left?
20   A    Yes, sir, you could.
21   Q    The general area by the trailer just left to the
22        brick house, in other words, where there's a
23        concrete driveway, is it a wooded -- or
24        semi-wooded-type area?
25   A    Yes, sir, it is.

1   Q   Was there another trailer further off to the

2       extreme left of the first trailer I referred to

3       that was unoccupied during this time?

4   A   I believe so, yes, sir.

5   Q   And between the unoccupied trailer, the trailer I

6       referred to as the first trailer close to the

7       brick house, Mose McGriff's house, is that the

8       house you went to?

9   A   Yes, sir.

10  Q   That's the brick house. So if I could, the brick

11      house, Mr. McGriff's house, the first trailer to

12      the left, and then is there a dirt path or some

13      bushes or some wooded area and then that

14      unoccupied trailer further to the extreme left a

15      hundred and fifty yards whatever it is further

16      away?

17  A   Yes, sir.

18  Q   Now, if I could, Mr. McGriff's house, directly

19      behind his house and to the right somewhere, the

20      road is when you come in off the highway, was

21      there a house or a structure in close proximity to

22      Mr. McGriff's house? When I say behind it or to

23      the right as you look at the front?

24  A   I believe there was. I'm not real positive on

25      that.

```
 1    Q    Did you ascertain or determine where Jonteria

 2         Jones -- where she had been staying before she

 3         went missing?

 4    A    Yes, sir.

 5    Q    Is that the house I was referring to?

 6    A    Yes, sir, it is.

 7    Q    Behind Mr. McGriff's house?

 8    A    Yes, sir.

 9    Q    Was that with her grandmother or her guardian or

10         aunt is what I'm asking?  Grandmother.

11    A    Yes, sir.

12    Q    Now, tell Judge Mendheim when you arrived on the

13         scene, do you see anybody in this courtroom you

14         saw out there on that occasion?

15    A    Yes, sir.  Mr. McLeod.

16    Q    Did you have any type of cameras in your car?

17    A    I have a Polaroid.

18    Q    Take it out on this occasion?

19    A    Yes, sir, I did.

20    Q    And let me commend you as the Prosecutor for

21         having that equipment.  Did you -- tell Judge

22         Mendheim, did you take any pictures?

23    A    Yes, sir.  I believe I took three Polaroid

24         pictures.

25                   (State's Exhibits No. 1, 2, and 3 were
```

```
 1                    marked for identification for the

 2                    purposes of the suppression hearing.)

 3            THE COURT:  Show Mr. Brantley what you're

 4       marking.

 5            MR. VALESKA:  This is State's 1, 2, and 3.

 6       Show State's Exhibit 4 for the Judge and 5.

 7                    (State's Exhibits No. 4 and 5 were

 8                    marked for identification for the

 9                    purposes of the suppression hearing.)

10  Q    First of all, I asked you about a house or a

11       trailer.  Looking at State's 4, can you see in

12       this picture any wooded area or trailer I referred

13       to?

14  A    Yes, sir, I can.

15  Q    Which trailer is that?

16  A    Right there (indicating).

17  Q    76 Depot, that's in Gordon, Alabama, Houston

18       County, correct?

19  A    Yes, sir.

20  Q    I asked you about a path or wooded area as well as

21       an unoccupied trailer at 80 Depot Street.  Do you

22       see that in the picture?

23  A    Yes, sir.

24  Q    And then the location where the victim, Jonteria,

25       was found, is that depicted in here in the bushes?
```

1   A   Yes, sir, it is.

2   Q   And this is the location?

3   A   Yes, sir.

4   Q   State's 4, is that truly and accurately the way it

5       looked except after she had been removed from the

6       scene, correct?

7   A   That's correct.

8   Q   Let me go to State's 5 and ask you looking at

9       State's 5 and tell me, what is 5?

10  A   Drag marks in the dirt leading from the trailer.

11  Q   Which trailer?  What address?

12  A   76 Depot Street.

13  Q   Is that the trailer that when I referred to that

14      was behind or an angle from Mr. McGriff's how, the

15      brick house?  Close proximity?

16  A   Yes, sir.

17  Q   You could see it from that direction from the

18      trailer to his house and or his house to the

19      trailer, correct?

20  A   Yes, sir.

21  Q   Now, refer to the officer, the unoccupied trailer

22      you referred to as 80 Depot Street up in the upper

23      left-hand corner as well as the wooded area,

24      correct?

25  A   Yes, sir.

1    Q    Now, if I could, let me go to State's Exhibit 1.

2         State's Exhibit 1 plus a picture with it, in other

3         words, there's a copy and a picture, do you

4         recognize State's 1?

5    A    Yes, sir, I do.

6    Q    Tell Judge Mendheim who took State's 1.

7    A    I took it.

8    Q    Is that truly and accurately the way it looked

9         when you found Jonteria on the concrete of Mr.

10        McGriff's house?

11   A    Yes, sir.

12   Q    The occupants that were around her when you took

13        the picture, were they there?

14   A    Yes, sir.

15   Q    Does that picture truly and accurately depict the

16        way she looked on October 6, 2001?

17   A    Yes, sir, it is.

18   Q    Same substantial condition?

19   A    Yes.

20            MR. VALESKA:   Offer State's 1.

21            MR. BRANTLEY:   Judge, is this for -- offering

22        for the suppression hearing?

23            THE COURT:   I assume.

24               Is that --

25            MR. VALESKA:   Yes, sir.

1      MR. BRANTLEY:  No objection.

2      THE COURT:  It's admitted.

3              (State's Exhibit No. 1 was admitted into

4              evidence for the purpose of the

5              suppression hearing.)

6  Q    Going to State's 2 for identification purpose.

7      Actual photo as well as a printed copy, correct?

8  A    Yes, sir.

9  Q    Who took the photo?

10 A    I did.

11 Q    Is that the way it looked on October 6, 2001, when

12     you found Jonteria on the concrete the way she

13     looked?

14 A    Yes, sir.

15 Q    Same substantial condition, correct?

16 A    Yes, sir.

17     MR. VALESKA:  Offer 2.

18     MR. BRANTLEY:  That's a picture of what?

19     MR. VALESKA:  Picture of Jonteria on the

20     concrete with blood coming from her head --

21     MR. BRANTLEY:  No objection for the

22     suppression hearing.

23     THE COURT:  It's admitted for the

24     suppression.

25              (State's Exhibit No. 2 was admitted into

```
 1                    evidence for the purpose of the
 2                    suppression hearing.)
 3     Q    State's 3 for identification purposes, the photo
 4          itself, who took the actual photo?
 5     A    I did.
 6     Q    Is the copy, one compared to the other, two
 7          copies true and correct as well as the original
 8          photos you took?
 9     A    Yes, sir.
10     Q    The original photos not been marked, altered,
11          changed in State's 3 in any way, has it?
12     A    No, sir.
13     Q    Who is in State's 3?  Is that Jonteria?
14     A    Yes, it is.
15     Q    And does it indicate the injuries you could see
16          from her head and the blood on the concrete of her
17          body?
18     A    Yes, sir.
19     Q    The sheets she was covered up or a white cloth?
20     A    Yes, sir.
21              MR. VALESKA:  Offer State's 3.
22              MR. BRANTLEY:  No objection.
23              THE COURT:  State's 3 is admitted.
24                  (State's Exhibit No. 3 was admitted into
25                   evidence for the purpose of the
```

```
 1                    suppression hearing.)

 2   Q    Now, were you present or observed at that time

 3        when Jonteria Jones, who was six years old, was

 4        talking or was lying on the concrete while her

 5        mother was in close proximity to her?

 6   A    Yes, sir.

 7   Q    Did you yourself hear anything that the mother

 8        asked in the presence of her daughter, Jonteria,

 9        within the presence of Freeshone McLeod as to who

10        had done this and who had hurt her or caused this

11        injury?

12             MR. BRANTLEY:  Judge, I'm going to object.

13        We're here on suppressing his statements.  And

14        it's just irrelevant as to any statements anybody

15        else made with regards to any statement he made.

16        This is a suppression hearing on his statements.

17             MR. VALESKA:  If I could just --

18             THE COURT:  I guess whatever answer just go

19        to the facts.  I assume he's going to tie it up.

20             MR. VALESKA:  I believe there's going to be

21        testimony -- I'm just making a proffer so there's

22        no surprise to the Defense.  She asked her

23        daughter who did this, and she pointed out

24        Freeshone.  So that's a non-verbal, but it's a

25        communication by her so it's a statement or a
```

1   spontaneous remark by the victim in the presence

2   of the Defendant as to who had assaulted her or

3   did rape her and bash her in the skull and caused

4   skull fractures.

5       MR. BRANTLEY:  I understand she's going to

6   testify today -- the victim is.

7       THE COURT:  How does that go to suppression?

8   Did he make a -- did the Defendant make a

9   response?

10      MR. VALESKA:  The victim's mother then turned

11  around and said, you did this to this baby I'm

12  going to kill him, and a fight ensued between

13  them.

14      THE COURT:  Did he make any statements?

15      MR. VALESKA:  I can't tell you until I ask

16  the mother what he said.  But he made statements

17  to this officer if you will allow me to get into

18  it while we're outside the presence of the jury.

19  In other words, I will make a pre-offer that once

20  this officer places him in the car and there's

21  been discussions about what happened to her, did

22  you do this to my child, I'll kill you, and then

23  he's asking questions of this officer, Judge

24  Mendheim, in the patrol car and when he's

25  detained.  He says, something to the effect, how

1    is she, she has got a skull fracture; will that

2    effect her memory.  So I think that's why at this

3    point I'm laying a predicate to put this in.  Once

4    again, we're outside the presence of the jury.

5         THE COURT:  I'm just trying to see how that

6    related necessarily back to the statement whether

7    it happened or not.  I mean, I can see her

8    condition.

9         MR. VALESKA:  It's a non-communicated

10   statement by the victim with the Defendant present

11   as to who assaulted her and raped her and bashed

12   her skull in.  In other words, once again, so they

13   don't say -- they have a right to suppress it or

14   keep it out.

15        THE COURT:  Is it a motion to suppress that

16   and what he supposedly told the deputy in the

17   car?

18        MR. BRANTLEY:  Well, I guess -- I don't

19   know.  But I think the State is saying this.  Is

20   that the victim pointed to Freeshone.  That's not

21   a statement made by Mr. McLeod.  And, of course --

22        MR. VALESKA:  The only reason I bring it up

23   is so they don't want to suppress it and have the

24   jury go out at a later point in time.  We want --

25        THE COURT:  All I'm trying to get at is what

1    are you-all wanting me to decide at this point.

2    I thought it was just -- what he allegedly --

3        MR. VALESKA:  I'm trying to save some time.

4        THE COURT:  But if that's also going to be an

5    issue, I guess we might as well go ahead and take

6    that up also.

7        MR. BRANTLEY:  I understand what Mr. Valeska

8    is doing.  I don't have any objection.  I see now

9    what he's doing.

10        THE COURT:  You're already objecting to it.

11    So we will admit it for purposes of I guess what

12    will technically be a motion in limine by the

13    Defense at a future point.

14  Q  Were you present at that time, was there any

15     communications between Freeshone McLeod, Kinyeta

16     -- Kinyota -- I's mispronouncing it -- Jonteria's

17     mother who was assisting her child and taking her

18     out of the bushes -- I'm sorry, Dinthea is

19     Jonteria's mother.  Were you present or were you

20     not present during these times?

21  A  I was present when she began stating, he did this

22     to my child.  As far as seeing her point, I did

23     not see her point.

24  Q  When Dinthea said, he did this to my child,

25     Jonteria was still there on the concrete bleeding?

```
 1    A    Yes, she was.

 2    Q    The ambulance hadn't gotten there.  And tell Judge

 3         Mendheim who was present.

 4    A    The mother was present and Mr. Freeshone was

 5         standing --

 6    Q    Close proximity?

 7    A    Correct.

 8    Q    Within a couple of feet?

 9    A    Enough to hear her statement.

10    Q    You see him in the courtroom, correct?

11    A    Yes, sir.

12    Q    Point him out for Judge Mendheim.

13    A    (Complied.)

14    Q    Would you tell Judge Mendheim, did he deny it in

15         your presence or say anything?

16    A    He didn't say anything.

17    Q    Would you tell Judge Mendheim, the ambulance

18         arrived shortly after the paramedics.  And did you

19         yourself ever see Freeshone McLeod touch Jonteria

20         in any way?

21    A    No, I did not.

22    Q    Now, who placed Freeshone McLeod in the back of

23         the patrol unit?

24    A    I did.

25    Q    Tell Judge Mendheim, at that time was he under
```

1     arrest?

2   A   No, sir.

3   Q   Was he handcuffed?

4   A   I believe he was.

5   Q   And where was he placed?

6   A   In the back seat.

7   Q   And while he was placed in the back seat, were you

8       with him the entire time or did you shut the door

9       and leave him in there alone?

10  A   When I first sat him in, he asked me if the child

11      was okay.

12  Q   Let me ask you.  Before -- if I could stop you.

13      You placed him in the car.  Would you tell Judge

14      Mendheim, he was detained, correct?

15  A   Correct.  I cannot remember if he was handcuffed

16      or not.

17  Q   I understand.  But you had him detained?

18  A   Correct.

19  Q   In other words, he was in the unit under your

20      control you placed him in?

21  A   Correct.

22  Q   Would you tell Judge Mendheim as an investigator

23      with the sheriff's department, were you

24      questioning him in any way trying to get any

25      statements out of him?

1    A    No, I was not.

2    Q    In any manner or fashion?

3    A    No, sir.

4    Q    Who made a voluntary spontaneous statement or

5         question to who?  Tell Judge Mendheim.

6              MR. BRANTLEY:  Object as to leading.

7              THE COURT:  Try not to lead.  Go ahead and

8         see if you can answer the question.  Try not to

9         lead.

10   A    Mr. Freeshone --

11   Q    Did you make any -- ask him any questions?

12   A    No, I did not.

13   Q    Any other police officers in the hearing and

14        presence of the Defendant, Freeshone, question him

15        anytime during this time?

16   A    Not that I know of, no, sir.

17   Q    Anybody else standing next to you-all when you're

18        in the car?

19   A    No, sir.

20   Q    Tell Judge Mendheim, when you were in the car, did

21        anybody make a statement?

22   A    Mr. Freeshone made a statement.

23   Q    Tell Judge Mendheim, did you ask him a question?

24   A    No, I did not.

25   Q    What did he say to you?

32

1   A   He asked me was the child okay.  I responded, she

2       probably has a fractured skull.  And then he asked

3       me, does that affect her memory.  And I responded,

4       I don't know.

5   Q   Tell Judge Mendheim, at any time during the

6       response of those questions were you leading or

7       asking the questions of him?

8   A   No, sir, I never asked.

9   Q   Who was asking the questions?

10  A   Mr. Freeshone.

11  Q   And the time that you responded to what he said in

12      any manner or fashion were you trying to get a

13      statement from him?

14  A   No, I was not.

15  Q   Now, was Jonteria, the six-year-old little girl,

16      was she still there on the scene while he was in

17      the car?

18  A   I believe the ambulance had gotten there while she

19      was -- while he was in the car.

20  Q   So she was still present; correct?

21  A   I believe so, yes, sir.

22  Q   Did he remain in the car with you until the

23      ambulance left, or did you leave first with him?

24  A   I waited.  The ambulance had left before I took

25      him to the office.

33

| | | |
|---|---|---|
| 1 | Q | Did you see any blood yourself on Freeshone McLeod? |
| 2 | A | I do not recall any. |
| 3 | Q | Now, when you -- Freeshone asked you the last |
| 4 | | thing you responded, did you leave him locked in |
| 5 | | the car? |
| 6 | A | Yes, sir.  I stood beside the car. |
| 7 | Q | No one else had access to get in there and |
| 8 | | question him.  I want to go back.  You didn't |
| 9 | | threaten him any time when you placed him in the |
| 10 | | car in order to get him to make a statement in any |
| 11 | | manner or fashion? |
| 12 | A | No, sir. |
| 13 | Q | Did he appear to be under the influence of drugs |
| 14 | | or alcohol prior to him asking you any questions |
| 15 | | or initiating these questions? |
| 16 | A | He did not appear to be, no, sir. |
| 17 | Q | You observed people under the influence of drugs |
| 18 | | or alcohol? |
| 19 | A | Yes, sir, I have. |
| 20 | Q | Speech slurred, was it? |
| 21 | A | No, sir. |
| 22 | Q | Was he falling down in any manner or fashion, |
| 23 | | motor movement or walk or talk? |
| 24 | A | No, sir.  He appeared fine. |
| 25 | Q | What you observed, tell Judge Mendheim, did he |

```
 1              appear to understand the responses you gave him?
 2     A        Yes, sir.
 3     Q        Could you understand what he said to you in the
 4              English language?
 5     A        Yes, sir.
 6     Q        At any time when you took him over to the car
 7              until he asked you the questions, did he tell you
 8              he wanted a lawyer?
 9     A        No, sir.
10     Q        Now, you got back in the patrol unit with him and
11              the sheriff's department.  You transported him
12              where, tell Judge Mendheim?
13     A        To the Houston County Jail.
14     Q        On the way down did you question him in any way?
15     A        No.
16     Q        Did he make any statements to you on the way down?
17     A        No, sir.
18     Q        When you got him to the jail and took him out and
19              took him inside for booking, did you question him
20              in any way?
21     A        I took him to the sheriff's office for
22              investigators.  I transported him.  While taking
23              him into the sheriff's office, he did not make any
24              statements to me.  And I did not ask him
25              anything.
```

35

1    Q    And after you turned him over, did you ever have

2         custody of him again?

3    A    No, sir, I did not.

4    Q    Who was bigger, Jonteria -- the six-year-old

5         little girl, or Mr. Freeshone?

6    A    Mr. Freeshone.

7    Q    Did you also talk to Mose McGriff?

8    A    I believe he told me that -- I believe he talked

9         to myself and Sergeant Forehand telling us where

10        they found the victim.

11   Q    Jonteria?

12   A    Yes, sir.

13   Q    Just for Judge Mendheim's benefit, we showed

14        pictures of the trailer I'll refer to as 76 Depot

15        Street, Gordon, Alabama, Houston County.  The

16        distance to where Jonteria was found, tell Judge

17        Mendheim from where you're sitting, was it ten

18        times away or as long as this courtroom or shorter

19        than that?

20   A    It was probably from here to the wall maybe.  It

21        wasn't that far away from the trailer.

22   Q    When you saw Jonteria and her condition

23        yourself, what did you see on her body?

24   A    A lot of blood.  I thought when I first arrived

25        that she was shot in the head.

36

```
 1    Q    And could you tell Judge Mendheim, did you hear
 2         any kind of sounds coming from her body?
 3    A    When I arrived, her mouth was open almost
 4         convulsing-type on the ground.  Other than --
 5         other than that, I didn't hear anything.
 6    Q    Did you find you yourself, tell Judge Mendheim,
 7         any blood in the location where she was found?
 8    A    I actually did not go back to the actual area
 9         where she was found.  I believe Sergeant Forehand
10         did.
11    Q    Tell Judge Mendheim from the trailer at 76 Depot
12         Street, whose trailer was that, if you know?
13              MR. BRANTLEY:  If I could interrupt briefly.
14         Could we invoke the Rule?  I don't know if Mr.
15         Forehand is going to testify or not.  But he's in
16         here.
17              THE COURT:  Anybody that may be a witness on
18         this case either the motion or the trial needs to
19         step outside.
20              (At which time the Rule was invoked.)
21    Q    Would you tell Judge Mendheim, please, from 76
22         Depot, the actual trailer itself, could you see
23         any type of marks on the ground from the trailer?
24    A    Yes, sir.  Drag marks in the dirt.
25    Q    Did you see what direction they went?
```

37

| | | |
|---|---|---|
| 1 | A | Yes, sir. |
| 2 | Q | Is that the direction she was found in the bushes? |
| 3 | A | Yes, sir.  That's the point where Mose and myself |
| 4 | | and Freeshone were talking.  When we saw those |
| 5 | | drag marks, Freeshone went to step into the drag |
| 6 | | marks.  And myself and Sergeant Forehand stopped |
| 7 | | Mr. Freeshone from walking in the drag marks, and |
| 8 | | I pulled him away from the drag marks, and |
| 9 | | Sergeant Forehand and Mr. Mose walked back to |
| 10 | | where the body was actually found at. |
| 11 | Q | And who found the body? |
| 12 | A | Mr. Mose and Freeshone actually found it. |
| 13 | Q | Did you step over to where she was at that |
| 14 | | location? |
| 15 | A | Sir? |
| 16 | Q | Who got her out of the bushes? |
| 17 | A | Mr. Mose carried her.  When I was there. |
| 18 | Q | And then the mother also picked her up and carried |
| 19 | | her? |
| 20 | A | Correct. |
| 21 | Q | She was taken over to Mr. Mose McGriff's concrete |
| 22 | | where the pictures indicate? |
| 23 | A | Correct. |
| 24 | | MR. VALESKA:  That's all.  Pass the witness. |
| 25 | | Thank you, Judge Mendheim. |

1          THE COURT:  Mr. Brantley?

2              CROSS EXAMINATION

3    BY MR. BRANTLEY:

4    Q    Make sure I understand your testimony correctly.

5         You said that you did not see her point to

6         Freeshone?

7    A    I did not, no, sir.

8    Q    Were you present at all times when she was brought

9         up there in front of the house?

10   A    No, sir.  I don't know how long she was in the

11        driveway before I arrived.

12   Q    But from the time you got there until the time you

13        left, how many minutes was that?

14   A    It was quite a while.  I was not present with the

15        -- once rescue -- basically once rescue got on the

16        scene, I left that area.

17   Q    But you were there how long?  About twenty

18        minutes?  Thirty minutes?

19   A    Probably twenty minutes.

20   Q    During that time she didn't point to anybody,

21        right?

22   A    Not to my knowledge, no, sir.

23   Q    And also you said that you heard her say what,

24        now?  What was the question presented to --

25        talking about Jonteria?

| | | |
|---|---|---|
| 1 | A | The victim? |
| 2 | Q | Yes, sir. |
| 3 | A | I did not hear the victim say anything. |
| 4 | Q | You didn't hear her say anything? |
| 5 | A | No, sir. |
| 6 | Q | Now, and you were present about twenty or thirty |
| 7 | | minutes prior to the time rescue came there, right? |
| 8 | A | Yes, sir.  It was probably -- it was probably |
| 9 | | about twenty minutes. |
| 10 | Q | Now, how did it come about that Freeshone was |
| 11 | | placed in the back of the patrol car?  Did you |
| 12 | | place him back there? |
| 13 | A | Yes, sir. |
| 14 | Q | And do you-all have a procedure when you put |
| 15 | | somebody in the back of a patrol car that you go |
| 16 | | through?  Are you trained to do that -- on how to |
| 17 | | do that? |
| 18 | A | Yes, sir. |
| 19 | Q | Don't you normally cuff them first? |
| 20 | A | Not all times. |
| 21 | Q | But is that the procedure? |
| 22 | A | We pat them down.  That's our procedure.  We pat |
| 23 | | them down. |
| 24 | Q | Pat them down? |
| 25 | A | Yes, sir. |

1   Q   And then put them in the back of the car?

2   A   Yes, sir.

3   Q   What would determine whether or not you cuff them?

4   A   If we know the -- if the suspect is -- you know,

5       did the crime, if we saw him do the crime most of

6       the times.  If he's just for questioning,

7       sometimes we will sit them in there and not cuff

8       them.  We transport people, sometimes we will not

9       handcuff them.

10  Q   But he was under arrest at this time, was he not?

11  A   No, sir.  He was detained for questioning.

12  Q   You advised him of his rights?

13  A   I did, yes, sir.

14  Q   You did?

15  A   Yes, sir.

16  Q   Why would you advise him of his rights?

17  A   Sergeant Forehand told me when I went to place him

18      in the car to advise him of his rights.

19  Q   Now, what did he say when you advised him of his

20      rights?

21  A   That's when -- when I advised him of his rights.

22  Q   Were you in the car with him when you gave him --

23  A   I was standing outside the car.

24  Q   And Freeshone --

25  A   He was sitting in the car.

1    Q    In the back?

2    A    Yes, sir.

3    Q    And when you gave him his rights, what did he say?

4    A    That's when he asked me if the child was okay.

5    Q    Did he respond -- you asked him, did you not, once

6         you gave him his rights, did you present him a

7         little document called waiver of rights?

8    A    I don't recall if I did or not.

9    Q    If you didn't do that, did you ask him does he

10        waive those rights?

11   A    I asked him if he understood his rights.

12   Q    And he said yes, didn't he?

13   A    Yes, sir.

14   Q    And then did you ask him does he waive those

15        rights?

16   A    I don't know if I did or not, sir.

17   Q    So you don't know if he waived his rights or not,

18        do you?

19   A    No, sir.

20   Q    So without knowing if he waived his Miranda rights

21        or not, you then proceeded to take his statement

22        from him?

23   A    I didn't ask him any questions.  He volunteered

24        the statement.

25   Q    When he volunteered his statement, did you then

1    because he had not waived it, did you then caution

2    him that he had the right not to make that

3    statement?

4  A  No, sir. I let him keep talking whatever he was

5    wanting to say.

6  Q  And that's when he asked you what was wrong with

7    her -- what did he ask you?

