COURT OF CRIMINAL APPEALS NO. _____

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

CIRCUIT COURT OF ___HOUSTON___ COUNTY, ALABAMA

CIRCUIT COURT NO. ___CC-2002-235 & 236    Volume III___

CIRCUIT JUDGE ___Brad Mendheim___

Type of Conviction / Order Appealed From: ___Rape 1 and Attempted Murder___

Sentence Imposed: ___99 Years $20,000.00 Fine, $5,000.00 Victime Compensation.___

Defendant Indigent: [X] YES  [ ] NO  99 years, $20,000.00 Fine $5,000.00 Victim Comp

___Freeshone Cornelius McLeod___

___Hon. Clark Parker   PAR 069___      ___793-9009___      NAME OF APPELLANT
(Appellant's Attorney)                              (Telephone No.)
___401 N. Foster St.___
(Address)
___Dothan___      ___Alabama___   ___36303___
(City)          (State)        (Zip Code)

### V.

# STATE OF ALABAMA

(State represented by Attorney General)                    NAME OF APPELLEE
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

**(For Court of Criminal Appeals Use Only)**

Part 6 of 9

```
 1            did your momma tell you what to say.  Do you
 2            remember him asking you that?
 3      A     (Witness nodded.)
 4      Q     Did she tell you everything to say, or did
 5            somebody really do something to you?
 6                  MR. BRANTLEY:  Again, object.
 7                  THE COURT:  Overruled.  Go ahead.
 8      Q     Who did something to you?
 9      A     Freeshone.
10      Q     And are you sure?
11      A     (Witness nodded.)
12      Q     So Mr. Brantley said your momma got you to say
13            that, did she tell you to say that, or did he do
14            it to you?
15      A     He did.
16                  MR. VALESKA:  That's all.
17                  THE COURT:  Any other questions, Mr.
18            Brantley?
19                  FURTHER RECROSS EXAMINATION
20      BY MR. BRANTLEY:
21      Q     Are you telling us you remember being hit in the
22            head with a frying pan?
23      A     (Witness nodded.)
24      Q     You remember it a little bit or a lot?
25      A     A lot.
```

```
 1    Q    Where were you when -- where were you when you got
 2         hit?  Outside or inside?
 3    A    Inside.
 4    Q    Where?
 5    A    With a frying pan.
 6    Q    But where were you inside?  Whose house?
 7    A    My momma's house.
 8    Q    Is that Tunt's house?
 9    A    (Witness nodded.)
10    Q    What room were you in?
11    A    Her room.
12    Q    What did you say?
13    A    He said, Tera, did you want to go with me.
14    Q    What room were you in --
15    A    My momma's room.
16    Q    Is that the bedroom?
17    A    (Witness nodded.)
18    Q    And he hit you --
19    A    With a frying pan.
20    Q    With a frying pan.  Okay.
21            Where did he get the frying pan?
22    A    He got it out of that cabinet.
23    Q    And how many times did he hit you?
24    A    One time.
25    Q    Just one time.
```

```
 1              And then you -- after that you went down --
 2         you walked outside and told your -- Mary Lizzie?
 3     A    (Witness nodded.)
 4     Q    And have you talked about this case about the
 5         frying pan and how many times you got hit with
 6         your momma?
 7     A    (Witness nodded.)
 8     Q    And your momma told you you got hit with a frying
 9         pan, didn't she?
10     A    (Witness nodded.)
11     Q    Would you say -- does this (indicating) mean yes?
12     A    Yes, sir.
13              MR. BRANTLEY:  That's all.
14              FURTHER REDIRECT EXAMINATION
15     BY MR. VALESKA:
16     Q    Jonteria, can you tell the jury when Freeshone hit
17         you with the frying pan, what did it sound like?
18         What did you feel or what did it sound like?
19         Either one?
20     A    It did, like, boing.
21              MR. VALESKA:  That's all.
22              FURTHER RECROSS EXAMINATION
23     BY MR. BRANTLEY:
24     Q    Did your momma tell you she saw it?
25     A    (Witness nodded.)
```

1    Q    Your momma saw everything that happened, didn't

2         she?

3    A    (Witness nodded.)

4    Q    Is that yes?

5    A    Yes, sir.

6             MR. BRANTLEY:  All right.  That's all.

7             MR. VALESKA:  No more questions.  Ask if she

8         could step down.

9             THE COURT:  That's it, Jonteria.  Be careful.

10            MR. VALESKA:  Call Dr. Head -- Dr. Robert

11        Head.

12                        ROBERT HEAD

13        having first been duly sworn, was examined and

14        testified as follows:

15                     DIRECT EXAMINATION

16   BY MR. VALESKA:

17   Q    Tell us your, name, please, sir.

18   A    Dr. Robert Head.

19   Q    What is your profession or occupation, please,

20        sir?

21   A    I'm a board certified pediatrician.

22   Q    Where did you get your undergraduate training as

23        well as your medical training?  Tell us, Dr. Head.

24   A    Undergraduate, University of Mississippi;

25        residency training, University of Alabama in

```
 1           Children's Hospital.
 2    Q      How many years was that?
 3    A      Three years.
 4    Q      Now, if I could, didn't you become -- at that time
 5           licensed in the State of Alabama, correct?
 6    A      That's correct.
 7    Q      And then you came to Houston County when?
 8    A      1976.
 9    Q      And did you open a practice then?
10    A      Yes, I did.
11    Q      The name of your practice or business then?
12    A      Southeastern Pediatrics.
13    Q      Still in practice today in Southeastern
14           Pediatrics?
15    A      Yes, I am.
16    Q      Dr. Head, have you had the opportunity before to
17           examine patients, females, in relationship to
18           whether they have been sexually assaulted before?
19    A      Yes, sir.
20    Q      Have you had training and education in medical
21           school as well as during your residency as well as
22           seeing young female patients -- I'll say sixteen
23           years and under -- evaluating and examining them
24           to see if they had any injuries in relationship to
25           possible or alleged or sexual assaults over the
```

1          vaginal or anal area?

2     A    Yes.

3     Q    Many times you have examined those type patients?

4     A    Examined a lot of kids.  Unfortunately more times

5          than I would like to admit for sexual abuse.

6     Q    Can you give me your opinion, when you say more,

7          is it more than a hundred in your career?

8     A    Yeah.  Over twenty years, yes.

9     Q    Now, if I could, Dr. Head, could you tell Judge

10         Mendheim, have you had the opportunity before

11         based on your training, education, and experience

12         to come into trial courts in front of juries in

13         Houston County or the State of Alabama and to

14         testify as an expert in your field as a

15         pediatrician in relationship to examining children

16         that have been sexually assaulted, females?  Have

17         you done that before?

18     A    Yes, sir.

19     Q    Have you -- did you give your testimony based on

20         your examinations as well as your report that you

21         prepared in front of juries before?

22     A    Yes, sir.

23     Q    And the trial judges in this circuit or other

24         circuits in this state, did they declare you to be

25         an expert as a pediatrician in relationship to

1    sexual assault dealing with young children?

2  A   Yes, sir.

3  Q   Many times?

4  A   I don't remember it being an issue any time. I

5    don't remember it being an issue.

6  Q   But what I'm asking you, there's never been a time

7    you were not qualified and allowed to give your

8    opinion, correct?

9  A   No, sir.

10    MR. VALESKA: At this time I ask you to

11    declare him to be an expert in his field as a

12    pediatrician and give his opinion on his

13    examination?

14    BRANTLEY: Judge, I respectfully object if

15    he's going to give an opinion in regards to sexual

16    assault. His background doesn't include any

17    training with regards to examination as to sexual

18    assaults as far as I know. Can I take him on voir

19    dire?

20    THE COURT: Yes, sir.

21    VOIR DIRE EXAMINATION

22  BY MR. BRANTLEY:

23  Q   Dr. Head, you're a pediatrician; is that correct?

24  A   Yes, sir.

25  Q   And your residency included three years in

1       pediatric residency; is that correct?

2   A   That's correct.

3   Q   And that was how many years ago?

4   A   Seven -- finished in '76.  '73 to '76.

5   Q   Pediatricians are trained to do a multitude of

6       things other than examine for sexual abuse; is

7       that correct?

8   A   We specialize in the care of children.

9   Q   And that includes the total care of the child from

10      the time the child is born until, what, puberty?

11      Fourteen -- fifteen years of age?

12  A   We tend to go to about eighteen.

13  Q   And actually examining for sexual abuse is a very

14      small part of your practice, is it not, from

15      day-to-day?  I understand you have testified that

16      it was more times than you would like to admit.

17      But that's still -- you don't see that every day,

18      do you?

19  A   No.  Well, I want to say -- no, I don't see it

20      every day.

21  Q   In fact, you've never -- let me just ask you.

22      Have you ever attended any seminars with regard

23      specifically to examination of pediatric patients

24      with regards to sexual abuse?

25  A   Yes, sir.

1   Q   How long ago?

2   A   I can't remember the last date.  I've also

3       lectured and been the speaker in seminars.

4   Q   How many times?

5   A   Once.

6   Q   Once.  And how long ago was that lecture?

7   A   That was about a year ago -- year and a half.

8   Q   Have you ever written any scholarly articles or

9       book or treatises or pamphlets on the issue of

10      sexual abuse with regards --

11  A   No.

12  Q   You have given one lecture.  How long was that

13      lecture?

14  A   About an hour.

15  Q   And how long ago did you attend the seminar on the

16      issue of sexual abuse in pediatric patients?

17  A   That's probably been greater than ten years ago.

18  Q   And you've never been admitted as an expert before

19      specifically for sex abuse in pediatric patients,

20      have you?

21  A   I've testified in court before for both sexual and

22      physical abuse.

23  Q   How many times have you testified for sexual abuse?

24  A   Two or three times.

25  Q   Has that been in here in this circuit?

1   A   Yes, sir.

2        MR. BRANTLEY:  That's all I have on voir

3   dire, Judge.  I would ask that he -- I don't

4   believe he's met the threshold to be qualified as

5   an expert on the issue of sex abuse.  Albeit his

6   credentials are fabulous in general pediatrics.

7        THE COURT:  I don't follow that at all

8   because in fact the alleged victims referred to

9   him for that among other things.  I mean, of all

10   the doctors to be refer to in Dothan, you know,

11   he's -- I guess he's an eye witness number one.

12   So there is no qualification required for that.

13   But as far as any hypothetical opinions, he

14   clearly meets the legal requirement for an expert

15   for that purpose.  So overruled.  Go ahead.

16        DIRECT EXAMINATION  (Continued)

17 BY MR. VALESKA:

18   Q   Dr. Head, can you tell ladies and gentlemen of the

19   jury on or about October 6 of 2001, did you have

20   an opportunity to see a black female patient

21   identified to you by the name of Jonteria Jones?

22   A   Yes, I did.

23   Q   Her date of birth?  Was she under twelve years of

24   age?

25   A   Yes, sir.

1    Q    No doubt about it?

2    A    She was six years old.

3    Q    Did you see her when you were coming in just a

4         minute ago to testify?

5    A    Yes, I did.

6    Q    Did you know that was Jonteria?

7    A    I would not have recognized her as Jonteria.

8    Q    Why would you have not recognized her today

9         compared to seeing her on October 6 of 2001?

10   A    The first time I saw her she was in the operating

11        room.  Her brain was exposed, and they were

12        operating on her, and you couldn't really see her

13        face.  And she was critically ill.  The next time

14        I saw her she was wrapped up in bandages, which I

15        have never seen her walking down the hall like

16        that.

17   Q    Could you tell us, Dr. Head, in relationship to

18        treating her as a pediatrician, did you actually

19        see her on October 6, 2001?

20   A    Yes, sir, I did.

21   Q    Were you part of the trauma team that was called

22        to assist in the treatment for her for her

23        injuries and her health and general welfare?

24   A    I was called by Dr. Woodham, the neurosurgeon, to

25        participate in her care.

1    Q    When you saw her looking at her charts and medical

2         history, could you determine whether she had any

3         injuries as a pediatrician?  What her injuries

4         were?

5    A    Yes, sir, I did.

6    Q    What were they?

7    A    She obviously had the massive head trauma which he

8         was taking care of.  At the time I saw her she was

9         in shock, had lost a lot of blood.  And so we

10        started transfusion in the OR and got her out of

11        shock.  At that particular time I think we gave

12        her four units of blood.  We gave her three

13        thousand CC's, which is three of those large bags

14        that you give them.  And we got her stable in that

15        sense.  Her chest was clear.  I had to -- I

16        examined her literally -- I got under the sheet to

17        examine her because I was worried about whether or

18        not she had any kind of other trauma, both to the

19        abdomen and chest.  Her chest was clear.  Abdomen

20        was soft.  The vaginal area caused me concern, and

21        I -- because the vaginal opening, specifically the

22        hymenal area, was not smooth and regular which you

23        would normally see.  And I called either from the

24        OR or right after that and asked that -- to see if

25        we could get somebody to photograph her,

1   especially while she was under anesthesia because

2   I was not in a really good position to get a great

3   view.

4  Q Did you determine in your opinion when you

5   examined her up under the bed sheets in

6   relationship because she was being operated on by

7   Dr. Woodham in your opinion whether or not in your

8   opinion she had been sexually assaulted?

9  A I was suspicious that she had been sexually

10   assaulted, yes, sir.

11  Q What did you find or look, tell the jury, that

12   made that determination?

13  A She had some bruising.  The biggest thing is the

14   hymenal area.  In pre-pubertal females, normally

15   when you open -- when you spread the labia apart,

16   and you go in, the hymenal area is nice and

17   smooth.  And probably the opening on most girls is

18   probably the size of her little finger.  And it's

19   smooth all the way around.  The edges are normal.

20   On hers there were indentations and breaks in that

21   varrier (phonetic) so that it had been opened and

22   it was not normal.

23  Q Did you see any type of bruising inside the labia

24   itself inside the vaginal area on either side or

25   whether she had any fresh or recent bruising?

330

```
1    A    I think -- there was just -- there was some blood
2         in the area.  I can't remember exactly where the
3         blood was.
4    Q    Would that be consistent with a female of six
5         years old she should have blood in that area?
6    A    She shouldn't have anything in that area.
7    Q    Okay.
8    A    She -- normally you should see that hymenal ring,
9         and it should be nice and pink all the way
10        around.  On hers there's area of -- the visible
11        wasn't -- it was not.  You could just see little
12        portions that were normal appearing, and the rest
13        of it was abnormal.
14   Q    If I could ask you, Dr. Head, the outer covering
15        of the vagina, what do you call that?
16   A    That's called the labia.
17   Q    If she's in a seated position with her knees
18        touching each other what you observed on Jonteria,
19        would the labia have covered the opening of the
20        vagina?
21   A    Yes, sir.
22   Q    To examine her the picture made and when you did
23        the examination, were her legs spread apart; or
24        did you open the labia?
25   A    I opened the labia.  The ideal exam would be to
```

1       have her laying down with her legs apart and feet

2       together so everything kind of opens up.

3  Q   Like a gynecologist would do on a female or adult?

4  A   Right.

5  Q   So what I'm asking -- you had to actually -- help

6       me with this -- the labia, open it up?

7  A   That's correct.

8  Q   So it was in a closed position before you looked,

9       right?

10  A   That's correct.

11  Q   Did you note any injuries yourself before you

12       opened the labium itself that you could see with

13       the naked eye when you first saw her?

14  A   I can't remember seeing anything that just, you

15       know, struck me at that particular time.

16  Q   And if there had been any long scars or puncture

17       marks, tears, or large rips, cuts in any manner or

18       fashion, you would have noted that, correct?

19       MR. BRANTLEY:  Object.  Form of the question.

20       MR. VALESKA:  Asking about her medical

21       condition.

22       MR. BRANTLEY:  If there had been.  He stated

23       he didn't see any.

24       THE COURT:  Overruled if the doctor can

25       answer the question.

1   Q   Would you have noted that?

2   A   Yes, sir, I would have.

3   Q   Now, what I want to ask you about.  Once again,

4       help me a little bit.  I know we are dealing with

5       a six-year-old little girl.  The labium, when it's

6       -- it was closed and you had to open it up, when

7       you opened it up, can you explain to me for my

8       benefit, tell me, the entrance of the labium or

9       the outer folds are when they are closed to the

10      hymenal ring you saw on her, is there any distance

11      from the outer to where you saw the injury on the

12      hymen ring?  Any kind of distance measurewise?

13  A   Yes, sir.  I would say, again, the distance is

14      close to a centimeter to a centimeter and a half.

15      Which is basically the width of most people's

16      fingers.  If you just lay it sideways, it would be

17      that much distance.

18  Q   If I could, let me show you State's Exhibit 26,

19      which has been admitted into evidence.  It's a

20      diagram.  You can hold it, Dr. Head.  And also I

21      want to show you State's Exhibit No. 18, which has

22      been admitted into evidence.  Looking at those two

23      exhibits -- 18 -- I believe there's a picture on

24      the back, Dr. Head.  If you could look at State's

25      Exhibit 17, which has been admitted, using those

333

1      two pictures and the diagram, I want to ask you,

2      does that refresh your memory or recollection as

3      to the injuries you saw on Jonteria Jones?

4   A   Yes, sir.

5   Q   What injuries did you see as a pediatrician in

6      relationship to any injuries she had inside the

7      labium of her vaginal genitalia if you could tell

8      us?

9   A   The picture 18 -- Exhibit 18 shows fairly well.

10     Instead of a nice round circle, you see it's kind

11     of oblong going right.  And the area that they are

12     marking -- two o'clock.  If you envision her

13     laying on her back, twelve o'clock is straight up

14     and down, the catheter really would be closer to

15     twelve o'clock.  I would not label it three.

16     Because it's straight up.  And the urethral

17     opening, which is where the bladder is, is

18     directly above the vaginal opening and the

19     urethra.  And the urethra is on top of that.  So

20     at about the two o'clock position or left to right

21     you can see it's opening up instead of going

22     around in a circle, it kicks out to the right.

23     There's also redness on the bottom area below

24     that.  And you can see as you spread the part --

25     the pink sides is the lining -- the inside lining

1    of the labia.  And it goes down to where you see a

2    perpendicular -- which is the hymenal ring, and

3    then you see the ring.

4   Q    If I could ask you, inside the labia, the tissue,

5    the actual flesh if I could refer to that side, is

6    that thick or very tender skin if I could refer to

7    it that way?  Very coarse?  Like I guess the heel

8    of an adult foot?  In other words, that hard or

9    coarse?  What's the comparison?

10  A    It's a single layer of tissue so it's very thin in

11   pre-pubertal female.

12  Q    Do you have opinion, Dr. Head, if you can tell me

13   hypothetically looking at a six-year-old female

14   using those pictures, okay, in other words, the

15   hypothetical, if you have an opinion as to whether

16   or not a stick, a thorn on a blackberry bush or a

17   plum tree in your opinion would have made those

18   kind of bruising or tears what you observed?

19  A    No, sir, I don't think that would cause that.

20  Q    Now, let me ask you about a male penis

21   hypothetically if I could on the diagrams.  I

22   believe it's 17, 18, and 26.  Do you have any

23   opinion the injuries you saw on the inside of the

24   labia would be consistent in your opinion if a

25   male penis could have caused those kinds of

335

1  injuries in your opinion as a pediatrician?

2  A  Yes, sir, I could.

3  Q  Now, tell the jury, once again, as a physician

4     examining, dealing with children, what's the

5     medical purpose, if any, for the labia on a

6     six-year-old little girl hypothetically?  What's

7     it there for?

8  A  Well, basically the genitalia in females are

9     internal.  And the labia protects the internal

10    organs.  So they fold across the opening as a

11    protective barrier.  So if you're riding down the

12    street and you have fallen and come across the

13    handle bars, which kids do all the time, usually

14    most of the damage it's all outside and so you

15    don't really have internal damage on the inside.

16    When you get inside the labia, then you -- then

17    you're into a different ballgame.

18 Q  And did you observe any injuries on Jonteria Jones

19    that you noted externally on her thighs or on the

20    outer part of the labia that showed any type of

21    injury that you recall?

22 A  No, sir.

23 Q  Betadine, what is Betadine?  Can you tell me?

24 A  It's an antiseptic.  It's -- basically kills

   germs.

MR. VALESKA:  That's all.  Thank you very
much, Dr. Head.  Pass the witness.

### CROSS EXAMINATION

BY MR. BRANTLEY:

Q    Dr. Head, do I understand you correctly in saying
that you examined Jonteria during the time that
she was undergoing brain surgery?

A    That's correct.

Q    And there's a sheet I guess covering all of her
body other than her head?

A    That's right.

Q    And Dr. Woodham I guess was at the brain area, and
you were called in by Dr. Woodham, and so in order
to perform -- were you called specifically to do a
sexual or vaginal examination or just a general
total examination?

A    Total examination.  He's asking me to help him
take care of her.

Q    Do you know Jonas -- I believe his name is Salna?

A    Yes, sir.

Q    Was he present then?

A    No, he wasn't.

Q    Had you talked with him prior to your examination?

A    No, I hadn't.

Q    Did you talk with Dr. Salna subsequent to your

1   examination?

2   A   I believe I called him from the OR and asked him

3       if he couldn't get a rape kit and a picture

4       because I couldn't get in the position to do that.

5   Q   Did someone suggest to you that this was a case

6       that involved sexual assault?

7   A   No, sir.

8   Q   No one told you that prior to your examination?

9   A   No, sir.

10  Q   Now, with regards to the hymen, is it your

11      testimony that the hymen was intact?

12  A   No.  It's not.  It was not intact.

    Q   The hymen was not intact?

    A   Yes, sir.

    Q   What would you call that?  Was it ruptured?

    A   I would say it has bruises and a small tear at

        about the two to three -- this Exhibit 26 has a

18      little area that's probably three or four o'clock,

19      which is a pretty accurate description of that.

20  Q   Did Dr. Salna examine this patient prior to your

21      examining the patient?

22  A   No, sir.

23  Q   Did he examine the patient subsequent?

24  A   To my knowledge I believe he -- when she was in

25      the recovery room.

1    Q    He then examined her vaginal area just like you

2         did?

3    A    I think he had a little more of advantage

4         because --

5    Q    He was under a sheet?

6    A    Right.  So he could position her legs so the labia

7         would be easier visualized.

8    Q    You had less light in examining the vaginal area

9         than Dr. Salna did?  Would that be a true

10        statement?

11   A    Yes, sir.

12   Q    And would you call it somewhat of an impairment in

13        examining a vaginal area when you're having to

14        look under a sheet during the time brain surgery

15        is going on?

16   A    Yes, sir, I would call it an impairment.

17   Q    Significant impairment?

18   A    It was enough that I wanted someone to have a

19        better exam with all conditions ideal.

20   Q    Do you know what Dr. Salna's examination revealed

21        about the hymen?

22   A    I don't.

23   Q    Would you defer to his examination or conclusion

24        as opposed to yours considering the fact that his

25        examination was not handicapped by lack of light?

339

1   A    I'm not sure I would defer to anybody a hundred

2        percent.  Just because I see thousands of

3        six-year-old kids.  And sometimes people don't

4        examine them as well as me.  So I -- if somebody's

5        advice or examination is compatible with mine, I

6        will concur with him.

7   Q    If it's incompatible, you won't defer to him?

8   A    I wouldn't defer it, no.

9   Q    Would it be true to say that what you examined or

10       what you observed in the vaginal area was bruises

11       caused by a blunt instrument?

12  A    I would say there was probably some bruising as

13       the picture 26 shows on the inside.  The

14       biggest --

15  Q    On the inside of what?

16  A    On the inside of the labia.  On the wall going

17       down to the hymenal ring.  But the biggest concern

18       on mine was the area about four o'clock -- two

19       o'clock right side.

20  Q    Outside of the labia?

21  A    Inside the labia.

22  Q    Inside the labia?

23  A    Everything I'm talking about is inside.

24  Q    And this bruising in your opinion was caused by

25       some object that was blunt?

1 A Yes.

2 Q And certainly one blunt object would be an erect

3   human penis; is that correct?

4 A That's correct.

5 Q But there are other blunt objects that might be

6   forced into the vaginal area, correct?

7 A That's correct.

8 Q And you from time to time have seen that blunt

9   objects forced into a child's vagina that is not a

10   human penis?

11 A Yes.

12 Q We just don't know whether it was a penis or some

13   other blunt object, do we?

14 A Not without witnessing it first hand.

15 Q You saw no semen, no human sperm in the area?

16 A No, sir.

17 Q Saw no pubic hairs?

18 A No pubic hairs.

19 Q Did this child have pubic hair much?

20 A No, she did not.

21 Q And you observed no pubic hair in her vaginal

22   area, did you?

23 A No, sir.

24 Q Did you notice any bruising around the anus?

25 A I didn't -- I don't think I noticed the anus.  I

```
1    A    Yes.

2    Q    And certainly one blunt object would be an erect

3         human penis; is that correct?

4    A    That's correct.

5    Q    But there are other blunt objects that might be

6         forced into the vaginal area, correct?

7    A    That's correct.

8    Q    And you from time to time have seen that blunt

9         objects forced into a child's vagina that is not a

10        human penis?

11   A    Yes.

12   Q    We just don't know whether it was a penis or some

13        other blunt object, do we?

14   A    Not without witnessing it first hand.

15   Q    You saw no semen, no human sperm in the area?

16   A    No, sir.

17   Q    Saw no pubic hairs?

18   A    No pubic hairs.

19   Q    Did this child have pubic hair much?

20   A    No, she did not.

21   Q    And you observed no pubic hair in her vaginal

22        area, did you?

23   A    No, sir.

24   Q    Did you notice any bruising around the anus?

25   A    I didn't -- I don't think I noticed the anus.  I
```

1    couldn't get to the anus.

