COURT OF CRIMINAL APPEALS NO._____

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

FROM

## CIRCUIT COURT OF ___HOUSTON___ COUNTY, ALABAMA

CIRCUIT COURT NO. ____CC-2002-235 & 236____ Volume IV

CIRCUIT JUDGE _____Brad Mendheim_____

Type of Conviction / Order Appealed From: __Rape 1 and Attempted Murder__

Sentence Imposed: _99 Years $20,000.00 Fine, $5,000.00 Victime Compensation._

Defendant Indigent: [X] YES [ ] NO    99 years, $20,000.00 Fine $5,000.00 Victime Comp

__Freeshone Cornelius McLeod__

__Hon. Clark Parker   PAR 069__          __793-9009__              NAME OF APPELLANT
(Appellant's Attorney)                          (Telephone No.)
__401 N. Foster St.__
(Address)
__Dothan__          __Alabama__      __36303__
(City)              (State)          (Zip Code)

V.

## STATE OF ALABAMA

(State represented by Attorney General)                    NAME OF APPELLEE
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)

Part 8 of 9

1    A    It would be the kitchen.

2    Q    The kitchen going down the hall, describe the

3         rooms.  Tell me what we have.

4    A    It was a room to the left.  You went by and there

5         was an area where a washer and dryer or laundry

6         area would have been.  On past it was the

7         bathroom, and then another bedroom in the south

8         end of the trailer.

9    Q    Now, Investigator Cook, I was looking for a

10        diagram, but I notice you told the ladies and

11        gentlemen of the jury there was a washer and

12        dryer.  Was there a washer and dryer in that

13        trailer?

14   A    No.  It was an area for one.

15   Q    So are you sure a hundred percent beyond all doubt

16        there was no washer and dryer in that trailer?

17   A    I'm sure.

18   Q    I want to show you a diagram that's been admitted,

19        State's Exhibit 38.  And I ask you about the

20        rooms.  Let you look at 38.  And ask you looking

21        at 38 that's been admitted, is that a rough

22        diagram -- I know it's been a long time -- in

23        reference to that trailer in Gordon, Alabama?

24   A    Yes.

25   Q    I ask you and you went in and you were going left

```
 1        and you described the rooms as you went down.  The

 2        last bedroom at the end of the trailer is what I

 3        want to ask you.  Just before that bedroom, okay,

 4        walking down the wall on the right, was there

 5        another door to exit that trailer or back in that

 6        location?

 7   A    Yes.

 8   Q    Tell the ladies and gentlemen of the jury, go back

 9        to the entrance wherever you came in.  You were

10        going left and describe.  Let's go right.  If I

11        went right, in other words, what rooms according

12        to the diagram that you have in that trailer, if

13        any?

14   A    You have another bedroom and rest room.

15   Q    Now, if I could, let's go to -- just go out that

16        back door or to the extreme right-hand corner.

17        Looking at the trailer stepping up on the wooden

18        porch and looking at that entrance, okay, right

19        angle of the trailer.  On that angle, was there

20        any structures close to that trailer?  Whose house?

21   A    If you are stepping on the porch?

22   Q    Step off the porch and go down to the left and go

23        down the end of the trailer where that last

24        bedroom is you said and you go around there, what

25        house or structure is behind that trailer close
```

1   to?

2 A You go to the -- are you saying south end of the

3   house?

4 Q I say south. That's fine. South.

5 A There was a trailer adjacent to this trailer to

6   the left side of the trailer.

7 Q Close or far away?

8 A It's about a hundred -- hundred and fifty yards

9   probably.

10 Q Anybody living in that trailer?

11 A No. It was empty.

12 Q Any other houses out there? When I say a house,

13   not a trailer, close to the trailer? Actual

14   houses?

15 A Yes.

16 Q Whose house?

17 A Mose McGriff's house.

18 Q And what was that house made of? Do you remember?

19 A Brick.

20 Q Now, tell the ladies and gentlemen of the jury,

21   the grandmother that kept Jonteria that day, what

22   kind of structure did she live in? Was it a brick

23   house?

24 A No. It was vinyl-siding-type house.

25 Q And if I use the trailer and I'm stepping off

```
 1        under the wooden porch of Freeshone and Dinthea

 2        Jones' trailer, which direction would that be?

 3        I'm standing on the porch.  Here's the door.

 4        Where would that house have been if I'm in that

 5        direction?

 6   A    It would have been to the west.

 7   Q    Back this way (indicating)?

 8   A    Back of you.

 9   Q    Back in this area, correct?

10   A    Right.

11   Q    Now, the approximate location of all these houses

12        and trailers except that one house that you said

13        was a hundred and fifty yards or whatever, are

14        those houses approximately close to each other?

15        Pretty close?

16   A    Pretty close.

17   Q    Take a baseball and almost hit them or whatever?

18   A    Correct.

19   Q    Looking at the diagram I asked you about the

20        porch.  And I know it's been a while.  Use that

21        diagram to refresh your memory if you can.  I

22        asked you about the porch when you stepped up onto

23        it.  Was there anything around the porch?  Look at

24        that diagram.

25   A    Oh, there was a lot of debris.
```

522

```
1    Q    I believe there's two or three pages there of the
2         diagram itself.  That's the page I want to ask you
3         about.  Looking at -- do you see a porch there?
4    A    Right.
5    Q    What do you see on either side of the porch coming
6         out on the diagram?
7    A    There was a rail.  I didn't remember there was a
8         rail.
9    Q    I understand.  But that refreshes your memory,
10        correct?
11   A    Right.
12   Q    Tell the ladies and gentlemen of the jury when
13        you got down there was the victim, Jonteria Jones,
14        still there?
15   A    She was on the ambulance.  She was leaving as I
16        was arriving.
17   Q    When you went into the trailer, I want to ask you,
18        tell the ladies and gentlemen of the jury, did you
19        go left or right?  Freeshone or Dinthea Jones'
20        trailer?  Just for identification purposes the
21        trailer in Gordon, Alabama, in Houston County.
22   A    I believe I went left.
23   Q    As you went left as an investigator with the
24        sheriff's department before October 6, 2001, did
25        you ever work cases with people, human beings, had
```

```
 1          been injured, cut, shot, stabbed, assaulted?  Did
 2          you work those cases?
 3    A     Yes.
 4    Q     Did you see any kind of substance in relationship
 5          to those victims if that occurred to them what
 6          would come out of their body?
 7    A     Yes.
 8    Q.    What was it?
 9    A     Blood.
10    Q     Now, you yourself, have you ever been cut or
11          injured during your lifetime and see something
12          come out of your body?
13    A     Yes.
14    Q     A red substance?
15    A     Yes.
16    Q     What was it?
17    A     Blood.
18    Q     Now, as you went into the trailer, would you tell
19          the ladies and gentlemen of the jury, did you
20          notice any blood?
21    A     I noticed some blood, yes, sir.
22    Q     Help me a little bit.  Either yourself getting cut
23          or seeing blood in the past over a period of time
24          blood, in other words, fresh blood versus old
25          blood, is there a difference in the colors for the
```

524

| | | |
|---|---|---|
| 1 | | period of time fresh blood versus old blood? |
| 2 | A | Yes, sir. |
| 3 | Q | When you were in the trailer and you went left, |
| 4 | | the best you can recall -- let me show you some |
| 5 | | exhibits if I could.  I know it's been a while. |
| 6 | | State's Exhibit 42, 41, which are in evidence -- |
| 7 | | let's do 41 first.  Let me show you these others. |
| 8 | | I will just place them up here.  And we'll go back |
| 9 | | into those.  34 and 42.  But I'm asking you |
| 10 | | particularly about State's Exhibit 41.  And then |
| 11 | | there's 42 on the back.  Stick with 41.  Tell the |
| 12 | | ladies and gentlemen of the jury, you recognize 41 |
| 13 | | for identification purposes? |
| 14 | A | Yes, sir. |
| 15 | Q | What is it? |
| 16 | A | It's a spot of blood on the door on the south end |
| 17 | | of the door on the south bedroom door. |
| 18 | Q | I don't mean to be picky.  Is it a house or |
| 19 | | trailer? |
| 20 | A | Trailer house. |
| 21 | Q | What was the number?  Do you recall?  The number |
| 22 | | of the trailer on Depot Street? |
| 23 | A | 76. |
| 24 | Q | Yes, sir. |
| 25 | | Now, tell the ladies and gentlemen of the |

525

| | | |
|---|---|---|
| 1 | | jury, when you saw that blood what you observed |
| 2 | | yourself, was it fresh? |
| 3 | A | Yes. |
| 4 | Q | When you went in the trailer, did you have any |
| 5 | | difficulty yourself as you walked in that |
| 6 | | direction seeing that blood? |
| 7 | A | No. |
| 8 | Q | Now, I want to ask you, do you recall |
| 9 | | approximately what time you were down there?  Was |
| 10 | | it six or seven o'clock, or was it early? |
| 11 | A | No. |
| 12 | Q | Jonteria had just left, correct? |
| 13 | A | Two or three o'clock in the afternoon. |
| 14 | Q | What I want to go back and ask you you yourself as |
| 15 | | a human being, an investigator, when you've seen |
| 16 | | blood except yourself when it's fresh versus when |
| 17 | | it gets old, does it change colors in any way? |
| 18 | A | Yes, sir. |
| 19 | Q | The blood you saw, can you tell the ladies and |
| 20 | | gentlemen of the jury, was it fresh? |
| 21 | A | It was fresh. |
| 22 | Q | Was it red? |
| 23 | A | It was red. |
| 24 | Q | Did you have any difficulty when you entered this |
| 25 | | trailer walking down and observing it right away? |

| | | |
|---|---|---|
| 1 | A | No, sir. |
| 2 | Q | Anything in that trailer that would have prevented |
| 3 | | you from seeing that as you walked in there |
| 4 | | yourself? |
| 5 | A | No, sir. |
| 6 | Q | Did you have to get a microscope get down or a |
| 7 | | little magnifying glass to see it? |
| 8 | A | No, sir. |
| 9 | Q | Did it stand out? |
| 10 | A | Yes. |
| 11 | Q | Is that the way it looked when you found it on |
| 12 | | State's 41? |
| 13 | A | Yes, sir. |
| 14 | Q | Whose foot is in the picture?  Do you know?  Is |
| 15 | | that your foot, or is that another investigator's? |
| 16 | A | It would have been Sergeant Ducker's. |
| 17 | Q | And the picture, does it truly and accurately |
| 18 | | depict the inside of 76 Depot Street at that |
| 19 | | trailer that Freeshone and Dinthea Jones lived in |
| 20 | | when you saw it the time shortly after the victim |
| 21 | | had been taken off in the ambulance? |
| 22 | A | Yes, sir. |
| 23 | Q | Marked, altered, or changed in any way? |
| 24 | A | No, sir. |
| 25 | Q | Same substantial condition, correct? |

527

| | | |
|---|---|---|
| 1 | A | Correct. |
| 2 | | MR. VALESKA:  Offer 41 into evidence.  Just |
| 3 | | the picture.  I understand there's some writings, |
| 4 | | and we will take those off, Judge. |
| 5 | | THE COURT:  Any objection to 41? |
| 6 | | MR. BRANTLEY:  Let me see them for a second, |
| 7 | | if I could. |
| 8 | | With the stipulation he will take that |
| 9 | | little sticker off. |
| 10 | | MR. VALESKA:  Just identification sticker, |
| 11 | | and we will do that. |
| 12 | | MR. BRANTLEY:  And subject to cross |
| 13 | | examination. |
| 14 | | THE COURT:  41 is admitted. |
| 15 | | (State's Exhibit No. 41 was admitted |
| 16 | | into evidence.) |
| 17 | Q | Go to 42, if I could, Investigator Cook.  Tell us |
| 18 | | what 42 is. |
| 19 | A | That's blood splatter.  It's on the wall in the |
| 20 | | south end of the mobile home. |
| 21 | Q | And once again, is that 76 Depot Street, Gordon, |
| 22 | | Alabama, Houston County, when Jonteria had just |
| 23 | | left you walked in and saw it? |
| 24 | A | Yes. |
| 25 | Q | Was it fresh? |

528

```
1    A    Yes, sir.
2    Q    Did you have any problems seeing it?
3    A    No, sir.
4    Q    Now, I notice on the picture if you'll tell the
5         jury, in other words, there's -- help me, but it's
6         on what?  What's the blood on?
7    A    It's on the wall.
8    Q    See the red substance, correct?
9    A    Yes.
10   Q    It's fresh?
11   A    Yes.
12   Q    Something circling around it.  Tell me what that
13        is.
14   A    I believe that's going to be the flashlight.
15   Q    Help me a little bit.  My experience a
16        flashlight, did you have to have a flashlight to
17        see it?
18   A    With a thirty-five millimeter camera, you have to
19        have certain amount of light for it to flash.
20   Q    With your naked eye what I'm asking, tell this
21        jury, could you see it without any difficulty
22        without using a flashlight to illuminate to take a
23        picture using that camera?
24   A    Yes.  I could see it without the flashlight.
25   Q    Is that the position you found it in in the
```

1   trailer at 76 Depot Street?

2 A  Yes.

3 Q  Marked, altered, or changed in any way?

4 A  No, sir.

5 Q  Same substantial condition?

6 A  Same.

7 Q  I believe you used the term blood splattering.

8   Is that how you described it?

9 A  Yes.

10    MR. VALESKA:  Offer that picture into

11  evidence.  Take off any sticker.

12    THE COURT:  What number is that?

13    MR. VALESKA:  42.

14    THE COURT:  Any objection to 42?

15    MR. BRANTLEY:  No, sir.

16    THE COURT:  Other than -- 42 is admitted,

17  again, with the sticker to be removed and covered

18  up.

19    (State's Exhibit No. 42 was admitted

20     into evidence.)

21 Q  Let me go to State's Exhibit No. 40 -- it's

22  already in, but I want to ask you about it,

23  Investigator Cook.  Tell the jury what 40 is.

24 A  It's blood splatter going to be on the north wall

25  of the trailer number 76 Depot Street.

```
 1    Q    Once again, is that the same position or the same
 2         as the other photographs?  Is that another
 3         location?
 4    A    It's another location that was in the same
 5         bedroom.
 6    Q    Now, help me once again.  Go in the front door --
 7         we got the diagram that's admitted into evidence.
 8         We go in on the wooden porch what you refer to as
 9         the living room on the diagram.  Which way, left
10         or right?
11    A    Left.
12    Q    Which bedroom?
13    A    South end bedroom.
14    Q    Just for identification purposes, is that the last
15         bedroom in the trailer?
16    A    Yes, it is.
17    Q    Did you have any problems seeing the blood on
18         State's Exhibit No. 40 that's in evidence?
19    A    No, sir.
20    Q    Once again, I notice -- if I'm wrong, correct
21         me -- but to the left of it, once again, you tell
22         me, but to the left, does it show flashlight or
23         light attempting to illuminate for purposes of the
24         picture?
25    A    Yes.
```

531

1   Q   Was that blood fresh?

2   A   Yes.

3   Q   Now, that picture as well as others, did you have

4       any difficulty with the naked eye when you walked

5       down there seeing that red fresh blood yourself in

6       that trailer shortly -- and I mean within a minute

7       or two -- after Jonteria had been taken off from

8       the scene?

9   A   No problem seeing it.

10  Q   Let me go to State's 39.  It's in evidence.  Ask

11      you -- and also 35.  It's in evidence.  Do you

12      recognize 35 and 39 as to what they are?

13  A   Yes.

14  Q   What are they?

15  A   Blood smears on the floor in the kitchen.

16  Q   Did you have any problems seeing that?

17  A   No, sir.

18  Q   Now, if I could, if you'd flip over.  I believe

19      there's another picture I want to ask you about.

20      I'm sorry.  State's 34 for identification

21      purposes.  Just tell me, what is 34?

22  A   It was a shirt with blood stains on it that was

23      located in the bedroom.

24  Q   Is that the last bedroom, once again, referring to

25      the ladies and gentlemen of the jury?

532

1   A   Yes, sir.

2   Q   Would you tell the ladies and gentlemen of the

3       jury, when you saw it, in your opinion was it

4       fresh blood?

5   A   Yes, it was.

6   Q   Have any difficult seeing it in any way as you

7       walked in there?

8   A   No, sir.

9   Q   Did you have to illuminate that with a flashlight

10      to get a picture that you can tell from the

11      picture that you see?

12  A   I don't remember.  I don't think so.

13  Q   Compared to the other pictures where you can tell,

14      in other words, what I'm asking about, where

15      there's a circle of light you could see, is there

16      any circle of light on that picture that you

17      notice?

18  A   No, sir.

19  Q   Now, let me show you State's Exhibit 33 for

20      identification purposes.  33 for identification

21      purposes, what is that?

22  A   That was a radio located in the kitchen as you go

23      in the front door.

24  Q   Did you see any substances on that?

25  A   Yes, I did.

1   Q   What did you see?

2   A   Blood.

3   Q   Was it fresh or old?

4   A   It was fresh.

5   Q   Did you have any difficult seeing it when you went

6       in there without any artificial light in any

7       manner of fashion?

8   A   No, sir.

9   Q   Has it been marked, altered, or changed from the

10      time you saw it right after Jonteria had been

11      left, been a minute or two, you went in there and

12      saw it on that radio, correct?

13  A   No.

14  Q   Same -- it hadn't been changed?

15  A   No.

16  Q   Same substantial condition?

17  A   Same.

18          MR. VALESKA:  Let me show Mr. Brantley.  I

19      offer 33 without any stickers, Judge Mendheim.

20      I'm not publishing anything at this time, Judge.

21          THE COURT:  Any objection to 33, Mr.

22      Brantley?

23          MR. BRANTLEY:  No, sir.

24          THE COURT:  33 is admitted again with the

25      understanding that the sticker with investigator's

1    notes will be removed or covered up before sent to

2    the jury.

3                    (State's Exhibit No. 33 was admitted

4                    into evidence.)

5            THE COURT:  And I note that there's a lot --

6    nobody is trying to hide anything from you-all.

7    It's just that you need in this case to rely on

8    what you view of the picture, not what somebody

9    else may make notes of.  You can rely on his

10   testimony.  But, again, nobody is trying to hide

11   anything from you.  It's just necessary to do

12   that.

13  Q    Now, if I could, tell the ladies and gentlemen of

14       the jury -- State's Exhibit No. 6 for

15       identification purposes, Investigator Cook, it was

16       sealed and ripped open in open court with the

17       Judge's permission.  Take it out and stick it in

18       front of you.  Do you recognize State's 6?

19  A    Yes, I do.

20  Q    What is it?

21  A    It was a wok.

22  Q    Tell the ladies and gentlemen of the jury, did you

23       see any substances on the wok?

24  A    We discovered some type brown substance on the

25       wok.  We didn't know if it was blood at that time

1     when we recovered it.

2   Q   Could you tell the ladies and gentlemen of the

3     jury, what I want to ask you about, that substance

4     and you referred to brown, was it the same color

5     of all the other fresh blood that you saw on the

6     wall and the clothing -- that reddish color in

7     your opinion?

8   A   No.

9   Q   Or on the kitchen floor?

10   A   No, sir.

11   Q   Or the radio?

12   A   No, sir.

13   Q   The condition it's in now, in other words, I'm not

14     an expert on that kind of panware, but is that the

15     condition you found it in or were these handles

16     and these --

17   A   The handles were off.  We recovered the handles.

18   Q   What about the pins?  Were they in or out?

19   A   They were off.  We recovered them on the floor.

20   Q   You see this wok.  Do you see any -- is it

21     complete -- I'll use geometry.  Three hundred and

22     sixty degrees or a hundred and eighty degrees

23     completely perfect shape the wok itself?

24   A   Yes, sir.

25   Q   Are there any indentions in it?

1    A    There's an indention in the bottom of it.

2    Q    When you found it, was there an indention in the

3         bottom of it?

4    A    Yes, sir.

5    Q    Besides having fingerprint powder or residue as

6         well as substances applied to it and any magic

7         markers you can see, or is that -- besides that

8         and the court's identification number and case

9         numbers and initials, is that the condition you

10        found it in?

11   A    Yes, sir.

12   Q    Tell me where you found it.

13   A    It was in the bedroom in the south end of the

14        trailer, which is the last bedroom on the left.

15   Q    That's where the shirt was found with blood?

16   A    Yes, sir.

17   Q    And the blood stains that went from the kitchen

18        floor -- if I'm wrong, correct me -- down I

19        referred to it the left end and you said south

20        end, correct?

21   A    That's correct.

22   Q    That's the path and on the walls and doors where

23        you found the red substances with fresh blood,

24        correct?

25   A    Correct.

1    Q    State's Exhibit 6, when you took it into your

2         custody, did you mark, alter, or change it in any

3         way?

4    A    No.

5    Q    Does it look different except what I've asked you

6         about, the fingerprint powder, the markings with

7         the magic marker or black writing, and initials,

8         and yellow substances on it now?  Besides that,

9         does it look to be the same?

10   A    Same.

11             MR. VALESKA:  Offer State's 6, the wok.

12             MR. BRANTLEY:  Judge, I would object.

13        Obviously they are trying to say this is the

14        murder weapon -- or the attempted murder weapon.

15        There's no -- there's an indentation in it.  We

16        don't know how the indentation got there.  It's

17        just circumspection.  There's no fingerprints on

18        it.  It was found in the bedroom.  But other than

19        that, I mean, it's just -- there's no -- I don't

20        think the relevance -- the quality of the

21        relevance is there, and I think the prejudice to

22        the Defendant to have that introduced as an

23        alleged murder weapon outweighs any probative

24        evidence.

25             MR. VALESKA:  They object.  I withdraw it and

1    offer it at a later point.

2         THE COURT:  Their offer to withdrawn at this

3    point.  Go ahead.

4  Q   Investigator Cook, did you have the opportunity

5    yourself to see Freeshone McLeod while he was down

6    there?

7  A   Yes, sir.

8  Q   Does he look the same today?

9  A   No, sir.

10  Q   What looks different today?

11  A   He looks a little heavier, and he has cut his

12    hair.

13  Q   Do you recall the color of clothing or what he was

14    wearing on that day?  I know it's been a while.

15  A   I know he had a T-shirt on and silky-type shirt

16    with some dark pants.

17              (State's Exhibit No. 56 was marked for

18                  identification.)

19  Q   Let me show you State's Exhibit 56 for

20    identification purposes, Investigator Cook.  56,

21    what is 56?

22  A   Photograph of child's shoes.  It was located in

23    the living room as you go in the front door.

24  Q   And did you find any blood or red substances in

25    the living room on our diagram in that area?

| | | |
|---|---|---|
| 1 | A | No, sir. |
| 2 | Q | Was the kitchen connected to that area? |
| 3 | A | Yes, sir. |
| 4 | Q | There's no door that separate? |
| 5 | A | No, sir. |
| 6 | Q | In other words, doors like this? |
| 7 | A | It's an open area. |
| 8 | Q | And does that truly and accurately depict when you |
| 9 | | went in that door with the child's shoes with the |
| 10 | | furniture in that location as well as a mattress |
| 11 | | and other shoes in that location? |
| 12 | A | That's correct. |
| 13 | Q | Appear to be marked, altered, or changed in any |
| 14 | | way? |
| 15 | A | No, sir. |
| 16 | | MR. VALESKA:  Offer 56 with the same |
| 17 | | condition with removing the sticker. |
| 18 | | MR. BRANTLEY:  No objection, Your Honor. |
| 19 | | THE COURT:  56 is admitted, then, without the |
| 20 | | sticker on it. |
| 21 | | (State's Exhibit No. 56 was admitted |
| 22 | | into evidence.) |
| 23 | Q | Investigator Cook, did you get to look at |
| 24 | | Freeshone McLeod's hands yourself? |
| 25 | A | Yes, I did. |

1   Q   Now, let me ask you something.  In your lifetime
2       -- I don't mean to be personal, but how old are
3       you now?
4   A   Forty.
5   Q   During those forty years have you ever fallen down
6       and scraped your knuckles or cut your knuckles,
7       your hands, with any type of object, sharp object,
8       or anything in any manner or fashion?  Have you
9       done that?
10  A   Yes, sir.
11  Q   Now, when you looked at Freeshone McLeod's hands,
12      let me show you some pictures if I could.  State's
13      Exhibit 24 for identification purposes and State's
14      Exhibit 25 for identification purposes.  Take a
15      look at both of them.  Now, I want to ask you,
16      okay.  You had a lot of cases since then, right?
17  A   Yes, sir.
18  Q   Have you ever had a case dealing with a
19      six-year-old little girl, Jonteria Jones, with the
20      injuries of what allegedly occurred to her since
21      you've been an investigator, or is this the only
22      case you've had like this one?
23  A   Only one like this one, yes, sir.
24  Q   What I want to ask you about.  Have you had a
25      chance, tell the jury, in your experience to look

```
 1           at a lot of defendants' hands?
 2    A      Yes, sir.
 3    Q      Have you seen cuts or marks on other defendants'
 4           hands?  You have, haven't you?
 5    A      Yes, sir.
 6    Q      Tell the ladies and gentlemen of the jury, I've
 7           shown you 24 and 25 for identification purposes.
 8           Whose hand is that?
 9    A      Freeshone McLeod's.
10    Q      Now, it's been a while since October 6 of 2001.
11           How do you remember that's his hand?
12    A      We took photographs of his hands, and we remember
13           that there was a laceration-type gouge in his
14           middle index finger.
15    Q      And flip over.  You've looked at both pictures,
16           right?
17    A      Yes, sir.
18    Q      They truly and accurately depict the injuries on
19           the finger;  in other words, the angle of the
20           camera that there was a injury on Freeshone
21           McLeod's hand?
22    A      Yes, sir.
23    Q      In your opinion as you looked at it, saw it, his
24           hand, was it fresh?
25    A      Yes, sir.
```

542

1   Q   The picture, does it appear to be marked, altered,

2       or changed in any way as you've looked at it as

3       well as looking at his hand that day?

