COURT OF CRIMINAL APPEALS NO._____

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

CIRCUIT COURT OF _____HOUSTON_____ COUNTY, ALABAMA

CIRCUIT COURT NO. ____CC-2002-235 & 236___ Volume V

CIRCUIT JUDGE _____Brad Mendheim_____

Type of Conviction / Order Appealed From: __Rape 1 and Attempted Murder__

Sentence Imposed: __99 Years $20,000.00 Fine, $5,000.00 Victim Compensation.__
__99 years, $20,000.00 Fine $5,000.00 Victim Comp__

Defendant Indigent: [x] YES [ ] NO

__Freeshone Cornelius McLeod__                          NAME OF APPELLANT

__Hon. Clark Parker   PAR 069__         __793-9009__
(Appellant's Attorney)                                    (Telephone No.)
__401 N. Foster St.__
(Address)
__Dothan__        __Alabama__        __36303__
(City)              (State)          (Zip Code)

V.

__STATE OF ALABAMA__                                   NAME OF APPELLEE

(State represented by Attorney General)
**NOTE:** If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)

Part 9 of 9

1        THE COURT:  Hang on just a second.  Let me
2   find that charge.
3        MR. BRANTLEY:  They asked you to give it, and
4   you agreed to give it.
5        THE COURT:  Hang on.
6        MR. VALESKA:  Can you ask him to quit
7   commenting?
8        THE COURT:  Hold on.  Well, he can argue what
9   that charge says, and I'm going to give a charge
10  that includes several discussions of that point.
11  That won't be the only one given on that.  But
12  your argument should be consistent with what the
13  law is, not what the charge is that this Court
14  will give.  So please don't argue anything beyond
15  that.
16       MR. BRANTLEY:  I'm reading from the charge
17  you're going to give.
18       THE COURT:  I know.  And you can read from
19  that charge.  That's their charge that we agreed
20  to be given.
21            (At which time closing arguments were
22            continued by Mr. Brantley.)
23       MR. VALESKA:  I object.  That's just not the
24  evidence.  That's not --
25       MR. BRANTLEY:  They have their own --

1    THE COURT:  Let Mr. Valeska have his

2    objection.

3    MR. VALESKA:  I object.  That's clearly not

4    the evidence.  There wasn't one shred of evidence

5    of any doctor or any witness who said there was

6    any outside injury to the labium.  It was

7    particularly asked.  All of it was inside.  It's

8    just not true.

9    MR. BRANTLEY:  Labia.

10    THE COURT:  I thought he argued that there

11    was some bruising outside of the vagina?  Is that

12    what you were arguing?

13    MR. BRANTLEY:  Yes, sir.

14    THE COURT:  And my understanding of the

15    evidence there was something around the anal area.

16    MR. BRANTLEY:  Around the what?

17    THE COURT:  Around the anal area.

18    MR. BRANTLEY:  There was some around the anal

19    area.  But certainly that wouldn't be rape.  So I

20    think that's just irrelevant.

21    THE COURT:  He objected to the arguments not

22    consistent with the evidence.  But I think it was

23    if you factor in the testimony about the anal

24    area.  So overruled on that point.

25    MR. BRANTLEY:  Judge, can I approach the

1    bench?

2    THE COURT:  Yes, sir.

3    (At which time the following proceedings

4    were held at the bench outside of the

5    hearing of the jury:)

6    MR. BRANTLEY:  Judge, with all due respect

7    to this Court, I believe the Court has commented

8    on the evidence, and could you give the jury an

9    instruction now they are not to consider any --

10   that you have no feeling one way or the other

11   about the evidence?

12   THE COURT:  I thought that's what you were

13   arguing is what the evidence was.  So I have to

14   decide if that's what the evidence was.  I don't

15   see how I can rule on that without deciding what

16   the evidence was.  That was his objection, and I

17   ruled that you were consistent with the evidence

18   about --

19   (At which time the following proceedings

20   were held in open court:)

21   THE COURT:  Ladies and gentlemen, I just want

22   to be perfectly clear.  In no way in my previous

23   ruling am I forming any opinion as to facts or

24   evidence in this case.  You, again, rely on what

25   you heard from the witness stand and not what I

1    may say or what the attorneys may say.

2         Go ahead.

3         (At which time closing arguments were

4         continued by Mr. Brantley.)

5    THE COURT:  Mr. Valeska.

6         (At which time rebuttal arguments were

7         made by Mr. Valeska.)

8    THE COURT:  Ladies and gentlemen, the

9    Defendant in this case as in all criminal cases is

10   presumed innocent of this charge.  The

11   presumption of innocence is evidence in his favor

12   that you must consider along with all the other

13   evidence.  The presumption of innocence stays

14   with him throughout the trial until the State

15   overcomes the presumption of innocence and proves

16   his guilt beyond a reasonable doubt.

17        The burden of proof in this case rests

18   on the State of Alabama.  The Defendant is not

19   required to prove his innocence.  The State is

20   required to prove the Defendant's guilt beyond a

21   reasonable doubt.  This is the highest standard of

22   proof that we have in our legal system.  However,

23   the State is not required to prove guilt beyond

24   all doubt or to a mathematical certainty so that

25   there is no possibility that you could be

mistaken.  A reasonable doubt is a doubt for which you have a reason arising from the evidence or the lack of evidence and remaining after a careful consideration of the evidence such as reasonable men and women would entertain under all the circumstances.  If conflicting inferences may be drawn from the same facts, the jury should draw an inference consistent with innocence.  You should rely on the evidence and the testimony in making your verdict.  You must follow the laws as I have explained them to you.  You should make your decision about the evidence using your own common sense as reasonable men and women.  You should not imagine things that cannot be proven by the evidence.  You must be -- you must consider all of the evidence in this trial without bias, prejudice, or sympathy for either side.  You must being equally just to both sides.  Your verdict must not be based on suspicious, speculation, or conjecture.

You are the sole judges of the evidence and the credibility of the witnesses.  You may accept or reject any part of the testimony you consider worthy of belief.  In determining the weight to be accorded the testimony of any

witness, you may consider the demeanor of the witness while on the witness stand, his or her apparent candor or evasion, or the existence or nonexistence of any bias or interest. You may take into consideration any matter which you would consider in your everyday affairs. In passing upon the truthfulness and accuracy of the testimony, you may weigh it in the light of your common observation and experience and reach a verdict that will be based upon the truth as you determine it from all of the evidence.

If after considering the evidence, testimony, and the law you believe that the State has proven the Defendant's guilt beyond a reasonable doubt, you should find him guilty. If after considering the evidence, testimony, and the law you believe the State has failed to prove the Defendant's guilt beyond a reasonable doubt, you should find him not guilty.

The Defendant in this case has not testified. This is his right under our law and constitution. You cannot hold it against the Defendant because he's exercised his constitutional right to remain silent.

From time to time -- or in this case

circumstantial evidence has been presented to
justify a verdict at your hands against the
Defendant.  The circumstances must not only be
consistent with the hypothesis that the Defendant
is guilty, but inconsistent with the hypothesis
that he is innocent and must be inconsistent with
every other rational hypothesis except that of his
guilt.  Otherwise, you must return a verdict of
not guilty against the Defendant in this case.

Circumstantial evidence is not a lesser
degree of evidence than direct evidence, which is
-- direct evidence would be something such as eye
witness evidence.  Circumstantial evidence is just
the circumstances surrounding the events.  You
should not refuse to consider circumstantial
evidence simply because it is not direct
evidence.  The law does allow the State to rely on
either or both, direct and circumstantial
evidence, when presenting its case.  However, you
may not convict the Defendant based on
circumstantial evidence unless it can be
reconciled with the theory that the Defendant is
innocent of the charge.

The Defendant has been placed on trial
by two indictments which charge him with attempted

1　murder and rape in the first degree.  And in no

2　particular order, just the first one I picked up,

3　I want to go over with you is the charge of rape

4　in the first degree.  And, again, by way of

5　caution, I told you when we started, the evidence

6　must stand alone on each case.  In other words,

7　you must be convinced beyond a reasonable doubt

8　as to each charge before you could convict him of

9　either one.  So if you believe that the State has

10　proven their case as to one charge but not the

11　other, you would be justified in finding him

12　guilty of one and not guilty of the other.  If

13　they have not proven their case as to both charges

14　in your judgment, you should find him not guilty

15　of both charges.  And by the same token, if they

16　have proven the case to your satisfaction beyond a

17　reasonable doubt as to both charges, you should

18　find him guilty of both charges.

19　　　　But on the rape charge, it reads as

20　follows.  Freeshone Cornelius McLeod, whose name

21　is otherwise unknown to the grand jury, a male,

22　did engage in sexual intercourse with Jonteria

23　Jones, a female, who was less than twelve years of

24　age, he, the said Freeshone Cornelius McLeod,

25　being sixteen years -- or being sixteen years or

older, in violation of Section 13A-6-61 of the
Code of Alabama against the peace and dignity of
the State of Alabama.  And that charge is signed
by the District Attorney.

Included in that are several elements,
and that is what you have to look at to determine
from the evidence if he is guilty or not guilty of
rape in the first degree.  And I want to go over
those elements with you at this time.  And you
must be convinced as to each element that he is
guilty beyond a reasonable doubt as to that
element before you could return a verdict of
guilty.  If you are not convinced as to each
element, then you would return a not guilty
verdict.

