*In the COURT of CRIMINAL APPEALS*
*of ALABAMA*

———————————————— ◆ ————————————————

FREESHONE MCLEOD,

4Appellant,

v.

STATE OF ALABAMA,

Appellee.

———————————————— ◆ ————————————————

*On Appeal From the Circuit Court*
*of Houston County*
*(CC-02-235; 02-236)*

═══════════════════════════════════════

## BRIEF OF APPELLEE

William H. Pryor Jr.
Attorney General

Beth Slate Poe
Assistant Attorney General
Counsel of Record*

State of Alabama
Office of the Attorney General
11 South Union Street
Montgomery, Alabama  36130-0152
(334) 242-7401, 242-7300*

February 17, 2004



EXHIBIT
C

## STATEMENT REGARDING ORAL ARGUMENT

The State of Alabama does not request oral argument.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT........................ i

TABLE OF CONTENTS....................................... ii

TABLE OF AUTHORITIES................................... iii

STATEMENT OF THE CASE................................... 1

ISSUES PRESENTED FOR REVIEW............................. 2

STATEMENT OF THE FACTS................................. 3

STANDARD OF REVIEW.................................... 14

SUMMARY OF THE ARGUMENT............................... 14

ARGUMENT............................................. 17

   I.  McLeod Has Failed To Prove That The Trial Court's
   Summary Disposition Of His Motion For New Trial Was An
   Abuse Of Discretion. ................................ 17

      a.  Factors one and four............................ 20

      b. Factors two, three, and five...................... 22

   II.  The Trial Court Properly Sustained The State's
   Objection To McLeod's Attempt To Question The Minor
   Victim's Mother Regarding Custody Of The Child. ........ 24

   III.  The Evidence Was Sufficient To Sustain The
   Jury's Verdict. ..................................... 29

   IV.  The Evidence Was Sufficient To Sustain McLeod's
   Conviction Of Rape In The First Degree. ............... 34

CONCLUSION........................................... 38

CERTIFICATE OF SERVICE................................. 39

## TABLE OF AUTHORITIES

**Cases**

Moran v. State, 649 So. 2d 1292 (Ala. Crim. App. 1993)... 19

Beckley v. State, 353 So. 2d 542 (Ala. Crim. App. 1977).. 35

Bush v. State, 695 So. 2d 70 (Ala. Crim. App. 1995)...... 31

Cavender v. State, 629 So. 2d 721 (Ala. Crim.
  App. 1993)............................................ 24

Chaney v. State, 417 So. 2d 625 (Ala. Crim. App. 1982)... 31

Ex parte Griffin, 790 So. 2d 351 (Ala. 2000)............ 29

Ex parte Heaton, 542 So. 2d 931 (Ala. 1989)............. 18

Ex parte Scales, 581 So. 2d 1192 (Ala. 1991)............ 38

Ex parte Swain, 629 So. 2d 699 (Ala. 1993).............. 35

Ex parte Walker, 623 So. 2d 281 (Ala. 1992)............. 25

Freeman v. State, 555 So. 2d 196 (Ala. Crim.
  App. 1988)........................................... 35

Jackson v. State, 471 So. 2d 516 (Ala. Crim.
  App. 1985)........................................... 35

Lee v. State, 586 So. 2d 264 (Ala. Crim. App. 1991)...... 30

McNabb v. State, 2001 WL 1299193 (Ala. Crim. App.
  Oct. 26, 2001)....................................... 31

Snyder v State, 683 So. 2d 45 (Ala. Crim. App. 1996)..... 19

Sullivan v. State, 48 Ala. App. 347, 264 So. 2d
  576 (1972)........................................... 30

Synder v. State, 2003 WL 22463403 (Ala. Crim. App.,
  Oct. 31, 2003)....................................... 26

Turner v. State, 2002 WL 3629839 (Ala. Crim. App.,
  Aug. 29, 2003)........................................ 36

White v. State, 546 So. 2d 1014 (Ala. Crim. App. 1989)... 33

## STATEMENT OF THE CASE

This is an appeal from a conviction in the Circuit Court of Houston County Alabama of first degree rape and attempted murder (CC-02-235 and CC-02-236). Judge Brad Mendheim presided.

Freeshone Cornelius McLeod, alias "Freek Nasty", the appellant in this case, was indicted by a Houston County Grand Jury on January 31, 2002 and charged with first degree rape in violation of Section 13A-6-61 of the Code of Alabama (1975) (CC-02-235) and with attempted murder in violation of Sections 13A-6-2 and 13A-4-2 of the Code of Alabama (1975). (C. 13-16, 57) On March 4, 2002, McLeod waived arraignment. (C. 1, 7)

McLeod's trial commenced on April, 2003, at which time he was represented by the Honorable Thomas K. Brantley. (R. 2, 3) The jury returned a verdict finding him guilty of first degree rape and attempted murder. (C. 4, 10) On May 28, 2003, McLeod was sentenced to ninety-nine years' imprisonment on both charges. (C. 4-5, 10-11) Both sentences were ordered to run consecutively. (C. 6, 11) McLeod was also fined $20,000 and ordered to pay court

costs and a Victim Compensation Assessment of $5,000. (C. 5, 11)

McLeod filed a motion for new trial on May 15, 2003 (C. 68-69), which the trial court denied on that same date. (C. 11) On May 15, 2003, Mr. Brantley was allowed to withdraw as counsel and the Honorable C. Parker was appointed to represent McLeod on appeal. (C. 11)

## ISSUES PRESENTED FOR REVIEW

1. Did McLeod fail to prove that the trial court's summary disposition of his motion for new trial was an abuse of discretion?