8  A  He asked if the child was okay. And I responded,

9    no, she's probably got a fractured skull. He then

10    asked, does that effect her memory. I responded,

11    I don't know.

12  Q  Anybody else hear that statement made by him?

13  A  No, sir. I don't believe so.

14  Q  What else -- and that was it?

15  A  Yes, sir. That was the extent of my conversation.

16  Q  And --

17        MR. BRANTLEY:  That's all I have, Judge.

18              REDIRECT EXAMINATION

19  BY MR. VALESKA:

20  Q  If I could, just for the Record, Mr. Brantley

21    asked you about giving him constitutional Miranda

22    rights and him waiving them. Tell Judge Mendheim,

23    were you questioning him?

24  A  No, sir, I did not.

25  Q  And are you thirty-eight fifty one, in other

1          words, the pictures indicate a photo of Jonteria

2          Jones, in other words, listed one of three, two of

3          three, three of three with thirty-eight fifty-one

4          -- that --

5     A    That's my number.

6     Q    In other words, your deputy investigation number

7          for radio communications assigned to you?

8     A    Correct.

9     Q    As well as a case number that was placed on the

10         upper left corner?

11    A    Nodded.

12    Q    You use the term voluntarily spontaneous statement

13         by him.  Is that what was occurring when you said

14         you just let him talk?

15    A    Correct.

16    Q    And Mr. Brantley asked if anyone besides you heard

17         what was said or asked.  Who else heard what was

18         said or asked at that time besides you?

19    A    No one other than himself.

20    Q    That's what I'm asking.  Freeshone McLeod?

21    A    That's it.

22              MR. VALESKA:  That's all, Judge Mendheim.

23         Pass the witness.

24                    RECROSS EXAMINATION

25    BY MR. BRANTLEY:

1  Q   Adam, at that point in time back in October of

2      '01, how long had you been a law enforcement

3      officer?

4  A   I started around April of 2000.

5          MR. BRANTLEY:  That's all.

6          MR. VALESKA:  No more questions of him, Judge

7      Mendheim.  Ask that he step down.

8          THE COURT:  Any other witnesses from the

9      State?

10         MR. VALESKA:  No.  From what we told you at

11     the bench, if I plan to offer any other statements

12     by the other officers, I will make known to the

13     Court.

14         THE COURT:  So the State rests on the

15     suppression issue?

16         MR. VALESKA:  Yes, sir.

17         THE COURT:  Anything from the Defense on the

18     motion to suppress?

19         MR. BRANTLEY:  No, sir.

20         THE COURT:  Anything else from either side?

21         MR. VALESKA:  No, sir.

22         THE COURT:  I do think that the statements

23     made to Mr. Robinson would be inadmissible.

24     Clearly from what I've heard there was no question

25     he initiated -- the Defendant initiated all the

1    questioning.  Also, apparently his Miranda rights

2    were given before he did that.  So I do believe

3    that that would be admissible.  It's my

4    understanding from a conversation earlier, since

5    we're on the Record, there may be some other

6    statements made by the Defense in this case, but

7    the District Attorney has said that he would not

8    mention those or seek to introduce those unless he

9    first comes up privately and let's us know

10   beforehand so that the Defense can make any

11   objections.

12          Is that correct?

13        MR. VALESKA:  Yes, sir, Your Honor.

14        MR. BRANTLEY:  Just, too, for the Record, as

15   long as we're talking about that particular

16   statement, does that effect her memory, I'm going

17   to object to relevance, too.

18        THE COURT:  Well, I can see how it could be

19   relevant.  It's not an admission.  He's not

20   admitting he did it.  But apparently it is

21   relevant if he's potentially the one that did it

22   he's curious about her memory at a later date.  Of

23   course, you can argue the reverse as well.  So I

24   do believe it is relevant.

25          Anything else from the Defense by way

1   of motions before we call a jury?

2         MR. BRANTLEY:  Judge, I believe that's it.

3         THE COURT:  Anything from the State?

4         MR. VALESKA:  No, Your Honor.

5         THE COURT:  And, also, while we're on the

6   Record before they come in, we did consolidate

7   these cases before we went on the Record without

8   objection.  The two charges are rape in the first

9   degree and attempted murder.

10        Let me take a quick break, and we'll go

11  ahead and be calling them in here and we'll strike

12  a jury.

13        (Off the Record.)

14        (Jury venire present.)

15        THE COURT:  Ladies and gentlemen, I'm Judge

16  Mendheim.  Sorry about the wait.  We were taking

17  guilty pleas and doing other business that would

18  make your week hopefully shorter.  But at this

19  time the clerk is going to call your names out.

20  If you would, stand up since I don't know if these

21  lawyers have seen you before.  Stand up and we'll

22  recognize you, also make sure that we didn't lose

23  anybody between the other courtroom and here.

24        (At which time the roll of the jury

25        venire was called by the clerk.)

1    THE COURT:  If you would, at this time please

2    stand and raise your right hand and the clerk will

3    put you under oath.

4         (At which time the jury venire was sworn

5         by the clerk.)

6    THE COURT:  Ladies and gentlemen, at this

7    time I'm going to ask you some general questions.

8    When I finish, the attorneys for each side will

9    have the opportunity to follow up and ask you some

10   more questions also.  The questions, some of which

11   I may ask and/or the attorneys may ask you, you

12   may prefer not to answer in front of everyone else

13   if it applies to you.  I know there are some that

14   if they applied to me I would rather not answer.

15   And if anything like that does occur, you don't

16   need to raise your hand or indicate that that

17   question does apply to you, but just remember that

18   it was asked.  And when the attorneys finish

19   asking their questions, I will give you an

20   opportunity to come up privately and explain to me

21   what your response is in this case.  But it is

22   important that you answer the questions either

23   publicly if that doesn't bother you or come up

24   privately and let us know.

25         To begin with, are any of you related by

1    blood or by marriage to the Defendant in this

2    case, Freeshone Cornelius McLeod?

3            And if Mr. McLeod could stand up,

4    please.

5         THE DEFENDANT:  (Complied.)

6              (No response.)

7         THE COURT:  Or is anyone related by blood or

8    by marriage to the alleged victim in these cases,

9    which is Jonteria Jones?

10             (No response.)

11        THE COURT:  The State in this case is

12   represented by Mr. Doug Valeska, the district

13   attorney for Houston County.  Is anybody related

14   by blood or by marriage to Mr. Valeska?

15             (No response.)

16        THE COURT:  Mr. Gary Maxwell is the chief

17   assistant district attorney.  Anyone related by

18   blood or by marriage to Mr. Maxwell?

19             (No response.)

20        THE COURT:  And Ms. Denise Bates is an

21   assistant district attorney.  Anyone related by

22   blood or by marriage to Ms. Bates?

23             (No response.)

24        THE COURT:  And the Defendant in this case is

25   represented by Tom Brantley, a practicing attorney

```
 1          here in Dothan.  And is anyone related by blood or
 2          by marriage to Mr. Brantley?
 3                    (Hand raised.)
 4               THE COURT:  Obviously Ms. Brantley is.
 5                    Are any of you witnesses in this case
 6          either for the State or for the Defendant?
 7                    (No response.)
 8               THE COURT:  Any of you on the Defendant's
 9          appearance bond in this case?
10                    (No response.)
11               THE COURT:  Any of you on the grand jury that
12          returned these indictments?  It's in fact two
13          charges.  It was the January 2002 grand jury for
14          Houston County.
15                    (No response.)
16               THE COURT:  I'm going to -- like I said,
17          there are two charges.  And I'm going to read the
18          indictments to you.  That's the formal charge.
19          You should not draw anything adverse to the
20          Defendant because he has been charged.  It's just
21          the legal mechanism that gets us here today.  But
22          after I read these, I need to know if anyone knows
23          anything about either of these charges or both of
24          these charges.  The first one reads:
25                    (At which time the indictment was read
```

1          by the Court in case number CC-2002-236

2          to the jury venire.)

3     THE COURT:  And that is a charge of attempted

4  murder.  The second charge reads:

5          (At which time the indictment was read

6          by the Court in case number CC-02-235

7          to the jury venire.)

8     THE COURT:  That does charge the offense of

9  rape in the first degree.  Does anybody know

10  anything about either or both of these two

11  charges?  Any knowledge at all?

12          (No response.)

13     THE COURT:  Do any of you have an interest in

14  the conviction or acquittal of the Defendant in

15  this case?

16          (No response.)

17     THE COURT:  Have any of you made any promises

18  or given any assurances you would convict or

19  acquit the Defendant?

20          (No response.)

21     THE COURT:  Do any of you have a fixed

22  opinion as to the guilt or innocence of the

23  Defendant which would bias your verdict?

24          (No response.)

25     THE COURT:  And at this time I'm going to

1    read off to you the names of witnesses who have

2    been subpoenaed.  And, again, I need to know

3    whether or not you are related by blood or by

4    marriage to any of these witnesses in this case.

5    And there's quite a few, and I want you to

6    understand that I don't anticipate all of these

7    people being called as witnesses.  It's just often

8    times easier to go ahead and subpoena somebody in

9    advance as opposed to trying to find them the day

10   of trial.  So don't infer that this may be a trial

11   that lasts a week or two weeks or anything of that

12   nature.  But, again, if you would, please let me

13   know if you're related by blood or by marriage to

14   the following people.  And I'm going to read them,

15   and throw your hand up or yell out or get my

16   attention.

17           Keith Cook, a deputy sheriff; Rickey

18   Ducker, a deputy sheriff; Gary Jenkins, a deputy

19   sheriff; Chris Rocco; Susan Seay, a deputy

20   sheriff; Donald Valenza, a deputy sheriff; Peter

21   Macchia with the Alabama Department of Forensic

22   Sciences; Shannon Fitzgerald of the Alabama Bureau

23   of Investigation; Donna Phillips with the

24   Southeast Alabama Medical Center; Nicholas Voss,

25   medical doctor; Carol Walding, registered nurse;

1    Billy Littlefield, register nurse; Robert Head,

2    medical doctor; Bruce Woodham, medical doctor;

3    Annetta Collins, a registered nurse; Adam

4    Robinson, a deputy sheriff; Tracy Ward, a deputy;

5    Ashley Forehand, a deputy; Rickey Vann, a deputy;

6    Donnovan Arius, a deputy; and Chase Little, a

7    deputy sheriff; and Jonas Salna, a medical

8    doctor.  Anyone related by blood or by marriage to

9    any of these people that I just read off to you?

10            (No response.)

11        THE COURT:  Mr. Valeska, any questions?

12            (At which time Mr. Valeska further

13            qualified the jury venire.)

14        THE COURT:  We're getting close to twelve,

15    ladies and gentlemen.  We're going to hopefully

16    finish with the attorneys asking their questions,

17    and I'm going to release all of you to come back

18    later this afternoon.  The attorneys will have to

19    stay here and continue to work on the case as far

20    as striking the jury.  Although, it is getting

21    close to lunch, but hopefully Mr. Brantley will be

22    able to present his questions in the next few

23    minutes.

24            Go ahead, Mr. Valeska.

25            (At which time Mr. Valeska continued to

```
 1                      further qualified the jury venire.)
 2             THE COURT:  Mr. Brantley?
 3                      (At which time Mr. Brantley further
 4                      qualified the jury venire.)
 5             THE COURT:  Ladies and gentlemen, pick up
 6     where Mr. Brantley left off.  If there is anyone
 7     that needs to come up and make any responses, I'm
 8     going to give you an opportunity to do that at
 9     this time.  If you would, just form a line back
10     around this way around the jury box.  Everyone
11     else, you can be on break for lunch until
12     one-thirty.  And if you come back and the lawyers
13     are still at the table calling out numbers
14     striking the jury, just -- you don't have to sit
15     in the courtroom.  You can take a few more
16     minutes.  But please be back in the building
17     around this courtroom by one-thirty.  And if
18     anybody needs to talk to me, come up at this
19     time.
20                      (Jury venire not present.)
21                      (At which time the following proceedings
22                      were held at the bench outside of the
23                      hearing of the jury venire members:)
24             THE COURT:  What is your name?
25             A JUROR:  Lela Baxter.  I was in a grocery
```

1    store, and he used to be a customer.

2         THE COURT:  Mr. McLeod?

3         A JUROR:  Yes.  And I wasn't for sure of the

4    case that he was doing until Mr. Valeska got into

5    more detail.  But I had heard something about that

6    when that occurred.

7         THE COURT:  Do you remember what it is that

8    you may know of or heard about the case?

9         A JUROR:  Yes.

10        THE COURT:  What is it?

11        A JUROR:  Like, what happened and happening

12   and everything that he had -- this child really

13   badly beaten this child and she was unconscious.

14   And everything.  And I don't know -- she could

15   have died and everything.

16        THE COURT:  Did you hear that from anybody in

17   particular like his family, or the deputies,

18   doctor?

19        A JUROR:  No.  Just people -- it's a small

20   town.  And everybody was talking pretty much about

21   it.

22        THE COURT:  Mr. Valeska, any questions?

23        MR. VALESKA:  I have no questions.

24        THE COURT:  Mr. Brantley?

25        MR. BRANTLEY:  I don't have any.

1          THE COURT:  That's it.  Just be back at

2     one-thirty.

3          A JUROR:  You know, I taught you.  I don't

4     know if that has any effect.

5          THE COURT:  That's why I'm a lawyer now

6     instead of an engineer.  She's an algebra

7     teacher.

8          A JUROR:  And, also, I went to see these two

9     gentlemen about something and -- anyhow, I just

10    wanted you to be aware of it.  Also, I'm a very

11    tired teacher, and this is my spring break week.

12    And, anyhow, I just wanted you to be aware.

13         THE COURT:  I appreciate that.  The fact that

14    you know Mr. Brantley or he may have represented

15    you, would that be a problem in this case as far

16    as listening to Mr. Valeska's version and Mr.

17    Brantley's in rendering of a verdict?  Would you

18    automatically -- in other words, would you tend to

19    believe what Mr. Brantley told you just because of

20    the relationship with him versus what Mr. Valeska

21    and the other prosecutors may present to you?

22         A JUROR:  It might have some effect.

23         THE COURT:  Mr. Valeska, any questions?

24         MR. VALESKA:  Could you tell me what the

25    matter you went to see him about was?

1   A JUROR:  Divorce.

2   MR. VALESKA:  That's enough.

3   Is that pending or still going on or

4   resolved?

5   A JUROR:  It really was --

6   MR. VALESKA:  Was it tried?  I'll ask you

7   that way.

8   A JUROR:  No.

9   MR. VALESKA:  Was it settled?

10  A JUROR:  Yes.

11  MR. VALESKA:  And I don't mean to be

12  personal.  I appreciate your honesty.  But you

13  said it might have some effect.  In other words,

14  the Judge asked you because they represent the

15  Defendant versus our side.

16  A JUROR:  He did not take the case.  I

17  decided not to --

18  MR. VALESKA:  I understand.

19  A JUROR:  Anyhow, I just talked with him.  I

20  guess it was about two -- two and a half hours.

21  MR. BRANTLEY:  A couple of years ago, yes,

22  ma'am.

23  A JUROR:  Actually, it was last year I

24  think.

25  THE COURT:  Mr. Brantley, any questions?

1    MR. BRANTLEY:  I don't have any questions.

2  Just for the Record, this is Ms. Devane.

3    THE COURT:  That's it.  You can go until

4  one-thirty.  I appreciate it.

5    A JUROR:  Judge Anderson said that I could be

6  excused after tomorrow.

7    THE COURT:  What's your name?

8    A JUROR:  Jacqueline Dendy.

9    THE COURT:  So, in other words, you're

10  available through tomorrow but after that --

11    A JUROR:  After that --

12    THE COURT:  -- you have a possible --

13    A JUROR:  He says I can be excused.

14    THE COURT:  Reaching a verdict could very

15  well run into Wednesday at the rate we're going.

16    A JUROR:  That's what I'm afraid of.

17    THE COURT:  We'll go ahead -- any objection

18  to -- I really don't --

19    MR. BRANTLEY:  I don't have any objection.

20    THE COURT:  If you do object, I guess you

21  have to take it up with Judge Anderson.  He's

22  ruled.

23    MR. BRANTLEY:  I don't have any objection.

24    THE COURT:  Based on Judge Anderson ruling --

25  we will finish testimony tomorrow, but you never

1   know how long a jury would deliberate.  I hate to

2   keep them down here to midnight or something.

3   We'll go ahead and excuse you.

4          A JUROR:  Shall I come back this afternoon?

5          THE COURT:  I'm just going to go ahead and

6   let you go for the week.  I don't know the answer

7   to that question, so I'll go ahead and release you

8   for the week.

9                Yes, ma'am?

10          A JUROR:  I'm Bobbie Godwin.  And my son was

11  in a criminal case in Clayhatchee, and I don't

12  know if you wanted to know that or not.  But, you

13  know.

14          THE COURT:  Mr. Valeska, any questions?

15          MR. VALESKA:  What was the case, ma'am?

16          A JUROR:  It was assault.

17          MR. VALESKA:  Was he convicted?

18          A JUROR:  He was, and they dropped it.

19          MR. VALESKA:  Thank you very much.

20          THE COURT:  Mr. Brantley, any questions?

21          MR. BRANTLEY:  I don't have any questions.

22                What is your son's name?

23          A JUROR:  Kevin.

24          MR. BRANTLEY:  How long ago was that?

25          A JUROR:  This year.

1    MR. BRANTLEY:  Thank you, ma'am.

2    THE COURT:  Yes, ma'am?

3    A JUROR:  Myshell Baxter.  I know the

4    victim's mother.

5    THE COURT:  How well?

6    A JUROR:  I growed up with her.

7    THE COURT:  Do you see still see her on

8    occasion?

9    A JUROR:  From time to time.  Not that much.

10   But from time to time.

11   THE COURT:  Do you know anything about this

12   case?

13   A JUROR:  I seen it on TV and stuff.

14   THE COURT:  Mr. Valeska, any questions from

15   the State?

16   MR. VALESKA:  I don't have any questions.

17   Thank you, ma'am.

18   MR. BRANTLEY:  Ma'am, it will be difficult

19   for you to sit on this jury and return a verdict

20   based solely on the evidence because you know --

21   A JUROR:  Yes.

22   MR. BRANTLEY:  You would rather not sit on

23   it?

24   A JUROR:  I would rather not.

25   MR. BRANTLEY:  Thank you.

1        THE COURT:  Be back at one-thirty.

2              Yes, ma'am?

3        A JUROR:  Norva Baxter.

4        THE COURT:  What was your response?

5        A JUROR:  I had an aunt to be murdered, and I

6    had a cousin to be murdered.

7        MR. VALESKA:  I didn't hear the first

8    response.

9        A JUROR:  I had an aunt to be murdered.  And

10    cousin.

11        MR. BRANTLEY:  Did you say cousin and aunt?

12        A JUROR:  Cousin and aunt.

13        MR. BRANTLEY:  How long ago was that?

14        A JUROR:  Eight years ago, and cousin two

15    years ago.

16        MR. BRANTLEY:  Who is your cousin?

17        A JUROR:  It's not in Alabama.

18        MR. BRANTLEY:  Another state.  Okay.

19              Do you think that that would interfere

20    with your ability to sit on this jury and to

21    return a verdict --

22        A JUROR:  (Nodded.)

23        MR. BRANTLEY:  You could do that?

24        A JUROR:  I could do that.

25        THE COURT:  Thank you, ma'am.  Be back at

1    one-thirty.

2              Yes, sir?

3        A JUROR:  Ray Doss.  I have a case pending on

4    my son right now on a rape case, and I just wanted

5    to bring that before the Court.

6        THE COURT:  Mr. Valeska, any questions for

7    the State?

8        MR. VALESKA:  Mr. Doss, that's in this

9    circuit?

10       A JUROR:  Yeah.  This county.

11       MR. VALESKA:  Do you know who your son's

12   lawyer is?

13       A JUROR:  Mr. Brantley.

14       MR. VALESKA:  Thank you.

15       THE COURT:  Any other questions?

16       MR. VALESKA:  No.  Thank you, Mr. Doss.

17       THE COURT:  Mr. Brantley, any questions for

18   Mr. Doss?

19       MR. BRANTLEY:  I don't have any.

20       THE COURT:  Be back at one-thirty.

21            Go ahead and do any challenges for cause

22   while they are all fresh in our mind.

23            Mr. Valeska first.

24       MR. VALESKA:  Edward Charles Freeman, number

25   thirty-five.  He was the one that said he had to

1    be convinced a hundred percent.

2         THE COURT:  And just for the Record I have a

3    cold and my ears are stuffed.  I know the two of

4    you conversed, but I didn't hear anything he said.

5    I understood based on your further questioning

6    sort of what the gist of it was.

7              Any response?

8         MR. BRANTLEY:  Judge, if I could, I would

9    like to call him and question myself.  I don't --

10    I got the opinion he was just agreeing to be

11    agreeing, and I don't know if he really understood

12    what the question was.  But I would like a chance

13    to rehabilitate him here in front of the bench.

14        THE COURT:  We'll pass that until one-thirty

15    because I just couldn't hear him.  The jurors

16    didn't talk very loud.

17        MR. BRANTLEY:  Judge, I have two --

18        THE COURT:  Any other for Mr. Valeska?

19        MR. VALESKA:  Yeah.  Ray Doss.

20        THE COURT:  Okay.  Any response to Mr. Doss?

21        MR. BRANTLEY:  Judge, I do represent his son

22    on a pending rape case.  But I don't know that

23    that qualifies him to be struck for cause.

24        MR. VALESKA:  Judge, I'll just point out --

25        THE COURT:  He didn't say anything --

63

1    MR. VALESKA:  Well, let me respond.  I just

2    point out on the Record that anybody know Mr.

3    Brantley in any manner or fashion.  He didn't

4    raise his hand.  And then Mr. Brantley asked about

5    any crimes of violence.

6         THE COURT:  I did tell them before we started

7    specifically you didn't have to raise your hand if

8    you didn't want to.  You could come up front.

9         MR. VALESKA:  I'm prosecuting his son for

10   rape in this circuit.  That's grounds to challenge

11   somebody wholeheartedly.  He's facing going to the

12   penitentiary.  And Mr. Brantley is the lawyer.

13   That's a little bit more than charged with some

14   speeding case.

15        THE COURT:  I don't disagree.  But nobody

16   asked him whether or not he could -- I mean, I

17   don't know -- sometimes relatives tell me their

18   kin folks ought to be in jail over serious

19   charges.

20        MR. BRANTLEY:  Actually, Mr. Doss, my client,

21   Ray Doss, junior, is in the prison system, and I

22   think his rape case has just been put on the

23   administrative docket.

24        MR. VALESKA:  Who put it on the

25   administrative docket?

1    MR. BRANTLEY:  I don't know that it is.

2    THE COURT:  You think your client is already

3    in prison?

4    MR. BRANTLEY:  I know he is.

5    THE COURT:  On the charge?

6    MR. BRANTLEY:  No.  On another charge.

7    MR. VALESKA:  And we prosecuted him on that

8    one?

9    MR. BRANTLEY:  I think so.  I don't know.

10   MR. VALESKA:  I want Doss brought back, and I

11   want to know how he got to the administrative

12   docket because we didn't --

13   MR. BRANTLEY:  I don't know that he did.

14   It's just a case pending a long time.

15   THE COURT:  I think for me to take them off

16   they have to indicate they couldn't follow

17   instructions, they have such a bias for or

18   against.  I agree on the surface.  But, like I

19   said, I've had as many people wanting their kin

20   folks locked up as not.  For what's in front of

21   me, I don't think I can release him for cause.

22   But if you want to bring him back up at

23   one-thirty.

24   MR. VALESKA:  I want to bring him back up and

25   the clerk to bring the records and especially why

```
 1    he's gone to the administrative docket.
 2         THE COURT:  Since we're going to bring Mr.
 3    Freeman back, we'll just ask Mr. Doss to come back
 4    at one-thirty also.
 5              Any others, Mr. Valeska?
 6         MR. VALESKA:  Yes.  The teacher.  Martina
 7    Devane, number twenty-five.
 8         THE COURT:  She did indicate -- said it may
 9    influence her.
10         MR. VALESKA:  Said it might have some
11    effect.
12         THE COURT:  Unlike Mr. Doss strangely
13    enough.
14              Any response?
15         MR. BRANTLEY:  No objection.
16         THE COURT:  We will remove Ms. Devane for
17    cause.  Just for the Record, she's number
18    twenty-five on the list.
19              Mr. Valeska, anybody else for cause?
20         MR. VALESKA:  Number nine, Ms. Frankie
21    Brantley.  She works in his office -- Mr.
22    Brantley's office.
23         THE COURT:  Your wife in all fairness.
24         MR. BRANTLEY:  I don't have any objection.
25         THE COURT:  Of course, you may want her on.
```

1    MR. BRANTLEY:  I don't think he knows what

2    he's doing there.

3    THE COURT:  It would be awkward.  We'll

4    remove her without objection, number nine, Ms.

5    Brantley.

6    Any others, Mr. Valeska?

7    MR. VALESKA:  That's all.

8    MR. BRANTLEY:  Lela Baxter.  She said that

9    she knew the facts of the case and that the

10    Defendant was a customer in the grocery store and

11    the Defendant's family.  Whether she knows the

12    facts of the case or not, she has in her mind what

13    she believes to be the facts of the case, and I

14    think that's going to be hard to get her to be

15    unbiased.  And I would ask that Lela Baxter be

16    struck for cause.

17    THE COURT:  Mr. Valeska?

18    MR. VALESKA:  He did not ask her if she could

19    not be fair if that would effect her in any manner

20    or fashion.  Not different what I asked about Mr.

21    Doss.  He didn't ask the questions.  She brought

22    up --

23    THE COURT:  I did apply the same standard.

24    But I'll learn next time I fill in for Judge

25    White I'll ask it.  We're not making some

1    progress.  Since I applied this standard to him

2    on one of his strikes, I guess we do need the

3    magic words, so to speak.