2    Q    You stated that her abdomen was soft.  Is that --

3         is that a normal thing to have a soft abdomen, or

4         is that abnormal on a child?

5    A    It's a normal thing.  What you're trying to

6         determine on somebody who is unconscious is

7         whether they have internal injuries, you know, so

8         if they are -- use a car wreck.  If they have

9         bleeding, sometimes their abdomen will be tense.

10        So you're trying to look for other -- you're

11        looking for trauma everywhere on her.

12   Q    So would you say that the abdomen was okay?  You

13        didn't see any damage to the abdomen area?

14   A    Did not see any surgical necessities.  You're

15        trying to find out if she needs to be operated on.

16   Q    Right.  Considering -- did you find blood in the

17        vagina?

18   A    I think I saw some secretions.  But my memory of

19        that, I couldn't -- I don't remember consciously

20        saying that.  I think I would have dictated if I

21        saw a lot of bleeding.  The problem I had just

22        from the visualization is that she's, you know,

23        strapped on a table so that she can't fall off

24        while she's asleep and while he's operating on

25        her.  They have a brace across her legs.  So I'm

1    going under the blanket and having to spread

2    things apart to see what you can see.

3  Q  What's the correct procedure to determine whether

4    or not there's blood in the vagina?

5  A  You look.  I mean, you can see.  If somebody is

6    hemorrhaging, depending on that, you can introduce

7    a Q-tip or some small object on a small child.  As

8    you get older, you can use a little speculum and

9    actually look down.  If somebody is hemorrhaging,

10   somebody has to get something to look inside.

11  Q  Did you see -- if you insert a Q-tip into a

12   child's vagina to determine if there's blood in

13   the vagina, isn't the accuracy of that conditioned

14   upon whether there's external blood there because

15   the Q-tip necessarily would -- might pick up blood

16   on the external?

17  A  It shouldn't.  If you're doing it right, you would

18   be able to pass it through that little opening

19   directly into the vaginal vault and extract it

20   without causing any problem whatsoever.

21  Q  It determines on whether or not the procedure was

22   done right or not, correct?

23  A  Yeah.  You should be able to do it without getting

24   blood from the outside on it.

25  Q  Certainly if one did insert a cotton-tip

343

1    applicator or a Q-stick into a vagina and were not
2    trained specifically in obstetrics or pediatric or
3    vaginal areas and did get blood from the external
4    labia or whatever, that would give a false --
5    cause one to have a false opinion about blood in
6    the vagina, would it not?
7  A  I think -- whoever has got control of the Q-tip
8    and wherever he points it, if it comes up blood,
9    it's going to be blood.  Where he puts it is, you
10   know -- he's got control of that.
11 Q  And on the outside at least of the vagina, you
12   observed some abrasions?
13 A  Yeah.  I think that this picture kind of shows the
14   wall was a little irritated.  I'm not sure you
15   would call it scratch marks, but it was not
16   totally normal.
17 Q  Would the abnormalities that you saw be consistent
18   with enough blood or fluid there or bloody fluid
19   that would reflect on a cotton-tip applicator?
20 A  I didn't think so.  It was more -- I would have
21   counted the fluid more what's called the term
22   serous, which is more when you scrape yourself and
23   it just oozes.  It's more clear.  If you scrape it
24   a little bit more, you get more blood.  But more
25   in that category.

1   Q   What is serous?

2   A   It's a protein that comes from the blood.

3   Q   After it clots?

4   A   Well, it's really -- it's really just -- it's a

5       protein coming out in the blood.  It's not really

6       clotting.  But you may see -- if you let a clot --

7       you draw a blood sample and let it drop out, the

8       top point will have proteins in it, and that's

9       where the serous fluid is coming from.

10   Q   But you would agree even serous fluid contains red

11      blood cells?

12   A   Yes.

13         MR. BRANTLEY:  That's all.

14           REDIRECT EXAMINATION

15  BY MR. VALESKA:

16   Q   Let me ask you, Dr. Head, if I could.  Mr.

17      Brantley asked you three questions ago the

18      injuries you saw to the bruising were outside.

19      Were they outside or inside the labium?  Which

20      were they?

21   A   They were inside the labia.

22   Q   The injuries you've testified to on Jonteria

23      Jones, were they on the outside of the labium or

24      the inside?

25   A   The bruises were on the inside of the labia.

1    Q    The hymenal ring was torn and lacerated you

2         indicated inside or outside?

3    A    Inside.

4         MR. VALESKA:  That's all.

5         THE COURT:  Anything else, Mr. Brantley?

6                  RECROSS EXAMINATION

7   BY MR. BRANTLEY:

8    Q    But, once again, you were handicapped by lack of

9         light?

10   A    Yes, sir.

11   Q    And certainly awkward positioning?

12   A    Yes, sir.

13        MR. BRANTLEY:  That's all.

14             FURTHER REDIRECT EXAMINATION

15  BY MR. VALESKA:

16   Q    Dr. Head, in your opinion as a pediatrician when

17       you examined Jonteria Jones, was the position she

18       is, were you handicapped to determine as a

19       physician in your opinion as to whether you

20       formulated in your opinion she had been sexually

21       assaulted?

22       MR. BRANTLEY:  Object.  That invades the

23      province of the Court and the jury.

24       THE COURT:  Overruled.  Go ahead.

25       THE WITNESS:  Answer?

1            THE COURT:  You can answer, yes, sir.

2   A    I thought she was sexually abused.

3            MR. VALESKA:  Thank you very much.  That's

4    all.

5            THE COURT:  Anything else, Mr. Brantley?

6            MR. BRANTLEY:  That's all.

7            THE COURT:  Thank you very much, Dr. Head.

8            MR. BRANTLEY:  Can I ask him one more

9    question?

            FURTHER RECROSS EXAMINATION

BY MR. BRANTLEY:

12  Q    In your opinion she was sexually abused; is that

13       correct?

14  A    Yeah.  I thought she was assaulted.

15  Q    Sexually assaulted.  Which does not necessarily

16       mean she was raped?

17  A    I don't know the legal terms on rape and things.

18       I would think something was causing trauma to her

19       vaginal area that's not supposed to be.

20  Q    But you don't know whether it was a penis or what?

21  A    That's correct.

22            MR. BRANTLEY:  That's all.

23            THE COURT:  Anything else of Dr. Head?

24            MR. VALESKA:  No, Your Honor.  Ask if he

25       could be excused.

347

1      THE COURT:  That's it.

2      MR. VALESKA:  Mr. Brantley, I offer 28, the

3  clothing.  Not the other little exhibits.  I will

4  lay a predicate for those.  Just the clothing.

5      MR. BRANTLEY:  Okay.

6      MR. VALESKA:  I will offer 28 with the

7  stipulation just the two pieces of clothing, not

8  any contents inside the bag.  That has to lay a

9  chain.  Is that fair?

10     MR. BRANTLEY:  That's fair.

11     THE COURT:  So you are offering that now?

12     MR. VALESKA:  Yes.  I offer the two pieces of

13  clothing now, excluding those things.

14     MR. BRANTLEY:  Well, let me ask Doug

15  something.

16          (At which time a discussion was had

17          between Mr. Valeska and mr. Brantley off

18          the Record.)

19     MR. BRANTLEY:  No objection.

20     THE COURT:  They are admitted.

21          (State's Exhibit No. 28 was admitted

22          into evidence.)

23            <u>DINTHEA JONES</u>

24  having first been duly sworn, was examined and

25  testified as follows:

348

### DIRECT EXAMINATION

BY MR. VALESKA:

Q    Tell us your name, please, ma'am.

A    Dinthea Jones.

Q    Ms. Jones, pull up that chair and pull up towards that microphone.  It will pick you up.

A    (Witness complied.)

Q    Let's go back to October 6 of 2001.  And ask you if I could, let me show you State's Exhibit 22, which is in evidence.  State's Exhibit 22, do you know who is in State's Exhibit 22?  Who is that?

A    My daughter.

Q    What's her name?

A    Jonteria.

Q    Is that the way Jonteria looked before noon on October 6, 2001?  Is that how she looked before that time?

A    No, sir.

Q    Now, before October 6 of 2001, did she need a cane?

A    Uh?

Q    Did she need a cane before October 6, 2001?

A    No, sir.

Q    Before that day could she run and play with other children?

A    Yes, sir.

1    Q    After that day was her life changed?

2    A    Yes, sir.

3    Q    Is she different after October 6 than she was

4         before that of 2001?

5    A    Yes, sir.

6    Q    How is she different?  Tell the jury what's

7         different with her.

8    A    Well, she -- after all this here happened to her

9         and everything, it just hadn't been the same.

10        That's all I can say.

11   Q    Now, you have to speak up a little bit.  Pull the

12        microphone up here.  You're taller than our last

13        couple of witnesses if I could.  What I'm asking

14        you, is her physical appearance, what she can do

15        physically or mentally, is it different after what

16        happened to her on October 6 of 2001?  Is she a

17        different child?

18   A    Yes, sir.

19   Q    Now, let's go back to October 6 of 2001 and ask

20        you can you tell the ladies and gentlemen of the

21        jury did you know a man by the name of Freeshone

22        McLeod?

23   A    Yes, sir.

24   Q    Before October 6 of 2001, before that day, okay,

25        had you lived with Freeshone McLeod?

1    A    Yes, sir.

2    Q    Tell the jury where you had lived and where you

3         lived with him.

4    A    Well, where I stay now?

5    Q    No, ma'am.  Where you lived with him before

6         October 6.  In other words, October 5 or even that

7         day of October 6 that morning hours, where did you

8         and Freeshone live?

9    A    He was staying with me in Gordon.  And we had --

10   Q    What kind of building did you stay in?  Was it a

11        house?  A trailer?

12   A    We stayed in a trailer.

13   Q    The trailer that you stayed in, if you came out of

14        that trailer the front door and went behind the

15        trailer, were there any other houses or trailers

16        behind it?

17   A    Yes, sir.  My next door neighbor, he had one

18        behind it and beside us -- a brick house beside

19        it.

20   Q    Did you know his name?  The next door neighbor.

21   A    Mose McGriff.

22   Q    And his house was made out of what?

23   A    Brick.

24   Q    Did he have a wife?

25   A    Yes, sir.

351

1    Q    Now, on October 6 of 2001, on the trailer that you

2         lived in, did Jonteria come over to visit while

3         you were there with Freeshone?

4    A    No, sir.

5    Q    Did she ever come over and visit that trailer?

6    A    No, sir.

7    Q    Where was your bedroom in the trailer?  You came

8         in the front door, what's the first room?

9    A    The front -- well, I slept in the living room.

10    Q    Slept in the living room.  Was there any bedrooms

11         in the trailer?

12    A    Yes, sir.

13    Q    Left or right or front or back?

14    A    I got three bedrooms.

15    Q    As where were the bedrooms, then?

16    A    Kitchen right there.

17    Q    You said the kitchen.  Where from the kitchen?

18    A    The kitchen right there and in the back is two

19         bedroom, and the living room -- there's another

20         room right there beside it.

21    Q    The trailer you lived in with Freeshone to Mr.

22         McGriff's house, was it close?  Could you see it

23         like you see from where you're sitting in this

24         courtroom to, I don't know, somewhere back in this

25         area -- the wall?  Is it that close?

352

1    A    Yes, sir.

2    Q    If I could, on October 6 of 2001, tell the jury

3         who had legal custody of Jonteria.

4    A    My sister, Mary Wesley.

5    Q    And at nighttime before October 6 of 2001, where

6         would she sleep at night normally?

7    A    My sister's house.

8    Q    Was that close -- or how close was that to your

9         trailer you were living with Freeshone?

10   A    From my -- where my momma stay, right up the

11        road.  Just a skip and a hop.

12   Q    But where your sister kept Jonteria, was that

13        further away?

14   A    Huh-uh.  No.  No, sir.

15   Q    Was it close as McGriff's house?  It wasn't, was

16        it?

17   A    Huh-uh.

18   Q    Tell the ladies and gentlemen of the jury on

19        October 6, 2001, do you remember that day?

20   A    Yes, sir.

21   Q    Do you remember what time you first saw Jonteria

22        that day?  Morning or afternoon?

23   A    It was morning.

24   Q    Now, did you lose sight of her?  Did you go

25        somewhere after you saw her early that morning?

1    A    I seen Jonteria early that morning, and then about
2         once and I had left.
3    Q    After you left, did you come back to the trailer
4         that you lived in with Freeshone McLeod close to
5         Mose McGriff's house?
6    A    No, sir.
7    Q    Did you ever come back to any -- your sister's
8         house or your grandmother's house?
9    A    I came back to my momma's house.
10   Q    Your momma's house.  And when you came back, who
11        was in the house?
12   A    My aunt -- well, that morning?
13   Q    When you came back that afternoon.
14   A    My sister and them.
15   Q    And who else?
16   A    And my cousin Carolyn and my momma.
17   Q    Did you have any conversation with Freeshone about
18        your daughter?
19   A    Earlier that morning I did.
20   Q    What did you say to him, or what did he say to you?
21   A    My daughter just came and just said Freeshone was
22        messing with her.  And I, like, what kind of way
23        he messing with you.  He was just fussing at her.
24   Q    Did you talk with Freeshone about that?
25   A    I told him to leave her alone.

354

1   Q   Now, let's go to later in the day.  Did you come
2       back -- you said you came back to your momma's
3       house?
4   A   Yes, sir.
5   Q   Did you see Jonteria like I see you right now
6       walking and talking?
7   A   No, sir.
8   Q   Was she at the house?
9   A   No, sir.
10  Q   Did you go looking for her?
11  A   Yes, sir.
12  Q   And how did you -- what caused you to go looking
13      for Jonteria this time?
14  A   Well, right after I left from my momma's house,
15      that's when I went to my friend's house.  And when
16      I came back, that's when Freeshone said, I seen
17      Jonteria looking for you.  I said, why you going
18      to send her looking for me.  You already knew
19      where I was.
20  Q   And then what did he say to you about where she
21      was?
22  A   He didn't say where she was.  Somebody came up the
23      road and said, Jonteria was on the next street.
24      And that's when Freeshone said, when I see her I
25      was going to beat her ass.

355

1   Q   Now, did you go looking for Jonteria?

2   A   Yes, sir.

3   Q   And who went looking with you, if anybody?

4   A   He did.

5   Q   Now, did you go to Mose McGriff's house with

6       Freeshone yourself?

7   A   No, sir.

8   Q   Did you come to find Jonteria anywhere close to

9       the trailer where you and Freeshone lived?

10   A   Yes, sir.

11   Q   Now, was it -- is it solid woods out there where

12       you found her?

13   A   Yes, sir.

14   Q   When I say solid woods, I'm talking about there's

15       a tree here, there's a tree here, there's a tree

16       here.  There's bushes.  You can't even walk

17       through.  Was it that thick?  It wasn't that

18       thick, was it?

19   A   No, sir.

20   Q   Now, how far away from your trailer -- let's just

21       say this is the front door of your trailer.  When

22       you come out of that trailer, what do you step out

23       on?  On that day what did you step out on?  What

24       was it made of?

25   A   Sand.

1  Q    The trailer.  When you're in the trailer, you come

2       out the den door.  When you step out, what did you

3       step out on?

4  A    On the ground.  The steps.

5  Q    What are the steps made of?

6  A    Wood.

7  Q    That's what I'm asking about.  So when you stepped

8       off the dirt, you stepped onto what to get into

9       the trailer?

10 A    The step.

11 Q    And what was the step made of when you stepped up

12      on it?

13 A    Wood.

14 Q    And what went around the outside of the wood?  Was

15      there a rail?

16 A    Yes.

17 Q    What was it made of?

18 A    Wood.

19 Q    Now, what I want you to tell the jury, when you

20      stepped out of your trailer that morning and

21      stepped on the wooden platform and then the porch

22      and then stepped down onto the dirt and you're

23      standing right there with the porch right there

24      and the trailer here and this is you, you tell me

25      how far away to stop from where you found Jonteria

1         approximately.

2    A    Okay, like, from my trailer it's a little path

3         that you can just walk right through it.

4    Q    I'm walking back here.

5    A    Yes, sir.

6    Q    Is it much further than this?

7    A    No, sir.

8    Q    Okay. About this distance? Somewhere around in

9         here?

10   A    Yes, sir.

11   Q    And then you walk through that path, right?

12   A    Yes, sir.

13   Q    Then how far from that path where you walk through

14        until you actually found Jonteria? How many more

15        feet? Use something in the courtroom where you're

16        sitting. Let's just say where I am. Is it any

17        more than this, or is it further back or closer?

18   A    It's further back.

19   Q    Tell me when to stop.

20   A    Right --

21   Q    Somewhere back in here?

22   A    Yes, sir.

23   Q    If I go back to the door, is that the total

24        distance?

25   A    Yes, sir.

358

1    Q    Who came and got you and took you to Jonteria?

2    A    Freeshone.

3    Q    And what did he say about Jonteria when he came to

4         you?

5    A    He told me he found her -- he took me straight to

6         the body.

7    Q    When you got to her as you were walking up to her,

8         did you walk?

9    A    No.  We ran.

10   Q    When you ran, when you got up to her, could you

11        hear any sounds?

12   A    No, sir.

13   Q    Where was she?

14   A    In the bushes.

15   Q    What did you see on her body?

16   A    Nothing but her T-shirt and her underclothes.

17   Q    Let me show you what's been admitted State's

18        Exhibit No. 28.  This shirt with flowers on it.  I

19        know it's been cut open.  And these underpants.

20        Is that what she was wearing?  Is that what you

21        remember?  I know it's been cut, okay.  If I put

22        it together like this, though, does that look like

23        the shirt with flowers and underpants that she had

24        on?  Did she have her pants on, her shorts?

25   A    She just had on underclothes and a T-shirt.

| | | |
|---|---|---|
| 1 | Q | And this is it, right? |
| 2 | A | I don't remember what she had on. |
| 3 | Q | Look at these pictures right here.  State's |
| 4 | | Exhibits 1, 2, and 3.  Do you see those pictures? |
| 5 | A | Yes, sir. |
| 6 | Q | Who is in those pictures?  Do you know who that |
| 7 | | person is? |
| 8 | A | Yes, sir. |
| 9 | Q | Who is it? |
| 10 | A | Freeshone. |
| 11 | Q | And who else? |
| 12 | A | And me. |
| 13 | Q | Who else? |
| 14 | A | That's it. |
| 15 | Q | That's it, though.  Who is on the ground with the |
| 16 | | orange shirt bleeding?  Who is it? |
| 17 | A | Jonteria. |
| 18 | Q | That's what I want to ask you about.  When you saw |
| 19 | | her in the bushes, how did you get her out of the |
| 20 | | bushes? |
| 21 | A | I picked her up. |
| 22 | Q | Who carried her? |
| 23 | A | I did. |
| 24 | Q | And where did you carry her? |
| 25 | A | Next door to Mose's house. |

360

1           (State's Exhibit No. 31 was marked for

2           identification.)

3    Q    State's Exhibit 31, who is in 31?  Who is that?

4    A    My daughter.

5    Q    Is that Jonteria?

6    A    (Witness nodded.)

7    Q    Now, when you saw her and you carried her out of

8         the bushes to Mr. McGriff's house, where did you

9         lay her down?

10   A    I laid her down next door on the cement.

11   Q    And that shows in these pictures 1, 2, and 3

12        where you laid her down, right?

13   A    That's right.

14   Q    And I showed you the picture 31 of your daughter.

15        Is that how Jonteria looked when you saw her in

16        the hospital after she got to the Medical Center

17        later on?

18   A    Yes, sir.

19   Q    It didn't looked marked, altered, or changed in

20        any way, that picture?

21   A    Huh-uh.

22        MR. VALESKA:  Offer 31.

23        THE COURT:  Any objection?

24        MR. BRANTLEY:  No objection.

25        THE COURT:  31 is admitted.

```
 1                    (State's Exhibit No. 31 was admitted
 2                    into evidence.)
 3      Q    Would you tell the ladies and gentlemen of the
 4           jury, when you carried Jonteria over there and
 5           laid her down on the concrete, who was close to
 6           you?  What man?
 7      A    Melissa's brother.
 8      Q    Anybody else in this courtroom as close to you
 9           then or within close distance?
10      A    Freeshone.
11      Q    And did you say anything to Freeshone?
12      A    Yes, sir.
13      Q    And who did you say -- who were you talking to
14           Freeshone about?  Which child of yours?
15      A    Jonteria.
16      Q    And what did you say to him?
17      A    I said, Freeshone, if you did this to my baby, I
18           told him I was going to kill him.
19      Q    And then when you said that to him, what did you
20           and he start doing?
21      A    We were fussing -- I started choking him.
22      Q    Now, did you ever go back into that trailer again
23           after that day?
24      A    No, sir.
25      Q    I want you to ask -- tell the jury about the
```

1        trailer.  The bedrooms, what were the walls made

2        of?  Do you know?

3   A    Wood.

4   Q    I want to show you some pictures, if I could.

5              (State's Exhibit No. 32 through 42 were

6              marked for identification.)

7   Q    Show you State's Exhibit No. 38, which is a

8        diagram, okay.  I want to show you State's Exhibit

9        No. 38 and ask you if that purports to be a

10       diagram of the trailer.  It's not to scale.  Not

11       perfect.  Just a rough drawing.  I want to show

12       you the second page, okay.  Showing you -- it

13       appears to be the porch, the trailer, bedroom,

14       living room, rest room, hall, bedroom.  You see

15       that diagram?

16   A    (Witness nodded.)

17   Q    To the best of your knowledge, is that -- once

18       again, it's not to scale, perfect.  Is that how

19       the trailer looked that you lived in with

20       Freeshone with the rooms and their positions and

21       where they were as well as the porch, correct?

22   A    Yes, sir.

23      MR. VALESKA:  Offer 38.  It's not scale.  We

24      have that stipulation, the diagram.  Not to scale.

25      MR. BRANTLEY:  That's fine.  No objection.

1        THE COURT:  38 is admitted.

2           (State's Exhibit No. 38 was admitted

3           into evidence.)

4  Q  Show you State's Exhibit 35.  Can you tell by

5     looking at 35 what room or what part of the

6     trailer that is?  What the floor is made of?

7  A  It's the kitchen floor.

8  Q  That how it looked on or before you left that

9     morning?

10  A  No, sir.

11  Q  What is different?

12  A  This right here (indicating).

13  Q  The stain -- she's referring to brown and yellow

14     stain -- the reddish stain right here.  Besides

15     that, is that how it looked?

16  A  No, sir.

17  Q  Besides that, what is different besides the

18     sticker, or is everything else the same that you

19     can tell?

20  A  It is.

21  Q  Everything else is the same, correct?

22       MR. VALESKA:  Offer 35.

23       MR. BRANTLEY:  Object to that, Judge.  I

24    don't know the relevance.  Got a yellow stain.

25       MR. VALESKA:  That's kitchen floor she

1    testified to.  And alleged stain.  I didn't say

2    what it was.  She said it's an alleged stain.

3         MR. BRANTLEY:  Object.  Relevance.  Just

4    some kind of yellow stain on there.  We don't know

5    what it is.

6         THE COURT:  Mr. Brantley, if you can

7    approach.

8              (At which time the following proceedings

9              were held at the bench outside of the

10             hearing of the jury venire:)

11        THE COURT:  Is that what you're alleging?

12        MR. VALESKA:  Yes.

13        THE COURT:  Do you know what it is?

14        MR. VALESKA:  Yeah.

15        THE COURT:  You're going to be able to prove

16   that?

17        MR. VALESKA:  Yes.  Which is the better

18   picture?

19        MR. BRANTLEY:  I object to both of them

20   because I think the inference he's trying to

21   create is that --

22        THE COURT:  Here's what I'm getting at.  Are

23   you going to be able to with forensic evidence to

24   prove that's what it is?

25        MR. VALESKA:  Yes, sir.  Ask questions about

1    that.

2        THE COURT:  I'm tempted to admit it without

3    the reference.  But if you're going to be able to

4    proof that, maybe just not publish it until -- and

5    leave the sticker --

6        MR. VALESKA:  I won't publish it right now.

7        MR. BRANTLEY:  I object until they can prove

8    that that's blood.  I would hate for an inference

9    to be made that's blood.

10        MR. VALESKA:  I didn't say it was blood.  I

11    said it's a stain.

12        THE COURT:  Well, I'm going to go ahead and

13    admit it at this point, you don't have to take it

14    off, but without the sticker.  If he can -- offer

15    evidence that's what it is and make him face -- I

16    think the others have those stickers on them.

17        MR. VALESKA:  I said it was a stain.  I

18    didn't say it was blood.

19        THE COURT:  But the sticker said.

20        MR. VALESKA:  I understand that.  But I'm not

21    publishing that.

22        MR. BRANTLEY:  I object to 39 and 35 on the

23    ground it's irrelevant and it doesn't show

24    anything.