4   A   No, sir.

5   Q   Same substantial condition?

6   A   Same.

7   Q   Hadn't been marked in any way?

8   A   No.

9         MR. VALESKA:  Offer 24 and 25 into evidence

10      once again --

11         MR. BRANTLEY:  Can I take him on voir dire

12      briefly?

13         THE COURT:  Go ahead.

14              VOIR DIRE EXAMINATION

15 BY MR. BRANTLEY:

16   Q   On the pictures right there of the hands, Keith,

17       did you take those pictures?

18   A   I think I did.

19   Q   Well, you did or didn't?

20   A   I'm not sure.  It's been a year or so ago -- or a

21       couple of years.  I think I did.

22   Q   And when did you observe those hands in-person?

23   A   I believe when we were getting major case prints

24       on him at the time we noticed it, or it may have

25       been when I was scraping his fingernails.

1   Q   Have you looked at those pictures recently before
2       coming into trial?
3   A   I've looked at some.  I don't remember if I
4       actually looked at these.
5   Q   Is this the first time you've seen those pictures
6       in a year and a half?  Is that what you're saying?
7   A   I may have seen them prior to today.  I just don't
8       remember when.
9   Q   Are you're saying you saw them prior to today and
10      subsequent to the time this picture was taken,
11      correct?
12  A   I believe I did.
13  Q   And who did you look at them with?
14  A   By myself.  I was just looking through the case
15      file.
16  Q   And you're saying that those hands in that
17      photograph are the hands of this gentlemen, Mr.
18      McLeod?
19  A   Yes, sir.
20  Q   And you don't even remember when the picture was
21      taken?
22  A   Yeah.  They were taken the next day after the --
23      or the morning of the incident.
24          MR. BRANTLEY:  That's all, Judge.
25          MR. VALESKA:  Offer those into evidence.

544

1       THE COURT:  Any objection?

2       MR. BRANTLEY:  I object, Judge.  Because I

3  don't think that he has authenticated the

4  photographs.  I just don't see the relevance of

5  it.

6       MR. VALESKA:  He doesn't have to take the

7  photographs as long as he authenticates and says

8  whose hand it was, hadn't been marked, altered, or

9  changed.  He witnessed it.  He saw the pictures.

10  I can get it in.  It goes to its weight, not his

11  credibility of admission.

12       THE COURT:  I'm going to admit State's 24 and

13  25.  But, again, on this one there's not a

14  sticker.  It's just actually written on the

15  picture.  But at some point --

16       MR. VALESKA:  Scissors, Your Honor.

17  Scissors.

18       THE COURT:  So with the understanding that 24

19  and 25 will have the writings taken off it, just

20  leave the court report sticker, is admitted over

21  the Defendant's objection.

22            (State's Exhibits No. 24 and 25 were

23            admitted into evidence.)

24            (State's Exhibit No. 57 through 66 were

25            marked for identification.)

DIRECT EXAMINATION CONTINUED

BY MR. VALESKA:

1

2

3   Q   Investigator Cook, you saw Freeshone McLeod, the

4       clothing he was wearing?

5   A   Yes, sir.

6   Q   Can I show you some pictures?  State's Exhibit No.

7       41, State's Exhibit 42, 43, 57, 60, 39 -- I'm

8       sorry, 59.  Those exhibits, do you recognize whose

9       clothing?

10  A   They were Freeshone McLeod's.

11  Q   When you observed him, in other words, those --

12      did you take custody of his clothing?

13  A   Yes, I did.

14  Q   Those are pictures of the clothes, correct?

15  A   Yes.

16  Q   Do they truly and accurately depict the clothing

17      after it was taken off him?

18  A   Yes.

19  Q   Did you see yourself with the naked eye any kind

20      of stains or items on the clothing yourself when

21      you saw them on him as well as taken off when the

22      pictures were made?

23  A   They were the same as the one I took off of him.

24  Q   Did you see any stains with your own eyes, though,

25      when he had the clothes on?

1    A    On the shirt -- on the outer shirt --

2    Q    You looking at an exhibit.  Give me the number

3         when you say outer shirt.  Number on the exhibit?

4    A    57.

5    Q    Keep it down for me, Keith, if you could.

6              Let me refer to 61, 62, 63, and 59.  Is that

7         the outer shirt or inner shirt?

8    A    That's the inner shirt.

9    Q    So you saw stains on the outer one, which is 57,

10        correct?

11   A    Correct.

12   Q    And then you took custody of the inner shirt, the

13        other numbers, in your possession as well as when

14        the outer shirt was taken off you saw the inner

15        shirt; is that correct?

16   A    That's correct.

17   Q    Did you mark, alter, or change them in any way?

18   A    No.

19   Q    Did you put any stains on them in any way?

20   A    No.

21   Q    Did you keep them in your care, custody, and

22        control until they were taken to the lab in

23        Montgomery?

24   A    Yes, sir.

25   Q    And they sealed in paper bags so there's no

```
 1        contamination?
 2   A    Yes, sir.
 3             MR. VALESKA:  Offer those pictures into
 4        evidence, once again, with the limitation of no
 5        stickers or writings.
 6             MR. BRANTLEY:  What numbers?
 7             MR. VALESKA:  61, 62, 63, 57, 60, 59.
 8             THE COURT:  Mr. Brantley, any objection to
 9        any or all of those?
10             MR. BRANTLEY:  No, sir.
11             THE COURT:  So 57, 59, 60, 61, and 62, and 63
12        are admitted.
13                  (State's Exhibits No. 57, 59, 60, 61,
14                  62, and 63 were admitted into evidence.)
15   Q    Showing you State's 58 for identification
16        purposes, Investigator Cook.  What is 58?
17   A    A pair of pants.
18   Q    Whose pants?
19   A    Belonging to Freeshone McLeod.
20   Q    And did you observe any colors or stains on them
21        in your opinion when you saw them on him?
22   A    Yes.
23   Q    Were they taken off in your custody and pictures
24        were made, any stains on the pants that you saw?
25   A    Yes.
```

548

| | | |
|---|---|---|
| 1 | Q | Did you place any stains on them? |
| 2 | A | No, sir. |
| 3 | Q | And then did you take the pictures and take the |
| 4 | | pants as well as and keep them in your care, |
| 5 | | custody, and control and sealed up until you took |
| 6 | | them to Montgomery and turned over to the lab in a |
| 7 | | sealed condition, correct? |
| 8 | A | Yes, I did. |
| 9 | Q | Offer -- was it marked, altered, or changed in any |
| 10 | | way? |
| 11 | A | No. |
| 12 | Q | Same substantial condition? |
| 13 | A | Same condition. |
| 14 | | MR. VALESKA:  Offer 58, the pants, a picture |
| 15 | | of the pants. |
| 16 | | MR. BRANTLEY:  No objection. |
| 17 | | THE COURT:  58 is admitted. |
| 18 | | (State's Exhibit No. 58 was admitted |
| 19 | | into evidence.) |
| 20 | Q | Let me show you No. 65 and 66.  Do you recognize |
| 21 | | what those are? |
| 22 | A | Yes, sir. |
| 23 | Q | Whose are they? |
| 24 | A | A pair of shoes belonging to Freeshone McLeod. |
| 25 | Q | Now, did you observe those on him? |

1    A    Yes, sir.

2    Q    And were you present when they were taken off him

3         when you took custody of those shoes?

4    A    Yes, sir.

5    Q    Marked, altered, or changed in any way?

6    A    No, sir.

7    Q    Does that include the right shoe?  In other words,

8         I know there's two shoes.  Is that a right and

9         left shoe?

10   A    Yes, sir.

11   Q    And there's two pictures, just for the Record, the

12        two numbers that you gave me, 66 and 65.  66 is

13        the right shoe, correct?

14   A    Yes, sir.

15   Q    And then 65 is the picture of both of them, right

16        and left?

17   A    That's correct.

18   Q    Now, have the shoes been marked, altered, or

19        changed in any way from the time you took them off

20        Freeshone McLeod and you kept them in your care,

21        custody, and control in a sealed condition until

22        you took them into Montgomery and turned them over

23        in a sealed condition?

24   A    No, they haven't.

25   Q    Did you put any kind of stains on them?

1   A   No, sir.

2   Q   Are you sure?

3   A   I'm sure.

4   Q   And they remain sealed in your custody in paper

5       bags after they had air dried; is that correct?

6   A   That's correct.

7   Q   And looking at them now, the pictures is what I'm

8       asking about, including any writings, okay, we

9       agree, any writings, is that the way they looked

10      with the stains?

11  A   Yes, sir.

12          MR. VALESKA:  Offer 65 and 66, the pictures

13      of the shoes, Mr. Brantley.

14          MR. BRANTLEY:  No objection.

15          THE COURT:  65 and 66 are admitted.

16              (State's Exhibits No. 65 and 66 were

17              admitted into evidence.)

18  Q   I believe Mr. Brantley asked you a couple of

19      questions on voir dire about pictures of the

20      Defendant's hands.  When you saw the Defendant's

21      hands, you testified about the pictures and the

22      cut that he had.  Tell me what you saw on the

23      fingernails he asked you about on Freeshone McLeod

24      in your opinion.  What did you see?

25  A   A real dirty look to me -- looked like blood was

1    inside the fingernails.

2         MR. BRANTLEY:  Object.

3         MR. VALESKA:  Judge, Mr. Brantley on voir

4    dire asked him that emphatically, did he take any

5    clippings or find any blood under the clippings.

6         MR. BRANTLEY:  I did not ask him that on voir

7    dire.

8         THE COURT:  At this point I'm going to

9    sustain.  If you want to go back and try to lay a

10   foundation as to what leads him to that opinion.

11        MR. VALESKA:  Yes, sir.

12        THE COURT:  It's not hearsay what a lab or

13   somebody did.  If you want to lay that foundation.

14   Q    Once again, in your lifetime and experience have

15        you ever cut your hand around your fingernails or

16        pulled a fingernail off or bit the quick where it

17        opens up and bleeds?

18   A    Yes, sir.

19   Q    Have you ever seen on yourself after it's dried

20        what the color of the blood looks around the nail

21        or under the nail?

22   A    Yes.

23   Q    Have you done that many times?

24   A    Yes, sir.

25   Q    Have you seen another defendants you worked cases

1      about when you looked at their fingers in

2      relationship to an assault or murder or a rape or

3      any blood looking to see if you see anything on

4      their nails or fingernails?

5  A   Yes, sir.

6  Q   Have you done that many times?

7  A   Yes, sir.

8  Q   Let's go back and help me if you could.  When you

9      did it on yourself and immediately there was

10     blood, what color was the blood immediately?

11  A   It was --

12  Q   When it first happened.

13  A   It was red, and then it turned.

14  Q   Going back to the pictures of inside the trailer

15     that you testified to on the walls and the

16     splattering, what color was that?

17  A   Red.

18  Q   Was it the same color you saw on your finger,

19     fresh is what I'm asking?

20  A   Yes, sir.

21  Q   After a period of time on yourself personally

22     after that blood that came out of your body around

23     the nail or under started to dry, did it change

24     colors?

25  A   Yes, sir.

1    Q    What color would it have been compared to when it
2         first came out and it was red?
3    A    Brownish color.  Dark brown.
4    Q    Now, would you tell the ladies and gentlemen of
5         the jury, seeing defendants in other cases before
6         this case on October 6 of 2001, have you seen
7         defendants where there's been a shooting, a
8         stabbing, a murder, or a rape where there was
9         blood on hands or fingernails?
10   A    Yes, sir.
11   Q    Did you form an opinion yourself as to what it
12        was?
13   A    Yes, sir.
14   Q    And what was it on those cases in your opinion?
15             MR. BRANTLEY:  Still object, Judge.  I mean,
16        there's still so many other things it could be
17        just based on color.
18             MR. VALESKA:  Goes --
19             MR. BRANTLEY:  There's too many things it
20        would be.
21             MR. VALESKA:  It goes to the weight, not the
22        credible.
23             MR. BRANTLEY:  But the prejudice to the
24        Defendant --
25             THE COURT:  Hang on just a minute.  What I'm

1    going to do is let him finish trying to lay his

2    foundation on that point and then if you want to

3    voir dire him on it I will give you a chance to be

4    heard.  Or give you an opportunity to try to and

5    establish what it is.

6         Mr. Valeska, anything else?

7         MR. VALESKA:  Yes, sir.  I'm sorry.

8    Q    So what I want to ask you then, Mr. Cook, on

9         October 6, 2001, when you saw Freeshone McLeod's

10        hands when pictures were taken for the injury on

11        finger that you indicated, did you look at the

12        fingernails?

13   A    Yes.

14   Q    Did you look at his hands?

15   A    Yes.

16   Q    Did you see anything in your opinion under the

17        nails, around the cuticles, under the fingertips

18        in any manner or fashion?

19   A    Yes.

20   Q    I want to go back and ask you, the clothing that

21        he was wearing; in other words, the outer clothing

22        on the shirt, did you see any substances on that?

23   A    Yes, sir.

24   Q    In your opinion, in other words, what did you see,

25        if anything, on Freeshone McLeod's nails and under

1        his nails if you have an opinion as to what it was?

2   A   My opinion it was blood.

3   Q   Now, I want to ask you about the shoes, pictures

4        64 and 65 admitted on the shoes as I recall the

5        numbers -- 65 and 66, the shoes is what I'm asking

6        you about.  One picture shows two shoes and then

7        the other pictures shows the right shoe.  Do you

8        recall looking at those pictures, Investigator

9        Cook?

10   A   Yes.

11   Q   Once again, I want to ask you on those pictures,

12        did you form an opinion as to whether you saw any

13        substances on those shoes?

14   A   Yes.

15   Q   What was it in your opinion?

16   A   Look like blood.

17           MR. BRANTLEY:  Object to that, Judge.  Any

18        opinion he would give with regards to stains or

19        coloring --

20           MR. VALESKA:  I'll withdraw and ask it this

21        way.

22           THE COURT:  Hang on.  Isn't there a picture

23        that's been admitted?

24           MR. VALESKA:  There's two pictures admitted.

25        But I'll withdraw it and ask it this way.

1    Q    Investigator Cook, what I want to ask you, what

2         you saw on Freeshone McLeod's shoes in your

3         opinion, what was the color of the substance?

4    A    Red.

5    Q    And what was the color of the substance you found

6         inside the trailer on the walls that you've

7         testified as well as his shirt and in the back

8         bedroom and that color of those stains? What

9         color?

10   A    Red.

11   Q    What is the color that you saw on his

12        fingernails? Was it the same red or a different

13        color red?

14   A    It was a different color red.

15   Q    Now, what I want to ask you in your lifetime and

16        your experience as a human being, have you ever

17        cut your hand and had blood get on any parts of

18        your body and you actually watched it get on any

19        type of clothing or shoes yourself?

20   A    Yes, sir.

21   Q    That happen to you many times?

22   A    Yes.

23   Q    And when you watched it drop on your shoes or your

24        clothing, was there any doubt a hundred percent

25        beyond all doubt to a mathematical certainty when

1        you were cut you know it was your blood, correct?

2   A   That's correct.

3   Q   The substance you saw on his shoes, was it any

4        different color than what you had seen on the

5        clothing in the past?

6   A   No.

7   Q   When you saw where Jonteria had been lying when

8        she was moved by the ambulance off, the concrete

9        is what I want to ask you about, that location,

10       Mr. McGriff's driveway is what I'm referring to,

11       do you recall seeing any substances on that

12       driveway?

13   A   Yes, sir.

14   Q   What color were they?

15   A   Red.

16   Q   Were they different from the color you had seen

17       inside on the trailer?

18   A   No, sir.

19   Q   Any different what you had seen on the shoes?

20   A   No, sir.

21   Q   Do you have an opinion as to what was coming from

22       Jonteria when she was on the driveway?

23   A   No, sir.

24          Would you repeat that, please?

25   Q   Do you know what was on the driveway that came

1       from Jonteria?  Do you have an opinion as to what

2       it was?

3  A   In my opinion, yes, sir, it was blood.

4  Q   Tell the ladies and gentlemen of the jury, when

5       you saw Jonteria and you've seen her and you've

6       seen the Defendant, Freeshone McLeod, who was

7       taller?

8  A   Freeshone McLeod.

9  Q   Who was bigger?

10  A   Freeshone McLeod.

11       MR. VALESKA:  That's all.  Pass the witness.

12       Thank you, Judge Mendheim.

13               CROSS EXAMINATION

14  BY MR. BRANTLEY:

15  Q   Keith, let's go back to that day October 6, 2001.

16       And how did you know to go out there?  Did you get

17       a dispatch call?

18  A   Yes, sir.  I was called at home.  Communications

19       called me.

20  Q   And was that in the late afternoon, early

21       afternoon, or what?

22  A   It was around two-thirty or three o'clock.

23  Q   And so did you go out there by yourself?

24  A   Yes, sir.

25  Q   What --

```
 1   A   There were already units there.

 2   Q   What did you say?

 3   A   There were already units there when I arrived.

 4   Q   How many people were there?  How many law

 5       enforcement people were there when you arrived?

 6       One or two --

 7   A   There was two or three.  Sergeant Forehand and

 8       Adam Robinson were there.

 9   Q   What about Chief Roney?

10   A   He may have been there, too.

11   Q   Was there crime scene tape up when you got there?

12   A   Yes, sir, I believe there was.

13   Q   And what did you do when you got there?

14   A   I spoke with Sergeant Forehand after I observed

15       the spot where Jonteria was lying.

16   Q   And what did you do after you talked with Mr.

17       Forehand?

18   A   We --

19   Q   Who was we, now?

20   A   Myself and Sergeant Forehand.  He showed me where

21       they had found Jonteria.

22   Q   And then what did you do?

23   A   I believe I called Lieutenant Valenza, and he

24       advised that he was en route.  And then I entered

25       the trailer.
```

1   Q   I would like to ask you about this trailer when

2       you went in there, okay.  Was anyone else in there

3       when you entered it?

4   A   No, sir.

5   Q   Had anyone been in there?  Had Forehand or Roney

6       or anybody?

7   A   I don't know.

8   Q   You don't know if anyone had been in there or not,

9       do you?

10   A   No, sir.

11   Q   So what did you do, Keith -- incidentally, how

12       long had you been an investigator with the

13       sheriff's office on this date?

14   A   Investigator with the department -- an

15       investigator?

16   Q   Yes.

17   A   About four years.

18   Q   And prior to that time how long had you been a law

19       enforcement officer?

20   A   Twelve -- thirteen years.

21   Q   Now, let's go to this day.  You go in the house,

22       and what happens in the house?

23   A   I go in and -- front door.  Go to the left.  I see

24       the radio.  See some blood smears on the floor of

25       the kitchen.  And then I walk through the trailer.

561

1    Q    You walked into the bedroom, right?  You see that

2         wok; is that correct?

3    A    Yes, sir.

4    Q    You go into the kitchen.  And you see in the

5         kitchen other things; is that correct?  You see

6         kitchen utensils in the kitchen?

7    A    I don't remember seeing any utensils, no, sir.

8    Q    What do you see in the kitchen that looks like it

9         belongs in the kitchen?  Anything?

10   A    No, sir.

11   Q    How do you know it's a kitchen?  Got a stove and

12        refrigerator, right?

13   A    I believe it had a refrigerator and I think it had

14        a stove, too.

15   Q    Other than that, you don't see any pots and pans

16        or anything?

17   A    No, sir.

18   Q    I believe you testified there was an area where

19        there ought to be a washing machine?

20   A    It looked like there may have been.  If I

21        remember.

22   Q    That's what we're asking you to do is to remember.

23   A    On the hallway.  Going down the hallway if I

24        remember it seemed like.

25   Q    What do you mean it seems like it may have been.

1        What does that mean?

2  A    It looked like it was a -- if I can remember, an

3        outlet for a plug for a washer or a dryer.

4  Q    Well, what are you saying?  There was or there was

5        not?

6  A    I believe there were.

7  Q    Does that mean there was?

8  A    I don't know.  I don't remember.

9  Q    You don't remember?

10  A    I don't remember.

11  Q    Now, you saw blood in the kitchen, correct?

12  A    Yes, sir.

13  Q    You saw blood in the bedroom; is that right, or

14        not?

15  A    Yes, sir.

16  Q    You saw what appeared to be blood under the

17        fingernails of Mr. Freeshone McLeod, correct?

18  A    Correct.

19  Q    Did you scrape any of that blood off and get

20        samples of it?

21  A    From his nails?

22  Q    Anywhere.

23  A    Well, I collected blood in the house, and I

24        scraped his nails, yes, sir.

25  Q    And did you send it off?

1   A    Yes, sir.

2   Q    And you have the results of those today, right?

3   A    Yes, sir.  They should be in.

4   Q    What type of blood did, if you know -- did you

5        take samples of blood from Jonteria?

6   A    I didn't.

7   Q    With regards to the condition of the house when

8        you went in there, was the house in -- had it been

9        kept up?  Was everything in order?  Or what?

10  A    It was pretty dilapidated, but it was empty.  Most

11       of the house was empty.  Other than what was in

12       the living room there.  The bed.

13  Q    What do you mean by dilapidated?

14  A    The floors looked like they were falling in in

15       different places.

16  Q    Did you see any two by fours or wood or planks

17       around?

18  A    No, sir.

19  Q    You didn't see any wood?

20  A    Other than what --

21  Q    You're looking at a dilapidated trailer?

22  A    There was carpet that was caved in, and it looked

23       like -- it was rotted up under the carpet.

24  Q    And there was a rail around the porch?

25  A    I don't remember seeing --

```
 1              MR. VALESKA:  I'll stipulate there was a rail
 2         around the porch.
 3    Q    But you don't remember the rail around the porch?
 4    A    I don't remember seeing it.
 5    Q    Was the porch dilapidated like the house?
 6    A    Yes, sir.
 7    Q    How many people walked through the house as far as
 8         investigators go?
 9    A    Four, I believe.
10    Q    And who was that?  You?  Don Valenza?
11    A    Sergeant Ducker and Sergeant Jenkins.
12    Q    What's Jenkins' first name?
13    A    Gary.
14    Q    Gary was down there?
15    A    Yes, sir.
16              MR. BRANTLEY:  That's all.
17                    REDIRECT EXAMINATION
18    BY MR. VALESKA:
19    Q    If I could, I want to ask you about the wok.  Who
20         did you turn it over to?
21    A    Lieutenant Valenza.
22    Q    And I want to ask you, if I could, Mr. Brantley
23         asked you whether you remembered or didn't
24         remember about any outlets for a washer and dryer
25         in that hall.  That is what I want to ask you
```

1    about what he asked you about, okay.  Any doubt in

2    your mind one hundred percent beyond all doubt,

3    was there any washer or dryer in that trailer?

4         MR. BRANTLEY:  Object.  This is asked and

5    answered.  He said he just doesn't remember.

6         MR. VALESKA:  No, sir.  He said he doesn't

7    remember about outlets.  I'm asking about a washer

8    and dryer.  There's a difference between outlet

9    what you plug them it into.

10         THE COURT:  Since this is redirect, I will

11    let you ask him one time.  But then after that

12    let's move on to something else.  But just for --

13         MR. VALESKA:  It's only in reference to the

14    question he asked about the outlets.

15         THE COURT:  If he can answer.

16   Q    Any doubt a hundred percent you're sure whether

17        there was a washer or dryer?

18   A    There was not.

19   Q    Now, Mr. Brantley asked you about the porch.

20        State's Exhibit 37, which is not in evidence.

21        Look at 37.  What is 37?

22   A    It's a piece of a nail that's coming out of the

23        board on the porch.

24   Q    Is that the porch how it looked and the condition

25        of the angle?

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Hasn't been marked, altered, or changed in any |
| 3 | | way? |
| 4 | A | No, sir. |
| 5 | | MR. VALESKA:  Offer 37, the picture of the |
| 6 | | porch. |
| 7 | | THE COURT:  Any objection? |
| 8 | | MR. BRANTLEY:  No objection. |
| 9 | | THE COURT:  37 is admitted. |
| 10 | | (State's Exhibit No. 37 admitted into |
| 11 | | evidence.) |
| 12 | Q | I ask you about the Defendant's outer shirt, his |
| 13 | | inner shirt, did you also collect his boxer shorts? |
| 14 | A | Yes, sir. |
| 15 | Q | You mark, alter, or change them in any way? |
| 16 | A | No. |
| 17 | Q | Mix them up with any other? |
| 18 | A | No, sir. |
| 19 | Q | Put his boxer shorts with any others or alleged |
| 20 | | rape case investigation, any other cases within |
| 21 | | the sheriff's department? |
| 22 | A | No, sir. |
| 23 | Q | Are you sure? |
| 24 | A | Sure. |
| 25 | Q | Kept them in a sealed condition when you turned |

```
 1              them over to forensic in Montgomery, correct?
 2      A    That's correct.
 3                 MR. VALESKA:  That's all.
 4                 MR. BRANTLEY:  I don't have anything
 5           further.  Thank you.
 6                 MR. VALESKA:  Call Shannon Fitzgerald.
 7                      SHANNON FITZGERALD
 8           having first been duly sworn, was examined and
 9           testified as follows:
10                      DIRECT EXAMINATION
11      BY MR. VALESKA:
12      Q    Tell me your name, please, sir.
13      A    Shannon Fitzgerald.
14      Q    Tell the jury what your profession or occupation
15           is.
16      A    I'm a certified latent print examiner.
17      Q    Before becoming a latent print expert, what type
18           of training or education did you have in
19           relationship to going to work with the Alabama
20           Department of Forensic Science?  What's your
21           degree?
22      A    Received a bachelor of science from Auburn
23           University in criminal justice.  I've also
24           received certificates of completion from the
25           ABI -- Alabama Bureau of Investigation -- in crime
```

1    scene photography, nighttime crime scene

2    processing, classification of ink prints,

3    classification and comparison of latent prints;

4    and also received a certificate of completion from

5    the FBI -- the Federal Bureau of Investigation --

6    for crime scene photography; also certified

7    through the International Association for

8    Identification as a latent print examiner of which

9    there are less than two thousand members

10   worldwide.