The first element of that charge is that
the Defendant be sixteen years of age or older.
The second one is that the female in this case,
Jonteria Jones, be less than twelve years of age.
And, third, that the Defendant, the male, engage
in sexual intercourse with the female in this
case.  And the fourth and final element would be
that the Defendant acted knowingly.  And obviously
the first two elements are self-explanatory as to
the age.  You must determine that from the

1   evidence.  I can't give you any further

2   definitions what it means to be sixteen years of

3   age or older or under twelve.  You know what that

4   means.

5        As to the law in Alabama in regard to

6   sexual intercourse, I want to give you some

7   instructions on that.  The law of the State of

8   Alabama says that sexual intercourse has its

9   ordinary meaning and occurs with any penetration

10   however slight.  Emission is not required.  Lack

11   of finding of semen is irrelevant in a prosecution

12   for rape because sexual intercourse occurs upon

13   any penetration of the vagina however slight, and

14   emission is not required.  There must be

15   penetration of the sexual organ of the female by

16   the sexual organ of the male to constitute rape,

17   but the slightest penetration is sufficient since

18   the slightest penetration is sufficient to prove

19   rape, and ejaculation of semen is not required to

20   support a rape conviction.  And those charges are

21   correct statements of law, and they go to the

22   element of sexual intercourse on the charge of

23   rape in the first degree.

24        Also, the final element that the

25   Defendant must act knowingly in this

1    circumstance, the law defines that as follows.

2    And, again, it's something that is not -- you kind

3    of know what that is, but specifically the law

4    says, a person acts knowingly with respect to

5    conduct or to a circumstance when he or she is

6    aware that his conduct is of that nature or that

7    the circumstance exists.

8         And so on the charge of rape in the

9    first degree if after consideration of the

10   evidence you believe that the State has proven the

11   Defendant guilty beyond a reasonable doubt of rape

12   in the first degree, your verdict would be, we,

13   the jury, find the Defendant guilty of rape in the

14   first degree.  If after considering the evidence

15   you are not convinced beyond a reasonable doubt

16   that the State has proven its case, then your

17   verdict would be, we, the jury, find the Defendant

18   not guilty.

19        On the attempted murder charge, I want

20   to begin again by reading the indictment to you.

21   And, again, the indictment is not evidence against

22   the Defendant.  It's just the formal means that

23   tells the State what they must attempt to prove;

24   the Defendant, what he must be prepared to defend

25   against; and it tells you what you need to be

1    looking at in making your decision.  But it does

2    contain the elements of the charge as well.  And I

3    will read it to you at this time.  Freeshone

4    Cornelius McLeod, whose name is otherwise unknown

5    to the grand jury, did with the intent to commit

6    the crime of murder in violation of Section

7    13A-6-2 of the Alabama Criminal Code attempt to

8    cause the death of Jonteria Jones by striking her

9    on the head with a pan in violation of Section

10   13A-4-2 of the Code of Alabama against the peace

11   and dignity of the State of Alabama.  That charge

12   is also signed by the district attorney.

13         And it contains certain elements as

14   well.  And because it's an attempt, what I will

15   have to do is go over with you what the law of

16   Alabama says in general regarding an attempted

17   crime and then specifically go over with you the

18   law in Alabama regarding murder because the two

19   sort of have to go together to form this charge.

20   So it will be slightly different in the way I

21   present it to you than the rape charge.

22         The elements of an attempt that the

23   State must prove beyond a reasonable doubt each

24   element in order for you to find the Defendant

25   guilty, the first element is that the Defendant in

this case intended to commit the crime; in other words, a specific intent to commit the crime in this case, murder, is required of the Defendant. Secondly, that acting with the intent to commit the crime, that being murder, the Defendant did an overt act toward the commission of such offense.

And I want to go over some definitions or further explanations of those two elements with you. A person acts intentionally with respect to a result or to conduct when his or her purpose is to cause that result or to engage in that conduct. What constitutes commission of an overt act or the commission of the offense of in this case murder is for the jury to decide under the circumstances. It requires that the Defendant do some act directed towards the eventual effectuation of the crime. However, mere remote prepatory acts which are not reasonably in the chain of causation leading to the effectuation of the crime are not sufficient.

Now, to look at this charge, you also need to know exactly what the elements of murder are. And I want to be perfectly clear. Obviously the State is not attempting to prove a murder case against him. But since that is what the State

1     does have to prove is that the Defendant intended

2     to commit that crime, then by definition you need

3     to know what the elements of murder would be.  And

4     let me look one other place also.  Just a second.

5          Alabama law defines murder as a person

6     commits the crime of murder if with intent to

7     cause the death of another person he causes the

8     death of that person.  And so the elements would

9     be -- of the murder charge that obviously the

10    person is in fact dead, that the crime was

11    completed.  Secondly, that the Defendant caused

12    the death in the means described by the State in

13    the indictment.  And, third, that he committed the

14    homicide with the intent to cause that result.

15         So on the charge of attempted murder,

16    again, if after considering that offense and the

17    elements of that crime you are convinced beyond a

18    reasonable doubt that the Defendant did in fact

19    commit the crime of attempted murder, then the

20    State has proven the case, your verdict would be,

21    we, the jury, find the Defendant guilty of

22    attempted murder.  If, however, in reviewing the

23    evidence you are not convinced that the State has

24    proven each element of that charge beyond a

25    reasonable doubt, your verdict would be, we, the

1   jury, find the Defendant not guilty.

2           Now, that concludes my discussions with

3   you about the actual charges in this case.  I want

4   to finish by going over with you how to conduct

5   your deliberations and reach your verdict in this

6   case.  Upon entering the jury room the first

7   matter you should consider is a selection of a

8   foreperson.  It can obviously be a man or a

9   woman.  The foreperson has the following duties.

10  One, to keep order and make sure that everyone who

11  wants to speak has the opportunity to do so.

12  Second, to communicate with the Court on behalf of

13  the jury should it become necessary.  And, three,

14  to sign and present the verdict on behalf of the

15  jury.  However, the foreman has no special power

16  or privilege over the other jurors in deciding the

17  verdict.  All jurors must be equal.  Your verdict,

18  whether guilty or not guilty, must be unanimous;

19  that is, all twelve of you must agree as to the

20  final verdict on each charge, whether it's guilty

21  or not guilty of the two charges.

22          Now, then, I have prepared for you

23  verdict forms -- written verdict forms, and the

24  verdict will need to be in writing when you do

25  reach the verdict on these two cases.  And when

1   you have finished with both cases, you have

2   reached verdicts on both charges, the I want you

3   to present them to me.  You don't need to reach a

4   verdict on one, bring it out, and then go back on

5   the other.  Just finish both charges and bring

6   them out.  I do want to go over the forms the way

7   they would read.  And, again, in no particular

8   order.  Just the first one I picked up.  If after

9   considering the evidence and the law as I've

10  explain it to you you are convinced beyond a

11  reasonable doubt that the Defendant is guilty of

12  the crime of attempted murder, your verdict would

13  read, we, the jury, find the Defendant, Cornelius

14  Freeshone McLeod, guilty of attempted murder as

15  charged in the indictment.  And the foreperson

16  would signed it, and there's a space on there for

17  the foreperson to sign that verdict.  And that's

18  the one that would be signed and presented to the

19  Court.  If, however, after having the evidence and

20  the law as I have explained it to you you are not

21  convinced beyond a reasonable doubt that the

22  Defendant committed the crime of attempted murder,

23  your verdict would read, we, the jury, find the

24  Defendant, Cornelius Freeshone McLeod, not guilty.

25  And then the foreperson would sign that verdict

1    form on behalf of the jury.

2          Then on the rape first degree charge,

3    again, if after considering the evidence and the

4    law you are convinced beyond a reasonable doubt as

5    to the guilt of the Defendant, your verdict form

6    would read, we, the jury, find the Defendant,

7    Cornelius Freeshone McLeod, guilty of rape in the

8    first degree as charged in the indictment.  And,

9    again, there's a place for the foreperson to sign

10   it.  If after considering the evidence and the law

11   you are not convinced beyond a reasonable doubt

12   that the Defendant is guilty of the crime of rape

13   in the first degree, your verdict form would read,

14   we, the jury, find the Defendant, Cornelius

15   Freeshone McLeod, not guilty.  And the foreperson

16   would sign that verdict and would present it on

17   behalf of the jury.

18          Again, after you have reached verdicts

19   on both charges, if you would let us know.  We'll

20   have a deputy or court personnel waiting there by

21   the door for you.  Or if anything comes up during

22   the deliberations where you need to contact me, if

23   you will just -- the foreperson let either the

24   deputy or court person know.

25          And along those lines, again, I want to

1    be perfectly clear.  You determine what the facts

2    are in this case.  I can't help you if there's any

3    disputed facts.  You-all are to deliberate and

4    determine what the facts are in this case.

5              Is the State satisfied with the

6    instructions of the Court?

7        MR. VALESKA:  The State is satisfied, Judge

8    Mendheim.

9        THE COURT:  Mr. Brantley, is the Defense

10   satisfied?