2. Did the trial court properly sustain the State's objection to McLeod's attempt to question the minor victim's mother regarding custody of the child?

3. Was the evidence sufficient to sustain the jury's verdict finding McLeod guilty of attempted murder?

4. Was the evidence sufficient to sustain the jury's verdict finding McLeod guilty of first degree rape?

## STATEMENT OF THE FACTS

On October 6, 2001, six-year-old[1] Jonteria Jones was living with her aunt, Mary Wesley, who was her guardian, and four other children: "Digger", "Marqeeta", "KiKi", and Tylena Wesley. (R. 9, 128, 352) Ms. Wesley's mother, Mary Lizzie Jones kept Jonteria while Ms. Wesley worked. (R. 129) Jonteria's mother, Dinthea Jones was living in a trailer nearby with the defendant, Freeshone McLeod. (R. 111) Jonteria did not live with her mother and Freeshone. On that date, Jonteria left Mary Lizzie's house with McLeod. (R. 99, 100, 101) Jonteria walked out of the house and McLeod followed her. (R. 102) They were on foot, not in a car, when they left. (R. 117) When McLeod returned that day Jonteria was not with him. (R. 102) Jonteria had told Tylena Wesley that she was going to get some "noodles" but she did not return. (R. 105, 114) The only adult present when Jonteria left with McLeod was a girl named "Kim". (R. 114) Jonteria testified that McLeod took her to the trailer he shared with her mother and he hurt her there. (R. 307, 308) She testified that McLeod

---

[1] Jonteria was born on June 9, 1995. (R. 609)

hit her in the head with a frying pan. (R. 308, 309, 313, 314, 318)

On October 6, 2001, Melissa Ann Lee, Jonteria's twenty-seven-year-old aunt, saw McLeod sometime after 1:00 or 1:30 p.m. "standing outside a house by the light pole at the edge of the grass." (R. 124, 127, 128, 131) When she noticed that he was "just standing out there looking around" she went to the door and asked him what he was doing. (R. 132) McLeod said he was looking for "Tera" (Jonteria Jones). (R. 132) When Ms. Lee asked McLeod where Jonteria was, McLeod said he did not know but that he had sent her "down to the trailer to get a pack of noodles." (R. 135) When Ms. Lee asked him what he meant by saying he did not know where she was, McLeod said he had sent her to her mother's trailer to get a pack of noodles for her to eat. (R. 135) Ms. Lee said that McLeod was acting "like something was wrong with him", but noted that, during the time she observed him, he did not move in any direction to find her. (R. 136) McLeod did not ask her to help him look for Jonteria. (R. 137) The next time she saw Jonteria was about thirty minutes later when Jonteria was laying on the concrete at Mr. Mose McGriff's house on

4

Depot Street in Gordon, Alabama (Houston County). (R. 137, 147)

About 2:00 p.m. that afternoon, Mr. Mose McGriff was at his home at 62 Depot Street cooking when he looked outside and saw McLeod "keep going back and forth down the road" in front of his house. (R. 262, 263) When McGriff went out to talk to McLeod, McLeod asked him if he had seen Jonteria, to which McGriff said he had not. (R. 263) McLeod told McGriff that Jonteria had been missing for about thirty-five to forty minutes. (R. 264) Mr. McGriff then went with McLeod to look around for Jonteria, when after a short period of time, McLeod called McGriff's attention to some "drag marks" "close to the front door of the trailer" where McLeod lived with Jonteria's mother. (267-268, 282)

Mr. McGriff thought that the drag marks looked like "the front of somebody drug." (R. 268,282) They then walked about fifty feet on a "little" dirt road through the bushes when McLeod said "Oh, my God". (R. 270) Mr. McGriff then looked down and saw Jonteria "taking deep breaths" laying face down on top of some bushes with a large amount of blood on her. (R. 270, 283) Mr. McGriff

5

hurried home and had someone in his family call 911. (R. 272) McGriff then saw Jonteria's mother "toting" her to his driveway and she was very upset. (R. 272, 359) Jonteria was not fully clothed. (R. 141, 142) She was wearing a yellow shirt and white panties. (R. 274, 358)

Jonteria's mother Dinthea ("Tunt") and McLeod were there by Jonteria along with other persons. (R. 147, 148) Dinthea told McLeod that, if he did this to her child, she was going to kill him. (R. 361) McLeod responded that "he ain't do nothing." (R. 149) Dinthea then pushed McLeod and/or started choking him and he "just stood there" acting "weird". (R. 149, 361) Then McLeod and Dinthea "went to fight". (R. 273) McLeod did not appear to be concerned for Jonteria in any way. (R. 150) When Ms. Free was around McLeod and Jonteria, she noticed that McLeod "always hollered at her" but that he did not "holler" at other children who were around. (R. 153) Jonteria was taken to the hospital by ambulance and stayed hospitalized for a long time. (R. 151)

McLeod was placed in a police car. (R. 600) On the way to the jail, McLeod asked spontaneously if Jonteria was "going to be all right." (R. 604) When Investigator Adam

6

Robinson replied that the victim probably had a fractured
skull, McLeod then asked if that would affect her memory.
(R. 606)  Investigator Robinson replied that he did not
know if her memory would be affected.  (R. 605)  He said
McLeod's birthday was October 13, 1977.  (R. 607)