4         MR. BRANTLEY:  We'll let Doss go if you let

5    Lela Baxter.

6         MR. VALESKA:  That's fine.

7         THE COURT:  Let me get the Record straight

8    since we don't have the clerk here.  So without

9    objection -- or based on the State agreeing to Ms.

10   Lela Baxter, number five, the Defense is agreeing

11   to number twenty-nine, Ray Doss, released, right?

12   And visa versa?

13        MR. BRANTLEY:  Yes, sir.

14        THE COURT:  And then reverse, Mr. Valeska,

15   since the Defense is agreeing to Mr. Doss being

16   released you're agreeing for Ms. Lela Baxter,

17   number five?

18        MR. VALESKA:  Yes, sir.  So she doesn't have

19   to come back and answer for questions.

20        MR. BRANTLEY:  I want a strike for cause

21   Myshell Baxter.  She stated she knew the victim's

22   mother, and that's pretty close, and she said she

23   has seen it on TV.  Of course, here again, I

24   didn't follow up the colloquy with it.

25        THE COURT:  She did say she would rather not

1  sit.  I wrote that down on her.

2          Any response, Mr. Valeska, to number

3  six, Ms. Baxter?

4          MR. VALESKA:  No.

5          THE COURT:  I'm going to -- since she did say

6  she would rather not sit, which is at least saying

7  something about how she is leaning, I suppose, I

8  will release number six, Ms. Myshell Baxter, for

9  cause on Defendant's motion.

10          Any other strikes for cause?

11          MR. BRANTLEY:  That's all I have.

12          THE COURT:  We're just going to bring back

13  number thirty-five, Mr. Freeman, at one-thirty,

14  right?  Unless you can think of somebody else?

15  But just while it's fresh in my mind.

16          MR. VALESKA:  That's fine.

17          THE COURT:  If you would, just be back at

18  one-thirty, and we will strike the jury then.

19          (Off the Record.)

20          (Jury venire present.)

21          THE COURT:  Mr. Edward Charles Freeman, I

22  need to see you one more time if you don't mind.

23          (At which time the following proceedings

24          were held at the bench outside of the

25          hearing of the jury venire:)

1    THE COURT:  After you left, the lawyers -- I

2    forget what the exact issue was -- but wanted to

3    ask you some questions about -- was it Mr.

4    Valeska?

5    MR. BRANTLEY:  It was actually me.  If I

6    could ask you this.  During the questioning of the

7    voir dire out there, Mr. Valeska asked you would

8    you require him to prove the Defendant's guilt one

9    hundred percent, and you said yes.  And I wasn't

10   at all sure you understood.  Here's my question.

11   If the Judge instructs you that the burden of

12   proof in this case is beyond a reasonable doubt,

13   not a hundred percent, can you follow his

14   instructions to be convinced only to beyond a

15   reasonable doubt, or will you have to be convinced

16   a hundred percent?

17   A JUROR:  Yes, I can follow.

18   MR. BRANTLEY:  Can you follow instructions

19   that the burden of proof is beyond a reasonable

20   doubt?

21   A JUROR:  Yes.

22   THE COURT:  Mr. Valeska?

23   MR. VALESKA:  Mr. Freeman, I'm confused.  You

24   told me you would have to be convinced a hundred

25   percent.  Is that true?

1    A JUROR:  I said before I could find him.

2    MR. VALESKA:  I just want to make sure.  In

3    other words, the test is beyond a reasonable

4    doubt.  It is not a hundred percent.  But your

5    opinion was you individually would have to be

6    convinced a hundred percent of his guilt before

7    you could return a verdict of guilty on either

8    case; is that true?

9    A JUROR:  Right.

10   MR. VALESKA:  In other words, if it's less

11   than a hundred percent, you wouldn't convict under

12   any circumstances, correct?

13   A JUROR:  If I said if he could make --

14   saying, you know, not enough evidence I probably

15   could.

16   MR. VALESKA:  But the burden is it's not a

17   hundred percent.  I don't have to prove a hundred

18   percent, and you were telling me earlier -- and if

19   I'm wrong, you correct me.

20   A JUROR:  That's what I said.

21   MR. VALESKA:  You wanted a hundred percent.

22   You have to have a hundred percent?

23   A JUROR:  Right.

24   MR. VALESKA:  And that's the way you feel?

25   A JUROR:  At the time I didn't really

1    understand what you were saying.  Yeah.  I'm sure

2    -- I could make a decision.

3        MR. VALESKA:  It's not whether you could make

4    a decision.  It's I want to make sure you're not

5    going to make me prove him guilty beyond all doubt

6    or a hundred percent.  And there's nothing wrong

7    with that, okay.  In other words, a lot of people

8    feel that way.  It needs to be a hundred percent.

9    Is that the way you feel?

10       A JUROR:  Yes, it is.

11       MR. VALESKA:  And that's the way you feel.

12   And I respect that.  And the question I want to

13   make sure.  If I'm wrong, you tell me.  In other

14   words, it has to be a hundred percent in order to

15   find him guilty of the murder or attempted rape,

16   correct?  For you?

17       THE COURT:  Let me ask you this way.  I will

18   read to you exactly what the law says and what I

19   will tell this jury if you're on it.  And the

20   issue is whether you can follow this instruction,

21   obey this law.  Not whether you agree with it or

22   disagree with it.  We all have laws we disagree

23   with, but we still obey those laws.  The Defendant

24   in this case as in all criminal cases is presumed

25   innocent of this charge.  The presumption of

1    innocence -- I'm sorry, the burden of proof in

2    this case as in all criminal cases rests on the

3    State of Alabama.  The Defendant is not required

4    to prove his innocence.  The State is required to

5    prove the Defendant's guilt beyond a reasonable

6    doubt.  This is the highest standard of proof in

7    our legal system.  However, the State is not

8    required to prove guilt beyond all doubt or to a

9    mathematical certainty so that there is no

10   possibility that you could be mistaken.  A

11   reasonable doubt is a doubt for which you have a

12   reason arising from the evidence or the lack of

13   evidence and remaining after a careful

14   consideration of the evidence such as reasonable

15   men and women would entertain under all the

16   circumstances.  Can you follow that instruction or

17   not?

18          A JUROR:  Yes, I could.

19          THE COURT:  No doubt about it?

20          A JUROR:  Right.

21          THE COURT:  So if the D.A. proves the case to

22   you beyond a reasonable doubt but not one hundred

23   percent or beyond all doubt, would you still vote

24   to find this man guilty?

25          A JUROR:  Yes.

1    THE COURT:  Any more questions for the D.A?

2    MR. VALESKA:  No, sir.

3    THE COURT:  Anything from the Defense

4    attorney?

5    MR. BRANTLEY:  If the State doesn't prove his

6    guilt beyond a reasonable doubt, you would vote to

7    find him not guilty?

8    A JUROR:  Right.

9    THE COURT:  You can go back and have a seat.

10          There's one other.

11    MR. BRANTLEY:  I think the other one we

12    swapped out.

13    THE COURT:  No.  A lady came up to Amber and

14    said she knows the Defendant's people.

15    THE CLERK:  Says where she works at Southside

16    Kiddie College, she works with the Defendant's

17    cousin.

18    MR. BRANTLEY:  What was her name?

19          (At which time the following proceedings

20           were held at the bench outside of the

21           hearing of the jury venire:)

22    THE COURT:  Is Melissa Michele Haden in the

23    courtroom?

24          (Hand raised.)

25    THE COURT:  Could you come up?

74

1    A JUROR:  (Complied.)

2        (At which time the following proceedings

3        were held in open court:)

4    THE COURT:  The clerk indicated to me that

5  you realize you may know some of the Defendant's

6  people or the Defendant or something?

7    A JUROR:  I just found that out today.

8    THE COURT:  Tell me what it is that you

9  know.

10    A JUROR:  The Defendant's cousin is my

11  co-worker.

12    THE COURT:  Did she tell you that?

13    A JUROR:  She told me that today.  When I

14  went back to my job.

15    THE COURT:  During the break?

16    A JUROR:  Yeah.

17    THE COURT:  How did she know you were on jury

18  duty?

19    A JUROR:  Well, because I'm not at work.

20    THE COURT:  And she mentioned it.  Did she

21  know specifically you were on this case?

22    A JUROR:  She does because -- well, I was

23  actually talking to my mother, and the girl that

24  works in the back heard me, and she said, is it

25  the six year old.  And I said, yes.  And she said,

1    that's Mary's cousin.  So I thought maybe it would

2    be inappropriate for me to be on this jury.

3         THE COURT:  Mr. Valeska, any questions?

4         MR. VALESKA:  No.  Thank you for your

5    honesty.

6         MR. BRANTLEY:  Is the victim the cousin to

7    someone you work with?

8         A JUROR:  Yes.

9         MR. BRANTLEY:  Or the Defendant?

10        A JUROR:  The victim.

11        MR. BRANTLEY:  The victim?

12        A JUROR:  The victim.

13        MR. BRANTLEY:  The little girl?

14        A JUROR:  The little girl.

15        MR. BRANTLEY:  Would that interfere with your

16   ability to sit on the jury and return a verdict

17   based only on the evidence considering the fact

18   that someone you work with is kin to the little

19   girl?

20        A JUROR:  It wouldn't mess with my verdict,

21   but it would make me uncomfortable.

22        MR. BRANTLEY:  Such that you would not want

23   to serve on this jury?

24        A JUROR:  That's correct.

25        MR. BRANTLEY:  What is your name?

1    A JUROR:  Melissa Haden.

2    MR. BRANTLEY:  Let me ask you this while

3    you're up here.  If the Judge instructed you

4    you're to set that aside and not consider the

5    impact that the victim has a mother that works

6    with you, could you set that aside and render a

7    verdict based solely on the evidence?

8    A JUROR:  To the best of my ability, but I

9    would be uncomfortable.

10   MR. BRANTLEY:  And that would interfere with

11   you to some extent?

12   A JUROR:  Possibly I guess.  I'm just being

13   as honest as I can be.

14   MR. BRANTLEY:  I understand.  I appreciate

15   it.

16        That's all.

17   MR. VALESKA:  No, Your Honor.

18   MR. BRANTLEY:  I'm going to move to strike

19   for cause.

20   THE COURT:  Any response, Mr. Valeska?

21   MR. VALESKA:  No.

22   THE COURT:  We'll grant that.

23   THE CLERK:  Number forty is stricken for

24   cause?

25   THE COURT:  Yes.

1      THE CLERK:  And number thirty-five?

2      THE COURT:  He's still on.

3          Correct?

4      MR. BRANTLEY:  Yes, sir.

5      THE COURT:  Mr. Valeska, any other challenges

6  for cause or jury issues at this point?

7      MR. VALESKA:  No, sir.

8      THE COURT:  Mr. Brantley, anything else?

9      MR. BRANTLEY:  No, sir.

10     THE COURT:  We will have one alternate, and

11  she will give you the total number.

12     THE CLERK:  The State eleven strikes and

13  Defense ten.

14     MR. VALESKA:  So our last strike is the

15  alternate, correct?

16     THE COURT:  The Defense is.  We're just

17  having one alternate.

18          (At which time the following proceedings

19          were held in open court:)

20     THE COURT:  Ladies and gentlemen, thank you

21  for your patience.  At this time the attorneys are

22  going to strike the jury in this case and you can

23  be on break.  We'll say fifteen minutes.  At five

24  till two, one-fifty-five, please be back in this

25  courtroom.

1          Also, while you're outside, please do

2     not talk about this case.  Because of the

3     facilities there's potentially relatives or

4     friends or witnesses on both sides of this case

5     that may be outside waiting to get started.  If

6     people are talking about it, please either come

7     back in here or go somewhere else because it just

8     creates a huge problem if jurors end up on this

9     case and they have some knowledge outside of what

10    you hear in court.  Please don't let that occur.

11         Anybody that's here on behalf of one

12    side or the other or is a witness, you are under

      no circumstances to talk with anyone with a juror

4     button about this case.  So please don't do that

15    either.

16         And, also, you can be on break.  But is

17    Ms. Devane in the courtroom?  If you'll come up,

18    and everybody else will be on break.  Thank you.

19              (Jury venire not present.)

20              (At which time the attorneys and the

21              clerk struck the jury off the Record.)

22              (Off the Record.)

23              (State's Exhibits No. 1, 2, 3, 4, and 5

24              were marked for identification.)

25              (Jury venire present.)

1      THE CLERK:  As I call your name, would you

2    please have a seat in the jury box.

3          Clyda Baldwin.  Norva Baxter.  Joyce

4    Benton.  Beverly Bromfield.  David Chavez.  Sandra

5    Crenshaw.  Rickey Crowe.  Margaret Davis.  Chandra

6    Dixon.  Julie Drummer.  Phyllis Folkes.  Tommy

7    Frith.  Betty Green.

8          (At which time the roll of the jury was

9          called by the clerk.)

10      THE COURT:  Any motions?

11          (At which time the following proceedings

12          were held at the bench outside of the

13          hearing of the jury venire:)

14      MR. BRANTLEY:  Yes, sir.  I want to put on

15    Record that I am not going to make a Batson

16    motion.  I've explained that to Mr. McLeod.  I've

17    explained it to him for my reason.  And that

18    reason is I myself struck some African-Americans

19    for cause.  And, number two, the victim -- just

20    from a strategy standpoint I've decided not to

21    make a Batson motion because the victim is black

22    also.  And I've explain those to Mr. McLeod, and

23    he understands my reasoning and agrees with that.

24          That okay?

25      THE DEFENDANT:  (Nodded.)

1    MR. BRANTLEY:  Would you say yes or no?

2    THE DEFENDANT:  Yes, sir.

3    THE COURT:  Any other motions from the

4    Defense before we swear in the jury?

5    MR. BRANTLEY:  No.

6    THE COURT:  From the State before we swear in

7    the jury?

8    MR. VALESKA:  No, sir.

9         (At which time the following proceedings

10        were held in open court:)

11   THE COURT:  Ladies and gentlemen, everyone

12   else out in the audience, thank you for your

13   patience on this case.  You are released until

14   tomorrow morning at nine o'clock.  At that time

15   you need to report back to the -- what we call

16   Courtroom A -- the big courtroom maybe where you

17   started out.  But just be back at Courtroom A at

18   nine o'clock tomorrow morning.  Thank you, and you

19   can go.

20        (Jury venire excused.)

21        (At which time the jury was sworn by the

22        clerk.)

23   THE COURT:  Ladies and gentlemen, you

24   obviously will be the trial jury in these two

25   charges involving Mr. McLeod.  Just briefly the

1    procedure that we'll follow, in just a minute the

2    attorneys will give you their opening statements

3    in which they will outline to you what they expect

4    the evidence to be from their standpoint.  The

5    District Attorney will get to go first since he

6    does have the burden of proof in this case.  And

7    then Mr. Brantley on behalf of the Defendant can

8    address you.  And then the State will have the

9    opportunity to present their case to you by

10   calling witnesses to the witness stand.  You will

11   hear them testify.  Any evidence that the State

12   wants to introduce, they will do so at that time.

13   Mr. Brantley will have the opportunity to cross

14   examine the State's witnesses.  When they are

15   finished presenting those witnesses, then the

16   Defense if they choose to can present any evidence

17   to you.  And the Defendant is not required to

18   present any evidence to you.  That would be their

19   decision.  And if they choose not to, you cannot

20   hold that against him because the burden of proof

21   in this case is on the State to present the

22   evidence to you.  But they do have the opportunity

23   if they choose to do so.

24        When they finish, then the attorneys

25   will give you their closing arguments, and I will

1      charge you as to the law that you should apply in

2      this case.  Again, please keep in mind the

3      Defendant is presumed innocent of this charge, and

4      it is up to the State of Alabama to prove his

5      guilt beyond a reasonable doubt as to each

6      charge.  Each charge stands alone.  In other

7      words, the State would have to prove beyond a

8      reasonable doubt the crime of rape in the first

9      degree in order for you to find him guilty of that

10     charge.  And they would have to separately prove

11     the crime of attempted murder to be proven guilty

12     of that charge.  So please keep that in mind as

13     well.

14         During the course of the trial -- we

15     obviously won't finish the case today.  It will

16     run into tomorrow.  We will probably take breaks

17     about every hour to hour and a half.  If for some

18     reason you need to take a break sooner, for

19     whatever reason that may be, just please raise

20     your hand.  Not a problem to do that.  Again, as I

21     cautioned you before, please keep in mind that

22     when we do take breaks because of the

23     surroundings, everyone is sort of packed together,

24     it is very important especially since you're now

25     the jury in this case that you not have any

1 discussions among yourselves or with anyone else.

2 If you're out in the hallways or rest rooms -- and

3 there's not a separate rest room for jurors.  We

4 only have the public rest room.  It's very

5 important that you not let people talk to you.  If

6 someone does attempt to talk to you about the

7 case, you need to report it immediately.  I will

8 just tell you that has happened as the judge from

9 time to time they will get you in the bathroom and

10 a captive audience so to speak, and folks like to

11 start talking about their cases.  So please let me

12 know if that should occur.

13  Obviously tonight I will let you go

14 home.  You won't be forced to stay together in a

15 motel.  There could very well be some news

16 coverage of this case.  I have seen a reporter

17 here and someone from the television station.  And

18 when that happens, it's very important in exchange

19 for you being allowed to go home to be with your

20 families that you not watch anything on television

21 about the case, discuss the case with anyone, read

22 any newspaper accounts.  Also, it's important that

23 you not go to the scene where any of these events

24 allegedly occurred.  Also, that you not do any

25 independent research -- getting on the computer or

84

1    looking things up in books or anything of that

2    nature.  Everything you know about this case you

3    should hear from the witness stand and the witness

4    stand only.

5            Are you ready for your opening

6    statements?

7            MR. VALESKA:  Yes.

8            THE COURT:  Go ahead.

9                (At which time opening statements were

10                made by Mr. Valeska.)

11            THE COURT:  Mr. Brantley?

12            MR. BRANTLEY:  Your Honor, we're going to

13    waive our opening statement.

14            MR. VALESKA:  Let me get my first witness.

15                    TYLENA WESLEY

16                DIRECT EXAMINATION

17    BY MR. VALESKA:

18    Q    I'm going to come over here, okay.  And I'm going

19        to ask you some questions, okay.  Can you say yes

20        or no?

21    A    (Witness nodded.)

22    Q    Give me an answer.  Can I ask you a question?

23    A    (Witness nodded.)

24    Q    I need you to say yes or no.  Let's do it this

25        way.  Tell me your name.

```
 1   A    Tylena.

 2   Q    Okay.  And, Tylena, how old are you?

 3   A    Five.

 4   Q    Do you go to church sometimes?

 5   A    (Witness nodded.)

 6   Q    Do you know what it means to tell the truth?  Is

 7        it good to tell the truth?  How about this?  Do

 8        you know what a lie or a story is?

 9   A    (Witness nodded.)

10   Q    If you tell a lie, do you get in trouble?

11   A    (Witness nodded.)

12   Q    Do you get a spanking?

13   A    (Witness nodded.)

14            MR. VALESKA:  Judge, can you put her under

15        oath?  I need to do that.  I understand she's

16        young.  But put her under oath and let me try to

17        qualify her.

18            THE COURT:  Does she understand?

19            MR. BRANTLEY:  Judge, could the Court examine

20        her to see if she does know what an oath is?  I

21        don't know that we have proved it.

22            THE COURT:  That's my question I guess.

23            MR. VALESKA:  Let me do it this way.

24   Q    When you go to church, who are you supposed to see

25        in church?  Who is supposed to be there?  Who do
```

```
 1        you go to pray to?  It's okay.  Tell me.  Is it
 2        God?
 3   A    (Witness nodded.)
 4   Q    What's your mother's name?
 5   A    Bootsie.
 6   Q    Do you know Jonteria Jones?
 7   A    (Witness nodded.)
 8   Q    How do you know her?  Is she a friend of yours?
 9   A    (Witness nodded.)
10   Q    Is your ear hurting?
11   A    Yes.
12   Q    Put your hand down for me.  Can you do that?
13   A    (Witness complied.)
14   Q    Do you go to school?
15   A    (Witness nodded.)
16   Q    You got to say yes or no.  Do you go to school?
17   A    Yes.
18   Q    Where do you go to school?  Tell this jury.
19        What's the name of the school?
20   A    Dothan.
21   Q    What grade are you in?  Do you know?
22   A    Headstart.
23   Q    Headstart.  Okay.  Is it good to tell the truth?
24   A    (Witness nodded.)
25   Q    Is that a yes?
```

87

```
1   A   (Witness nodded.)
2           Yes.
3   Q   That's a girl.  See, she's taking down what you're
4       saying.  So if I just shake my head, she can't
5       take that down, can she?  I've got to say
6       something, right?
7   A   (Witness nodded.)
8   Q   If you raise your right hand -- can you raise
9       your right hand for me?  If you promise to tell
10      the truth so help you God, is that good?
11  A   (Witness nodded.)
12  Q   Got to say yes or no.
13  A   Yes.
14  Q   And if you say no, can you get in trouble if you
15      don't tell the truth or tell a lie or a story?
16      Will you get in trouble?
17  A   (Witness nodded.)
18  Q   Is that a yes or no?
19  A   Yes.
20  Q   That's a girl.
21          And would you get in trouble with your momma?
22  A   Yes.
23  Q   Would you get in trouble with God?
24  A   Yes.
25  Q   And how about the preacher?  He wouldn't want you
```

| | | |
|---|---|---|
| 1 | | to tell a story, would he? |
| 2 | A | (Witness nodded.) |
| 3 | Q | Would he? |
| 4 | A | (Witness nodded.) |
| 5 | Q | Is that a no? |
| 6 | A | No. |
| 7 | Q | If I ask you or this Judge asks you to promise to |
| 8 | | tell the truth, can you do that? |
| 9 | A | (Witness nodded.) |
| 10 | Q | Can you look at this Judge?  He has three |
| 11 | | children.  Could you tell him if you raise your |
| 12 | | right hand and promise to tell the truth to help |
| 13 | | you God, could you do that? |
| 14 | A | (Witness nodded.) |
| 15 | Q | Could you tell him that?  Could you tell Judge |
| 16 | | Mendheim you promise to tell the truth? |
| 17 | A | (Witness nodded.) |
| 18 | Q | Remember you got to say yes or no. |
| 19 | A | Yes. |
| 20 | Q | That's a girl.  Let me ask you this.  Who were you |
| 21 | | in the room with back there?  What people?  Tell |
| 22 | | me their names.  What little girl was back there |
| 23 | | with you? |
| 24 | A | Marqeeta. |
| 25 | Q | And was Jonteria older or younger than you? |

1    A    Older.

2    Q    Would you know her when saw you her?

3    A    (Witness nodded.)

4    Q    Was she in the room when you were back there?

5    A    (Witness nodded.)

6    Q    Do you remember when something happened to

7         Jonteria?

8    A    (Witness nodded.)

9    Q    Do you remember that?

10   A    (Witness nodded.)

11   Q    How do you remember that?

12        MR. BRANTLEY:  I'm going to object to going

13        into that.  I would like to take her on voir

14        dire.

15        MR. VALESKA:  I would object to him --

16        THE COURT:  Why don't you approach.

17             (At which time the following proceedings

18             were held at the bench outside of the

19             hearing of the jury venire:)

20        THE COURT:  She's -- it took a few minutes,

21        but she does seem to understand.

22        MR. BRANTLEY:  Well, if the Court --

23        THE COURT:  I will let you voir die.  What I

24        guess I'm getting to.  I suppose we're at the

25        point now if you wanted to voir dire on that

1      issue --

2          MR. BRANTLEY:  Also to --

3          THE COURT:  Unless the D.A. knows more than I

4      do.

5          MR. VALESKA:  No, sir.  I understand he can

6      voir dire her.

7          MR. BRANTLEY:  Judge, I would move at this

8      point to exclude her as a witness for the lack of

9      capacity because she's so young.  The Court can

10     take notice that it took the State leading her on

11     certain questions and the Court well knows that a

12     witness that young is very susceptible on leading

13     questions.  Number two, it's also his witness.  He

14     can't lead his own witness no matter how young.

15     Number three, I don't believe that he's

16     established that she understands what telling the

17     truth means and what the consequences are.  So I

18     would move to exclude her as a witness for lack of

19     capacity.

20         THE COURT:  I just state that when she first

21     started, I mean, she -- you know, a little bit of

22     trouble.  I think the Record reflects that.  But

23     from my observation of her, it is more to do with

24     she's -- me having children myself, a child her

25     age more to do with the surroundings.  She was

1    brought in here, and there's more than twelve --

2    there's thirteen jurors as well as several people

3    and the deputies over there and numerous people

4    here in the courtroom.  And to me that she seems

5    as much unfamiliar with her surroundings initially

6    it seemed like.  But after a couple of minutes of

7    sort of becoming accustomed to the room, it seems

8    to me that he did ask a question I didn't think

9    was leading basically is it good or -- is it good

10   or bad to tell the truth or something along those

11   lines, which to me does not suggest an answer,

12   especially for a five-year-old child.  It may an

13   adult.  She could have said bad or good or yes or

14   no to that.  And it seems to me that the Record

15   shows that she's minimally competent and kind of

16   based on his direct obviously -- if you want to

17   question her.

18        MR. BRANTLEY:  Take her on voir dire.

19        THE COURT:  I'm not saying it won't change my

20   mind, but at this point he does seem to minimally

21   establish foundation for her.  If you want to ask

22   questions on that issue to do that.