25        THE COURT:  I'm going to let it in at this

1    point without the sticker unless there's some

2    affirmative evidence offered, and I will give you

3    a chance to be heard.

4         MR. BRANTLEY:  What does the sticker say?

5         MR. VALESKA:  That's just identification.

6         MR. BRANTLEY:  Take that -- I didn't see

7    that.

8         THE COURT:  That's what I'm getting at.  I

9    don't know what other evidence he has.

10        MR. VALESKA:  I'm not publishing it right.

11        THE COURT:  That's fine.  And we will admit

12   it.  And you either need --

13        MR. BRANTLEY:  Go ahead and take these off

14   now.

15        THE COURT:  He's not going to publish it

16   until it's all -- maybe during the lunch break.

17        THE COURT:  What numbers are those, Mr.

18   Valeska?

19        MR. VALESKA:  I haven't asked her about 39

20   yet.  It's just 35.  I need to lay a predicate.

21        THE COURT:  You're offering --

22        MR. VALESKA:  I'm offering 35 with

23   instructions you indicated.

24        THE COURT:  35 is admitted over the

25   Defendant's objection with the specific addition

1    that there's a sticker on there other than the

2    court reporter's sticker that would need to be

3    removed before it's published to the jury.

4                (State's Exhibit No. 35 was admitted

5                into evidence.)

6                (At which time the following proceedings

7                were held in open court:)

8    Q    Let me show you State's Exhibit 39 for

9         identification purposes.  And using 35 that's been

10        admitted with certain conditions that the Judge

11        indicated, what part of the house is 39?  What

12        room is that, ma'am?

13   A    The room by the kitchen.

14   Q    And is that how it looked when you left that

15        morning, or is it different?  Is it different --

16             THE COURT:  Hang on.  Ms. Jones, if you

17        would, speak up.  All the people in the jury need

18        to be able to hear you and Mr. Brantley needs to.

19   Q    What's different?

20   A    This right here (indicating).

21   Q    What is it, ma'am?  What's different?  Just tell

22        me.

23   A    The stuff on -- this right here (indicating).

24   Q    Stuff where?

25   A    On the floor by the kitchen room.

1    Q    Besides the stuff on the floor, is everything
2         else, is that how it looked when you left that
3         morning?
4    A    No, sir.
5    Q    What else is different?
6    A    That's about it.
7    Q    So, then, the only thing that is different is the
8         stain on the floor you've indicated?  Everything
9         else that's how it looked, correct?
10   A    Yes, sir.
11             MR. VALESKA:  Offer State's Exhibit 39 with
12        the agreement that these stickers be taken off.
13             MR. BRANTLEY:  Still object.
14             THE COURT:  Same objection?
15             MR. BRANTLEY:  Yes.
16             THE COURT:  39 is admitted over the Defense's
17        objection with the understanding that sticker on
18        there other than the court reporter's sticker
19        would be removed before it's published to the
20        jury.
21                 (State's Exhibit No. 39 was admitted
22                 into evidence.)
23   Q    Let me show you State's Exhibit No. 40.  See 40,
24        ma'am?
25   A    Uh-huh.

1    Q    You got to speak up, Ms. Jones.

2         Do you see 40?

3    A    Yes.

4    Q    What part of the trailer is that?

5    A    This is the room -- beside the kitchen that's back

6         in the back.

7    Q    The let me --

8    A    By the bathroom.

9    Q    Is that the way it looked?  Is there something

10        different; in other words, were these red stains

11        on there when you left that morning on the wall?

12   A    No, sir.

13   Q    Besides the red stains being on the wall and

14        paneling, everything else looked the same?

15   A    No, sir.

16   Q    What else is different?

17   A    Got blood stain all on --

18   Q    Besides the blood stains, everything else is the

19        same?

20   A    No, sir.

21   Q    What else is different?

22   A    Let me see.

23   Q    Remember, Ms. Jones, you got to speak up.  I know

24        this is hard.  But besides the blood stains,

25        everything else the same when you left that

1     morning?

2  A  No, sir.

3  Q  What else is different?

4  A  Blood on the wall and all that there.

5  Q  Ms. Jones, listen to me.  Besides the blood, the

6     blood was not there, was everything else there,

7     though?

8  A  No, sir.

9  Q  What else was not there when you left that

10     morning, ma'am?

11  A  The frying pan and all that.  That was not in

12     there either.

13  Q  Where is the frying pan in the picture?

14  A  It ain't in there.

15  Q  I'm asking about this picture, okay.  In this

16     picture besides the blood, is that the way it

17     looked, yes or no?

18  A  No, sir.

19  Q  What is different, Ms. Jones?

20  A  I don't --

21  Q  Do you see anything that's different?  You don't,

22     do you?

23  A  I guess I'm confused.  I don't know.

24  Q  Here's the question, ma'am.  When you left that

25     morning, was there any blood on the wall or any

1       parts on the floor or trailer of that house that

2       you lived in with Freeshone?

3   A   No, sir.

4   Q   Now, looking at those pictures, you see blood on

5       there, correct?

6   A   Yes, sir.

7   Q   Besides that blood being there, take the blood

8       away, everything else, is that just how it looked

9       when you left?

10  A   No, sir.

11  Q   What is different, Ms. Jones?

12  A   Ain't --

13  Q   What else is not in that picture was there when

14      you left?  You said the blood was not there.  What

15      else was not there?

16  A   Nothing.

17  Q   Okay.  That's what I'm asking.  Besides that,

18      that's the way --

19  A   I'm just confused.

20  Q   I understand, it's all right.  Besides that,

21      that's how it looked, correct?

22  A   Uh-huh.

23       MR. VALESKA:  Offer 40.

24       MR. BRANTLEY:  Object.

25       THE COURT:  Same as before or different?

1    MR. BRANTLEY: Yes, sir.

2    THE COURT: Same objection?

3    MR. BRANTLEY: Yes, sir.

4    THE COURT: 40 is admitted over the Defense's

5 objection, again, with the understanding that the

6 descriptive sticker will be removed before it's

7 published to the jury.

8      (State's Exhibit No. 40 as admitted into

9      evidence.)

10 Q Let me show you State's 34. Do you recognize what

11   room State 34 is in, please, ma'am, that picture?

12 A That's the bathroom floor.

13 Q The back of where?

14 A That's -- where the room at, it's the bathroom

15   right there.

16 Q Looking on my diagram, that's the bathroom --

17   going into the bathroom?

18 A Yes, sir.

19 Q Is that the way it looked with blood on those

20   clothes when you left?

21 A No, sir.

22 Q Besides that, take that away, okay, when you left

23   besides that blood on those clothes, is that the

24   way it looked then?

25 A No, sir.

373

1    Q    What else is different?

2    A    That shirt, that wasn't there.

3    Q    Okay.  Besides the shirt, anything else different?

4    A    And the shoes.

5    Q    There's a man's picture taking the picture with

6         his shoes in there.  You're correct.  Anything

7         else different?  Is that the way it looked besides

8         those changes?

9    A    Huh-uh.

10   Q    What else is different?

11   A    Wait a minute.  That's it.

12   Q    That's it, okay.

13            MR. VALESKA:  Offer State's 34 with what you

14       said.

15            MR. BRANTLEY:  Object.

16            THE COURT:  34 is admitted over the Defense's

17       objection, and, again, with the descriptive

18       sticker to be removed or covered over before it's

19       published to the jury.

20               (State's Exhibit No. 34 was admitted

21                into evidence.)

22   Q    Now, let me show you State's Exhibit 6.  Do you

23       recognize State's Exhibit 6?  In other words, have

24       you ever seen that before?  Tell this jury.

25   A    Yes, sir.

1  Q  Before October 6, 2001, before you left that

2       morning, where was that exhibit in your trailer?

3  A  In the kitchen in the sink.

4  Q  And what was that used for before October 6 while

5       you lived in the house with Freeshone?  What would

6       you-all use that to cook with?

7  A  Noodles.

8  Q  Now, and when you left that morning on October 6

9       of 2001, was it busted like it is now?

10  A  No, sir.

11  Q  And what I want to ask you, if I could, if I hold

12      it up and ask you to take a look at it, do you see

13      anything in that wok?

14  A  Uh-huh.

15  Q  What do you see that I'm pointing to?

16  A  Dent.

17  Q  Was that dent in there before you left that

18      morning on October 6 of 2001 while it was in the

19      trailer of your kitchen?  Was that how it looked?

20  A  No, sir.

21  Q  The last question I want to ask you.  Look at

22      these ladies and gentlemen of the jury and tell

23      them at any time have you told Jonteria at any

24      time since she got hurt until today, did you ever

25      tell her what to say if anybody asked her any

1    questions about what happened to her?

2  A   I never told her -- I never asked her any

3    questions, and she did it on her own.

4  Q   Now --

5        MR. VALESKA:  That's all.

6        THE COURT:  At this point -- I assume you

7    have some cross?

8        MR. BRANTLEY:  Yes, sir.

9        THE COURT:  At this point, ladies and

10   gentlemen, we're going to go ahead and break for

11   lunch.  It's a little early.  But we got way off

12   schedule for lunch and the evening break

13   yesterday.  Let's go ahead and stop for lunch.  If

14   you would, be back in the jury room at

15   one-fifteen.  We will come back a little bit

16   earlier.  Just go back to the jury room about

17   one-fifteen.

18         Again, there have been reporters here

19   that I have seen in the courthouse this morning,

20   both TV and newspaper.  So please don't watch

21   anything on TV or read anything in the papers

22   about this case.  Also, don't talk about the case

23   among yourselves or with other people while you're

24   away from the courthouse either.  So with that,

25   you can be excused until one-fifteen.  Thank you.

376

1          (Jury not present.)

2          (Off the Record.)

3          (Jury present.)

4     THE COURT:  We're to the point of cross

5     examination of this witness by the Defense.

6          MR. BRANTLEY:  Yes, sir.  Thank you very

7     much.

8                    CROSS EXAMINATION

9     BY MR. BRANTLEY:

10    Q    Your name is Dinthea.  Is that D-a-n-e-i-t-h-a?

11    A    D-i-n-t-h-e-a.  Dinthea.

12    Q    Dinthea.  And last name is Jones; is that correct?

13    A    Yes, sir.

14    Q    Your nickname is -- how do you pronounce your

15         nickname?  Is T-o-o-n-k?

16    A    Tunt.

17    Q    T-u-n --

18    A    Yes, sir.

19    Q    Tunt?

20    A    Yes.

21    Q    What would you prefer me to call you?  Dinthea or

22         Tunt?

23    A    Dinthea.

24    Q    First of all, ma'am, how old are you?

25    A    Twenty-six.

1   Q    And where do you live today?

2   A    Where I live at now?

3   Q    Yes, ma'am.

4   A    I live on Hamilton Street in Dothan.

5   Q    Here in Dothan?

6   A    Yes, sir.

7   Q    And I believe your daughter -- what do you call

8        your daughter?

9   A    Jonteria.

10  Q    Sometimes do you call her just Tera?

11  A    Yes, sir.

12  Q    She's been living with you now for a couple of

13       weeks?

14  A    No, sir.

15  Q    Longer than that?

16  A    No, sir.

17  Q    She's not living with you?

18  A    No, sir.

19  Q    Who does she live with?  Who has her custody?

20  A    My sister.

21  Q    And what's your sister's name?

22  A    Mary Wesley.

23  Q    And how long has Ms. Wesley had custody of Tera?

24  A    Going on two years.

25  Q    Why does she have custody of your daughter?

378

1    MR. VALESKA:  Objection.  Irrelevant.

2    MR. BRANTLEY:  It kind of explains, Your

3  Honor, back there on October who was responsible

4  for her.

5    THE COURT:  But how is that necessarily

6  relevant to -- I mean, I don't see how that's

7  relevant either.

8    MR. BRANTLEY:  Well, understanding what we're

9  saying is that if this gentlemen didn't do this,

10  someone else did it.

11    THE COURT:  I understand that.

12    MR. BRANTLEY:  Someone else did it.  And I

13  believe we can show, you know, who custody of this

14  child was vested in, that's the person --

15    THE COURT:  You've shown that, though.  My

16  understanding from the witnesses is that the

17  sister had custody of the child during this time.

18    MR. BRANTLEY:  If she says this -- and she

19  probably won't say it.

20    MR. VALESKA:  I'm going to object to Mr.

21  Brantley just arguing and testifying.

22    MR. BRANTLEY:  Well, I object.

23    THE COURT:  Wait.  Wait.

24    THE WITNESS:  It doesn't matter.  I can

25  explain --

1      THE COURT:  Ma'am.  Ma'am.  I make the
2  decisions about what witnesses say.
3          Why don't you just approach.
4          (At which time the following proceedings
5          were held at the bench outside of the
6          hearing of the jury:)
7      THE COURT:  Why is it relevant?
8      MR. BRANTLEY:  Well, several --
9      THE COURT:  It's the reason why she's not
10  with the mother --
11      MR. VALESKA:  Could we talk little louder?
12      MR. BRANTLEY:  In the presence of the jury.
13      THE COURT:  That's what we're trying to do I
14  guess.
15      MR. BRANTLEY:  It could be relevant for this
16  reason.  If she says, I don't have custody of my
17  daughter because I physically abused her and said,
18  I whipped her.  Then I think that that needs to
19  come in because that shows that she in the past
20  has physically abused her child such as the case
21  here.  That shows identity, maybe even common
22  plan, scheme, and design.
23      MR. VALESKA:  Identity, plan, scheme, and
24  design of who?
25      THE COURT:  We don't need to search for that

1    because there could be a multitude of other highly

2    prejudicial embarrassing reasons that have no

3    relevance.

4            So do you know?

5    MR. VALESKA:  No, I don't know.  It's not

6    relevant.

7    MR. BRANTLEY:  But, Judge, I should not be

8    prevented from going into that just because it's

9    embarrassing.

10   MR. VALESKA:  Relevant.  It's not material.

11   First of all, he just argued that the sister has

12   custody.  We have semen.  Women can't give semen.

13   You can't say the identity is another woman.  And

14   the bias he's trying to get into, he's not making

15   no basis for bias.  And common plan and scheme has

16   nothing to do with it.

17   MR. BRANTLEY:  Here's what it is.  I cannot

18   -- I don't know the reason, okay.  Now, let's

19   say --

20   THE COURT:  You shouldn't just fish for it.

21   MR. BRANTLEY:  I say the fourteenth amendment

22   of due process requires us to get into it because

23   we say we didn't do it and certainly she's one of

24   the people that had access and opportunity to that

25   child.  And what if she says this to my question?

1    Why don't you have custody of your daughter.

2    What if she says, because they claim I tried to

3    kill her.

4        THE COURT:  But the problem is, you know,

5    just fishing for the jury -- obviously whatever

6    the reason is it's potentially embarrassing both

7    to her and the child.  But my understanding she

8    has custody now.

9        MR. BRANTLEY:  No.  She said she didn't.

10   That's what the little girl testified to.  She

11   just said it's not true.

12       MR. VALESKA:  The little girl never said

13   momma has custody.  The question was --

14       MR. BRANTLEY:  Mr. --

15       MR. VALESKA:  Can I finish without getting

16   cut off?  Mr. Brantley asked her, Your Honor, did

17   she stay with her mother, sleep with her the last

18   couple of nights; and she says, yes.  He's drawing

19   that as legal custody.  That's just questions.

20   There's no testimony.--

21       THE COURT:  I guess let's send the jury out

22   and find out why.  Because if it's something --

23   not knowing the answer to the question.

24           (At which time the following proceedings

25            were held in open court:)

1     THE COURT:  Ladies and gentlemen, if you
2  don't mind, and I apologize, would you step out to
3  the jury room for -- it shouldn't be more than
4  just a few minutes.
5          (Jury not present.)
6     THE COURT:  Ma'am, why did you not have
7  custody -- or why did your sister have custody at
8  the time they are talking about?
9     THE WITNESS:  The reason why my sister had
10  custody of Jonteria was she fell in Ozark, she had
11  fell off the slide -- off the slide and broke --
12  off the slide and she got custody of her since
13  then.  She had broke her hip.
14     THE COURT:  The child had?
15     THE WITNESS:  Yes, sir.
16     THE COURT:  In Ozark?
17     THE WITNESS:  Yes, sir.
18     THE COURT:  How old was she when that
19  happened?
20     THE WITNESS:  She was five.
21     THE COURT:  Did you-all go to court?
22     THE WITNESS:  Yeah, we went to court.
23     THE COURT:  And you saw a judge and the judge
24  made that decision?
25     THE WITNESS:  Yes, sir.

383

1           MR. BRANTLEY:  Can I ask her some questions?

2           THE COURT:  Briefly.  And then we're going

3  to need to bring the jury back in.

4           MR. BRANTLEY:  You lost custody of your child

5  because -- she fell off something, but because of

6  improper or inadequate supervision?

7           THE WITNESS:  What did you say, now?

8           MR. BRANTLEY:  You lost custody of your child

9  because DHR said you were not properly supervising

10  your child?

11           THE WITNESS:  Uh-huh.

12           MR. BRANTLEY:  Judge, I think that needs to

13  come in.

14           MR. VALESKA:  How does that need to come in

15  anything to do -- I'm sorry.  I didn't mean to cut

16  the Court off.

17           THE COURT:  Anything you want to ask her, Mr.

18  Valeska, on this issue?

19           MR. VALESKA:  No.

20           THE COURT:  I don't see how that's relevant.

21  As far as her explanation.  I don't see how that

22  tends to say that she is the one that made him

23  commit these acts on this victim.  That's what you

24  need to convince me of, I guess.

25           MR. BRANTLEY:  Here's one of the things the

1  State is contending, Your Honor. They are saying

2  that Mr. McLeod knew where this child was all the

3  time because he dragged the child up in the woods

4  and he killed -- attempted to kill the child and

5  dragged the child up into the woods. We're

6  saying, no, that didn't happen. If we can show

7  that she had -- that she lived close to the child,

8  which she did, and that she at least may not have

9  had legal custody but she had physical custody

10 from time to time, and we can show that at least

11 in the past she has not properly supervised the

12 child, then that would tend to disprove the

13 State's theory that he dragged the child in the

14 woods but rather she improperly supervised her and

15 that's how the child --

16      THE COURT: I tend to think the State under

17 what I have heard would agree for whatever

18 relevancy it has that the child at the time this

19 occurred was not being properly supervised. If

20 you assume their theory of the case that the child

21 was left basically in this man's supervision and

22 that he's guilty of these two offenses, that's

23 clearly inadequate supervision whether it's her

24 part or the guardian's part. Under their theory,

25 something terrible happened to the child. I

1    think that's a logical conclusion.  It's sort of

2    irrelevant.  That could be said of any child sex

3    or child abuse case.

4        MR. BRANTLEY:  One of the things we're

5    contending is that we did not have supervision of

6    the child that afternoon.  She did.  And if she --

7    if the jury were to know that she has improperly

8    and negligently supervised the child previously,

9    it would make it easier for them to believe that

10   she improperly supervised and negligently

11   supervised and perhaps not even supervised the

12   child on this occasion, thereby explaining how the

13   child got in the woods.

14       MR. VALESKA:  First of all, what does that

15   have to do -- the testimony this Court has heard

16   is the little girl was taken off by Freeshone

17   McLeod.  Whether she has custody or not has

18   nothing to do with this case.  What they are

19   asking you to say because she doesn't have custody

20   we can argue she wasn't supervising the child.

21   That equates to not guilty for this defendant?

22   That's ridiculous.

23       THE COURT:  I think -- what I was looking for

24   for her answer to be relevant I think would have

25   to be something along the lines of supervision was

1    taken away because the mother had attempted to

2    kill or seriously harm the child before, which is

3    one of the charges, or, for instance, the mother

4    had been a party to a sexual abuse or rape of the

5    child before, which we've had those sort of cases

6    where a mother is involved in that situation.

7    Here we are allegedly claiming he's doing the same

8    thing that she allegedly did before. But, again,

9    based on her testimony -- and I don't have those

10   records or anything else -- what she has testified

11   I don't think is going to make it relevant. So at

12   this point I will sustain the State's objection as

13   to the reason why she did not have custody, or to

14   phrase it another way, why the sister had

15   guardianship of the child according to the

16   witness' testimony at this point.

17        MR. BRANTLEY:  Your Honor, could I briefly

18   respond to that for the Record?

19        THE COURT:  Very briefly.

20        MR. BRANTLEY:  I understand -- I'm not

21   arguing that her not having custody has anything

22   to do with what we're trying to infer.  What I'm

23   arguing is the reason that she lost custody

24   certainly fits with our theory of a defense.  And

25   that is, is that she improperly supervised the

child that afternoon, and that explains why in the world that child was lost, not because he had hidden the child.

THE COURT: Any case involving harm to a child, by definition I don't see how you can avoid that the child was inadequately supervised. In theory. In hindsight being twenty/twenty, anytime another person harms a child there has to by definition to be inadequate supervision of the child. Because adults are responsible for children by law. Their safety and well being. So if that being be the case, then in every situation of this nature then that becomes relevant. But what I was looking for was a specific act by her that is similar to the acts that he is charged with.

MR. VALESKA: He's not charged with neglect either. This Defendant is not charged with neglect. Or under complicity. He's charged with rape and attempted murder. So for him to argue to the Court, well, she wasn't being supervised, thus that's how the child got hurt, the last time I recall physical evidence in this case we have semen found in her panties. That doesn't come from women.

1    THE COURT:  It's the same for the State.  If

2    they are going to want to offer other bad acts of

3    a witness or a defendant, they have to be similar

4    to what's in issue here.  A man on trial for

5    murder, the fact that he may have stolen something

6    earlier in his life is clearly a bad thing, but

7    it's clearly not relevant to the murder charge.

8    But his history of violence and that sort of thing

9    would be.  But here what she's testified as being

10    the reason and what are the two charges in this

11    case, they're just simply not similar.

12    MR. BRANTLEY:  And I will hush after this.

13    But one of the questions I would expect the jurors

14    to ask themselves in the deliberation room is,

15    well, how in the world did that child get in those

16    woods except for him dragging her there.  Well, if

17    they know that on that afternoon she was partly

18    responsible just by her own acceptance of that

19    responsibility of keeping up with that child and

20    they don't know that previously she lost custody

21    because of inadequate supervision, they would say

22    this, maybe, well, the mother is going to

23    supervise her.  There's nothing that came out that

24    said that mother was a -- negligently supervised

25    the child or ever had.

1    THE COURT: But if there's any inadequate

2    supervision specifically at the time that this

3    occurred it would be by her sister and not her

4    because under -- by law she had no responsibility

5    for the supervision, so I don't even see how you

6    can -- in other words, DHR can't charge her with

7    negligent supervision because she's not the one

8    responsible for supervision at the time.

9    MR. BRANTLEY: Not talking about legal

10   negligent supervision. I'm talking about

11   practical negligent supervision.

12   MR. VALESKA: Practical legal supervision has

13   nothing to do with the law in this case. You just

14   hit the nail on the head. It's the guardian that

15   had custody who dropped the child off at the

16   grandmother's because she had to go to work. She

17   had no connection. She had no responsibilities.

18   THE COURT: I think you could still argue to

19   the jury your theory that someone else -- I assume

20   if I understand your theory, you're basically not

21   disputing the injuries to the child that have been

22   presented but simply somebody else unknown to you

23   did it. And, you know, there are points in

24   evidence that clearly let you make that argument.

25   And even the fact -- if I were to let in what she

1    said, it's not going to strengthen that argument

2    at all in my opinion.  So I'm going to -- yes,

3    sir?

4        MR. BRANTLEY:  One last question.

5        THE COURT:  Last one.

6        MR. BRANTLEY:  How does letting this evidence

7    in that she lost custody because of neglect

8    supervision, how does that prejudice the State?

9    It doesn't.

10       MR. VALESKA:  It prejudices the State --

11       THE COURT:  Hang on.  The issue is not

12   prejudice.  It's relevancy.  That's what I'm

13   looking at.  And I don't see how any of it is

14   relevant to this charge.

15       MR. BRANTLEY:  I think under the fourteenth

16   amendment the Defendant has a right to develop his

17   theory of a defense, however remote.  And if we

18   have got to error, we've got to error on the side

19   of letting him develop that theory.  And when you

20   have a piece of evidence here that doesn't

21   prejudice the State, then there's no reason to not

22   let it in.

23       THE COURT:  The law applies to you-all just

24   like it applies -- if that's the case, if I have

25   to give you free rein to anything under the blue

moon, then anything they want to present as well.
Suddenly we just do away with any relevancy. I'm
not convinced in the least bit that that
information is relevant to these charges, so I'm
going to sustain the objection. If you have some
new evidence to shed on that point, we can revisit
it, but please approach before we just start
asking somebody else questions about it.

MR. BRANTLEY: Judge, as long as the jury is
out, I want to introduce into evidence a
conviction against Ms. Jones for assault third
degree which occurred in February of 2001 in the
Gordon Municipal Court. Can I go into that to
impeach her?

MR. VALESKA: That's not a crime under moral
turpitude under McElroy's.

THE COURT: Under the new rules of evidence
it has to be a felony or by definition a crime
that involves dishonesty.

MR. BRANTLEY: Assault third degree under the
old --

THE COURT: We're not under the old.

MR. BRANTLEY: I know that. But assault
third degree was listed as a crime involving moral
turpitude.