11   Q    Now, if I could, you use the term ink prints as I

12        refer to major case prints just terminology, is

13        that the same thing?  Major case prints versus

14        just regular prints?  Is there a difference?

15   A    No, sir.  Inked prints generally are done by

16        taking the first joint of each finger, placing a

17        thin coat of black printer's ink on a slate of

18        glass, or tile, and then rolling that joint

19        completely from nail to nail and then placing it

20        on a contrasting background such as a fingerprint

21        card.  Major case prints, they encompass the

22        entire palm, or surface, of the hand -- the

23        joints -- the first joints all the way down and

24        the palms and extreme sides.

25   Q    I guess this is a silly question.  Can you find

1    ridges, loops, swirls for identification off human

2    beings from their feet?

3    A    Yes, sir, you can.

4    Q    And have you had training on that also?  In other

5    words, points of identification looking for those

6    for identification for feet marks and when I say

7    toes, I'm talking about underside if I could refer

8    to it that way, correct?

9    A    Right.  The ridge characteristics or the ridge

10    detail that is on the undersides of the hands is

11    also present on the undersides of the feet.

12    Q    If I could, how many times have you yourself tried

13    to lift latent fingerprints by using powder or

14    Super Glue or apply any substances before October

15    6, 2001?

16    A    I would say thousands.

17    Q    How many times have you looked at known ink print

18    cards or major case file prints as well as looking

19    at them to see if you could make an examination to

20    get a match from a latent print that was submitted

21    on some kind of substance whether it's a wok, it's

22    glass, it's a door knob, wood itself, anything,

23    use Super Glue to try to raise it?  How many times

24    have you done that before October 6, 2001?

25    A    I would say, again, several thousand times.

1   Q   I want to go back.  Once again, the training,

2       education you've had, how many times have you

3       working with the Alabama Department of Public

4       Safety, the fingerprint identification bureau,

5       worked under other experts before actually working

6       cases yourself with your training and come to

7       court?

8   A   Several times.

9   Q   Who have you worked under?  What individuals?

10      What names?

11  A   Marietta Prevos, Fulton Prevos, each retired from

12      the Alabama Bureau of Investigation.  Each with

13      combined fifty years of experience.  Carrol Curley

14      with thirty years of experience.

15  Q   Is she still there?

16  A   No, sir.  Gloria Walters, who is twenty-six years

17      of experience, who is still there.

18  Q   Who is head of the department?

19  A   The head of --

20  Q   Fingerprints identification bureau?

21  A   Gloria Walters.

22  Q   Can you tell the ladies and gentlemen of the

23      jury, can you always find fingerprints on human

24      beings if they are transferred to some type of

25      substance and every and each occasion a hundred

1    percent?

2 A  No, sir.

3 Q  What are smudges or smears?

4 A  On the undersides of the hands and soles of the

5    feet where these ridges appear there are tiny

6    sweat pores, and they naturally excrete sweat.

7    Some people sweat more than others.  Some not as

8    much.  Therefore, occasionally when a surface is

9    touched a print may or may not be left.  It

10   depends on the surface that's being touched and

11   also the individual touching the surface.

12 Q  What can effect the condition of a latent print

13   from a hand, a palm, a foot, the sides of a human

14   being?  In other words, what kind of conditions

15   can effect whether you can go back and lift it or

16   find it or Super Glue it or put the powder or take

17   pictures so you can take it and compare it to

18   known prints?  What would effect those conditions

19   of the print itself?

20 A  The environment.  Latent prints are ninety-eight

21   percent moisture; therefore, they are very fragile

22   by nature.  And they require some type of

23   processing in order to make visible; therefore,

24   several factors can influence whether a print is

25   left.  Since they are ninety-eight percent

1    moisture, they can be dried up.  They can be wiped

2    away.  And, again, the surface dictates a lot of

3    that.

4  Q  Now, the term latent fingerprints, what does that

5    mean just generally?

6  A  It means hidden or invisible.

7  Q  Now, if I take my finger or my thumb print -- my

8    finger tips, and I touch my glasses, as an expert

9    in fingerprint identification is that what you

10    call a latent fingerprint?

11  A  Yes, sir.

12  Q  Help me a little bit.  You just said it's

13    invisible.  If I touch my glasses and there's

14    moisture, in other words, good conditions, won't I

15    be with the naked eye able to see some possible

16    ridge, loop, swirl, or points of identification or

17    some kind of identification marks off my actual

18    tips or my palm print on my glasses with my naked

19    eye and see it?

20  A  Some in some instances you may be able to, yes,

21    sir.

22  Q  Now, use the term latent print.  If we can't see

23    it and it's on some kind of substance whether it's

24    a wok with metal, this kind of a table, Formica,

25    whatever that plastic top is, how do you try to

1   raise it to find it if you can't see it?  What's

2   the procedure you've been taught in the scientific

3   community?

4   A   On non-porous evidence, which would be glass,

5   metal, iron, plastics, there are several ways that

6   you can process evidence.  The two general ways

7   that the Department of Public Safety that we

8   process non-porous evidence would be first to

9   Super Glue the evidence and then to actually

10  powder with black powder or a light colored

11  powder.

12  Q   And then when you do that, does it become visible

13  that you can see some kind of impression with the

14  naked eye or microscope or whatever it is?

15  A   Yes, sir.

16  Q   And then to attempt to take it off that substance

17  if you don't photograph it, in other words, you

18  want to take it off and put it on another card so

19  you can preserve it in case any known ink prints

20  come in or palm prints or identification prints

21  to see if you can make the comparison, is that

22  one of the ways it's done with tape?

23  A   Yes, sir.

24  Q   Now, what if you touch paper?  In other words, can

25  you Super Glue it to use fumes?  How do you get it

1      off pieces of paper that you can't really see in

2      whether it's on there or not?

3   A  With porous evidence it's generally used -- a

4      chemical is generally used which is called

5      Ninhydrin, which reacts with the amino acids that

6      are present in the latent prints.  Because on

7      porous evidence generally the print has had time

8      to soak down in like a sponge into the evidence.

9      Therefore, a chemical is needed to bring out that

10     print, and that chemical we use is Ninhydrin.

11  Q  And then once you do that with the fumes and the

12     Ninhydrin, sometimes or a lot of times whether you

13     see some impression, in other words, from the

14     ridges or loops or swirls when you actually have a

15     full print, a partial print, or even possibly a

16     smear, will that come up sometimes?

17  A  Yes, sir, it does.

18  Q  Do you always find prints every time from crime

19     scenes a hundred percent when someone has actually

20     touched something beyond all doubt always?

21  A  No, sir.

22  Q  And if you find smears or smudges as an expert in

23     fingerprint identification and testifying, does

24     that mean that I definitely didn't touch it or

25     there's just not enough to make an identification?

1    A    It means there's not enough ridge detail in order

2         for us to make an identification.

3    Q    Now, the Federal Bureau of Investigation, the

4         FBI, have you had any training or been to any of

5         their courses?

6    A    Yes, sir.  Crime scene photography class.

7    Q    In addition have you yourself trained or helped to

8         educate prosecutors or law enforcement officers in

9         relationship to what to look for about

10        fingerprints, how to ask questions about making

11        comparison to known prints, to ink prints, to

12        latent prints?  Have you done that?

13   A    Yes, sir.

14   Q    Have you done that many times?

15   A    Yes, sir.

16   Q    Now, what I want to ask you, if I could, the

17        points of identification, if I refer to that to

18        make a match, does the Federal Bureau of

19        Investigation have a certain number of points that

20        it requires for them to make a match on a latent

21        print if I could use that term to known prints or

22        ink prints or major case prints different from the

23        number of points of identification that you have

24        to have working for the Alabama Department of

25        Public Safety for you to make an identification?

1      Different numbers?

2   A   From time to time, yes, in the past there has been

3       different numbers.  The required number of

4       characteristic points that the Department of

5       Public Safety has to have -- or nine

6       characteristic points.  I know from time to time

7       in the past the FBI has used seven or eight.

8   Q   Worldwide, in other words, you mentioned you

9       belong to an organization you're one of the only

10      two thousand that are certified worldwide in the

11      entire world, those other individuals you

12      mentioned, Curley and the others, are they also

13      members of that association?

14  A   Yes, sir.

15  Q   Worldwide, in other words, let's just jump over to

16      England, what's their investigative bureau?  What

17      are they called?

18  A   Not Interpol.  I'm not sure what they are called.

19  Q   Scotland Yard.  In other words, their department,

20      do they have a different number of points they are

21      required to make an identification?  In other

22      words, another part of the world?  Is it less than

23      what you use, if you know?

24  A   I'm not aware at this time.  Like I said, it does

25      change from time to time in other departments.

1   Ours has been the same for several years.  But our

2   different departments or different countries may

3   use different points of identity.

4   Q   Is there anything by any state statute, any law,

5   federal law, or state law that requires you to

6   have twelve points to make identification in the

7   fingerprint world?  Any legal --

8   A   No, sir.

9   Q   So the Alabama Department of Public Safety makes

10   their own determination how many points of

11   identification they have to have to make a match

12   from latent prints to known or major case prints,

13   correct?

14   A   Yes, sir.

15   Q   Can you make it with less than seven or nine?

16   A   Nine is what the Department of Public Safety uses.

17   Q   Would you make an identification if you find my

18   prints and you know and you watch me do it but

19   because of the condition you only get eight

20   identification marks, would you make a match?

21   A   No, sir.

22   Q   Now, what I want to ask you, if I could, have you

23   come into the trial courts in the State of Alabama

24   in front of juries and testified before based on

25   your training, education, and experience as to

1       looking for latent fingerprints, taking them off

2       physical evidence, lifting them yourself, and then

3       taking a comparison to major case prints or known

4       ink prints and to give your opinion whether you

5       could make identification with certain number of

6       points?  Have you done that many times?

7  A    Yes, sir.

8  Q    In those cases did the defense lawyer have the

9       opportunity to cross examine you on voir dire or

10      during the trial about your experience and your

11      criteria and what you found?

12  A    Yes.

13  Q    In the ordinary course of business do you publish

14      a report as to your findings?

15  A    Yes, sir.

16  Q    The entire workload that you do on a case, in

17      other words, your notes, every test, every

18      procedure you follow, anything you do, is that

19      kept in the case filed for that particular case?

20  A    Yes, sir, it is.

21  Q    Is that available under subpoena power for anybody

22      on the other side to examine, in other words, from

23      the Defense?

24  A    Yes, sir.

25  Q    And let me ask you, you have testified how many

1      times in front of trial judges?

2   A   Hundreds.

3   Q   At any time can you tell me identification marks

4      you have made, in other words, see if there was a

5      match or there was not a match, have there been

6      any other experts that have come in on the other

7      side for the defense that have shown that what you

8      testified to was incorrect or wrong?

9   A   There have been other experts to come in, but none

10      have never --

11   Q   To impeach your credibility is what I'm asking.

12   A   No.

13   Q   Now, worldwide, can you tell me based on your

14      training, education, experience the number of

15      tests you've done in the state of Alabama -- let

16      me ask you and withdraw that.

17          What is CODIS?

18   A   Excuse me?

19   Q   What is CODIS?  AFIS.  I'm sorry.

20   A   AFIS?  AFIS is the Automated Fingerprint

21      Identification System.

22   Q   What is that briefly?  Tell me.

23   A   It's a large mainframe computer in which inked

24      fingerprint cards that I spoke of earlier are

25      entered into this large mainframe database and

1    registered there for future searches with latent

2    prints and other inked prints.

3  Q  Those known ink prints or major case prints, are

4    those the Alabama Department of Safety has entered

5    into AFIS, the computer, itself as well as hooked

6    up nationwide with the FBI computer if a crime

7    occurs and you get latent prints like let's say

8    you took something off this wok -- well, I'll just

9    say took something off this rail here, and you

10    have no suspects through that computer, with known

11    prints that have been submitted, can you run that

12    through and see if you get a match?

13  A  Yes, sir.  We're only able to run the first joint,

14    you can't enter palm prints or joint prints.

15  Q  And is that -- states that subscribe or allow or

16    hook up nationwide and gives you access to other

17    states, correct?

18  A  Correct.

19  Q  Now, have you done that, in other words, taken

20    prints, submitted them yourself into that computer

21    to see if you got a match?

22  A  Yes, sir.

23  Q  When you got a match, would you yourself as a

24    human being because you relied on a computer go

25    back and check it yourself if you're going to

1      testify or make a match yourself to make sure what

2      was entered into the computer was correct?

3  A   Yes, sir.

4  Q   Relying on your own credibility, your words, in

5      other words, what I'm asking you?

6  A   Yes, sir.

7  Q   Do you do that also?

8  A   Yes, sir.

9         MR. VALESKA:  Judge, at this time I ask you

10     to declare him to be an expert in his field as a

11     fingerprint examiner and to give his opinion as to

12     any prints he lifted and comparison to any known

13     or major case prints in this case.

14         THE COURT:  Any objection?

15         MR. BRANTLEY:  No objection.

16         THE COURT:  No objection.

17  Q   What I want to ask you, State's Exhibit 6, did it

18     come into your identification?  I'll refer to it

19     right here.  This exhibit here as well as State's

20     Exhibit 44, the manila envelope with contents

21     inside?  Did they come into your custody?

22  A   Yes, sir, they did.

23  Q   State's 6, the metal wok, was that brought to you

24     and turned in to you by Investigator Valenza with

25     the sheriff's department?

1    A    Yes, sir, it was.

2    Q    The major or case prints referred to in the manila

3         envelope, if I could refer to you.  You took them

4         out.  44.  There were some different cards as well

5         as three white pieces of paper I refer to major

6         case prints.  What I'm asking, did you just look

7         at those pieces of paper, all of them?

8    A    Yes, sir.

9    Q    They were identified to you as major or case

10        prints, the white pieces of paper, identified as

11        coming from who?  Which individual?

12   A    The major case prints were submitted to me by

13        Investigator Rocco --

14   Q    Identified to be whose?

15   A    Identified to be -- the prints were identified to

16        be Freeshone McLeod.

17   Q    Now, taking State's 6, the wok, request the

18        D.A.'s office, the sheriff's department, did you

19        see if you could lift any latents off the wok

20        itself?

21   A    Yes, sir, I did.

22   Q    Were you able to do so?

23   A    Yes, sir, I was.

24   Q    How many latents were you able to lift off

25        State's Exhibit 6, the wok?

1    A    Three latent fingerprints and one latent
2         impression value were developed on the inside of
3         the wok.
4    Q    Did you then take and make a comparison to the
5         known ink prints which is State's Exhibit 45?
6         What I want to ask you about.  The identification
7         is just for the envelope.  But the three white
8         pieces of paper, State's 45, the major case prints
9         of Freeshone McLeod, did you make a comparison to
10        that on to State's Exhibit No. 6, the wok, the
11        latents you were taking off?
12   A    Yes, sir.  Comparisons were made with both
13        exhibits, 44 and 45.
14   Q    If I'm wrong, you published a report of your
15        findings, correct?
16   A    Yes, sir.
17   Q    If you could, tell me, latent one, two, three, and
18        four, did you match all four?
19   A    No, sir.
20   Q    Did you match one through three?
21   A    Yes, sir.
22   Q    Found number four was unidentified, correct?
23   A    Yes, sir.
24   Q    The latent you pulled off State's Exhibit 6, the
25        wok, you didn't have a print to compare that to;

1    is that correct?  Excuse me, you didn't have any

2    known prints or ink prints you could make a match

3    with, correct?

4  A  That is correct.

5  Q  What I want to ask you, if I could, latent one,

6    two, and three, taking State's 45, the three white

7    pieces of paper identified coming from Freeshone

8    McLeod, on latent one, were you able to make a

9    match?

10  A  Yes, sir.

11  Q  What did you find on latent one?

12  A  The latent number one was identified with the

13    right little finger of the fingerprints on the

14    fingerprint card bearing the name Freeshone

15    McLeod.

16  Q  Any doubt in your mind as a fingerprint expert

17    that was a match in your opinion?

18  A  No, sir.

19  Q  One hundred percent?

20  A  Yes, sir.

21  Q  Latent number two, could you tell us what you

22    found on two?

23  A  It was identified with the left little finger of

24    the fingerprints on the fingerprint card bearing

25    the name Freeshone McLeod.

1   Q   Any doubt in your mind a hundred percent beyond
2       all doubt there was a match in your opinion?
3   A   No, sir.
4   Q   Latent number three, did you find a match?
5   A   Yes, sir.
6   Q   Did you compare it to 45, the major case prints?
7   A   Yes, sir.
8   Q   Freeshone McLeod, what did you find?
9   A   Latent number three was identified with the left
10      ring finger of the fingerprints on the fingerprint
11      card bearing the name Freeshone McLeod.
12  Q   Any doubt in your mind one hundred percent beyond
13      all doubt you had a match on all three of those
14      latents, correct?
15  A   That's correct.
16  Q   Now, if I could, did you then take State's Exhibit
17      6, the wok, and then seal it back up after you had
18      tested it and return it to the law enforcement
19      agency in this case?
20  A   Yes, sir.
21  Q   Now, looking at it today, in other words, I know
22      it was sealed up, did you see any writings or
23      markings on the back or evidence numbers or latent
24      numbers or case numbers from your department that
25      you placed on the bag yourself?  The paper bag is

1    what I'm asking about.

2  A    I saw my initials.

3  Q    No doubt about it those are your initials; is that

4       correct?

5  A    That's correct.

6  Q    Looking at the wok today, it's now out of the bag.

7       Under it was unsealed and in a sealed condition in

8       this courtroom, does it appear to be any different

9       in any manner or fashion?

10  A   No, sir.  Other than the processing of the powder,

11      no, sir.

12  Q   Can you tell me, if you can, once again, for my

13      experience where on the wok you found latents one,

14      two, and three?  Where they were on the wok?

15  A   They were on the inside portion inside side of the

16      wok.

17  Q   Now, can you tell the ladies and gentlemen of the

18      jury, of all the fingerprint identification you've

19      done using a computer doing latent prints to ink

20      print cards, major case cards yourself,

21      fingerprint cards, your training, education,

22      experience, the organizations you belong to,

23      certified, worldwide plus your training,

24      education, and history, still in the business

25      today, can you tell these ladies and gentlemen of

1      the jury anybody in this world have the same

2      fingerprints on their ridges, loops, swirls,

3      points of identification, or match another human

4      being?  In other words, mine and yours would

5      match?  Is that going to occur?

6    A    No, sir.  No two people have ever been known to

7      have the same ridge characteristics.  Even the

8      same person on each person or identical twins.

9          MR. VALESKA:  That's all -- I offer the wok,

10     State's Exhibit 6, into evidence.

11         MR. BRANTLEY:  No objection.

12         THE COURT:  State's Exhibit 6 is admitted.

13             (State's Exhibit No. 6 was admitted into

14             evidence.)

15         MR. VALESKA:  And I offer 45, the major case

16     prints.  I didn't offer the envelope.

17         THE COURT REPORTER:  They are in.

18         MR. VALESKA:  That's all.  Pass the witness.

19                CROSS EXAMINATION

20   BY MR. BRANTLEY:

21   Q    Mr. Fitzgerald, you would agree that this article

22     up here is a -- what would you call it?  A wok?

23   A    Looks like a wok.  A pan.

24   Q    Cooking utensil?

25   A    Yes, sir.

1   Q   And how long have you been in the fingerprint

2       business?

3   A   A little over eight years.

4   Q   And have you ever been in law enforcement?  Are

5       you considered law enforcement now?

6   A   No, sir.  I'm a civilian employee.

7   Q   Have you ever been a law enforcement officer?

8   A   No, sir.

9   Q   Let me ask you this.  You've been a fingerprint

10      expert for eight years.  Does it astound you that

11      this cooking utensil will possess the fingerprints

12      of a person who owned it?

13   A   No, sir.

14          MR. BRANTLEY:  That's all.

15          THE COURT:  Mr. Valeska, anything else?

16               REDIRECT EXAMINATION

17  BY MR. VALESKA:

18   Q   Looking at the wok, Mr. Brantley asked you about

19      if it astounded you the fingerprints could be on

20      the person who owned it.  Pick up the wok.  Pick

21      it up and hold it in your hand.

22   A   (Complied.)

23   Q   Look at the bottom and the top part.  Looking at

24      the wok itself -- I won't use the term astound

25      you -- but do you see any indentions in the wok?

1    A    Yes, sir, I do.

2    Q    Small or large?  Or the size is what I'm asking

3         you.  Is it real tiny?

4    A    No, sir.

5              MR. VALESKA:  That's all.

6                    RECROSS EXAMINATION

7    BY MR. BRANTLEY:

8    Q    Let me ask you this.  You found how many sets of

9         fingerprints on there that you could not identify?

10   A    I found one latent of value that I could not

11        identify.

12   Q    Did you find some other prints not of value?

13   A    No, sir.

14   Q    Now, finding the fingerprints -- finding

15        fingerprints on that cooking utensil, does that

16        tell you who put the indentation on the bottom of

17        that cooking utensil?

18   A    No, sir.

19                FURTHER REDIRECT EXAMINATION

20   BY MR. VALESKA:

21   Q    Mr. Brantley asked you if it told you who put the

22        indention on that wok.  As a fingerprint expert,

23        does it tell you who touched that wok?

24   A    Yes, sir.

25   Q    And who was it?

1    A    The fingerprints were identified with Freeshone

2         McLeod.

3              MR. VALESKA:  That's all.

4                   FURTHER RECROSS EXAMINATION

5    BY MR. BRANTLEY:

6    Q    Once again, Freeshone McLeod, if I tell you he's

7         the owner of that wok, does that astound you --

8              MR. VALESKA:  I object.  Mr. Brantley is

9         testifying and telling him something.  There's no

10        evidence to that that's been introduced to this

11        jury.

12             MR. BRANTLEY:  Let me say it this way.

13   Q    If I tell you it was found in his house --

14             MR. VALESKA:  I'm going to object because he

15        wasn't -- no, I don't object to that.

16   Q    That it was found in his house and also that it

17        was the only cooking utensil found in his house,

18        there were no other pots and pans there, now

19        considering those facts, does that astound you

20        that Freeshone McLeod, that his fingerprints are

21        on that one cooking utensil found in his house?

22   A    No, sir.

23             MR. BRANTLEY:  Thank you.

24             THE COURT:  Mr. Valeska, anything else?

25             MR. VALESKA:  No more questions.  Ask that he

1    be excused and go back to Montgomery.  Thank you

2    very much.

3         THE COURT:  Thank you.  That's it.

4         MR. VALESKA:  Take a short recess?  I need an

5    attachment for a witness I think.

6         THE COURT:  Ladies and gentlemen, it's

7    probably a good point.  Let's just go ahead and

8    take what would be just short of a fifteen minute

9    mid-morning recess.  Just be back at ten-thirty.

10   Thank you.

11         (Jury not present.)

12         (Off the Record.)

13        THE COURT:  Mr. Valeska wants to ask for the

14   attachment of a witness.  He tells me they have

15   one other shorter witness, Mr. Adam Robinson.  I

16   want to know for scheduling.  I don't want to get

17   into trying the case.  Do we need to go ahead and

18   start talking about jury charges now?  Any

19   proposed charges you have ready or the State --

20        MR. BRANTLEY:  I was just going to let the

21   Court submit its standard jury charge.  But I

22   would want one.  I've got one, Judge, on -- do you

23   have a standard jury charge on circumstantial

24   evidence?

25        THE COURT:  There's one in here I can give.

1    I'll need to get it out and see.

2            Any others that you want given?

3        MR. BRANTLEY:  Well, I did have one, but --

4        THE COURT:  Do you have any charges, Mr.

5    Maxwell?

6        MR. MAXWELL:  Yes, sir.

7        THE COURT:  Have you shown Mr. Brantley?

8        MR. MAXWELL:  I've got them.

9        THE COURT:  We are sort of calling this our

10   charge conference.  The D.A. has submitted three

11   proposed instructions.  Have you looked at them?

12       MR. BRANTLEY:  No, sir.

13       THE COURT:  You don't have any objections to

14   the three proposed charges?

15       MR. BRANTLEY:  No, I don't, Your Honor.

16       THE COURT:  Without objection, we will give

17   the State's three proposed charges.

18           Stella is going to need whatever

19   information you want on that attachment.

20           Do you have any objection to these

21   three?

22       MR. BRANTLEY:  I don't.

23       THE COURT:  We will give those three

24   instructions.

25           For the Record he's asked for a charge

1    on circumstantial evidence.  And just for the

2    Record I'm going to give it as well at his request

3    the standards charge.

4         MR. BRANTLEY:  Thank you, Judge.

5              (Jury present.)