11       MR. BRANTLEY:  The Defendant is satisfied,

12   Your Honor.

13       THE COURT:  Ladies and gentlemen, there's a

14   typo on the verdict forms.  And we will redo

15   these.  But they will read the same otherwise.  We

16   have the Defendant's first and middle name

17   transposed.  I read it to you Cornelius Freeshone

18   McLeod.  His name is Freeshone Cornelius McLeod.

19   And so we will correct those verdict forms for

20   you.

21             Also, I want to mention.  On the not

22   guilty verdict forms, they read identical.  There

23   is no reference to them as to which charge that

24   is.  You just have two not guilty forms.  But you

25   have the case numbers on them.  And you-all don't

1    know what the case numbers correspond to.  So what

2    I did for purposes of whoever the foreperson is I

3    put rape first degree on the not guilty form that

4    goes with that case number and then attempted

5    murder in my own handwriting on the top of the not

6    guilty form for that charge so there's no

7    confusion.  But we will correct those forms.

8         I am going to go ahead and let you go to

9    lunch, though, because, like I said, I know the

10   D.A. needs to take some officer's notes off the

11   exhibits and give them an opportunity to do that.

12   If you would, please, report back to the jury room

13   at one-fifteen.  And we will have the evidence

14   ready for you at that time.  Once all twelve of

15   you -- and there is an alternate who is fixing to

16   be released and not have to come back.  But once

17   -- on second thought, let me just keep the

18   alternate and have them come back at one-fifteen

19   in case something comes up.  But when you come

20   back and all thirteen of you are present, just let

21   me know -- somebody just stick your head out the

22   door.  I'll be in here.  Let me know all of you

23   are here.  At that point I will release the

24   alternate.  My apologies to that person for making

25   them come back.  But the minute I do that, make

```
 1    you come back, then you-all aren't going to need
 2    the alternate.  But the minute I let the alternate
 3    go now, somebody is going to get sick or something
 4    bad happen during lunch where you can't come back
 5    and we just wasted the past three or four days on
 6    this trial when that occurs because we do have to
 7    have twelve people.  With that, you're free to
 8    go.
 9              Again, let me caution you.  Especially
10    since you heard everything you're going to hear
11    about this case, there's to be no discussions even
12    among yourselves until we released the alternate
13    and I tell you to deliberate.  Also, don't have
14    any contact with any third person about this
15    charge either.  Thank you.  You can go.  Just come
16    back at one-fifteen.
17                   (Jury not present.)
18                   (Off the Record.)
19                   (At which time the Court excused the
20                   alternate juror, Julie Drummer.)
21                   (At 1:25 p.m. the jury began their
22                   deliberations.)
23                   (Off the Record.)
24                   (At 2:10 p.m. the Court was notified the
25                   jury had reached a verdict.)
```

1    THE COURT:  Bring the jury.

2         (Jury present.)

3    THE COURT:  Ms. Davis; is that right?

4    THE FOREPERSON:  Yes.

5    THE COURT:  You're are the foreperson of the

6    jury?

7    THE FOREPERSON:  Yes.

8    THE COURT:  It's my understanding the jury

9    has reached a verdict in both cases?

10    THE FOREPERSON:  Yes, sir.

11    THE COURT:  I will ask the clerk to read the

12    verdicts at this time.

13    THE CLERK:  In case CC-2002-235, the State of

14    Alabama versus Freeshone Cornelius McLeod, we, the

15    jury, find the Defendant, Freeshone Cornelius

16    McLeod, guilty of rape first degree as charged in

17    the indictment.

18         In case CC-02-236, State of Alabama

19    versus Freeshone Cornelius McLeod, we, the jury,

20    find the Defendant, Freeshone Cornelius McLeod,

21    guilty of attempted murder as charged in the

22    indictment.

23    THE COURT:  Do you want the jury polled?

24    MR. BRANTLEY:  Would you please, Your Honor?

25    THE COURT:  Ladies and gentlemen, at this

1    time, I need to poll you, and that is, ask if

2    those two verdicts are your verdicts.  I hate to

3    point, but just start with Ms. Davis and then down

4    the back row and work my way back.  And so as I

5    point to you, if you'll just nod or say yes if

6    that's your verdict.  If it's not, let me know.

7                    (At which time the jury was polled and

8                    each juror indicated in the affirmative

9                    it was their verdict.)

10    THE COURT:  Let the Record show that all

11    twelve juror did agree that those were their

12    verdicts.

13            At this time, ladies and gentlemen,

14    thank you for your service in this case.  I know

15    it was a difficult case to sit on, and we

16    appreciate your patience as well.  You are

17    discharged for the week so you are free to go.

18    You won't have to serve on any more juries this

19    week.  You can go down to the clerk's office which

20    is to the right as you come in the building and

21    they will have the checks ready.  Thank you for

22    serving.

23                    (Jury dismissed.)

24    THE COURT:  Mr. McLeod, the jury having found

25    you guilty of rape in the first degree and

1    attempted murder, do you have anything to say as

2    to why sentence of law should not be pronounced

3    upon you at this time?

4         THE DEFENDANT:  (Nodded.)

5         THE COURT:  Is that no?  She needs to be able

6    to take it down.

7         THE DEFENDANT:  No.

8         THE COURT:  Is there anything for the State

9    as to why sentence should not be pronounced at

10   this time?

11        MR. VALESKA:  No.  We would like to go ahead

12   with the sentencing.

13        THE COURT:  Are you prepared to go forward

14   with the sentencing at this time?

15        MR. BRANTLEY:  Judge, we would request a

16   sentencing hearing.

17        THE COURT:  We will set that for May 28.

18        MR. VALESKA:  Can we have a no bond on both

19   of those cases?

20        THE COURT:  May 28 at nine o'clock.  I don't

21   know if it will be here or back in the

22   courthouse.

23             Anything in response to the District

24   Attorney's argument to having his bond revoked?

25        MR. BRANTLEY:  Judge, actually, we would

1   request a bond.  We believe the evidence shows the

2   Court that his guilt is not overwhelming.  He was

3   found guilty.  But I don't believe that he has a

4   history of being dangerous in the community other

5   than but for this particular incident.  And we

6   would ask that he be allowed to spend some time

7   home with his family.  He's been incarcerated --

8       THE COURT:  If you need to say something, say

9   it to Mr. Brantley.

10       Anything else?

11       MR. BRANTLEY:  Your Honor, we would request

12   seventy-five hundred dollar bond on each case if

13   we could.

14       THE COURT:  Mr. Valeska, anything on your

15   motion?

16       MR. VALESKA:  Yes, sir.  If I could, he's

17   been convicted of two Class A felonies of twenty

18   years to life.  Seventy-five hundred dollar bond

19   is a joke, and he's a danger to the community, to

20   children.  He's been convicted.  This jury was

21   out.  There should be no bond.  He shouldn't be

22   able to get out.  If he's on the street, he could

23   hurt somebody else.  We think the facts are

24   warranted and he should get no bond and stay in so

25   no other child has to see Freeshone McLeod.

1    THE COURT:  At this point the facts were

2  especially bad in this case and the jury has found

3  him guilty --

4    MR. BRANTLEY:  Judge, he has no prior

5  felonies.

6    MR. VALESKA:  We got a fractured skull here,

7  Judge.

8    THE COURT:  Gentlemen, let me rule.

9    And the jury has found him guilty of

10  these two charges.  So at this point his bond is

11  revoked pending his sentencing hearing, which will

12  be May 28 at nine o'clock.

13    (The proceedings for April 9, 2003, were

14    concluded.)

15    (Off the Record.)

16

17

18

19

20

21

22

23

24

25

```
 1              * * * * * * * * * * * *

 2                 REPORTER'S CERTIFICATE

 3              * * * * * * * * * * * *

 4  STATE OF ALABAMA

 5  COUNTY OF HOUSTON

 6

 7          I, Carla H. Woodall, Court Reporter and

 8  Notary Public in and for the State of Alabama at Large,

 9  do hereby certify that the above-styled and numbered

10  cause was reported stenographically by me and is a true

11  and correct transcript of the testimony, objections,

12  motions, rulings of the Court, and was transcribed by

13  or under my direction and control.

14          I further certify that I have filed all

15  exhibits offered in the trial of this cause, if any,

16  with the Circuit Clerk of Houston County, Dothan,

17  Alabama, for incorporation into the Record on Appeal.

18          I further certify that I have on this day,

19  filed with the Clerk of the Court of Criminal Appeals,

20  the Attorney General, and the parties here involved, a

21  copy of the Reporter's Index to the Testimony and a

22  Certificate of Completion of Reporter's Transcript of

23  the said cause.

24          I further certify that I have filed the

25  original and three copies of this transcript in the
```

645

1    office of the Circuit Clerk of the Circuit Court of

2    Houston County, Dothan, Alabama.

3

4         Done this the 15th day of October, 2003.

5

6

7    Carla H. Woodall
     Court Reporter and Notary Public
8    State of Alabama at Large

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| State of Alabama<br>Unified Judicial System<br>Form ARAP 13 | CERTIFICATE OF COMPLETION<br>REPORTER'S TRANSCRIPT | Page Number<br>646 |
|---|---|---|

**TO:    The Clerk of the Court of Criminal Appeals**                    Fax: (334) 242-4689
**P. O. Box 301555**
**Montgomery, Alabama 36130-1555**

**Criminal Appeals Case Number**         CR _02_ - _1610_

_Freestone Cornelius McLeod_ v. _State of Alabama_
**Appellant's Name**                                    **Appellee**

On appeal from the:    [✓] Circuit Court of
                       [ ] District Court of    _Houston_ County
                       [ ] Juvenile Court of

**Trial Court Case Number** _CC-02-235-236_

**Notice of Appeal Date** _5-28-2003_

    I, _Carla H. Woodall_ , certify that I have this date completed and
filed with the clerk of the trial court an original and three copies of a true and correct transcript of all proceedings
in the above referenced case that were reported by me and were specifically designated by the appellant for
inclusion on the Reporter's Transcript Order.   The transcript, which is numbered serially in the upper right-hand
corner of each page, begins with a copy of the Reporter's Transcript Order and an index of both the exhibits and
the testimony of the witnesses.  The original transcript concludes with the original of this notice and the copies of
the transcript conclude with copies of this notice.  The page number appearing in the upper right-hand corner of
this certificate is the last page of my portion of the transcript in this case.