Dr. Jonas Salna, an emergency room physician at
Southeast Alabama Medical Center treated Jonteria Jones on
October 6, 2001.  (R.173, 175)  "Her condition was critical
near death."  (R. 175)  When she came in she was intubated,
had an artificial plastic tube down her throat into her
lungs.  (R. 176)  Jonteria had "swelling and blood towards"
the back of her head.  (R. 176)  Her head was swollen to
twice its normal size.  (R. 203)  According to the
radiologist, Jonteria suffered a subdural hematoma meaning
the "type of blood clot that occurs on the inside of the
brain between the skull and the brain tissue."  (R. 177)
She also had a depressed skull fracture "and just general
blood in an around the brain which they called subarachnoid
blood that was in and around the brain as well."  (R. 177,
178) She had swelling on the right side of her face,
bruising of her upper lip on the right side, and some
bruising on the inside of the gum line.  (R. 179)  Her lips

7

were swollen and the swelling was consistent with "a hand,
a punch, a backhand" and "with the wok itself." (R. 215)
In his opinion, Jonteria was struck more than once and, in
fact, "multiple times."    (R. 227, 228)

Jonteria suffered additional bruising toward her back
right shoulder and linear abrasions or scrapes running up
and down her back and shoulder. (R. 179-180) Those
abrasions were "absolutely" consistent with having been
"dragged across a hard area, dirt, rocks, or sticks, or
roots, in any manner or fashion, or a piece of plywood or
down - off a piece of concrete." (R. 191)

Both of her eyes were swollen. (R. 180)  The injuries
to her face were fresh injuries. (R. 184)   The C.T. scan
revealed two fractures to Jonteria's skull: one in the
"back part of the frontal bone" and one "in the back part
of the parietal bone". (R. 189) In Dr. Salna's opinion,
the injuries to Jonteria were "absolutely not" the result
of a fall by a little girl involved in ordinary play.  (R.
190) Dr. Salna described Jonteria's injuries as thus:
"she suffered extremely significant force and trauma.  In
my opinion someone was trying to beat her to death.  And if
that wasn't the case, then I see this kind of trauma in

8

Dr. Robert Head, a pediatrician who treated Jonteria following her injuries on October 6, 2001, found injuries inside the labium of her vaginal genitalia. (R. 327, 333) Dr. Head opined that "a stick, a thorn on a blackberry bush or plum tree" would not have caused the kind of tears and bruising he observed on Jonteria. (R. 334) He did believe that those injuries on the inside of Jonteria's labia were consistent with having been caused by a penis. (R. 334, 335, 344)

Lieutenant Donald Valenza of the Houston County Sheriff's Department participated in the investigation of this case. (R. 427) At trial he identified the wok that was found in the trailer where McLeod lived. (R. 428, 429, 430) Valenza saw what "appeared to be blood spots" in various parts of the trailer including the bedroom in which the wok was found. (R. 429, 430, 438)

Investigator Keith Cook of the Houston County Sheriff's Department noticed that the blood found in the trailer was "fresh". (R. 516, 525) He saw fresh blood spatters on the walls in the trailer at 76 Depot Street as well as fresh blood smeared on the kitchen floor. (R. 531) There were also fresh blood stains on the radio in the

10

high-speed motor vehicle wrecks."    (R. 190)    In Dr.
Salna's opinion, Jonteria's head and face injuries were
consistent with her having been struck by a wok which he
was shown at the trial.  (R. 192-194, 204-205)

When Dr. Salna performed a sexual assault kit on
Jonteria he noticed "that there was bruising in and around
her vaginal area."  (R. 191) There was bruising on both
sides of her vaginal opening and a small bruise right above
her anus.  (R. 197)  There was bruising to the top of her
vaginal area.  (R. 198)  The bruising was consistent with
having been caused by a penis.  (R. 211, 237)  The hymen
had "not completely been ripped open, but it was bruised
enough."  (R. 199)  The bruises and abrasions to her hymen
and the opening to the urinary tract were "fresh".  (R.
200)  Dr. Salna did not believe Jonteria's vaginal injuries
were the result of having fallen and straddled a bicycle.
(R. 198)  He also found blood in her vagina, which was not
a normal condition for a child her age.  (R. 196, 197)  The
head injuries would not have caused bleeding in Jonteria's
vagina.  (R. 197)  When Dr. Salna performed his
examination, Jonteria was "in a complete coma" and was "on
life support".  (R. 200)

9

kitchen. (R. 532, 533) He found the shirt identified in State's exhibit number thirty-four with blood stains on it in the bedroom. (R. 531) Cook found the wok in the bedroom where the shirt with the blood on it was found. (R. 536) The handles were off of the wok and there was an indention in the bottom of the wok. (R. 536)

Investigator Cook saw McLeod's hands the day of the rape and attempted murder and noted that McLeod had a fresh wound he described as "a laceration type gouge" in his left middle index finger. (R. 541) Cook also noticed blood under McLeod's nails and "around the cuticle and fingertips". (R. 545, 555, 557) He additionally noticed that day what looked like blood on McLeod's shoes. (R. 557)

Fingerprints found inside the wok were compared to known prints of McLeod. (R. 582) The prints on the wok matched those known prints of McLeod. (R. 583, 584) Only one print was found inside the wok that could not be identified. (R. 589)

Numerous items were submitted to Mr. Peter Macchia at the Department of Forensic Sciences for testing. (R. 453, 468, 476) The items that he received that tested positive