23        MR. BRANTLEY:  And I will be very careful

24   with her to do that, Judge.

25             (At which time the following proceedings

1                   were held in open court:)

2                    VOIR DIRE EXAMINATION

3    BY MR. BRANTLEY:

4    Q    Can you tell me your name?

5    A    (Witness nodded.)

6    Q    What is your name?

7    A    Tylena.

8    Q    Tylena.  And you're how old?

9    A    (Witness nodded.)

10   Q    How old are you?

11   A    Five.

12   Q    And you go to Headstart School, right?

13   A    (Witness nodded.)

14   Q    And do you know the difference between telling the

15        truth and telling a story?

16   A    (Witness nodded.)

17   Q    Tell me what the difference is.

18   A    Telling a story.

19   Q    Is telling a story, is that good?

20   A    (Witness nodded.)

21   Q    Is that bad?

22   A    (Witness nodded.)

23   Q    Is telling the truth good or is that bad?

24   A    Bad.

25           MR. BRANTLEY:  That's all.

1    MR. VALESKA:  Can I go ahead?

2    THE COURT:  Sure.

3    MR. BRANTLEY:  Judge, she said telling the

4    truth was not bad.

5    MR. VALESKA:  She also said telling the truth

6    is good and telling a story is bad, Judge.

7    THE COURT:  You-all come back up.

8         (At which time the following proceedings

9         were held at the bench outside of the

10        hearing of the jury venire:)

11    THE COURT:  I still think she's minimally

12    qualified.  I'm not saying I was confused first

13    you asked -- you asked her to tell the difference

14    between the two.  Confusing may be the wrong term

15    for it.  Clearly seemed to confuse this child that

16    would confuse other children.  To me she's

17    indicated that she does minimally know the

18    difference.  I understand that last response.  But

19    reading into the Record in its entirety, both your

20    examination and the D.A.'s, that she does

21    understand the difference.  And we could sit here

22    and obviously representing your client and he

23    obviously wants her testimony admitted, and both

24    are good lawyers and you can sort of build up to a

25    certain answer you want out of this -- or any

1    child.  So I'm going to allow it.  Obviously you

2    can argue to the jury that to exclude it

3    otherwise.

4         MR. BRANTLEY:  I understand.

5              (At which time the following proceedings

6              were held in open court:)

7              DIRECT EXAMINATION (Continued)

8    BY MR. VALESKA:

9    Q    I want to go back and ask you some more

10        questions.  Is that okay?

11   A    (Witness nodded.)

12   Q    I know you told us a couple of times.  But tell

13        me your name again.

14   A    Tylena.

15   Q    And do you have any brothers or sisters?

16   A    (Witness nodded.)

17   Q    I know this is real hard, okay.  But remember that

18        court reporter, if I say do you have any more

19        brothers and sisters, can you tell me a yes or

20        no?  Do you have brothers and sisters?

21   A    (Witness nodded.)

22   Q    Can you say yes?

23   A    Yes.

24   Q    Give me their names.  Can you tell the jury some

25        of their names?

1   A   (Witness nodded.)

2   Q   Tell them your name -- your brother or sister's

3       name.

4   A   Wilka, Nesha, and Nick.

5   Q   Nick is the last one, right?

6   A   (Witness nodded.)

7   Q   Now, what's your momma's name?  Tell me your

8       momma's name.

9   A   Bootsie.

10  Q   I'm sorry?

11  A   Bootsie.

12  Q   Bootsie.  Okay.  Is that what you call her?

13  A   (Witness nodded.)

14  Q   What do you call her?

15  A   Momma.

16  Q   So is it fair to say Bootsie is her nickname what

17      adults call her, but you call her momma; is that

18      right?

19  A   (Witness nodded.)

20  Q   Remember you got to say yes or no.

21  A   Yes.

22  Q   That's a girl.

23          Jonteria, what do you call her?

24  A   Tera.

25  Q   And she's older or younger than you are?  Is she

1    older or younger than you are?  Is she bigger or
2    small -- I'm sorry?
3  A  Bigger.
4  Q  Is she older?
5  A  (Witness nodded.)
6  Q  Who fixed your hair today?  It looks nice.
7  A  My momma.
8  Q  It looks nice.
9       Now, when you go to school at you said
10    Headstart, right?  Do you go at nighttime?
11  A  (Witness nodded.)
12       MR. VALESKA:  With the Court's permission,
13    I'd like -- come in.  I would like someone to come
14    in.  Let this young lady just come on in.  Just
15    let her step right there.
16       Jonteria, if you would, stop there for
17    me.
18  Q  You see that girl at the door?
19  A  (Witness nodded.)
20  Q  Who is that?
21  A  Jonteria.
22       MR. VALESKA:  You can go back out.  Thank you
23    very much.
24  Q  Now, if I told you that was Bootsie, is that
25    right?  Is that Bootsie?

```
 1    A    (Witness nodded.)

 2    Q    Is that Mary?  Who was that?

 3    A    Jonteria.

 4    Q    And you-all are friends; is that right?

 5    A    (Witness nodded.)

 6    Q    Have you-all played together before?

 7    A    (Witness nodded.)

 8    Q    Is that a yes or no?

 9    A    Yes.

10    Q    Now, do you remember when Jonteria went missing or

11         she got hurt?  Do you remember back then?

12    A    (Witness nodded.)

13              MR. VALESKA:  Judge, do you need to put her

14         under oath?

15              THE COURT:  Can you answer a question for me

16         now?  Do you promise to tell the truth to

17         everything that he asks you and the other man asks

18         you?

19              THE WITNESS:  (Nodded.)

20              THE COURT:  Can you say yes or no?

21              THE WITNESS:  Yes.

22              THE COURT:  Yes.  Okay.  Go ahead.

23    Q    That's a girl.

24              Let's go back, okay.  Do you remember when

25         Jonteria got hurt?
```

```
 1    A    (Witness nodded.)

 2              Yes.

 3    Q    And was it daytime or nighttime?  Do you remember?

 4    A    Day.

 5    Q    Now, had you seen Jonteria at whose house before

 6         she got hurt?  Whose house were you-all at?

 7    A    My grandma.

 8    Q    Do you know your grandma's name?

 9    A    Yeah.

10    Q    Tell me her name.  What's her name?  Does she have

11         a nickname?

12    A    (Witness nodded.)

13    Q    Is that a yes?

14    A    Yes.

15    Q    What's her nickname?  What do they call her?  What

16         do other adults call your grandma?

17    A    Momma.

18    Q    Does she drive a car?

19    A    Yes.

20    Q    Do you know what color it is?

21    A    Brown.

22    Q    And where do you live?  Whose house do you live in?

23    A    My momma.

24    Q    And who lives in the house with you?

25    A    My momma.
```

```
 1   Q   And what other children?  Give me the names of
 2       other children that stay in the house with you and
 3       your momma.
 4   A   Digger and Marqeeta and Jonteria.
 5   Q   Okay.
 6   A   And KiKi.
 7   Q   And KiKi.
 8           Now, let's go back and I asked you about do
 9       you remember when Jonteria got hurt.  Did you
10       remember that?
11   A   Yes.
12   Q   And you said it was in the daytime, right?
13           MR. BRANTLEY:  Object.  Leading.
14           MR. VALESKA:  She's already answered it was
15       in the daytime.
16           THE COURT:  I'm not saying that necessarily
17       was leading with a five year old.  But do your
18       best not to lead.  Not that you have been, but do
19       your best not to.
20   Q   When Jonteria got hurt, before she got hurt, did
21       she leave the house with somebody?
22   A   Yes.
23   Q   Who was it?
24   A   Freeshone.
25   Q   Do you see Freeshone in the courtroom if I move?
```

1       Do you see him?

2   A   (Witness nodded.)

3   Q   Can you see the whole courtroom?

4   A   (Witness nodded.)

5   Q   Do you see him in the courtroom now?

6   A   (Witness nodded.)

7   Q   If I showed you a picture, would you know

8       Freeshone?

9   A   (Witness nodded.)

10          MR. BRANTLEY:  Judge, object unless he shows

11      her several pictures at the same time and let her

12      pick one photo out of many.

13          THE COURT:  I'm not sure it's improper.

14      Obviously you can argue to the jury later on the

15      weight of it and the jury can decide how much

16      weight to give it.

17  Q   The man that took -- that went with Jonteria, what

18      was his name?

19  A   Freeshone.

20  Q   And who did he look like?  What color was his

21      skin?  Was it the color of your skin?

22  A   (Witness nodded.)

23  Q   Or a different color?

24  A   Different.

25  Q   Can you see the whole courtroom now?  Go ahead and

```
 1            stand up if you can.
 2    A       (Witness complied.)
 3    Q       Go ahead and stand up.  The Judge will let you.
 4            Can you see?  Can you see me by Mr. Brantley?  Can
 5            you see these people at the table?  See the people
 6            at that table?  See the people back here?  And how
 7            about over here?  Now, do you see Freeshone in the
 8            courtroom now?
 9    A       (Witness nodded.)
10    Q       You don't see him?
11    A       (Witness nodded.)
12    Q       Do you see this -- you can sit back down for me.
13    A       (Witness complied.)
14    Q       Do you see this picture?
15    A       (Witness nodded.)
16    Q       Remember you got to say yes or no.
17    A       Yes.
18    Q       Who is that?
19    A       Freeshone.
20    Q       Now, is that the way he looked the day Jonteria
21            got hurt?
22    A       (Witness nodded.)
23    Q       Is that the way he wore his hair?
24    A       (Witness nodded.)
25    Q       Now, since that day, have you seen Freeshone any
```

```
 1        more since then?
 2    A   (Witness nodded.)
 3    Q   How did Jonteria get out of the house?
 4    A   She walked.
 5    Q   Did anybody go with her or follow her?
 6    A   Follow her.
 7    Q   Who followed her?
 8    A   Freeshone.
 9    Q   And did Freeshone say anything or did you hear him
10        say anything?
11    A   (Witness nodded.)
12    Q   Did you ever see Jonteria come back that day and
13        come in and play with you any more in the house?
14    A   (Witness nodded.)
15    Q   Did you ever see Freeshone come back in the house
16        without Jonteria that day?
17    A   (Witness nodded.)
18    Q   You're doing real good, okay.  But you moved your
19        head.  Was that a yes or no?
20    A   Yes.
21    Q   And when Freeshone came back, was Jonteria with
22        him?
23    A   No.
24    Q   Jonteria's momma, do you know her when you see her?
25    A   (Witness nodded.)
```

1   Q   The lady that came into the door that you said was

2       who, who was that that came in that you said came

3       to the door a few minutes ago?  Who was that that

4       came in that door?

5   A   Tera.

6   Q   Tera.  Is Tera Jonteria?

7   A   (Witness nodded.)

8   Q   Now, you saw how she was walking, right?

9   A   (Witness nodded.)

10  Q   What was she walking with?

11  A   A cane.

12  Q   Now, the day Jonteria got hurt before she got

13      hurt, did she have to use a cane before she got

14      hurt?

15  A   (Witness nodded.)

16  Q   Is that a no?

17  A   No.

18  Q   Remember -- you're doing real good.  She has to

19      take down so I need you to tell me.  You're doing

20      real good.

21          Now, did you see Jonteria's mother come back

22      in the house looking for Jonteria that day?  Do

23      you remember that --

24          MR. VALESKA:  Come to the door, please.  Just

25      come on in, please, ma'am.  Just come all the way

```
 1        in.
 2   Q    Do you see that lady?
 3   A    (Witness nodded.)
 4   Q    Who is that lady?
 5   A    Tunt.
 6   Q    Can you turn around and look at me?  I need you
 7        to tell me -- speak to the microphone.  Who was
 8        that lady?
 9   A    Tunt.
10   Q    And how is she related to Jonteria?  Maybe you
11        don't understand my question.  Who is Jonteria's
12        mother?
13   A    Tunt.
14   Q    Did you see her in the courtroom today?
15   A    Yes.
16   Q    When did you see her?  Tell this jury.  Where did
17        you see her in the courtroom?  What door did she
18        come through?
19   A    (Indicating.)
20   Q    Is that her that just came in?
21   A    (Witness nodded.)
22   Q    You sure?
23   A    (Witness nodded.)
24   Q    Now, when Jonteria was leaving, okay, when she
25        left that day, what was she going to go do?  Do
```

1    you know?

2    A    (Witness nodded.)

3    Q    You're doing real good, okay.  I asked you, do you

4         know.  Is that a yes or no?

5    A    Yes.

6    Q    That's a girl.

7             Tell the ladies and gentlemen of the jury

8         when Jonteria was leaving where she was going.

9         What was she going to do?

10   A    Going to get some noodles.

11   Q    Going to get some noodles.

12            Did you ever see Jonteria come back in the

13        house with any noodles?

14   A    (Witness nodded.)

15   Q    Is that a yes or no?

16   A    No.

17   Q    That's a girl.

18            Now, do you remember after Jonteria got hurt,

19        if I ask you what a deputy is or a police officer

20        or a man in a uniform with a badge, do you know

21        what I'm talking about?

22   A    (Witness nodded.)

23   Q    Is that a yes or no?

24   A    Yes.

25   Q    Did you see any deputies, either men or women in

```
1        uniform or plain clothes, did they come talk to

2        you about what happened to Jonteria?

3    A   Yes.

4    Q   And when they talked to you, do you recall them

5        taking a machine with a tape -- tape recorder and

6        recording what they asked you?  Do you remember

7        that?

8    A   (Witness nodded.)

9    Q   You're doing real good.  Is that a yes or no?

10   A   Yes.

11   Q   And when they talked to you, they asked you

12       questions; is that true?

13   A   Yes.

14   Q   And you answered; is that true?

15   A   Yes.

16   Q   And they recorded it, right?

17   A   (Witness nodded.)

18   Q   Would you know your -- is that a yes?

19   A   Yes.

20   Q   That's a girl.

21           Would you know your voice if you heard it?

22   A   Yes.

23           MR. VALESKA:  I would like to play this.

24           THE COURT:  Any objection?

25           MR. BRANTLEY:  When was this recorded?
```

1    Q    Tell the jury when those deputies came and talked

2         with you.  Was it a man or a woman or both?  Do

3         you remember?

4    A    A girl.

5    Q    It was a girl deputy, right?

6    A    (Witness nodded.)

7    Q    Would you know her if you saw her?  Do you think

8         you would remember what she looked like maybe?

9    A    (Witness nodded.)

10    Q    Was she white or black?

11    A    White.

12    Q    I want to see if you recognize somebody.  Has it

13         been a while?  It's been kind of a while, hasn't

14         it?  A couple of days or months have gone by; is

15         that true?

16    A    (Witness nodded.)

17    Q    And do you remember where she asked you questions

18         or where you were when they recorded this

19         interview?  Where were you?  Do you remember where

20         you were?

21    A    I was at my grandma's house.

22    Q    At your grandma's house, okay.

23            And is that house close to the house to where

24         Freeshone and Jonteria had left that day?

25    A    (Witness nodded.)

1    Q    Is it the same house?

2    A    (Witness nodded.)

3    Q    Now, I want you to tell the jury this.  The house

4         that you had stayed with your grandma's house with

5         Jonteria, if you go out that book door and play in

6         the backyard, are there any other houses around

7         there?

8    A    Yes.

9    Q    What are those houses made of?  When I say made

10        of, this is kind of made of wood, right?

11   A    (Witness nodded.)

12   Q    This is made of plaster board or whatever.  And

13        this is made of tin, right?

14   A    (Witness nodded.)

15   Q    If you come out your back door at your grandma's

16        house, there are other houses, what are they made

17        of?  What do they look like?  Do you know the

18        word?

19   A    (Witness nodded.)

20   Q    Do you know any men and women who live close --

21        live close to your grandma's house back then?

22   A    (Witness nodded.)

23             No.

24   Q    If I give you a name Mr. McGriff, did you know him?

25   A    (Witness nodded.)

109

1    Q    Jonteria's mother and Freeshone, do they live in

2         the house with your grandma's house?

3    A    (Witness nodded.)

4         MR. VALESKA:  Come on in.  I ask them with

5         the Court's permission.

6    Q    I've asked some lady to come in.  Do you see that

7         lady?

8    A    (Witness nodded.)

9         MR. VALESKA:  Okay.  You can go back out.

10   Q    Now, I asked you to look at that lady, too,

11        right?

12   A    Yes.

13   Q    Who was that lady?  Have you ever seen her before?

14   A    (Witness nodded.)

15   Q    When a lady recorded your voice, did you ever get

16        to listen to it?

17   A    (Witness nodded.)

18   Q    Is that a yes?

19   A    Yes.

20        MR. VALESKA:  I would like to play the tape

21        now.

22        MR. BRANTLEY:  Again, I object.  We don't

23        know when this recording was made.  It was made

24        right after this incident allegedly happened.

25        This child then could have been four, possibly

1    even three years of age.  And we're really getting

2    down to the age in which her testimony if she were

3    four and certainly if she were three just --

4         THE COURT:  Why don't you --

5         MR. VALESKA:  I'm going to wait.  Just

6    withdraw it at this time.

7    Q    I want you to tell the ladies and gentlemen of the

8         jury, do you remember when that deputy, that

9         woman, interviewed you on tape?  Do you remember

10        that?

11   A    (Witness nodded.)

12        Yes.

13   Q    That's a girl.

14        And did you tell her the truth the best you

15        could remember what happened?

16   A    Yes.

17   Q    And were you younger then?  A little bit younger?

18   A    Yes.

19   Q    Let me show you State's Exhibit 4.  I showed it to

20        Mr. Brantley.  Showing you State's 4.  Do you see

21        that picture?

22   A    (Witness nodded.)

23   Q    Can you recognize --

24        MR. VALESKA:  Mr. Brantley, I'm pointing to

25        the extreme right.

111

| | | |
|---|---|---|
| 1 | Q | -- what that is? What is that? Can you tell me |
| 2 | | what that is? Is that the house you lived in with |
| 3 | | your grandma? |
| 4 | A | (Witness nodded.) |
| 5 | Q | Okay. Well, did you live in a house or a trailer? |
| 6 | A | Trailer. |
| 7 | Q | And what is this? Can you tell if you can tell |
| 8 | | enough? And you may not know what it is. Is it a |
| 9 | | trailer or a house? |
| 10 | A | Trailer. |
| 11 | Q | You lived in the house with your grandma with a |
| 12 | | trailer. Did Freeshone and Jonteria's mother live |
| 13 | | in something? Where did they live? Do you know? |
| 14 | | In a what? Was it a house? |
| 15 | A | (Witness nodded.) |
| 16 | Q | Or was it a trailer? |
| 17 | A | House. Yes. |
| 18 | Q | Was that close to Grandma's house? |
| 19 | A | (Witness nodded.) |
| 20 | Q | Real close? |
| 21 | A | (Witness nodded.) |
| 22 | Q | Close as from where you are to that back wall? |
| 23 | | Is that fair? About that distance? |
| 24 | A | (Witness nodded.) |
| 25 | Q | While you were there, did Freeshone say what he |

1    and Jonteria were going to go or what they were

2    going to go get or do?

3        MR. BRANTLEY:  Judge, object again.  When

4    he's talking about while you were there, when are

5    we talking about?  We need -- the jury needs to

6    know how old she was when allegedly she's supposed

7    to remember.

8        MR. VALESKA:  I don't have to ask how old she

9    was.  You can cross examine.

10       THE COURT:  Presumably if she remembers.  If

11   she doesn't -- we've said that she can --

12   understands the difference between right and

13   wrong.  If she doesn't remember, the truthful

14   answer would be I don't remember, and you can

15   cross examine her regardless of what the answer

16   is.

17            And if you would, ask the question again

18   for her.

19  Q   The question I want to ask you, okay, when you

20      were in your grandma's house with Freeshone there,

21      okay -- do you remember that?

22  A   Yes.

23  Q   Did something happen to Jonteria that day?

24  A   Yes.

25  Q   Now, when Freeshone was at the house with you and

| | | |
|---|---|---|
| 1 | | Jonteria and the others, did he say that you heard |
| 2 | | from Freeshone like you hear me asking you |
| 3 | | questions, did he say what he and Jonteria were |
| 4 | | going to go do?  Where they are going or what they |
| 5 | | were going to do? |
| 6 | A | Go get some noodles. |
| 7 | Q | And did Freeshone ask you to go with them to get |
| 8 | | noodles? |
| 9 | A | (Witness nodded.) |
| 10 | Q | Did he take anybody else except her? |
| 11 | A | (Witness nodded.) |
| 12 | Q | Nobody else, right? |
| 13 | A | (Witness nodded.) |
| 14 | Q | Were there other children there? |
| 15 | A | (Witness nodded.) |
| 16 | Q | And who were -- you got to answer. |
| 17 | A | Yes. |
| 18 | Q | Who were the other children that were there when |
| 19 | | he left with Jonteria? |
| 20 | A | Marqeeta and. |
| 21 | Q | Who else? |
| 22 | A | And me. |
| 23 | Q | Now, Jonteria's momma, was she there when |
| 24 | | Freeshone left with Jonteria? |
| 25 | A | No. |

114

```
 1    Q    Was your grandma there?

 2    A    No.

 3    Q    Any other adults around that you remember except

 4         for Freeshone?

 5    A    (Witness nodded.)

 6    Q    Who else?

 7    A    Kim.

 8    Q    Kim?

 9    A    (Witness nodded.)

10    Q    And is Kim a boy or a girl?

11    A    Girl.

12    Q    And who is Kim related to?  Who is her momma, or

13         who is her family?  Do you know?

14    A    (Witness nodded.)

15    Q    Who?

16    A    Grandma.

17    Q    Grandma.

18             Jonteria's momma, do you remember her?

19    A    (Witness nodded.)

20             Yes.

21    Q    Did you see Jonteria after she had been hurt?

22    A    (Witness nodded.)

23             No.

24    Q    Did you see Jonteria's momma after she had been

25         hurt?
```

115

```
 1   A     No.
 2              MR. VALESKA:  That's all.  This man has some
 3         questions.  Thank you very much, okay.
 4                      CROSS EXAMINATION
 5   BY MR. BRANTLEY:
 6   Q     Tylena, is that your name?
 7   A     Yes.
 8   Q     And today you are five years old?
 9   A     (Witness nodded.)
10   Q     Do you know when your birthday is?
11   A     (Witness nodded.)
12   Q     When is your birthday?
13   A     September.
14   Q     In September.  So this past September you were
15         four?
16   A     (Witness nodded.)
17   Q     And the September before that you were three?
18   A     (Witness nodded.)
19   Q     So you were just a little over three when all
20         this happened; is that right?
21   A     (Witness nodded.)
22   Q     Now, who is -- what's your momma's name?
23   A     Bootsie.
24   Q     Uh?
25   A     Bootsie.
```

```
 1   Q   Bootsie.  You and Bootsie, your momma, you call
 2       her momma?
 3   A   (Witness nodded.)
 4   Q   She in the courtroom right now?  Do you see her
 5       back there?
 6   A   (Witness nodded.)
 7   Q   Where is she?
 8   A   (Indicating.)
 9           MR. BRANTLEY:  Would Bootsie stand up?
10           UNKNOWN PERSON:  (Stood.)
11   Q   Now, you and Bootsie have talked about this
12       case?  You and your momma?
13   A   (Witness nodded.)
14   Q   Has your momma ever talked to you about what's
15       going on?
16   A   (Witness nodded.)
17   Q   What has she told you?  Has she told you to help
18       Tera?
19   A   (Witness nodded.)
20   Q   What did your momma tell you? Can you tell us
21       what your momma told you?
22   A   (Shrugged.)
23   Q   Can you?
24   A   (Shrugged.)
25   Q   Well, let me ask you this.  Have you talked with
```

**DOCUMENT NAME:** McLeod, Freeshone Cornelius

*CR 02-1610*

**CLIENT & MATTER:** 54599-001

**DESCRIPTION:**

*Part 3 of 9*

County: Houston

CC#s: 2002-~~200~~-235+236

Attorney: Beth Poe

Circle: (TRANSCRIPT)    CASE FILE    BOTH

*5 vol.*

*HMM ✓*

## CERTIFICATION

I hereby certify that the preceding imaged records and documents
are a true, accurate, and complete image of the original records or
documents as received by the Office of the Attorney General of
the State of Alabama.

This the 21st day of September, 2004.

Signed: _Melissa A. Martin_

Notary: _Coleen F Gibson_

Coleen F. Gibson
Notary Public
Commission expires 06/11/06

```
 1              Tunt about this case?  Have you talked with Tunt
 2              about coming to court today?
 3      A       (Witness nodded.)
 4      Q       You hadn't talked with her?
 5      A       (Witness nodded.)
 6      Q       Who have you talked with about coming to court
 7              today?
 8      A       Nobody.
 9      Q       Hadn't even talked with your own momma?
10      A       (Witness nodded.)
11      Q       Well, who's got a brown car?
12      A       My grandma.
13      Q       Your grandmomma does?
14      A       (Witness nodded.)
15      Q       Well, did -- when you saw Tera -- when Tera left
16              the house that day, was she on a car?
17      A       (Witness nodded.)
18      Q       Did she leave with Freeshone?
19      A       (Witness nodded.)
20      Q       Did they leave walking, or did they leave in a car?
21      A       Walking.
22      Q       Could you tell us, what are noodles?  Do you know
23              what noodles are?
24      A       (Witness nodded.)
25      Q       Who told you to say that they went to buy noodles?
```

```
 1    A    Nobody.
 2    Q    You just remember that from when you were about
 3         three years old?
 4    A    (Witness nodded.)
 5    Q    And you haven't from that day to this, you haven't
 6         talked with anybody about those noodles?
 7    A    (Witness nodded.)
 8    Q    Is that no or yes?
 9    A    No.
10    Q    Have you ever told a story before in your life?
11    A    (Witness nodded.)
12    Q    You never have told a story before?
13    A    (Witness nodded.)
14              MR. BRANTLEY:  That's all.
15              THE COURT:  Mr. Valeska?
16                   REDIRECT EXAMINATION
17    BY MR. VALESKA:
18    Q    Noodles, he asked you about noodles.  Do you
19         remember him asking you about that?
20    A    (Witness nodded.)
21         Yes.
22    Q    Remember.  You got to answer.  You're doing real
23         good, okay.
24         Tell this jury, do you know what noodles are
25         made of?  How you make noodles?  Do you know that?
```

1   A   No.

2   Q   Now, tell this jury what you do with noodles when

3       you get them.