1    THE COURT:  But under the new rules of

2    evidence -- I don't have a copy up here, but

3    correct me if I'm wrong, but my understanding it

4    has to be within ten years, which apparently it

5    is; it has to be either a felony or any crime that

6    by definition involves dishonesty such as theft or

7    some sort of false report -- making a false report

8    or something like that.

9        MR. BRANTLEY:  Can we introduce it under our

10   claim that she is a person who had access to the

11   child on that afternoon and that she has a history

12   of violence as demonstrated by her assault third

13   degree conviction?

14       THE COURT:  It would depend on the facts of

15   the assault third.

16       MR. BRANTLEY:  A few months prior to this

17   case.

18       MR. VALESKA:  I'm confused.  They argue the

19   capital murder case, the State versus Mr.

20   Hollomon, that one crime does not commit or show a

21   history of violence.  Now today it's one

22   conviction shows a history of violence.  It's not

23   admissible.

24       MR. BRANTLEY:  Two different cases, two

25   different fact situations.

393

1     THE COURT:  I guess you're wanting to offer

2  her prior misconduct is shedding light like a

3  prior bad act like the State normally tries to do

4  I guess.

5     MR. BRANTLEY:  Here's what we're trying to

6  show.

7     THE COURT:  I was just going to say.  If

8  that's the theory, the State just can't introduce

9  a conviction.  They have to offer the underlying

10  facts.  So if it involved -- if we're going to --

11     MR. BRANTLEY:  It was domestic-violence

12  related.

13     THE COURT:  To a child?

14     MR. BRANTLEY:  Not to a child.  But to a

15  family member.

16     MR. VALESKA:  To who?

17     MR. BRANTLEY:  It was a family member.  A

18  person that lived with her.

19     THE COURT:  But, I mean, I need more

20  information if I'm going to sort of let you go in

21  reverse and offer the conviction and then offer

22  the supporting facts.  Don't put the conviction

23  in.  Eventually in the trial you're going to have

24  to offer the underlying facts that are going to

25  have to be relevant to this charge.

1     (Defendant's Exhibit No. 1 was marked

2     for identification.)

3   MR. BRANTLEY: Judge, can I prove the

4 conviction now?

5   MR. VALESKA: I object first of all this is

6 not certified in any way.

7   THE COURT: I still go back go --

8   MR. VALESKA: It's just a computer printout.

9   THE COURT: I need to know more -- if we want

10 to discuss it now, that's fine. If not, I'm not

11 going to let you get into it with her until we can

12 discuss it. She can be subject to recall. But

13 whether that comes in or not, you're still going

14 to have to in my opinion offer the underlying

15 facts of this charge.

16   MR. BRANTLEY: Can I do that through her

17 right now?

18   THE COURT: I suppose.

19    Let's do this -- let's make wise use of

20 our time. I'll phrase it that way. Get right to

21 it and decide this.

22   MR. BRANTLEY: Ma'am, let me show you what

23 I've marked as Defendant's Exhibit 1. And would

24 you take a few seconds and look at it? Can you

25 read that? Now, were you convicted in the Gordon,

1     Alabama, municipal courtroom in February of 2001

2     of assault third degree?

3         THE WITNESS:  Huh-uh.

4         MR. BRANTLEY:  You didn't plead guilty to

5     that, ma'am?  You're under oath.

6         THE WITNESS:  You talking about a fight or

7     something?

8         MR. BRANTLEY:  Yes.

9         THE WITNESS:  Yeah.

10        MR. BRANTLEY:  You plead guilty to that,

11     didn't you?  And you got a fine and court costs

12     that you had to pay, didn't you?

13        THE WITNESS:  Yes, sir.

14        MR. BRANTLEY:  In fact, you haven't paid

15     those fines and court costs yet, have you?

16        MR. VALESKA:  I object.  That's -- what does

17     that have to do with --

18        THE COURT:  That's what I mean.  Let's make

19     wise use of our time.

20        MR. BRANTLEY:  You plead guilty to assaulting

21     Mr. Bobby -- what's his last name?

22        THE WITNESS:  Bobby.

23        MR. BRANTLEY:  Who?

24        THE WITNESS:  Who?

25        MR. BRANTLEY:  Kevin Jones.

1    THE WITNESS:  That's my brother.

2    MR. BRANTLEY:  Okay.  And you lived in the

3    same household with him at that time?

4    MR. VALESKA:  Judge.  Judge.  Can you tone it

5    down a little bit?  Those walls are paper thin.

6    THE WITNESS:  No, sir.

7    MR. BRANTLEY:  I've proven that she plead

8    guilty to assault on her brother, a member of her

9    family.  That's called domestic violence.  I do

10   think here we've got her daughter who was

11   assaulted.  She at least had practical supervision

12   of that child.  We're going to get into where she

13   was during this time of when this child was lost

14   and how she found the child.

15   THE COURT:  How old is this brother of

16   yours?

17   THE WITNESS:  Twenty-one.

18   THE COURT:  Two things.  Based on --

19   THE WITNESS:  He's twenty-two.

20   THE COURT:  I don't see how that's relevant

21   based on what she said.  Secondly, I hope this

22   isn't what they use as a -- I realize it's not

23   certified.

24   MR. BRANTLEY:  It's not.

25   THE COURT:  I understand that.  But if this

1   is what they are going to certify.  All it says,

2   the defendant appears in open court and pleads

3   guilty.  It doesn't even say for what.  It says

4   what the charge was.  But we all know what you're

5   charged with does not prove what you're convicted

6   of.

7        MR. BRANTLEY:  She just admitted.

8        THE COURT:  That's true, too.  But as far as

9   this document itself.

10        MR. BRANTLEY:  I understand.  That's the best

11   Gordon can do for us unless we get somebody up

12   here.

13        THE COURT:  If we get that far, you probably

14   need to have somebody up here.  Like you said, she

15   did admit to this I suppose.

16        But at this time I'm going to I guess

17   sustain the State's objection.  I appreciate you

18   bringing it up so we don't have to send them back

19   out.  But I'm going to rule that -- not to get

20   into this either because it does not fit within

21   the parameters of the Rules of Evidence for prior

22   convictions to impeach a witness.  And also the

23   underlying --

24        MR. BRANTLEY:  What about under our claim

25   that -- certainly it's relevant to prove our claim

1    that she had access and opportunity to the child

2    and also had the propensity to commit acts of

3    violence on a family member as evidenced by a

4    previous conviction of such?  Here's what I'm

5    saying.  If the jury doesn't know that, they are

6    going to find it extremely hard to believe that I

7    would claim that this young mother would have a

8    propensity of violence toward a family member.

9    They are going to think --

10         THE COURT:  That's the whole purpose of the

11    Rules of Evidence to prevent such a thing I

12    suppose.  Just outright unprovable accusations

13    aren't made against people in open court.

14         MR. BRANTLEY:  But when it's the Defendant's

15    theory of defense as opposed to the State's

16    proving a prosecution, it's a little different we

17    claim under the fourteenth amendment.

18         THE COURT:  So you're saying that you-all's

19    theory is that she committed these two crimes?

20         MR. BRANTLEY:  We don't know.  We just

21    absolutely don't know.  But there's strong

22    inferences out there that she -- that the jury

23    needs to know about.

24         MR. VALESKA:  What's the strong inference how

25    this woman got her semen in her little girl's

1    pants?  How do we jump to that?

2        THE COURT:  Back to the original thing.  I

3    clearly think there's evidence out there that you

4    can argue that somehow she may be responsible and

5    the jury can decide whether they agree or disagree

6    with that.  But it's come out from everybody that

7    was involved that day that the child was in the

8    lawful -- legal custody of somebody else but was

9    staying with her, was familiar with her house,

10   trailer, that she had some supervisory role, that

11   apparently the Defendant had some supervisory role

12   as well.  All that is out there and can be

13   argued.  But what she described as being the

14   underlying facts of this case, which apparently

15   this occurred not long ago, I just --

16       MR. VALESKA:  What's the date?

17       THE COURT:  -- involving a grown man versus a

18   five or six year old child --

19       MR. BRANTLEY:  Judge, I don't know --

20       THE COURT:  -- I do not believe is relevant.

21       MR. BRANTLEY:  I don't know if I have moved

22   to admit my exhibit.  But let me for the Record

23   move to admit it now.

24       MR. VALESKA:  And I object.  It's not proper.

25       THE COURT:  Because it's not certified?

MR. VALESKA:  Yes, sir.  It's not relevant.

MR. BRANTLEY:  Judge, if the Court would let me admit it, I will get the clerk up here from Gordon.

MR. VALESKA:  It's still not relevant.

THE COURT:  Going back to your point earlier, which is a good point, she's admitted she had the conviction on the date in question.  And this honestly to me does not prove anything other than she was charged with assault third in Gordon and she plead guilty to something and was ordered to pay a certain amount of money by a certain date, but it doesn't even say what she was convicted of for the Record.  And we all know as lawyers that there can't be a conviction unless it tells us what they are convicted of.  But she has admitted it.  So I'm going to deny the motion to admit Defendant's Exhibit 1 for those two reasons.  One, it doesn't prove anything or disprove anything and; second, she had admitted apparently what you were wanting to offer it for.

(Defendant's Exhibit No. 1 denied by the Court.)

THE COURT:  So, anything else at this point?

MR. BRANTLEY:  That's all I have of her on

1    this little hearing.

2         THE COURT: Anything else from the State?

3         MR. VALESKA: Motion in limine that he not

4    ask that in front of the jury and I have to

5    object. Once again, he's been told not to go into

6    that. I've got to object.

7         MR. BRANTLEY: I won't do that in front of

8    the jury.

9         THE COURT: I have ruled. So don't do that.

10        (Jury present.)

11         CROSS EXAMINATION (Continued)

12  BY MR. BRANTLEY:

13  Q    Let me show you State's Exhibit No. 35 and 31.

14     Are those pictures of your kitchen floor?

15  A    Yes, sir.

16  Q    And Mr. Valeska asked you did everything on that

17     floor look the same except was there anything on

18     there that looked different about your kitchen

19     floor. And did you mention the yellow stain on

20     the floor?

21  A    Uh-huh.

22  Q    Was that different, or had that been there for

23     some time?

24  A    It hadn't been there.

25  Q    Now, that yellow stain, do you recall a few days

402

1    prior to Tera being missing that Mr. McGriff gave

2    Freeshone some sulfur?

3    A    No, sir.

4    Q    What is sulfur used for out in Gordon?

5    A    Sulfur used for snakes I guess.

6    Q    For snakes?

7    A    Yes.

8    Q    And you-all had had snakes around your house,

9    hadn't you?

10   A    Yes, sir.

11   Q    And it scared you, didn't it?

12   A    Uh-huh.

13   Q    And Freeshone told you he was going over to Mr.

14   McGriff's --

15       MR. VALESKA:  Objection to what Freeshone

16   told her.

17       THE COURT:  In regard to the sulfur you

18   mean?

19       MR. BRANTLEY:  Yes.

20       THE COURT:  Sustained.

21   Q    Well, Freeshone went to Mr. McGriff's and got some

22   sulfur from Mr. McGriff, did he not?

23       MR. VALESKA:  I'm going to object to what

24   Freeshone went and did with Mr. McGriff unless she

25   watched it.  Mr. Brantley is testifying.

1    THE COURT:  Rephrase it.  And see if you can

2    lay a foundation without hearsay I suppose.

3  Q  Did you tell Freeshone that you were having snakes

4    around the house?

5  A  No, sir.

6  Q  But you had snakes around the house?

7  A  Yeah.  It was in the house.

8  Q  Huh?

9  A  I didn't know anything about the snakes until him

10    and my cousin told me about it.  I didn't see it.

11    MR. VALESKA:  I move to exclude what him and

12    his cousin --

13    MR. BRANTLEY:  That's spontaneous.

14    THE COURT:  They objected, and it's

15    sustained.

16    And, ladies and gentlemen, you should

17    disregard her last response about what other

18    people told her.  That's hearsay.  And it's

19    inadmissible.  So sustained.

20    Go ahead.

21  Q  Before Tera came up missing on October 6,

22    Freeshone put sulfur around your house and in your

23    kitchen on your kitchen floor --

24    MR. VALESKA:  I object unless she observed

25    that herself and that he ask the question that

1 way.

2   THE COURT:  Please rephrase it and -- you

3 need to find out if she knows these things.

4 Q Did you observe Freeshone or anybody else for

5 that matter put sulfur around your house to ward

6 off snakes?

7 A No, sir.

8 Q How do you know it was put there, then?

9   MR. VALESKA:  Object.  She doesn't know.

10   MR. BRANTLEY:  She's already stated.

11   MR. VALESKA:  It's hearsay.

12   THE COURT:  Can you answer that question

13 about --

14 A What did you say, now?

15 Q How do you know you had sulfur put on your kitchen

16 floor?

17   THE COURT:  Can you answer that without --

18 A He put it around the house but not inside the

19 house.

20 Q He put it around the house?

21 A Yes, sir.

22 Q What color was that sulfur?

23 A Yellow.

24 Q Just like that stain, wasn't it?

25 A There ain't no sulfur there.

1    Q    But it was the same yellow as that stain, wasn't

2          it?

3    A    No.

4    Q    Now, let me take you back to October 6, 2001.

5          Now, you were living in this house where this

6          yellow stain was then; is that correct?

7    A    No, sir.

8    Q    Where were you living?

9    A    Repeat that again.

10    Q    Just tell me where you were living.

11    A    Where I was living?

12    Q    Yes, ma'am.

13    A    Before or after?

14    Q    On October 6.  Were you living with your momma?

15    A    Yeah.  When I first moved back from Ozark, I was

16          staying with my momma.

17    Q    And were you living with your momma on October 6,

18          2001?

19    A    No, sir.

20    Q    Who were you living with?

21    A    I had my own place.

22    Q    What was the address of your own place?

23    A    I don't know that address.

24    Q    Was it down in Gordon?

25    A    Uh-huh.

1  Q   How far did you live from -- were you living with
2      Freeshone?
3  A   Yes, sir.
4  Q   How far were you-all living?
5  A   From my momma's house?
6  Q   Yes, ma'am.
7  A   Just right -- well, you can just walk -- it's not
8      far.  Just a skip and a hop.
9  Q   Now, where did you go on October 6?  Where were
10     you?  Were you working then?
11 A   No, sir.
12 Q   Where did you go that day?
13 A   That day?
14 Q   Yes, ma'am.  When you woke up, where did you go?
15 A   That day?
16 Q   Yes, ma'am.
17 A   From where?  From my house or my momma's house?
18 Q   Well, October 6, when you woke up, did you just
19     stay around the house all day?
20 A   No, sir.
21 Q   Where did you go?
22 A   I go around my momma's house.  Sometimes I be with
23     my friend.
24 Q   Do you remember what you did on that day?
25 A   Yes.

1    Q    Where you went?

2    A    The same day it happened?

3    Q    Yes, ma'am.

4    A    I went to -- like, from my momma's house there's a

5         house right there.  I went from right there.  I

6         sat there until about one something, and I had

7         left from there and went to my friend's house.

8    Q    What friend did you go see?

9    A    Lakeshia.

10   Q    What's her last name?

11   A    Lee.

12   Q    Lakeshia Lee?

13   A    Yes, sir.

14   Q    About twenty-two -- twenty-three years old?

15   A    Yes, sir.

16   Q    Used to live in Dothan?

17   A    Do she stay in Dothan?

18   Q    Did she used to live up here?

19   A    Yeah.

20   Q    Used to go with Roderick Melton?

21   A    No, sir.

22   Q    Not the same one?

23   A    Huh-uh.

24   Q    How long did you stay over at Lakeshia's?

25   A    How long did I stay there?

1    Q    Yes, ma'am.

2    A    About thirty minutes.

3    Q    And about what time was it now?  Around noon?

4    A    It was about -- I left from there about one --

5         yeah, about one something.

6    Q    Where did you go after you left Lakeshia's?

7    A    We was talking at the end of the road.  That's

8         when he came and told me he -- he said her looking

9         for Jonteria.  I said, why you sitting there

10        looking for me if you already knew where I was.

11   Q    And how are you claiming that he knew where you

12        were?

13   A    Because I told him where I was going.

14   Q    When did you tell him?

15   A    The same house I was at -- I mean, my momma -- I

16        was over at Walt Lee's.  I was at Walt Lee's

17        house.

18   Q    Walt Lee's?

19   A    Yes, sir.

20   Q    But when did you see Freeshone to tell him where

21        you were going to be that morning?

22   A    When I told him?

23   Q    Yes, ma'am.

24   A    I told him right after I left.  We were both --

25   Q    Right after you left where?

1  A    We were both over there together.

2  Q    Both over where together?

3  A    Over to Walt Lee's house.

4  Q    What were you doing at Walt's?

5  A    We were eating oysters.

6  Q    Were you drinking beer?

7  A    No, sir.

8  Q    You didn't have any beer to drink while you ate

9       those oysters?

10 A    No, sir.

11 Q    Anybody else drinking?

12 A    No, sir.

13 Q    So when did you first become aware on October 6

14      that your daughter was missing?  Is that when --

15 A    That's the same day it happened?

16 Q    Right.  October 6 is.

17 A    That's when -- repeat that again.

18 Q    Okay.  On the day she was missing, okay, October

19      6, 2001, is that day.  If I say October 6 here on,

20      that means the day she was missing, okay.  Is that

21      fair enough?

22 A    Uh-huh.

23 Q    October 6, when did you first find out that your

24      daughter was missing?

25 A    I ain't know she was missing until he came up the

410

1    road and tell me.

2  Q   That's what I'm asking you.  What time was that?

3  A   That was -- I say time I left that's when he came

4    up the road.

5  Q   Was that about one o'clock?  Two o'clock?  Three

6    o'clock?

7  A   One.

8  Q   About one?

9  A   Yes.

10 Q   What did you do then?

11 A   What did I do?

12 Q   Yes, ma'am.

13 A   We both left together.  We both left together

14    looking for her.

15 Q   And that's when you went back to the bushes?

16 A   No, we went back to the trailer.  I told him to go

17    inside the house and see was she in there, and

18    that's when he came back and told me she went in

19    the house.

20 Q   Did he go in the trailer?

21 A   Yes, sir.

22 Q   Whose trailer did he go in?

23 A   It was mine.

24 Q   And you're saying you lived with him then or not?

25 A   Yeah, we lived together.

1    Q    But Tera didn't live with you-all?

2    A    No, sir.

3    Q    Did she come to visit you-all quite often?

4    A    No, sir.

5    Q    You-all went to visit her?

6    A    Yes, sir.

7    Q    Why would you ask him to go in your trailer to

8         look for Tera when she never came to visit

9         you-all?

10   A    Because we were just looking for her.  We didn't

11        know where she was.

12   Q    Did you ever go look in her trailer --

13   A    My momma's house?

14   Q    Well, whoever had guardianship of her.  Who was

15        that?

16   A    She was at my momma's house.  She was with my

17        sister and my cousin.

18   Q    Did you go look in your momma's house?

19   A    Yes.

20   Q    Before you went and looked in your trailer?

21   A    No.  Because from my friend's house, we just --

22        from my friend's house the next road, that's where

23        I -- I checked my house first, and then we went --

24        we went to my momma's house and let my momma know

25        we hadn't found her yet.  So me and him both was

412

1      still looking for her.

2    Q    And he appeared to be concerned about where she

3         was, correct?

4    A    Yes, sir.

5    Q    And what about Mr. McGriff?  When did he join the

6         hunt?

7    A    I don't know.  That's when he came and told me,

8         he said -- that's when he came and told me, he

9         said, Mr. -- I mean, Mose -- said he knew where

10        Jonteria was, and that's when I come running up

11        the road.  I thought he was going to tell me she

12        was probably in the house, but she wasn't in

13        there, and so he -- Freeshone came and told me --

14        he took me straight to the body.

15   Q    After Mr. McGriff got involved in the hunt?

16   A    Uh-huh.

17   Q    So Mr. McGriff was hunting for Tera while you and

18        Freeshone were together?

19   A    I don't know.  I wasn't with them.

20   Q    All right.

21   A    I was still looking for her.

22   Q    And when you-all -- when you-all found Tera up

23        there in the woods, did you walk up with

24        Freeshone?

25   A    Uh-huh.

1    Q    Did Mr. McGriff walk up with you-all?

2    A    No, sir.

3    Q    Had Mr. McGriff -- if you know, had he discovered

4         Tera before then?

5    A    No, sir.

6    Q    You're saying he didn't or you don't know?

7    A    I didn't know -- I didn't know.

8    Q    So you walked up there and were you-all together

9         when you-all found Tera?

10   A    Uh-huh.  Me and him.  Me and Freeshone was.

11   Q    And what time was that?

12   A    I don't know.

13   Q    Was it nighttime?  Daytime?

14   A    It was during the daytime.

15   Q    And you walked up there.  And what happened when

16        you-all found her?

17   A    Well, Freeshone say he was going to take me to

18        where she was.  That's when -- he showing -- and

19        pointed right at, and when he pointed, he had a

20        evil look on his face.

21   Q    An evil look?

22   A    Yes, sir.

23   Q    Describe -- show me the evil look he had on his

24        face.

25   A    I can't do that.  He --

1          MR. BRANTLEY:  Judge --

2  A   He showed me -- when he showed me where he was --

3          MR. BRANTLEY:  Can I ask for an instruction

4    to the jury to disregard an evil look?

5  A   I know how an evil look --

6          THE COURT:  Hang on just a minute.

7           You can -- I mean, it's her description.

8    It's like the thing yesterday about weird.  What

9    does it mean in the abstract?  You can cross

10    examine her on it --

11         MR. BRANTLEY:  It's certainly prejudicial.

12         THE COURT:  -- as best you can.

13         MR. VALESKA:  He asked how he looked.  She

14    gave a description.  Now he doesn't like the

15    answer.

16         MR. BRANTLEY:  Well, the answer is evasive.

17    I mean, what if she --

18         THE COURT:  I know.  That's why you need to

19    cross examine her.  That's your role.  Just like

20    the D.A. on witnesses from another side, he's

21    responsible for cross examining them.

22  Q   You say he had an evil look?

23  A   Yes.

24  Q   I want to ask you about that evil look.  You

25    understand me?  Now, when did you first notice the

```
 1        evil look on his face?
 2   A    When he showed her to me.
 3   Q    When he did what, now?
 4   A    When he showed her to me, he said, there she go
 5        right there.
 6   Q    And he said there her -- there she is?
 7   A    Uh-huh.
 8   Q    And now describe to me every feature of his face
 9        that you observed that led you to the conclusion
10        that it was evil.
11   A    Describe the evil look he had?
12   Q    Yes, ma'am.
13   A    Like this (indicating).
14   Q    Like what, now?
15   A    I can't do that --
16   Q    Well, you're laughing.  Was he laughing?
17   A    No, sir, he wasn't.  He wasn't laughing.
18   Q    Was he screaming?
19   A    No, sir.
20   Q    Was he crying?
21   A    No, sir.
22   Q    What else?
23   A    He had an evil look like he did it, so he did it.
24   Q    Okay.  And so because you're convinced the look on
25        his face, ma'am, was evil, then you believe he did
```

1        that?

2   A   Yeah.  Because he kept staring.  He kept staring

3        right there.  And I was, like, Freeshone, why do

4        you keep staring at her.  And he was, like -- he

5        just -- he was just -- he was shocked the way I

6        looked at him.  I said, Freeshone, why -- why you

7        looking like that.  And when my baby had -- when I

8        found her, she was doing like this (indicating),

9        and she was shaking and everything.  And she said,

10       momma.  And that's when I got her, and I picked

11       her up.  And I took her.

12  Q   Let me make sure I understand this.  Here's your

13       daughter on the ground unconscious?

14  A   Uh-huh.

15  Q   And she's gasping for breath?

16  A   Uh-huh.

17  Q   She's shaking?

18  A   Yes, sir.

19  Q   And you're staring at his face?

20  A   Uh-huh.  I looked right at him.

21  Q   Before you even attend to your daughter?

22  A   Yes, sir.

23  Q   Now, what happened then?

24  A   Then after that I had got her and I picked her up

25       and I took her next door.

417

1    Q    Now, you mentioned to me that he had already been

2         to her?

3    A    Yeah.

4    Q    And during the time that you were there, he did

5         not -- you're saying he did not reach down and

6         touch your daughter?

7    A    No, sir.

8    Q    But you don't know what he did prior to the time

9         that you got there on his previous occasion, do

10        you?

11   A    No, sir.

12   Q    Prior to coming to court today, this case has been

13        going on, what, about a year and a half?

14   A    Uh-huh.

15   Q    You've talked with Tera about what happened

16        several times, haven't you?

17   A    No, sir.

18   Q    Never have discussed it with her?

19   A    No, sir.

20   Q    Did she ride to court with you today?

21   A    No, sir.

22   Q    Who did she ride with?

23   A    My sister.

24   Q    And you weren't in the car?

25   A    No, sir.

CR 02-1610

**DOCUMENT NAME:** McLeod, Freeshone Cornelius

**CLIENT & MATTER:** 54599-001

Part 6 of 9

**DESCRIPTION:**

County: Houston

CC#s: 2002-235 - 235+236

Attorney: Beth Poe

Circle:    (TRANSCRIPT)    CASE FILE    BOTH    5 vol.