6         MR. VALESKA:  Call Mary Wesley to the stand.

7                   MARY WESLEY

8    having first been duly sworn, was examined and

9    testified as follows:

10                 DIRECT EXAMINATION

11   BY MR. VALESKA:

12   Q    Tell us your name, please, ma'am.

13   A    Mary Wesley.

14   Q    If I could, this young lady right here, do you

15        know her?

16   A    Yes.

17   Q    How do you know her?

18   A    That's my niece.

19   Q    What's her name?

20   A    Jonteria Jones.

21   Q    Now, let me take you back to about October 6 of

22        2001 and ask you, could you tell the ladies and

23        gentlemen of the jury, did you see her that

24        morning before she went somewhere?

25   A    Yes.

1   Q   Her clothes, her underwear, her shirts, her
2        T-shirt, shorts that she wore, her clothing, who
3        washed her clothes for her?

4   A   I did.

5   Q   How did you wash her clothes?  Tell the jury.

6   A   I washed them with the rest of the kids' clothes,
7        separate from grown-up clothes.

8   Q   Did you ever wash her clothes with any adult
9        male's or female's clothing?

10   A   No.

11   Q   Now, if I could, I want to show you some underwear
12        and a shirt identified what she was wearing
13        October 6 of 2001.  I'm looking for a name brand
14        on here.  Keddie Creations, size medium.  Do you
15        recognize this is the type underwear consistent
16        that she wore that you washed or kept when she
17        lived in your home?

18   A   Yes.

19   Q   And the same with her shirt here with the flowers
20        on it?

21   A   Yes.

22   Q   Now, if I could, Freeshone McLeod, do you know him?

23   A   Yes.

24   Q   Do you see him in the courtroom?

25   A   Yes.

| | | |
|---|---|---|
| 1 | Q | Does he look different today than he did on |
| 2 | | October 6, 2001? |
| 3 | A | He got a lower haircut. |
| 4 | Q | Can you tell the ladies and gentlemen of the jury, |
| 5 | | before October 6 of 2001, have you ever been to 76 |
| 6 | | Depot Street, Gordon, Alabama, Houston County, the |
| 7 | | trailer that Freeshone and Dinthea Jones -- I |
| 8 | | mispronounced it; I apologize -- but Jonteria's |
| 9 | | mother, they were living together in? |
| 10 | A | Yes. |
| 11 | Q | Been in that trailer many times before October 6, |
| 12 | | 2001? |
| 13 | A | Yes. |
| 14 | Q | In that trailer, was there a washer or dryer? |
| 15 | A | No. |
| 16 | Q | And did Jonteria's mother, did she wash her |
| 17 | | clothes or handle her clothes in any manner or |
| 18 | | fashion in October of 2001? |
| 19 | A | I washed all the clothes. |
| 20 | Q | Did you ever wash or take any of Freeshone |
| 21 | | McLeod's clothes to wash with Jonteria's? |
| 22 | A | No. |
| 23 | Q | Did you take any of her mother's clothes, |
| 24 | | undergarments, panties, underwear, pants, shirts, |
| 25 | | T-shirt, jeans and wash them with Jonteria's |

1      clothes?

2   A    No.

3           MR. VALESKA:  That's all.  Pass the witness.

4      Thank you very much.

5                    CROSS EXAMINATION

6   BY MR. BRANTLEY:

7   Q    What is your name again?

8   A    Mary Wesley.

9   Q    Mary Wesley?

10  A    (Witness nodded.)

11  Q    And you are the sister to Jonteria's mother?

12  A    Yes.

13  Q    Are you-all in addition to being sisters, are you

14     friends?

15  A    Yes.

16  Q    You been friends with her your whole life

17     literally, haven't you?

18  A    Yes.

19  Q    You love Jonteria very much, don't you?

20  A    Yes.

21  Q    You're here to help her, aren't you?

22  A    Yes.

23           MR. BRANTLEY:  That's all.

24                  REDIRECT EXAMINATION

25  BY MR. VALESKA:

1   Q   Mr. Brantley said you love her and here to help

2        her. Would you tell a story or lie for her in any

3        way?

4   A   No.

5          MR. VALESKA: That's all. Thank you, ma'am.

6                  RECROSS EXAMINATION

7  BY MR. BRANTLEY:

8   Q   Have you ever told a story or lie before today?

9   A   I done told one, but not nothing like this.

10          MR. BRANTLEY: That's all.

11          MR. VALESKA: Ask that she step down and be

12       excused and stay in the courtroom.

13          THE COURT: You can be excused.

14            Any other witnesses for the State?

15          MR. VALESKA: Adam Robinson.

16            I need to make sure State's Exhibit 45,

17       the case prints -- 44, the three white pieces of

18       paper that Shannon Fitzgerald testified Valenza

19       took of the chain evidence, make sure they -- I

20       offer them into evidence.

21          MR. BRANTLEY: What is 44?

22          MR. VALESKA: The ink cards.

23          MR. BRANTLEY: Okay. That's fine.

24          THE COURT: 44 is admitted without

25       objection.

1                (State's Exhibit No. 44 was admitted

2                into evidence.)

3                    ADAM ROBINSON

4      having first been duly sworn, was examined and

5      testified as follows:

6                DIRECT EXAMINATION

7  BY MR. VALESKA:

8  Q    Tell us your name.

9  A    Investigator Adam Robinson.

10  Q    Tell the jury where you're employed, please, sir.

11  A    Houston County Sheriff's Department.

12  Q    You work with which department?

13  A    Houston County Sheriff's Department.

14  Q    Still investigator today with the sheriff's

15      department?

16  A    Yes.

17  Q    Let me take you back to October 6 of 2001 and ask

18      were you working with the sheriff's department on

19      that occasion?

20  A    Yes, sir.

21  Q    Did you have the opportunity or request to go down

22      into Gordon, Alabama, 76 Depot Street, Gordon

23      Alabama, Houston County, October 6, 2001?

24  A    Yes, I did.

25  Q    Let me step back here and ask.  Do you see anybody

1        in the courtroom today that you had the occasion

2        to see out there on that day?  How many people?

3   A   I see about three people I recognize.

4   Q   Do you recognize who I got my hand on right here?

5        This lovely young lady?

6   A   Yes, sir.

7   Q   Did you see her?

8   A   Yes, sir, I did.

9   Q   What was her condition that you saw?

10   A   That I saw when I arrived?

11   Q   Yes, sir.

12   A   When I arrived, the female was in a fetal position

13        almost convulsing, what appeared to be convulsing.

14        Her mouth was open bleeding profusely from the

15        head.

16   Q   If I could, let me show you these pictures.

17        State's Exhibit 1, 2, and 3.  Would you hold them?

18   A   (Witness complied.)

19   Q   Ask you, Investigator Robinson, did you take

20        those pictures of Jonteria while she was on the

21        concrete bleeding with those injuries that you

22        just described for the jury?

23   A   Yes, sir.

24   Q   Now, do you see anybody if I say from this part of

25        the courtroom from the rail and the jury box and

| | | |
|---|---|---|
| 1 | | the rail and the attorneys forward, anybody else |
| 2 | | you see out there that day? |
| 3 | A | Yes, sir. |
| 4 | Q | Man or a woman? |
| 5 | A | Man. |
| 6 | Q | White male or black male? |
| 7 | A | Black male. |
| 8 | Q | Point him out. |
| 9 | A | (Witness complied.) |
| 10 | | MR. VALESKA:  Let the Record reflect he |
| 11 | | pointed out Freeshone McLeod. |
| 12 | Q | Would you tell the ladies and gentlemen of the |
| 13 | | jury, did you take Freeshone McLeod into your |
| 14 | | custody? |
| 15 | A | I placed him in his police car, yes, sir. |
| 16 | Q | Were you questioning him yourself asking him any |
| 17 | | specific questions as a law enforcement officer |
| 18 | | about the case in any way? |
| 19 | A | No, sir, I did not. |
| 20 | Q | Were any other police officers in your hearing or |
| 21 | | presence at that time questioning Freeshone McLeod? |
| 22 | A | Not that I know of. |
| 23 | Q | In your presence or hearing were they? |
| 24 | A | No. |
| 25 | Q | Did you give him his Miranda rights? |

1    A    I read him of rights.

2              MR. BRANTLEY:  Can I approach the bench?

3                   (At which time the following proceedings

4                   were held at the bench outside of the

5                   hearing of the jury:)

6              MR. BRANTLEY:  I guess where we're headed is

7         another statement.  Doug told me there was just

8         one statement.  And if we're going to have

9         another, I want to do a motion to suppress.

10             MR. VALESKA:  First of all, I say, if I told

11        Mr. Brantley something, that's what I'm going to

12        do.  We've already been in his statement if you

13        want to recall.  We took this up Monday.

14             MR. BRANTLEY:  This has already come in,

15        hasn't it?

16             THE COURT:  Just in the motion to suppress.

17        He's not testified in front of the jury.

18             MR. BRANTLEY:  Okay.

19             THE COURT:  I assume if we're going by the

20        rules?

21             MR. VALESKA:  That's it.

22                  (At which time the following proceedings

23                  were held in open court:)

24    Q    You gave him his Miranda rights; is that correct?

25    A    Yes, sir.

1    Q    You said he had the right to remain silent,

2         anything he said could or would be used against

3         him in a court of law?

4    A    Yes, sir.

5    Q    You told him if he could not afford a lawyer,

6         couldn't hire his own lawyer, the Court would

7         appoint one for him?

8    A    No, sir.

9    Q    No questions would be asked if he didn't agree to

10        talk or gave his Miranda rights or if he wanted a

11        lawyer present?

12   A    Correct.

13   Q    You didn't threaten him or offer him -- any

14        coercion in order to get him to talk to you?

15   A    No, sir.

16   Q    Didn't tell him it would be better or worse for

17        him if he would or would not talk to you?

18   A    No, sir, I did not.

19   Q    Did you offer any hopes, enumeration, probation,

20        reward in order to get him to talk to you?

21   A    No, sir, I did not.

22   Q    Did he appear to be under the influence of any

23        drugs or alcohol that you could tell based on your

24        training, education, experience in arresting

25        people who are under the influence of alcohol or

1    drugs in your opinion?

2    A    No, sir, he did not.

3    Q    And once again, did you ask him any questions

4    after you gave him his rights?

5    A    No, sir, I asked him nothing.

6    Q    And you gave him his rights, if I could ask you,

7    just as a precautionary matter?

8    A    I was told by my lieutenant to go ahead and advise

9    him of his rights, and that's what I did.

10    Q    But your lieutenant or any other officers or

11    deputies or anybody yourself did not ask him any

12    questions about what had occurred in any manner or

13    fashion?

14    A    No, sir.

15    Q    Placed him where?

16    A    In the back seat of my police car.

17    Q    Was he handcuffed?

18    A    I do not recall.

19    Q    Was there anybody else in the back?

20    A    No, sir.  No one else was in the back.

21    Q    Did you get back into the car with him or stand?

22    A    I stood at the door, yes, sir.

23    Q    Now, did you ask him any questions at that time?

24    A    No, sir, I did not.

25    Q    Did he make a voluntary, spontaneous statement or

1        ask you a question?

2    A    Yes, he did.

3    Q    Tell the jury what he asked you.

4    A    He asked --

5        MR. BRANTLEY:  I object.

6        THE COURT:  Same as before?

7        MR. BRANTLEY:  Yes, sir.

8        THE COURT:  And note the objection, and it's

9    overruled.  All that is on the Record.  Thank

10   you.

11   Q    Tell the jury what he asked you.

12   A    He asked me if she was okay.

13   Q    And did you respond?

14   A    Yes, sir, I did.

15   Q    And what did you say?

16   A    I stated, no, she's probably got a fractured

17   skull.

18   Q    And did you ask him any other questions then?

19   A    No, sir, I did not.

20   Q    And let me go back.  Of all the people that were

21   around you before you put Freeshone McLeod in the

22   car, were there numerous people?

23   A    Yes, sir.

24   Q    Did anybody, anybody out there up to this time ask

25   you in any manner or fashion if the victim,

1    Jonteria Jones, would have any memory or remember

2    what happened to her?

3  A    No, sir.

4         MR. BRANTLEY:  Object.  This is just

5    irrelevant.  If anybody asked her that.

6         THE COURT:  Anybody asked Jonteria --

7         MR. VALESKA:  Asked him.

8         MR. BRANTLEY:  If he wants to say what the

9    Defendant said.  But since -- you know, he's

10   asking did anybody out there.

11        MR. VALESKA:  I'm trying to ask what the

12   Defendant said.  If anybody else asked him

13   anything.

14        THE COURT:  Anything or the lack of anything

15   between the Defendant and this officer.  But as

16   far as anyone else out there, I sustain.  I don't

17   know that there is anybody else out there.

18  Q    What -- when you told the Defendant she had -- her

19   skull was probably fractured, what did the

20   Defendant, Freeshone McLeod, say to you?

21  A    Once I advised him her skull was possibly

22   fractured, he asked me, does that effect her

23   memory.  I stated, I don't know.

24  Q    And point out the man that asked you about whether

25   or not that would effect her memory in this

1       courtroom.  Do you see him?

2  A    (Pointing.)

3         MR. VALESKA:  Let the Record reflect he

4       pointed out Freeshone McLeod.

5  Q    Can you tell the jury in your opinion when you saw

6       Jonteria Jones, any doubt in your mind one hundred

7       percent beyond all doubt that you could tell she

8       was under twelve years of age in your opinion?

9  A    Yes, sir, I could tell she was young.  Very young.

10  Q    Looking at Freeshone McLeod, could you tell in

11       your opinion once again whether he was older than

12       eighteen years of age in your opinion?

13         MR. BRANTLEY:  The way you prove age is with

14       a certified copy of birth certificate.  That's the

15       best proof.

16         MR. VALESKA:  No, sir, Judge.

17         MR. BRANTLEY:  To give opinion evidence on

18       age when it's an element of the offense I think is

19       impermissible.

20         MR. VALESKA:  The case law in this state says

21       anybody can give their opinion about age.  That

22       goes to, once again, its weight, not its

23       admissibility.

24         THE COURT:  For the Record, I think he can

25       give his opinion.  So with that, overrule the

```
 1          objection.  It is an element of the offense they

 2          have to try and prove.

 3     Q    Now, tell the ladies and gentlemen of the jury,

 4          did you get the biographical birthday when you got

 5          information from Freeshone McLeod?

 6     A    Yes, sir.

 7     Q    What was it?

 8     A    Birthday I have for Freeshone was 10-13 of '77.

 9     Q    And what was the birthday of Jonteria Jones that

10          you had?

11               MR. BRANTLEY:  Object.  Hearsay.

12               MR. VALESKA:  Judge, if he knows he can

13          testify.

14               MR. BRANTLEY:  He's reading from notes that

15          are hearsay notes.

16               MR. VALESKA:  Those are notes he took and

17          made.

18               MR. BRANTLEY:  That's what I'm saying --

19               THE COURT:  You-all can address me.

20                    He can give his opinion just like he did

21          the Defendant's age.  I think it's -- everybody

22          has seen her.  But he can give his opinion.  But

23          as far as the specific date, if it's hearsay, it's

24          hearsay.  I sustain on that point unless you can

25          establish it's not hearsay.  He can give his
```

1    opinion.

2  Q   Was she under twelve years of age?

3  A   My opinion she appeared to be under twelve years

4    of age.

5        MR. VALESKA:  That's all.  Pass the witness.

6        MR. BRANTLEY:  No questions.

7        THE COURT:  Thank you.

8           Anything else from the State, Mr.

9  Valeska?

10       MR. VALESKA:  Recall Mary Wesley.

11      MR. BRANTLEY:  Judge, I've asked for the Rule

12  to be invoked, and she has been sitting in here

13  listening to this testimony, and I would ask that

14  the -- the Court to exclude her.  She should have

15  gone to the witness room.

16      THE COURT:  I assume based on what happened,

17  tell me if I'm wrong, you're offering her for the

18  child --

19       MR. VALESKA:  Age only.  She's the guardian.

20      THE COURT:  And I'm going to overrule because

21  my understanding the deputy did not give that

22  answer and may have had it in his records.  I

23  don't see how her being in here on that point.  If

24  there's some other testimony, I will let you renew

25  that objection.

1                MARY WESLEY (Recalled)

2      having previously been sworn, was examined and

3      testified as follows:

4                DIRECT EXAMINATION

5  BY MR. VALESKA:

6  Q   Ms. Wesley, I want to recall you to the stand.

7      Understand you're still under oath.

8      Jonteria's birthday?

9  A   June 9, 1995.

10  Q   1995, correct?

11  A   (Witness nodded.)

12        MR. VALESKA:  Thank you very much.  That's

13      all I have.

14              CROSS EXAMINATION

15  BY MR. BRANTLEY:

16  Q   Ma'am, were you present at the hospital when she

17      was born?

18  A   Huh-uh.

19        MR. BRANTLEY:  That's all.

20            REDIRECT EXAMINATION

21  BY MR. VALESKA:

22  Q   Are you her guardian; in other words,

23      court-appointed guardian and legal papers that you

24      have?

25  A   Yes.

610

1    Q    Do you know when she was born?

2    A    (Witness nodded.)

3    Q    Did you see her in the hospital when she was born?

4    A    (Witness nodded.)

5         MR. VALESKA:  That's all.

6         THE COURT:  Mr. Brantley, anything else?

7         MR. BRANTLEY:  Nothing further.

8         THE COURT:  Does she need to step out?

9         MR. VALESKA:  No, sir.

10        THE COURT:  Anything else?

11        MR. VALESKA:  The State of Alabama rests at

12   this time, Judge Mendheim.

13        THE COURT:  The State rests.

14             Anything from the Defense?

15        MR. BRANTLEY:  Judge, I have some motions to

16   make.

17        THE COURT:  Can we just come up here and do

18   it?

19        MR. BRANTLEY:  Yes, sir.

20             (At which time the following proceedings

21             were held at the bench outside of the

22             hearing of the jury:)

23        MR. BRANTLEY:  Judge, if I could submit

24   that.  If you can give that in lieu of the other

25   one.

1    THE COURT:  You say the other one, Mr.

2    Brantley.  This one?  Is that what you're talking

3    about?

4    MR. BRANTLEY:  Yes.  Give my requested number

5    one in lieu of that one.

6    THE COURT:  Any objection?

7    MR. VALESKA:  No.

8    THE COURT:  I think it's basically --

9    MR. BRANTLEY:  It's real close.  It's real

10   close.

11   THE COURT:  I'm going to take that one out.

12   And for the Record I will give Defendant's charge

13   number one on circumstantial evidence without

14   objection from the D.A.

15   MR. VALESKA:  No objection, Your Honor.

16   THE COURT:  Anything else from the Defense?

17   MR. BRANTLEY:  Judge, I move for a judgment

18   of acquittal, number one, on the rape case for

19   failure of the State to prove prima facie case.

20   In support of that motion let me point out that

21   the State has not proved -- they have not given us

22   any evidence that the, quote, blunt-force object

23   used to arguably penetrate, and we're not even

24   going to say penetration, but even if we conceded

25   penetration, which we're not, there still is no

1    proof that the object that did the penetration was

2    a penis.  The doctor testified it could have been

3    any blunt-force object.  He said a sexual

4    assault.  And this Court well knows there is a

5    statute covering use of objects to place in female

6    vagina it's a lesser degree felony than rape.

7        THE COURT:  Actually, for the Record, I was

8    checking earlier.  It's not.  It's sexual torture

9    is what you're referring to.  Sexual torture is

10    Class A.  But that's what you're referring to.

11        MR. BRANTLEY:  Of course.  A finger is a

12    blunt-force object, and that would be sexual

13    abuse.

14        THE COURT:  Are you asking for a charge on

15    that?

16        MR. BRANTLEY:  Well, right now I would ask

17    for a judgment of acquittal on the rape charge

18    because there's been no evidence presented, no

19    evidence, that the object used was a penis.  And

20    that is -- that is a fundamental requirement of

21    rape is that it be a penis.  And there's just --

22    there's no evidence.

23        THE COURT:  I'm going to deny that.  I think

24    that the evidence viewed most favorably to the

25    State, particularly Dr. Salna's testimony.  He

1  testified without any doubt in his opinion based

2  on the location of the vagina around the hymenal

3  area that in his opinion it could be nothing

4  other than a penis anatomically between a male and

5  female.  That presents a jury question.  Obviously

6  the jury doesn't have to agree with that finding.

7  Second, there's been evidence presented by the

8  State of semen, sperm found in the victim's

9  panties.  And those are enough to give the rape

10  charge to the jury over an objection.  And the

11  jury can make any factual determination from

12  there.

13      MR. BRANTLEY:  Judge, also on the attempted

14  murder charge, I would move for a judgment of

15  acquittal on the grounds that the State has failed

16  to prove a prime facie case.  One of the things

17  that the State has got to prove is this was more

18  than an assault, it was an attempted murder.  They

19  have not met that burden of proof that it was --

20  that whoever the assailant was attempted to take

21  -- kill this person.  Now, I point out to the

22  testimony of Dr. Salna, I believe that was the one

23  -- yes, stating that although he gave the -- that

24  scale -- that fifteen scale, and I really forget

25  the title of it, a three, one on each one, there

1    were three categories, he still stated that a

2    person who was unconscious, who was unconscious,

3    Judge, would still get a three.  And, of course,

4    being unconscious is not being dead.

5        THE COURT:  I think that the evidence creates

6    a jury issue to attempted murder.  The jury could

7    well agree with you and find him not guilty.  But

8    there is I think substantial evidence to let a

9    jury decide that point.  So I will deny that

10   motion as well.

11           Any other motions?

12       MR. BRANTLEY:  That's all.

13       THE COURT:  Anything from the D.A.?

14       MR. VALESKA:  No, sir.

15       THE COURT:  Mr. Brantley, do you plan to

16   offer any evidence at this point?

17       MR. BRANTLEY:  No, sir.

18       THE COURT:  Go straight to argument --

19       MR. BRANTLEY:  Can I put on the Record that

20   my client does not want to testify?

21       THE COURT:  Yes.

22           (At which time the following

23           proceedings were held in open court:)

24       THE COURT:  Ladies and gentlemen, I

25   apologize.  We're working to get this case where

1  you can deliberate after lunch. We're getting

2  toward the end of it. I do need for you if you

3  can just step back into the jury room. Hopefully

4  for no more than a couple of minutes or so at the

5  most. And we will bring you back out and start

6  the final part of the trial at that time.

7            (Jury not present.)

8        MR. BRANTLEY: Freeshone, what I want to ask

9  you here outside the presence of the jury, we've

10  discussed your case over and over, and we've

11  discussed strategy of it. And you understand that

12  you have the right to get on the stand and testify

13  if you want to; is that correct?

14        THE DEFENDANT: (Nodded.)

15        MR. BRANTLEY: And you understand if you

16  don't get on the stand and testify, no one can

17  comment to the jury that you didn't take the stand

18  and testify? Do you understand that?

19        THE DEFENDANT: (Nodded.)

20        MR. BRANTLEY: Would you say yes or no?

21        THE DEFENDANT: Yes.

22        MR. BRANTLEY: Now, we have discussed just a

23  few minutes ago whether or not you wanted to get

24  on the stand and testify. And I said that

25  decision basically is yours; is that correct?

1    THE DEFENDANT:  Yes.

2    MR. BRANTLEY:  You told me you did not want

3 to testify; is that correct?

4    THE DEFENDANT:  Yes.

5    MR. BRANTLEY:  Have you changed your mind

6 since then?

7    THE DEFENDANT:  No.

8    MR. BRANTLEY:  That's all.

9         (Jury present.)

10    THE COURT:  Ladies and gentlemen, we have

11 completed all of the testimony that you will hear

12 in this case.  We're about to go into the final

13 phase of it where the attorneys give you their

14 closing arguments.  As I told you when we started,

15 and I will tell you again before we finish, the

16 burden of proof in this case is on the State of

17 Alabama to prove the case to you beyond a

18 reasonable doubt.  For that reason the District

19 Attorney will get to address you first with his

20 closing argument.  Then Mr. Brantley on behalf of

21 the Defendant will address you.  And then the

22 State will have a final opportunity, once again,

23 to address you when Mr. Brantley finishes because

24 the burden of proof is on them.

25         I do want to caution you that what the

1    attorneys say and what I may have said by way of
2    rulings during the trial, none of that is
3    evidence.  You're to consider as evidence what
4    you've heard from the witness stand and any of the
5    exhibits that have been introduced to you.  The
6    argument is simply the attorneys' view of the
7    evidence in this case for you to consider.
8         When they finish, I will go over with
9    you specifically the law that you are to apply in
10   this case when you begin your deliberations.  We
11   will break for lunch.  I have put the attorneys --
12   the District Attorney and Mr. Brantley will each
13   have fifteen minutes to argue their case.  The
14   D.A., since he gets to go twice, can break up his
15   time however he chooses.  After that, I hope to go
16   ahead and begin my oral charge to you as to the
17   law in this case.  Hopefully finish it and not
18   have to break in the middle of it for lunch.  As I
19   told you, I have a small child in day care and
20   it's my personal problems kind of interfere.  So
21   at a certain point I'm going to have to break if
22   I'm not finished with the oral charge and come
23   back after lunch.  But I hope to avoid that if at
24   all possible.  If we do finish the oral charge, we
25   will go ahead and break for lunch, and then when

1    you come back you can just go straight into your

2    deliberations.  You won't have to come back in

3    here and listen to me or anyone else.

4            So with that, Mr. Valeska, are you ready

5    to address the Court?

6        MR. VALESKA:  I'm ready.  Thank you very

7    much.

8            (At which time closing arguments were

9            made by Mr. Valeska.)