Done this the _15th_ day of _October_ , _2003_.

_Carla H. Woodall_
Court Reporter

**FILING AND SERVICE OF THIS FORM:**    Pursuant to Rule 11(b), A.R.App.P., the court reporter should file a copy of
this certificate with the Clerk of the Court of Criminal Appeals and should serve copies of the certificate on counsel
for the appellant or the appellant if he or she is not represented by appellate counsel, the attorney general and the
district attorney, unless the appeal is from a municipal appeal, in which event a copy of the form should be served on
the municipal prosecutor rather than the attorney general and district attorney.

| State of Alabama<br>Unified Judicial System<br><br>Form ARAP- 1C    8/91 | REPORTER'S TRANSCRIPT ORDER — CRIMINAL<br>See Rules 10(c) and 11(b) of the<br>Alabama Rules of Appellate Procedure (A.R. App.P.) | Criminal Appeal Number<br><br>02 - 1610 |

BE COMPLETED BY COUNSEL FOR THE APPELLANT OR BY THE APPELLANT IF NOT REPRESENTED AND FILED WITH THE WRITTEN NOTICE OF PEAL OR FILED WITHIN 7 DAYS AFTER ORAL NOTICE OF APPEAL IS GIVEN.

☒ ☒CIRCUIT COURT ☐ DISTRICT COURT ☐ JUVENILE COURT OF _____ HOUSTON _____ COUNT

_____ FREESHONE CORNELIUS MCLEOD _____ , Appellan

v.    ☒STATE OF ALABAMA    ☐ MUNICIPALITY OF _____

| Case Number<br>CC-2002 000235/CC-2002 000236 | Date of Judgment/Sentence/Order<br>5/28/03 | |
| Date of Notice of Appeal<br>Oral:  5/28/03    Written: | | Indigent Status Granted:<br>☒☒Yes    ☐No |

**PART 1. TO BE SIGNED IF THE APPEAL WILL NOT HAVE A COURT REPORTER'S TRANSCRIPT:**
I CERTIFY THAT NO REPORTER'S TRANSCRIPT IS EXPECTED AND THAT THE RECORD ON APPEAL SHALL CONSIST OF THE CLERK'S RECOF ONLY. IF THE APPEAL IS FROM DISTRICT COURT OR JUVENILE COURT, I ALSO CERTIFY (1) THAT A STIPULATION OF FACTS WILL BE INCLUDE IN THE CLERK'S RECORD AND THAT THE APPELLANT WAIVES HIS RIGHT TO A JURY TRIAL IF SO ENTITLED; OR (2) THAT THE PARTIES HAV STIPULATED THAT ONLY QUESTIONS OF LAW ARE INVOLVED AND THAT THE QUESTIONS WILL BE CERTIFIED BY THE JUVENILE/DISTRIC COURT FOR INCLUSION IN THE CLERK'S RECORD (SEE RULE 28(A)(1), ALABAMA RULES OF JUVENILE PROCEDURE, AND §12-12-72, CODE C ALABAMA 1975).

_____    _____    _____
Signature    Date    Print or Type Name

**PART 2. DESIGNATION OF PROCEEDINGS TO BE TRANSCRIBED.** Request is hereby made to the court reporter(s) indicated below for a transcript c the following proceedings in the above referenced case (see Rule 10(c)(2), Alabama Rules of Appellate Procedure (A.R.App.P.)):

**MARK PROCEEDINGS REQUESTED:**    **COURT REPORTER(S)**

A. ☒☒TRIAL PROCEEDINGS - Although this designation will include the judgment and sentence    Carla Woodall
proceedings, a transcript of the organization of the jury and arguments of counsel must    C/O Hon. Larry Anderson
be designated separately.    Dothan, AL 36302

B. ☒☒ORGANIZATION OF THE JURY - This designation will include voir dire examination and    Deborah C. Vann
challenges for cause. Note that in noncapital cases the voir dire of the jury will not be    C/O Hon. Denny Holloway
recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)    Dothan, AL 36302

C. ☒☒ARGUMENTS OF COUNSEL - Note that in noncapital cases the arguments of counsel will    _____
not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)    _____

IN ADDITION TO ANY PROCEEDINGS DESIGNATED ABOVE, SPECIAL REQUEST IS HEREBY MADE TO INCLUDE THE FOLLOWING PROCEEDINGS IN THE REPORTER'S TRANSCRIPT PORTION OF THE RECORD ON APPEAL. (ATTACH ADDITIONAL PAGES IF NECESSARY):

**ADDITIONAL PROCEEDINGS REQUESTED**    **DATE**    **COURT REPORTER(S)**

D. _____    _____    _____

E. _____    _____    _____

F. _____    _____    _____

G. _____    _____    _____

FILED

JUN 6  2003

Judy Byrd

JUDY BYRD, CLERK
HOUSTON

**IMPORTANT NOTICE:** The court reporter who reported the proceedings for which a transcript is requested must be identified on this form to b effective. Additionally, it is important to note that the appellant may not be permitted to raise any issue on appeal relating to any proceedings the case that are not specifically designated on this form for inclusion in the reporter's transcript. A general designation such as "all proceedings not sufficient. (See Rule 10(c)(2), A.R.App.P.)

**PART 3. MUST BE SIGNED IF THE APPEAL WILL HAVE A COURT REPORTER'S TRANSCRIPT:**
I CERTIFY THAT I HAVE DISTRIBUTED THIS FORM AS SET OUT BELOW. I ALSO CERTIFY (1) THAT I HAVE MADE SATISFACTORY FINANCIA ARRANGEMENTS WITH EACH COURT REPORTER LISTED ABOVE FOR PREPARING HIS OR HER PORTION OF THE REPORTER'S TRANSCRIF HEREIN REQUESTED; OR (2) THAT THE APPELLANT PROCEEDED AT TRIAL AS AN INDIGENT AND THAT THAT STATUS HAS NOT BEE REVOKED; OR, (3) THAT THE APPELLANT HAS BEEN GIVEN PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS.

Clark M. Parker    6/6/03    Clark M. Parker Attorney
Signature    Date    Print or Type Name

**DISTRIBUTION: Original filed with Clerk of Trial Court and copies mailed to:** (1) Clerk of the Court of Criminal Appeals. (2) the District Attorne (3) the Attorney General or the municipal prosecutor in lieu of the District Attorney and the Attorney General if the appeal is from municipal conviction and (4) to each Court Reporter who reported proceedings designated for inclusion in the reporter's transcrip

1                        **STATE OF ALABAMA**

2        **IN THE CIRCUIT COURT FOR THE COUNTY OF HOUSTON**

3              **TWENTIETH JUDICIAL CIRCUIT**

4                   **CRIMINAL**

5

6 **THE STATE OF ALABAMA,**

7          **PLAINTIFF,**

8 **VS.**                     **CASE NO. CC-02-235-236**

9 **FREESHONE McLEOD,**

10          **DEFENDANT.**

11   ————————————————————————/

12       **REPORTER'S OFFICIAL TRANSCRIPT ON APPEAL**

13 **BEFORE:**

14               **Hon. Brad Mendheim**

15                **Dothan, Alabama**

16                **May 28, 2003**

17 **APPEARANCES:**

18 **For the State:**

19 **Hon. Douglas Valeska**
   **District Attorney**
20 **Dothan, Alabama**

21

   **For the Defendant:**
22

23 **Hon. Thomas Brantley**
   **Attorney at Law**
   **Dothan, Alabama**
24

   **Deborah C. Vann, CSR, RPR, RMR**
25 **Official Court Reporter**

1

INDEX

2

3    REPORTER'S TRANSCRIPT ORDER            1

4    CAPTION                               2

5    INDEX                                 3

6    SENTENCING                            4

7    MOTION HEARING                        13

8

        DEFENDANT'S TESTAMENTARY EVIDENCE
9
    TANA COLEMAN
10        DIRECT BY MR. BRANTLEY            13
          CROSS BY MR. VALESKA             18
11        FURTHER CROSS BY MR. BRANTLEY    25

12
    RULING OF THE COURT                   34
13
    CERTIFICATE                           37
14
    REPORTER'S CERTIFICATE OF COMPLETION   39

15

16

17

18

19

20

21

22

23

24

25

4

PROCEEDINGS

THE COURT:  There is a motion for new trial.  Why don't we go ahead with the sentencing aspect first and then do the motion for new trial.  You don't expect that will take very long?