11

for blood were:  (1) vaginal swabs and smears from the
victim; (2) oral swabs and smears from the victim; (3) a
genital swabbing from the victim; (4) a pair of the
victim's panties; (5) a t-shirt belonging to the victim;
(6) a pair of McLeod's boxer shorts; (7) McLeod's red t-
shirt; (8) a pair of McLeod's pants; (9) McLeod's right
shoe; (10) a radio cassette recorder found in the living
room; (11) stains from the rear bedroom wall; and, (12) a
stain from the wall above the vent.  (R. 482)  Those items
and others submitted were retained so that independent
testing could be done if requested.  (R. 486)

    Mr. Macchia, an expert in DNA analysis, found that the
human DNA on McLeod's shirt was "a consistent match with
the DNA profile from the saliva sample identified to be
from Jonteria Jones [the victim]".  (R. 488-489)  He also
found that the semen on the victim's panties "matched the
DNA profile obtained from the tube of blood identified to
be from" McLeod.  (R. 490)  According to Mr. Macchia,
McLeod's DNA profile "occurs in approximately one of 314
billion Caucasians and one of 15.3 billion African-
Americans."  (R. 490-491)  The DNA tests on the stains on
the short-sleeved shirt identified as that of McLeod's

showed that the DNA matched the DNA profile of the victim
and that McLeod's DNA was excluded from the saliva sample
on the shirt. (R. 492-493) The semen found in the victim's
panties matched samples of McLeod's blood. (R. 493-494)
Mr. Macchia explained that each washing of the underwear
would "drastically reduce your chances of finding a DNA
sample, but not completely eliminating the possibility."
(R. 504) The panties were still available for additional
testing. (R. 503, 512-513)

Mary Wesley, the victim's aunt, testified that she
washed the victim's clothes and that she always washed them
with the other children's clothes. (R. 593, 594) Ms.
Wesley never washed the victim's clothes with any adult
male or female's clothes. (R. 594) She never washed any
of the victim's mother's clothes nor those of McLeod. (R.
595) Ms. Wesley identified a pair of "Kiddie Creations"
underwear as a size medium, which were consistent with
those the victim wore and that she kept washed when the
victim lived in her house. (R. 594) She said the same was
true of the shirt she was shown that had flowers on it.
(R. 594)

## STANDARD OF REVIEW

1.    The standard of review for cases involving the
grant or denial of a new trial based on newly discovered
evidence is whether the trial court abused its discretion
in ruling on the motion.  Ex parte Heaton, 542 So. 2d 931,
933 (Ala. 1989).

2.    The standard of review of a trial court's ruling on
the admission of evidence is whether that decision
constituted an abuse of judicial discretion.  Ex parte
Walker, 623 So. 2d 281, 284 (Ala. 1992) citing Baker v.
State, 555 So. 2d 273 (Ala. Crim. App. 1989).

3. and 4.  The standard of review of the sufficiency of
the evidence is whether the evidence, when viewed in the
light most favorable to the State, was such that the fact-
finder might reasonably find that the evidence excluded
every reasonable hypothesis except that of guilt.  Goodloe
v. State, 783 So. 2d 931, 935 (Ala. Crim. App. 2000).


## SUMMARY OF THE ARGUMENT

McLeod contends on appeal that the trial court's
summary disposition of his motion for new trial based on
newly discovered evidence was error and that he is entitled

14

to a new trial or at least a remandment of the case for the trial court to hold an evidentiary hearing on his motion for new trial. The State submits that McLeod is entitled to neither of those because he has failed in his burden of proof to show that the trial court's decision constituted an abuse of discretion.

McLeod argues on appeal that the trial court prevented him from offering a defense that a third party committed the crimes with which he was charged when it did not allow defense counsel to prove why the victim's mother no longer had custody of the victim at the time of the charged incidents.

Under Alabama law three elements must exist before this type of evidence is admissible: "(1) the evidence must relate to the "res gestae of the crime"; (2) the evidence must exclude the accused as a perpetrator of the offense; and, (3) the evidence 'would have to be admissible if the third party was on trial." The trial court's ruling was correct and therefore not an abuse of discretion because the evidence failed the above stated test. The evidence was not relevant as a part of the res gestae; it did not rule out McLeod as the perpetrator, and it was not proved

15

that it would have been admissible in the trial of a third party. The evidence was properly disallowed because it would have amounted to no more than collateral and bare speculation, which would provide no material probative value to the trial process.

3. McLeod contends the State's evidence of attempted murder was insufficient because it did not establish that he specifically intended to kill the victim. This contention is without merit.

The State presented evidence, which viewed in the light most favorable to the State established that McLeod attempted to kill the child victim by beating her so severely with a frying pan or wok that he caused brain injuries that nearly cost her her life. The jury resolved the question of intent. McLeod has not shown by a preponderance of the evidence that the verdict was wrong and unjust. Therefore, no reversal is due on appeal.

4. McLeod contends that there was not sufficient evidence to convict him of first degree rape. He argues that, to convict him of rape, the State must prove beyond a reasonable doubt that his male sex organ penetrated the victim's sexual organ. He argues that, because "the

16

defense provided a reasonable alternative theory that the child's vaginal area and parts were bruised and injured during the time she was drug into the woods and over the brush and sticks." McLeod states the State's evidence was insufficient to overcome his presumption of innocence.

The evidence, when viewed in the light most favorable to the State, established that McLeod did penetrate the labia of the victim which was sufficient to satisfy the element of penetration required for a rape conviction. The "alternative theory" suggested by McLeod is refuted by the evidence and is ridiculous. Therefore, no reversal is due on this issue.