4   A   Cook them.

5   Q   And when noodles are cooked and they are for you,

6       what do you get to do with those noodles?  Tell

7       this jury.

8   A   Eat them.

9   Q   And have you ever seen how noodles are cooked at

10      your house?  What they are cooked in?

11  A   A pot.

12  Q   And when noodles are cooked with the pot, is there

13      water in there?

14  A   Yes.

15  Q   And when they are cooking, does something come up

16      out of that water?  Do you see something coming up

17      out of it?

18  A   (Witness nodded.)

19  Q   Is it hot or cold?

20  A   Hot.

21  Q   Mr. Brantley asked you a question about had you

22      ever told a story.  When you were at Headstart,

23      okay, does the teacher ever read to you?

24  A   Yes.

25  Q   And does she tell you when she is getting ready to

| | | |
|---|---|---|
| 1 | | take a break, it's time to do what?  What is she |
| 2 | | going to do? |
| 3 | A | Read. |
| 4 | Q | If I say story time, do you know what story time |
| 5 | | means?  What does that mean?  What is the teacher |
| 6 | | going to do? |
| 7 | A | Read. |
| 8 | Q | Read a story, right? |
| 9 | A | (Witness nodded.) |
| 10 | Q | So Mr. Brantley asked you about a story, had you |
| 11 | | ever told a story before, tell the jury, can you |
| 12 | | read completely? |
| 13 | A | No. |
| 14 | Q | A little.  Are you learning to try to read? |
| 15 | A | (Witness nodded.) |
| 16 | | Yes. |
| 17 | Q | That's a girl. |
| 18 | | Now, I want to ask you about this.  You |
| 19 | | remember the Judge, the man in the robe sitting |
| 20 | | next to you, looked over there, you saw him, |
| 21 | | didn't you? |
| 22 | A | (Witness nodded.) |
| 23 | Q | He asked you do you promise to tell the truth if |
| 24 | | I ask you some questions and Mr. Brantley asked |
| 25 | | you some questions.  Do you remember him asking |

```
 1            you that?
 2     A      (Witness nodded.)
 3               Yes.
 4     Q      That's a girl.
 5               Now, my question to you is, Mr. Brantley
 6            said, have you ever told a story.  I want to ask
 7            you this way, okay.  If I tell a lie or I tell a
 8            fib, is that good or bad?
 9     A      Bad.
10     Q      So when Mr. Brantley asked you had you ever told a
11            story during your lifetime -- are you looking at
12            somebody over there?
13     A      (Witness nodded.)
14     Q      Do you see somebody over there?  It's okay if you
15            do.  Can you tell the jury -- you're looking over
16            there, aren't you?
17     A      (Witness nodded.)
18     Q      Who is over there?  What's his name?
19     A      Freeshone.
20               MR. VALESKA:  No more questions.
21               THE COURT:  Mr. Brantley, anything else?
22                    RECROSS EXAMINATION
23     BY MR. BRANTLEY:
24     Q      Mr. Valeska asked you was telling a lie good or
25            telling a lie bad.  Do you know what a lie is?
```

122

```
 1    A    (Witness nodded.)

 2    Q    You don't?

 3    A    (Witness nodded.)

 4    Q    Is telling a lie good or is it bad?

 5    A    Bad.

 6    Q    Have you ever told a lie before?

 7    A    (Witness nodded.)

 8              MR. VALESKA:  Let the Record reflect that she

 9         shaked her head up and down, or a yes.

10    Q    Is that yes or no?

11    A    Yes.

12    Q    Are you telling any lies today?

13    A    No.

14    Q    What will happen to you if you tell a lie today?

15    A    (Shrugged.)

16    Q    Huh?

17    A    (Shrugged.)

18    Q    Will you get in trouble?

19    A    (Witness nodded.)

20    Q    Is that yes or no?

21    A    Yes.

22    Q    And one other thing, now.  Are you going to tell

23         me the truth or tell me a lie?

24    A    Truth.

25    Q    Who all have you talked about this case with?
```

| | | |
|---|---|---|
| 1 | | Have you talked about this case with your momma? |
| 2 | A | (Witness nodded.) |
| 3 | Q | What about with Tunt? You have? |
| 4 | A | No. |
| 5 | Q | Have you talked about it with Tunt? |
| 6 | A | (Witness nodded.) |
| 7 | Q | Have you talked about it with your grandmother? |
| 8 | A | (Witness nodded.) |
| 9 | Q | What about with any people with police uniforms on |
| 10 | | or policemen? |
| 11 | A | (Witness nodded.) |
| 12 | Q | Has anybody told you what to say up here today? |
| 13 | | Has your momma told you what you need to say? |
| 14 | A | (Witness nodded.) |
| 15 | Q | She has, hasn't she? |
| 16 | A | (Witness nodded.) |
| 17 | | MR. VALESKA: Let the Record reflect she's |
| 18 | | shaking her head no. |
| 19 | Q | What's the answer? Your momma has told you what |
| 20 | | to say up here today, hasn't she? |
| 21 | A | No. |
| 22 | Q | She hasn't? |
| 23 | A | (Witness nodded.) |
| 24 | Q | What about Tunt? Has she -- |
| 25 | | MR. VALESKA: Objection. He's asked four |

1          times.

2      A    Yes.

3      Q    Has Tunt told you what to say?

4           MR. VALESKA:  Object.  That's the fifth time.

5      A    (Witness nodded.)

6           THE COURT:  You have asked about that person

7      the same question, and she shook her head no on

8      those.  If there's any other people.

9           MR. BRANTLEY:  That's all, Judge.

10          MR. VALESKA:  No more questions.  Ask if she

11     can step down.

12                        MELISSA ANN LEE

13     having first been duly sworn, was examined and

14     testified as follows:

15                      DIRECT EXAMINATION

16     BY MR. VALESKA:

17     Q    Pull that microphone -- tell us your name, please,

18          ma'am.

19     A    Melissa Ann Lee.

20     Q    Ms. Lee, how old are you now?

21     A    Twenty-seven.

22     Q    If I could, let's go back to on or about October

23          6 of 2001.  Take you back to then, okay.  Do you

24          remember that day?

25     A    Uh-huh.

1   Q   Now, let's see.  It's been October 6 of 2002.  Why
2       do you remember October 6 of 2001 versus October 6
3       of 2002?  Why do you remember that day versus the
4       next year the same day?
5   A   Because that's the day that that stuff happened to
6       Jonteria.
7   Q   And since that day in your lifetime has anything
8       happened to another child like what's happened to
9       Jonteria that related to you in any way?
10  A   Uh-huh.
11  Q   Lets's go back to that day and ask, did you have
12      an occasion sometime around one, two -- two
13      o'clock on October 6 to be in the area of Depot
14      Street in Gordon, Alabama, Houston County?
15  A   Uh-huh.
16  Q   I know it's been a while.  Help me a little bit.
17      Gordon, Alabama, in Houston County, tell me if I
18      could, Depot Street, how do you get from the main
19      road, the highway, down to Depot Street?  What's
20      the route?
21  A   Off 84 take the left in front of the Melton's
22      Grocery Store.
23  Q   Now, you get down to Depot Street.  If I could, if
24      I could use a point of reference 76 and 80, use
25      those two locations.  Tell the ladies and

1        gentlemen of the jury, is this a complete

2        residential area where there's a house or trailer

3        every ten feet?

4   A   Uh-huh.

5   Q   Back on October 6 of 2001, were there any other

6        houses or structures besides trailers in that

7        general area, close?

8   A   Uh-huh.

9   Q   Mr. McGriff, if I use that man's name, did you

10       know him?

11  A   Yeah.

12  Q   Where did he live in relationship to -- between 76

13       and 80 Depot Street?

14  A   He stay right beside the trailer where this

15       happened at.

16  Q   His house, is it a trailer?

17  A   No.  It's a brick house.

18  Q   Did he have a wife then?  Still now?

19  A   Uh-huh.

20  Q   Know her?

21  A   Uh-huh.

22  Q   Do you know her name?

23  A   I don't know her name.

24  Q   You know her when you see her?

25  A   Yeah.

```
 1    Q    Do they still live there?

 2    A    Uh-huh.

 3    Q    Now, let's go back to October 6 of 2001.  Tell

 4         the jury, Mr. McGriff's house, if you're standing

 5         in front of Mr. McGriff's house and looking at it

 6         with the concrete driveway, back then on October

 7         2001, to the left of his house, what kind of

 8         structure or building was close to his house?

 9    A    A trailer.

10    Q    Now, do you know, could you tell us, on October 6

11         of 2001, who owned that trailer?

12    A    Dinthea Jones.  She was renting it.  But Melton

13         owned it.

14    Q    And who lived in the trailer on or about October 6

15         or the 5 during that time, if anyone?

16    A    Freeshone.

17    Q    Use the name Freeshone.  Do you see him in the

18         courtroom?

19    A    Uh-huh.

20    Q    Can you point him out for the Record?

21    A    He's over there (indicating).

22              MR. VALESKA:  Let the Record reflect she

23         pointed out the Defendant.

24    Q    Thank you very much.

25              Tell this jury today, does he look the same
```

```
 1            as he did on October 6 of 2001?
 2     A      No.  He got his hair cut.
 3     Q      Now, I want to show you -- pick up that picture in
 4            front of you.  Flip it over.
 5     A      (Witness complied.)
 6     Q      Does that look how Freeshone looked on or about
 7            October 6 of 2001?
 8     A      Uh-huh.
 9     Q      Tell the ladies and gentlemen of the jury, did you
10            know Jonteria?
11     A      Uh-huh.
12     Q      How did you know her?  Tell the jury.
13     A      My sister by my dad, she is staying with her.
14            She's like my niece.
15     Q      Who was Jonteria's guardian on or about October 6
16            of 2001, if you know?
17     A      Mary Wesley.
18     Q      Is that her mother?
19     A      Huh-uh.
20     Q      Did Mary have a full-time job back then?
21     A      Uh-huh.
22     Q      Where did she work?
23     A      She was at the nuclear plant.
24     Q      Still work there today, if you know?
25     A      Yeah.
```

```
1    Q    When she would go to work, in other words, I don't
2         know their shifts, in the morning seven to
3         whatever or six, to your knowledge on or about
4         October 6 of 2001, who was keeping Jonteria?
5    A    Her momma.
6    Q    And her mother's name?
7    A    Mary Lizzie Jones.
8    Q    And how close to the house of Mr. McGriff was her
9         mother's trailer?  Short --
10   A    Around the corner.
11   Q    And then Jonteria's grandmother, did you know her
12        on or about October 6 of 2001?
13   A    Uh-huh.
14   Q    Where did she live in relationship to Mr. McGriff
15        or Jonteria's mother's trailer?  Close or far away?
16   A    Close.
17   Q    Now, Jonteria's guardian who actually had custody
18        of her and kept her at nighttime is what I'm
19        asking on or about October 6 of 2001, is it right
20        next door or further away?
21   A    It's further away.
22   Q    You tell me on or about October 6, with that
23        distance, close enough for a six year old to walk
24        really?
25   A    Huh-uh.
```

130

```
 1    Q    So it's miles away, correct?

 2    A    Uh-huh.

 3    Q    And to get from Mr. McGriff's house and the

 4         trailer where Jonteria's mother was living and

 5         where her grandmother lived, what's that road that

 6         she was going towards Jonteria's guardian's

 7         house?  What was the road made of?

 8    A    Depot.  It was made of -- which one?

 9    Q    Either one of them.

10    A    Concrete.

11    Q    The one that runs up to the extreme -- if this is

12         Mr. McGriff's house facing this way the front this

13         way and the trailer back here and the road running

14         this way, what's it made of?

15    A    Dirt and grass.

16    Q    That's what I want to ask about.  That dirt.  And

17         you go which direction to get to Jonteria's

18         guardian's mother's house on that dirt road?

19    A    It's right down the corner.

20    Q    Was it a block?  Not the grandmother but the

21         guardian who had custody of her.

22    A    Oh, that was on the other street.

23    Q    That's what I'm asking about.  Going down that

24         dirt road, is it a short distance or far distance?

25    A    Far distance.
```

1    Q    When you get to the dead end, is it right there on
2         the corner, or do you have to go left or right?
3    A    You have to go right.
4    Q    What is that road made of?
5    A    Concrete.
6    Q    Is it a block or two or further?
7    A    It's further.
8    Q    Now, if I could, let me take you down to around
9         one o'clock, one-thirty, somewhere around that
10        time period October 6 of 2001.  Do you remember
11        that time?
12   A    Uh-huh.
13   Q    Freeshone McLeod, had you seen him before that day
14        ever close or around Jonteria?
15   A    Huh-uh.
16   Q    On or about October 6 of 2001, did you see
17        Freeshone in the afternoon after one or one-thirty?
18   A    Uh-huh.
19   Q    Where did you first see him?  Tell the jury.
20   A    He was standing, like, outside a house by the
21        light pole at the edge of the grass.
22   Q    Did you have a conference with him?
23   A    Uh-huh.
24   Q    When you saw him, where were you when you first
25        observed him out there?

```
 1    A    I was standing in the kitchen washing dishes.
 2    Q    How did you get outside to have a conference with
 3         him?
 4    A    I didn't go all the way out.  I opened the door.
 5    Q    And what caused you to open the door and have a
 6         conversation, if anything, with Freeshone?
 7    A    Because he was just standing out there and just
 8         standing there looking around.
 9    Q    And that got your attention?
10    A    Uh-huh.
11    Q    And when you did that, what did you say to him or
12         did he say to you?
13    A    I went to the door, and I asked him what he was
14         doing.
15    Q    And what did Freeshone McLeod say?
16    A    He said he was looking for Tera.
17    Q    And, now, you say Tera.  If I say Jonteria Jones,
18         is that the same person?
19    A    Uh-huh.
20    Q    And to your knowledge was she under twelve years
21         old then?
22    A    Uh-huh.
23    Q    You sure?
24    A    Uh-huh.
25    Q    And when he said that to you, what did you say to
```

1       him?

2   A   I said, Tera, I said, where she.  He said, I don't

3       know.  I said, what do you mean you don't know.

4       He said he sent her down to the trailer to get a

5       pack of noodles.

6   Q   Would you tell the ladies and gentlemen of the

7       jury when he said he sent her down to a trailer to

8       get a pack of noodles, what trailer are we talking

9       about if you know?

10   A   Tunt.  Her mom.  Dinthea Jones.

11   Q   Dinthea Jones.  Tunt.  What you said, in

12       reference, once again, Mr. McGriff's house, if

13       that's the corner of Mr. McGriff's house facing

14       this back door, okay, facing this way, and this is

15       the driveway you pull up into, what street is over

16       here?  The dirt street, what's that?

17   A   Which one?

18   Q   On the left side of his house.

19   A   Where Tunt stay at.

20   Q   How close to the trailer to that?  Use this

21       courtroom.  Is it closer from where you are to the

22       back door or ten times longer?

23   A   It's a little closer.

24   Q   Could you take a baseball or softball or a can and

25       almost hit that trailer?

| | | |
|---|---|---|
| 1 | A | Yeah. |
| 2 | Q | Now, tell the ladies and gentlemen of the jury, |
| 3 | | this is afternoon on October.  Was it raining or |
| 4 | | dark out? |
| 5 | A | Uh-huh.  It was sunny. |
| 6 | Q | Now, and you had been down to this residence how |
| 7 | | many times before? |
| 8 | A | Down to Tunt's house? |
| 9 | Q | Where you are now, yes, ma'am. |
| 10 | A | Where I stay at now? |
| 11 | Q | No.  Then.  October 6 2001.  Is this the first |
| 12 | | time you have -- |
| 13 | A | I go down there all the time. |
| 14 | Q | Had you been down there when Jonteria was around? |
| 15 | A | Uh-huh. |
| 16 | Q | Had you been around when she was playing out in |
| 17 | | the neighborhood? |
| 18 | A | Uh-huh. |
| 19 | Q | Did you see her come in and go out? |
| 20 | A | Uh-huh. |
| 21 | Q | At any time did you ever see her go out and not |
| 22 | | come back before this day? |
| 23 | A | Uh-huh. |
| 24 | Q | Now, the other children were down there, if you |
| 25 | | know.  Who was down there around the area then? |

1    A    I wasn't down there to the trailer down that way.

2    Q    I understand.  But at the grandmother's house.

3    A    Tylena and Runt -- which is Marqeeta.

4    Q    Were they younger or older?

5    A    Younger.

6    Q    Do you see any of them today that you mentioned?

7    A    Uh-huh.

8    Q    Who did you see?  Tell us who you've seen.

9    A    Tylena, and I've seen Marqeeta.

10   Q    Now, and who is Tylena's mother?

11   A    Mary Wesley.

12   Q    Do you see her in the courtroom?

13   A    Uh-huh.

14   Q    Who is her grandmother, if you know?

15   A    Mary Lizzie.

16   Q    Now, when you -- Freeshone told you on October 6,

17        2001, in Gordon in Houston County, that he was

18        looking for Tera, I refer to Jonteria, what did

19        you say to him then?

20   A    I asked him where she was.  And he said he didn't

21        know where she was.  And I asked him what he mean

22        by he didn't know where she was.  And he said he

23        sent her down to her mom's trailer to get a pack

24        of noodles.  And I asked, a pack of noodles.  And

25        he was, like, yeah, for her to eat.

136

```
 1    Q    Tell the jury, when you observed him and his
 2         demeanor and appearance, how he was acting.
 3    A    Like something wrong with him.  He was standing
 4         there staring and looking around.
 5    Q    Tell the jury, when you saw him in the house when
 6         you observed him before you went out there, did
 7         you ever see him go ten -- fifteen -- twenty --
 8         thirty feet either direction looking for Jonteria
 9         when you were watching him?
10    A    Huh-uh.
11    Q    Anything prevented him in that time that you
12         watched for him to go left, right, straight, or
13         even towards the house you were in looking for
14         Jonteria that you saw?
15    A    Huh-uh.
16    Q    What happened next?
17    A    Then after that my brother road by, and then
18         that's --
19    Q    Did you have a conversation with your brother?
20    A    Yeah.
21    Q    Not what you said, that's hearsay.  Did you ever
22         go over to -- excuse me.  Did you ever see
23         Jonteria's mother after that?
24    A    Uh-huh.
25    Q    Where did you see her next?
```

1    A    Down Mr. Mose's house.

2    Q    How much time elapsed your best judgment?  I know

3         you didn't take out your watch.  But when you last

4         saw Freeshone that location until you went down to

5         Mr. McGriff's house -- Mose as you said?

6    A    About thirty minutes.

7    Q    Did you see any other adults the time you had the

8         conversation looking for --

9    A    Huh-uh.

10   Q    -- Jonteria when you were talking to Freeshone?

11   A    Huh-uh.

12   Q    Were there any phones in that location?

13   A    Huh-uh.

14   Q    Anybody have any phones?

15   A    Huh-uh.

16   Q    Now, did Freeshone himself ask you to come out and

17        help look for Jonteria?

18   A    Huh-uh.

19   Q    Now, I asked you when you next saw either

20        Jonteria's mother or Jonteria.  Where was he?

21        Tell the jury.

22   A    It was Mose's house when she is laying on the

23        concrete.

24   Q    I want you to tell the ladies and gentlemen,

25        you're standing out front of Mr. Mose McGriff's

```
 1          house, going from the street up to his house, the
 2          actual brick of his house, what surrounds the
 3          house, if anything?
 4     A    Trees.
 5     Q    How do you get up off the street if you walk
 6          straight from the street, not on the grass, but
 7          you walk under any kind of structure to get up to
 8          his --
 9     A    Concrete.
10     Q    Now, the concrete from Mr. McGriff's house, is
11          that even closer to the trailer that Freeshone and
12          Jonteria's mother were living in?
13     A    Yeah.
14     Q    The area where the trailer is, had you ever been
15          in that trailer --
16     A    Huh-uh.
17     Q    -- that Freeshone and Jonteria's mother lived in?
18     A    Uh-huh.
19     Q    How would you get into that trailer?  Which way?
20     A    The trailer was turned, like, sideways.
21     Q    And how many doors, if you recall, if any, did it
22          have to it?
23     A    Two.
24     Q    And where were the doors in relationship to Mr.
25          McGriff's house?
```

1   A   The back door was facing his house, and the front

2         door was on the other side.

3   Q   Now, to get into the trailer, in other words, away

4         from the concrete driveway, there's the back and I

5         refer to it the front part of the trailer, what

6         was that made of that entrance of that trailer?

7   A   Wooden steps.

8   Q   And if you stood on those wooden steps, were there

9         any other trailers if you stood on the steps and

10        looked away from Mr. McGriff's where Jonteria and

11        Freeshone -- Jonteria's mother's trailer with

12        Freeshone, I'm standing there with the back door

13        behind me, that entrance you described, and you

14        look straight ahead away from Mr. McGriff's house,

5        would there have been any other structures or

         buildings out there?

   A   There's a little trailer up in the cut part.

.8   Q   At that time do you know if anybody was living

19        there?

20   A   No.  Nobody staying there.

21   Q   Tell the jury this area where that trailer was

22        standing on the porch, is that -- everything all

23        cut down and flat like a peanut field?

24   A   Huh-uh.  There's a lot of trees.

25   Q   To get to that trailer from the street, the one

```
1          you said no one was living in, when you came off
2          the street, was there a paved or concrete drive?
3     A    Huh-uh.
4     Q    What was --
5     A    It was grass and dirt.
6     Q    Now, and the other area surrounding that, was it
7          all cut down completely?
8     A    Huh-uh.
9     Q    Describe what was out there at that time.
10    A    It was trees, plum -- peach trees that stand high
11         as six -- seven feet.
12    Q    Did you yourself ever go to the location where
13         Jonteria was found?
14    A    Huh-uh.
15    Q    Now, you're in -- the house you're in, how did you
16         get to your house to Mr. McGriff's concrete
17         driveway?
18    A    I ran down there.
19    Q    You ran slow or fast?
20    A    Fast.
21    Q    When you got down there, did you see anybody you
22         know?  Tell the ladies and gentlemen of the jury.
23    A    Uh-huh.
24    Q    Who did you see?
25    A    I seen Tunt, Freshone, and a lot more people
```

1           around there.  Mr. Mose.  Ms. Mose.

2    Q    Did you hear any conversations between, if any,

3           Freeshone McLeod and Jonteria's mother?

4    A    Uh-huh.

5    Q    What, if anything, was said between those two

6           people?

7    A    Tunt --

8               MR. BRANTLEY:  Object to hearsay.

9               MR. VALESKA:  First of all, it's part of the

10       res gestae; second, it's not hearsay, a

11       conversation between the Defendant and Jonteria's

12       mother that she heard is not hearsay.

13           MR. BRANTLEY:  Well --

14           THE COURT:  I think she can testify to what

15       the Defendant said, but I'm not so sure about --

16           MR. BRANTLEY:  What the other person said.

17           THE COURT:  -- what the other person said.

18    Q    Was -- let me ask you this way.  When you ran down

19           there and you saw Jonteria, was she walking and

20           talking?

21    A    No.

22    Q    Did she have any color of substances on her body

23           that you saw?

24    A    Nothing but blood.

25    Q    Was she completely clothed that you saw?

1    A    No.

2    Q    Had you ever seen her with any kind of blood like

3         that before?

4    A    No.

5    Q    Was she talking?

6    A    Huh-uh.

7    Q    The Defendant, Freeshone, and Jonteria's mother,

8         were either one of them excited that you could see?

9    A    Huh-uh.

10   Q    What did Freeshone McLeod say to Jonteria's

11        mother?

12   A    She just told him --

13             MR. BRANTLEY:  Whoa, she said she just told

14        him.  And that's hearsay.

15             MR. VALESKA:  That's not hearsay.  If there's

16        a question asked of the Defendant against his

17        interest and she's present and the Defendant is

18        present, that's not hearsay.

19             MR. BRANTLEY:  Well, it is, Judge.

20             MR. VALESKA:  No, it's not.

21             THE COURT:  Why don't you approach up here.

22                  (At which time the following proceedings

23                  were held at the bench outside of the

24                  hearing of the jury:)

25             THE COURT:  This is the mother and she's

1    overhearing what the victim said or the mother
2    said?

3        MR. VALESKA:  This is the mother of the
4    victim saying something to the Defendant while the
5    little girl is laying there.

6        THE COURT:  What I already heard before this
7    morning?  Is it the same thing or something else?
8    You know more about this than I do.  Is this where
9    she said she was going to kill him or something?

10        MR. VALESKA:  Yes, sir.  She asked him --

11        THE COURT:  Is the mother going to testify?

12        MR. BRANTLEY:  If the mother is going to
13    testify, then that would be the best evidence.

14        MR. VALESKA:  No, that's not true.  She can
15    testify to what the Defendant said what she heard
16    him say.