MMV

## CERTIFICATION

I hereby certify that the preceding imaged records and documents

are a true, accurate, and complete image of the original records or

documents as received by the Office of the Attorney General of

the State of Alabama.

This the 21st day of September, 2004.

Signed: _Melisa A. Martin_

Notary: _Coleen F Gibson_

Coleen F. Gibson
Notary Public
Commission expires 06/11/06

1      forty-five degrees up.

2   Q  What's that purpose for?

3   A  To reduce the amount of swelling in the brain.

4   Q  Truly and accurately depict the injuries that you

5      could see and the position that she was in?

6   A  Her eyes are swollen.  Her lips are swollen.

7          MR. VALESKA:  Offer 12 into evidence.

8          MR. BRANTLEY:  No objection.

9          THE COURT:  12 is admitted into evidence.

10             (State's Exhibit No. 12 was admitted

11             into evidence.)

12  Q  What is 11?

13  A  This shows a picture of the inside of her mouth

14     and the right upper part of her teeth towards the

15     center.  She is missing her frontal teeth.  So

16     this is the incisor.

17  Q  Is that the one you indicated you observed in

18     your opinion as fresh in relationship --

19  A  Yes, that's about the location I described in my

20     physical examination when I saw her that I noticed

21     some bruising right upper part of her gum.  Her

22     lip is swollen.  She has her artificial life

23     support tube out of the right corner of her mouth.

24  Q  What is the purpose of that?

25  A  The purpose of that is to keep her alive and keep

1        oxygen flowing in her body.

2  Q  I want to go back and ask you when you determined

3        she was a scale of three in relationship to the

4        injuries and you talk about the injury to the

5        brain stem in relationship to controlling

6        breathing, after her surgery in your opinion as an

7        emergency room physician and a doctor, was she

8        able to sustain or control her own breathing?

9  A  When she left the emergency room, she was not able

10       to breath on her own.  We were doing all the

11       breathing for her.

12  Q  The condition she was in further treatment, in

13       other words, the records and helping her

14       continuing to treat her, at that position was she

15       able to breath herself?

16  A  If she were able to breath on her own, she

17       wouldn't be on life support.

18  Q  State's 11, does it truly and accurately depict

19       her condition of Jonteria Jones?

20  A  That is correct.

21          MR. VALESKA:  Offer 11.

22          MR. BRANTLEY:  No objection.

23          THE COURT:  Let it be admitted.

24            (State's Exhibit No. 11 was admitted

25            into evidence.)

1    A    I have State's Exhibit No. 10 next, which shows

2         similar picture to State's Exhibits No. 11, not

3         quite as clear.

4              MR. VALESKA:  I withdraw 10.

5                   (State's Exhibit No. 10 was withdrawn by

6                   the State.)

7    Q    Go ahead, Doctor.  Is there another picture?  I

8         believe that's all?

9    A    This is State's Exhibit No. 9, which is also

10        similar to State's Exhibit No. 10.  Again, showing

11        the bruising to the upper gum line and also

12        bruising to her right upper lip.

13   Q    Truly and accurately depict the injuries you saw

14        on her?

15   A    Yes, it does.

16             MR. VALESKA:  Offer 9.

17             MR. BRANTLEY:  No objection.

18             THE COURT:  9 is admitted.

19                   (State's Exhibit No. 9 was admitted into

20                   evidence.)

21   A    And then State's Exhibit No. 8, this is a

22        depiction of, again, of the examination of the

23        inside of her mouth.

24   Q    Show any marks on the tongue or the lip or --

25   A    It does appear to show an injury to the right tip

```
1              of her tongue.

2    Q    Is it fresh or old in your opinion?

3    A    In my opinion it's fresh.  There's bruising to --

4    Q    Be consistent with some type of blunt-force

5         trauma?

6    A    Yes, it is.

7    Q    I'm sorry.  You said another bruise?

8    A    Oh, there's also bruising noted also to the upper

9         lip again.  There's also bruising noted to the gum

10        line.

11   Q    And you saw those personally on Jonteria Jones?

12   A    I did.

13   Q    And doesn't appear to be marked, altered, or

14        changed in any way, correct?

15   A    They are not marked, altered, or changed.

16             MR. VALESKA:  Offer No. 8, Mr. Brantley.

17             MR. BRANTLEY:  No objection.

18             THE COURT:  8 is admitted.

19                 (State's Exhibit No. 8 was admitted into

20                 evidence.)

21                 (State's Exhibits No. 24 and 25 were

22                 marked for identification.)

23   Q    Let me show you State's Exhibits 24 and 25.  What

24        I want to ask you, do you recognize what that is

25        first of all as a doctor?
```

1    A    This is an injury to the middle finger.

2    Q    And you look at the back, too?  Both pictures, 24

3         and 25?

4    A    Again, is an injury to the middle finger.

5    Q    As a physician can you tell me looking at 24 and

6         25, do you have an opinion as to looking at the

7         picture of the injury whether that's a fresh

8         injury or an old injury, week old or more, or was

9         it fresh?

10   A    In my opinion it appears fresh.

11   Q    Do you see any type of infection in there in the

12        wound itself?

13   A    There does appear to be.  When you compare the

14        size to the middle finger, and this is what we

15        call the proximal innerphalangeal joint, or the

16        PIP joint, right above, there's noted swelling,

17        which when you compare it to the other finger, the

18        index finger and the ring finger, is prominent and

19        more noticeable than in a normal finger.  So in my

20        opinion this appears to be some kind of a fresh

21        injury that appears to have some early infection

22        to it.

23   Q    I want to go back and ask you about Jonteria's

24        tooth that you observed had been chipped as well

25        as the injuries on the tongue or the lip inside or

1    the base of the tongue and the redness and any

2    swelling that you saw.  Do you have an opinion

3    whether it would be consistent, the injuries you

4    observed on 24 and 25, if there was a backhand to

5    Jonteria's tooth in relationship to the

6    approximate size or depth the injuries on 24 or 25

7    could have caused that in your opinion?

8    A    In my opinion it could.

9    Q    Now, if I could go back, quickly, Dr. Salna, and

10       ask you to tell the ladies and gentlemen of the

11       jury, Jonteria Jones, the injuries she observed --

12       that you observed and you treated, to your

13       knowledge as an emergency room physician keeping

14       up with your care, did she have to come back to

15       the hospital again?

16   A    In my opinion -- to my recollection I believe when

17       I reviewed her medical records she had come to the

18       hospital on two other occasions.

19   Q    What I want to ask you about.  Only limited to

20       and relationship to the injuries you observed on

21       October 6 of 2001, the brain surgery and what was

22       done to alleviate her problems, fractured skull,

23       can infection develop in relationship to the

24       injuries or what she had in relationship to the

25       surgery?

1    A    Oh, absolutely.

2    Q    I asked you about the X-ray that you observed.

3         The CAT scan.  When the skull, particularly in

4         Jonteria Jones, the injuries you observed and the

5         skull fractures she had caused by blunt-force

6         trauma and refer to State's Exhibit 6 for

7         identification purposes, the wok, what I want to

8         ask you, that wok, when it struck her skull with

9         tremendous amount of force --

10             MR. BRANTLEY:  Object.  There's no evidence

11        that the wok struck her skull, Your Honor.

12             MR. VALESKA:  Hypothetically.

13   Q    If I could phrase it hypothetically that skull --

14        that wok was used to strike her skull,

15        hypothetically, I'll ask you, with a tremendous

16        amount of force, what I want to ask you, the

17        injuries to the skull, do we have a complete break

18        -- clean break, what happens when the skull is

19        crushed in relationship to the bone itself?  What

20        happened?  Is there a clean break that you saw of

21        her injuries?

22   A    This type of instrument if used to impact on a

23        skull would produce just a -- depending on the

24        amount or the area of impact -- for instance, her

25        injuries would not be consistent with a blow by a

1  hammer, okay.  A hammer would be much more of

2  sharply defined injury.  Probably more

3  depression.  Her injuries are more consistent with

4  a wider source of impact.  A wok like this, a pan,

5  possibly even if somebody took a two by four.

6  But, again, not -- but it would have to be with

7  something wider and a lot of force.

8  Q     What happens to the bones is what I'm asking, or

9        the fractures?  If I take a two by four and just

10       cut it straight in half with a saw, would there

11       have been a clean break in relationship to the

12       fractures she had when occur with blunt-force

13       trauma?

14 A     No.  In this case these kind of traumas there's a

15       lot of force, there's separation.  There could be

16       depression of the bones.  The bones pushed out of

17       the way.  It's -- all the difference for instance

18       if you're walking and you fall and you cut your

19       hand, that kind of shearing force tends to do a

20       lot more distorting injury to the skin as opposed

21       to cutting your hand washing some dishes and

22       breaking a glass or cutting it with a knife in the

23       sink.

24 Q     What I'm asking about, if I could, please, in

25       other words, the bone itself, would it break

1            cleanly or the bone fragment and come apart?

2   A     The bone can fragment and come apart.

3   Q     When the bone fragments in relationship to her

4            injuries, where would those fragments have gone in

5            Jonteria's brain?  Where do they go?

6   A     Well, they have to be pushed inside to the brain.

7   Q     When they are pushed inside to the brain, will a

8            CAT scan or X-ray always pick up every bone

9            fracture a hundred percent when you're looking for

10           them?

11   A     We so very rarely and seldom do any plain skull

12           X-rays.  Most of everything now days is CAT scan.

13           So the CAT scan is a very good test for picking up

14           almost all fractures, but not completely all

15           fractures.  I have in my experience have seen only

16           one case where a scull fracture was missed on a

17           CAT scan, but that was only one case out of

18           thousands that I've seen.  Tens of thousands.

19   Q     If I said fracture, I meant fracture of the bone.

20           In other words, splintering.  What I'm asking you,

21           checking the medical records and history and

22           treating her as her physician, if there would have

23           been fragments of the bone itself, whatever

24           microscopic amounts, really tiny, could they cause

25           infection?  I understand I murdered the

1    terminology.  You understand what I'm saying?

2    Could they have caused future infection in her

3    brain if they were not found?

4  A    The brain is surrounded by the dura mater.  It's

5    basically a real tough covering.  And anytime any

6    of these areas are violated, injured, you

7    introduce bacteria from the outside, especially

8    when you're talking about blunt force.  You're

9    talking about shearing forces embedding

10    potentially dirt, bacteria that lie normally in

11    our skin down deep into our tissue.  And sometimes

12    there is just no way you can get out every single

13    little piece of dirt and debris that's in the skin

14    like that.  So there's always, always a risk of

15    infection that can occur like that.

16  Q    Did she have to come back for any relationship for

17    any injuries from the trauma?

18  A    Apparently in the medical record it showed that

19    she had come back twice for infections related to

20    the bones of her head.

21  Q    Can you tell us --

22         THE COURT:  Mr. Valeska, let me do this.  If

23    we're going to continue, and obviously we are, he

24    hasn't gotten to his cross examination.  I need to

25    go make a phone call.  If anybody else on the jury

1    needs to make a phone call --

2         MR. VALESKA:  I'm almost finished, too.  I

3    promise -- I understand -- with my part.

4         THE COURT:  He's got to cross.  I just -- my

5    wife had a c-section and has a couple of small

6    kids, and I just need to verify what their status

7    is.  But we're going to finish with this witness

8    this evening.  So if there's anybody else on the

9    jury that needs to make a phone call, come with

10   me.  Everybody else stay here and stand up, and

11   we'll get back as soon as possible.

12              (State's Exhibit No. 26 was marked for

13              identification.)

14              (Off the Record.)

15  Q   Dr. Salna, I believe I wanted to ask you the

16      injuries you observed on Jonteria, do you have an

17      opinion if she had been struck more than one time

18      or just once?

19  A   In my opinion she's been struck more than once.

20  Q   And what I'll ask you, all injuries you observed

21      externally as well as internally, vaginally, on

22      her back, in the mouth, on the skull, once again,

23      would it be consistent with just being struck one

24      time in your opinion as an emergency room

25      physician?

1   A    Absolutely not.  Multiple times.

2   Q    If I could, I'm almost finished, I apologize.

3        Could you tell the ladies and gentlemen of the

4        jury, when she was brought in, her clothing, her

5        panties and/or shirt, Billy Littlefield, did you

6        know that nurse?

7   A    Yes, I do.

8   Q    He still work for the Medical Center?

9   A    Yes, he does.

10  Q    Responsible for collecting her clothing?

11  A    He may be one of several nurses responsible.

12           MR. VALESKA:  That's all.  Pass the witness.

13                    CROSS EXAMINATION

14  BY MR. BRANTLEY:

15  Q    Is it S-a-l-n-a?

16  A    Correct.

17  Q    Dr. Salna, can you tell me what the Cushing's

18       reflex is if you can, sir?

19  A    Cushing's reflex is a triad of three things that

20       occurs when brain swelling and injury occurs.  It

21       causes a person to become hypertensive; in other

22       words, their blood pressure would elevate, their

23       heart rate can slow down, and their breathing

24       becomes irregular.

25  Q    Cushing's reflex, is that a test that you

```
 1          administer?
 2     A    That's a clinical condition --
 3     Q    It's an observation?
 4     A    It's a clinical observation done by Dr. Cushing's,
 5          who was a neurosurgeon in the early twentieth
 6          century.
 7     Q    You perform that on --
 8     A    This isn't a test, Counselor.  This is just
 9          observations.
10     Q    You made that observation?
11     A    Yes.
12     Q    Now, does the Glascow Coma Scale relate to the
13          Cushing's reflex at all?
14     A    There's no direct association between the two
15          because the Cushing's reflex has to do more with a
16          person's blood pressure, breathing, and heart rate
17          whereas the Glascow Coma Scale has to do with
18          patient's eye opening abilities, patient's verbal
19          abilities --
20     Q    And movement.
21     A    -- and movement ability.  Now, ultimately eye and
22          -- eye and verbal and movement will result on
23          blood pressure and heart rate because a person
24          who is dead has no vital signs will not have a
25          Glascow Coma Scale higher than three.
```

1   Q   Now, you determined that this patient had a
2       Glasgow Coma Scale of three?
3   A   That is correct.
4   Q   Was she conscious when she came in?
5   A   No, sir.
6   Q   Now, was part of your diagnosis based on the fact
7       that she was unconscious?
8   A   Could you explain your question better?
9   Q   Well, she was unconscious, right?
10  A   That's correct.
11  Q   She couldn't move?
12  A   That is correct.
13  Q   She couldn't speak?
14  A   Correct.
15  Q   And what was the other one?
16  A   She had no spontaneous eye opening.
17  Q   Now, how does -- how do you arrive at a person who
18      has a Glasgow Coma Scale of three is near death?
19  A   When they developed the Glasgow Coma Scale and
20      they looked at patients and they assigned the
21      values to this, the people who have Glasgow Coma
22      Scales of fifteen, basically normal, have the best
23      outcomes.  The lower the Glasgow Coma Scale the
24      worse the outcome.
25  Q   My question is this.  What about the patient who

1    presents simply with being unconscious as opposed

2    to having other manifestations of skull injuries?

3    Wouldn't they also score three and they would just

4    be unconscious?

5  A    Counselor, the Glasgow Coma Scale is only used in

6    patients with head injuries.  We don't use the

7    Glasgow Coma Scale with persons that, say,

8    overdose on heroin and unconscious because of an

9    overdose.

10  Q    I understand.  But let's say a patient presents

11    who has been hit in the head with injuries not as

12    severe as Miss Jones and she's unconscious.  Would

13    she still -- would that person still score a three

14    because they had no verbal movement, no verbal

15    response, no physical response?

16  A    If a patient does not open their eyes to any

17    verbal or tactile stimuli, they are assigned a

18    scale of one.  If when you pinch them by the

19    shoulder and there's absolutely no movement, they

20    would have a one.  If a patient -- if you tried to

21    talk with them and ask them to do simple things,

22    move an arm, open your eyes, and there was

23    absolutely -- or you ask them to talk or who are

24    you or what are you, and they have absolutely no

25    verbal component, then their scale is one, which

1     would be a three.  So anybody who has an isolated

2     head injury, there are very specific things that

3     we can look for regarding the Glascow Coma Scale.

4     So any person who basically has a Glascow Coma

5     Scale of three means they can't open their eyes,

6     they can't move, and they can't talk.

7  Q  It doesn't mean necessarily that a person with a

8     Glascow Coma Scale rating of three that that

9     person is near death?  It could just mean they are

10    unconscious at that particular time?

11 A  Well, they are probably unconscious and near

12    death.

13 Q  Well, let me take you back, Doctor.  If a person

14    simply falls down and has a concussion with no

15    fractured skull and the person is unconscious when

16    the patient presents to you, they would have a

17    scale of three, correct?

18 A  No, sir.  Because if I went and pinched their

19    shoulders, they might reach up and grab my hand,

20    for which case that would give them -- but,

21    Counselor, anybody who comes in with a Glascow

22    Coma Scale of three is at a very morbid condition,

23    in other words, a very serious condition.  These

24    are not as a result of simple little bumps on the

25    head.

233

1    Q    I understand that.  But it could be a simple bump
2         on the head; and if the patient were unconscious,
3         then that person would have -- and had no verbal
4         response, no physical response, and had no -- what
5         was the other one?
6    A    Eye opening.
7    Q    Eye opening.  If that person didn't exhibit those
8         three responses and if the person, hypothetically,
9         only had a bump on the head that had caused the
10        person to be, quote, knocked out, that would be a
11        scale of three, would it not?
12   A    It's all hypothetical.  I've never seen that in
13        practical experience.
14   Q    But that's not my question?
15   A    Hypothetically, sure, anything is possible.
16   Q    It would be a three?
17   A    Anything is possible, sure.  Hypothetically.
18   Q    It would be a three.  That's a yes or no?
19   A    Yes.
20   Q    And that person would not be near death, would
21        they, with only a bump on the head?
22   A    With only a bump on the head, they wouldn't have a
23        Glascow Coma Scale of three.
24   Q    If they didn't have the other responses to the
25        Glascow Coma Scale, they would, wouldn't they?

1   A    Wouldn't have what?

2   Q    The other three criteria that you talked about

3        necessary to establish a Glasgow Coma Scale of

4        three.

5   A    Yeah.  But clinically patients with a little bump

6        on their head -- Glasgow Coma Scale of three

7        usually means that a person has a very severe head

8        injury.  These are not people that fall and bump

9        their head and come in and can't open their eyes.

10  Q    I'm not asking you what it usually means,

11       Doctor.

12  A    But that's what I'm telling you.

13  Q    I'm asking you it's possible?

14  A    Anything is possible, Counselor.

15  Q    I understand anything is possible.  It's possible

16       for a patient to present and exhibit a score of

17       three on the Glasgow scale and not be near death,

18       is it not?

19  A    Not in my opinion, no.

20  Q    It's impossible?

21  A    I would say nearly impossible, yeah.

22  Q    Now, I would like to ask you some questions about

23       her vaginal entrance.

24  A    Yes, sir.

25  Q    You've spoken about injuries to the inside of her

1            vagina; is that correct?

2   A    Inside of her vaginal opening.

3   Q    And you've stated that these injuries appear to

4            have been caused by blunt-force instrument?

5   A    Blunt-force trauma.

6   Q    Blunt-force trauma.

7               Now, let me give you a hypothetical.  If she

8            were dragged on the ground for some distance, and

9            let's just say by the legs into brush, into the

10           woods, would these injuries to her vagina, would

11           it be consistent with the appearance that you saw

12           that these injuries to the inside of her legs to

13           her vaginal area, that they could have been caused

14           by limbs, portions of the bottom of plants like

15           small trees and things like that?

16  A    Not in my opinion in this case.

17  Q    Tell us why not.

18  A    Well, where are the bruises to the inside of the

19           thighs?

20  Q    What did you say?

21  A    There were no bruises to the inside of her thighs.

22           I think that if a branch -- if you were dragging

23           somebody -- now, are you asking me are you

24           dragging them with both legs, are you dragging

25           them with one leg with the other leg hanging out?

1  Q   Let's take one at a time.  Does it make any
2      difference?
3  A   I think that if you're dragging them -- first off,
4      if you have somebody and you are dragging them by
5      one leg, I think that if a branch was going to
6      strike them in the vagina, it would have to work
7      its way up her leg, and you would be seeing
8      abrasions or contusions to the inside of the legs,
9      which were not identified.
10 Q   What if she were just thrown unconscious into
11     some brushes with her legs open?  That would
12     certainly cause some blunt-force trauma to her
13     vaginal area, would it not?
14 A   Sure.  But it wouldn't cause the type of
15     blunt-force trauma that noted that's appeared to
16     be symmetrical on both sides of the labia.  The
17     cases that I've seen of straddle injuries as a
18     result of bicycle or something of that nature have
19     usually been on one side or the other, but never
20     on both sides.
21 Q   You don't know what blunt-force trauma caused
22     these injuries, do you?
23 A   I was not there when it happened.
24 Q   That's a yes or no?
25 A   Do I know exactly what caused it?

```
 1    Q    That was my question to you.

 2    A    No, I don't know exactly.

 3    Q    It would not have necessarily been a penis, would

 4         it?

 5    A    In my opinion I think it was.

 6    Q    But it would not necessarily have been a penis?

 7         Why do you think it was a penis?

 8    A    Because it looks very typical for a sexual

 9         assault.

10    Q    There was no sperm in the vaginal canal?

11    A    I'm not aware of those results.

12    Q    You don't know that there was, do you?

13    A    I'm not aware of those results.  I tested it, and

14         I'm not aware of the findings.

15    Q    Hypothetically, if there's no sperm in the vaginal

16         canal, does that change your opinion that the only

17         object that could have caused this blunt-force

18         trauma was a human erect penis?

19    A    All it means is the assailant didn't ejaculate.

20    Q    Is that all it means?

21    A    I just have never seen these injuries at all with

22         a straddle injury with somebody being dragged

23         through the woods, being pelted by, you know,

24         brush, by sticks.  I've just never seen it.

25    Q    What about an object?  What about if the assailant
```



1      used an object to touch the vagina other than a
2      penis?
3   A  Then it still would be probably some form of
4      sexual assault.
5   Q  I agree with you, but it wouldn't be rape, would
6      it?
7   A  That's a legal definition, sir.
8   Q  Now, you stated that these bruises appeared to be
9      fresh?
10  A  Yes, sir.
11  Q  What do you mean by fresh?
12  A  They were swollen.  They had discoloration.
13  Q  What I mean by fresh -- what time length do you
14     place on fresh?
15  A  In my best medical opinion anything probably six
16     to eight hours or less.
17  Q  Prior to your seeing it, okay.
18  A  Now, Counselor, I'm not a forensics physician.
19     I'm an emergency physician.  So a forensic
20     physician --
21  Q  I understand that.
22  A  -- can probably give you a much better time frame.
23  Q  Do you know the date of birth of the patient when
24     you saw her?
25  A  No.  It was told to me that they were bringing in

```
1        an approximately six-year-old child.  I think the
2        medics had found out.
3    Q   And you used the phrase attempted penetration.
4        What do you mean by attempted penetration?
5    A   If I had noted that the hymen had been lacerated
6        or cut, then if it had been a penis that was used,
7        then I think the penis would have penetrated
8        inside the vagina.  A six-year-old's vagina is
9        extremely small.  You're talking about the size of
10       my pinky finger.  When you're talking about an
11       adult penis, you can't penetrate the vagina
12       without ripping her apart.
13   Q   And she was not ripped apart?
14   A   Not to my knowledge.
15   Q   So in your medical opinion no penetration
16       occurred?
17            MR. VALESKA:  Objection.
18            MR. BRANTLEY:  That's a proper question.
19            MR. VALESKA:  Penetration to what?  All I
20       have to do is show penetration inside the labium.
21       I don't have to prove penetration.  I object to
22       the form of the question.
23            MR. BRANTLEY:  I will follow it up.
24   Q   No penetration occurred to the vagina?
25            THE COURT:  Hang on.  You need to lay a
```

1    foundation with the doctor as to what he

2    considered that term I suppose.

3         MR. BRANTLEY:  Well, Judge, I can do it

4    either before or after my question?  I think he's

5    gotten wind of where I'm heading now and --

6    anyway.

7         MR. VALESKA:  I object and move to exclude

8    someone has gotten wind to where Mr. Brantley is

9    heading.

10        THE COURT:  It's getting late.  I'm getting

11   irritated.  You-all are arguing.  Let's try to

12   work through this witness so we can all go home

13   for the evening.

14   Q    You stated on direct examination it was attempted

15        penetration, Dr. Salna?

16   A    Now, attempted penetration to what?  To inside the

17        vagina.

18   Q    Are you saying that there was not penetration to

19        the vagina?

20   A    I'm saying there was attempted penetration.

21   Q    But it was not successful based on your

22        observations?

23   A    Well, again, the vagina being so small and the

24        penis being larger, to have actual internal

25        penetration I think that would have provided a lot

1      more injuries.

2   Q   I agree.

3          MR. BRANTLEY:   That's all.

4                REDIRECT EXAMINATION

5   BY MR. VALESKA:

6   Q   Let me ask you if I could, Doctor, can you tell

7      the ladies and gentlemen of the jury, any doubt in

8      your mind, the labium that covered the

9      genitalia -- internal genitalia of Jonteria Jones,

10     I ask you about from the outside to the inside the

11     injuries, how many centimeters was the depth.  Do

12     you remember me asking you that?