10       THE COURT:  Mr. Brantley.

11           (At which time closing arguments were

12           made by Mr. Brantley.)

13       THE COURT:  There is to be no laughing or

14   nothing while court is in session or while the

15   attorneys are talking.  Any more outbursts, any

16   problems by anybody, the deputies will take you

17   outside and over to the county jail.  So there's

18   absolutely not to be any of that.

19           (At which time closing arguments were

20           continued by Mr. Brantley.)

21       MR. VALESKA:  Objection.  That is not the law

22   in the state of Alabama.

23       MR. BRANTLEY:  It's their own jury charge.

24       MR. VALESKA:  It's incorrect what he's

25   arguing.

CR 02-1610

**DOCUMENT NAME:** McLeod, Freeshone Cornelius

**CLIENT & MATTER:** 54599-001

Part 8 of 9

**DESCRIPTION:**

County: Houston

CC#s: 2002 ~~235~~ -235+236

Attorney: Beth Poe

Circle:  (TRANSCRIPT)    CASE FILE     BOTH        5 vol.

MMV

## CERTIFICATION

I hereby certify that the preceding imaged records and documents

are a true, accurate, and complete image of the original records or

documents as received by the Office of the Attorney General of

the State of Alabama.

This the 21st day of September, 2004.

Signed: _Melissa G. Martin_

Notary: _Coleen F Gibson_

Coleen F. Gibson
Notary Public
Commission expires 06/11/06

```
1    Q    What about yesterday?

2    A    I rode with her yesterday.

3    Q    And you're telling the jury that you've never

4         discussed this case with Tera?

5    A    No, sir.

6    Q    Why would Tera tell the jury you had?

7    A    I don't know.

8    Q    Is Tera too young to understand what the truth is?

9    A    No, sir.

10   Q    But you're saying you haven't discussed the case

11        with her?

12   A    No.

13   Q    Do you know she told the jury that you had told

14        her what to say?

15   A    No, sir.

16   Q    Does that surprise you at Tera?

17   A    Yeah.

18            MR. BRANTLEY:  That's all.

19                    REDIRECT EXAMINATION

20   BY MR. VALESKA:

21   Q    Let me ask you, if I could, ma'am.  Mr. Brantley

22        asked you would it surprise you that Tera was too

23        young to know to tell the truth.  Do you remember

24        him asking you that?

25   A    Uh-huh.
```

1  Q    Since Tera got out of the hospital --

2  A    Yes, sir.

3  Q    -- have you seen her?

4  A    Since she got out?

5  Q    Uh-huh.

6  A    Yes, sir.

7  Q    Now, what I want to ask you, let me show you a

8       picture.

9              (State's Exhibit No. 43 was marked for

10             identification.)

11 Q    Show you State's 43 for identification purposes.

12      Who is in State's 43?

13 A    Freeshone.

14 Q    And I want to ask you, is that how Freeshone

15      looked on or about October 6 of 2001, or does he

16      look like he does today?  How did he look?

17 A    He didn't look like that then.

18 Q    He didn't look like he's sitting at the table.  Is

19      that how he looked on October 6, the picture?

20 A    Yes, sir.

21             MR. VALESKA:  Offer State's 43 into evidence.

22             THE COURT:  Any objection to State's 43?

23             MR. BRANTLEY:  No.

24             THE COURT:  43 is admitted.

25                 (State's Exhibit No. 43 was admitted

1           into evidence.)

2      Q    Now, could you tell the ladies and gentlemen of

3           the jury, Mr. Brantley asked you about things in

4           the house, in other words, that yellow stain on

5           the floor.  I want to ask you about things in the

6           house.  I already asked about the wok.  You've

7           identified that, correct?  Were there other pots

8           or pans in that house?

9      A    No, sir.

10     Q    That was the only one?

11     A    Yes, sir.

12     Q    And how much time from when you first saw

13          Freeshone McLeod and he told you your daughter was

14          missing until he took you to where she was?  Was

15          it a long time or hour or thirty minutes or

16          shorter than that?

17     A    Thirty -- it was just, about the time I left,

18          that's when he just -- I just say about thirty

19          minutes.

20     Q    Well, tell the jury if it's thirty minutes up at

21          your momma's house, right?

22     A    Yes, sir.

23     Q    Your momma's house is within twenty feet of Mr.

24          McGriff's house, right?

25     A    Yes, sir.

1    Q    And Mr. McGriff's house was not less than twenty

2         feet or twenty feet from the trailer you were

3         living in that you identified from those pictures

4         with Freeshone, right?

5    A    Yes, sir.

6    Q    And from where Freeshone took you and showed you

7         where Jonteria was, that's not any more than ten

8         -- twenty -- thirty -- forty -- fifty feet, right?

9    A    Yes, sir.

10   Q    Is that the path you went from your momma's house

11        down the street to McGriff's and then over --

12   A    It's a trail from, like -- it come from my

13        friend's house, there's a trail like you can cut

14        right through that, too.

15   Q    Is it a short distance?

16   A    Yes, sir.

17   Q    The last question I want to ask you.  You said

18        that -- just answer the question for Mr. Brantley

19        that Mr. Freeshone went into the trailer with you

20        outside that you and he lived in, right?

21   A    Yes, sir.

22   Q    Now, I showed you pictures of the trailer, right?

23   A    Yes, sir.

24   Q    You could see the blood throughout the trailer,

25        correct?

1  A    Yes, sir.

2  Q    Did Freeshone McLeod mention that he saw or found

3       blood in the trailer when he came out when you

4       were looking and he was looking for your

5       daughter?  He didn't, did he?

6           MR. BRANTLEY:  Object.  Hearsay.  Plus he's

7       leading his own witness.

8           THE COURT:  Overruled as to the hearsay.  But

9       try not to lead the witness.

10 Q    Did he make any comments to you about seeing any

11      blood that you saw on those pictures, ma'am?

12 A    No, sir.

13          MR. VALESKA:  That's all.

14                    RECROSS EXAMINATION

15 BY MR. BRANTLEY:

16 Q    Let me ask you this about that house that you and

17      Freeshone lived in.  That house had two doors, did

18      it not?

19 A    Yes, sir.

20 Q    And you-all never locked those doors, did you?

21 A    Yes, sir.

22 Q    They wouldn't lock, would they?

23 A    Yes, sir.

24 Q    You didn't lock them every day?

25 A    Not every day.

423

| | | |
|---|---|---|
| 1 | Q | In fact, most of the time you left them unlocked, |
| 2 | | didn't you?  Especially during the daytime? |
| 3 | A | Uh-huh. |
| 4 | Q | And on this day of October 6, 2001, Tera was seen |
| 5 | | about a block away by herself, wasn't she? |
| 6 | A | Who? |
| 7 | Q | Tera. |
| 8 | A | She was what? |
| 9 | Q | Seen about a block away by herself away from the |
| 10 | | house? |
| 11 | A | I don't know nothing about it. |
| 12 | Q | If you know. |
| 13 | A | No, sir. |
| 14 | Q | You don't have any knowledge of that that she was |
| 15 | | by herself about a block -- |
| 16 | A | She never walked off by herself. |
| 17 | Q | Never have? |
| 18 | A | No, sir. |
| 19 | Q | How do you know if you don't supervise her? |
| 20 | A | Because my daughter don't never go.  She always -- |
| 21 | | the only time she go somewhere unless she with my |
| 22 | | sister or her cousin or something like that. |
| 23 | Q | How do you know if you don't live with your |
| 24 | | daughter? |
| 25 | A | I should know.  I be around.  If I be around my |

424

1          mother.

2     Q    If you're over at Lakeshia Lee's house, how are

3          you going to know what your daughter is doing?

4     A    She still won't leave that house unless somebody

5          with her.

6     Q    That's what you believe?

7     A    Yes.

8     Q    But you don't know that for a fact?

9     A    I know.

10    Q    And you were over at Walt Lee's -- is Walt Lee

11         any kin to Lakeshia?

12    A    No.

13    Q    You were at Walt Lee's eating oysters earlier that

14         day?

15             MR. VALESKA:  Objection.  Asked and answered.

16         Repetitious.

17    Q    You don't know where your daughter was then, do

18         you?

19             MR. VALESKA:  Objection.

20    A    She was at my mother's house.

21             MR. VALESKA:  Objection.  Outside the scope.

22    Q    When you left --

23    A    It just -- my mother's house --

24             THE COURT:  Hang on.  Hang on.  Ma'am.

25         Ma'am.  Ma'am.

1       What's your objection?

2           MR. VALESKA:  This is outside the scope.

3       It's already been asked and answered.  It's

4       irrelevant.

5           MR. BRANTLEY:  Judge, I will tie it up and

6       wind it up naturally.

7           THE COURT:  Either plow some new ground or

8       wind it up.  It's repetitive questions.

9           MR. BRANTLEY:  That's all.

10              FURTHER REDIRECT EXAMINATION

11  BY MR. VALESKA:

12  Q   Last question I have.  You told Mr. Brantley that

13      your daughter, Jonteria, would go off with

14      grandmother, your sister.  Who else in this

15      courtroom would she go off with in this courtroom?

16          MR. BRANTLEY:  Judge, she's not competent to

17      testify to that because she can say who they have

18      gone off with that she knows, but that doesn't

19      exclude the fact that she can go off by herself.

20          THE COURT:  Obviously -- rephrase it so that

21      there's a foundation laid for her as to what she

22      would know.

23  Q   Ma'am, the time that you were around Jonteria and

24      she would leave in your presence and go off with

25      other adults, okay, what you saw, not what Mr.

1      Brantley asked you when you were someplace else,
2      tell the jury what you actually saw.  You said the
3      questions to him she would go off with who?
4  A   My sisters.
5  Q   That's one.
6  A   And my grandmomma.
7  Q   Two --
8  A   I mean my momma and my cousin.
9  Q   Anybody else in this courtroom she would go off,
10     ma'am?
11 A   My sister.
12 Q   Who else in this courtroom?
13 A   Nobody else.
14 Q   What about Freeshone?
15 A   She wouldn't leave with him either.
16         MR. VALESKA:  That's all.  Thank you.
17                FURTHER RECROSS EXAMINATION
18 BY MR. BRANTLEY:
19 Q   Talk about going off with your sisters and your
20     momma, right?
21 A   Yes, sir.
22 Q   The reason that your sisters or your momma would
23     go with her when Tera left the house was to
24     supervise her; is that correct?  Make sure she
25     didn't get hurt?

```
 1   A   Yes, sir.

 2   Q   So it's important you would agree that a child as

 3       young as she was back then, three years of age,

 4       not to leave the house unsupervised?  That's

 5       important, isn't it?

 6   A   Uh-huh.

 7           MR. BRANTLEY:  Thank you.

 8           MR. VALESKA:  No further questions.

 9           THE COURT:  That's it, ma'am.  You may step

10       down.

11           MR. VALESKA:  Donald Valenza.

12               (State's Exhibits No. 44 and 45 were

13               marked for identification.)

14                      DONALD VALENZA

15       having first been duly sworn, was examined and

16       testified as follows:

17                    DIRECT EXAMINATION

18   BY MR. VALESKA:

19   Q   Tell me your name, please, sir.

20   A   Donald Valenza.

21   Q   Where are you employed?

22   A   Houston County Sheriff's Department.

23   Q   What position?

24   A   Lieutenant over criminal investigations division.

25   Q   Are you assigned to investigate and head
```

1           investigators of the case of the State of Alabama

2           versus Freeshone McLeod?

3   A   Yes.

4   Q   On or about October 6 of 2001 did you go down to

5           Gordon, Alabama, to the trailer to the vicinity

6           where Jonteria was found looking for physical

7           evidence with your other investigators?

8   A   Yes, I did.

9   Q   Let me ask you, Lieutenant Valenza, State's

10          Exhibit 6, see that object to the right?  The

11          paper bag, reach out and touch it.  What is that?

12          Can you tell the jury?

13   A   A wok.

14   Q   Did it come into your custody?

15   A   Yes, it did.

16   Q   How did it come into your custody on or about

17          October 6 of 2001?

18   A   The crime scene --

19   Q   Where?  You said the crime scene?

20   A   In Gordon at the mobile home.  And from that point

21          I transported it to Montgomery, Alabama, to the

22          Department of Forensic Science.

23   Q   Now, if I could, at the time it came into your

24          custody, did you mark, alter, or change it in any

25          way?

1    A    No.

2    Q    Investigator Cook, the one that turned it over to

3         you, Keith Cook?

4    A    Yes.

5    Q    And where was it in the trailer?  Do you recall?

6    A    I believe it was in the back bedroom as you go in

7         the door to the far left.

8    Q    Now, I could --

9         MR. BRANTLEY:  Could I have a -- I need to

10   move for clarification or take him on voir dire.

11   He said it was turned over to him.  And if he's

12   testifying to what somebody else told him, then

13   I'm going to object as to where it was found.

14        MR. VALESKA:  That wasn't the question.

15        MR. BRANTLEY:  Where was the wok?

16        MR. VALESKA:  Did he see the wok is what I

17   asked.

18        THE COURT:  They are not offering anything at

19   this point.  You can voir dire when they attempt

20   to offer something into evidence.  But are you

21   making a hearsay objection?  I'm not sure

22   exactly.

23        MR. BRANTLEY:  Well, where it's found in the

24   house certainly is relevant.  And he just

25   testified it was found in the bedroom.  Now, is

1    that hearsay, you know?  I guess I can clear it up

2    on cross.

3         THE COURT:  Go ahead.

4  Q  Where was it found in the trailer, Lieutenant

5    Valenza?

6  A  Back bedroom.

7  Q  Did you see it there yourself?

8  A  Yes, I did.

9  Q  Thank you.

10        Could you tell the ladies and gentlemen of

11   the jury, Keith Cook one of the investigators that

12   took custody of it and handed it to you on or

13   about that day?

14  A  Yes.

15  Q  Why did you take custody of State's Exhibit, the

16   wok, at that point in time?

17  A  I made contact with Loyd Arrington of ABI --

18   Alabama Bureau of Investigations.

19  Q  And after you talked with him who did you talk to?

20  A  He had made arrangements for the Department of

21   Forensic Sciences -- ABI to come in on Sunday, and

22   I transported it the very next morning.

23  Q  And did you turn it over to Shannon Fitzgerald in

24   the Alabama Department of Public Safety

25   fingerprint identification bureau?

431

```
1   A   I would have to look at the guy.  I'm not familiar
2       with his name.
3   Q   At the time it came into your custody did you
4       mark, alter, or change State's Exhibit 6, the wok,
5       in any way?
6   A   No.
7   Q   Was it put in a paper bag?
8   A   Yes.
9   Q   Now, if I could, Lieutenant Valenza, let me show
10      you another exhibit in front of you in a manila
11      envelope.  Do you see that?  Is there a number on
12      the outside?
13  A   44.
14  Q   Yes, sir.  Would you open it up and take the
15      contents out?
16  A   (Witness complied.)
17  Q   Just keep them down in front of you.  I'm looking.
18      There's multiple exhibits.  I'm asking about 43,
19      44, and 45.  Do you see that with three exhibits
20      attached to that?  Three long pieces of white
21      paper?
22  A   Yes.
23  Q   State's 45?
24  A   That's correct.
25  Q   Tell the jury what 45 is.
```

432

1           MR. VALESKA:  With the Court's permission,
2      can you come in, please, sir, and stand right
3      there?
4   Q  I asked you who you turned it over to at the
5      Department -- I mean, Alabama Department of Public
6      Safety fingerprint identification bureau.  Do you
7      see that man in the courtroom?
8   A  Yes, sir.  This gentlemen right here (indicating).
9   Q  That is Mr. Fitzgerald.
10          MR. VALESKA:  Take him back out.
11  Q  Lieutenant Valenza, what is that?
12  A  Set of major case prints from Freeshone.
13  Q  Tell the ladies and gentlemen of the jury, you
14     used the name Freeshone McLeod and major case
15     prints.  Who took the prints from Freeshone McLeod
16     on that exhibit?
17  A  I did.
18  Q  Would you point out the person that you took the
19     major case prints on all three of those pieces of
20     paper?
21  A  (Witness indicated.)
22          MR. VALESKA:  Let the Record reflect he
23     pointed out the Defendant.
24  Q  What prints did you take, tell the jury, on those
25     pieces of paper?

1    A    I had taken a full, flat-hand-down print, a roll
2         of the bottom --
3    Q    Of what part of the body?
4    A    The bottom part of the hand and then the inside
5         between the thumb and finger.
6    Q    Did you also take complete palm prints?
7    A    That's the flat part.
8    Q    Did you do all three pieces of paper on the major
9         ink prints of Freeshone McLeod?
10   A    Yes.
11   Q    Now, do you see they -- are they different now,
12        got different writings on the corner now from the
13        time you took them from McLeod?
14   A    Yes.
15   Q    Are your writings or initials in the corners on
16        any of the three pages?  Your initials?
17   A    Not my initials.
18   Q    Let me ask you.  Look at the jury and tell them,
19        the writing on there, is that marked, altered, or
20        changed, the major case fingerprint what you
21        rolled off and put on the paper, did that effect
22        the prints in any way those initials in the
23        corners?
24   A    No.
25   Q    After you got the major case fingerprint,

1    Lieutenant Valenza, what did you do with those?

2    Who did you turn them over to?

3    A    Investigator Cook.

4    Q    And after you turned them over to Investigator

5    Cook, did you ever take custody of them again?

6    When they came back is what I'm asking.

7    A    I don't recall if I got possession of it again.    I

8    would have to look at the submission.

9    Q    You're looking at this now; in other words,

10    State's 45, do they appear to be different, the

11    actual case prints, the prints themselves,

12    excluding the initials or numbers or dates in the

13    corners effect in any way you can tell?

14    A    No.

15    Q    Marked, altered, or changed in any manner or

16    fashion from the time you took them and turned

17    them over to Cook and sent them off for testing?

18    A    Not from the time they left my hands, no.

19    Q    And as you're looking at them now in your opinion,

20    a hundred percent beyond all doubt, have they been

21    changed in any way from what you can see?

22    A    No.    That's the prints that I took.

23    Q    Prints on all three pages?

24    A    That's the prints I took.

25        MR. VALESKA:    Offer 45 into evidence, the

435

1    major case prints he took from the Defendant.

2         THE COURT: Any objection, Mr. Brantley?

3         MR. BRANTLEY: No, sir.

4         THE COURT: State's 45 is admitted.

5              (State's Exhibit No. 45 was admitted

6              into evidence.)

7    Q    Lieutenant Valenza, tell the ladies and gentlemen

8         of the jury, the trailer that the wok was found

9         in, what's the distance from that trailer if you

10        go out the back door approximately to Mose

11        McGriff's house, the brick house?  I mean, is it

12        thirty minutes away if you walk?

13   A    No.  It's very, very short.

14   Q    And could you tell the ladies and gentlemen of the

15        jury, if you could, please, Lieutenant Valenza,

16        being one of the chief investigators going inside

17        the trailer, did you see any substances of any

18        colors on any parts of the trailer when you went

19        inside on October 6 of 2001?

20   A    There was in -- appear to be blood spots in

21        various locations.

22   Q    I want to show you State's Exhibit 5 for

23        identification purposes, which is in evidence.  Do

24        you recognize 5?

25   A    Yes.

436

1   Q   Show you State's Exhibit No. 29, which is in

2       evidence.  29 and 5, do you recognize that?

3   A   Yes.

4   Q   What is it?

5   A   They are both the same photograph of the location

6       coming out the -- what I would say the main

7       entrance to the mobile home.  And on No. 5, this

8       picture is showing where -- like a burn pile.

9       Like, drag marks through the burn pile.  And then

10      on the Exhibit 29 -- I'm not sure what the left

11      arrow, but this is the trail right here that went

12      up in this little area where the victim was at?

13  Q   Did you see another structure up there?  You

14      referred to an arrow that was pointing.  Do you

15      see another structure that it's point to?  What is

16      that other structure?

17  A   There's another mobile home next door.

18  Q   So that is all that arrow was pointing reference

19      to mobile home.  Is that the mobile home that

20      you're referring to that you went into, the one

21      with the arrow in extreme left-hand corner, or is

22      it the one on the right?

23  A   I went in both.

24  Q   Did you find any blood in the one on the left-hand

25      corner?

1     A     No.

2     Q     Any evidence?

3     A     No.

4     Q     The one on the right-hand corner 29, as well as on

5           5 on the right-hand corner, identified as whose

6           trailer?

7     A     I was told the suspect --

8                 MR. BRANTLEY:  Object.  Hearsay.

9                 THE COURT:  Sustained.

10    Q     Let me show you State's Exhibit 37.  What is 37,

11          Lieutenant Valenza?

12    A     A porch.

13    Q     The porch going to what trailer?  Look at State's

14          5 and 29 if you need to in reference to the

15          trailer that you found any blood or the wok in.

16    A     The victim's trailer.

17    Q     Let me ask you, if I could.  Take this red marker

18          and circle the one -- just put a V for Valenza on

19          5 and 29 for the picture where the porch was as

20          well as you went in and found blood.  Which of

21          those two trailers in those two pictures.  Put a V

22          for Valenza.

23    A     (Witness complied.)

24    Q     And then do it on the other picture if you could

25          -- 5.

438

| | | |
|---|---|---|
| 1 | A | (Witness complied.) |
| 2 | Q | Now, State's 37, that's the porch going into the |
| 3 | | trailer on 5 and 29, you put a V on, correct? |
| 4 | A | Yes, sir. |
| 5 | Q | If I could, let me show you some other pictures. |
| 6 | | State's Exhibit 42, State's Exhibit 41, State's |
| 7 | | 32, do you recognize those pictures in reference |
| 8 | | to -- I want to go back, once again, if I could |
| 9 | | refer, Lieutenant Valenza, to State's 5 and |
| 10 | | State's 29 that are in evidence that you put the V |
| 11 | | on the trailers. |
| 12 | A | If I'm not mistaken, these were the panel walls |
| 13 | | in that back bedroom. |
| 14 | Q | Well, what did you see in the trailer that you put |
| 15 | | the V on that you've identified as the Defendant |
| 16 | | and his girlfriend's?  What was the substance in |
| 17 | | your opinion you saw? |
| 18 | A | Appeared to be blood. |
| 19 | Q | When you first walked in the trailer and you went |
| 20 | | in and walked down the halls, did you see blood in |
| 21 | | more than one place?  Look at the pictures, front |
| 22 | | and back. |
| 23 | A | I recall the bedroom, and I recall this part right |
| 24 | | here (indicating). |
| 25 | Q | You're looking at pictures just for the jury's |

1    benefit that -- is that more than one location you

2    saw blood?

3  A    Yes.

4  Q    When you went in the trailer, can you tell the

5    ladies and gentlemen of the jury any doubt in your

6    mind as a lieutenant with the sheriff's department

7    and as an investigator that you could see a red

8    substance that you believed to be blood? You saw

9    it no problem?

10  A    I saw it with no problem.

11  Q    Now, let me show you if I could, State's Exhibit

12    33. What's 33? And you can use my diagram if you

13    need to, which is State's 38. What room did you

14    find the radio?

15  A    I don't recall right off.

16  Q    Did you see the Defendant at the scene?

17  A    At the scene?

18  Q    Freeshone McLeod? At the house with Mose McGriff?

19  A    No. Not at Mr. McGriff's house.

20  Q    Did you see him between 76 and 80 Depot Street,

21    Gordon, Alabama, in Mr. McGriff's house? Was he

22    in that area?

23  A    I saw him in the area, yes.

24  Q    Do you recall what kind of clothing he was

25    wearing?

1    A    Not right off I don't, no.  Not without notes.

2         MR. VALESKA:  That's all I have.  Pass the

3         witness.

4                    CROSS EXAMINATION

5    BY MR. BRANTLEY:

6    Q    What time did you get to this trailer out there?

7         I'm assuming the trailer you are talking about is

8         the trailer where Tunt -- do you know who Tunt is?

9    A    Not right off.

10   Q    Jonteria's mother, Ms. Jones.

11   A    Okay.

12   Q    Did she live in that trailer?  Is that the trailer

13        you're talking about?

14        MR. VALESKA:  I would stipulate she did.

15   Q    Well, do you know that she lived in that trailer?

16   A    I heard she did.

17   Q    And that's also the trailer where Freeshone lived;

18        is that correct?  Is that your understanding?

19   A    That was my understanding.

20   Q    What time did you arrive at that trailer?  Was it

21        on October 6?

22   A    I would have to check our logs on that to give you

23        an exact time.

24   Q    Give me an approximate time.

25   A    I really -- I really can't tell you that because I

1    think I stayed on this one case about thirty

2    hours.

3    Q    Well, did you arrive on the day that they took --

4    A    The day of the incident, yes.

5    Q    The day of the incident?

6    A    That's correct.

7    Q    October 6?

8    A    That's correct.

9    Q    Was it nighttime when you arrived, or daytime?

10    A    I believe it was evening.

11    Q    What does that mean?

12    A    I believe it was still daylight when I arrived.

13    Q    Now, when you got there, did you arrive there by

14    yourself?

15    A    I traveled by myself, yes.

16    Q    When you got there, who was there?

17    A    Who was there?

18    Q    Yes, sir.

19    A    Uniform patrol.

20    Q    How many people?

21    A    Pardon me?

22    Q    How many people?

23    A    I didn't count them.

24    Q    Hundreds or dozens?

25    A    We don't have that many in our department.

1    Q    Roughly how many?

2    A    I think maybe Lieutenant -- or Sergeant Forehand,

3          Robinson, and I can't recall right off without the

4          notes.