MR. BRANTLEY:  No, sir.  I didn't bring my file.  I will need to borrow the Court's copy if I could.

THE COURT:  Mr. Valeska, any problems with us going forward with the sentencing and/or the motion for new trial?

MR. VALESKA:  I'm trying a capital murder case.  I apologize to this Court.  I understand you are a different judge.  But it's a problem --

THE COURT:  If you-all want me to go forward, now is the time to tell me.

MR. BRANTLEY:  We probably ought to continue it because we probably need the affiant here to testify.

MR. VALESKA:  How about just after lunch if you are available.  I have got a capital case I'm trying with Brantley and there will be some

5

1    time, unless you are booked up, is what I'm

2    asking.

3         THE COURT:  I have got first appearances at

4    2.

5         MR. VALESKA:  I expect they are close to

6    being done on the capital case.  If we have any

7    witnesses they will be very short and we will go

8    straight to argument.   This won't be a three

9    hour argument.  If you could say 2:30 I think we

10    could do it then.

11         MR. BRANTLEY:  Considering the fact that my

12    motion for new trial is based on newly

13    discovered evidence -- I have got an

14    affidavit -- if Mr. Valeska won't object to me

15    getting the affidavit into evidence.

16         MR. VALESKA:  I'm not going to agree to

17    anything.

18         MR. BRANTLEY:  I will need time to subpoena

19    the witness.  I didn't do that because of the

20    capital murder case.

21         THE COURT:  Why don't we -- is there any

22    problem, say, at 4 o'clock doing this?

23         MR. BRANTLEY:  I'm still not going to have

24    my witness here.  I just need my witness here.

25         THE COURT:  We can issue an instanter now

6

1   for the witness if you will with Mrs. Byrd and

2   they can get out on the patrol car and if you

3   know where she is --

4       MR. BRANTLEY:  What time, Judge?

5       THE COURT:  Back here at 4 o'clock.  You-all

6   please -- I mean -- because, see, the problem I

7   run into, since I don't normally do these cases,

8   is if you-all get stuck with Judge White -- of

9   course, that case, I understand, is on-going and

10  takes precedence, but it's such a problem trying

11  to rearrange to get the court reporter and

12  courtroom.  That was the problem this morning,

13  no courtroom.

14      So we will just be back here at 4 o'clock in

15  this courtroom.

16      MR. VALESKA:  Thank you very much.

17      THE COURT:  If you need an instanter, get

18  Mrs. Byrd and we will issue them.

19          (Recess.)

20      THE COURT:  We are back where we left off

21  this morning, Freeshone McLeod.  He has been

22  charged with -- convicted of attempted rape and

23  attempted -- was it rape and attempted murder?

24      MR. BRANTLEY:  Rape one and attempted

25  murder.

THE COURT: And, Mr. Brantley, anything from the defense before sentencing?

MR. BRANTLEY: Yes, sir, Your Honor.

I would like to point out to this Court that Freeshone McLeod, when this crime was committed, he was not under the age of twenty-one, but he is a young man still. He has a lot to learn. I think socially he is probably, in my opinion, a lot younger than twenty-one. He needs to mature some. I don't think the fact he has been convicted of attempted murder and rape are attributed to meanness or pathology so much as they are just to immaturity. That doesn't lessen the impact on the victim, but I do think it explains and mitigates his role in society or his potential role in society.

I think he can be rehabilitated. I don't think he has to be locked up or incarcerated for years upon years upon years.

I would ask the Court, based on my observation of him and -- his criminal record is not substantial or significant. He does have some misdemeanor and youthful offender convictions, but he does not have, as we say in this profession, a rap sheet as long as your

1    arm.   That's not the case at all.

2        I do believe that he certainly has, as

3    evidenced by his family here today, tremendous

4    family support at home.   I think that's

5    important in the Court reaching any type of

6    decision on sentencing, on probation or even

7    parole, as far as that goes for with the Parole

8    Board.   He has tremendous family support.

9        He is probably socially immature.   And his

10   criminal record is not substantial and

11   significant.

12       And I would ask the Court to sentence him on

13   the lighter range of his ranges of sentence in

14   these two cases.

15       Thank you very much.

16       THE COURT:   Mr. Valeska.

17       MR. VALESKA:   If I could point out the

18   probation report by Rodney Peake, it says,

19   Freeshone McLeod's reputation in the community

20   is not good.   He has problems getting along with

21   fellow employees.   He has a reputation of being

22   capable of exhibiting violent behavior as can be

23   witnessed by the two previous assault

24   convictions that he has.   You see copies of the

25   convictions.

Once again, I want to offer those for purposes of this sentencing on these cases.

I would remind the Court the victim was seven years old in these cases. If you recall when the victim came to the witness stand, she had to use a crutch, the sound she made as she hobbled up to the witness stand.

She was asked the question about what Freeshone did to her, did he hit her in the head, and what the sound -- as I recall, she made the sound, it went boink.

Once again, attempted murder of a seven-year-old, plus the rape of a seven-year-old girl by this defendant, those are outrageous, wicked crimes against one facet of the community that can't protect itself, children, a seven-year-old little girl who lived down in Gordon.

Once again, we disagree with Mr. Brantley and ask you to sentence him to the maximum sentence of ninety-nine years on both cases and to make them consecutive in these cases and not run them CC, Your Honor.

If we don't protect children, we don't protect anyone. There is no worse crime. The

1    victim in this case, because of all she has been

2    through -- it might have been where she would

3    actually lost her life.  She has come a long

4    way.  You observed her and watched her testify.

5    What I mean by that, she paid a tremendous price

6    what this defendant did.  They now ask you to

7    give him some consideration in relationship to

8    the case, what happened in this case.

9         So we don't believe there is any gray area.

10   We think he deserves the maximum sentence

11   because she was seven years old, Judge Mendheim.

12         Thank you.

13         THE COURT:  Having heard the evidence in

14   this case, it's clearly a very brutal attack.

15   It was a disturbing case to hear.  I have been

16   involved in cases of this nature before and it

17   was a disturbing case, and simply but for the

18   grace of God it wasn't a capital murder case.

19         With that, on CC-02-236, the attempted

20   murder case, I set punishment at ninety-nine

21   years in the state penitentiary, twenty thousand

22   dollar fine, five thousand dollars to the

23   Victim's Compensation Fund, plus costs.

24         On CC 200-2235, the rape in the first

25   degree case, I set that punishment at

1    ninety-nine years in the state penitentiary, a

2    twenty thousand dollar fine, five thousand

3    dollars to the Victim's Compensation Fund, plus

4    costs.

5        MR. BRANTLEY:  Your Honor, we would move

6    those two sentences be run concurrently.  They

7    both happened as part of the same res gestae,

8    and I would ask that you run those concurrently.

9        MR. VALESKA:  Can we approach the bench one

10    second, Mr. Brantley and I?

11            (Whereupon, bench conference was held,

12            following which the following

13            occurred:)

14        THE COURT:  Mr. McLeod, let me back up.

15    Is there anything that you want to say

16    separate and apart from what your attorney

17    said?

18        THE DEFENDANT:  No, sir.

19        THE COURT:  With that, again, I do set

20    punishment on CC-02-236 at ninety-nine years,

21    twenty thousand dollar fine, five thousand

22    dollars Victim's Compensation Fund assessment,

23    plus costs.

24        And on CC-02-236, I, again, set punishment

25    at ninety-nine years in the state penitentiary,

1  twenty thousand dollar fine, five thousand

2  dollars to the Victim's Compensation Fund

3  assessment, plus costs.

4       Also, I'm going to deny the motion that

5  they run concurrent.

6       MR. VALESKA:  Thank you, Judge.

7       MR. BRANTLEY:  Also, I have a pending motion

8  for new trial based on

9  newly-discoveredevidence.  I'd like permission

10  to put on a witness pursuant to that motion.

11       THE COURT:  Okay.  You-all are ready to go

12  forward on the motion?

13       MR. BRANTLEY:  Yes, sir, we are.

14       THE COURT:  Is the State ready to go forward

15  on the motion for new trial?

16       MR. VALESKA:  We called for some witnesses.

17  They have not gotten here yet.  We changed the

18  time.  If could I read the affidavit for one

19  second, Judge Mendheim, please.  I apologize to

20  the Court.

21       THE COURT:  I haven't read the motion

22  either, so I'm going to take a moment to read

23  it.

24            (Brief interruption.)

25       MR. VALESKA:  I read the affidavit.  If they

13

1    have a witness, I wouldn't agree to the

2    affidavit.  If they have a live witness I can go

3    forward.

4         THE COURT:  With that said, are you ready to

5    go forward?

6         MR. BRANTLEY:  Is Tana Coleman here?  Miss

7    Coleman, would you take the stand up here,

8    please?