## ARGUMENT

**I. McLeod Has Failed To Prove That The Trial Court's Summary Disposition Of His Motion For New Trial Was An Abuse Of Discretion.**

McLeod contends on appeal that the trial court's summary disposition of his motion for new trial based on newly discovered evidence was error and that he is entitled to a new trial or at least, a remandment of the case for the trial court to hold an evidentiary hearing on his motion for new trial. The State submits that McLeod is

17

entitled to neither of these because he has failed to meet his burden of proof to show that the trial court's decision constituted an abuse of discretion.

The standard of review for cases involving the grant or denial of a new trial based on newly discovered evidence is the same as that for a motion to withdraw a guilty plea. The appellate courts look with disfavor on motions for new trial based on newly discovered evidence and the decision of the trial court will not be disturbed absent abuse of discretion. Further, this Court will indulge every presumption in favor of the correctness of the trial judge's decision. The trial court is in the best position to determine the credibility of the new evidence.'" Ex parte Heaton, 542 So. 2d 931, 933 (Ala. 1989), quoting, Isom v. State, 497 So. 2d 208, 212 (Ala. Crim. App. 1986). To establish a right to a new trial based on newly discovered evidence, McLeod must have established the following:

> 1.  that the evidence will probably change the result  if a new trial is granted;
>
> 2.  that the evidence has been discovered since the trial;

3.  that it could not have been discovered before the trial by the exercise of due diligence;

4.  that it is material to the issue; and,

5.  that it is not merely cumulative or impeaching.

Snyder v. State, 683 So. 2d 45, 46 (Ala. Crim. App. 1996), citing Ex parte Heaton, 542 So. 2d at 933.  Ordinarily, the defendant must satisfy all five requirements to be entitled to a new trial based on newly discovered evidence.  Moran v. State, 649 So. 2d 1292, 1294 (Ala. Crim. App. 1993). The law has recognized an exception to that requirement when the alleged newly discovered evidence is cumulative or impeaching, it may still be a basis for a new trial "if it appears probable from looking at the entire case that the new evidence would change the result…." Id.

In the present case, McLeod must not only overcome the legal presumption that the trial court's ruling was correct, but must prove to this Court that the trial court abused its discretion in implicitly finding that McLeod failed to meet his burden of proof in establishing the above criteria required for a motion for new trial.  This he has not done.

19

McLeod's "newly discovered" evidence was in the form of an affidavit by "an acquaintance" of the victim's mother, Dinthea Jones, stating that the victim's mother "often dressed the victim in her [the mother's] own soiled and dirty clothes." (McLeod's brief, pg. 11)  Applying the above test to this "evidence" it is abundantly clear that the trial court's denial of the motion for new trial was an appropriate exercise of judicial discretion.

### a.   Factors one and four

McLeod "submits that it is patent that the evidence that the panties were worn by and put on the victim by the mother after having sex with the victim most probably would change the outcome of the trial." (McLeod's brief, pgs. 12-13) Notwithstanding McLeod's assertion, this "evidence" would not likely change the result if a new trial was granted.  The "acquaintance" who provided this "new evidence" was not living with the victim or the victim's mother on October 6, 2001 when the rape occurred.  (R. 22-24)  In fact, at that time the victim was not living with her mother and there is no evidence her mother dressed her that day.  As the district attorney correctly noted, "At no time were her clothes, the underwear she wore, ever mixed

up with any adults in any manner or fashion and the underwear that the victim wore in this case. So there could be no mixing up of underwear." (R. 30)   This is borne out in the testimony of Mary Wesley who kept the victim and washed her clothes. Mary Wesley, the victim's aunt, testified that she washed the victim's clothes and that she always washed them with the other children's clothes. (R. 593, 594) Ms. Wesley never washed the victim's clothes with any adult male or female's clothes. (R. 594) She never washed any of the victim's mother's clothes or those of McLeod. (R. 595) Ms. Wesley identified a pair of "Kiddie Creations" underwear as a size medium, which were consistent with those the victim wore and that she kept washed when the victim lived in her house. (R. 594)

Moreover, as the trial court astutely observed, "the underwear was clearly not an adult female underwear. [I]t was a small child we had. [T]he underwear was clearly not something that a grown woman could have worn." (R. 28) Thus, there is absolutely no reasonable basis for finding that this "evidence" was material to the issue or that is would have probably changed the result of the defendant's

21

trial if a new trial were granted.  Furthermore, there was clearly other physical evidence of rape as set out in the statement of facts which seriously lessens any probability of a different outcome.

### b. Factors two, three, and five

Moreover, even if arguendo, the alleged new "evidence" was material and would probably have changed the outcome of the trial, McLeod still failed to establish that the evidence had been discovered since the trial or that it could not have been discovered by the time of the trial with the exercise of due diligence or to indicate that the evidence is not merely cumulative.

During the trial, defense counsel explored the subject of the victim's underwear that had the presence of McLeod's semen on it and inquired whether the trailer where McLeod lived with the victim's mother had a washing machine.  Yet, McLeod apparently sat mute and never informed defense counsel of the information alleged to be newly discovered evidence contained in the affidavit or the testimony given by the affiant at the hearing on the motion for new trial. As the trial judge noted at the hearing on the motion for

22

new trial, "it does seem lie the defendant himself should have known that this - known of this witness. I can understand the lawyers not knowing, but clearly the defendant knew about her and should have made that available to his attorneys." (R. 35)  Additionally, this witness knew this information when the trial was going on and knew McLeod's family and yet never came forward with this "evidence" until well after the trial. (R. 23)  McLeod simply has failed to show that this evidence was newly discovered or could not have been discovered with the exercise of due diligence.