17        THE COURT:  An admission he made, but not
18    what the mother said.

19        MR. VALESKA:  If the mother says to the
20    Defendant, if you did this to my baby I'm going to
21    kill you, and the Defendant doesn't deny it and is
22    silent, that's an admission against interest.

23        THE COURT:  I don't disagree with that.  But
24    the question is whether this witness can get that
25    in versus to -- made the admission.

144

1    MR. BRANTLEY:  If I could be heard on that.
2    Number one, the mother can testify she said that.
3    Now, the State wants to argue inferences on that
4    his silence during the closing argument is fine.
5    But I for one don't think just because at that
6    particular situation as opposed to being in a
7    structured setting by the police where they ask
8    him a question and he doesn't say anything, I
9    think that's where silence can be taken as a
10   silent admission.  Here out in public and emotions
11   that are going on.  I mean, just because he didn't
12   say anything I don't think raises an inference of
13   an admission.
14    THE COURT:  Either way it comes in.  If it
15   doesn't raise an inference of admission, then it's
16   not incriminating.  But just for you-all's
17   argument as far as what that means.  But I'm just
18   not so sure that she's the witness that can get
19   this in.  Why wouldn't it be --
20    MR. VALESKA:  What if she's not available?
21    THE COURT:  The mother?
22    MR. VALESKA:  Yeah.
23    THE COURT:  I thought she was sitting out
24   there.
25    MR. VALESKA:  That's the little girl.

1    MR. BRANTLEY:  She came in that door.

2    MR. VALESKA:  I don't have to put her on.

3  That's not a police custodial statement.

4    THE COURT:  I know.  But -- it seems like

5  it's still hearsay if she's testifying to it as

6  opposed to -- what the mother said not to what he

7  said.

8    MR. VALESKA:  It is not any different if I

9  put a gun on you during a robbery and I ask a

10  witness watching the robbery what the Defendant

11  said to you or what you said to him.  That's the

12  exact same example.  This is part of the res

13  gestae where the little girl has been brought out

14  of the bushes, lying there.  Describe what her

15  mother says and how he responds.

16    THE COURT:  And he responds by saying

17  nothing, correct?

18    MR. BRANTLEY:  That's the point I'm trying to

19  make.  I don't think saying nothing in a situation

20  like that would -- raises an inference of an

21  admission.  Now, by the same token if it's in --

22    MR. VALESKA:  Don't talk so loud.

23    THE COURT:  That's for you-all to argue that

24  point for the jury to decide.  They can agree with

25  you or --

1       MR. BRANTLEY:  And then I've got my hearsay
2   objection, too.  And the mother just walk in
3   court.  Isn't that Tunt?
4       MR. VALESKA:  Call Tunt if you want to call
5   her.
6       THE COURT:  You-all let's finish this.  It's
7   just like if a defendant makes an incriminating
8   statement to the police on tape.  It seems like
9   the way you get it in you call the police they
10  made the statement to, not to a policeman who was
11  sitting behind the glass window or listening to
12  the tape later.
13      MR. VALESKA:  I can do that.  I can put the
14  officer on.  Someone who overheard --
15      THE COURT:  But it seems like you put on the
16  person who -- it's hearsay, what that person
17  said.  That's what he's objecting to I think.
18      MR. BRANTLEY:  It is.
19      THE COURT:  It's not so much --
20      MR. VALESKA:  It's not hearsay if it's part
21  of the res gestae, and it's an utterance made by
22  him when the victim is lying here after she has
23  had her brain smashed in.  But if it's five or six
24  hours later -- but I understand what you said.
25      THE COURT:  You have to lay the foundation

```
 1      that the -- how long the mother had been there --
 2             MR. VALESKA:  I will.
 3             THE COURT:  If he -- I haven't heard
 4      anything.
 5             MR. VALESKA:  I will go forward.
 6             THE COURT:  I'll just sustain at this point.
 7                 (At which time the following proceedings
 8                 were held in open court:)
 9             MR. VALESKA:  I just need to make sure.  I
10      wanted to ask what the mother said to the
11      Defendant, and he objected and said it was --
12             THE COURT:  We sustained as to what the
13      mother said at this point.
14   Q  Tell the ladies and gentlemen of the jury when you
15      got down to Mr. McGriff's house, who was by
16      Jonteria?
17   A  Tunt was.
18   Q  Tunt is how related to Jonteria?
19   A  Her mother.
20   Q  Show you State's Exhibits 1, 2, and 3.  Do you see
21      those pictures?
22   A  Uh-huh.
23   Q  First of all, where in Gordon, Alabama, Houston
24      County, was that on October 6, 2001?
25   A  Depot Street.
```

1    Q    And who do you recognize in those pictures that
2         you saw on that day?
3    A    Tunt and Jonteria and my brother.
4    Q    Is that the condition you saw Jonteria in when you
5         got down there or shortly after that after they
6         covered her up?
7    A    Uh-huh.
8    Q    The pictures been marked, altered, or changed in
9         any way except the Court's identification, the
10        little stickers, is that how they looked when you
11        actually observed that with your own eyes?
12   A    Uh-huh.
13   Q    Same substantial condition, correct?
14   A    Uh-huh.
15             MR. VALESKA:  Offer State's 1, 2, and 3.
16             THE COURT:  Any objection?
17             MR. BRANTLEY:  No objection.
18             THE COURT:  They are admitted.
19                  (State's Exhibits No. 1, 2, and 3 were
20                  admitted into evidence.)
21   Q    What I want to ask you, if I could, when you got
22        down there, did Jonteria's mother -- give her
23        name.  Not her nickname.
24   A    Dinthea.
25   Q    Did Dinthea say anything to Freeshone McLeod?

```
 1   A    Uh-huh.
 2   Q    Now, when she said something to Freeshone McLeod,
 3        did Freeshone McLeod say anything?
 4   A    He said he ain't do nothing.
 5   Q    Now, would you tell the ladies and gentlemen of
 6        the jury, when Freeshone McLeod said that, what
 7        did Jonteria's mother do to Freeshone?
 8   A    She pushed him.
 9   Q    And what did -- occur then?
10   A    Nothing.  He just stood there.
11   Q    Now, would you tell the ladies and gentlemen of
12        the jury was -- how was Freeshone acting then?
13   A    The same as when he was up to the house.  Weird.
14             MR. BRANTLEY:  Object.  Judge, I'm going to
15        object to the term weird.  That calls for a mental
16        conclusion on her part.  We don't know what it
17        means, and also I would ask to strike that just
18        like she stated earlier he was standing there like
19        he was crazy.
20             THE COURT:  The D.A. asked how he appeared.
21             MR. BRANTLEY:  She can say nervous.
22             THE COURT:  Which wouldn't mean anything more
23        or less than any other term.  You can cross
24        examine as to what exactly that means to her.  I'm
25        not so sure it means much without some further
```

1    explanation.

2         Go ahead, Mr. Valeska.

3    Q    Would you tell the ladies and gentlemen of the

4         jury in your opinion what you observed in any way

5         Freeshone appear to be concerned for Jonteria in

6         any way?

7    A    No.

8    Q    Now, tell the ladies and gentlemen of the jury,

9         when -- how did Jonteria leave the concrete -- the

10        hard cold concrete?  How did she get off that?

11   A    When the ambulance came and got her.

12   Q    What did she look like?  Tell us.

13   A    She was bloody.  Her head was swollen up.

14   Q    Was that different from when you had seen her

15        earlier that day?

16   A    Uh-huh.

17   Q    And tell me about Jonteria during that time.  Was

18        she a real tall girl?  Heavy girl?

19   A    Huh-uh.  She wasn't tall.

20   Q    After this occurred, did you come to ever visit or

21        see Jonteria in the hospital?

22   A    Uh-huh.

23   Q    How many times did you see her in the hospital in

24        your opinion?

25   A    Every day she was there.

1  Q   Was she there a short time or long time?

2  A   Long time.

3  Q   The first time you saw her, was she able to talk?

4  A   Huh-uh.

5  Q   Was she able to walk?

6  A   Huh-uh.

7  Q   Was she able to communicate in any way?

8  A   Huh-uh.

9  Q   Was she able to feed herself?

10 A   Huh-uh.

11 Q   Did she have a feeding tube?

12 A   Uh-huh.

13 Q   How many months went by, short time or long time,

14     until she got out of the hospital?

15 A   A long time.

16 Q   Can you tell the ladies and gentlemen of the jury

17     today, have you seen her today?

18 A   Uh-huh.

19 Q   How did she get around today?  What does she use

20     to assist her?

21 A   She had a cane.

22 Q   Before you saw her lying there on the concrete

23     with her skull bashed in with the blood, would you

24     tell the ladies and gentlemen of the jury, did she

25     shake in any manner or fashion as a little girl in

```
 1        relationship to sitting down and talking to her
 2        and her motor movement like this in any way
 3        (indicating)?
 4   A    Huh-uh.
 5   Q    Would you tell the ladies and gentlemen of the
 6        jury, if I could now, can she carry on complete
 7        long sentences like I'm asking you now?
 8   A    Huh-uh.
 9   Q    Does she run and play like the other children?
10   A    Huh-uh.
11            THE COURT:  Do me a favor.  Try to say yes or
12        no.  She has a hard time with huh-uh and uh-huh.
13   Q    Does she run and play like the other children?
14   A    No.
15   Q    Now, if I could, did you yourself ever go back
16        into the trailer yourself that Freeshone McLeod
17        and Tunt lived in?
18   A    No.
19   Q    Still there today?
20   A    Uh-huh.  Yeah.
21   Q    I want to ask you, before October 6 of 2001, did
22        you ever see Jonteria -- Tera -- with Freeshone
23        McLeod?
24   A    Yeah.
25   Q    Many times or few times?
```

| | | |
|---|---|---|
| 1 | A | Few. |
| 2 | Q | Did you see how Freeshone acted towards her that |
| 3 | | you observed yourself? |
| 4 | A | Yeah. |
| 5 | Q | How was that? |
| 6 | A | He always hollered at her. |
| 7 | Q | Were there are other children also around during |
| 8 | | this time period you observed? |
| 9 | A | Yes. |
| 10 | Q | Did he holler at those children? |
| 11 | A | No. |
| 12 | Q | Going back to October 6, 2001, I would like for |
| 13 | | you tell the ladies and gentlemen of the jury, was |
| 14 | | it your opinion who was stronger physically?  In |
| 15 | | other words, actual physical strength,  Jonteria |
| 16 | | Jones or Freeshone McLeod? |
| 17 | A | Freeshone. |
| 18 | Q | And on or before October 6, really, before that, |
| 19 | | what was the relationship to Jonteria and |
| 20 | | Freeshone and her life? |
| 21 | A | He was dating her mom. |
| 22 | Q | Where, if anywhere, can you tell us was Jonteria's |
| 23 | | real father during this time?  Where did he live? |
| 24 | A | He stayed in Donalsonville. |
| 25 | Q | What state is that? |

1   A    Georgia.

2           MR. VALESKA:  That's all.  Pass the witness.

3    Thank you very much.

4           THE COURT:  Why don't we take a break --

5           MR. VALESKA:  Indulge the Court, if the jury

6    really needs one.  I've got a doctor I need to get

7    on.

8           THE COURT:  It's been almost two hours.  Does

9    anybody need to take a break?  I think we

10   started --

11          MR. VALESKA:  If we do, I understand, Judge

12   Mendheim.

13          THE COURT:  I just mentioned to them before

14   we started.  If nobody needs to, we can go ahead.

15                (No response.)

16          THE COURT:  Mr. Brantley?

17          MR. BRANTLEY:  Thank you very much, Your

18   Honor.

19                   CROSS EXAMINATION

20   BY MR. BRANTLEY:

21   Q    What did you say your name was?

22   A    Melissa Ann Lee.

23   Q    Melissa Ann Lee?

24   A    Uh-huh.

25   Q    Do you go by Ann?

155

```
 1    A    Melissa.

 2    Q    Can I call you Melissa?

 3    A    Uh-huh.

 4    Q    How old are you?

 5    A    Twenty-seven.

 6    Q    And you work anywhere?

 7    A    Uh-huh.

 8    Q    Where do you work?

 9    A    Jeffers Vet Supply.

10    Q    Now, your brother is Larry Dixon?

11    A    Uh-huh.

12    Q    And how old is Larry?

13    A    Thirty-one.

14    Q    Does he live with you?

15    A    No.

16    Q    Does -- who is Bobbie McGhee?

17    A    That was somebody I was dating at the time.

18    Q    Back then?

19    A    Uh-huh.

20    Q    Did he live with you?

21    A    No.

22    Q    Larry, your brother, at one time, did he not,

23         dated Tera's mother?  Did they go together?

24    A    They wasn't dating.  They was just --

25    Q    Did they live together?
```

```
 1   A   No.
 2   Q   Tell us what their relationship was.
 3   A   It was sexual.
 4   Q   And there was some problems there between your
 5       brother, Larry, and Freeshone at least for a
 6       while, was there not?
 7   A   Not that I'm aware of.
 8   Q   In fact, are you aware of a fight that your
 9       brother got in with Freeshone over Tunt?
10   A   My brother ain't never fight over Tunt.
11   Q   Tunt is Jonteria's mother, right?
12   A   That's correct.
13   Q   When did your brother end his sexual relationship
14       with Jonteria's mother?
15   A   I don't know.
16   Q   Well, a week or two ago?
17   A   I don't know.  I don't get in his business.
18   Q   May still be going on for all we know?
19   A   No.  It's not going on because he stay with
20       somebody.
21   Q   He's with somebody else now?
22   A   Yeah.
23   Q   Now, are you and your brother close?
24   A   Yeah.
25   Q   I'm curious as to why you have described
```

157

```
 1         Freeshone's actions outside by that pole as
 2         appearing like I believe you said he was crazy.
 3         Is that what you said?
 4    A    Uh-huh.
 5    Q    Was this after when you saw him out by the pole,
 6         would this observation have been after your
 7         brother broke his sexual relationship up with
 8         Tunt?
 9    A    I can't say because I don't know when he broke it
10         up.
11    Q    You don't know if they were still going together
12         or not --
13    A    I don't know.
14    Q    -- on the day that Jonteria got hurt?
15    A    Huh-uh.  I don't know.
16    Q    It would be accurate to say that your brother --
17         his relationship with Freeshone was not good, at
18         least during the time when your brother was having
19         a sexual relationship with Tunt?
20             MR. VALESKA:  I object.  There's no way she
21         can testify --
22    A    I don't know --
23             THE COURT:  Hang on just a minute.
24             MR. VALESKA:  Mental conclusion of another
25         person.
```

```
 1            MR. BRANTLEY:  If she knows.
 2            MR. VALESKA:  Call that party.  That's
 3       hearsay.
 4            MR. BRANTLEY:  What was --
 5            THE COURT:  What was your question?
 6            MR. BRANTLEY:  Would it be accurate for her
 7       to say that her brother's relationship if she
 8       knows with Freeshone was not good at least on the
 9       day that she saw him out there by the pole.
10            THE COURT:  She can testify if she knew.
11            MR. BRANTLEY:  If she knows.
12   A   I don't know.
13   Q   Just didn't know.  Okay.
14   A   Huh-uh.
15   Q   And you can see Freeshone now, can't you?
16   A   Yeah.
17   Q   Does he look any different now as far as his
18       demeanor, not talking about his hairstyle or his
19       coat and how his tie, does he look any different
20       now than he did standing outside by the pole?
21   A   Huh-uh.
22   Q   He always looks weird, doesn't he?  So it's hard
23       to describe someone's intentions just by a
24       person's physical appearance, isn't it?
25   A   Yeah.
```

```
 1    Q    You would agree with that?

 2    A    He look more calm today than he did then.

 3    Q    I believe you testified that Jonteria had a

 4         guardian.  And is it Mary Winsler?

 5    A    Wesley.

 6    Q    Mary Wesley?

 7    A    Uh-huh.

 8    Q    And Mary Wesley is who?  The grandmother?

 9    A    No.  The sister.

10    Q    The sister.  Why did Jonteria need a guardian if

11         her mother were still alive if you know?

12              MR. VALESKA:  I object.

13    A    I don't know.

14              MR. VALESKA:  I object.

15    Q    You don't know the answer to -

16    A    I don't know.

17              THE COURT:  Hang on.  When one of them

18         objects, don't keep talking.

19                   I'm going to sustain on that one.  I

20         don't see how that's relevant.

21    Q    Do you have information -- do you know, do you

22         have knowledge if Jonteria were just allowed to

23         roam the neighborhood unsupervised?

24    A    No.

25    Q    You don't have any information of that?
```

```
 1   A    No, she wasn't allowed to roam like that.

 2   Q    How long had she been with this guardian, Mary

 3        Wesley?

 4   A    I don't know the exact time.

 5   Q    Been longer than a day or two?

 6   A    Yeah.

 7   Q    Been longer than, really, a month or two, had it

 8        not?

 9   A    Yeah.

10   Q    In fact, little Jonteria had had to have been with

11        a guardian for several months prior to this

12        incident, hadn't she?

13   A    Uh-huh.

14   Q    If Jonteria lived with Mary Wesley, her guardian,

15        where did Jonteria's mother live?

16   A    She stayed with Freeshone in the trailer.

17   Q    And prior to staying with Freeshone in that

18        trailer, did she stay with your brother in that

19        trailer?

20   A    My brother didn't ever stay in this trailer with

21        her.

22   Q    Did they live somewhere else together?

23   A    No.  She may have stayed the night, but they

24        didn't live together.

25   Q    Where would they have stayed at night?
```

```
 1    A    At my sister's house.

 2    Q    At your sister's house.  How far is that from your

 3         house?

 4    A    Across the street.

 5    Q    And when Jonteria's mother, Tunt, lived across the

 6         street from you, did you see her often?

 7    A    Yeah.

 8    Q    And did you-all become friends, so to speak?

 9    A    We been friends.

10    Q    How long have you been friends?

11    A    Ever since she was little.

12    Q    When you say little, what do you mean?

13    A    Three, four, five.

14    Q    So you-all have been life-long friends?

15    A    Yeah.

16    Q    Would it be true to say that you-all are very good

17         friends?

18    A    Yeah.

19    Q    And you're not very good friends with Freeshone?

20    A    I'm very good friends with him.

21    Q    Are you?

22    A    Uh-huh.

23    Q    How long have you known him?

24    A    Ever since he known Tunt.

25    Q    And how long has that been?
```

| | | |
|---|---|---|
| 1 | A | I don't know how long they were dating.  When they |
| 2 | | moved to Gordon, that's when I met him. |
| 3 | Q | When did he move to Gordon?  In terms of -- do you |
| 4 | | recall October 6? |
| 5 | A | Uh-huh. |
| 6 | Q | How many weeks, days, weeks, or months -- |
| 7 | A | They probably been staying there a year.  I'm not |
| 8 | | sure. |
| 9 | Q | What about the following April?  Does that refresh |
| 10 | | your memory? |
| 11 | A | I'm not sure. |
| 12 | Q | About five or six months? |
| 13 | A | I'm not sure how long they stay there. |
| 14 | Q | So did you give -- you gave a statement of |
| 15 | | everything you observed to the deputies, did you |
| 16 | | not? |
| 17 | A | Uh-huh. |
| 18 | Q | And when you gave this statement telling the |
| 19 | | deputies what you observed and what you heard |
| 20 | | Freeshone say, you had been life-long friends with |
| 21 | | the victim's mother? |
| 22 | A | That's right. |
| 23 | Q | And you had known Freeshone about six months? |
| 24 | A | Uh-huh.  That's correct. |
| 25 | Q | And even back then you thought he looked weird and |

1      crazy?

2  A   Yeah.

3  Q   And you would agree that when you went outside and

4      asked Freeshone what he was doing out there by a

5      pole, he told you he was looking for Tera?

6  A   That's correct.

7  Q   And was that at a time, if you know, ma'am, that

8      Freeshone and Tunt were living together?

9  A   Yeah.

10  Q   They were living together, weren't they?

11  A   That's right.

12  Q   Where was Tunt -- why wasn't Tunt looking for her,

13      if you know?

14  A   I don't know.

15  Q   Why wasn't her guardian looking for her, if you

16      know?

17         MR. VALESKA:  I'm going to object.

18  A   Because she was at work.

19  Q   And when they brought Tera back up there when Tunt

20      was there, her momma, and her momma was very

21      upset, and the only thing you heard Freeshone say

22      was, I didn't do it?

23  A   (Witness nodded.)

24        Yeah.

25  Q   I ain't done nothing?

```
 1    A    Yeah.

 2    Q    Bobbie McGhee, are you still going with him?

 3    A    No.

 4    Q    Did he live with you for a while?

 5    A    No.

 6    Q    And that was your boyfriend?

 7    A    Yes.

 8    Q    Bobbie McGhee was not living with you on October

 9         6, 2001?

10    A    He was there at night when the deputies questioned

11         me.  He was there.  But he don't live with me.

12    Q    You know Bobbie McGhee very well, don't you?

13    A    Yes.

14    Q    You know he's done drugs before --

15              MR. VALESKA:  Objection.  It has no

16         relevance.

17              THE COURT:  How would any of that be

18         relevant?

19              MR. BRANTLEY:  I'm going to tie it up right

20         now.

21              THE COURT:  But how?  Tell me.

22    Q    Was he under the influence --

23              THE COURT:  Wait.  You tell me.  He's

24         objected.  I've got to rule.  How is whether or

25         not this Bobbie fella is under --
```

165

1    MR. BRANTLEY:  Your Honor, I would offer and

2    argue that it's relevant in this way.  If Bobbie

3    McGhee on that night was under the influence of

4    controlled substances, and she were with him,

5    then I can go into whether or not she was under

6    the influence of controlled substances --

7    THE COURT:  That would be a relevant

8    question.  So as far as --

9    MR. BRANTLEY:  It's just a predicate.  I

10   think if I go straight to it and ask her, were

11   you under the influence of controlled substances

12   that night, she's just going to say no.  So I have

13   to step up to it.

14   THE COURT:  You're the lawyer.  I don't think

15   it's relevant to what I've heard so far about

16   Bobbie McGhee.  If we can just go forever on --

17  Q    Let me just ask you this, ma'am --

18   THE COURT:  As far as her mental state, I'll

19   let you go into that.

20  Q    That night or that day when you saw Tera, had you

21       been using controlled substances --

22  A    No.

23  Q    -- that day?  What about alcohol --

24  A    No.

25  Q    Had you consumed any alcohol?

```
 1   A    No, sir.

 2              MR. BRANTLEY:  That's all.

 3              THE COURT:  Mr. Valeska, any redirect?

 4              MR. VALESKA:  I guess we get an instruction

 5        to the jury to disregard what he was asking about

 6        some other party?

 7              THE COURT:  Sure.  I'm not sure if the jury

 8        sees how that's relevant either unless Mr. McGhee

 9        testifies.

10              But please disregard any questions about

11        a third person's alleged use of drugs or alcohol.

12        At this point it doesn't seem relevant.

13              MR. VALESKA:  That's all I have.  Ask she be

14        excused.

15              THE COURT:  That's it.  You can be excused.

16              MR. VALESKA:  Judge, I'm in a quandary.  I've

17        got a nurse from Birmingham who has changed jobs.

18        We need a break I think.  I need to get those two

19        people on.  And the doctor's going out of town, so

20        I need some indulgence with those two witnesses

21        before we break.  I guess take a quick recess.  I

22        apologize.  I'm working around their schedules.

23              THE COURT:  Let's take a ten minute break --

24              MR. VALESKA:  I'll have her on the stand --

25              THE COURT:  -- until ten after.  Again,
```

1   please don't let anyone talk directly or

2   indirectly about the case. If you hear anything

3   in the hallway or whatever, please don't let that

4   occur. So just be on break for about ten minutes

5   and then come directly back in here, okay.

6           (Jury not present.)

7       MR. BRANTLEY: I've talked with Mr. McLeod,

8   and I've told him we may can save this Court some

9   time over a chain witness, a nurse, if we

10  stipulate to chain of custody of some blood

11  samples. And I've told him in my opinion it's

12  more of an administrative piece of evidence than

13  it is guilt or innocence. So he's given me his

14  permission to stipulate to the nurse's chain of

15  custody testimony.

16      THE DEFENDANT: Yes, sir.

17      MR. BRANTLEY: Is that correct, Mr. McLeod?

18      THE DEFENDANT: Yes, sir.

19          (Off the Record.)

20          (Jury present.)

21      THE COURT: Go ahead, Mr. Valeska.

22      MR. VALESKA: I call Dr. Jonas Salna to the

23  stand.

24              JONAS SALNA

25  having first been duly sworn, was examined and

```
 1          testified as follows:

 2                      DIRECT EXAMINATION

 3   BY MR. VALESKA:

 4   Q    Have you been sworn in, please, sir?

 5   A    Yes, sir.

 6   Q    Tell the jury your name.

 7   A    My name is Dr. Jonas Salna.

 8   Q    What is your profession or occupation, please, sir?

 9   A    I'm an emergency physician, and I work at

10        Southeast Alabama Medical Center.

11   Q    And would you tell the ladies and gentlemen of the

12        jury how long you've been a licensed physician in

13        the state of Alabama, please, sir?

14   A    I have been licensed since April of 1992.

15   Q    And currently still employed at the Medical Center

16        as an emergency room physician today, correct?

17   A    That is correct.

18   Q    Dr. Salna, could you tell me, let's go backwards

19        before coming to be licensed in the state of

20        Alabama particularly in Houston County, where did

21        you practice medicine before that?

22   A    I attended medical school in Guadalajara, Mexico,

23        and then with Ross University.  I received my

24        medical doctor degree in 1985.  From 1985 to 1988

25        I specialized in internal medicine training at the
```

1    University of Health Sciences in North Chicago.

2    And then from 1988 to 1991 I specialized in

3    emergency room training at Charity Hospital in New

4    Orleans, which is a very big trauma facility. And

5    I became board certified in emergency medicine.

6    And then I have recently re-certified in emergency

7    medicine. I hold five state licenses that are

8    full and unrestricted in the state of Illinois,

9    Louisiana, Wisconsin, Florida, and Alabama.

10   Q    Now, if I could, Dr. Salna, if I could, do you

11        belong to any professional societies at this time?