13  A   It was about one to two centimeters.  It was right

14     outside of what we call the vaginal introitus.

15     Anatomy is such -- if I may, when you look at a

16     female's anatomy, you have two large thicker

17     folds, which we call the labia majora.  Going from

18     outside to inside, you have, like, a small little

19     valley.  And then in a normal adult female you

20     have what is called the labia minora,  and these

21     are much smaller folds than the outside labia

22     majora.  And then from the labia minora you then

23     go into what we call the vaginal introitus.  And

24     this vaginal introitus encompasses several

25     structures.  It encompasses the clitoris, which if

1    the female is lying on her back would be at the

2    twelve o'clock position. And then you have the

3    urinary meatus, which is the urinary opening,

4    which is right below the clitoris. And then you

5    have the vaginal opening, okay. Which in a

6    six-year-old female is surrounded by hymen. Now,

7    anything beyond the hymen on the inside would be

8    called the vaginal canal. So when I noticed her

9    injuries, they were located essentially on the

10   inside of the labia minora -- labia majora, but

11   the labia minora in a six-year-old girl is very

12   underdeveloped. You can see rudimentary features,

13   and as they mature sexually, then these features

14   become more prominent as in a normal adult

15   female. So the injuries that I saw were well

16   within the inside of the labia majora.

17  Q  I believe we did -- you did a diagram. I need to

18     make sure. I thought we put a number on it. It's

19     26. Looking at State's 26, if you would, in other

20     words, did you do that diagram?

21  A  Yes, I did.

22  Q  Does that indicate the injuries or markings or the

23     bruises or the tears of the hymen that were

24     observed that you saw on Jonteria Jones?

25  A  Yes, it does.

1           MR. VALESKA:  Offer State's 26 into

2      evidence.

3           THE COURT:  Any objection?

4           MR. BRANTLEY:  No objection.

5           THE COURT:  26 is admitted.

6                (State's Exhibit No. 26 was admitted

7                into evidence.)

8  Q   I don't mean to be gross, but the pictures done

9      internally --

10         MR. VALESKA:  State's Exhibit No. 17 is in.

11     Judge, could he come down with the Court's

12     permission?

13  Q   Come down and show you 18 that's in.  Come down

14     here and point to the jury panel.

15  A   (Witness complied.)

16  Q   I want to ask you about the internal examination

17     you did with the pictures we made on 17 and 18.

18     Let's use 18.  If you could, let me get you to

19     turn this way and hold it this way after you have

20     looked at it.  What I'm asking you, the labia

21     itself, if she's in a seated position sitting

22     down, and let me use my hands, would the labia

23     close and touch and protect the vaginal canal?

24  A   In a normal seated position seated like they are,

25     the labia majora, the thicker folds which you find

1    on the outside here, would normally close over the

2    vagina.

3  Q    What I'm asking you, the pictures you have here,

4    is it not true that Jonteria Jones that her labia

5    and her legs have been spread apart to show the

6    internal examination of her genitalia; is that

7    true?

8  A    That's correct.

9  Q    And the injuries that you observed with the

10    numbers three and two on the hymen, number two, is

11    that shown and pointed to the hymen?

12  A    Number two is pointed to the hymen.  And this is

13    the hole here that has kind of an oval shape to

14    it.  This yellow catheter right here, this is what

15    is going inside the urinary tract, what we call

16    the urinary meatus right here, or the urinary

17    opening.  And right below that is the opening to

18    the vagina.  And the vagina is circled by the

19    hymen.  And the labium majora, the thicker part of

20    the skin folds I explained earlier, are on the

21    outside here and here.  And the injuries I noted

22    are on the inside of the labium majora, not on the

23    outside.

24  Q    So what I'm asking you, the injuries of the

25    labia, are they on the outer or are they inside

```
 1        the labium itself?
 2   A    They are inside of the labia majora.
 3   Q    What I want to ask you -- and also Mr. Brantley
 4        asked you -- any injuries deep inside the canal,
 5        there are none, correct?
 6   A    On this photograph here, this is pretty much when
 7        -- the way you see this photo here, ladies and
 8        gentlemen, is pretty much the way when I examined
 9        her.  In adult female we usually since the hymen
10        is lost, we can use the speculum to look on the
11        inside to look for deeper penetrating injuries.
12        But, again, you have to realize -- I think
13        probably everybody here knows how large a man's
14        erect penis is, and, yet, a little girl's vagina
15        is probably smaller than my finger.  So when
16        you're going to try to force something potentially
17        that big in something that small, you're going to
18        cause a lot of injury.
19   Q    Did you see any injuries of any kind that were
20        fresh that would be consistent inside the labium
21        in your opinion on Jonteria Jones?
22   A    In my opinion this redness here is abnormal and
23        consistent with the bruise, and this labia here
24        not physically but I watched it -- where's my
25        diagram?
```

1    Q    You can use your diagram.  I'll hold it if you
2         like me to.
3    A    This is an adult female anatomy, so this is a
4         little different.  Here again, this is the labia
5         majora on both sides.  This is not as developed as
6         in Miss Jones.  In this case it's just a tiny
7         little bit right here.  There's a big difference
8         between the female child versus a female adult.
9         In our rape kits we only have female adult thing,
10        but we can -- so when I saw this bruising on the
11        inside here, this was the labia majora, which is
12        the large part of the opening, and then you have
13        the labium minora, which is here, and then there's
14        bruising here and here, this is right next to the
15        inside or right next to the vaginal opening.  This
16        circle here represents the hymen.  Can everybody
17        see?
18             (No response.)
19   A    And this represents the inside of the hymen.  What
20        I saw additional here was bruising to the hymen
21        here as well as to the hymen over here
22        (indicating).
23   Q    Any doubt in your mind the hymen is inside the
24        labia?
25   A    Of course.  It's anatomically that's the way it

1      is.  The hymen is inside the labium.

2  Q   Anyone doubt in your mind the bruising you saw

3      inside the labia, inside the outer labia folds

4      itself?

5  A   Yes, it was.

6  Q   What I want to ask you, the bruising, help me,

7      urinary meatus?

8  A   Meatus.

9  Q   Is that inside the labium on Jonteria Jones in

10     your opinion?

11  A  Yes, it is.

12  Q  So all three of those, am I wrong -- if I am,

13     correct me -- in the injuries you observed, are

14     they on the outside or the inside of her labia?

15  A  They are on the inside of her labia.

16      MR. VALESKA:  That's all.  Thank you.

17           RECROSS EXAMINATION

18  BY MR. BRANTLEY:

19  Q  But the labium is not inside the vagina, the

20     labium is outside the vagina?

21  A  That's correct, sir.

22      MR. BRANTLEY:  That's all.

23      MR. VALESKA:  No more questions.  Ask that he

24     be excused.

25      THE COURT:  All right.  Mr. Brantley?

1    MR. BRANTLEY: Judge, let me ask him another

2  question if I can.

3 Q You also stated that these bruises appeared to be

4  the result of blunt-force trauma which in your

5  opinion was a penis?

6 A That is correct.

7 Q You described some bruising around the anus?

8 A Yes, I did.

9 Q Is that blunt-force trauma, too, around the anus?

10 A In my opinion, yes.

11 Q And would that have to be in your opinion a penis,

12  too?

13 A In this case, yes.

14 Q When you say in this case, you're talking about

15  what?

16 A I'm talking about Miss Jones.

17 Q And in this case you were told that there may have

18  been a sexual assault?

19 A That is correct.

20 Q And what influence, if any, has that had on your

21  opinion the fact that you were told up front there

22  may have been a sexual assault?

23 A The only influence it had that I was asked to go

24  and do a sexual examination.

25 Q Knowing that there had been a suggestion that one

1    had occurred?

2  A    Huh?

3  Q    That's a yes or a no.

4  A    I lost your question.  Rephrase it for me again or

5       repeat it, please.

6  Q    You did not examine this vaginal area or anus

7       without first having been told there may have been

8       a sexual assault?

9  A    That is correct.

10  Q   So your opinion to some extent, Doctor, has been

11      tainted by the fact that there -- at least some

12      people believe there was one?

13  A   Counselor, if there were no findings whatever, if

14      she had a completely normal exam, if a child was

15      in other cases that I've had has told me that

16      somebody has sexually assaulted them, then I would

17      believe the child.  So the -- in this case I have

18      presence of physical evidence that she was

19      sexually assaulted.  Certainly without findings of

20      bruising, tearing, ripping, bleeding, what have

21      you, it would be I guess legally much harder to

22      make a case of sexual assault.  But the fact that

23      I was told that she may have been sexually

24      assaulted, all that means is I expanded my

25      physical exam after she was stabilized to go and

1   do a sexual assault exam.

2 Q What difference would it have made, if any, if you

3   had been told instead of a sexual assault may have

4   occurred if she may have suffered vaginal area

5   injuries due to having been dragged through

6   brush?  In other words, there was no mention of

7   sexual assault, would that change your opinion?

8 A If I was asking to go and examine her, I would

9   have done so.

10 Q Would that have made any difference in your

11   opinion --

12 A If I seen.

13 Q -- instead of being told --

14 A I see where you're going with this.  I got you.

15   If I was told --

16 Q In other words, if you had been told this little

17   girl had been dragged through brush and had been

18   -- a blunt-force instrument like a stick or a twig

19   had been placed between her legs and there had

20   been suggestion of sexual assault or rape, what

21   difference, if any, would that have made on the

22   opinion or the conclusion you reached after her

23   examination?

24 A Counselor, if I had seen these kinds of findings

25   on that -- I suppose hypothetical condition that

1    you're talking about, I would have been on the

2    phone to DHR in a heart beat.

3  Q    Still thinking that the only blunt-force trauma

4    would have been a penis?

5  A    No.  In your case you were asking me if I may --

6    if I'm correct, if I was told that she was injured

7    as a result of being dragged through some brush

8    would that have tainted or forced a different

9    opinion.  If I had seen these kind of findings, my

10    first and foremost conclusion first is to make

11    sure this is not a result of sexual assault, and

12    then I would have gone through DHR and let the

13    authorities work out what the details were as to

14    what actually occurred.

15  Q    So would it be true to say that automatically

16    you've been trained to consider on any bruising on

17    the vaginal area you first rule out sexual assault?

18  A    Counselor, if you're shot in the chest, my first

19    concern is to see whether or not it went through

20    the heart.

21  Q    Could you answer the question, sir?

22  A    I'm answering the question in that anytime --

23  Q    It's a yes or a no.

24        MR. VALESKA:  Judge, he's trying to answer.

25    Let him --

1         MR. BRANTLEY:  Well, he's not answering --

2         THE COURT:  Hang on just a minute.

3         You know, if you can answer the question

4  yes or no, you should answer yes or no.  If you

5  can't, then answer it to the best of your ability.

6  A   Yes.  Anytime we see any injury at all to the

7      vaginal area, my first consideration is some kind

8      of sexual assault.

9         MR. BRANTLEY:  That's all.

10        FURTHER REDIRECT EXAMINATION

11  BY MR. VALESKA:

12  Q   I want to ask you, Mr. Brantley said you got this

13      fixed opinion or you had been tainted by your

14      examination when you went and looked at Jonteria

15      Jones, which doctor did you talk to that asked you

16      to examine or take pictures and look at her

17      again?  Which doctor was it?

18  A   It was Dr. Robert Head.

19  Q   And what's his profession or occupation?

20  A   He's a board certified pediatrician here in

21      Dothan.

22        MR. VALESKA:  That's all.

23        THE COURT:  Mr. Brantley?

24        MR. BRANTLEY:  No, sir.

25        THE COURT:  Can the doctor be excused?

1    MR. VALESKA:  Yes.

2    THE COURT:  Thank you.  You can be excused.

3    MR. VALESKA:  Thank you for your indulgence.

4    And the jury's too.

5    THE COURT:  Ladies and gentlemen, we will

6    recess for you-all until nine o'clock in the

7    morning.  The attorneys need to be back at

8    eight-thirty.  If you would when you come back, we

9    may be taking a few guilty pleas.  There's other

10   cases set tomorrow also.  Just go direct to this

11   jury room.  You can enter it from the outside.

12   You probably figured that out by now.

13       Again, I want to caution you.  I know

14   that there was a reporter from the television

15   station and also the newspaper that have been in

16   the courtroom much of today.  You're not to watch

17   any news accounts of this.  I know you may have

18   family members at home that are interested in what

19   you've been doing.  Just tell them you are on a

20   jury and the judge has said you cannot talk about

21   the case.  You're not to talk to spouses or

22   children about it.  You're not to do any sort of

23   independent investigation of the case as far as

24   looking at any books, documents, if there's -- if

25   you're watching TV tonight and there's a show

1    about rape or attempted murder and all these crime

2    scene shows that are on TV, you shouldn't watch

3    those either.  Everything you should hear about

4    this case you need to hear from the witness stand.

5    So hopefully we will be able to finish tomorrow.

6    I can't promise that.  That's what we're going to

7    shoot for.  Please don't let that happen.  If the

8    attorneys want me to directly ask you-all in the

9    morning if you did any of these things, I will do

10    that.  So please be prepared for that as well.

11         But, again, you're free to go until nine

12    o'clock in the morning.  Just come directly back

13    to the jury room.

14         (Jury not present.)

15      MR. VALESKA:  This is outside the presence of

16    the jury.  I just want to offer the rape kit,

17    state' 27.  That's the one Mr. Brantley said they

18    had no objection to on the chain evidence of

19    Freeshone McLeod.

20      MR. BRANTLEY:  No objection.

21      THE COURT:  It is admitted.

22         (State's Exhibit No. 27 marked for

23         identification and admitted into

24         evidence.)

25      THE COURT:  Anything else from either side at

255

1      this point?

2              MR. VALESKA:  No, Your Honor.

3              THE COURT:  Anything, Mr. Brantley, at this

4      point?

5              MR. BRANTLEY:  No, sir.

6              THE COURT:  We're adjourned.

7                  (The proceedings for April 7, 2003 were

8                  concluded.)

9                  (Off the Record.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          IN THE CIRCUIT COURT OF HOUSTON COUNTY

2                    STATE OF ALABAMA

3

4   STATE OF ALABAMA,              *
                                   *
5   v.                             *    Case No. CC-002-235-236
                                   *
6   FREESHONE MCLEOD,              *
                                   *
7          Defendant.              *

8

9

10

11       REPORTER'S OFFICIAL TRANSCRIPT ON APPEAL

12

13

14

15  Before:

16          The Honorable Brad Mendheim and jury

17                  April 8, 2003

18

19

20

21

22

23

24
    Carla H. Woodall
25  Court Reporter

```
 1              (The proceedings for April 8, 2003,

 2              began at 9:00 a.m.)

 3          (Jury present.)

 4      THE COURT:  Go ahead, Mr. Valeska.

 5      MR. VALESKA:  Judge, if I could, I believe

 6  yesterday Mr. Brantley and I showed you State's

 7  Exhibit 27, which is the alleged -- it's the rape

 8  kit of Freeshone McLeod.  The blood.  All the

 9  samples from Nita Collins.  If we could stipulate

10  to chain and all that for the purposes -- the

11  nurse was here, and you released her; is that

12  correct?

13      MR. BRANTLEY:  That's correct.  What exhibit

14  number?

15      MR. VALESKA:  That's 27.  Go ahead and hand

16  it to you, yes, sir.

17      THE COURT:  And that was the one that your

18  client specifically agreed with your decision

19  also; is that right, Mr. Brantley?

20      MR. BRANTLEY:  Yes, Your Honor.

21      THE COURT:  What number?

22      MR. VALESKA:  27.  I'm going to let him hold

23  on to it.

24      THE COURT:  You don't want to introduce it at

25  this point.
```

1         MR. VALESKA:  I'm offering 27.  There's no

2  objection he said.

3       THE COURT:  No objection to 27?

4       MR. BRANTLEY:  No objection to 27.

5       THE COURT:  27 is admitted.

6       MR. VALESKA:  If I would, State's 7 is the

7  rape kit of Jonteria Jones, the victim.  They have

8  agreed to stipulate to that.  We have those

9  witnesses.  They know that.  They are available.

10  Just for the purposes of moving the trial along

11  and chain evidence on the rape kit on Jonteria

12  Jones.  Number 7.  So we offer that.

13       THE COURT:  Any objection to No. 7?

14       MR. BRANTLEY:  No, Your Honor.

15       THE COURT:  No. 7 is admitted.

16         (State's Exhibit No. 7 was admitted into

17         evidence.)

18       MR. VALESKA:  We call Mose McGriff to the

19  stand.

20           MOSE MCGRIFF

21  having first been duly sworn, was examined and

22  testified as follows:

23          DIRECT EXAMINATION

24  BY MR. VALESKA:

25  Q   Have you been put under oath, promise to tell the

| | | |
|---|---|---|
| 1 | | truth? |
| 2 | A | Yes, sir. |
| 3 | Q | Tell the jury your name, please, sir. |
| 4 | A | My name is Mose McGriff. |
| 5 | Q | Mr. McGriff, are you married? |
| 6 | A | Yes, sir. |
| 7 | Q | What is your wife's name? |
| 8 | A | Bettie McGriff. |
| 9 | Q | Let's go to on or about October 6 of 2001 and ask |
| 10 | | could you tell the ladies and gentlemen of the |
| 11 | | jury, please, Mr. McGriff, where did you live in |
| 12 | | Houston County on that occasion? |
| 13 | A | I stay at 62 Depot Street, Gordon, Alabama. |
| 14 | Q | The address of Depot Street? |
| 15 | A | I stay on Depot Street. |
| 16 | Q | The number? |
| 17 | A | 62. |
| 18 | Q | 62 Depot Street, Gordon, Alabama, Houston County? |
| 19 | A | Right. |
| 20 | Q | Could you tell the ladies and gentlemen of the |
| 21 | | jury, on October 6 of 2001, Mr. McGriff, please |
| 22 | | tell the panel, did you know Jonteria -- Jonteria |
| 23 | | Jones? |
| 24 | A | Yeah. |
| 25 | Q | Did you know her to be about six years old? |

1    A    Right.

2    Q    Did you know her grandmother?

3    A    Yes.

4    Q    Her grandmother's name, could you tell us?

5    A    Mae Lizzie Jones.

6    Q    Mr. McGriff, you and your wife live in a house in

7         Gordon, Alabama.  What is the house made of?  Is

8         it wood or plaster?

9    A    Brick.

10   Q    Now, to get from the street out in front of your

11        house up to your house, what goes from your house

12        down to the street.  That's made of concrete,

13        what is that?  When you drive up --

14   A    Concrete driveway.

15   Q    Tell the ladies and gentlemen of the jury, your

16        house facing -- if you're standing in the front of

17        your house out in front in the driveway looking at

18        your house, okay, on left or right or behind your

19        house, what other kind of houses or structures or

20        buildings were close to your house?

21   A    Trailer.

22   Q    Now, if I'm at your house standing this way with

23        the front door behind me and your house and I look

24        to my right where your concrete driveway, how

25        close was the trailer to your house then?

1    A    It would be from here to that wall.

2    Q    From here to the wall?

3    A    That's right.

4    Q    And who was living in that trailer on or about

5         October 6 of 2001?  Who was living in it?  Who

6         stayed in it?  Can you not think of her name?

7    A    Tunt.  I call her Tunt.

8    Q    Is Tunt Jonteria Jones's momma?

9    A    Right.

10   Q    Was anybody else living in the house with her

11        during this time?

12   A    At that time he staying with them.

13   Q    You kind of looked over there and said him, is it

14        Freeshone McLeod, the man you see sitting over

15        there with Mr. Brantley?

16   A    That's right.

17        MR. VALESKA:  Let the Record reflect he

18        indicated it was Mr. McLeod.

19   Q    Would you tell the ladies and gentlemen of the

20        jury, was there another trailer close to that

21        trailer -- once again, if I just use this jury

22        box.  That is the trailer that Tunt and Jonteria

23        Jones and Freeshone were living in with your brick

24        house -- and I know you said the distance -- but

25        somewhere right over here.  Was the front of their

1          trailer close to your house or the back?

2    A     The back close to my house.

3    Q     The front of their trailer they were living in,

4          Freeshone and Tunt, was there another trailer on

5          the other side of that about a hundred or two

6          hundred yards away?

7    A     Right.

8    Q     Do you know if anybody was living in that trailer

9          back then that you know for sure?

10   A     I'm not for sure.

11   Q     Tell the ladies and gentlemen of the jury, had you

12         seen Jonteria Jones play in the neighborhood

13         before October 6 of 2001?

14   A     Yeah.  I seen her all the time.

15   Q     Did you see her other sisters?

16   A     Yeah.

17   Q     Now, would you tell the ladies and gentlemen of

18         the jury, on or about around two o'clock on

19         October 6 of 2001, do you recall what you were

20         doing that day?

21   A     I was -- well, I was cooking.

22   Q     Did somebody or did you see something get your

23         attention somebody outside your house?  Did you

24         see somebody?

25   A     Well, he keep going back and forth down the road

1    so I didn't know what he was doing.

2    Q    Remember the jury wasn't there, and what I want to

3         ask you, Mr. McGriff, you said you looked out and

4         you saw somebody going up and down if front of

5         your house; is that right?

6    A    That's right.

7    Q    Who was it?

8    A    It was Freeshone.

9    Q    Had you seen Freeshone in the neighborhood before

10        October 6 of 2001?  Many times?

11   A    Oh, yeah.

12   Q    Did you ever see him walking or acting like he was

13        this time when you saw him on October 6, or was it

14        different?

15   A    Well, to me he was.

16   Q    Now, would you tell the ladies and gentlemen of

17        the jury, did you go out and talk to him or say

18        anything to him?

19   A    Yeah.  He asked me have I seen the daughter.

20   Q    Was that Jonteria Jones?

21   A    That's right.

22   Q    What did you tell him?

23   A    I told him, no, I haven't seen her.

24   Q    What did he ask you to do, if anything?

25   A    He said the little girl lost.  And I asked how

264

```
 1              long been gone.  He said about thirty-five to
 2              forty minutes.  I said, what the problem.  He
 3              couldn't find her.
 4     Q        Mr. McGriff, you got to slow down.  I talk real
 5              fast.  I think you're faster than me a little bit.
 6                   Did Freeshone have any conversations with you
 7              about Jonteria Jones then?
 8     A        Well, he said, my little girl been gone.  He said
 9              he couldn't find her.  So I said --
10     Q        She was gone and couldn't find her, correct?
11     A        Uh-huh.
12     Q        And then what did he ask you or say next about
13              Jonteria Jones?
14     A        Well, he just said he couldn't find her, and I
15              told him I would help him look for her.
16     Q        Did you leave your house with Freeshone McLeod at
17              that time?
18     A        No.  Me and him went together.
19     Q        That's what I'm asking.  You went out of the house
20              and you are out talking to --
21     A        Right.  Uh-huh.
22     Q        Let's go back.  I asked you about Jonteria's
23              grandmother.  Was that house -- or trailer close
24              to your house also?
25     A        Yes, sir.
```

265

| | | |
|---|---|---|
| 1 | Q | Now, if I could, do you know who kept Jonteria? |
| 2 | | Who was her guardian?  The name of the person, if |
| 3 | | you know?  You may not know. |
| 4 | A | It's sister -- niece. |
| 5 | Q | Now, if I could, was that house close to yours |
| 6 | | where she would be dropped off while she had to go |
| 7 | | to work and the grandmother watched her?  Is that |
| 8 | | close to your house? |
| 9 | A | Yes, it is. |
| 10 | Q | Is that a trailer or a house? |
| 11 | A | It's a house. |
| 12 | Q | When I say close, I'm talking about no further |
| 13 | | than the length of this courtroom or double this |
| 14 | | courtroom -- |
| 15 | A | It's a little further than that. |
| 16 | Q | But you could see it with no problem? |
| 17 | A | Right.  No problem. |
| 18 | Q | Now, when you went outside your house with |
| 19 | | Freeshone McLeod on October 6 of 2001, how was he |
| 20 | | acting that you observed? |
| 21 | A | Well, he act normal to me. |
| 22 | Q | He act normal to you? |
| 23 | A | Right. |
| 24 | Q | You still live down there? |
| 25 | A | Me? |

1   Q   Yes, sir.

2   A   Yes.

3   Q   And do you know his family?

4   A   Uh-huh.  I mean, I don't know Freeshone family --

5       his family.  I thought you meant the baby's

6       family.

7   Q   My question to you, Mr. McGriff, when you went

8       outside and you saw Freeshone McLeod and had the

9       conversation, was there anybody else looking for

10      Jonteria at that time?

11  A   Not that I know of.

12  Q   Now, tell me about the area, in other words, in

13      front of your house.  Is this like a residential

14      area?  There's a house every five feet, and

15      there's hundreds of cars and children, or is it a

16      rural area?

17  A   No.  It wasn't no hundred cars.  Just a field in

18      front of my house.

19  Q   A field you said, correct?

20  A   Uh-huh.

21  Q   Is there a lot of woods?

22  A   No.  Just a big field in the ditch right outside

23      my house.