5    Q    Was local police there?  Officer Roney from Gordon?

6    A    I don't recall.  I don't remember talking to Roney

7          if he was.

8    Q    You would recognize him if you saw him?

9    A    Oh, I know him, yes.

10    Q    And people been going in and out of the house?

11          Were people inside the house when you got there?

12    A    No.

13    Q    All of them outside?

14    A    You're talking about people or officers?

15    Q    Well, officers and -- well, just say officers.

16    A    Officers are recorded normally.  If you don't have

17          the right to be inside the crime scene, you won't

18          go in.

19    Q    What did you observe when you got there?  Did you

20          see officers in the yard?

21    A    I saw officers in the yard, correct.

22    Q    Did you see officers inside the house?

23    A    I spoke with a couple of my investigators outside

24          before I entered, so I really don't know if they

25          were or not.

1   Q   You don't know if there were any officers -- did
2       you walk inside the house?
3   A   Eventually, yes.
4   Q   When you walked in there, was there anyone else in
5       there?
6   A   When I went in, there was some of my investigators
7       with me.
8   Q   And were there already some in there?
9   A   I just don't recall right off.
10  Q   Not saying there wasn't, you're just saying you
11      don't remember?
12  A   I just don't recall right off, no.
13  Q   Was there crime scene tape up?
14  A   Yes.
15  Q   Where was that?
16  A   Crime scene tape was stretched around the front
17      and back that I can recall back towards the fence,
18      which would have been I believe the south fence.
19  Q   Who had been in the house prior to your arriving?
20  A   I don't know.
21  Q   That would be good for you to know as a chief
22      investigator on this case, would it not?
23  A   Not at that particular time, no.
24  Q   That would not be good to know?
25          MR. VALESKA:  I will stipulate Keith Cook was

1    in the house with the sheriff's department.

2 Q Anyone other than Keith Cook that you know of,

3    Don, that had been inside the house prior to your

4    arrival?

5 A I don't know.

6 Q You don't know if anything was moved after the

7    alleged assault on Tera?

8 A I don't know.  I know what the scene looked like

9    when I arrived and what I viewed.

10 Q Did you go in the kitchen?

11 A I went throughout the trailer, yes.

12 Q What did you say?

13 A I went throughout the trailer, yes.

14 Q And that included the kitchen?

15 A You go through the kitchen to get to the back,

16    yes.

17 Q Describe to me what you saw in the kitchen.  See

18    pots and pans?  Dishes?

19 A There was a few.  There wasn't an overabundant

20    amount of dishes or anything in the place.  And

21    like I said, without photographs or notes --

22 Q Officers have good memories, don't they?  Law

23    enforcement officers?

24 A I would think so.

25 Q Do you recall seeing cooking utensils in the

```
 1              kitchen?
 2    A    There was -- there might have been some utensils.
 3         I can't say what they were.
 4    Q    Pots and pans?
 5    A    There was some utensils.  I didn't -- I can't say
 6         what they were.
 7    Q    You can't say if you saw pots and pans --
 8              MR. VALESKA:  Objection.  Asked and answered.
 9         Repetitious.
10              MR. BRANTLEY:  All right.
11    Q    But you can remember a wok?
12    A    You have a primary and secondary objective on a
13         crime scene.
14    Q    I understand that.  But my question is you have no
15         problem in remembering a wok?
16    A    It was a primary objective on a crime scene.
17    Q    Now, what did you do with regards to gathering
18         evidence?
19    A    I didn't gather.  I didn't collect.
20    Q    Who collected the evidence?
21    A    The case officers working the scene.
22    Q    And that's who?
23    A    It would have been Investigator Cook.
24    Q    Now, who took possession of the wok?
25    A    You would have to ask Investigator Cook upon
```

1    collection.

2    Q    So you didn't actually collect it?

3    A    I don't recall collecting it, no.

4    Q    And you -- and when you first observed the wok,

5         there had been other people in the house prior to

6         you?

7    A    That's what I'm told, yes.

8         MR. BRANTLEY:  That's all.

9         THE COURT:  Mr. Valeska?

10        MR. VALESKA:  That's all.

11        THE COURT:  Who is your next witness?

12        MR. VALESKA:  I have a short witness, and

13   then I need some fingerprint people.

14        THE COURT:  How short is your short witness?

15        MR. VALESKA:  Just chain.  One piece.

16                    KRIS ROCCO

17   having first been duly sworn, was examined and

18        testified as follows:

19                DIRECT EXAMINATION

20   BY MR. VALESKA:

21   Q    Tell us your name, please, ma'am.

22   A    Kris Rocco.

23   Q    Where are you employed?

24   A    Presently?

25   Q    Yes.

1    A    I'm not.  I'm a student.

2    Q    Where?

3    A    Tallahassee Community College.

4    Q    Let's go back on or about October 6 of 2001 and

5         tell the jury, were you employed at that time?

6    A    I was employed by the sheriff's department as an

7         investigator assigned to the Violent Crimes Task

8         Force sponsored by the FBI.

9    Q    If I could, particularly, look at the manila

10        envelope in front of you with your hand three

11        pieces of white pieces of paper as well as some

12        cards with it and ask you if those came into your

13        custody?  That is 45 for the Record.

14   A    I believe they did.  I believe --

15   Q    Did Investigator Valenza turn those over to you?

16   A    Yes.

17   Q    And then you took them to Montgomery and turned

18        them over to Shannon Fitzgerald?

19   A    Yes.

20   Q    Did you mark, alter, or change them in any way?

21   A    No.

22   Q    Now, if I could, looking at -- I want to ask you,

23        please, ma'am.  Did you also receive from Susan

24        Seay some clothing identified coming from the

25        victim, Jonteria Jones?

1  A  Yes.

2  Q  Included an orange and white pair of panties in a

3     sealed condition envelope from Susan Seay?

4  A  Yes.

5  Q  And you took them and turned them over to Kristen

6     Maturi working with the Alabama Department of

7     Forensic Science lab along with Peter Macchia?

8  A  Yes.

9  Q  Did you mark, alter, or change the clothing of

10    the little girl in any way, the panties or the

11    orange shirt?

12  A  No.

13  Q  Now, if I could, did you also receive both, I'll

14    refer to them both sexual assault kits to your

15    left?  Do you see those numbers?  Did you take

16    both of those into your custody?  No. 7 and 27,

17    did they come into your custody?

18  A  Yes, sir.

19  Q  Were they sealed when you got them?

20  A  Yes, they were.

21  Q  And you took them and turned them over in

22    Montgomery in a sealed condition to -- on both 7

23    and 27, both to Kristen Maturi as well as to Pete

24    Macchia at the Alabama Department of Forensic

25    Science, a DNA expert?

1    A    Yes.

2    Q    Did you mark, alter, or change any exhibit?

3    A    No, I didn't.

4    Q    Remain sealed while they were in your care,

5         custody, and control?

6    A    Yes.

7    Q    Did you also receive clothing identified to come

8         from the Defendant, Freeshone McLeod, given to you

9         by Investigator Keith Cook?

10   A    I believe I did.

11   Q    Do you need to take a look at your records if you

12        could?

13   A    There's so much.  Do you have your copy?

14   Q    No.  Just go ahead and look.

15            Let me show to you, if I could, identified as

16        Department of Forensic Science number nineteen,

17        one button-up shirt, time of recovery, 10-7-01,

18        Investigator Keith Cook.  Did that come into your

19        custody in a sealed condition?

20   A    Yes.

21   Q    Let me show you some other exhibits.  I'll keep

22        them up here in front of you.  Identified as

23        number twenty-one for the Department of Forensic

24        Science number with a case number on there

25        identified to come from Keith Cook, an

1         investigator, from the Defendant McLeod to you?

2    A    Yes.

3    Q    Once again, sealed when you got it?

4    A    Yes.

5    Q    One pair of pants and a belt, once again,

6         identified forensic science number twenty-two,

7         their identification number, their evidence on the

8         bag, or the evidence log, either of those numbers,

9         once again, identified coming from Freeshone

10        McLeod a pair of pants and belt given by Keith

11        Cook to you in a sealed condition?

12   A    Yes.

13   Q    Once again, identified as evidence log or

14        Department of Forensic Science identification

15        number twenty, one pair of shoes identified coming

16        from suspect Freeshone McLeod given to you by

17        Keith Cook in a sealed condition in this bag?

18   A    Yes, sir.

19   Q    Once again, exhibit number seven evidence log

20        Department of Forensic Science number seven

21        identified to be a radio coming from the room in

22        the apartment given to you by Keith Cook in a

23        sealed condition?

24   A    Yes.

25   Q    Identified number eighteen evidence log Department

1      of Forensic Science number in a sealed condition

2      at this time a paper bag identified to be the

3      underwear of Freeshone McLeod?  You got that in a

4      sealed condition from Keith Cook?

5  A   Yes.

6  Q   One piece of blind in a sealed condition

7      identified exhibit -- or evidence log number

8      thirteen Department of Forensic Science number

9      thirteen, manila bag sealed now given to you by

10     Keith Cook and that you took in a sealed condition

11     and turned over in Montgomery?

12  A   Yes.

13           (State's Exhibit No. 46 was marked for

14           identification.)

15       MR. VALESKA:  This is 46.  I want to open

16     it.  Mr. Brantley can see it.  It's sealed for the

17     Record.  Mr. Brantley has custody.

18  Q   And all the evidence you received from

19     Investigator Cook that you took to Montgomery,

20     where was that turned in in Montgomery?  Was that

21     the Alabama Department Forensic Science lab?

22  A   Yes.

23  Q   Had you transported evidence before many times?

24  A   Yes.

25  Q   Did you sign the evidence receipt log when you got

1   to Montgomery forensic science and turned it into

2   their care, custody, or control?

3 A Yes.

4 Q Did you date it?

5 A Yes.

6 Q And would a copy have been kept since you've been

7   an investigator sent back to the Houston County

8   Sheriff's Department for a chain of evidence as to

9   whatever evidence they received from you in a

10   sealed condition and as to what it was?

11 A Yes.

12 Q And, also, exhibit -- or identified to you coming

13   from Keith Cook given to you, Investigator Rocco,

14   the Defendant's shirt sealed in a condition on the

15   evidence log that you took to Montgomery?

16 A Yes.

17 Q Do you actually know the color yourself of the

18   shirt?  Do you know the color?  It was sealed?

19 A No.

20 Q I understand.

21    MR. VALESKA:  That's all.  Pass the witness.

22    MR. BRANTLEY:  I don't have any questions of

23   this witness.

24    MR. VALESKA:  May she be excused?  She's a

25   student now.

1           THE COURT:  Yes.

2           MR. VALESKA:  Judge, I'll stop because I need

3     to put on a fingerprint.  It will take a while.

4           THE COURT:  Ladies and gentlemen, the next

5     witness may take a little while, so we will go

6     ahead and take our mid-afternoon break.  Let's

7     just go ahead and take a fifteen minute break.

8     Just be back here at three o'clock.  Again,

9     please don't let anyone discuss the case with you

10    or among yourselves.

11              (Jury not present.)

12              (Off the Record.)

13              (Jury present.)

14                  PETER MACCHIA

15    having first been duly sworn, was examined and

16    testified as follows:

17                DIRECT EXAMINATION

18  BY MR. VALESKA:

19  Q     Tell us your name, please, sir.

20  A     My name is a Pete Macchia.

21  Q     Mr. Macchia, where are you employed, please, sir?

22  A     I'm employed by the Alabama Department of Forensic

23    Science.

24  Q     What position do you hold there, please, sir?

25  A     I'm a forensic scientist.

1   Q   I believe you wanted someone to come watch you,
2       one of your employees, just for the Record?
3       Training people for that purpose you asking me?
4   A   (Witness nodded.)
5   Q   As a forensic scientist, what type of training,
6       education do you have in relationship to the
7       position you have, particularly in the field of
8       DNA, please, sir?
9   A   Well, I have a degree in microbiology.
10  Q   Where did you get that?
11  A   From Auburn University.
12  Q   How many years?  Four-year program?
13  A   Yes, sir.
14  Q   Go ahead.
15  A   Then I have the masters degree in Science
16      Education.
17  Q   Where did you get that?
18  A   University of South Alabama.
19  Q   One year?
20  A   That actually took greater than two years.
21  Q   And what was that in?
22  A   That was a masters degree in Science Education.
23  Q   Okay.
24  A   After that I received on-the-job training.  As
25      well as training at Quantico, Virginia, at the FBI

1         Academy.

2    Q    How many weeks was that?

3    A    That was over a week long and --

4    Q    What was that dealing with?  I apologize for

5         keeping interrupting you.  Tell the panel what

6         that was in.

7    A    That was in DNA analysis.  In other words, it's

8         kind of specialized training in what I do on a

9         daily basis.  And I have received -- I'm required

10        to receive and I have received numerous training

11        seminars, workshops, and all in the related areas

12        of DNA analysis.

13   Q    How many times can you tell us either yourself or

14        under the instruction and training of other DNA

15        scientists in the Alabama Department of Forensic

16        Science lab have you actually done DNA testing?

17   A    Referring to approximately how many cases?

18   Q    How many numbers, yes, sir?

19   A    With my name on it -- I've probably issued over

20        four to five hundred cases with my name on this.

21   Q    Your name, is that a published report you do,

22        signed as a forensic scientist in the laboratory?

23   A    Yes, it is.

24   Q    Before those did you also work under the

25        assistance of other DNA experts in the in-house

1   training, learning how to do DNA and following the

2   steps that they themselves published their reports

3   and signed out in the lab?

4 A Yeah.  For a period of time during the training I

5   do DNA case work under the supervision of a

6   qualified scientist.

7 Q How long with the Alabama Department of Forensic

8   Science after you went to work with them in the

9   DNA field, how long were you required to test, to

10   train in-house before you were able to handle your

11   own cases and publish your own reports?

12 A It's not so much a matter of time as it is meeting

13   certain qualifications.  You have to complete a

14   training set.  You have to complete a proficiency

15   set.  You have to complete a set number of cases

16   working under a qualified scientist.  You have to

17   undergo certain other qualifications.  So the time

18   is not the essence there as much as it is just

19   meeting qualifications.

20 Q Did you perform or pass all those tests in order

21   to graduate up and do your own independent testing

22   in the lab and publish your own reports?

23 A Yes, sir.

24 Q Now, let me ask you in the Alabama Department of

25   Forensic Science, are there any safeguards in

1    relationship to doing DNA testing?  Could you tell

2    us in relationship to make sure that you're

3    following the scientific principles adopted

4    worldwide in the scientific community to follow

5    their guidelines?

6  A  As far as an individual basis thing, certain

7    double checks, and that the sort of thing?

8  Q  Yes, sir.

9  A  First of all, all reports that are issued are

10   reviewed by another qualified DNA analysis.

11  Q  Why is that done?

12  A  That's just simply a double check.  Just to make

13   sure that there's absolutely no room for error,

14   that kind of thing.  It's a double check by

15   another qualified expert.  That same report is

16   then double checked another time by our laboratory

17   director.

18  Q  Which is who?

19  A  Our laboratory director is A. Craig Bailey.

20  Q  Now, let me ask you, if I could.  Have you had

21   the opportunity based on being trained in your

22   education to do -- when I say independent testing,

23   I mean the testing within the lab to publish your

24   own reports and come into the trial courts of this

25   state and to be declared as an expert on DNA to

1       give your opinion as to your findings?

2    A   Yes, I have.

3    Q   How many times have you done that before today?

4    A   I don't have an exact number, but it's about

5        thirty or so times.

6    Q   And did the trial judge declare you to be an

7        expert based on your training, education, and

8        experience, number of tests you've done, and

9        allowed you to give your opinion as to what

10       substances you tested looking for the DNA to see

11       if you could get a match; is that correct?

12   A   That's correct.

13   Q   I want to go back briefly and tell the lab

14       generically -- let me ask you this way.  When you

15       do DNA testing and publish your reports, are all

16       the entire files and whatever case it is, are they

17       kept in the ordinary course of business in the

18       Alabama Department of Forensic Science?

19   A   Are the files kept?

20   Q   Yes, sir.

21   A   The files are kept within our laboratory until

22       they reach a certain age, and at that point they

23       are transferred to headquarters.

24   Q   Which is Auburn?

25   A   Auburn.  The Auburn laboratory, yes, sir.

1    Q    Let me ask you this.  If someone wishes to examine

2         or look at your work on any type of DNA testing,

3         they can make a request for discovery with those

4         documentation, all the notes, the work product,

5         and everything being turned over so they can see

6         if the test had been done properly?  Is that done?

7    A    That's commonly done, yes, sir.

8    Q    Now, can you tell the ladies and gentlemen of the

9         jury as a DNA expert, you yourself, can you review

10        the testing that another DNA expert did on certain

11        evidence and looking at that, their results, and

12        the test they did, the procedures, the safeguards

13        and make a determination if they themselves

14        followed the scientific method accepted worldwide

15        on testing DNA evidence to see if it was done

16        correctly?

17   A    Yes, sir.

18   Q    Now, can you tell the ladies and gentlemen of the

19        jury just what is DNA?  Tell me.

20   A    Briefly DNA just simply stands for

21        deoxyribonucleic acid.  That means it is a

22        molecule that's present within every cell within

23        your body.  And it doesn't change.  In other

24        words, the DNA, this molecule that's in your skin

25        cells, is going to be the same chemical structure,

1   the same DNA that we find in the hair.  And so

2   within your body you have this molecule that's

3   unchanging.  And that molecule is composed of

4   these repeating units, millions upon millions

5   long.  And that is what we utilize.  When we do a

6   DNA profile, we examine those repeating units

7   within the DNA molecule.

8 Q Can you tell me, can any other human being in the

9   world have the exact same DNA completely as

10   another human being except if they are an exact

11   twin?  Identical?

12 A Yes.  No, sir, the only time you're going to have

13   -- DNA is unique, except in the case of identical

14   twins.

15 Q Now, and when you take DNA samples that are

16   submitted to the lab, what are the type of ways

17   you get DNA to be sent to you for testing by law

18   enforcement?  How do they come to your lab, in

19   what manner or fashion, are they submitted to you

20   to do testing on?  What are some of the examples

21   they come in?

22 A The means by which they come?

23 Q Not the means.  But what you get to test that's

24   turned in by law enforcement.  Give me some

25   examples of what you would be looking for in DNA

1           -- what substances?

2       A   As I mentioned, DNA is a molecule found throughout

3           your body.  So naturally we're looking for

4           biological material.  So typically what's

5           submitted to us is going to be clothing.  It's

6           going to be objects which may have had blood

7           splatter on them.  Anything that the law

8           enforcement suspects might have biological fluid

9           on it.

10      Q   Does that include semen, spermatozoa?

11      A   That could include anything from saliva, semen,

12          spermatozoa, blood.  Anything that's going to have

13          DNA molecules in it, which is most biological

14          fluids.  They are going to have DNA present.  And

15          that evidence is submitted to the forensic biology

16          section.

17      Q   What type of DNA testing has the Alabama

18          Department of Forensic Science lab done since you

19          have been doing DNA testing?  What types?

20      A   The method that we use is called -- that we -- one

21          of the methods that we employ is PCR, which stands

22          for polymerase chain reaction.  And it's just a

23          widely-used method which is used to amplify DNA.

24      Q   Is there another type of DNA testing that's been

25          done in the past or used to be done in the lab

1        called RFLP?

2    A    Once upon a time during the early stages of DNA

3        analysis they used a process called RFLP.

4    Q    How man laboratory experts in the lab you work in

5        in Montgomery actually do DNA testing?  How many

6        scientists?

7    A    Within my laboratory?

8    Q    Yes, sir.

9    A    Within my laboratory including myself there are

10       two scientists.

11    Q   How many counties do you cover within your

12       geographical area?  I'm not asking the district

13       circuit, in other words, the D.A.'s offices, but

14       generally how many counties?

15    A   I can tell you that it's greater than ten

16       counties.  I don't know the exact number.

17    Q   Now, if I could, when you receive court orders to

18       do DNA testing in relationship to have it done by

19       a certain date and time, do you comply with that

20       if it's signed by a circuit judge?

21    A   We do our best to comply with these requests, yes,

22       sir.

23    Q   Is there a backlog of DNA testing in this state?

24    A   Most definitely.

25    Q   Tell the jury why there's a backlog on doing DNA

1    testing in the state of Alabama at the forensic

2    science lab?  Why?

3  A  Why is there?

4  Q  Yes, sir.

5  A  Primarily it's due to understaffing, which is in

6    turn due to underfunding.

7  Q  Now, can you tell the ladies and gentlemen of the

8    jury, do you have an opinion as to how many cases

9    you have -- let's just go back on or about the

10    published report in this case on February 5 of

11    2003.  Approximately how many cases you had

12    backlogged prior to receiving a court order to do

13    this one immediately?  Your best judgment.

14  A  Approximately six hundred.

15  Q  Now, tell the jury, can you yourself do six

16    hundred DNA testing cases in one year if you have

17    to still come to court and testify during a work

18    week?  Can you get that many done yourself?

19  A  Not even close.  No, sir.

20  Q  Now, testing DNA samples when you do the testing,

21    do you destroy in all cases the substances you

22    test when you do PCR testing?  The complete sample

23    used up and destroyed in relationship to the DNA?

24    Is there some left over?

25  A  That's going to vary on a case-by-case basis.

1      Sometimes all of it is consumed.  Sometimes

2      there's enough stain present to not need to

3      consume the entire sample.

4   Q   The PCR or testing on DNA, can you tell us if you

5      had a sample that was not degraded, that was put

6      on a card, whole blood, or a semen sample that was

7      taken off a pair of panties or clothing and when

8      you examined it there was actually DNA there

9      enough, how long could it last timewise that you

10     could come in X number of years and still test it

11     and see what the DNA was, if any?

12   A   Well, there's certain conditions that, you know,

13     it's going to be dependent on the packaging and

14     that sort of thing.  There's various environmental

15     factors there.  But generally if a sample is

16     sitting, you know, a few years it's not going to

17     have an impact if it's packaged properly.

18   Q   Now, let me ask you this, if I could.  When you do

19     DNA testing, generally take me through the steps,

20     generally, what you do when you have a semen or

21     whole blood sample to make a comparison to see if

22     you can find what DNA is.

23   A   It's just a matter of a few steps.  The first

24     thing that we do -- let's say we have a piece of

25     clothing with a biological stain on it -- blood,

1    for example.  We'll -- the first that we're going

2    to want to do is to purify the DNA.  In this

3    sample we're going to have fabric and all sorts of

4    debris perhaps.  And then within your cells

5    yourself there's all sorts of stuff that's in the

6    biological fluid that's not DNA.  We want to get

7    rid of all of that.  So at the end of step one we

8    have purified it.  So what we will end up is a

9    tube that's got a clear solution with DNA in it.

10   Purified DNA.  After that we will quantitate it.

11   Just determining how much do we have.  And after

12   we quantitated it, we will do that step I

13   mentioned previously called PCR.  What that does

14   is it takes that DNA, and we will amplify it.

15   Take that same DNA and basically picture of a

16   Xerox copy machine.  It just multiplies the DNA.

17   After we have multiplied the DNA and have enough

18   to work with, the last step is we will do

19   something called gel -- g-e-l -- electrophoresis.

20   what that involves is simply taking that DNA

21   sample, putting on that gel, and a DNA profile

22   will be visible using lasers.  We will visualize

23   the DNA pattern because that DNA will travel down

24   this gel, and we will be able to see the

25   individual's genetic profile on this gel

1   apparatus.  And the final step would just simply

2   be analyzing that gel imagine.

3 Q Are there any kind of substances or chemicals you

4   use to prevent contamination to make sure that if

5   you're doing the DNA testing yourself that you

6   yourself don't contaminate the item that you're

7   testing or that the chemicals that you're using to

8   protect the DNA sample to make sure it doesn't

9   break down or degrade them?

10 A As far as those type of tests, I mean, first of

11   all, we operate under normal quality control

12   procedures.  In other words, you know, everything

13   has to be cleaned and gloves and lab coats and

14   that sort of standard procedures for quality

15   control.  But beyond that we use certain samples

16   that are termed controls.  We will have a negative

17   control, which should remain blank throughout the

18   whole procedure.  If we see any DNA in that

19   sample, then there's contamination.  We have a

20   positive control which will give us a known DNA

21   type.  We know what that DNA type should be when

22   we're done.  And if it doesn't give us that type,

23   we may have problems.  So there's various controls

24   and procedures that we go through to make sure

25   that everything is clean and no contamination is

1    present.

2  Q    And does your lab throughout the year have those

3       samples that are sent to you from whichever

4       companies or organizations you use to when you

5       referred to a sample that is sent for testing

6       whether it's blank or some real DNA to make sure

7       that your department basically knows what you're

8       doing on testing for that quality control?

9  A    Yes, sir.  Approximately every six months we have

10      to run samples that come from a -- like the

11      National Institute of Justice.  Samples that are

12      validated, and we have to run those samples.  Yes,

13      sir.

14 Q    And do you have periodic reviews either quarterly

15      or every six months or once a year to determine

16      whether you are following the standards that are

17      set down by the scientific community to do DNA

18      testing?  Do you do that?

19 A    On an individual scientist basis?

20 Q    For the entire department for doing DNA in Alabama

21      labs; in other words, Montgomery, Mobile,

22      Birmingham, Huntsville?

23 A    Yes, sir.  As far as individually, we have to

24      complete these proficiency tests, and we're

25      required to successfully complete those two tests

1       per year, which is just a matter of samples that

2       are sent to us that we don't know the results and

3       we have to act like it's a normal case work.

4   Q   Before February 5 of 2003, have you done that

5       yourself?