9                    TANA COLEMAN

10        The witness, having first been duly sworn to

11   speak the truth, the whole truth and nothing but the

12   truth, testified as follows:

13                  DIRECT EXAMINATION

14   BY MR. BRANTLEY:

15   Q.   You are Tana Coleman?  You spell your name

16        T-A-N-A?

17   A.   T-A-N-A; that's correct.

18   Q.   That's your first name.  C-O-L-E-M-A-N.

19        How old are you?

20   A.   I'm twenty -- it's not a good day for me.

21   Q.   You are what now?

22   A.   Twenty.

23   Q.   You are twenty.  What's your date of birth?

24   A.   8/17/82.

25   Q.   Where do you live right now?

```
 1    A.   1291-C East Andrews Avenue, Ozark, Alabama.
 2    Q.   Do you know Denitha Jones?
 3    A.   Yes.
 4    Q.   Who is Denitha Jones?
 5    A.   Denitha used to be one of my best friends.  I
 6         used to live with her.
 7              Go ahead or just --
 8    Q.   Let me ask you this:  How long have you known
 9         Denitha Jones?
10    A.   Since 1998.
11    Q.   And how do you know her?  Did you live with her?
12    A.   Yes.  I stayed with her.  She was first staying
13         at Ozark --
14    Q.   Where did you-all live?  In apartments or what?
15    A.   Ozark Heights is where we stayed.
16    Q.   Did you live in Ozark Heights with her?
17    A.   Yes.
18    Q.   Were you-all roommates?
19    A.   Yes.  We were both roommates, but they were both
20         staying with somebody else at the time.
21    Q.   Okay.  And did you ever -- did you continue to
22         maintain a relationship, a friendship with Miss
23         Denitha Jones when she moved to Gordon,
24         Alabama?
25    A.   Yes, I moved with her.
```

15

```
 1    Q.   Did you move in down in Gordon with her?

 2    A.   Yes.

 3    Q.   Did she have a young child?

 4    A.   She had both of her kids.

 5    Q.   What were her kids' names when she moved down to

 6         Gordon?

 7    A.   Jonteria and Marquita.

 8    Q.   Jonteria is the victim here today?

 9    A.   Yes.

10    Q.   How old was Jonteria when she moved down there

11         to Gordon?

12    A.   She was about five maybe.  I can't remember.

13         It's been so long.  I just -- she was -- she was

14         like a lot smaller than she is now.

15    Q.   Now, you recall that this incident, this

16         attempted rape, attempted murder and rape,

17         allegedly happened down there at Gordon.  Are

18         you aware of that?

19    A.   Yes.

20    Q.   Now, when did you begin living -- did you begin

21         living with Denitha and Jonteria in Gordon in

22         the same house that they were in?

23    A.   The same house that they were in.

24    Q.   In Gordon?

25    A.   Well, I don't know if she is staying in the same
```

1       place now, you know, or whatever, but I know

2       that when I stayed in Gordon, she stayed in the

3       trailer and it was run down.

4   Q.  Did you ever visit her in her trailer?

5   A.  I lived with her in her trailer.

6   Q.  You lived with her?

7   A.  Yes.

8   Q.  Let's go back.

9       When did you start living with her down at

10      Gordon in her own trailer?

11  A.  Once we moved -- when I met her in '98, when we

12      were staying in Ozark Heights, we moved directly

13      from Ozark Heights to Gordon.

14  Q.  Would it be safe to say you moved down there in

15      1998 with her?

16  A.  Yes.

17  Q.  Then when did you quit living with her?

18  A.  Close to the -- like close to the end of '99.

19  Q.  Now, would you tell us, during the time you

20      lived with Denitha and her little girl Jonteria

21      down in Gordon in that trailer, what did you

22      observe, if anything, about the underwear that

23      little Jonteria would wear with regards to the

24      way the underwear was cleaned and things like

25      that?

A.   The underwear was not clean.  All the stuff that
     she had in her house was dirty.  The clothes
     that she had in her house was dirty.  It was
     like you walk in and it's like clothes all over
     the floor.  I mean, her clothes, she would use
     dirty clothes and just pile them up in closets
     and on the floor.  And they be mixed all in
     together, her clothes and her daughter clothes.

Q.   When you say her daughter's clothes, talking
     about Jonteria's clothes?

A.   Yes.

Q.   Did you ever see her underwear, like panties?

A.   They were dirty, too.  Like if she -- I don't
     mean to be, you know, interrupting, but like say
     she just take off her underwear or whatever and
     throw them in the pile and then a couple of days
     or so later, she just goes over in a pile, and
     like if her daughter has to go somewhere, she
     like grab a pair of underwear out of the pile
     and roll them up and put them on her and they be
     her underwear.

Q.   You observed -- you are telling us that you
     observed Denitha Jones take dirty underwear of
     her own and put it on her child, Jonteria
     Jones?

1 A. Yes.  She would not have -- Jonteria hardly ever

2   wore her own underwear.  She basically wore her

3   mom's underwear, whatever she could just get out

4   of the pile.  She didn't have a washing machine.

5 Q. She wore, from time to time, dirty underwear

6   that was her mother's?

7 A. Yes.

8 Q. Now, how often did you observe Denitha wash

9   clothes in that trailer down there where you

10   lived at with her?

11 A. Not once a month if even.

12 Q. Where did she wash her clothes at?

13 A. She washed them by hand if she could, but she

14   would take them like either to her sister's

15   house every once in a while or somewhere like

16   that and wash clothes.

17 Q. Okay.

18     MR. BRANTLEY:  Your witness.

19       CROSS-EXAMINATION

20  BY MR. VALESKA:

21 Q. Can you tell Judge Mendheim, please, ma'am,

22   while you were living in Ozark with her, is it

23   not true that Mrs. Jones -- that she lost

24   custody of Jonteria while she was in Ozark?

25 A. Yes, it is.

1    Q.  In other words, it's true that Jonteria's mother

2         also had a son; correct?

3    A.  Had a what?

4    Q.  Jonteria had a brother?

5    A.  No, Jonteria had a sister.

6    Q.  Did Jonteria -- did she break her leg in Ozark?

7         Do you remember that?

8    A.  Yes.  She was playing outside unsupervised and

9         she fell off like a -- it's not -- it's like a

10       little thing that goes around and around and

11       they climb up and down.

12          MR. BRANTLEY:  Sliding board?

13          MR. VALESKA:  Mr. Brantley doesn't get to

14       testify.

15          MR. BRANTLEY:  I apologize.

16          THE COURT:  I'm listening to what she said.

17    Q.  It's true, in other words, that Mary Wesley is

18       the one who had custody of Jonteria

19       Jones; correct?  Do you know that?

20    A.  I do not know who had custody.  Denitha kept the

21       kids constantly.  The only time her mother kept

22       the kids is she would be so drunk and somebody

23       would have to call her momma to come get them.

24    Q.  In 1999, that's the last time, tell Judge

25       Mendheim, that you lived with Jonteria's

1     mother; correct?

2  A.  Yes.

3  Q.  So in 2000 you weren't living with her; right?

4  A.  In 2000?

5  Q.  Yes.  You weren't living with her?

6  A.  I moved back.  What happened is --

7  Q.  The question was:  In 2000, did you live with

8     Jonteria Jones' mother?  Yes or no.

9  A.  I left and came back.

10  Q.  When?

11  A.  It was in 2000 when I came back.

12  Q.  You told Mr. Brantley that you left at the

13     close of '99 and you moved out is what you said;

14     right?

15  A.  That was in Gordon.  She left there and moved to

16     --

17  Q.  Just answer my questions.

18       MR. VALESKA:  Would you instruct her to

19    answer my questions?

20       THE COURT:  If you would, just answer what

21    the lawyers ask.  If anyone needs to follow up

22    and let you explain something, he will do that.

23    Try to answer whatever is being asked.

24  Q.  You told Mr. Brantley at the close of '99 you

25     moved out of Gordon and you were not living with

```
 1            Jonteria Jones' mother; correct?
 2    A.    Yes.
 3    Q.    Now it's your testimony you moved back in 2000?
 4    A.    Yes.
 5    Q.    When in 2000 did you move back?  Give me a
 6          timeframe.
 7    A.    I moved back in 2000 when she stayed in Ozark
 8          Village.
 9    Q.    When they stayed in Ozark Village.  Is that
10          Jonteria and her mother?
11    A.    And Freeshone.
12    Q.    So you were living where in 2001 while they were
13          living in Ozark?
14    A.    I was staying in my own place then.
15    Q.    Where, ma'am?  What town?
16    A.    In Ozark.  I'm from Ozark.
17    Q.    How long did you continue to live there in Ozark
18          in 2000?
19    A.    That's my hometown, so I was there.
20    Q.    Never moved; is that fair to say?
21    A.    In 2000 I never moved out of Ozark, yes, that's
22          correct.
23    Q.    Did you ever move to Gordon?
24    A.    I moved to Gordon before I came back to Ozark.
25    Q.    Give me the timeframe.
```

22

```
 1    A.   In '98 I moved to Gordon.  Then in -- I came
 2         back almost close to the end of '99 back to
 3         Ozark.  Then she moved, her and Freeshone moved
 4         to Ozark and I moved in with them.
 5    Q.   My question is:  When did they move out of
 6         Ozark, ma'am -- tell Judge Mendheim -- move to
 7         Gordon, Freeshone and Jonteria Jones and her
 8         mother?  When was that?
 9    A.   I wasn't with them when they moved to Gordon.
10    Q.   That's what I want to ask you about.  Tell us
11         when they moved to Gordon.  Tell Judge Mendheim
12         when that was.
13    A.   I wasn't staying with them when they moved to
14         Gordon.
15    Q.   Give me the timeframe when they left Ozark and
16         moved to Gordon.  Can you tell me?
17    A.   No, I cannot because I was not there.
18    Q.   My question to you, ma'am:  On May 6th of
19         2001 -- excuse me -- October the 6th of 2001,
20         you were not living with them; correct?
21    A.   In 2001?
22    Q.   With Freeshone and Jonteria and her mother?
23    A.   No.
24    Q.   So where did they live then?  Is it Gordon?
25    A.   In 2001, no.
```

1  Q.  Yes.

2  A.  I don't know where they were in 2000.  I was not

3     with them.