Finally, other than McLeod's unsubstantiated speculations, there is no basis in reason or the record to prove that it is probable that new evidence would change the results of the trial because, as noted earlier, the substance of the information was inferred at trial and it did not result in an acquittal.  Furthermore, the alleged newly discovered information hardly bears the indicia of reliability and veracity.

Having come full circle, the trial court was present at the hearing on the motion for new trial to observe the demeanor of the witness and to listen to her testimony.  By

his ruling, he must surely have been unconvinced of the truthfulness of the "information" in the affidavits attached to the motion for new trial. If a trial judge does not believe the "new evidence", then he is not required to grant a motion for new trial because he is the "[f]actfinder in …a motion for new trial," and as a condition to the granting of a new trial on the basis of newly discovered evidence. . .the trial court must believe the evidence presented." Cavender v. State, 629 So. 2d 721, 723 (Ala. Crim. App. 1993). Thus, as McLeod has failed to show the trial judge abused his discretion in summarily denying the motion for new trial and, as "[a]n appellate court…is obliged to indulge every presumption in favor of the correctness of the trial court's decision", no reversal is due on appeal in this case.

II. The Trial Court Properly Sustained The State's Objection To McLeod's Attempt To Question The Minor Victim's Mother Regarding Custody Of The Child.

During defense counsel's cross examination of Dinthea Jones, the mother of the six-year-old victim, Jonteria Jones, defense counsel attempted to question her regarding who was supervising Jonteria at the time she was raped and

24

nearly murdered.  Ms. Jones testified that her sister, Mary
Wesley had custody of Jonteria.  (R. 377)  When defense
counsel asked Ms. Jones why she had lost custody of
Jonteria (R. 377), the prosecutor objected to the relevancy
of that line of questioning.  (R. 377)  A lengthy
discussion ensued between counsel and the judge.  Then Ms.
Jones testified outside the presence of the jury that she
had lost custody of Jonteria earlier because Jonteria had
fallen off of a sliding board on a playground and broken or
injured her hip.  (R. 382)  The trial court determined that
the reason she lost custody was not relevant and therefore
he sustained the prosecution's objection.  (R. 385-386)

"Generally, an accused may offer evidence that some
other person committed the crime," Ex parte Walker, 623 So.
2d 281, 284 (Ala. 1992), however, that right is not
unlimited.  Id.  "[T]he admissibility of such evidence must
rest within the sound discretion of the trial judge."  Id.,
citing Baker v. State, 555 So. 2d 273 (Ala. Crim. App.
1989).  Here, the trial court did not abuse its discretion
in sustaining the State's objection to this evidence sought
to be elicited.

25

The Supreme Court of Alabama has "set out a test to ensure that any evidence offered for this purpose [i.e. to show that another committed the crime charged] is admissible only when it is probative and not merely speculative." Synder v. State, 2003 WL 22463403, at *32 (Ala. Crim. App., Oct. 31, 2003). "Three elements must exist before this evidence can be ruled admissible: (1) the evidence 'must relate to the "res gestae" of the crime'; (2) the evidence must exclude the accused as a perpetrator of the offense; and, (3) the evidence 'would have to be admissible if the third party was on trial.'" Id. Applying this test to the present case, it becomes readily apparent that the trial court's decision was correct and not an abuse of discretion.

McLeod argues on appeal that the trial court's ruling was erroneous because it prevented him from presenting a defense that "someone other than the Defendant could have committed the offense against the victim by showing that the witness had 'in loco parentis' custody of her child, or at the least, implied responsibility to look after the child, and negligently supervised the child." (McLeod's brief, pg. 18)

The "evidence" sought to be introduced by defense counsel was not relevant to the res gestae of the crime. The crime was not supervision or lack thereof. As the court aptly noted poor supervision could be said of any child abuse or sex abuse case. (R. 384, 385) The victim's mother's supervisory role was not part of the res gestae of this case. The mother was not her guardian, did not have custody or control of the child the day the rape occurred and essentially had no role until after the fact when she went to her nearly dead child. McLeod might have a point if the mother had been in charge of the child that day or if the mother's reason for losing custody related in a material way to the crimes charged -- but it did not. As the trial court correctly observed,

> I think - what I was looking for her to answer to
> be relevant I think would have to be along the
> lines of supervision was taken away because the
> mother had attempted to kill or seriously harm the
> child before, which is one of the charges, or, for
> instance, the mother had been a party to a sexual
> abuse or rape of the child before, which we've had
> those sort of cases where a mother is involved in
> that situation . . . .    [B]ut, based on her
> testimony -- . . .what she has testified I don't
> think is going to make it relevant."

(R. 385-386)   Thus, the reason why the victim's mother no longer had custody of the victim was not part of the res gestae and hence not relevant or material.

The second factor was not shown by McLeod either.   The evidence he sought to admit did not exclude him as perpetrator of the crime.   Regardless of whether the victim's mother had lost custody for lack of supervision and the child had been injured on a playground, all of that did not change the evidence that Jonteria was raped and almost murdered; nor does it negate all the evidence tending to show McLeod's guilt: He left alone with the victim; the physical evidence on the victim's pelvic and vaginal area indicating a sexual assault; the presence of McLeod's semen on Jonteria's panties, and Jonteria's testimony that McLeod was the one who hurt her.   Even if the victim's mother had had custody or charge of Jonteria that day, that does not negate the evidence of McLeod's guilt and certainly does not exclude him as the perpetrator of the offense.