12   A    I belong to the Alabama College of Emergency

13        Physicians and the American College of Emergency

14        Physicians.

15   Q    And if I could, let me take you back to on or

16        about October 6 of 2001 and ask you were you

17        working for the Medical Center at that time?

18   A    Yes, I was.

19   Q    Dr. Salna, could you tell the ladies and

20        gentlemen of the jury, I notice you mentioned

21        Charity Hospital in New Orleans, if I'm not

22        mistaken.

23   A    That's correct.

24   Q    Is that also working down there taking care and

25        seeing children who have been injured, in other

| | | |
|---|---|---|
| 1 | | words, adolescents, I'll just say sixteen or |
| 2 | | eighteen and under? |
| 3 | A | We took care of all trauma victims that came no |
| 4 | | matter what the age, anywhere from infancy to |
| 5 | | elderly. We were the major trauma center, and we |
| 6 | | handled all of the major accidents, stabbings, and |
| 7 | | shootings. |
| 8 | Q | Have you had any training, education in |
| 9 | | relationship to being a medical doctor, and I |
| 10 | | understand the question seems a little silly, but |
| 11 | | in reading or examining or seeing CAT scans or |
| 12 | | X-rays? |
| 13 | A | I have had both formal and informal training, and |
| 14 | | that's what we would call on-the-job experience |
| 15 | | with attending physicians supervising the |
| 16 | | residency and intern staff in looking at X-rays, |
| 17 | | interpreting lab work, examining patients, |
| 18 | | pointing out important features of their medical |
| 19 | | conditions. So I have been in a position where I |
| 20 | | was supervised and then in turn I've also been in |
| 21 | | supervisory positions where I have in fact taught |
| 22 | | residents and interns that were placed under my |
| 23 | | care. |
| 24 | Q | Have you had the opportunity, Dr. Salna, also in |
| 25 | | teaching the instruction to use mechanical |

```
1        equipment; i.e., cameras, to help gather evidence
2        in relationship to sexual trauma of injuries or
3        injuries to any part of the body and request to do
4        by law enforcement or for the patient's own health
5        and protection?
6    A   I have had that instruction during residency
7        training.
8    Q   Can you tell the ladies and gentlemen as an
9        emergency room physician, have you had the
10       opportunity to testify ever before in the trial
11       court of the State of Alabama or in front of a
12       jury anywhere in the United States?
13   A   Yes.  I was an expert in emergency medicine in
14       several sections of the New Orleans court system,
15       mostly for sexual assault cases; and then I've
16       also testified here in Houston County on at least
17       three or four other occasions.
18   Q   And before October 6 of 2001 in New Orleans,
19       Louisiana, did you testify in front of juries and
20       in front of judges and allowed to give your
21       opinion based on your training, education, and
22       experience as to what you had seen on treating
23       human beings or injuries or what caused them to
24       give your opinion as to the medical condition?
25   A   Yes, I have.  I was certified as a medical expert
```

1    in emergency medicine.

2    Q    And testify in the trial courts here in Houston

3         County before today you've testified before and

4         declared to be an expert in your field as

5         emergency room physician as well as treating

6         patients and allowed to give your opinion here in

7         Houston County at the courthouse, correct?

8    A    Yes, I was.

9              MR. VALESKA:  At this time I would ask you to

10        declare Dr. Salna to be an expert as an emergency

11        room physician and to give his opinion as to any

12        type of injuries and causes he saw in relationship

13        to the case of the State of Alabama versus

14        Freeshone McLeod dealing with Jonteria Jones, a

15        six-year-old little girl, that occurred on or

16        about October 6 of 2001 and progressing through

17        her medical history.

18             THE COURT:  Any objection?

19             MR. BRANTLEY:  No objection, Your Honor.

20             THE COURT:  Go ahead.

21             MR. VALESKA:  Thank you very much, Judge

22        Mendheim.

23   Q    Dr. Salna, would you tell the ladies and gentlemen

24        of the jury, the case dealing with Jonteria Jones,

25        a black female, a six year old that was brought

1         to the emergency sometime after two-thirty or

2         three o'clock on or about October 6 of 2001, of

3         all the cases you've had, do you remember that

4         case?

5    A    I do have recollection of this case.  There is --

6         we see a fair amount of trauma victims.  Some

7         trauma victims tend to stand out in your mind,

8         especially when they are younger children.  We

9         don't see as many as adult trauma.  So the ones

10        that we see usually tend to stick with us pretty

11        well.

12   Q    Dr. Salna, could you tell the ladies and gentlemen

13        of the jury, is there an emergency room physician

14        at Southeast Alabama Medical Center, if we use the

15        term trauma staff or treat patients that are

16        coming in and identified whether it's alleged

17        gunshot wound or trauma to the head or heart

18        conditions, do you have a team that prepares prior

19        to them arriving at the Medical Center?

20   A    We have instituted years ago a trauma alert

21        system.  When the paramedics and emergency medical

22        technicians, or EMT's, in the field identify

23        patients with certain types of injuries, a trauma

24        alert is called.  This is usually either a phone

25        call or an alert over our radio system.  And

1    basically happens when we receive the call, they
2    will sometimes have information about the exact
3    nature of the injury, sometimes sketchy
4    information.  But at that point once we receive
5    that a trauma alert is coming in, we mobilize as
6    many services as we can to be available at the
7    time the patient reaches the emergency
8    department.  Our trauma alerts may be anywhere
9    from a minute notice to twenty minute notice.  It
10   just depends on the emergency medical personnel at
11   the scene as to how well they can get us the
12   information.  And the emergency physician, we're
13   always staffed twenty-four hours a day there.  We
14   are all board certified.  So there's always an
15   emergency physician on duty.  The
16   anesthesiologist is called.  The nurse anesthetist
17   is called.  The radiologist is alerted.  CAT
18   scan.  Laboratory.  Blood transfusion.  Nursing
19   staff.  It is very wide-team effort in order to be
20   able to take the trauma patient that we receive
21   and provide initial stabilizing measures, provide
22   necessary diagnostic and therapeutic measures to
23   get their injuries identified, and then afterwards
24   to get them either to an operating room where
25   further life-saving and stabilize measures are

```
 1            instituted or admission to an intensive care unit
 2            or -- this is basically generally the process.
 3     Q      Would you tell the ladies and gentlemen of the
 4            jury, did you in fact see Jonteria Jones, a black
 5            female identified to be six years old, in the
 6            emergency room on October 6 of 2001?
 7     A      Yes, I did.
 8     Q      What was her condition when you saw her?
 9     A      Her condition was critical near death.
10     Q      Describe the injuries you observed in relationship
11            to what you saw physically or as a result of
12            X-rays or CAT scans, the conditions that she had
13            that you observed dealing with her upper body, if
14            I could refer to it that way, please, Dr. Salna.
15     A      Miss Jones was brought in as a trauma alert so we
16            had mobilized all of our resources at that time.
17            Initially it wasn't sure.  It was reported as a
18            possible gunshot wound.  The medics at the scene
19            were not entirely sure.  So if head injury,
20            gunshot wound, blunt trauma, in other words,
21            forceful injury, not a penetrating injury, we'll
22            sort all of that out when it comes to the
23            emergency room.  But we still called the trauma
24            alert.  When she came in, she was intubated.  She
25            had an artificial plastic tube down her throat
```

```
 1              into her lungs doing the breathing for her since
 2              she had apparently had either stopped breathing or
 3              was gasping at the scene, which is what emergency
 4              medical technicians are trained to do.
 5       Q      Let me ask you something.  The injuries you
 6              observed on her skull, would that be consistent
 7              with what you observed and saw that would have
 8              effected her breathing?
 9       A      Yes.  She had swelling and blood towards the back
10              of her head.  It was in -- there are several bony
11              areas.  And the area that I found it was towards
12              the back of the parietal bone, which is the side
13              bone located on the side of the head.  And that
14              area was swollen and bleeding.
15       Q      Did you order X-rays?
16       A      We ordered a CAT scan of her head to be done.
17       Q      Why was it important to do the CAT scan to get an
18              X-ray of the skull when you've got external
19              bleeding, please, Dr. Salna?
20       A      It's important to delineate the nature of the
21              injury.  Again, it still wasn't clear right off
22              the bat initially what exactly had happened to
23              her.  So the CAT scan would give us an idea if she
24              suffered some kind of a blunt injury, hard object
25              hitting her, falling, what have you, or a
```

1    penetrating injury if she had been shot.  So the

2    CAT scan is a method by which an X-ray can do some

3    internal three-dimensional imaging and allow us to

4    determine whether or not there was anything that

5    had penetrated into the skull such as a bullet or

6    bullet fragments, or if in fact some kind of a

7    blunt injury associated with a skull fracture.

8    Sometimes skull fractures if they happen can

9    actually be pushed in towards the brain.  And if

10   there's any kind of injury to the brain tissue

11   itself, because the brain tissue can be bruised

12   severely, a blood clot can form between the skull

13   and the brain which can cause basically a fatal

14   situation.

15   Q    Did the CAT scan tell you if Jonteria Jones --

16        Jonteria, excuse me, could you tell us whether or

17        not she had internal injuries inside the scalp

18        inside the skull itself?

19   A    The radiologist reported that she had what they

20        called a subdural hematoma.  That's just a medical

21        term describing the type of blood clot that occurs

22        on the inside of the brain between the skull and

23        the brain tissue.  There was also a depressed

24        skull fracture that they had noted, and there was

25        just general blood in and around the brain which

1    they called subarachnoid blood that was in and

2    around the brain as well.  And I believe -- but,

3    again the report would have to be in front of me,

4    I believe they also describe that there was

5    contusions to the brain; in other words, a bruise

6    to the brain itself.

7  Q    Could you tell the ladies and gentlemen of the

8    jury, Jonteria Jones' skull itself, being six

9    years old, what would have been the thickness in

10   relationship in your opinion of the actual skull

11   the bones or fractures were observed on her body

12   on the cranial bone?  Give me your opinion.

13 A    The thickness of the bone in that area is anywhere

14   from about a half an inch to three quarters of an

15   inch.  And when I examined her there was swelling

16   around that side, but I thought I had felt that

17   that plate of bone had been depressed on the

18   initial exam.  But, again, that was confirmed

19   later with the CAT scan that showed that there was

20   some displacement some.  The bone had been cracked

21   and pushed in.  If you can just imagine just like

22   taking an egg -- just a normal egg and then it

23   forms the crack and it just kind of caves in, that

24   is basically what it looked like on a CAT scan.

25 Q    As an emergency room physician why is it important

1    to treat the internal injuries to the brain, in

2    other words, from the CAT scan and what it tells

3    you, in relationship to the patient's safety or

4    health?

5    A    The brain is one of your most important organs.

6    It only -- it's comprises about two percent of

7    your total body weight, but, yet, it receives

8    twenty percent of your oxygen supply, and it

9    receives fifteen percent of your entire blood

10    supply.  So here you are talking about an organ

11    that only weighs two percent of your total body

12    weight, but, yet, takes up a fifth of your oxygen

13    and a little bit less than a fifth of your blood

14    supply.  So that's an extremely important organ.

15    Q    Could you determine externally whether Jonteria

16    Jones had any kind of bruises, scrapes, or marks

17    on her face you could see externally on other

18    parts of her body externally is what I'm asking?

19    A    Externally.  She had swelling to the right side of

20    her face over here what we call the right

21    maxillary area.  She -- when I -- she also had

22    bruising of her upper lip on the ride side.  When

23    I examined her mouth, I noticed there was also

24    some bruising on the inside of the gum line.  She

25    also had additional bruising towards her back.  I

1    believe the medical records show it was on the

2    posterior right shoulder, which would be in this

3    area (indicating).  They were what we call linear

4    abrasions, or scrapes, and they were in a vertical

5    orientation, straight up and down versus

6    sideways.  And she had those on the back of her

7    shoulder and on her back.  Those are the ones that

8    I recall immediately.  If I can review the record,

9    there may be other findings that I had that I may

10   be missing on independent recollection.

11   Q   Can you tell us, if I could, what your opinion

12       the injuries that you observed externally, the

13       swelling, the bruising, the contusions to the

14       face, anything about the eyes you remember?  Were

15       they swollen?  Were they darkened?

16   A   To the best of my recollection her eyes were

17       swollen.  Both of them.

18   Q   Now, if I could, let me ask you about the brain

19       itself.  In other words, the motor function, the

20       breathing, the pumping of the heart, muscular

21       movement, walking, talking, thinking.  What part

22       of the body controls all of those things?

23   A   The brain controls all of that.

24   Q   And let me ask you from the brain itself from the

25       brain stem down to the spinal column that runs

1      down to the back part of a human being, nerve

2      endings branch out, tell us about the brain stem,

3      why that's important.

4   A   The brain stem is the major part that controls

5      your breathing.  The heart does receive some input

6      from the brain -- from the brain stem, but

7      ultimately the heart is the only muscle that can

8      survive on its own without having a direct input.

9      For instance, if you take patients who have had

10     cardiac transplants, when they transplant a heart,

11     they cut all of the nerve supply to the heart.

12     But, yet, the heart has it's own internal

13     pacemaker that takes over and allows it to work.

14     The lungs, however, do not have that kind of

15     function.  They still receive input from the brain

16     stem.  And once enough swelling develops on the

17     brain and the downward motion pushes on the brain

18     stem, then that brain stem also becomes bruised.

19     And in turn when a brain stem is bruised and

20     injured, it does not send signals to the

21     diaphragm, which is the muscle that allows us to

22     breath, and then your breathing can stop.

23   Q   Let me ask you, do you have an opinion as a

24     medical doctor and Jonteria's case the injuries

25     she received externally to her skull, based on the

1       CAT scan and X-rays whether her brain stem was

2       injured?

3   A   She had what we call Cushing's reflex.  When she

4       came in, her blood pressure was elevated.  Her

5       heart rate was diminished.  And apparently from

6       what the medic said at the scene she was gasping

7       for breath.

8   Q   Would that be consistent there was an injury to

9       the brain stem in your opinion?

10  A   It would be consistent with a very severe

11      traumatic injury to the brain that would involve

12      the brain stem.

13  Q   Now, can you tell me, is there any kind of scale

14      you use when you assess patients to determine when

15      they first come in as an emergency room doctor as

16      to their condition that you use in relationship to

17      injuries to the head or the brain?  Is there a

18      scale or education that you have in your training

19      and education?

20  A   One of the scales we use is called a Glascow Coma

21      Scale, abbreviated GCS.  This is a number scale

22      that they try to make uniform through all trauma

23      patients that receive head injuries.  And in

24      trying to make that uniformity, they try to make

25      it easier to be able to identify patients that

1    have the potential for a more serious injury.  The

2    Glasgow Coma Scale is divided into three different

3    sections.  It has to do with eye opening, verbal

4    ability for a person to speak, and the ability for

5    a person to move.  A normal scale level of fifteen

6    is a person who is anybody in this room who has no

7    brain injury or no significant head injuries.  A

8    person with a level of three, okay, which is the

9    lowest end of the scale, is a person who has

10   basically vital signs and has no eye opening, has

11   no ability to do anything with their eyes, has no

12   movement, and no breathing.  But for that matter,

13   dead people also can be afforded a Glasgow Coma

14   Scale of three as well.  And when Miss Jones

15   entered the emergency department and when I

16   performed a Glasgow Coma Scale on her, her level

17   was three.  She had no eye opening at all, which

18   gave her a level of one.  She had no speech

19   capacity, which also gave her a level of one.  And

20   she had no spontaneous movement at all.  And in

21   assessing movement, a person who comes in with a

22   head injury, I ask them simple commands, move your

23   arm.  Well, they do.  Okay.  Their level at this

24   point is a six.  If they ask them to move an arm

25   and they can't, then I will go over and I will tap

1    them on the shoulder and say, move your shoulder.

2    Or what I will do is I will squeeze the shoulder.

3    If they withdraw or if they what they say

4    localize, they take their hand and they knock away

5    that stimulus that's irritating them, then that

6    gives them a five, for instance. If I squeeze

7    their shoulder and it hurts and they draw away,

8    then that gives them a level of four. So,

9    finally, when you get down to a level of three and

10   a level of two when you are doing everything that

11   you possibly can, you're squeezing a shoulder,

12   doing everything that you can to try to get them

13   to move, they are afforded a level of one. So

14   when Miss Jones came in, her level was three,

15   which is the lowest scale you can get.

16   Q    The injuries you observed to her face, in your

17        opinion were they fresh injuries?

18   A    Yes, they were.

19   Q    If I could, did you determine internally if she

20        had any injuries to her mouth inside or her teeth?

21   A    What I observed when I lifted up her gum line --

22        when I saw the swelling of her upper lip, I lifted

23        the lip up and I noticed that there was bruising

24        to her tooth above I believe it was position

25        number eight, which an adult would be your upper

```
 1            right frontal incisor.

 2    Q       Let me ask you, if I could.  When she came in in

 3            her condition, what is a catheter?

 4    A       A catheter is just a very soft, rubber, very

 5            flexible tube that we place inside a person's

 6            bladder.  And we do that with intent to monitoring

 7            urine output, which gives us an idea what kidney

 8            function is like.  And also -- to also run urinary

 9            tests on a person if they can't pee for us -- if

10            they can't go to the bathroom or pee or whatever

11            then we will put in a catheter to have a sample.

12    Q       Anything that's done by the nurses prior to

13            inserting a catheter on a child or even an adult

14            in relationship dealing with infection?  What's

15            done?

16    A       Right.  Whenever a catheter is inserted, we

17            usually have a standard Betadine prep.  And if we

18            know the patient doesn't have any allergies, then

19            we take this Betadine and we swab the urinary

20            opening and afterwards use lubricant applied to

21            the catheter and then it is placed.  Once the

22            urinary opening is visualized correctly by nursing

23            staff or physician, then we go ahead and pass the

24            catheter in.  Once it reaches the bladder, usually

25            we will see urine output -- yellow fluid coming
```

1    out, which we know is urine, and then there's a

2    tiny little balloon that's about the size of a

3    teaspoon at the very end, and that is inflated

4    with sterile water and that acts as a catch to

5    allow the catheter to remain in place inside the

6    bladder.

7    Q    Dr. Salna, if I could ask you, you mentioned the

8         injury to Jonteria's tooth, is it your position to

9         be treated adult or children in relationship to

10        whether they had any marks, cuts, or tearing of

11        the skin on their hands before?  Have you done

12        that in your experience?

13   A    Yes, I have.

14   Q    Can you tell me if someone hypothetically uses

15        their hands, the back part of their hands and

16        fingers, and hits someone hypothetically in the

17        mouth, a tooth, with a certain amount of force to

18        have an opinion as to whether that could cause a

19        cut or abrasion or a tear in the skin in the human

20        being's hand?

21   A    Absolutely.

22   Q    And if that -- hypothetically if that occurred,

23        Dr. Salna, can you tell the ladies and gentlemen

24        of the jury and it was not treated immediately or

25        within a short period of time with an antiseptic

1      or germ-killing items, what would occur to the
2      wound hypothetically?  What would you see?
3    A  This is something we call similar to a
4      clinched-fist injury.  We see this typically in a
5      bar-room brawl.  Where someone will clinch their
6      fist and hit someone in the mouth.  The mouth is
7      an extremely dirty environment.  And lots and lots
8      of different kinds of bacteria all throughout the
9      mouth and any -- especially on the hand, finger,
10      any kind of penetrating injury like that with a
11      dirty wound is probably just as dirty as sticking
12      it in the toilet or rubbing it in the dirt.
13      There's fair significant propensity for infection
14      in those cases.  And infection that can occur in a
15      matter of twenty-four hours or less.  We will
16      start to see signs and changes of infection,
17      meaning there will be redness there.  It will be
18      tender.  It will be swollen.  There may be signs
19      of puss forming at the wound site.
20    Q  I want to ask you hypothetically if someone took
21      their hand and struck a child the age of Tera, the
22      tooth that you saw, backhand and hit the mouth and
23      tore or cut the finger, what I want to ask you
24      about, would the skin -- outer skin, epidermis,
25      completely always be torn off or could it still

1    with a certain type blow remain still attached to

2    the finger or skin itself, not a complete three

3    hundred degree circumvential tear off?  Can that

4    occur?

5    A    Yes.  Absolutely.  When you get a tear in your

6    skin, your skin has layers, and you will be able

7    to just tear off the superficial layer, and it

8    will still be attached at one point.  It will be

9    bunched up.  Kind of like if you had a bed and you

10   had your comforter you push your comforter back

11   and it's still attached and you have got your

12   blanket or sheets up underneath.  And the skin is

13   layered and it also has ability to separate

14   between the layers.

15   Q    Now, have you ever looked at an injury

16   hypothetically and determined whether or not it's

17   what I will refer to as a fresh injury in relation

18   to my hypothetical or whether it's old -- six or

19   seven days old?  Can you make that determination

20   as a doctor if it goes untreated?

21   A    If it's infected and it goes untreated, then

22   you're going to see a fair amount of infection,

23   inflammation, again, redness, tender, swollen,

24   draining puss.  And those signs should start to

25   appear within a matter of twenty-four hours or

1    less if left untreated.  If there was a

2    significant amount of bacteria that got into a

3    wound like that.  Other people who have those kind

4    of wounds if they are washed and cleansed

5    immediately, a lot of that can be averted.  The

6    longer you leave an infected wound unattended, the

7    greater amount of infection that can be present.

8  Q   Now, could you tell me, in other words, you got

9    the CAT scan and X-rays how many fractures, if

10   any, Jonteria Jones had of her skull?

11 A   The CAT scan to the best of my recollection

12   recorded two fractures.  One was in the -- the

13   front part of your skull is bordered the frontal

14   bones and the very middle part of your skull is

15   what we call the parietal bone.  The side here is

16   called the temporal bone.  And the very back is

17   called the occipital bone.  She had two fractures.

18   One was at the back part of the frontal bone,

19   which would be right about where my finger is at

20   (indicating); and the other fracture was described

21   by the radiologist as depressed, and it was in the

22   back part of the parietal bone, which would be

23   right about here (indicating).  So she had one

24   fracture here and then a slightly depressed

25   fracture where my finger is pointing now

1    (indicating).

2    Q    Can you tell the ladies and gentlemen of the jury,

3        do you have an opinion whether what you saw of

4        Jonteria Jones if she would have fallen herself as

5        a little girl ordinary playing would have caused

6        those fractures in your opinion?

7    A    Absolutely not.

8    Q    What type of force of trauma in your opinion in

9        relation to position would it have taken to have

10        cause the injuries you observed externally on her

11        as well as CAT scan X-ray in your opinion on

12        Jonteria Jones?

13    A    She suffered extremely significant force and

14        trauma.  In my opinion someone was trying to beat

15        her to death.  And if that wasn't the case, then I

16        see this kind of trauma in high-speed motor

17        vehicle wrecks.

18    Q    Now, if I could, let me show you some pictures.

19        Before I do that, did you determine, in other

20        words, working with the other doctors whether or

21        not she had sustained or there were other injuries

22        internally in relationship to Jonteria Jones

23        excluding her head?  Below her neck line?

24    A    Other than the abrasions that were noted, I would

25        have to review exactly.  But there were not any

1    obvious external signs of injury to her chest or

2    her belly that we could see.  There were

3    abrasions, scratches, if you will, that were to

4    her back side.  And later it was brought to my

5    attention that she may have been sexually

6    assaulted.  And when I performed a sexual assault

7    examination on her, I noticed that there was

8    bruising in and around her vaginal area.

9  Q   Did you make any writings or markings or diagrams

10    of those injuries yourself?

11  A   Yes, I did.

12  Q   Could you tell the ladies and gentlemen of the

13    jury, you mentioned she had marks on her back,

14    linear marks?

15  A   Yes.

16  Q   And that opinion -- would it be consistent in your

17    opinion that -- I'll ask you hypothetically.  If

18    those marks hypothetically could have been caused

19    as you observed the position if she had been

20    dragged across a hard area, dirt, rocks, or

21    sticks, or roots in any manner or fashion, or a

22    piece of plywood or down -- off a piece of

23    concrete?

24  A   Absolutely.

25  Q   Now, I ask you the amount of force on her skull.

1    I guess what I'm trying to ask you is, if I took

2    my fist, hypothetically, and swung in this manner

3    or fashion like that on that table (indicating),

4    would that have caused the injuries on her skull

5    in your opinion?

6  A  Not to a child of that age, no, sir.

7  Q  Now, if I could, the blunt-force trauma that you

8    saw, let me show you what's been marked --

9            (State's Exhibit No. 6 was marked for

10              identification.)

11    MR. VALESKA:  It's sealed.  I would like to

12    open it up with your permission.

13    THE COURT:  Go ahead.

14    MR. VALESKA:  I'm going to keep it 6, Judge

15    Mendheim, if I could.  Do you want to come up and

16    look?  I've taken some items out.  I'm going to

17    keep it State's 6 for identification purposes.

18  Q  I ask you to take a look at it.  State's 6 for

19    identification purposes, if you can tell me as a

20    doctor or a layman or human being, what is it, if

21    you know?