24  Q   Let's go out your driveway on the concrete, step

25      out, and go from your house to the concrete to the

```
 1         trailer where Freeshone and Tunt lived.  Is there
 2         some bushes and trees around in there?
 3    A    There's fence and trees there.
 4    Q    That's what I want to ask about.  So is this like
 5         downtown Gordon?  In other words, businesses or
 6         houses -- or is it kind of a rural area, a lot of
 7         bushes and trees around there?
 8    A    That's right, yes.
 9    Q    When you went outside and you were looking for
10         Jonteria with Freeshone McLeod, did you go to a
11         particular place or did he tell you to go look in
12         a place?
13    A    No.  He told me what the marks was.
14              MR. BRANTLEY:  What did you say?
15    Q    Let me go back.
16              MR. VALESKA:  I'll ask him, Mr. Brantley.
17    Q    He told you to look at what?
18    A    Some drag marks.
19    Q    And if I'm wrong, you correct me, Mr. McGriff.
20         You said the first time he asked you to look at a
21         mark is what you said?
22    A    Yeah.
23    Q    And that's the drag marks, correct?
24    A    Uh-huh.
25    Q    Were they close to your house or the trailer he
```

1   was living in with Tunt, Jonteria's mother?

2 A Close to the front door of the trailer.

3 Q Of the trailer.  Did you see the marks?

4 A Yes, I seen them.

5 Q They look like drag marks?

6 A Right.

7 Q Did he say what could have caused those drag marks?

8 A No, he didn't.

9 Q It's been a while.  Do you remember when you

10   talked with the officers about the case?

11 A Well, he had me -- what kind of marks those was.

12   I said, I don't know.

13 Q And then did he tell you what he thought those

14   kinds of marks were made from what?

15 A Not that I -- not that I recall.

16 Q You looked at the mark.  Could you tell what had

17   caused those marks yourself, Mr. McLeod?

18 A To me it looked like it was the front of somebody

19   drug.

20 Q The front of someone had been drug?

21 A Right.

22 Q Now, please tell the jury, at that point in time

23   which person, you or Freeshone McLeod, walked or

24   told you which direction to go?  As you're looking

25   at those marks, who told you or who walked in the

1       direction then?  You or him?

2   A   We both walking that way.

3   Q   Which way did you walk?

4   A   We walked to out -- we went to our left.

5   Q   Is that from the trailer he lived in?

6   A   That's right.

7   Q   And was that towards the direction of another

8       trailer?

9   A   Right.

10  Q   Now, were you walking on concrete?

11  A   No.  In the bushes.  A little road through there.

12  Q   The road made of dirt?

13  A   That's right.

14  Q   And how far did you walk before Freeshone McLeod

15      said something?  Short distance or a long distance?

16  A   I say around about fifty feet.

17  Q   Fifty feet?

18  A   From that house -- that mark.

19  Q   And as you're walking, what did it look like

20      around there?  Is it all just a flat field

21      completely cut down, or something in there?

22  A   No.  Plum trees and bushes.

23  Q   And as you were walking, who then said something

24      next about finding somebody?  Was it you or

25      Freeshone?

1   A   He did.

2   Q   Tell the jury what he said then.

3   A   He said, oh, my God.

4   Q   Oh, my God?

5   A   And then about that time he said it, I look, and I

6       seen the baby taking deep breaths.

7   Q   Describe those breaths that you saw Jonteria, the

8       baby, how she was breathing.  Was it --

9   A   It was uh-uh-uh (indicating), like that.

10  Q   And when you saw Jonteria in the bushes, did you

11      see any color of any substance on her?  What was

12      on her face or head or body?

13  A   She was face down.

14  Q   Do you ever cut your finger?

15  A   Yeah.

16  Q   Does something come out of your finger when you

17      get cut?

18  A   Yeah.

19  Q   What comes out?

20  A   Blood.

21  Q   Did you see any of that on her?

22  A   Yes, I have.

23  Q   Small amount or large amount?

24  A   Large amount.

25  Q   Would you tell the ladies and gentlemen of the

| | | |
|---|---|---|
| 1 | | jury, did you see Freeshone McLeod touch Jonteria |
| 2 | | at that time? |
| 3 | A | Not that I recall because I was really upset. |
| 4 | Q | And where did you and Freeshone go then? |
| 5 | A | We went -- I went back toward -- I said, do not |
| 6 | | touch the baby.  We're going to call 911. |
| 7 | Q | And he went with you? |
| 8 | A | I assume he did.  I was all upset.  I about to |
| 9 | | fall down.  And I went home and trying to call |
| 10 | | 911, and I couldn't call them.  My family took |
| 11 | | over then. |
| 12 | Q | Why couldn't you call 911? |
| 13 | A | I was scared.  I was all shook up. |
| 14 | Q | Why were you upset or you couldn't talk?  What had |
| 15 | | you seen? |
| 16 | A | Because, the baby, I thought she was dead.  I was |
| 17 | | hurt so bad by a little child like that in the |
| 18 | | bush like that. |
| 19 | Q | Now, you had seen Jonteria before in the |
| 20 | | neighborhood, right?  You had seen her before |
| 21 | | this? |
| 22 | A | Oh, yeah. |
| 23 | Q | You talked to her and spoken to her? |
| 24 | A | Yes. |
| 25 | Q | What kind of child was she? |

1   A   She was a nice baby.  She speak, how you-all

2       doing.  Like she do every day in the back of the

3       house.

4   Q   Have you seen her since this happened to her again?

5   A   Yes, I have.

6   Q   Is she different?

7   A   Yes, Lord, she different.

8   Q   Now, tell the ladies and gentlemen of the jury,

9       after you called 911, did you go back with anybody

10      else to see her -- Jonteria?

11   A   I did not go back.

12   Q   Who got her out of the bushes?

13   A   As far as I know -- as far as I --

14   Q   That you saw?

15   A   I seen her mother toting her to my driveway.

16   Q   Now, her mother, is that Tunt?

17   A   Yeah.  I call her Tunt.

18   Q   But that's her mother, right?

19   A   That's her mother.

20   Q   And when her mother was carrying her, how was her

21      mother acting?

22   A   Oh, she was very upset.

23   Q   Now, where did Tunt bring Jonteria when you were

24      at your house on the outside?

25   A   Right at my driveway.

273

1    Q    And who was present then?

2    A    It was a lot of people there then.

3    Q    Did you see Freeshone?

4    A    Yes.

5    Q    Did you see Freeshone touch Jonteria at any time

6         yourself?

7    A    No.

8    Q    Did you say while her mother, Tunt, was looking at

9         Jonteria, her baby, what I want to ask you, did

10        she say anything to Freeshone in your presence?

11   A    Yes, she did.  She said --

12             MR. BRANTLEY:  Object.  Hearsay.

13             THE COURT:  Sustained.

14   Q    After she said something, listen to my question,

15        Mr. McGriff, after she said something to

16        Freeshone, did she act different or do something

17        to him?

18   A    Yeah.  They went to fight.

19             MR. VALESKA:  Now, I showed Mr. Brantley.

20        This is State's Exhibit No. 28, Mr. Brantley.

21        The clothing of Jonteria.  It's sealed.  Can I

22        open it up with your permission?

23             THE COURT:  Yes.

24                  (State's Exhibit No. 28 was marked for

25                  identification.)

274

1    Q    State's Exhibit No. 28, a white bag, for the

2         Record.  Just taking out some items.  Let Mr.

3         Brantley come up and see.  Taking out, Mr.

4         Brantley is looking.  It's five items.

5              MR. VALESKA:  I'm only going to ask him about

6         three and identify the color of these two items,

7         Mr. Brantley.

8    Q    State's Exhibit 28, do you see the items of

9         clothing, the yellow shirt and white panties, are

10        these the clothes you saw Jonteria on?

11   A    Yes.

12   Q    I identified two items.

13             MR. VALESKA:  That's all.  I have.  Thank

14        you.  Pass the witness.  Thank you, Mr. McGriff.

15        Mr. Brantley has some questions.

16                      CROSS EXAMINATION

17   BY MR. BRANTLEY:

18   Q    Mr. McGriff, my name is Tom Brantley, and I

19        represent Mr. McLeod sitting by me.  He used to be

20        your neighbor?  Is that what you said?

21   A    Right.

22   Q    And how long did he live there next to you?

23   A    About a couple of years.

24   Q    A couple of years?

25   A    Right.

275

1    Q    And who did he live with?

2    A    Tunt.

3    Q    Tunt is Jonteria's mother?

4    A    Yes.

5    Q    And let's go to October 6.  That's the day that

6         Jonteria was found out there in the woods, okay.

7         Now, you saw Mr. McLeod on that day and walking

8         outside your house, didn't you?

9    A    Yeah.

10   Q    And he looked normal to you, didn't he?

11   A    Yeah.

12   Q    And you had seen him before from time to time

13        outside your house, hadn't you?

14   A    Correct.

15   Q    And you had seen -- do you call her Jonteria or

16        Tera?

17   A    Tera.

18   Q    Just Tera?

19   A    Uh-huh.

20   Q    You had seen him outside before with Tera from

21        time to time, had you not?

22   A    Walking down the road, yeah.

23   Q    Not just on that day, but previous days, too?

24   A    Uh-huh.

25   Q    In fact, you had seen Tera and Mr. McLeod out

1        there quite often from time to time, hadn't you?

2   A    A few times, yeah.

3   Q    And he was always taking care of her, wasn't he?

4   A    Well, they was, you know, going around the road

5        walking together.

6   Q    Just walking around, and he was looking at her?

7   A    Yeah.

8   Q    He would be the only adult with her, would he

9        not?  I mean, he would be the grown-up person with

10       her to take care of her?

11   A    I guess so.

12   Q    Let me ask you something.  Do you have bad

13       eyesight?

14   A    Now I do.

15   Q    You do now?

16   A    Yeah.

17   Q    Did you -- you've got these glasses on.  Is that

18       because your eyes are not good?

19   A    At this time not good.

20   Q    How were they back a couple of years ago on

21       October 6, 2001?

22   A    They were good then.

23   Q    What happened to your eyes, if I can ask?

24   A    Well, I had retina detachment in my eye.

25   Q    A retinal detachment?

1    A    Yeah.

2    Q    And is that a surgical procedure that a doctor

3         did?

4    A    Right.

5    Q    Prior to having the retinal detachment, were you

6         suffering problems with your -- was your vision

7         going bad?

8    A    Yes.

9    Q    And would it be true to say that on October 6 you

10        were having some problems with your eyesight then,

11        weren't you?

12   A    No.

13   Q    Weren't having any?  You were not having any

14        problems with your vision back in --

15   A    I was having small problem then during that time.

16   Q    Okay.  I understand.  What does -- what kind of

17        problems were you having with your vision back

18        about a year and a half ago?

19   A    Looking long way off.

20   Q    What about at night?

21   A    Oh, at night, no problem.

22   Q    Your night vision was not -- were you having

23        problems seeing things at night in low light?

24   A    No.  Because I wear my glasses.

25   Q    What did you say?

278

| | | |
|---|---|---|
| 1 | A | Glasses.  My glasses helping me doing that. |
| 2 | Q | You had glasses that you wore back then? |
| 3 | A | Yes. |
| 4 | Q | Did you wear them all the time? |
| 5 | A | All the time. |
| 6 | Q | Let me ask you about these drag marks.  Did you |
| 7 | | have your glasses on when you saw those drag marks? |
| 8 | A | Yeah. |
| 9 | Q | And it looked like to you something had been |
| 10 | | dragged? |
| 11 | A | Right. |
| 12 | Q | It wasn't necessarily a body or a person that was |
| 13 | | dragged, it was just something; is that correct? |
| 14 | A | That's right. |
| 15 | Q | And were they clearly visible to you with your |
| 16 | | glasses on? |
| 17 | A | I could see that good. |
| 18 | Q | In other words, could you look down and see those |
| 19 | | drag marks?  In fact, nobody had pointed them out |
| 20 | | to you, you could see them just plain, couldn't |
| 21 | | you? |
| 22 | A | Yeah. |
| 23 | Q | When you-all went up into the woods, is that where |
| 24 | | you-all went when you-all started looking for |
| 25 | | Tera? |

1    A    Uh-huh.

2    Q    How big were these woods in terms of -- do you

3         know how big an acre is?

4    A    Yes.

5    Q    Were these woods as big as an acre, or smaller?

6    A    Smaller.

7    Q    Were they as big would you say a half acre, or

8         smaller?

9    A    No.  It wasn't no half.  It wasn't that big.

10   Q    A quarter of an acre.  Would it be like a lot, a

11        vacant lot that's covered with brush?

12   A    Right.

13   Q    And some plum trees?

14   A    Yeah.

15   Q    And I would assume you had been over there from

16        time to time?

17   A    Yeah.

18   Q    Picking plums I guess?

19   A    Uh-huh.

20   Q    You were familiar with that little vacant lot

21        there that had the plum trees in it?

22   A    Uh-huh.

23   Q    And how far was this vacant lot from where

24        Freeshone and Tunt lived?

25   A    From the way I see it from about fifty foot.

1    Q    In fact, a lot of people went over there, didn't

2         they?  In the neighborhood to pick plums?

3    A    I couldn't tell you that.

4    Q    Were there paths in this vacant lot?

5    A    Paths?

6    Q    Paths.  Do you know what a path is?  People walk

7         and create a path?

8    A    Oh, no, sir.

9    Q    There were no paths to the plum trees?

10   A    No.

11   Q    How long had you-all looked in this vacant lot

12        with plum trees and brush?  How long had you-all

13        been looking before you-all found Tera?

14   A    Well, to my knowledge it wasn't long.

15   Q    Well, an hour --

16   A    No.  About thirty minutes.  Something like that.

17   Q    How long?

18   A    About thirty minutes.  Something like that.

19   Q    About a half hour?

20   A    Uh-huh.

21   Q    So you-all searched -- both of you-all searched

22        this vacant lot pretty well, didn't you?  You-all

23        were looking for that child in that vacant lot for

24        about half an hour?

25   A    What vacant lot you talking about?

| | | |
|---|---|---|
| 1 | Q | The vacant lot where you-all found Tera. |
| 2 | A | Right. |
| 3 | Q | You-all looked in there pretty well? |
| 4 | A | That was the last place we looked at when we found |
| 5 | | the baby. |
| 6 | Q | What did you say? |
| 7 | A | That was the last place. |
| 8 | Q | The last place? |
| 9 | A | Right. |
| 10 | Q | Okay.  Where did you-all look before then? |
| 11 | A | Around my house and in front of the ditch. |
| 12 | Q | So you-all looked in the ditch? |
| 13 | A | Down that ditch, yeah. |
| 14 | Q | When I say you-all, you talking about yourself and |
| 15 | | Freeshone? |
| 16 | A | Right. |
| 17 | Q | Let's start off first.  Where did you look when |
| 18 | | Freeshone came up to you and asked you would you |
| 19 | | help him look for Tera, that Tera was lost? |
| 20 | A | Right. |
| 21 | Q | Where did you-all start looking first? |
| 22 | A | I started in my ditch.  I started me and him both. |
| 23 | Q | In the ditch? |
| 24 | A | Uh-huh. |
| 25 | Q | And then where did you go? |

282

1   A   We went back towards the trailer.  He went back

2       towards the trailer, and I went the other way.

3   Q   He went back to the trailer?

4   A   Right.

5   Q   And where did you go?

6   A   I went back -- I be looking toward the ditch.

7   Q   And then after you-all got through when he got

8       through looking around the trailer, did you see

9       him when he was looking around his trailer?

10   A   No.  Because I was looking for her myself.

11   Q   Where did you-all look after that, Mr. McGriff?

12   A   Well, he come back and told me, Mose, come here

13       and let me show you something.  We went back to

14       the trailer.  He said, what are those marks right

15       there.  I said, it look like somebody been drug.

16   Q   He had been up there around his trailer and seen

17       that, and he came back and wanted to see what your

18       opinion was?

19   A   Right.

20   Q   What did you tell him?

21   A   I told him, well, go back towards the bushes over

22       there.

23   Q   And did you-all go out towards the bushes?

24   A   Yeah.

25   Q   And how long from the time you-all left this

```
 1          trailer where these drag marks are, how long was
 2          it before you-all found Tera?
 3     A    It wasn't two or three minutes.
 4     Q    Were you-all together when you-all found her?
 5     A    Yes.
 6     Q    You-all both walked up on her together?
 7     A    Well, my knowledge he seen her first.
 8     Q    How far away from you was Freeshone when he found
 9          Tera?  Just a few feet?
10     A    About a couple of feet.
11     Q    So you-all were pretty much together?
12     A    Yeah.
13     Q    Now, when you found her, was she in -- do you know
14          what I mean when I say brush?  Do you know what
15          brush is?
16     A    Yeah.
17     Q    What is brush?
18     A    Bushes.
19     Q    Bushes.  Did you-all find her in some brush, or
20          bushes?
21     A    She was laying on top of them bushes.
22     Q    What did you say?
23     A    She was laying on top of them.
24     Q    In other words, she was on top of some bushes,
25          right?
```

```
 1    A    Uh-huh.  Face down.
 2    Q    Now, when you found her, were her legs together or
 3         were her legs spread out?
 4    A    They were together.
 5    Q    Together like that (indicating)?
 6    A    Yeah.  Stretched out.
 7    Q    What did you say?
 8    A    She was stretched out laying on her face.
 9    Q    How were her arms?
10    A    (Indicating.)  Like that.
11    Q    Arms like that.  And do you know what I mean when
12         I say legs are spread out?
13    A    Yeah.
14    Q    Were her legs spread out?
15    A    No.  No.  They weren't spread out.  They were like
16         this, like people normal legs.
17    Q    Her legs weren't stuck together like this
18         (indicating), were they?
19    A    Not.
20    Q    There was space between her legs?
21    A    I couldn't say.
22    Q    Between her legs there were bushes?  Brushes?
23    A    She was laying on top of the brushes.
24    Q    She was laying on top of it?
25    A    Yes.
```

285

1    Q    How big was this brush?

2    A    A bunch of bushes all I know.

3    Q    Did it have limbs to it?  Twigs?  Was it brush

4         kind of like small -- see how big a hole I'm

5         making (indicating)?

6    A    Yes.  About like your finger.

7    Q    Brush about -- with twigs or stalks about that

8         big around about an inch diameter?

9    A    Yeah.

10   Q    And these drag marks led up to where this brush

11        was, right?

12   A    Not exactly, now.  Because there was drags and

13        bushes all between that so he couldn't -- after

14        left the dirt, they disappeared.

15   Q    Now, this brush would be the kind of brush that if

16        a person were dragged over it it would cause

17        scratch marks on the person, correct?

18   A    I guess so.

19   Q    Did you see any -- this is October.  Did you see

20        any blackberry bushes out there, things with

21        thorns on it, or do you remember?

22   A    The plum trees.

23   Q    Sir?

24   A    The plum trees only thing that have thorns on

25        them.

286

| | | |
|---|---|---|
| 1 | Q | Just the plum trees? |
| 2 | A | Yeah. |
| 3 | Q | Any gravel out there?  Is there any rocks, stones, |
| 4 | | anything like that out there? |
| 5 | A | Not that I recall. |
| 6 | Q | You would agree that that area, that vacant lot, |
| 7 | | certainly is not a -- it's not a playground for |
| 8 | | kids, is it? |
| 9 | A | Nope. |
| 10 | Q | In fact, there's a lot of things out there that |
| 11 | | would scratch kids and bruise kids, isn't there? |
| 12 | A | I don't guess so. |
| 13 | Q | Well, sticks?  Brush?  Twigs?  Especially if a |
| 14 | | person is being dragged, there's a lot of things |
| 15 | | out there that would cause a person to get bruised |
| 16 | | or scratched? |
| 17 | A | Yeah. |
| 18 | Q | And that's the reason kids don't play over there |
| 19 | | probably is because it's dangerous, correct? |
| 20 | A | Woods and all. |
| 21 | Q | Now, when Mr. McLeod located Tera he said, oh, my |
| 22 | | God? |
| 23 | A | Uh-huh. |
| 24 | Q | Did he appear to be concerned about Tera? |
| 25 | A | Well, when he said that, that's all I can |

```
 1              remember.  When he seen that and I seen her, too,

 2              and he said that, and I look and seen that baby

 3              bleeding like that, that's when I got upset and I

 4              run back and told him do not touch the child,

 5              going to call 911.

 6    Q    Did you tell him not to touch Tera?

 7    A    Yeah.  Stay with her.

 8    Q    And when you told him that, did you go on back to

 9              the house?

10    A    Yes.

11    Q    What did he do?  Did he stay there with her?

12    A    I don't know.  Because I was running.

13    Q    You certainly -- if you were running back to the

14              house, he was behind you?

15    A    I guess so.

16    Q    Because certainly -- he wasn't in front of you,

17              was he?

18    A    Nope.

19    Q    When you went back to the house, when is the next

20              time you saw Freeshone?

21    A    When the mother had the baby.

22    Q    How many minutes was that?

23    A    Well, I couldn't say.

24    Q    Five or ten or fifteen.

25    A    Something like that.  Because I was crying and
```

1      going on.  I couldn't tell you about that.

2   Q  In fact, that whole afternoon when you saw

3      Freeshone and when he asked you to help him look

4      for Tera up until the time that the momma came up

5      there and hollered at him, Freeshone appeared to

6      you to be concerned about Tera?

7   A  Yeah.  At the time, yes.

8          MR. BRANTLEY:  That's all.

9                    REDIRECT EXAMINATION

10  BY MR. VALESKA:

11  Q  Let me ask you, Mr. McGriff.  You said it was

12     thirty minutes that you looked for Jonteria.  Are

13     you sure it was thirty minutes?  That long?

14  A  Well, I just sat there.  Because I tell you --

15  Q  Was it a short time or long time until she was

16     found?  From the time he came up and asked --

17  A  I don't know how long -- she been laying there.

18  Q  No.  No.  No.  Listen to my question, Mr.

19     McGriff.  When Freeshone McLeod asked you to help

20     look for Jonteria, you said you walked out to look

21     where?

22  A  My ditch over there.

23  Q  This is you right here.  You walked out to the

24     ditch.  It didn't take you ten minutes to walk to

25     the ditch, did it?

1    A    No.

2    Q    You got to the ditch.  Where was he then?  Where

3          was he looking?

4    A    He was looking out there in the bushes, too.

5    Q    You say bushes.  You talking about --

6    A    The ditch in the bushes.

7    Q    Now, how close was the trailer that Freeshone and

8          Dinthea -- Tunt Jones -- lived in from there?

9          Short or far?  It's short, isn't it?

10    A    It's short, yeah.

11    Q    So what I want to ask you, while he was in the

12          ditch looking, where did he go next?  Which way he

13          walked to where?

14    A    He walked toward the trailer.

15    Q    Did that take him thirty minutes to walk to the

16          trailer?  It didn't, did it?

17    A    No.

18    Q    It's real short, isn't it?

19    A    Yeah.

20    Q    And when he got to the trailer, you were still at

21          the ditch, right?

22    A    Yeah.

23    Q    Who came back and told you they saw drag marks?

24    A    Right.  Uh-huh.

25    Q    Short time or long time?

1   A   It was a short time.

2   Q   Now, when you went over there and saw the drag

3       marks, Mr. Brantley asked you about, you know for

4       sure they were drag marks, correct?

5   A   Yes, they was.

6   Q   And then when Freeshone McLeod was up there by the

7       trailer, he first saw the drag marks, you were in

8       the ditch, right?

9   A   Yes, uh-huh.

10  Q   Did you see anything that prevented Freeshone

11      McLeod to go looking around those drag marks

12      before he came and got you?  Nothing prevented him

13      from looking around, did it?

14  A   No.

15  Q   And when he brought you back up there and pointed

16      out the drag marks, what I want to ask you about,

17      Mr. Brantley keeps asking about this field.  The

18      open field is in front of whose house?

19  A   Mine.

20  Q   Where Jonteria Jones was found, is this an open

21      field, completely open?

22  A   No.

23  Q . There's the trailer Freeshone and her mother lived

24      in, right?

25  A   Right.

291

1   Q   There's another trailer fifty -- sixty feet away

2       that was unoccupied, right?

3   A   That's right.

4   Q   Is that solid bushes?  It's not, is it?

5   A   It's bushes.

6   Q   Is it solid bushes?  You can't even walk through,

7       or is it cut down and open?

8   A   No.  You can't walk through it.

9   Q   Mr. McGriff, is it your testimony if you came out

10      the trailer that Freeshone and Dinthea --

11          MR. BRANTLEY:  Object.  He's leading his

12      witness.  It's his witness.

13          THE COURT:  Sustained.  Try not to lead your

14      witness.

15  Q   Mr. McGriff, you were at Dinthea Jones' and

16      Freeshone McLeod's trailer standing on the porch.

17      Did you see that porch?

18  A   From my house?

19  Q   No, sir.  When you went and looked at the drag

20      marks.

21  A   Yeah.

22  Q   How close was the porch to the drag mark?

23  A   From here to that wall.

24  Q   So is it short or long?

25  A   For me that is short.

1   Q   My question to you, the drags marks went which

2         direction, towards the trailer or away from it?

3   A   Away from the trailer.

4   Q   Now, as you walked and looked at the drag marks,

5         I'm asking you, you looked down at them, from

6         where the drag marks are, tell the jury to where

7         you found Jonteria Jones, let's just say this is

8         the area, okay, this courtroom, is it solid woods?

9         Tree, tree, tree, bush?  You couldn't even walk

10        through?  It's not like that, is it?