6   A   Oh, yes.  I have to twice a year.  Yes, sir.  And

7       then as far as the lab, we are required to be

8       certified.  We have to meet certain guidelines

9       that are set up by certain DNA organizations that

10      we're required to meet those guidelines.

11         MR. VALESKA:  Judge, at this time I ask you

12      to declare him to be an expert in his field of DNA

13      forensic scientist allowed to give his opinion as

14      to any items he tested in this case and any

15      comparisons he's made to give his opinion as to

16      what those comparisons and statistic numbers were

17      on testing of those items.

18         THE COURT:  Any objection?

19         MR. BRANTLEY:  No, sir.

20   Q   Help me a little bit.

21         MR. VALESKA:  Thank you, Judge Mendheim.

22   Q   Can you tell the ladies and gentlemen of the jury,

23      doing DNA testing, in other words, is that done

24      outside the forensic world?

25   A   DNA testing is done within the medical community

1      as well as academic community worldwide.

2   Q   Would it be fair to, like, test for a heart or

3      liver whether a recipient could receive it or

4      reject it matched up with DNA?

5   A   Yes, sir.

6   Q   Also done at Auburn University dealing with

7      animals for their -- agriculture, if I could ask

8      you that way, Auburn as a worldwide or nationwide

9      participate, they do on all kinds of animals --

10      pigs, chickens, cows, birds, war eagles, whatever?

11   A   I would say -- safe to say any biology department

12      or major university is going to be basic methods

13      that we go through in our laboratory.

14   Q   So is it fair to say you can take DNA testing and

15      you can test it, can you exclude someone and say

16      they were not the contributor of the source,

17      whatever the source was, saliva, blood, semen,

18      tissue, hair -- hair itself?  Can you do that?

19   A   Exclusions are commonly done.

20   Q   Now, when you do DNA testing, and you compare it

21      for whatever sample you have, to see if you can

22      obtain a profile, are there a certain number of

23      markers that you have to have to make a

24      determination whether you have a match in your

25      opinion that are required by the Alabama

1      Department of Forensic Science?  In other words,

2      like, TPOX, D with all the numbers, what are the

3      required numbers you have to have markers?

4  A   The numbers that we work with within Alabama

5      Department of Forensic Science, we work with eight

6      markers, including a sex determination male or

7      female making it nine.

8  Q   Do you know what the Federal Bureau of

9      Investigation, do they use that many or less, if

10     you know?

11  A   The FBI?

12  Q   Yes, sir.

13  A   The FBI as far as -- I believe uses thirteen.

14  Q   And the history of Alabama Department of Forensic

15     Science are you familiar with the case of the

16     State of Alabama versus Artez Hammonds from this

17     circuit?

18  A   I'm not --

19  Q   The nurse that was murdered -- murdered from

20     Ozark?

21  A   I've heard about it.

22  Q   What I'm asking is in the initial stages of DNA

23     testing, did the FBI also use some of your

24     samplings or testing in cases to see if they could

25     have a DNA in their opinion as to what was

1       submitted?  Was that done?

2   A   I can say that the FBI will commonly test samples

3       from within our state.  But as far as that case, I

4       couldn't really testify to that case.

5   Q   Now, if I could, let me ask you, the markers

6       themselves, what are we talking about?  Explain to

7       me in layman's terms, what are these markers when

8       you do this DNA testing?  You've gone through the

9       procedure, but tell us what we're looking for.

10  A   The DNA molecule I mentioned earlier is millions

11      upon millions of these units long.  And we simply

12      cannot look at practically speaking every single

13      one of these units.  So what we do is we scope out

14      eight segments of this DNA.  So it's millions upon

15      millions long.  We will look at eight areas of the

16      DNA.  So we are not actually looking at the entire

17      genome.  We are looking at eight separate areas.

18      Each have a designated name, as you mentioned TPOX

19      is the name of one of these units.

20  Q   And let me ask you, if I could.  If you only had

21      seven markers, will you publish a report when you

22      are making a comparison to see if there was a

23      match?

24  A   If we get an inconclusive result on one of the

25      markers, we will sometimes publish that report.

```
 1         It's still valid.
 2   Q     And all the testing on the markers you find with
 3         the numbers and I refer to TPOX and some of the
 4         others beginning with D or the numbers that you
 5         used, if I'm an independent scientist requested to
 6         review your work, can I go in and look at the
 7         testing you do, do I actually have to test the
 8         substance to find those in the scientific
 9         community?  Can I look and see what you did
10         excluding any contamination to determine whether
11         you followed the proper procedures set down in the
12         scientific community recognized worldwide?
13   A     I think that if you examined all the worksheets
14         and everything that I have to document going
15         through the process of DNA analysis, you can make
16         a reasonable determination that all the guidelines
17         were or were not fulfilled.
18   Q     Do you have an opinion as a forensic DNA expert,
19         in other words, that you could review other work
20         without testing the substances yourself?  In other
21         words, actually testing them physically yourself
22         the semen, the blood, the clothing, whatever it
23         was, the saliva, and form an opinion as to it
24         would be your opinion, yes, that that DNA would
25         have been exactly what that report said in your
```

1    opinion without actually testing it?

2  A  Without actually testing it, I can look at all

3     their documentation and determine.

4  Q  A reasonable scientific certainty what I'm --

5  A  I can make a reasonable determination that all of

6     the processes were done correctly, yes, sir.

7  Q  Help me if you could.  Are there any type of

8     statistics or number of population that you use in

9     the genes or human beings to -- when you find a

10    DNA match to determine whether people in Los

11    Angeles would have the same DNA characteristics as

12    someone here in Houston County or in China or in

13    Iraq?  How do we do the population statistics to

14    form an opinion to see whether we have a match?

15 A  Well, statistics -- our statistics come from the

16    Alabama database.  So all of our samples we use

17    from our database to generate these numbers come

18    from local Alabama samples.

19 Q  How do we get those?  Where do you get those

20    numbers?

21 A  Where were these samples taken from?

22 Q  The Red Cross?

23 A  Yes, sir.  They were taken with the Red Cross.

24 Q  And then the Red Cross does testing on the blood;

25    is that correct?

1   A   The Red Cross simply would collect -- be involved
2       in collecting the blood, and then it would be sent
3       to our state laboratory which gives the DNA
4       profile.
5   Q   How do we get a population statistic to determine,
6       in other words, whether my DNA would make a match
7       with the evidence and you would go and look for
8       all the people in Alabama or the southeast or the
9       whole world whether it was hundreds or thousands,
10      millions, or billions to see if you would have to
11      search the entire world to make a comparison for
12      that number?
13  A   Well, what it basically involves is you take those
14      individuals -- random individuals that were tested
15      to generate our database.  And you look at those
16      eight areas I mentioned earlier.  And how common
17      within this population that we've got here, how
18      common is area one and how common is area two.  In
19      other words, we can make a -- we can determine the
20      frequency of that area one.  And so we can see
21      that TPOX, the number 66 at TPOX just to throw
22      that out to you, how common is that frequency
23      within this population.  And we look at all those
24      eight areas to determine the frequency of each
25      one.

1   Q   And then do you use that and come up with a number

2       statistically-wise that you would say randomly in

3       the entire Alabama or the world you would have to

4       look and find someone who would have those DNA

5       characteristics if they weren't excluded is what

6       I'm asking?

7   A   Can I get you to repeat the question?

8   Q   What I'm trying to figure out is, when you do your

9       DNA testing and you get a profile, how you come up

10      with your numbers by using what the Red Cross has

11      given you and the DNA you tested to make a

12      comparison to see if the DNA you found

13      particularly whatever case it is, you looked at

14      your markers and you did the multiplication, how

15      many people you would have to look at, ten,

16      hundred, thousand, hundred thousand, million,

17      billions, to see if you would have to find another

18      person that would have the same DNA profile with

19      those numbers?  Statistic-wise is what I'm asking.

20      How do you come up with those numbers is what I'm

21      asking?

22  A   The statistical numbers that we come up with

23      typically in DNA cases, how do we get those

24      numbers?

25  Q   Yes, sir.

1    A    Well, once we determine the frequency of all those

2         eight areas, let's say that the frequency of a

3         six, six on area one is one out of eight people,

4         okay.  And then we find the frequency out of area

5         two, how many people would have a nine, nine;

6         nine, eleven on area two.  One out of every fifty

7         people.  At this point we're going to multiply --

8         it's something called the product.  We're going to

9         multiply the frequencies together.  By the time

10        that we've done this eight times, multiplying the

11        frequencies of these, that's how we get these

12        sometimes astronomical numbers in the trillions or

13        the billions.  They are just a multiplication of

14        all these frequencies will wind up giving you

15        these kind of large numbers -- as far as how

16        common or uncommon this profile is.

17   Q    What I would like to ask you in this particular

18        case, did you receive evidence in a sealed

19        condition in the ordinary course of business at

20        your laboratory in Montgomery dealing with the

21        case of the State of Alabama versus Freeshone

22        McLeod?

23   A    Yes.

24   Q    And you published a ten-page report if I'm not

25        mistaken?  Is that approximately?  You got a copy

1     with you?

2  A   I do have a copy.

3  Q   And referring to the last page if I'm mistaken.

4     Ten-page report that you signed?

5  A   The report is ten pages long, that is correct.

6  Q   For time sake I want to go to some evidence.  I

7     don't want to go through every piece of evidence

8     But I want to ask you when you get evidence in in

9     this case, when this case occurred on or about

10    October 6 of 2001, and it was tested, your final

11    report was published, excuse me, that you

12    published and signed and dated if I'm not mistaken

13    it was February 5 of 2003; is that correct?

14  A   That is correct.

15  Q   Now, I what want to ask you is, there are numerous

16    pieces of evidence in this case that appear before

17    you now that you see as you're sitting up there as

18    well as using your published report to refresh

19    your recollection because I know you've had

20    thousands of cases.  Did you test every piece of

21    evidence that came in to you in this case?  Would

22    you tell the jury?

23  A   I want to make sure I'm clear.  Did I do DNA

24    analysis?

25  Q   I apologize.  Did you do DNA analysis on each

1       particular piece of evidence?

2   A   No, sir.

3   Q   Did you do preliminary tests on the evidence to

4       determine whether or not in your opinion any of

5       the evidence exhibited a positive result for

6       presumption for the presence of blood?  Did you do

7       that?

8   A   Yes, those tests were done.

9   Q   Now, if I could, I want to go to your report and

10      ask you particularly -- I want go to page seven if

11      I could for time sake.  If you'll refer to page

12      seven.  And what I want to ask you is I want you

13      to tell the ladies and gentlemen of the jury what

14      exhibits that you examined that were analyzed

15      looking to see if you found the presumptive

16      presence of blood but you didn't find any.  Tell

17      me what those were, what you did not find the

18      presence of any blood on in your opinion.

19   A   The following items exhibited a negative result

20      when analyzed for the presumptive presence of

21      blood.  The rectal swabs and smear that was

22      identified to be from Jonteria Jones.

23   Q   And referred to I think your item 1C, correct?

24   A   Yes, sir.

25   Q   Go ahead.  And I apologize for interrupting you.

1   A   A belt, which would be our item 12B.  The left

2       shoe, which would be item 13B.

3   Q   Identified coming from who?

4   A   13B was identified to be from Freeshone McLeod.

5   Q   That was the left shoe, correct?

6   A   Yes, sir.

7   Q   And the left shoe was negative for any presumption

8       of blood, correct?

9   A   That's correct.

10  Q   Just go throughout the items.  If you will give me

11      your identification on your numbers as to where

12      they were identified coming from.  That will save

13      us some time.

14  A   The Styrofoam tray, and this was labeled in part

15      trash pile on the east side of the residence of 7B

16      (sic) Depot Street.

17  Q   That's fine.

18  A   And that tray is item fourteen.

19  Q   I'm going to stop you there for time sake and drop

20      down and ask you did you test a wok or two rods,

21      please, sir, that was identified coming to your

22      lab?

23  A   Yes, sir.

24  Q   What did you find on those?

25  A   Those also give a negative test for blood.

1    Q    Let me ask you as a DNA expert if a piece of

2         evidence, particularly that wok, had been sent to

3         the Alabama Department of Forensic Science and

4         they had applied chemicals or solutions, could

5         that effect whether or not you would have found

6         any DNA -- any blood, excuse me, if the substance

7         -- actually the wok itself, if you can see it

8         State's 6, extreme right, if that was not a porous

9         substance, in other words, it couldn't soak in,

10        in other words, could that effect you whether you

11        found blood or not?

12   A    Whenever you apply chemicals or any liquid to a

13        biological sample, you are in a sense diluting it

14        and making the concentration go down.  So if you

15        have a low concentration to go so- to begin with,

16        it's reasonable to assume that if you add liquid

17        to that it would bring the concentration down to

18        an undetectable level.

19   Q    State's 6 for identification purpose, that wok,

20        you see it right there to your right?

21   A    (Witness complied.)

22   Q    If you would take a look at that.  What I want to

23        ask you, if there would have been any red

24        substances on there in your opinion because of the

25        condition before it was allegedly fingerprinted

1    and the actual substance itself being hard and not

2    porous if I could use those terms, do you have any

3    opinion where any blood if there had been blood on

4    there could have been wiped off in your opinion

5    which would have prevented you from finding it

6    when you did testing or any chemicals applied to

7    it?

8         MR. BRANTLEY:  Judge, we're going to object.

9    There's nothing in evidence that would suggest or

10    infer that anything was wiped off there.

11         MR. VALESKA:  Judge, we have testimony that

12    -- we will have testimony as the officer indicated

13    that fingerprint solutions or powder applied to it

14    could effect its ability.  So I have the right to

15    ask him if about whether other things could have

16    effected that.

17         MR. BRANTLEY:  That's just irrelevant.  If

18    it's negative for blood, it's negative for blood.

19    There's a lot of things that could happen or

20    could not have happened.

21         MR. VALESKA:  And that goes to the weight and

22    not the admissibility, so I have a right to ask

23    it.

24         THE COURT:  Overruled on that point.

25         MR. VALESKA:  Thank you, Your Honor.

1    Q    So chemicals or wiping off, could that effect
2         whether or not you would have been able to find it
3         in your opinion?
4    A    Certainly wiping it off could effect how much
5         sample left, if any, yes, sir.
6    Q    Moisture, humidity, other conditions, would that
7         effect it also in your opinion?
8    A    I think I believe I mentioned earlier that
9         environmental conditions do have an impact on DNA
10        analysis and the detection of biological stain.
11   Q    If I could, staying on page seven, and I would
12        like you to tell me what items you found that
13        showed a positive result for presumptive presence
14        for blood.  Could you tell us that on page seven?
15   A    Would you like me to give my item number and who
16        they were from as well?
17   Q    If you could, please.  Thank you.
18   A    The following items gave a positive presumptive
19        result for blood on -- these are on page seven --
20        of the vaginal swabs and smear.  And those were
21        identified to be from Jonteria Jones.  Orals,
22        that's item 1A.  The oral swabs and smear item,
23        item 1B, also identified to be from Jonteria
24        Jones.  Genital swabbing, item 1D, also identified
25        to be from Jonteria Jones.  Panties, item 2A, also

1    identified to be from Jonteria Jones. And orange

2    colored T-shirt that would be item 2B, and that is

3    also identified to be from Jonteria Jones. Boxer

4    shorts, item 9, those -- that would be identified

5    to be from Freeshone McLeod. A red color T-shirt,

6    item 10, identified to be from Freeshone McLeod.

7    Pants, item 12A, identified to be from Freeshone

8    McLeod. A right shoe, item 13A, identified to be

9    from Freeshone McLeod. A radio cassette recorder,

10    item 16, and that was labeled living room near

11    front door. Stains that are identified to be from

12    the kitchen floor, item 19. Stain identified to

13    be from the rear bedroom wall, item 20. And,

14    finally, stain identified to be from the wall

15    above vent, item 21.

16  Q    Now, make sure I'm correct. All those showed a

17    presumptive positive for blood, correct?

18  A    Yes, sir.

19  Q    Now, did you have item 3A-1 that was submitted for

20    any type of testing as well as the boxer shorts,

21    item number 9, to make a determination in your

22    opinion as to what you saw on those? Same page if

23    I could. I believe it's the middle paragraph.

24  A    Yes, sir. Those are also mentioned on that page.

25    The penal swabs identified to be from Freeshone

1    McLeod, item 3A-1, and the boxer shorts, item 9,

2    contained semen and were preserved.

3  Q    If I could, move on to page eight of your report,

4    and I want to ask particularly looking at the

5    second -- I call it the second paragraph.  Orange

6    colored T-shirt -- let me show you that T-shirt.

7    Showing you State's Exhibit 28 for identification

8    purposes.  It's open.  It's in a sealed condition

9    in this courtroom.  Do you see any writings?  And

10    I will hold it up if you need me to.  Writing or

11    identifications or testing that you did?

12  A    Yes, sir.

13  Q    And that's on the panties for identification

14    purposes on 28, correct?

15  A    Yes, sir.

16  Q    And let me show you the orange T-shirt.  Show you,

17    once again, a tag, any writings or markings you

18    placed on there?

19  A    Yes, sir.

20  Q    And State's 28 came in a sealed condition, and

21    then there's some other items if I could that are

22    contained in the box -- one, two, three, four.

23    Are those any cuttings or markings or slides you

24    made from the orange T-shirt and/or the panties

25    for any testing purposes looking for the presence

1    of any semen, or spermatozoa?  I'll ask you that

2    way.  I was referring to your report page eight,

3    once again, item 2B and item 3B-1.  I guess what

4    I'm asking, those slides or testing of those

5    exhibits you made yourself?

6  A    Were these slides prepared in our laboratory?

7  Q    Yes, sir.  Did you test those yourself?

8  A    These were tested within our laboratory, yes.

9  Q    Did you do those personally?

10  A    These were done under my supervision.

11  Q    Now, if I could, I want to go to your report and

12    ask you on page eight, if I could call out these

13    items to you on page eight.  The pubic combings,

14    items 3H; fingernail scrapings, item 1E; head

15    hairs, item 1F; the fingernail scrapings, 3G; once

16    again, white envelope containing head hairs, 3F;

17    pubic hairs, 3G; saliva samples submitted from

18    Freeshone McLeod, item 4; gauze with debris, item

19    5; item 6, gauze with debris; right nail clipping,

20    item 7; left nail clippings; item 8; a cigarette

21    butt, item 15.  What I want to ask you, did you do

22    any type of DNA testing or any type of presumptive

23    testing on those items?

24  A    No, sir.

25  Q    And tell the jury those numerous items why you did

1    not test those.

2  A    It simply for practical purposes.  If we obtain

3    biological materials on other evidence, when we

4    see fit in an experienced opinion we will elect

5    not to test every single item submitted to.

6  Q    In this case particularly, in other words, the

7    time frame, were you under a time frame to publish

8    a report whether there was any evidence that could

9    be used in the Prosecution's case against this

10    Defendant?

11  A    Yes, I was.

12  Q    What kind of time frame?

13  A    I don't know exactly the time frame, but I was

14    told that this case was priority and gave a

15    priority to get it done as quickly as possible.

16  Q    Now, the testing you've done on the items you've

17    indicated as well as the ones you have not, you've

18    retained all physical evidence still exist in

19    front of you that could be independent testing on

20    that if requested, correct?

21  A    Yes, sir.

22  Q    Now, if I could, let me move on and ask you, did

23    you make any type of indication of the DNA factors

24    on Freeshone McLeod's penal swabs?  If you need to

25    look at page ten or any other parts of your

1       report.

2   A   The DNA analysis was performed on the penal

3       swabs, but no DNA profile other than one matching

4       the sample identified to be from Freeshone McLeod

5       was found.

6   Q   I want to go to page six of your report and talk

7       about your results if you could that you published

8       in your opinion. And then I will go back to the

9       last page on your remarks to see if you had a

10      match. On page six I want to ask you did you have

11      the whole blood identified submitted to you from

12      Freeshone McLeod to do as well as the saliva

13      sample from Jonteria Jones to do any type of DNA

14      profiling on the PCR-based genetic systems?

15   A   Yes, sir.

16   Q   What did you find on page six?

17   A   What did I find?

18   Q   Yes, sir. The genetic markers. Just tell me what

19      they are.

20   A   What the genetic markers are?

21   Q   Yes, sir.

22   A   The genetic markers as we mentioned before, the

23      eight that we looked at in addition to the sex

24      determination one, is CSF1P0, TPOX --

25   Q   And I'm not going to ask you to read the last

```
 1          four with the D's, just refer to as you get to
 2          those by individual -- more than one I'll ask you
 3          for those numbers.  But I would like you to do the
 4          first five if you could.  Start with CSF.
 5   A      CSF1PO; TPOX; amelogenin --
 6   Q      That's AME, right?
 7   A      Yes, sir.
 8              THO1.
 9   Q      Okay.
10   A      vWA.
11   Q      Okay.  And then the last four, those are D's with
12          a lot of numbers, correct?  Those different
13          markers?
14   A      We refer to them, like, for example, the first one
15          would be D16, commonly refers to as D16.
16   Q      And then you have D7?
17   A      Yes, sir.  D7, D13, and D5.
18   Q      Let's go on to the penal swabs identified from
19          Freeshone McLeod.  Did you do any testing, in
20          other words, on the short-sleeve shirt that was
21          submitted as coming from him, whether he had any
22          stains on that, as to what the DNA was?
23   A      The same genetic markers were used using the PCR
24          system on the short-sleeve shirt identified to be
25          from Freeshone McLeod, item 11.  And human DNA was
```

1      present.

2    Q    The human DNA that was on the shirt identified as

3         coming from Freeshone McLeod, did it match up with

4         whether or not it was Jonteria Jones' DNA?  Show

5         you the same markers?  I'll ask you that way.

6    A    The DNA profile from the -- from that stain on the

7         short-sleeve shirt is a consistent match the DNA

8         profile from the saliva sample identified to be

9         from Jonteria Jones.

10   Q    Now, if I could, let me go to the final published

11        reports you made about the DNA profiles.  I would

12        like to ask you about those, if I could.  In

13        relationship to the semen that was on the panties

14        that you found on -- that was alleged on the

15        panties in front of you, exhibit from Jonteria

16        Jones, correct?

17   A    Yes, sir.

18   Q    And then the penal swabs identified come from

19        Freeshone McLeod, which was your item 3A,

20        correct?  On page nine?

21   A    Yes, sir.  Penal swabs are item 3A, that's

22        correct.

23   Q    And then the human DNA from the stains on the

24        short-sleeve shirt identified to be from Freeshone

25        McLeod, item eleven?

1 A Yes, sir.

2 Q Were they compared to the DNA profiles from the

3   tubes of blood identified to come from Freeshone

4   McLeod, 3E, as well as the saliva samples that

5   came from Jonteria Jones, item 24, to see if you

6   could get any conclusions in your opinion as you a

7   DNA expert as a forensic scientist?

8 A Yes, sir.

9 Q Tell us what you found, the jury, if anything.

10 A The semen on the panties were the DNA profile from

11   the semen on the panties was compared to --

12   matched the DNA profile obtained from the tube of

13   blood identified to be from Freeshone McLeod.

14 Q Now, did you then do a comparison, a statistic or

15   generic traits, to make a determination as to the

16   combination of those genetic traits, how many

17   people, if any, in the Caucasian race that you

18   would find that would have those exact same

19   characteristics as well as African-Americans, a

20   statistic number on those two?  Would you tell the

21   jury?

22 A Yes, sir.  This combination of genetic traits,

23   this DNA profile, occurs in approximately one of

24   three hundred and fourteen billion Caucasians and

25   one of fifteen point three billion

1      African-American individuals.

2   Q  Can you look at this jury and tell them as a DNA

3      expert, a scientist, dealing with population and

4      doing testing, do you have an opinion as to how

5      many people in the entire world, the whole world,

6      can you give us a number in your opinion?

7   A  To my understanding there are approximately six

8      billion people on earth.

9   Q  Now, help me.  Educate me as a district attorney.

10     If the genetic traits that would occur in the

11     Caucasian race -- with the six billion people what

12     you said if I'm not mistaken?  Comparing that you

13     would have to go and look for three hundred and

14     fourteen billion Caucasians to find those same

15     genetic characteristics; is that correct?

16   A  That's the frequency of how common you would find

17     it in about one out of three hundred and fourteen

18     billion Caucasians.

19   Q  And for African-Americans it would be one in

20     fifteen point three billion, correct?

21   A  Yes, sir.

22   Q  Now, if I could, I want to ask you the rest of

23     your report, did you do any other testing on major

24     components of the DNA from the stains and

25     short-sleeve shirt identified to be from Freeshone

1    McLeod, I believe it was item 11, matching whether

2    it was consistent with the DNA profile from the

3    saliva sample identified to be from Jonteria Jones

4    that was found on the shirt?  What was the

5    comparison you found, if any?

6  A  The DNA profile obtained from the -- from the DNA

7    from the stains on that short-sleeve shirt was

8    compared -- matched the DNA profile from the

9    saliva sample identified to be from Jonteria

10   Jones.

11  Q  And did you make a determination combination of

12   genetic traits to make a comparison to how many

13   people you have to search and find in relationship

14   to Caucasians or African-American?

15  A  Yes, sir.  This combination of genetic traits, in

16   other words, the frequency of this profile, is

17   found in approximately one of three point --

18   excuse me, two point seven five billion Caucasians

19   and one of one hundred and nineteen million

20   African-American individuals.

21  Q  Now, once again, go back.  How many people in the

22   world?  Approximately six billion is what you said?