4  Q.  Could you tell Judge Mendheim what was taking

5     place in September, October or November, 2001,

6     in relationship to the clothes being washed or

7     handled by anybody?  You didn't see that?

8  A.  In 2001 I cannot, you know, only for when I was

9     staying there.  I can vouch for when I was

10    staying there.  I cannot say anything other than

11    that.

12 Q.  Now, tell me, please, ma'am, when you first

13    became aware Freeshone had been convicted of

14    rape and attempted murder?  When did you become

15    aware of that?

16 A.  I heard it on TV.

17 Q.  When the trial was going on?

18 A.  Yes.

19 Q.  You knew that you had seen her with the clothes,

20    according to what you have said, underwear, you

21    knew that then?

22 A.  Yes, but I didn't know how to, you know --

23 Q.  You know Freeshone's family, don't you?

24 A.  Yes, I do.

25 Q.  Where were they living when you were living in

24

```
 1          Ozark when you heard about the trial?
 2    A.    They were living in Ozark.  I was not in Ozark
 3          whenever I heard about the trial.
 4    Q.    Where were you?
 5    A.    I was in Barbour County.
 6    Q.    Where in Barbour County?
 7    A.    In Clayton.
 8    Q.    House, trailer, where were you living in
 9          Clayton?
10    A.    In an apartment.
11    Q.    What was the name of it, please, ma'am?
12    A.    I don't know the apartment -- I don't know the
13          name of the apartments.  It's like some little
14          housing apartments.
15    Q.    Do you still live there?
16    A.    No.
17    Q.    Where did you move?
18    A.    Back to Ozark.
19    Q.    Do you know Mary Wesley?  You do, don't you?
20    A.    That's her mother.
21    Q.    You know Mary Wesley got custody of Jonteria
22          Jones; correct?
23    A.    Yes, I do.
24    Q.    And even today she still has custody of Jonteria
25          Jones; correct?
```

1    A.    I don't know.

2    Q.    Do you know Jonteria's grandmother that lives in

3          Gordon?  Do you know her name?

4    A.    No.  Her grandmother -- Tune's (phonetic) mother

5          is the only person I knew, her and her brother.

6          That was the only person that was there when I

7          was staying in Gordon.

8    Q.    Mary Wesley is Jonteria's mother's sister, isn't

9          she?

10   A.    Jonteria.

11         MR. VALESKA:  That's all.  Thank you, ma'am.

12                   FURTHER CROSS-EXAMINATION

13   BY MR. BRANTLEY:

14   Q.    First time you ever came to me and told me this

15         information, was that after you heard about it

16         on TV?

17   A.    Yes.

18   Q.    Prior to that time, had you ever talked with me?

19   A.    No.

20         MR. BRANTLEY:  That's all I have, Judge.

21         MR. VALESKA:  No more questions.

22         THE COURT:  That's it, ma'am.  You may step

23   down.

24         Anything else from the defense?

25         MR. BRANTLEY:  No, sir.  Could I be heard

1    briefly to argue?

2         THE COURT:  Let me see.  By way of evidence,

3    any response from the State?

4         MR. VALESKA:  We rest.

5         THE COURT:  Okay.  Go ahead.

6         MR. BRANTLEY:  Even though Miss Coleman

7    never observed what the laundry habits or

8    clothing habits were of Mrs. Denitha Jones in

9    the months immediately preceding this attempted

10   murder and rape, that would be a stronger case

11   for us.

12        But I do think it's a jury question.  If we

13   have a witness that we really had no way of

14   knowing about prior to this incident, we didn't

15   even know that was an issue about the laundry,

16   about the piling the clothes up, dressing the

17   little baby, the child, in dirty clothes.

18        What we would argue, what was an issue at

19   trial, was DNA evidence, in fact, semen evidence

20   on a pair of panties that this child had on.

21   That semen or DNA came from this defendant.  In

22   fact, one of our allegations, one of our

23   averments was going to be, our defense, was that

24   he had sex with this child's mother but not this

25   child.

Now, I think the jury needs to hear that the mother put her underwear on this child from time to time even if it was a year before. We can argue that she never broke that habit. And I think the jury needs to hear that or that custom. I think the mother of Jonteria, Denitha Jones, will admit she had sex with the defendant.

If we can then tell the jury -- let the jury know that the mother would take her own dirty underwear off, arguably with semen from time to time, and put it on the floor and not wash it, pick it back up.

MR. VALESKA: I object. There is no evidence of that. I object. He is just arguing something to you. He has the burden on his motion for new trial, in other words, to just what he argued. He would expect she would say that if we put her on the stand.

This is a motion for new trial. The burden is on him, Judge Mendheim.

THE COURT: On that point, what I'm -- the issue seems to be -- it's been a couple of months since we had all the evidence. If I'm not mistaken, the underwear was clearly not an

adult female underwear.

So I would tend to give you a little more credit, if that's the right term to use, if it was adult's.  It was a small child we had.  I forget her exact age when this happened, maybe five or six.  The underwear was clearly not something that a grown woman could have worn.

MR. BRANTLEY:  I beg to differ with the Court.

THE COURT:  If you want to address that.

MR. BRANTLEY:  I don't think the underwear, quote, was clearly not a size underwear that a five-year-old child would not wear.  I beg to differ.  I saw it.  I held it up with rubber gloves and showed it to the jury.

Now, obviously the jury convicted him.  The question becomes, did the jury believe it was not a size that a five-year-old child would wear or did they believe there is no way the semen could have gotten on there unless the child did not have it on?

What we are saying is they are saying the child had it on.  We are saying the mother wore it, too.  Obviously the child -- the jury never believed the mother wore it.

1   What we are saying is we have got a witness
2   here who will testify that we knew nothing about
3   it before trial, that the mother used to put her
4   own underwear on the child when it was dirty.  I
5   think the jury needs to know that.

6   I think that could make the difference on
7   the rape case with regards to arguably a
8   conviction or not a conviction.  We ask we get a
9   new trial based on this newly-discovered
10  evidence.

11  Thank you.

12  MR. VALESKA:  That's absolutely ludicrous.
13  What occurred, Judge Mendheim, is, the testimony
14  on the motion for new trial, their witness lived
15  with Freeshone and the victim's mother.  It's
16  not newly-discovered when this defendant, who
17  was in court when this case was tried, in other
18  words, was aware in the past who had lived with
19  him and the family.

20  Mr. Brantley just argued that, once again,
21  this defendant, who was in the courtroom, that
22  they would have known that he had sexual
23  intercourse with Jonteria's mother.  That's not
24  newly-discovered evidence in relationship to the
25  panties.

1    Mr. Brantley asked questions.  And the Court

2    will remember, the testimony was, Mary Wesley

3    testified, Judge Mendheim, that she had custody

4    of Jonteria.  At no time were her clothes, the

5    underwear she wore, ever mixed up with any

6    adults in any manner or fashion and the

7    underwear that Jonteria Jones, the victim, wore

8    in this case.  So there could be no mixing up of

9    underwear.

10    What they are asking you to do is consider

11    something that happened a year or two ago before

12    this case, from the testimony of this witness,

13    who admits she is completely biased because she

14    is friends with the defendant and the family.

15    She was aware of the trial taking place.  She

16    knew the family.

17    This is not newly-discovered evidence.

18    Second, second, whether this evidence would

19    change the outcome of the trial, Mr. Brantley

20    says he wants the jury -- they think they should

21    have heard that, it would change the evidence.

22    They argued those things to the jury in relation

23    to the underwear, the semen could have come from

24    another source, could have gotten mixed up with

25    the clothes.

31

1        That was already presented to the jury so

2   it's not newly-discovered evidence now in this

3   case, wholeheartedly.

4        Once again, the defendant sat there in this

5   trial, Judge Mendeim.  He knew beyond all doubt,

6   one hundred percent, who he was having a sexual

7   relationship with during the time, i.e. the

8   victim's mother.

9        But the Court will remember, Mary Wesley had

10  custody.  We impeached their witness they put on

11  for motion for new trial, that Mary Wesley is

12  the one who had custody, not Jonteria Jones.