With regard to the third factor of the test, there is no legal basis for this evidence being admissible against a third party if a third party was on trial.   Instead,

defense counsel's attempt to introduce such evidence was
interjecting speculative, collaterial, supposition into the
trial.  "Alabama Courts have recognized the danger in
confusing the jury with mere speculation concerning the
guilt of a third party."  Ex parte Griffin, 790 So. 2d 351,
354 (Ala. 2000).  Likewise, in weighing the defendant's
interest in presenting exculpatory evidence against the
State's interest "in promoting reliable trials,
particularly in preventing the injection of collateral
issues into the trial through unsupported speculation about
the guilt of another party," "the federal courts have
required the defendant to show that the evidence he is
offering is probative and not merely speculation that would
confuse the jury."  Id. at 353.  At best, all McLeod has
offered is tenuous speculation.  Therefore, the trial court
did not abuse its discretion in excluding the evidence
sought to be admitted by McLeod.  The trial court's
decision is due to stand on appeal.

III.  The Evidence Was Sufficient To Sustain The Jury's
      Verdict.

    McLeod contends on appeal that the evidence was
insufficient to sustain the jury's verdict finding him

guilty of attempted murder. (McLeod's brief, pg. 21)  He

argues that the trial court erroneously denied his motions

for judgment of acquittal made at the end of the State's

case and at the conclusion of all the evidence.

In reviewing a trial court's denial of a motion for

judgment of acquittal, the first consideration is whether

the State presented a prima facie case of the crime

charged.  If that is the case, then, even if there is

conflicting evidence, the case is properly submitted to the

jury for consideration and its "determination is not

subject to review on appeal."  Lee v. State, 586 So. 2d

264, 266 (Ala. Crim. App. 1991).  The evidence in this case

presented a prima facie case properly submitted to the jury

for resolution; therefore, the jury's determination is not

subject to review on appeal.

In reviewing the evidence to determine whether the

State presented a prima facie case sufficient to submit the

case to the jury for resolution, this Court must determine

if, when viewing the evidence in the light most favorable

to the State, there was evidence of each of the elements of

the crime charged.  See, Sullivan v. State, 48 Ala. App.

347, 349, 264 So. 2d 576, 578 (1972).  Moreover,

"[I]t is the province of the judge to determine
whether there is testimony sufficient to make it
appear prima facie that the offense has been
committed.  The evidence on which the judge acts
. . . may be, and often is, conflicting and
contradictory.  In such case, the credibility of
the witnesses and the sufficiency of the entire
evidence are for the ultimate decision of the
jury."

Bush v. State, 695 So. 2d 70, 120 (Ala. Crim. App. 1995).

The evidence was sufficient to support the jury's verdict

finding him guilty of attempted murder.

Adopting the legal standard cited above, the evidence

was sufficient to submit the attempted murder charge to the

jury and to sustain his conviction therefor.  "In Alabama,

a person commits the crime of attempt to murder if he

intends to cause the death of another person and does any

overt act towards the commission of that intent. Alabama

Code 1975, Sections 13A-4-2 (the attempt statute) and 13A-

6-2 (murder))." Chaney v. State, 417 So. 2d 625, 626 (Ala.

Crim. App. 1982); McNabb v. State, 2001 WL 1299193, at *36

(Ala. Crim. App. Oct. 26, 2001).

The evidence, viewed in the light most favorable to the

State, established that McLeod left with the victim alone;

and, when he returned, she was not with him.  (R. 102, 105,

114, 118)  The evidence further established that McLeod

31

took the child victim to the trailer nearby which he shared
with her mother and hit her in the head with a frying pan
(or wok). (R. 308, 309, 313, 314, 318) Shortly after
that, McLeod was seen without the victim. He asked the
victim's aunt where she was but did not look for her at the
time. (R. 132, 136) Later, McLeod claimed to have "found"
"drag marks" near the trailer he shared with the victim's
aunt and show them to Mr. McGriff, a neighbor, who then
"found" the victim in the bushes. (R. 267-268, 270, 282,
283) When McLeod was standing close to the nearly dead
victim, he did not appear concerned for her in any way.
(R. 150) According to Dr. Salna who treated the victim at
the emergency room, the victim's injuries were consistent
with "a hand, a punch, a backhand" and "with the wok
itself." (R. 215) Dr. Salna opined that the victim had
been struck "multiple times" (R. 227, 228) -- clear
evidence an intent on McLeod's part.

Dr. Jonas Salna, an emergency room physician at
Southeast Alabama Medical Center, treated Jonteria Jones on
October 6, 2001. (R.173, 175) "Her condition was critical
near death." (R. 175) When she came in she was intubated,
had a plastic tube down her throat into her lungs. (R.

32

176) Jonteria had "swelling and blood towards" the back of her head. (R. 176) Her head was swollen to twice its normal size. (R. 203) According to the radiologist, Jonteria suffered a subdural hematoma meaning the "type of blood clot that occurs on the inside of the brain between the skull and the brain tissue." (R. 177) She also had a depressed skull fracture "and just general blood in an around the brain which they called subarachnoid blood that was in and around the brain as well." (R. 177, 178) She had swelling on the right side of her face, bruising of her upper lip on the right side, and some bruising on the inside of the gum line. (R. 179) Her lips were swollen and the swelling was consistent with "a hand, a punch, a backhand" and "with the wok itself." (R. 215) In his opinion, Jonteria was struck more than once and, in fact, "multiple times." (R. 227, 228)

The jury's verdict finding McLeod guilty is due to be affirmed on appeal because he has not shown the evidence was legally insufficient to submit the case to the jury. White v. State, 546 So. 2d 1014, 1017 (Ala. Crim. App. 1989) ("The role of the appellate courts is not to say what the facts are. Our role, . . . is to judge whether the

evidence is <u>legally</u> insufficient to allow submission of the issue to the jury"). "'The rule is clearly established. . . that a verdict of conviction should not be set aside on the ground of the insufficiency of the evidence to sustain the verdict, unless, after allowing all reasonable presumptions of its correctness, the preponderance of the evidence is so decided as to clearly convince the court that it was wrong and unjust." <u>Id</u>. quoting <u>Bridges v. State</u>, 284 Ala. 412, 420 So. 2d 821 (1969).