22  A  Looks like a wok.

23  Q  Now, looking at -- you held it up.  Do you see any

24    indentions or markings on the wok itself?  I refer

25    to it indentions that you see with your own eyes

1        after taking off the handle or clasp or spikes.

2    A   Quite clearly.

3    Q   Do you have an opinion hypothetically in your

4        opinion using the wok and the size of the

5        indention if that had been consistent with the

6        marks on Jonteria Jones skull, if that would have

7        been consistent with that type of item being used

8        to apply blunt force would have fractured her

9        skull?

10   A   I'm very convinced that this is something that

11       could fracture anybody's skull with this much

12       force.

13   Q   I want you to look at the handles if I could.  The

14       one has a handle on it and one is missing.  You're

15       holding some parts.  Refer to the very tips and

16       the holes and see their depth and width size is

17       what I'm asking about.  Do you have an opinion if

18       a human being was struck with either handle

19       whether the handles were on them or a handle was

20       broken whether they would cause any type of marks

21       on a human being's face with their exact dimension

22       or size if they struck if I could refer to the

23       term equally and across a flat plane area on a

24       face?

25   A   Yeah.  If you took this and you strike any kind of

1         soft tissue, these would definitely leave

2         indentations with even probably just a small

3         amount of force would probably be enough to leave

4         indentations in tissue.

5    Q    Hypothetically, if that were used to strike a

6         human being's face, and I'm referring to a child

7         approximately six years old in the size and weight

8         of Jonteria, struck sideways or hit on an angle

9         whether they would make a mark in relationship to

10        the width -- I know it's curved -- but the handles

11        or force was applied to human tissue or cheeks,

12        would it make an indentation or a contusion or

13        mark in your opinion?

14    A    Yes, it would.

15    Q    Now, if I could, Dr. Salna, you indicated that you

16        did an internal exam or did an evaluation whether

17        she had been allegedly sexually assaulted.  Why

18        didn't you do that right then the minute when she

19        was brought in what I want to ask you?  In other

20        words, do a rape kit and take the swabs and go

21        internally in her vagina and do pubic combings and

22        do a traditional rape kit that you've done?  Why

23        didn't you do that right then?

24    A    Well, she had such severe brain injury that she

25        needed to go to the operating room right away to

1    have the blot clot removed and the pressure taken

2    off of her brain.  And at the extent of her

3    injury, we just didn't have any time.  I wasn't

4    notified until later that she had been sexually

5    assaulted, which is why I went back up to the

6    intensive care unit with a nursing staff to

7    perform her exam.  But even if somebody had told

8    me right off the bat that this child had been

9    sexually assaulted, during the process of doing

10   her resuscitation she was still in the emergency

11   department for probably anywhere from thirty

12   minutes to an hour, I may have taken a quick look;

13   but there's no way I would have taken the time to

14   do any kind of sexual assault exam at her initial

15   presentation just because of the severity of her

16   head injury.  Because any more time than necessary

17   in the emergency room I'm afraid it probably would

18   have led to her death.

19   Q    Can you tell the ladies and gentlemen of the jury,

20        Betadine in your opinion as a doctor, would it

21        effect in relationship whether semen or

22        spermatozoa if it was on the labium or barely

23        inside the labium, not complete depth in the

24        vaginal canal, would that have effected it in any

25        way in your opinion?

1    A    Betadine is what we call a bactericidal.  It

2         basically kills bacteria cells.  The most it may

3         have done is perhaps killed a sperm cell, but it

4         would not eliminate the chemical nature of the

5         sperm cell.  To the best of my recollection, I

6         don't believe that Betadine would have altered any

7         exams.

8    Q    When you did the internal examination and observed

9         Jonteria Jones vaginally, did you see any fluid

10        yourself that you observed with your own eyes that

11        you recall?

12   A    The only fluid that I saw was just a small amount

13        of blood that was inside the vaginal vault, which

14        I was able to determine by placing a small Q-tip

15        there.  But I did not see any obvious signs of any

16        other additional body fluids on the outside.

17   Q    Help me a little bit if you could.  You found

18        blood internally in her vagina.  Would that be

19        normal in relationship to a six year old?

20   A    There's no reason that a six year old would have

21        blood inside her vagina unless she had a medical

22        condition called precocious puberty, in which she

23        was ovulating and menstruating normally, in which

24        case she would have much more sexual development.

25        And that's in an abnormal condition.  So no normal

1    condition would allow her to have blood in her
2    vaginal vault inside the vagina.
3  Q  Let me ask you if any skull fractures of her
4    head, the injury she had, would that cause the
5    bleeding in the vaginal area in any way?
6  A  Not in my opinion, no.
7  Q  Now, if I could, when you did the internal
8    examination, in other words, looking for any type
9    of evidence for sexual assault, was a rape kit
10   done by you or in your presence by one of the
11   nurses?
12 A  Yes, it was.
13 Q  Did you-all follow the ordinarily protocol and
14   collect evidence?
15 A  To the best of my recollection, yes.
16 Q  Did you do it yourself, or did the nurse do it?
17   Or both?
18 A  It's -- we both do it.  I initially -- when I
19   examined her, I normally look for evidence of any
20   kind of injury to the vaginal area.  And in her I
21   found that there was bruising on both sides of her
22   vaginal opening.  Small bruise right above her
23   anus.  There was some blood inside her vaginal
24   vault.  I believe the hymen also appeared to be
25   injured.  And there was also some injury -- I

1    believe some bruising to the top of the vaginal

2    area.

3    Q    Let me ask you.  Help me a little bit if I could.

4         The labium, is that the outer folds that protects

5         the vagina?

6    A    Right.

7    Q    Would it be normal to find a six-year-old little

8         girl that would have fallen off, gee, a porch or

9         bicycle that would have sustained those kind of

10        injuries you observed on Jonteria Jones in your

11        opinion?

12             MR. BRANTLEY:  Object to the form of the word

13        normal.

14   Q    Did she exhibit -- well, let me ask you this.  Do

15        you have an opinion the injury that you observed

16        on Jonteria Jones would have been consistent with

17        falling off a bicycle in your opinion?

18   A    I have seen other individual cases of little girls

19        that have actually fallen and straddled a bicycle

20        rim, and her injuries were usually what we call

21        unilateral -- one side or the other, but not on

22        other sides as this.  I would not expect this to

23        be from a straddle injury.

24   Q    Can you tell the ladies and gentlemen of the

25        jury, in your opinion was there any type of

```
 1        penetration, the slightest, that you observed
 2        medically doing the exam as well as the pictures
 3        that were taken inside the labium that show there
 4        was some blunt-force trauma in your opinion
 5        introduced into her vagina?
 6   A    The hymen appeared to be injured and bruised.  So
 7        that would point out to me that there was some
 8        kind of penetration that was attempted.
 9   Q    Now, Dr. Salna, help me a little bit if I can.  I
10        don't mean to be graphic or gross.  But when we
11        refer to the vagina canal of a normal adult
12        female, if I could use eighteen years of age and
13        older, of the hymen that is not intact, did you
14        observe any deep penetration, injuries, in the
15        vaginal vault of the canal itself of Miss Jones?
16   A    Not deep inside the vault.  All I did -- all I
17        could do because the hymen even though it was
18        bruised, it had not been completely ripped open,
19        but it was bruised enough, and I did not see at
20        least in the lower part of the vaginal -- or
21        vaginal canal; in other words, not the opening to
22        the vagina but actually now passing beyond the
23        opening and inside the actual vagina canal, did
24        not see anything that was up high.  Did not do a
25        speculum exam on her; but, again, I placed a Q-tip
```

```
 1              in the entrance of the vagina vault, and there was

 2              blood on the Q-tip.

 3      Q       The bruising or the abrasions as to the hymenal

 4              ring, the bruising on the other side that you

 5              indicated, bruising to the urinary --

 6      A       Meatus.  That's the opening to the urinary tract.

 7      Q       Were those all fresh in your opinion?

 8      A       Yes, they were.

 9      Q       Now, if I could, the superficial abrasion to the

10              -- above the anus, is that fresh also?

11      A       Yes, sir.

12      Q       Now, if I could, at the time the exam was done,

13              you were present, pictures were made, correct?

14      A       Yes, they were.

15      Q       You observed those pictures being made, in fact,

16              holding the light or helping with your hands?

17      A       Yes, I was.

18      Q       Could you tell the ladies and gentlemen of the

19              jury, the condition she was in, Miss Jones, was

20              she resisting in any manner or fashion in this

21              examination?

22      A       No.  Miss Jones was in a complete coma.  She had

23              just come out of an operation.  She was in a

24              complete coma, on life support, and there was

25              absolutely no movement on her part.  She did not
```

1        move at all.

2                (State's Exhibit No. 7 was marked for

3                identification.)

4  Q  Show you State's Exhibit 7.  Do you recognize

5      what 7 is?

6  A  It's a State of Alabama sexual assault evidence

7      collection kit.

8  Q  Any writings or markings you placed that you can

9      use to refresh your memory that was done in your

10     presence or one of the nurse's at the Medical

11     Center on Jonteria Jones?

12  A  Yes, there were.  It has the patient's name,

13     hospital, the date of examination.  It has the

14     patient's medical record number, her sex, her

15     age.  It has my signature on it.

16  Q  Do you know her date of birth?

17  A  I would have to review the record unless it's on

18     the box here.

19  Q  And, once again, it's sealed at this time,

20     correct, that you see?  It's completely sealed?

21  A  Yes, it is.

22  Q  Red tape.  What I want to ask you, if you actually

23     did part of the examination, would you yourself

24     have made any writings and markings on the

25     envelopes or the swabs, or would your nurse have

1      done that?

2   A   Unusually the nurse will make a marking on the

3      actual envelopes and the swab boxes.  In terms of

4      any diagrams that come with the kit that are also

5      placed with the kit, I would personally fill out

6      those diagrams and signed on them myself.

7   Q   Now, if I could ask you, a large right subdural

8      hematoma she had, bilatral subdural hematoma, a

9      bifrontal contusion to the right and left, and

10     severe or I use the determine subdural edema, and

11     the brain stem was depressed, and she was in a

12     coma, correct?

13  A   That's correct.

14  Q   Fracture of the temporal, correct?

15  A   She had -- well, there were two initial fractures

16     that I noted.  After surgery they may have done

17     additional scans and they may have actually seen

18     other fractures.

19  Q   That's what I'm asking.

20        Now, let me ask you, if I could.  The right

21     occipital depressed fracture, where would that

22     have been?

23  A   A right occipital, which would have been the back

24     of the head, on the right side.

25  Q   Partial and temporal, what does that mean?  The

1      side?

2   A   The temporal bone would be right here, and then a

3      parietal bone would be up a little higher

4      (indicating).

5   Q   And how would her scalp have reacted in

6      relationship not to the initial injuries she

7      received but after the surgery?  What would have

8      happened to her skull or scalp then in your

9      opinion?

10  A   When I saw her in the intensive care unit, even

11     though she had a bandage around her head, it

12     looked to me like her head had swollen up twice

13     its normal size.

14  Q   What would have caused that?

15  A   The injury.  Mostly in my opinion they give

16     certain amounts of fluid during surgery, so

17     there's some fluid accumulation there.  But just

18     the fact that the tissue has been injured and

19     disrupted and it no longer has its normal

20     function, fluid will tend to leak in that area.

21     And as I said earlier, her head looked twice its

22     normal size.

23  Q   I want to show you some pictures.

24              (State's Exhibits No. 8 through 23 were

25              marked for identification.)

204

1    Q    Let me show you State's Exhibit 22 for

2         identification purposes.  Can you tell me what 22

3         is?

4              THE COURT:  Have you seen these, Mr.

5         Brantley?

6              MR. BRANTLEY:  I've seen them.  Let me kind

7         of look at them since there's exhibit numbers on

8         them.

9              THE COURT:  Just look over his shoulder.

10   Q    I'm just going to stand away from you.  He can

11        look at them.  Tell me what you're looking at.

12   A    State's Exhibit 22.  This is a picture of Miss

13        Jones after her operation on life support.  There

14        is bruising to the side of her face, and she has a

15        swollen shut eye.  And there's also several

16        linear, in other words, straight-line markings

17        also on the side of her face.

18   Q    Can you tell the ladies and gentlemen of the jury

19        looking at in reference to my wok, State's Exhibit

20        6 as I recall, the wok itself, looking at the

21        pictures and injuries you saw yourself on her,

22        would it be consistent in your opinion for any

23        marks or injuries you see that could have been

24        caused by the wok in your opinion?

25   A    Yeah.  These edges right here (indicating) could

1    definitely cause a linear markings that I see on

2    this picture.

3  Q    And that's what number?

4  A    This is State's Exhibit No. 22.

5  Q    State's 22, does it appear to be marked, altered,

6    or changed in any way except what you saw on her

7    body itself?  This is the way she looked?

8  A    This is the way she looked, that's correct.

9  Q    Same substantial condition?

10  A    Exactly.

11       MR. VALESKA:  Offer 22.

12       MR. BRANTLEY:  22, the photograph?

13       THE WITNESS:  Here it is.

14       MR. BRANTLEY:  No objection.

15          That's taken the night that she --

16       THE WITNESS:  This is taken post operatively.

17  In other words, after her life-saving operation.

18  She was in the intensive care unit.

19       MR. BRANTLEY:  How long after she came in was

20  this taken?

21       THE WITNESS:  I don't know the answer to --

22       MR. BRANTLEY:  A week later?

23       THE WITNESS:  No.  No.  It was the same day.

24       MR. BRANTLEY:  Same day.  Okay.

25       THE COURT:  Any objection?

```
 1              MR. BRANTLEY:  No.

 2              THE COURT:  22 is admitted.

 3                   (State's Exhibit No. 22 was admitted

 4                   into evidence.)

 5    Q    Flip over.  21 is in front of you.  What is 21,

 6         Dr. Salna?

 7    A    Yes, sir.

 8    Q    What is it?

 9    A    State's Exhibit 21 also shows a little different

10         angle of the bruising.  It's not quite as clear as

11         State's Exhibit 22, but also shows the abrasions.

12         In this view I cannot identify the linear marks.

13         But, again, it may be due to the angle.

14    Q    Can you see the color or the width in State's 21?

15    A    Yes.  I'm sorry.  In State's 21?

16    Q    Yes, sir.  That side.  Can you see the angle or

17         the size or the color of the wound in your opinion

18         on 21?

19    A    Not clearly, no, sir.

20    Q    Put that one down and go to the next, please.

21    A    (Witness complied.)

22              Okay.

23    Q    Give me the number.

24    A    We have State's Exhibit No. 23.

25    Q    Tell me what 23 is.
```

```
 1   A    23, this is a picture of her vaginal opening.  It
 2        is being separated by I believe my hand and --
 3        either my hands or my hand and a nursing hand.
 4        And it shows a Foley catheter, the flexible rubber
 5        tube I talked about earlier inside of her bladder
 6        to collect her urine.  It also shows some redness
 7        on the right side of the vaginal opening.
 8   Q    Is that fresh?
 9   A    In my opinion, yes.
10   Q    Is that inside the labium?
11   A    That is correct.
12   Q    Appear to be marked, altered, or changed in any
13        way from the time you observed it?  Is that how it
14        looked?
15   A    This is how it looked when I examined her.
16   Q    Same substantial condition?
17   A    Same condition.
18   Q    And those pictures were made and examined by you,
19        in other words, after she came out of brain
20        surgery; is that fair to say?
21   A    That is correct.
22             MR. VALESKA:  Offer State's 23.
23             THE COURT:  Any objection to 23?
24             MR. BRANTLEY:  No, sir.
25             THE COURT:  23 is admitted.
```

```
 1                    (State's Exhibit No. 23 was admitted

 2                    into evidence.)

 3    Q    Go to the next one.

 4    A    I have in my hand State's Exhibit No. 20.

 5    Q    What is 20?

 6    A    20 is again an assisted photograph taken of the

 7         top part of the patient's anal opening, which

 8         shows a bruise, which in my opinion is fresh.

 9    Q    You observed that yourself?

10    A    Yes, I did.

11    Q    And has it been marked, altered, or changed in

12         any way from the time the picture was made and you

13         actually observed it on Jonteria Jones; correct?

14    A    This is exactly how I observed it.

15              MR. VALESKA:  Offer State's 20 into evidence.

16              THE COURT:  Any objection?

17              MR. BRANTLEY:  All of these are subject to

18         cross examination, Your Honor.

19              THE COURT:  Any objection?

20              MR. BRANTLEY:  No.

21              THE COURT:  20 is admitted.

22                    (State's Exhibit No. 20 was admitted

23                    into evidence.)

24    Q    If you flip over, there's another picture.  The

25         number?
```

| | | |
|---|---|---|
| 1 | A | This is State's Exhibit No. 17. |
| 2 | Q | Tell me what 17 is. |
| 3 | A | Again, an assisted picture. Again, the Foley |
| 4 | | catheter in the urinary. It shows some bruising |
| 5 | | on this time the left side of the vaginal opening. |
| 6 | Q | Fresh? |
| 7 | A | In my opinion, yes. |
| 8 | Q | Inside the labium? |
| 9 | A | Yes. |
| 10 | Q | Help me, if you could. State's Exhibit 17, the |
| 11 | | injuries it shows on the left side, the bruising |
| 12 | | and the vaginal area, help me, if you can, in |
| 13 | | layman's terms, what is the depth in your opinion |
| 14 | | from the outer portion of the labia on Jonteria |
| 15 | | Jones and if her legs are together, okay, the |
| 16 | | labium covering the vagina, what is the depth in |
| 17 | | centimeters from the entrance to those injuries |
| 18 | | from the outer part of the labium? There's got to |
| 19 | | be some depth; is there not? It's not -- the |
| 20 | | picture, State's 17, the bruising that you saw, |
| 21 | | with the vaginal area opened up is what I'm |
| 22 | | asking, is that outside or inside the labium? |
| 23 | A | The bruising is on the inside of the labia. |
| 24 | Q | Can you tell me, if you can, the depth, in other |
| 25 | | words, if you can, I don't want to use inches, but |

1    in centimeters or the outer -- if she's sitting
2    down and her legs positioned with the labia is in
3    a normal position covering the vagina for
4    protection, that's the purpose it was made for, is
5    there any depth from the outer part of the labium
6    to those injuries in your opinion going inward?
7    From outward to inward.
8  A  You mean outside to inside?
9  Q  Yes, sir?  Some depth?
10  A  Centimeter -- two centimeters.
11  Q  17, does it show any other injuries, fresh
12    injuries?
13  A  The clearest injury is seen on the left side of
14    the labia.
15  Q  And is that Jonteria Jones?
16  A  It's identified as Jonteria Jones.
17  Q  She was six years old, correct?
18  A  That is correct.
19        MR. VALESKA:  Offer State's 17.
20        MR. BRANTLEY:  No objection.
21        THE COURT:  17 is admitted into evidence.
22            (State's Exhibit No. 17 was admitted
23            into evidence.)
24  A  We have State's Exhibit 18.
25  Q  Yes, sir.  Tell me what 18 is.

1    A    Again, this is another picture of the vaginal

2         opening.  Again, assisted examination which shows

3         bruising to the right side of the vaginal opening.

4         And then this one shows some bruising to the

5         hymen.  Looking at a clock directly on the wall,

6         that would be right at the two o'clock position.

7    Q    And the injuries on the right side to the vaginal

8         area in your opinion, are they once again inside

9         the labium, what I refer to in my example?

10   A    Yes, they are.

11   Q    Are they fresh?

12   A    In my opinion, yes.

13   Q    Do you have an opinion as whether it is consistent

14        to some type of blunt-force trauma would cause

15        that?

16   A    Yes, it is.

17   Q    Would it be consistent in your opinion

18        hypothetically this would have been caused

19        allegedly by a penis?

20   A    Yes.

21   Q    Now, the hymen, the injury you observed, I

22        understand it's not real good but the position of

23        the injuries or the tears or bruising, which is

24        it, at the two o'clock level?

25   A    It's bruising and some swelling at the two o'clock

1    level.

2    Q    And swelling, was that fresh in your opinion?

3    A    In my opinion, yes.

4    Q    Once again, the picture truly and accurately

5         depict the injuries, the bruising, as well as the

6         swelling that you observed on the right side on

7         the vaginal area of Jonteria Jones in your opinion

8         on or about October 6, 2001?

9    A    Yes, they are.

10             MR. VALESKA:  Offer 18.

11             MR. BRANTLEY:  No objection.

12             THE COURT:  18 is admitted.

13                 (State's Exhibit No. 18 was admitted

14                 into evidence.)

15   A    We have State's Exhibit 16.

16   Q    Tell us what 16 is.

17   A    This is a picture of Miss Jones, and she's being

18        placed on her left side in what we call the fetal

19        position curled up on her left side.  And it shows

20        pretty much her lower back and her buttock on the

21        right side.

22   Q    Any injuries or marks you observed on 16?

23   A    Very faintly I can see some abrasions, some linear

24        up and down scratches on her lower back.

25   Q    Flip over.  I believe -- what's the other one on

1          the other side?

2      A   This is State's Exhibit No. 15.

3      Q   Does it give a better view, or is it of a

4          different position than the abrasions on the lower

5          back on 16?

6      A   No.  The abrasions are a little bit better seen on

7          16.

8      Q   16, those the injuries, the fresh injuries you

9          observed on Jonteria Jones?

10     A   Yes.

11     Q   They appear to be marked, altered, or changed in

12         any way?

13     A   No.

14     Q   Same substantial condition?

15     A   Yes, sir.

16             MR. VALESKA:  Offer 16.

17             MR. BRANTLEY:  No objection.

18             THE COURT:  16 is admitted.

19                 (State's Exhibit No. 16 was admitted

20                 into evidence.)

21             MR. VALESKA:  Withdraw 15.

22                 (State's Exhibit No. 15 was withdrawn by

23                 the State.)

24     Q   What's the next number?

25     A   This is State's Exhibit 14.

```
1    Q    What's 14?
2    A    This is a picture of Jonteria Jones that is
3         similar to State's Exhibit No. 22.
4    Q    Does it show any injuries or markings on 14?
5    A    Yes.  It shows the same.  I believe this to be
6         virtually the same picture as State's Exhibit 22.
7              MR. VALESKA:  Withdraw 14.
8                   (State's Exhibit No. 14 was withdrawn by
9                   the State.)
10   Q    Another exhibit in front of you?
11   A    This has not been marked.
12              We have State's Exhibit 13.
13   Q    Tell me what 13 is.
14   A    13, again, is a picture of Miss Jones on life
15        support showing the right side of her face.  Over
16        here just in front of the ear shows some bruising
17        and swelling.
18   Q    Does it truly and accurately depict her size in
19        relationship to -- her physical size of her body
20        in relationship to the picture, her physical body
21        is what I'm talking about, her size and her weight
22        which is depicted in the picture plus the injuries
23        that you observed?
24   A    I'm sorry?
25   Q    Does it truly and accurately depict --
```

```
1   A   Yes.

2   Q   What the picture shows of the physical stature,

3       her size is what I'm asking about it?

4   A   Yes, it does.

5   Q   The angle of the picture, in other words, her arm,

6       body size, her chest, her head, her neck in

7       relationship to being six years old?

8   A   Yes, it does.

9   Q   Does it show the injuries you're talking about?

10  A   Again, it shows the swelling to the right side of

11      the face, the closed eye; but no other significant

12      injuries.

13  Q   Any bruising on the lips you can tell?

14  A   There is swelling to the right upper lip.

15  Q   Do you have an opinion what would be consistent

16      hypothetically of causing the swelling or the

17      markings on the lips internally or externally?

18  A   Any type of blunt force.

19  Q   Would it be consistent with a hand, a punch, a

20      backhand?

21  A   Absolutely.

22  Q   Also consistent with the wok itself, in other

23      words, if force was applied, less force was

24      applied to the skull?

25  A   Yes, it would.
```

1    Q    State's 13, has it been marked, altered, or

2         changed in any way that you observed in her

3         condition?

4    A    No, it has not.

5    Q    Same substantial condition you observed it?

6    A    Yes, it is.

7              MR. VALESKA:   Offer 13.

8              MR. BRANTLEY:   No objection.

9              THE COURT:   13 is admitted.

10                  (State's Exhibit No. 13 was admitted

11                   into evidence.)

12   Q    Next number?

13   A    This is State's Exhibit No. 12.

14   Q    What is 12?

15   A    This is a picture of Miss Jones basically showing

16        her overall condition after her operation on life

17        support.  She has electrical wires monitoring her

18        heart.  She has a tube that is placed appears to

19        be in her left nostril down into her stomach.

20        This is what we call a nasal gastric tube.  There

21        is also a drain.  After surgery there may be some

22        residual bleeding, and a drain is placed in order

23        to evacuate, or suck out, any residual blood that

24        may be left after the site of surgery.  She is

25        placed in the bed at least from thirty to

CR 02-1610

**DOCUMENT NAME:** McLeod, Freeshone Cornelius

**CLIENT & MATTER:** 54599-001

Part 4 of 9

**DESCRIPTION:**

County: Houston

CC#s: 2002-235 - 235 + 236

Attorney: Beth Poe

Circle: (TRANSCRIPT)    CASE FILE    BOTH         5 vol.

MMV

## CERTIFICATION

I hereby certify that the preceding imaged records and documents

are a true, accurate, and complete image of the original records or

documents as received by the Office of the Attorney General of

the State of Alabama.

This the 21st day of September, 200 4.

Signed: _Melisa A. Martin_

Notary: _Coleen F Gibson_

Coleen F. Gibson
Notary Public
Commission expires 06/11/06