11  A   No, it's not like that.

12  Q   Can you see pictures with your eyesight now?

13  A   Yeah.

14  Q   I want to show you some pictures, if I could.  Let

15       me show you what's been marked State's Exhibit 5

16       for identification purposes.  Can you see State's

17       5 now?  Can you see it?

18  A   Yeah.  I see at the right here.

19  Q   What I want to ask you. You're looking at State's

20       5.  It is not in.  Do you see any trailers on

21       there you recognize?

22  A   Right there.

23  Q   That's on the right side of the picture you're

24       looking at, right?  Whose trailer is that?

25  A   Tunt trailer.

1    Q    You see any other trailers on the other side?

2    A    Yeah, I see them.

3    Q    On the left side, correct?

4    A    Yeah.

5    Q    Does that show from the house to the trailer of

6         what the bushes looked like?

7    A    Yeah.

8    Q    And does that show the dirt?

9    A    The only dirt be right here (indicating).

10   Q    Where would the drag marks have been at?

11   A    Right here.

12   Q    Let me show you.  Does that picture truly and

13        accurately depict what you said are solid woods,

14        or is there opening or cuttings there where you

15        can walk through?

16   A    No.  It's solid.

17             MR. VALESKA:  Offer State's 5 into evidence.

18             MR. BRANTLEY:  No objection.

19             THE COURT:  State's 5 is admitted.

20                 (State's Exhibit No. 5 was admitted into

21                 evidence.)

22                 (State's Exhibits No. 29 and 30 were

23                 marked for identification.)

24   Q    Let me show you State's Exhibit 29 for

25        identification purposes.  Do you see 29?  Do you

```
 1            recognize 29?
 2   A    Uh-huh.
 3   Q    Whose trailer is on the right?
 4   A    That's Tunt's trailer.
 5   Q    You got to speak up.
 6   A    That's Tunt's trailer.
 7   Q    Was that Freeshone?
 8   A    Freeshone, yeah.
 9   Q    The trailer, that's 80 Depot Street, right?
10   A    That's right.
11            MR. VALESKA:  Offer 29.
12            MR. BRANTLEY:  What is that?
13            MR. VALESKA:  Picture of the trailer and the
14       dirt and the other trailer.
15            MR. BRANTLEY:  No objection.
16            THE COURT:  29 is admitted.
17                 (State's Exhibit No. 29 was admitted
18                 into evidence.)
19   Q    Showing you State's 30.  We asked you about some
20       drag marks.  Do you remember, Mr. McGriff?
21   A    Uh-huh.
22   Q    Is that the drag marks, how they looked in the
23       dirt?
24   A    Yeah.  That's them.
25            MR. VALESKA:  Offer State's 30, the picture
```

1      of the drag marks.

2              THE COURT:  30 is admitted.

3                  (State's Exhibit No. 30 was admitted

4                  into evidence.)

5              MR. VALESKA:  Can I publish 29 and 30 and 5?

6      They are in.

7              THE COURT:  Okay.

8              MR. VALESKA:  That's all.

9              MR. BRANTLEY:  If I could temporarily get

10      these pictures from the jury.  If I could, please,

11      ma'am.  Let me show them to him.

12              A JUROR:  (Complied.)

13              MR. BRANTLEY:  Thank you very much.

14                      RECROSS EXAMINATION

15      BY MR. BRANTLEY:

16      Q    This wooded area where you-all went to, are you

17           saying here -- and I'm showing you State's Exhibit

18           5.  Is this the wooded area right up here where

19           that red arrow is pointing?

20      A    Right here.

21      Q    All that?

22      A    That's Tunt's house.

23      Q    Okay.  And all that wooded area back up in there

24           is where you're saying you-all went and it's a

25           vacant lot size?  What did you say?  A quarter of

1          an acre?

2     A    Not big.

3     Q    Not even as big as a quarter of an acre.

4          THE COURT:  If you would, speak up.  I'm

5          having trouble hearing you, and I know the jurors

6          and Mr. Valeska need to be able to hear you also.

7     Q    On State's Exhibit 5 in terms -- you see where you

8          enter the woods right there?

9     A    Let me see it.

10    Q    Look at there where you enter the woods.

11    A    Yeah.

12    Q    I want you to stop me when I get about as far --

13         let's say the woods started right here.  You see

14         this?

15    A    I see it.

16    Q    The woods start right here.  And I tell you what

17         I'm going to do.  I'm going to walk this way, and

18         you tell me about when to stop about when you-all

19         found Tera.

20         (Walking).

21    A    All right.

22    Q    Right here?

23    A    Yeah.

24    Q    So she was just up in there a little bit?

25    A    That's right.

1   Q   About from me to you?

2   A   Yeah.

3   Q   Okay.  And between me and you there's some brushes?

4   A   Yeah.

5   Q   There's some briars?

6   A   Right.

7   Q   And some brambles?

8   A   Uh-huh.

9   Q   Twigs and sticks and bushes; is that correct?

10   A   Yeah.

11       MR. BRANTLEY:  That's all.

12       MR. VALESKA:  No more questions.  Ask if he

13 can step down.

14       THE COURT:  Okay.  Can he go?

15       MR. VALESKA:  He can be excused.

16       THE COURT:  You can be excused.  That's it.

17 Thank you.

18       Why don't we take about a five minute

19 break.  Use the rest room and if anybody needs a

20 drink or water or something.  We won't take a long

21 one.  And when you finish with your break, just

22 come directly back to the box.  I know everybody

23 is finished.

24       (Jury not present.)

25       (Off the Record.)

```
 1                    (Jury present.)
 2              MR. VALESKA:  Call Jonteria Jones to the
 3         stand.
 4                      JONTERIA JONES
 5                    DIRECT EXAMINATION
 6    BY MR. VALESKA:
 7    Q    Good morning.
 8    A    Good morning.
 9    Q    Can you tell me your name?
10    A    Jonteria.
11    Q    What is your last name?
12    A    Jonteria Jones Janice.
13    Q    And how old are you now?
14    A    Seven.
15    Q    Where do you go to school now?
16    A    Ashford Elementary School.
17    Q    Ashford; is that right?
18    A    Yes, sir.
19    Q    And what's your teacher?  What is her name?
20    A    Ms. Jackie.
21    Q    And how do you get to school?  In other words,
22         when you're at your house, how do you get to the
23         school?  How do you get there?
24    A    The bus.
25    Q    And when you leave your house to get to the bus,
```

| | | |
|---|---|---|
| 1 | | how do you get out to the bus?  If you're in your |
| 2 | | house, how do you get on that bus?  What do you |
| 3 | | do? |
| 4 | A | I walk. |
| 5 | Q | And what do you walk with?  What helps you walk? |
| 6 | A | Cane stick. |
| 7 | Q | Now, when you get on the bus, you go to school and |
| 8 | | you get off the bus at school, what do you do at |
| 9 | | school? |
| 10 | A | Do homework. |
| 11 | Q | And in the morning sometime at school after |
| 12 | | you-all have been doing homework, do you-all have |
| 13 | | a break of any kind? |
| 14 | A | (Witness nodded.) |
| 15 | Q | What do you do at break? |
| 16 | A | We play. |
| 17 | Q | And what about eating?  Where do you eat at school? |
| 18 | A | In the lunch room. |
| 19 | Q | And what are some things you have for lunch?  Tell |
| 20 | | the jury what you've been eating for lunch. |
| 21 | A | I have cornbread. |
| 22 | Q | Anything else besides cornbread? |
| 23 | | What do you drink? |
| 24 | A | Milk. |
| 25 | Q | And when you get through with school and you come |

1   back and you get off the bus, how do you get from

2   the bus to your house?  Do you walk?

3 A (Witness nodded.)

4 Q Can you run now?  Can you run?  You can't do that

5   real good, or can you?

6 A (Witness nodded.)

7 Q Do you need something to help you run?

8 A (Witness nodded.)

9 Q What do you use?

10 A My cane stick.

11 Q Tell the ladies and gentlemen of the jury, what's

12   your momma's name?

13 A Tunt.

14 Q You got any brothers or sisters?

15 A Marqeeta.

16 Q Do you have any friends, people you play with,

17   cousins, or nephews?

18 A Cousins.

19 Q Give me some of your cousins' names.

20 A Tylena, Justin, Marqeeta, and Marquis.

21 Q Now, let's see, if I ask you if you know what it

22   means to tell the truth or lie, or a story, do you

23   know what I'm asking you about?  Is it good to

24   tell the truth?

25 A (Witness nodded.)

| | | |
|---|---|---|
| 1 | Q | Is that a yes or no? |
| 2 | A | Yes. |
| 3 | Q | If you tell a lie, or a story, or a fib, do you |
| 4 | | get in trouble? |
| 5 | A | That's right. |
| 6 | Q | During your lifetime, Okay, have you ever once |
| 7 | | told a fib or a story? |
| 8 | A | (Witness nodded.) |
| 9 | Q | Is that a yes or no? |
| 10 | A | Yes. |
| 11 | Q | Did you get in trouble? |
| 12 | A | (Witness nodded.) |
| 13 | | Huh-uh. |
| 14 | Q | Do you go to church some? |
| 15 | A | (Witness nodded.) |
| 16 | Q | Who do you go to church to see?  Who do you go to |
| 17 | | pray to? |
| 18 | A | Pray for my grandmomma every day. |
| 19 | Q | And who do you pray to your grandma to to ask for |
| 20 | | help or protect your grandma?  Who are you praying |
| 21 | | to to help her? |
| 22 | A | So she can feel back better. |
| 23 | Q | Do you know who lives way up there in the sky? |
| 24 | | Who lives up there? |
| 25 | A | Santa Clause. |

1    Q    Who do you pray to, though, to help your

2        grandma?  What's that person's name?

3    A    Mae Lizzie.

4    Q    Do you know who Jesus is?

5    A    God.

6    Q    So when you pray, do you pray to God?

7    A    (Witness nodded.)

8    Q    Is that a yes or no?

9    A    Yes.

10    Q    Now, if I ask you some questions, see this Judge

11        up here?  Can you tell this Judge you will promise

12        to tell us the truth about questions we ask you?

13    A    (Witness nodded.)

14        MR. VALESKA:  At this time I ask you to

15      declare her competent to testify.

16        THE COURT:  Mr. Brantley?

17        MR. BRANTLEY:  Judge, can I take her on brief

18      voir dire?

19        THE COURT:  On that issue, yes.

20            VOIR DIRE EXAMINATION

21 BY MR. BRANTLEY:

22    Q    Jonteria, my name is Tom Brantley.  How are you

23        doing today?

24    A    Fine.

25    Q    How old are you?

1    A    Seven.

2    Q    And you're talking to us today, and you're

3         promising to tell us the truth; is that right?

4    A    Yes, sir.

5    Q    And are you promising if you don't remember

6         something you will tell us you don't remember; is

7         that correct?

8    A    (Witness nodded.)

9    Q    And is it good or bad to tell a lie?

10   A    Bad.

11   Q    Is it good or bad to tell the truth?

12   A    Tell the truth.

13   Q    Is that good?

14   A    (Witness nodded.)

15   Q    It is, isn't it?

16   A    (Witness nodded.)

17         MR. BRANTLEY:  I'm satisfied.

18         THE COURT:  The Defense is satisfied so we

19   declare she's competent.

20         MR. VALESKA:  You want to put her under

21   oath?

22         THE COURT:  Jonteria, do you promise to tell

23   us the truth in response to what he asks you and

24   the other man asks you?

25         THE WITNESS:  Uh-huh.

1      THE COURT:  Okay.

2              DIRECT EXAMINATION CONTINUED

3  BY MR. VALESKA:

4  Q    Jonteria, you got to say yes or no.

5  A    No.

6  Q    The Judge asked you would you tell the truth.

7       What's your answer to the judge?

8  A    (Witness nodded.)

9  Q    Is that a yes?

10  A    No.

11          THE COURT:  Jonteria, do you promise to tell

12      -- when Mr. Valeska and the other man that asks

13      you questions, do you promise me and these other

14      people and God that you will tell them the truth?

15          THE WITNESS:  (Witness nodded.)

16          THE COURT:  Is that a yes or no?

17          THE WITNESS:  Yes.

18          MR. VALESKA:  Thank you, Your Honor.

19          THE COURT:  Go ahead.

20  Q    Jonteria, I want to show you some pictures.

21          MR. VALESKA:  1, 2, and 3, are they in?

22          THE COURT REPORTER:  Yes.

23  Q    Show you some pictures.  1, 2, and 3.  Do you see

24      those pictures?

25  A    (Witness nodded.)

```
 1    Q    Jonteria, you got to answer for me because that
 2         court reporter has got to take down.  Do you see
 3         those pictures?
 4    A    (Witness nodded.)
 5    Q    Is that a yes or no?  Do you see the pictures?
 6    A    Uh-huh.
 7    Q    Who is in that picture?
 8    A    Jonteria.
 9    Q    And is she in all three of those pictures?
10    A    (Witness nodded.)
11    Q    Do you see what color shirt she's wearing?  Do you
12         know the color?
13    A    White.
14    Q    Do you know what orange is?  If I say the color
15         orange?
16    A    Blood.
17    Q    Do you see this shirt?
18    A    (Witness nodded.)
19    Q    And let you take a look at it.  Do you recognize
20         whose shirt that is with flowers on it?
21    A    (Witness nodded.)
22    Q    Whose shirt is that?
23    A    Jonteria.
24    Q    Now, let's go back -- let's go back a while,
25         okay.  On or about October 6 of 2001.  Let me take
```

1     you back a while back, okay.  Do you remember that

2     day?

3  A   (Witness nodded.)

4  Q   That day, did you have to have a cane before you

5     got hurt?

6  A   (Witness nodded.)

7  Q   That's a no, right?

8  A   (Witness nodded.)

9  Q   Now, could you tell the ladies and gentlemen of

10     the jury that day on October 6 of 2001, were you

11     at somebody's house or trailer?

12  A   (Witness nodded.)

13  Q   Whose?

14  A   My momma's.

15  Q   And did someone come and get you or ask you to go

16     look for something or get something to eat?

17  A   (Witness nodded.)

18  Q   What were you going to look for something to

19     eat?  What kind of food?

20  A   Noodles.

21  Q   And who took you to go look for noodles?

22  A   Freeshone.

23  Q   Now, when you left your grandmomma's house, did

24     you go to another house?

25  A   (Witness nodded.)

| | | |
|---|---|---|
| 1 | Q | What kind of house did you go to? |
| 2 | A | Mae Lizzie's house. |
| 3 | Q | And while you were at Mae Lizzie's house, did you |
| 4 | | go to another building? |
| 5 | A | (Witness nodded.) |
| 6 | Q | Your momma's name, what do you call your momma? |
| 7 | A | Tunt. |
| 8 | Q | Did Tunt live with Freeshone?  Live together? |
| 9 | A | (Witness nodded.) |
| 10 | Q | What did they live in?  Do you know what kind of |
| 11 | | building? |
| 12 | A | A trailer. |
| 13 | Q | Did somebody take you to that trailer on October |
| 14 | | 6, 2001, when you got hurt? |
| 15 | A | (Witness nodded.) |
| 16 | Q | Who took you? |
| 17 | A | Freeshone. |
| 18 | Q | And when he got you into that trailer, what did he |
| 19 | | do to you? |
| 20 | A | He hurt me. |
| 21 | Q | And what part of your body did he hurt? |
| 22 | A | Right there (indicating). |
| 23 | Q | Did he hurt any other part of your body? |
| 24 | A | (Witness nodded.) |
| 25 | Q | Did he hit you with something? |

```
 1   A   With a frying pan.
 2   Q   And what part of your body got hit with that
 3       frying pan?
 4   A   My head.
 5   Q   Did it hurt?
 6   A   (Witness nodded.)
 7   Q   Did you see any colors that you mentioned?  Any
 8       blood?
 9   A   Red.
10   Q   What color was it?  I'm sorry, it was what color?
11   A   Red.
12   Q   Now, after you got hit in the head, do you
13       remember anything after that?
14   A   He told me to go down to Mae Lizzie's to get some
15       noodles.
16   Q   Now, the pictures I showed you, 1, 2, and 3, do
17       you know whose house or driveway that is?
18   A   Tunt.
19   Q   Now, I'm going to show you these clothes, okay.  I
20       showed you the orange shirt with the flowers.  Do
21       you know whose underpants these are?
22   A   Jonteria.
23   Q   Jonteria's.
24       And before you got hit on the head by
25       Freeshone, did you have to use a cane before that?
```

1    A    (Witness nodded.)

2    Q    Now, I asked you who hit you on the head, and you

3         said a frying pan.  Do you see that person in the

4         courtroom?

5    A    (Witness nodded.)

6    Q    Is it me?

7    A    (Witness nodded.)

8    Q    Anybody in this jury box, or is it somebody else

9         in this courtroom?  Do you see Freeshone?

10   A    (Witness nodded.)

11   Q    Do you see the whole courtroom?

12   A    (Witness nodded.)

13   Q    You looked this way, okay, and then you looked

14        this way, right?

15   A    (Witness nodded.)

16   Q    Is this the whole courtroom, or is there some more

17        to this room?

18   A    There's more in this room.

19   Q    Look where some more of the room is.  If it's not

20        here and here, where is some more of the room?

21   A    Back there.

22   Q    I'm going to go stand back there, okay.  I'm going

23        to stand back here, okay.  Is there some more to

24        this room besides where I'm standing?

25   A    (Witness nodded.)

310

| | | |
|---|---|---|
| 1 | Q | Where do you see some more of the room? |
| 2 | A | Back there where you at. |
| 3 | Q | You see the lady at the table? |
| 4 | A | (Witness nodded.) |
| 5 | Q | You see anybody at any other tables? |
| 6 | A | Yes, ma'am. |
| 7 | Q | Who do you see? |
| 8 | A | I see -- I see her.  I see him and him and him |
| 9 | | (indicating) |
| 10 | Q | And who is him over there at the table, if |
| 11 | | anybody?  Do you know who that is? |
| 12 | A | Freeshone. |
| 13 | | MR. VALESKA:  Let the Record reflect she |
| 14 | | pointed out the Defendant. |
| 15 | Q | Is that the man that hit you what you said was a |
| 16 | | frying pan?  Was that the man, Freeshone? |
| 17 | A | (Witness nodded.) |
| 18 | | MR. VALESKA:  Let the Record indicate she's |
| 19 | | shaking her head up and down in the yes fashion. |
| 20 | | That's all I have. |
| 21 | | This man wants to ask you some |
| 22 | | questions.  Thank you. |
| 23 | | CROSS EXAMINATION |
| 24 | BY MR. BRANTLEY: | |
| 25 | Q | How are you doing? |

| | | |
|---|---|---|
| 1 | A | Fine. |
| 2 | Q | I want to ask you just a few questions about that |
| 3 | | day back on October 6. Is that okay? |
| 4 | A | (Witness nodded.) |
| 5 | Q | Now, is your momma in this room right now? |
| 6 | A | Yes, sir. |
| 7 | Q | Where is she sitting? Your mom is not in here, is |
| 8 | | she? Or is she? |
| 9 | A | (Witness nodded.) |
| 10 | Q | Okay. Let me ask you this. Let me ask you about |
| 11 | | these noodles. Did -- when -- did you go get some |
| 12 | | noodles? |
| 13 | A | (Witness nodded.) |
| 14 | Q | Did you go get the noodles after you were hit? |
| 15 | A | (Witness nodded.) |
| 16 | Q | Where did -- after you were hit with the frying |
| 17 | | pan, you went and got some noodles somewhere, |
| 18 | | didn't you? |
| 19 | A | (Witness nodded.) |
| 20 | Q | Where did you get these noodles? |
| 21 | A | From down at Mae Lizzie's. |
| 22 | Q | When you went down to Mae Lizzie's, did you tell |
| 23 | | her that Freeshone hit you with a frying pan? |
| 24 | A | (Witness nodded.) |
| 25 | Q | What did Mae Lizzie do? |

```
 1   A    He went to the jail house.

 2   Q    No.  Mae Lizzie, what did Mae Lizzie do after you

 3        told her that Freeshone hit you with a frying

 4        pan?  You don't remember, do you?

 5   A    (Witness nodded.)

 6   Q    Have you talked with your momma about this case

 7        here today?

 8   A    (Witness nodded.)

 9   Q    Many times or a few times?

10   A    Many times.

11   Q    And your momma has told you what to say?

12   A    (Witness nodded.)

13   Q    And are you telling us what your momma told you to

14        say?

15   A    (Witness nodded.)

16   Q    Would you say yes or no?

17   A    No.

18   Q    Did your momma tell you what to say?

19   A    (Witness nodded.)

20   Q    Does this mean yes?

21   A    Yes, sir.

22   Q    And you don't really remember who hit you, do you?

23   A    (Witness nodded.)

24   Q    You just remember what your momma told you?

25   A    (Witness nodded.)
```

1     MR. BRANTLEY:  That's all.

2     REDIRECT EXAMINATION

3 BY MR. VALESKA:

4 Q Let me ask you, Jonteria.  Mr. Brantley asked if

5   you don't know who hit you.  Do you remember him

6   asking you that?

7 A (Witness nodded.)

8 Q Did somebody hit you?

9 A Yes, sir.

10 Q Who was it?

11 A Freeshone.

12 Q Are you sure?

13 A Yes, sir.

14 Q Now, he asked you did your momma tell you what to

15   say?

16 A (Witness nodded.)

17 Q That man right over here, do you understand what

18   that means?  Do you know what that means?

19 A That means you hit people on the head that's mean.

20 Q Are you sure?  Look at these jurors over here and

21   tell them, you know for sure a hundred percent --

22     MR. BRANTLEY:  I'm going to object.  She's

23   very young.  And I think this is getting into the

24   area of leading, and, plus, the question has

25   already been asked and answered.

1    THE COURT:  I will let him go into it just a

2    little bit.  Try not to lead.  But he can follow

3    up specifically on I guess your cross.

4        Go ahead, Mr. Valeska.

5  Q    Look at this jury and tell them who hit you with

6    what you said was a frying pan.  Who was it?

7  A    Freeshone.

8  Q    Are you sure?

9  A    Yes, sir.

10    MR. VALESKA:  That's all.

11    THE COURT:  Anything else, Mr. Brantley?

12           RECROSS EXAMINATION

13  BY MR. BRANTLEY:

14  Q    What's your mom's name again?

15  A    Tunt.

16  Q    And how did you get to court today?

17    MR. VALESKA:  I object -- no, I don't.  I

18    withdraw that.

19  A    He hit me with a frying pan.

20  Q    I understand.  How did you get to court today?

21    Did you come with your momma?

22  A    (Witness nodded.)

23  Q    Do you live with your momma?

24  A    (Witness nodded.)

25  Q    And did your momma ride up here on the same car

```
 1          with you?

 2    A     (Witness nodded.)

 3    Q     Did you spend the night with your momma last

 4          night?

 5    A     (Witness nodded.)

 6    Q     And how long have you been living with your momma?

 7    A     Two weeks.

 8    Q     Two weeks.

 9                Who did you live with before that?

10    A     Mary.

11    Q     Is that Mary Lizzie?  Is that your grandmomma?

12    A     (Witness nodded.)

13    Q     And your momma has talked to you about this case,

14          and she's told you what to say, hasn't she?

15    A     (Witness nodded.)

16    Q     Is that -- when you do like that (indicating),

17          does that mean yes?

18    A     Yes, sir.

19                MR. BRANTLEY:  Thank you.

20                FURTHER REDIRECT EXAMINATION

21    BY MR. VALESKA:

22    Q     Jonteria, can you tell the jury this, okay?  If

23          your momma told you that this was black, would it

24          be black?

25    A     Orange.
```

1   Q   So when Mr. Brantley asks you did your momma tell

2       you what to say, okay, remember him asking you

3       that?  Did your momma get you to say something, or

4       did somebody really do something to you?

5   A   He did --

6          MR. BRANTLEY;  Object.  That's -- the form of

7       question.

8          MR. VALESKA:  Judge, under the rules this is

9       an eight-year-old little girl.  I can lead her,

10      and I don't see how that was leading.

11         THE COURT:  What specifically about the

12      form?

13         MR. BRANTLEY:  It's a compound question,

14      number one.  I'm objecting to the form.  It's a

15      compound question.  It requires different

16      answers.  We don't know which one she's going to

17      respond to, first or second.  And not only that,

18      but I think it's -- the part about leading, I

19      think the younger the witness is the less we

20      should lead because they are more suggestive.

21         THE COURT:  Let's just go with the question

22      that's been -- overrule your objection to that

23      question.

24          Go ahead, Mr. Valeska.

25   Q   Jonteria, I asked you -- Mr. Brantley asked you

CR 02-1610

**DOCUMENT NAME:** McLeod, Freeshone Cornelius

**CLIENT & MATTER:** 54599-001

Part 5 of 9

**DESCRIPTION:**

County: Houston

CC#s: 2002-235+236

Attorney: Beth Poe

Circle: (TRANSCRIPT)  CASE FILE  BOTH  5vol.

MMV

## CERTIFICATION

I hereby certify that the preceding imaged records and documents

are a true, accurate, and complete image of the original records or

documents as received by the Office of the Attorney General of

the State of Alabama.

This the 21st day of September, 2004.

Signed: _Melisa A. Martin_

Notary: _Coleen F Gibson_

Coleen F. Gibson
Notary Public
Commission expires 06/11/06