23  A  Is approximately six billion.

24  Q  The short-sleeve shirt that you made the

25   comparison identified coming from Freeshone

```
 1        McLeod, correct?
 2    A   The short-sleeve shirt was identified to be from
 3        Freeshone McLeod.
 4    Q   And can you give us an opinion as an expert
 5        whether or not what you found on his shirt,
 6        whether it would have been Freeshone McLeod's
 7        DNA?  Was it his?
 8    A   Freeshone McLeod would have been excluded from
 9        that.
10    Q   Help me.  I want to make sure I understand in my
11        ability.  In other words, the shirt that was
12        identified coming from him, the saliva sample that
13        was submitted by Jonteria Jones, matched what the
14        numbers you gave on his shirt, correct?
15    A   Yes, sir.
16    Q   Now, has DNA testing advanced or gone to a level
17        if you can tell us to a reasonable scientific
18        certainty if you determine there is a match?  Can
19        we do that in your opinion?
20    A   We can -- as I've said the DNA profiles match.  So
21        we can say it's a match.
22    Q   What I want to ask you is and when you found the
23        match and you testified from the semen and panties
24        of Jonteria Jones that was submitted for the DNA
25        matching the samples submitted to you from the
```

1    blood of Freeshone McLeod is what we're talking

2    about, correct?

3  A    Correct.

4  Q    And can you look at this jury and tell them no

5    doubt in your mind as a forensic expert that the

6    samples of DNA that you found of the semen as you

7    testified compared to the whole blood, you're

8    telling him he's a match, and he's not excluded,

9    correct?

10  A    He is not excluded from that sample.  That's

11    correct.

12  Q    And if I could, just help you -- help me for my

13    benefit.  If I was the contributor -- excuse me,

14    somebody else, some other mammal was the

15    contributor of that source and you had semen as

16    well as the whole blood from Freeshone McLeod, any

17    doubt in your mind that was a match of his and not

18    some other contributor?

19  A    There's no doubt that that's a match to the

20    samples identified to be from him.  That's

21    correct.

22        MR. VALESKA:  If I could, Mr. Brantley's

23    permission, I would like to go over some of the

24    exhibits and just offer them into evidence.

25        MR. BRANTLEY:  Which ones?

1          MR. VALESKA:  That has already been admitted.

2  These two items.

3          MR. BRANTLEY:  What are those two?

4          MR. VALESKA:  The T-shirt and panties.

5  That's 28.  That's in.  I don't have to do those.

6  I wasn't going to offer these, but if you want, I

7  will stick them in there, Mr. Brantley.  That's

8  the testing that he did --

9          MR. BRANTLEY:  No, that's all right.

10  Q  If I could, I would like to -- let's just go down

11     your list for time sake.  Well, I need to show you

12     the exhibits.  You testified to the one you

13     tested, the one you didn't test, and the one you

14     tested, all those came in a sealed condition,

15     correct?

16  A  Any evidence coming into our laboratory has to be

17     in a sealed condition.

18          MR. VALESKA:  That's all.  I pass the

19  witness.  I'm not offering.

20          THE COURT:  Why don't we take about a five

21  minute rest room break and then plan to finish by

22  five.  Do you see any problems with that?

23          MR. BRANTLEY:  No, sir.

24          THE COURT:  If you need to, take about a five

25  minute break.  And when you finish, just come

1    directly back to the box, and we'll start as soon
2    as the jury gets back.
3                (Jury not present.)
4                (Off the Record.)
5                (State's Exhibits No. 47 through 55
6                were marked for identification.)
7                (Jury present.)
8                      CROSS EXAMINATION
9    BY MR. BRANTLEY:
10   Q    Mr. Macchia, my name is Tom Brantley, and I
11        represent Freeshone McLeod.  I would like to ask
12        you some questions about your DNA analysis and
13        just some questions, too, about DNA in general.
14        If I could move this exhibit.  Can you reach up
15        here and move that exhibit down?
16             MR. VALESKA:  I will do it.
17   Q    I would like to ask you a question about how long
18        DNA or how durable DNA samples are with regard to
19        I guess the origin from which we get DNA.  Am I
20        correct in saying that we can get DNA obviously
21        from hair and skin, correct?
22   A    The qualification there is if it has a nucleus.
23        So, in other words, if your hair has a root on it,
24        then presumably you can get DNA from that.
25   Q    But not from the actual follicle without the root?

1    A    Not follicle DNA, no, sir.

2    Q    Now, we can get DNA from saliva, from sperm, from

3         -- I guess any body secretion; is that correct?

4         It's available to be gotten under --

5    A    Certainly available to be gotten from basically

6         every biological secretion.

7    Q    Can we get DNA from urine?

8    A    DNA I believe has been gotten from urine, but

9         that's one of the more hard, difficult ones to

10        obtain DNA from.

11   Q    Are there certain samples of DNA -- I guess I

12        should say certain samples of substances in which

13        DNA is gotten from?  What's the correct word

14        there?  If we take blood, that's not a sample of

15        DNA, that's a sample of what?

16   A    You can just say biological fluid.

17   Q    Biological fluid, okay.  And if it's not a fluid,

18        it would be a --

19   A    Just any biological material.

20   Q    Are there certain biological materials that

21        clinically or even historically last longer than

22        others with regards to our ability to get a DNA

23        sample from?

24   A    Not per se.  Because a lot is going to depend on

25        the condition that that sample is in.  In other

1    words, a dried blood stain can last years upon

2    years, but then a liquid blood stain -- a tube of

3    liquid blood in its liquid state is not going to

4    last as long.  So a lot is going to depend on the

5    condition that the sample is in.

6  Q    Let's say that we have some dried blood on a

7    T-shirt, and how long in your opinion would that

8    dried blood be capable of giving us a viable DNA

9    sample?

10 A    I can answer -- I would like to preface by saying

11    that the ultimate way to determine that would be

12    simply by testing it.  And if it doesn't work, it

13    is simply not viable.  And you don't know the

14    conditions that that material has been in.  So the

15    ultimate way of deeming that is simply by working

16    it.  And if it does work, then it's still okay.

17    But as I mentioned, we have a backlog of, you

18    know, six hundred odd cases.  So it's not uncommon

19    for us to work cases that are over three years

20    old, and they work perfectly well.

21 Q    And let's take that same example I gave you of

22    dried blood on a T-shirt, and let's say that the

23    dried blood had been there for a week.  And then

24    the dried blood -- the T-shirt was washed in a

25    washing machine, but it still had a blood stain on

1           it.  Would that blood stain after it had been

2           washed be rendered incapable of giving a DNA

3           sample?

4   A     Not necessarily.

5   Q     Okay.  In other words, it possibly could?

6   A     There is a possibility when you dilute a sample

7           and add chemicals to it, there's always a

8           possibility that you're effecting that DNA

9           sample.  But not necessarily.  We often have

10          worked clothes that have been washed, and they

11          work fine.

12   Q     Same theoretical presentation I've given you,

13          example, but let's substitute sperm for blood.

14          Dried sperm on a T-shirt.  How long would you

15          expect the dried blood to -- I'm sorry, the dried

16          sperm on the T-shirt to be viable to give us a DNA

17          sample?

18   A     Again, the same rules apply.  We work cases that

19          are commonly over three years old, semen cases,

20          and those work perfectly well.

21   Q     Same situation, T-shirt has been washed.  Does

22          that render the sperm from giving you a DNA

23          sample?

24   A     Again, not necessarily.

25   Q     Let's change from a T-shirt to panties.  Does that

1    change your answer to me any?

2  A    No.  The substrate is basically the same in both

3        cases.  So it's not going to have an impact.

4  Q    These panties that you received in State's Exhibit

5        28, those panties, these are the panties that you

6        took -- that you found human semen on?

7  A    Those are our item I believe 2A.  The panties

8        identified to be from Jonteria Jones, item 2A.

9        MR. BRANTLEY:  Is this item 2A, Doug?

10       MR. VALESKA:  Yes.  Two items.  No.  Not 2A.

11       MR. BRANTLEY:  What is that?  Two eight?

12       A JUROR:  That's his number.

13  Q    What's your number?

14  A    Yes, sir.

15  Q    Item 2A, it's Exhibit 28?

16  A    I have my number.

17       MR. VALESKA:  28 for court's identification.

18  Q    When you got these panties, had they been cut like

19       this?

20  A    The panties had been cut when we received them,

21       yes, sir.

22  Q    You're not aware of who all in the household where

23       Jonteria lived, who all wore these panties, are

24       you?

25  A    Absolutely not.



1  Q  And as you stated, these panties may have been
2     worn and washed and then worn by Jonteria, and it
3     still would give you a viable sperm sample?  Could
4     have?
5  A  Could have been washed.  That's correct.
6  Q  Could they have been washed many times and still
7     provide you with a viable sperm sample?
8  A  Just using common sense with each wash you're
9     going to decrease your amount.  So depending on
10    how much sperm is there to begin with is going to
11    tell me, you know, the likelihood that there's
12    going to be any sample remaining.
13 Q  And if these panties had been placed in a laundry
14    basket next to other panties that contained sperm
15    or a handkerchief that contains sperm or whatever,
16    and the sperm physically was placed on these
17    panties from another item, you have no way of
18    knowing that, do you?
19 A  I have no way of knowing what kind of cross
20    contamination would have occurred prior to coming
21    into my possession.
22 Q  Do you see a size on those panties at all?
23 A  I you would have to re-examine it.  I probably
24    would like to use some gloves.
25 Q  Who gave these panties to you?  Who brought them

1        to your office?

2    A    This item was submitted to the Montgomery

3        laboratory by Officer Kris Rocco.

4    Q    Kris Rocco.  Okay.

5           And as I understand, you examined pursuant to

6        your DNA testing here in this case, you examined a

7        swab, or a cotton tip applicator, that had swabbed

8        or been -- or had made contact with the vaginal

9        area of Jonteria Jones; is that correct?

10    A    We received swabs that were identified to be

11        vaginal swabs from Jonteria Jones, correct.

12    Q    Now, and you did not see any sperm or semen on

13        this vaginal swab of Jonteria Jones?  You did not

14        find any; is that correct?

15    A    That is correct.

16    Q    Did you have a swab of the anus of Jonteria Jones?

17    A    There was swabs identified to be rectal swabs from

18        Jonteria Jones.

19    Q    Did you find any sperm or semen on the anal swab

20        -- rectal swab?

21    A    No, sir.

22        MR. BRANTLEY:  That's all.

23             REDIRECT EXAMINATION

24  BY MR. VALESKA:

25    Q    Let me ask you.  Mr. Brantley asked you if those

1      panties would have been placed in a washing

2      machine where they had touched a handkerchief.

3      What I want to ask you, if I could, he asked you

4      if that was possible if that would effect the DNA,

5      correct?  If you could have a transfer is what I'm

6      asking?

7    A    Yes, sir.

8    Q    What I want to ask you, the DNA that you found on

9      the panties with a match, does that still exist?

10      In other words, the samples that you have, are

11      they still within your department and, in other

12      words, within the evidence?

13    A    Yes, sir.

14    Q    And if someone wanted to come back and test those,

15      they could request that and go and look at those

16      samples and see what another independent DNA

17      expert scientist could find, correct?

18    A    This is -- these stains and samples are accessible

19      to independent testing, yes, sir.

20    Q    Now, what I want to ask you about.  If according

21      to his example they had been in a washing machine

22      and they had been washed, do you have an opinion

23      as to the number of times they had been washed

24      whether or not there would continue to be a DNA

25      sample for semen and spermatozoa if they were

1      washed repeatedly in your opinion?

2   A   I can only say with each washing you're going to

3      drastically reduce your chances of finding a DNA

4      sample, but not completely eliminating the

5      possibility.

6   Q   Tell this jury the DNA testing you did of sexual

7      assaults with victims, do you always find semen on

8      a rectal or vaginal swabs?  Do you always find

9      them?

10   A   No, sir.

11   Q   Tell us on the panties where you found the semen

12      when you extracted it and looked for the DNA.

13      Where you took it from?  Was it on the outer

14      part?  Was it on the band?  What part of the

15      panties can you tell us you indicated in or out or

16      where you found those?

17   A   I'm going to have to refer to my notes.

18   Q   That's all right.  If you need to refresh your

19      memory.  I know you have a lot of cases.

20          I guess what I'm asking as you're looking,

21      too, the size of the stain?  What I mean, is it a

22      small amount of stain of DNA or a large amount?

23      You can tell us that as you look, too.

24   A   That is one of the criteria we're looking for is

25      it has to be of a sufficient size.  If it's not a

1 large enough stain and does not have spermatozoa,

2 sperm, then DNA is often not possible.

3 Q And tell me about the size and the numbers of

4 spermatozoa if you made any notes or markings that

5 you saw in your notes and reports.

6 A Okay.  A stain was present on the panties near the

7 hip seam area.  And there were greater than a

8 hundred sperm found when a sample from this area

9 was taken.

10 Q Now, if I could, once again, the washing machine,

11 any bleach or any laundry detergent, what I'm

12 asking about, Whisk, Tide, whatever, would that

13 also break down the sample if they were washed

14 repeatedly?

15 A Bleach is particularly -- is used as a

16 disinfectant for DNA.  That's what we use to clean

17 DNA areas often is bleach solution.  So DNA -- it

18 degrades DNA.

19 Q Let me ask you another chemical if you know.

20 Betadine?  Do you know what that is?

21 A These --

22 Q Is it an agent or killing germs, if you know?  If

23 you don't know.

24 A I'm not real familiar with that.

25 Q Have you ever got a shot before or did they swab

506

1     or do anything if they drew blood, have you ever

2     had blood drawn?

3  A    Yes, sir.

4  Q    Using that to refresh your memory, do they use a

5     Betadine swab or something orange when they did

6     that?

7  A    Yes, sir.

8  Q    Now, when I ask you, tell the ladies and gentlemen

9     of the jury, in doing other DNA testing throughout

10     the state -- I'll just use the example, panties,

11     that are submitted looking for semen, spermatozoa,

12     do you find it in different locations; or is it

13     always just found on the hip or the seam of the

14     hip? Is that the only place you ever find it, or

15     do you find it on different locations?

16  A    Certainly various locations.

17         MR. VALESKA: That's all. Thank you.

18             RECROSS EXAMINATION

19 BY MR. BRANTLEY:

20  Q    Mr. Macchia -- did I pronounce your name right?

21     Macchia?

22  A    Yes, sir.

23  Q    You didn't receive any DNA samples from Jeanetta

24     Jones, did you?

25  A    No, sir.

1   Q   Dinthea -- I'm sorry.   From Dinthea Jones?

2       Dinthea Jones?

3   A   The only two standards I've mentioned previously

4       are the only standards that we had.

5   Q   Is vaginal -- the vagina has secretions of

6       biological fluids, does it not?

7   A   Does the vagina secrete vaginal fluids?

8   Q   Yes.

9   A   Yes, sir.

10   Q   And those are capable of providing you DNA

11       samples, aren't they?

12   A   Yeah.  It's a biological fluid so it's potentially

13       capable of doing so.

14   Q   We don't know if these panties contained vaginal

15       secretions from Jeanetta Jones, the mother of

16       Jonteria Jones, do we?

17   A   No, sir.

18   Q   And you said the sperm that was found -- what's

19       the difference of sperm and semen?  Is that the

20       same thing?

21   A   Well, semen is a broader term.  Just within an

22       ejaculate you've got all sorts of different

23       components.  One of those components within this

24       fluid is spermatozoa, sperm.

25   Q   Semen is a broad, general term?

508

1    A    Semen we refer to the entire solution; sperm are
2         within the semen.
3    Q    What you're analyzing is semen, correct?
4    A    What contains the DNA would be the spermatozoa,
5         the sperm.
6    Q    Semen would not contain any DNA?
7    A    The sperm is part of the semen.  It's considered
8         part of the semen.
9    Q    You located the semen sample on the -- what did
10        you say?  Hip what?
11   A    Hip seam.
12   Q    Hip seam?
13   A    Yes, sir.
14   Q    Does that mean that you -- semen was in the -- if
15        a person wore these panties with the front part on
16        the front and the rear part on the rear, did that
17        mean the semen was located to the rear of these
18        panties?
19   A    It just -- would simply means that -- just in a
20        general sense it's in the hip area near the seam.
21   Q    On the inside or outside of the panties, or do
22        you know?
23   A    I can't tell if it was on exterior or interior,
24        no, sir.
25   Q    Did you take the sample of sperm from these

1        panties?  Did you cut it out?

2   A   The sample was cut out from these panties, yes,

3        sir.

4   Q   Could you look at and see if you cut it from the

5        inside or outside to look at those?

6   A   It's going to be a hole in the panties, and so

7        you're not going to be able to tell if it's from

8        the inside or outside, the cutting.

9   Q   With regards to the spermatozoa, you found only a

10       hundred sperm cells; is that what you said?

11  A   Within this cutting that was made and examined

12       from that hip area, I mentioned greater than one

13       hundred sperm per slide.

14  Q   Greater than one hundred, but did you also

15       classify with regards to less than a certain

16       number, too?  Greater than a hundred but less than?

17  A   That just simply means -- the sample is taken -- a

18       stain is determined that it potentially may

19       contain semen.  A cutting is made from that stain.

20       So we just take a small piece out, put it on a

21       slide, mix it with a little water, and we stain it

22       and look at it under a microscope.  And the

23       analyst will then count sperm.  Because we know

24       basically how much we have.  Do we have enough for

25       DNA?  And when these were counted, it was

1    determined that there was more than a hundred

2    there.

3  Q    More than a hundred total or per --

4  A    On this slide from this tiny piece that we took

5    from the stain contained over a hundred.

6  Q    Do you have an opinion in terms of ounces or cubic

7    centimeters or milliliters or CC's how many CC's

8    of sperm that would be?

9  A    I couldn't really make that determination.

10  Q    The semen is what gives its volume as opposed to

11    the sperm, correct?

12  A    That's right.

13  Q    And you didn't test the volume of semen, did you?

14  A    No, sir.

15  Q    Do you have an opinion as to how much semen it

16    would take to -- for a hundred sperm to be

17    dissolved in or housed in I guess is the correct

18    phrase?  How many CC's of semen would it --

19  A    That would be impossible to answer because every

20    male has a different sperm count.  So the number

21    of sperm per microliter is going to be a variable

22    from individual to individual.  So I really

23    wouldn't be able to make that determination on

24    that.

25  Q    Do you know that the normal or average sperm count

| | | |
|---|---|---|
| 1 | | for a human male? |
| 2 | A | I do actually have the average. Is fifty thousand |
| 3 | | to a hundred and fifty thousand sperm per |
| 4 | | microliter of ejaculate? |
| 5 | Q | Per microliter? |
| 6 | A | Yes, sir. |
| 7 | Q | Can you convert that to CC's? |
| 8 | A | No, I couldn't right here do any calculations. |
| 9 | Q | Is a microliter larger in volume or smaller in |
| 10 | | volume than a cubic centimeter, or CC? |
| 11 | A | It is smaller. |
| 12 | Q | Many times smaller? |
| 13 | A | Many times smaller. |
| 14 | Q | A million times smaller, isn't it? |
| 15 | A | No. |
| 16 | Q | Thousand? |
| 17 | A | Yes, sir, I believe it is. |
| 18 | Q | So the sample you got on this sperm was |
| 19 | | microscopic, basically, wasn't it? |
| 20 | A | The sample that we analyzed to -- for the presence |
| 21 | | of sperm or the sample that was used for DNA |
| 22 | | analysis? |
| 23 | Q | Both. |
| 24 | A | Well, the sample used to determine if there's |
| 25 | | sperm is naturally going to be smaller because we |

1        don't want to waste the whole sample just to see

2        if there's sperm present and how much.  So it's

3        going to be a smaller piece.  Now, it's not

4        microscopic.  The sperm itself are microscopic.

5        But the sample itself is going to fit in between,

6        you know, the tongs of a tweezer.  The sample used

7        for DNA were -- just the bigger the better.  In

8        other words, the more sample we can use for DNA

9        the better.  But there is a limit.

10   Q    A microliter, is that a billionth of a liter?

11   A    I believe a microliter -- doing the conversion.

12        It's been a while.  Going from millimeter to

13        microliter, I think it's a thousand fold

14        difference.  Three decimal places difference, I

15        believe.

16            MR. BRANTLEY:  That's all.

17                 REDIRECT EXAMINATION

18   BY MR. VALESKA:

19   Q    I do want to ask you, if I could.  The sample that

20        was left on the panties, do your notes indicate

21        whether you used up the entire sample that you

22        extracted, or was there some sample left on the

23        panties is what I want to know?  When you

24        extracted those, did you cut it off the panties

25        what I'm asking in your opinion?

1   A    Let me refer to my notes here.  The sample that

2        was submitted to DNA was consumed, but the samples

3        on the panties still should have DNA present.

4            MR. VALESKA:  That's all.  Thank you.

5            THE COURT:  Mr. Brantley?

6            MR. BRANTLEY:  I don't have anything, Your

7        Honor.

8            MR. VALESKA:  Ask if he can be excused.

9            THE COURT:  That's it.  Thanks.  You can go.

10           Ladies and gentlemen, we're going to go

11       ahead and break for today.  We're probably at a

12       good stopping point.  I think the State has one

13       more witness -- they probably have more than one

14       witness, but one more that may take a fair amount

15       of time.  So we will go ahead and stop for the

16       evening.  If you would, be back in the jury room

17       at eight-thirty tomorrow morning.  There may be a

18       few matters -- may be a few minutes before we get

19       back in here, but hopefully shortly after

20       eight-thirty we can go ahead and start in the

21       morning.  So just be back in the jury room.

22           Also, again, please, do not watch any

23       newspaper -- or watch any TV or read any newspaper

24       accounts.  Also, don't talk with anyone, including

25       family members, household members about the case.

514

1    Also, please don't do any sort of independent

2    research or watch any TV programs that may deal

3    with any of the issues that you are faced with in

4    this case.

5         So with that, you can go until

6    eight-thirty in the morning.  Thank you.

7         (Jury not present.)

8         (The proceedings for April 8, 2003, were

9         concluded.)

10        (Off the Record.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     IN THE CIRCUIT COURT OF HOUSTON COUNTY

2        STATE OF ALABAMA

3

4 STATE OF ALABAMA,     *
               *
5 v.          * Case No. CC-002-235-236
               *
6 FREESHONE MCLEOD,    *
               *
7    Defendant.    *

8

9

10

11   REPORTER'S OFFICIAL TRANSCRIPT ON APPEAL

12

13

14

15 Before:

16    The Honorable Brad Mendheim and jury

17      April 9, 2003

18

19

20

21

22

23

24

25 Carla H. Woodall
   Court Reporter

516

1                    (The proceedings for April 9, 2003,

2              began at 9:00 a.m.)

3                    (Jury present.)

4                         KEITH COOK

5         having first been duly sworn, was examined and

6         testified as follows:

7                    DIRECT EXAMINATION

8    BY MR. VALESKA:

9    Q    Tell us your name, please, sir.

10   A    Keith Cook.

11   Q    Where are you employed?

12   A    Houston County Sheriff's Department.

13   Q    What position do you hold?

14   A    Investigator.

15   Q    Take you back on or about October 6 of 2001, ask

16        you were you an investigator with the sheriff's

17        department at that time?

18   A    Yes, I was.

19   Q    Did you have occasion to go down to Gordon,

20        Alabama, in reference to Jonteria Jones who had

21        allegedly been raped and had her skull crashed in?

22   A    Yes, I did.

23   Q    Now, I want you to tell the ladies and gentlemen

24        of the jury the geographical area, I want to ask

25        you about some houses, okay.  The house that

517

| | | |
|---|---|---|
| 1 | | Freeshone McLeod and Dinthea Jones, Jonteria's |
| 2 | | mother, lived in, did you go to that trailer? |
| 3 | A | Yes, I did. |
| 4 | Q | Tell the ladies and gentlemen of the jury, from |
| 5 | | that trailer when you get up and walk up to it to |
| 6 | | get into the trailer, how many entrances?  Either |
| 7 | | side? |
| 8 | A | One.  From the porch to the inside? |
| 9 | Q | Describe the porch.  What was that porch made of |
| 10 | | so you can walk up and get in that trailer? |
| 11 | A | It was a wooden porch. |
| 12 | Q | And what was around the top of it?  If it's -- |
| 13 | A | It was just wood. |
| 14 | Q | The flat porch when you step on it, was there any |
| 15 | | kind of thing around it? |
| 16 | A | No. |
| 17 | Q | Any two by fours?  Any railings? |
| 18 | A | No. |
| 19 | Q | Can you tell the ladies and gentlemen of the jury |
| 20 | | when you went inside the trailer, first room, what |
| 21 | | would you describe or classify that room?  What |
| 22 | | was it? |
| 23 | A | It was a living room. |
| 24 | Q | Going to the left as you walk in from the living |
| 25 | | room, what is the next room? |

CR 02-1610

**DOCUMENT NAME:** McLeod, Freeshone Cornelius

**CLIENT & MATTER:** 54599-001

Part 7 of 9

**DESCRIPTION:**

County: Houston

CC#s: 2002 ~~235~~ -235+236

Attorney: Beth Poe

Circle: (TRANSCRIPT)   CASE FILE   BOTH      5 vol.

MMW

## CERTIFICATION

I hereby certify that the preceding imaged records and documents

are a true, accurate, and complete image of the original records or

documents as received by the Office of the Attorney General of

the State of Alabama.

This the 21st day of September, 2004.

Signed: _Melissa A. Martin_

Notary: _Coleen F Gibson_

Coleen F. Gibson
Notary Public
Commission expires 06/11/06