13       If you recall the testimony of the trial,

14  the trailer, there was no washer and dryer in

15  the trailer.  So, i.e., how did these clothes

16  the defense now wants to come, would have gotten

17  mixed up on the 6th of October of 2001 or the

18  7th, or going back in to August or September of

19  2001?  How conveniently that the semen that

20  matched up with the DNA from the defendant would

21  have gotten on the panties that this little

22  girl, Jonteria Jones, if she was seven at the

23  time.

24       I think the Court will recall the testimony

25  further from the experts in this case, the

doctors.  It was consistent, the injuries that
she had, that was sexual trauma, sexual
intercourse.  Mr. Brantley argued, if the Court
will remember, she could have gotten those
injuries by a stick, hole through the panties
when she was thrown through the woods or the
bushes.  There were no tears.  There was
testimony from Dr. Sullivan, as I recall,
consistent with a male penis, some kind of blunt
force trauma, in relationship to the evidence.
You remember how he described the hymen in
relationship to an injury.  He said it was not
consistent with a stick, something in the woods
or weeds where she was thrown because there
would be injuries, if you recall, on the outside
in relationship to going inside of the vaginal
canal where the hymen was on the labia.

Once again, it's clear this motion for new
trial should be denied based on the evidence.
It wouldn't change the outcome of the trial.
It's not newly-discovered in relationship they
had knowledge of all this.  The defendant knew
who he was having sexual intercourse with.  They
asked these questions.  It was submitted to the
jury wholeheartedly.  They denied and convicted

the defendant on both cases.

You should deny the motion for new trial.

MR. BRANTLEY:  The piece of evidence we have now through this witness, of course, is that we have an eye witness to a habit, to a custom, to a practice of Denitha Jones putting her own underwear, after it was dirty, laying on the floor for several days, arguably with semen stains on it from this defendant, putting that on Jonteria.  If that happened, and this witness, we argue, will testify that there was a custom, a practice, design where the mother did that.  If that did happen, then that would explain how the semen got on the panties that were taken off of Jonteria, not because he had sex with her, but because he had sex with her mother.

That's just a jury question.  I think it's such a critical piece of evidence in the rape case that the jury needs to hear that.  And we had no idea that that witness existed, none whatsoever.  We didn't even know that was going to be an issue about the mother putting her dirty clothes on the child.

MR. VALESKA:  The defendant knew, Your

Honor.

And, second, they still want to argue the junk that she had underwear that had semen. There is no evidence before you that they have put to you on their motion for new trial to make this hurdle. They put a witness up and said, oh, I watched her put on underwear, dirty underwear, the same underwear. There is still no evidence for the motion for new trial that those underwear in the past had semen.

Once again, this defendant knew of that person. They had lived together. So they failed and we ask you to deny it.

THE COURT:  I'm going to deny the motion.  I think -- I'm not going to try and go through this and outline the whole trial off the top of my head.  But the evidence was clear and convincing and overwhelming.  And with what she testified to is just too vague and it's just not tied up well enough to, in my judgment, change, with all the other evidence, when considering the totality of everything the jury heard, the medical testimony, the DNA testimony, the defendant's behavior and statements to the investigators when they came down there after

35

1  this happened, his behavior to other people

2  after the event, and based on what this witness

3  said, it's not going to come anywhere close to

4  overcoming any of the other evidence.

5        The second thing, from what I have heard,

6  it does seem like that the defendant himself

7  should have known that this -- known of this

8  witness.  I can understand the lawyers not

9  knowing, but clearly the defendant knew about

10 her and should have made that available to his

11 attorneys.

12       So I'm going to deny the motion for new

13 trial.

14       THE DEFENDANT:  Excuse me, Your Honor.

15       THE COURT:  Speak to Mr. Brantley first.

16       MR. BRANTLEY:  Judge, Mr. McLeod asked me to

17 give oral notice of appeal.

18       THE COURT:  Okay.

19       MR. BRANTLEY:  And if the Court would

20 appoint him a new lawyer for his appeal

21 purposes.  I believe there is an affidavit of

22 indigency on file.

23       THE COURT:  You want to withdraw; is that

24 right?

25       MR. BRANTLEY:  Yes, sir.

1          THE COURT:  With that, I will do that, and I
2    will appoint a new attorney.  And he is in
3    custody.
4          MR. BRANTLEY:  If I could approach the
5    bench.
6                   (END OF PROCEEDINGS)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# CERTIFICATE

## STATE OF ALABAMA
## COUNTY OF HOUSTON

I, Deborah C. Vann, Official Court Reporter for the 20th Judicial Circuit of Alabama and Notary Public at Large, do hereby certify that I have correctly reported in stenotype the proceedings in the above entitled cause, and that I later reduced my stenotype notes into typewriting, and that the foregoing pages, beginning with the word "Proceedings," where the same appears in the center of the page, contain a true and correct transcription of the evidence, including objections, oral rulings of the Court and the oral charge of the Court, where applicable, as therein set out.

I further certify that I have filed all exhibits offered in the trial of this cause with the Clerk of the Court of Criminal Appeals for incorporation into the Record.

I further certify that I have, on this date, filed with the Clerk of the Court of Criminal Appeals of Alabama and the parties here

1 involved a Certificate of Completion of

2 Reporter's Transcript.  And I further certify

3 that I have filed an original and three copies

4 of this transcript in the office of the Clerk of

5 the Circuit Court of Houston County, Houston

6 County Courthouse, Dothan, Alabama.

7    This the 9th day of September, 2003.

8

9

10

11

12

13    Deborah C. Vann, CSR, RPR, RMR
    Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

| State of Alabama<br>Unified Judicial System<br><br>Form ARAP 13 | CERTIFICATE OF COMPLETION<br>REPORTER'S TRANSCRIPT | Page Number<br><br>39 |
|---|---|---|

**TO:** The Clerk of the Court of Criminal Appeals    Fax: (334) 242-4689
P. O. Box 301555
Montgomery, Alabama 36130-1555

**Criminal Appeals Case Number**     CR _02_ - _1610_

_Freeshone C. McLeod_ _____ v. _State of Alabama_ _____

**Appellant's Name**                        **Appellee**

On appeal from the: [X] Circuit Court of

[ ] District Court of ⎤  _Houston_ County

[ ] Juvenile Court of ⎦

**Trial Court Case Number** ___CC-02-235-236___

**Notice of Appeal Date** _5/28/03_ _____

I, _Debbie Vann_ _____, certify that I have this date completed and filed with the clerk of the trial court an original and three copies of a true and correct transcript of all proceedings in the above referenced case that were reported by me and were specifically designated by the appellant for inclusion on the Reporter's Transcript Order.  The transcript, which is numbered serially in the upper right-hand corner of each page, begins with a copy of the Reporter's Transcript Order and an index of both the exhibits and the testimony of the witnesses. The original transcript concludes with the original of this notice and the copies of the transcript conclude with copies of this notice. The page number appearing in the upper right-hand corner of this certificate is the last page of my portion of the transcript in this case.

Done this the _9th_ day of _September_ , _2003_

_____
Court Reporter

---

**FILING AND SERVICE OF THIS FORM:**    Pursuant to Rule 11(b), A.R.App.P., the court reporter should file a copy of this certificate with the Clerk of the Court of Criminal Appeals and should serve copies of the certificate on counsel for the appellant or the appellant if he or she is not represented by appellate counsel, the attorney general and the district attorney, unless the appeal is from a municipal appeal, in which event a copy of the form should be served on the municipal prosecutor rather than the attorney general and district attorney.

AP 14-3 Certificate of Completion and Transmittal of Record on Appeal by Trial Clerk

## CERTIFICATE OF COMPLETION AND TRANSMITTAL
## OF RECORD ON APPEAL BY TRIAL CLERK

Total # of Pages

872

Freeshone Cornelius McLeod
 Appellant

V.

 State of Alabama
 Appellee

TO: The Clerk of the Court of
 Criminal Appeals of Alabama

Case No. ___CC-2002-235 & 236___

Date of Notice of Appeal ___5-28-03___

I certify that I have this date completed and transmitted herewith to the appellate court the record on appeal by

assembling __Total 685__ pages of the Clerk's record, and __186__ pages of

the Court Reporter's transcript, and that one copy of each of the record on appeal
has been served on the defendant and the Attorney General of the State of Alabama for the preparation of briefs.

I certify that a copy of this certificate has this date been served on counsel for each party to the appeal.

DATED this __13th__ day of __November__ , __2003__ .

_Judy Beyard_
 Circuit Clerk

__Houston__
 County

*CR 02-1610*

**DOCUMENT NAME:** McLeod, Freeshone Cornelius

**CLIENT & MATTER:** 54599-001

*Part 9 of 9*

**DESCRIPTION:**

County: Houston

CC#s: 2002 ~~235~~ -235+236

Attorney: Beth Poe

Circle: (TRANSCRIPT)    CASE FILE    BOTH    5 vol.

MMV

## CERTIFICATION

I hereby certify that the preceding imaged records and documents

are a true, accurate, and complete image of the original records or

documents as received by the Office of the Attorney General of

the State of Alabama.

This the 21st day of September, 2004.

Signed: *Melisa A. Martin*

Notary: *Coleen F Gibson*

Coleen F. Gibson
Notary Public
Commission expires 06/11/06