McLeod has not shown by a preponderance of the evidence that the verdict was wrong and unjust. All he has done is argue questions of credibility of the witnesses and evidence, which is not the same as insufficiency, and which this Court does not review. <u>See</u>, <u>id</u>. citing <u>Toles v. State</u>, 170 Ala. 99, 100, 54 So. 2d 511 (1911). Therefore, this issue warrants no relief on appeal and the jury's verdict should be affirmed.

IV.  The Evidence Was Sufficient To Sustain McLeod's
     Conviction Of Rape In The First Degree.

McLeod contends that there was not sufficient evidence to convict him of first degree rape. He argues that, to

34

convict him of rape, the State must prove beyond a reasonable doubt that his male sex organ penetrated the victim's sexual organ. (McLeod's brief, pg. 27)  He argues that, because "the defense provided a reasonable alternative theory that the child's vaginal area and parts were bruised and injured during the time she was drug into the woods and over the brush and sticks." (McLeod's brief, pgs. 26-27)  McLeod states the State's evidence was insufficient to overcome his presumption of innocence.

The crime of rape does require proof of an actual penetration of the female sex organ by the male sex organ. Ex parte Swain, 629 So. 2d 699, 701 (Ala. 1993); Jackson v. State, 471 So. 2d 516, 517 (Ala. Crim. App. 1985); Beckley v. State, 353 So. 2d 542, 544 (Ala. Crim. App. 1977); Freeman v. State, 555 So. 2d 196, 201 (Ala. Crim. App. 1988).  "However, penetration to any particular extent is not required, . . . nor need there be an entering of the vagina or repturing of the hymen, the entering of the vulva or labra being sufficient, but some degree of entrance of the male organ within the labium pudendum is essential." Freeman v. State, 555 So. 2d at 201.  "Whether such

penetration is accomplished is a factual question for the jury." Id.

In reviewing the sufficiency of the evidence, the evidence must be reviewed in the light most favorable to the State and must be accepted as true and accorded all legitimate inferences. Turner v. State, 2002 WL 3629839, at *33 (Ala. Crim. App., Aug. 29, 2003). Applying the above standard to the evidence in this case, the State proved that McLeod's sexual organ penetrated the sexual organ of the victim.

When Dr. Salna performed a sexual assault kit on Jonteria, he noticed "that there was bruising in and around her vaginal area." (R. 191) There was bruising on both sides of her vaginal opening and a small bruise right above her anus. (R. 197) There was bruising to the top of her vaginal area. (R. 198) The bruising was consistent with having been caused by a penis. (R. 211, 237) The hymen had "not completely been ripped open, but it was bruised enough." (R. 199) The bruises and abrasions to her hymen and the opening to the urinary tract were "fresh". (R. 200) Dr. Salna did not believe Jonteria's vaginal injuries were the result of having fallen and straddled a bicycle.

(R. 198)  He also found blood in her vagina, which was not
a normal condition for a child her age.  (R. 196, 197)  The
head injuries would not have caused bleeding in Jonteria's
vagina.  (R. 197)

Dr. Robert Head, a pediatrician who treated Jonteria
following her injuries on October 6, 2001, found injuries
inside the labium of her vaginal genitalia.  (R. 327, 333)

Dr. Head opined that "a stick, a thorn on a blackberry
bush or plum tree" would not have caused the kind of tears
and bruising he observed on Jonteria.  (R. 334)  He
believed that the injuries on the inside of Jonteria's
labia were consistent with having been caused by a penis.
(R. 334, 335, 344)

The evidence was sufficient to convict McLeod of rape
in the first degree.  His suggestion that the evidence
showed that the victim's injuries could have come from
having been drug over brush and sticks is not only
ridiculous but is not supported by the evidence in the
record.  Dr. Head opined that "a stick, a thorn on a
blackberry bush or plum tree" would not have caused the
kind of tears and bruising he observed on Jonteria.  (R.
334)  He believed that those injuries on the inside of

37

Jonteria's labia were consistent with having been caused by a penis. (R. 334, 335, 344)

"The jury by finding [McLeod] guilty of the offense charged, was obviously satisfied that the evidence excluded every *reasonable* hypothesis except that of guilt. [I]t was the jury's call." Ex parte Scales, 581 So. 2d 1192, 1197 (Ala. 1991). Therefore, there is no basis for reversing the jury's verdict on appeal.

### CONCLUSION

Based on the foregoing, this case is due to be affirmed on appeal.

Respectfully submitted,

William H. Pryor Jr.
Attorney General

By-

Beth Slate Poe
Assistant Attorney General
Counsel of Record

38

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of February, 2004, I served a copy of the foregoing on the attorney for McLeod, by placing the same in the United States Mail, first class, postage prepaid and addressed as follows:

> Hon. Clark Maurice Parker
> Brantley & Parker L.L.C.
> 401 N. Foster Street
> Dothan, AL  36303

Beth Slate Poe
Assistant Attorney General

ADDRESS OF COUNSEL:
Office of the Attorney General
Criminal Appeals Division
11 South Union Street
Montgomery, Alabama 36130-0152
(334) 242-7300

136691/54599-001

39