IN THE ALABAMA COURT OF CRIMINAL APPEALS


FREESHONE CORNELIUS McLEOD,
    APPELLANT,

VS.

STATE OF ALABAMA,
    APPELLEE.


ON APPEAL FROM THE CIRCUIT COURT OF
HOUSTON COUNTY, ALABAMA
CIRCUIT COURT CASE NO. CC-02-235 & 02-236

CRIMINAL APPEALS COURT NO. CR-02-1610

---

APPLICATION FOR REHEARING And BRIEF
For APPLICANT

---


Clark M. Parker, Attorney at Law (PAR069)
Attorney For Applicant
Ala. State Bar # ASB-4728-A63C
Brantley & Parker, L.L.C.
401 North Foster St.
Dothan, Alabama 36303
(334) 793-9009
(334) 793-2037 Facsimile

EXHIBIT
E
PENGAD 800-631-6989

IN THE ALABAMA COURT OF CRIMINAL APPEALS

FREESHONE CORNELIUS McLEOD,
    APPELLANT,

VS.

STATE OF ALABAMA,
    APPELLEE.

ON APPEAL FROM THE CIRCUIT COURT OF
HOUSTON COUNTY, ALABAMA
CIRCUIT COURT CASE NO. CC-02-235 & 02-236

CRIMINAL APPEALS COURT NO. CR-02-1610

---

## APPLICATION FOR REHEARING And BRIEF
## For APPLICANT

---

Clark M. Parker, Attorney at Law (PAR069)
Attorney For Applicant
Ala. State Bar # ASB-4728-A63C
Brantley & Parker, L.L.C.
401 North Foster St.
Dothan, Alabama 36303
(334) 793-9009
(334) 793-2037 Facsimile

## TABLE OF CONTENTS

TABLE OF CONTENTS ....................................... i

APPLICATION FOR REHEARING.................................ii

STATEMENT OF POINTS OF LAW OVERLOOKED OR MISAPPREHENDED.iii

MOTION TO ADOPT STATEMENT OF FACTS.......................iv

STATEMENT OF THE FACTS...................................1

**BRIEF IN SUPPORT OF APPLICATION FOR REHEARING**...... 12

TABLE OF CITATIONS AND AUTHORITIES...................... 13

ARGUMENT................................................14

CONCLUSION..............................................17

CERTIFICATE OF SERVICE..................................18

Notice: This unpublished memorandum should not be cited as precedent. See Rule 54, Ala.R.App.P. Rule 54(d), states, in part, that this memorandum "shall have no precedential value and shall not be cited in arguments or briefs and shall not be used by any court within this state, except for the purpose of establishing the application of the doctrine of law of the case, res judicata, collateral estoppel, double jeopardy, or procedural bar."

# Court of Criminal Appeals

State of Alabama
Judicial Building, 300 Dexter Avenue
**P. O. Box 301555**
**Montgomery, AL 36130-1555**



RELEASED

MAR 19 2004

CLERK
ALA COURT CRIMINAL APPEALS

H.W."BUCKY" McMILLAN
Presiding Judge
SUE BELL COBB
PAMELA W. BASCHAB
GREG SHAW
A. KELLI WISE
Judges

Lane W. Mann
Clerk
Wanda K. Ivey
Assistant Clerk
(334) 242-4590
Fax (334) 242-4689

### MEMORANDUM

CR-02-1610      Houston Circuit Court CC-02-235 and CC-02-236

Freeshone Cornelius McLeod v. State of Alabama

Cobb, Judge.

On April 9, 2003, McLeod was convicted of first-degree rape and attempted murder, violations of §§ 13A-6-61(a)(3), 13A-6-2(a)(1), and 13A-4-2, Ala. Code 1975. On May 28, 2003, the trial court sentenced McLeod to two consecutive sentences of 99 years. On May 15, 2003, McLeod filed a motion for a new trial, which the trial court summarily denied on May 28, 2003, after a hearing.

The evidence adduced at trial showed the following: On October 6, 2001, six-year-old J.J. was living with her aunt, who was her legal guardian, and four other children, including her cousin named T.W., in a house. J.J.'s mother lived in a



nearby mobile home with 24-year-old McLeod, a.k.a. "Freek Nasty." T.W. testified that, on the day in question, J.J. left the aunt's house during the daytime and that McLeod followed J.J. T.W. testified that McLeod and J.J. were "[g]oing to get some noodles." (R. 105.) When McLeod returned later that day, J.J. was not with him.

J.J. testified that, on the day in question, McLeod took her to her mother's mobile home to go look for noodles. J.J. testified that, while they were at her mother's mobile home, McLeod "hurt" her. (R. 307.) She testified that McLeod hit her in the head with "a frying pan" in her mother's bedroom and that she saw blood. (R. 308.) J.J. identified McLeod in court as the person who hit her in the head with a frying pan.

Two people witnessed McLeod on the day in question, at approximately 1:00 p.m., apparently looking for J.J. They joined him in the search for the child. J.J., partially clothed, bloody, and breathing heavily, was found face-down on top of some bushes where she had been dragged from her mother's mobile home into the woods. McLeod discovered her body while searching with the help of a neighbor. J.J.'s mother appeared, and she and McLeod started fighting.

Shortly thereafter, law enforcement arrived on the scene. J.J. was taken to the emergency room, and McLeod was taken to jail. On the way to the county jail, McLeod asked the investigator whether J.J. was going to be all right. When the investigator answered that she probably had a fractured skull, McLeod asked, "[D]oes that [a]ffect her memory[?]"

At the emergency room, J.J. was "near death." (R. 175.) Upon arrival, J.J. was intubated. She was suffering from "swelling and blood" in the back of her skull, a subdural hematoma, or blood clot, and two skull fractures. Her face was bruised and swollen; her mouth was bruised and bleeding, and one of her teeth was chipped. The emergency room doctor testified that, "[i]n [his] opinion[,] someone was trying to beat [J.J.] to death." (R. 190.) J.J.'s back and right shoulder were bruised and scraped, consistent with being dragged across a "hard area, dirt, rocks, or sticks...." (R. 191.) A rape kit examination was performed on J.J. while she was in a coma. The emergency room doctor also found "bruising in and around her vaginal area," that her hymen had been

2

bruised, and blood in her vagina.   (R. 191.)   The emergency
room doctor testified that he did not believe that the
injuries to J.J.'s vagina were caused by a bicycle accident,
but rather the injuries were consistent with having been
penetrated by a penis.

Further examination by her pediatrician several days
later revealed that J.J. had injuries to her vagina and that
those injuries were consistent with having been penetrated by
a penis.   The pediatrician testified that he believed that the
vaginal injuries were caused by a penis, not by "a stick, a
thorn on a blackberry bush or plum tree."   (R. 334.)

At the scene, a wok, with an indentation in the bottom,
was found in a bedroom in J.J.'s mother's mobile home.   Blood
spots were found throughout the mobile home, leading from the
kitchen to J.J.'s mother's bedroom, and on McLeod's clothing
that he was wearing at the time law enforcement arrived on the
scene.   Fingerprints on the wok matched McLeod's.   J.J.'s DNA
was found on McLeod's shirt.   Semen in the victim's panties
matched McLeod's DNA profile.

McLeod advances four arguments on appeal.   We address
each in turn.

I.

First, McLeod argues that the trial court erred by
denying his motion for a new trial.   Specifically, he contends
that newly discovered evidence, in the form of an affidavit by
one of J.J.'s mother's acquaintances, stating that J.J.'s
mother often dressed J.J. in her own adult-sized, soiled
underwear, required a new trial because the affidavit "would
have provided a basis for the jury to conclude that the semen
found on the garment that the victim was wearing did in fact
come into contact with the victim after the mother wore the
garment after having sex with ... McLeod."   (Appellant's
brief, pp. 11-12.)

> "'The standard of review for cases
> involving the grant or denial of a new
> trial based on newly discovered evidence is
> the same as that for a motion to withdraw
> a guilty plea.

3

"'"'The appellate courts look with disfavor on motions for new trials based on newly discovered evidence and the decision of the trial court will not be disturbed absent abuse of discretion.' Further, 'this court will indulge every presumption in favor of the correctness' of the trial judge's decision. The trial court is in the best position to determine the credibility of the new evidence."

"'Isom v. State, 497 So. 2d 208, 212 (Ala. Crim. App. 1986) (citations omitted). To establish a right to a new trial based on newly discovered evidence, the petitioner must show the following: (1) that the evidence will probably change the result if a new trial is granted; (2) that the evidence has been discovered since the trial; (3) that it could not have been discovered before the trial by the exercise of due diligence; (4) that it is material to the issue; and (5) that it is not merely cumulative or impeaching.'

"542 So. 2d 931, 933 (Ala. 1989) (some internal citations omitted; emphasis added.) See also Doty v. State, 647 So. 2d 41 (Ala. Crim. App. 1994); Hudson v. State, 623 So. 2d 387 (Ala. Crim. App. 1993)."

Banks v. State, 845 So. 2d 9, 20 (Ala. Crim. App. 2002).

At the hearing, the affiant testified that, one to two years prior to the crime, she lived with J.J. and J.J.'s mother and that J.J.'s mother would sometimes dress J.J. in the mother's dirty clothing, including underwear. She could not testify as to what J.J.'s mother did with her clothing at the time of the crime. The fact that, some time prior to the rape and attempted murder in the case at hand, the victim's mother sometimes dressed the victim in her own adult-sized,

4

soiled underwear is in no way relevant to the case at hand. That is to say, at the time of the crime, J.J. was not living with or cared for by her mother. Therefore, the newly discovered evidence in this case was not material to any of the issues involved in this trial.

Additionally, as the trial court noted, in the face of the overwhelming evidence of guilt against McLeod, the newly discovered evidence that, in the past, J.J.'s mother sometimes dressed her in the mother's own soiled underwear would probably not have changed the result of the trial had it been known at the time.

Therefore, the newly discovered evidence presented in McLeod's motion for a new trial did not warrant a new trial, and this argument is without merit.

II.

Second, McLeod argues that the trial court erred by sustaining the State's objection to defense counsel's questioning of the victim's mother regarding her lack of custody of the victim. Specifically, he argues that, at trial, he was

> "attempting to introduce a logical and reasonable theory that someone other than the Defendant could have committed the offense against the victim by showing that the witness had 'in loco parentis' custody of her child, or at least, implied responsibility to look after the child, and negligently supervised the child."

(Appellant's brief, p. 18.)

At trial, defense counsel attempted to question the victim's mother as to the circumstances surrounding J.J.'s custody. Defense counsel asked her why custody had been awarded to her sister. The State objected, argument ensued, followed by a bench conference. Defense counsel argued that, although he did not know why custody had been awarded to the mother's sister, the trial court should allow him to question the mother in case custody was awarded to the sister because J.J.'s mother tried to kill her. The jury was sent out, and

5

J.J.'s mother was questioned.   J.J.'s mother testified that J.J. was removed from her home following an accident that occurred on a slide where J.J. broke her hip.   J.J.'s mother stated that she had not been properly supervising her child at the time of the accident.

Further argument ensued.  Defense counsel then maintained that the mother's testimony regarding the loss of custody of J.J. was relevant and "fit[] with [the] theory of a defense. [T]hat is, ... [the mother] improperly supervised the child that afternoon, and that explains why in the world that child was lost, not because [McLeod] had hidden the child."  (R. 386-87.)  The trial court stated,

> "I think -- what I was looking for her answer to be relevant I think would have to be something along the lines of supervision was taken away because the mother had attempted to kill or seriously harm the child before, which is one of the charges, or, for instance, the mother had been a party to a sexual abuse or rape of the child before, which we've had those sort of cases where a mother is involved in that situation. Here we are allegedly claiming he's doing the same thing that she allegedly did before. But, again, based on her testimony -- and I don't have those records or anything else -- what she has testified I don't think is going to make it relevant.   So at this point I will sustain the State's objection as to the reason why she did not have custody, or to phrase it another way, why the sister had guardianship of the child according to the witness'[s] testimony at this point."

(R. 385-86.)  The trial court also pointed out that, because the sister had legal custody of J.J., the mother did not have a legal duty to supervise the child at the time of the crime; rather, that duty fell to the sister.

Later, during another related discussion, still outside the presence of the jury, the trial court asked whether the defense theory was that the mother committed the two crimes against J.J.  Defense counsel answered, "We don't know.  We just absolutely don't know.  But there's strong inferences out there that she -- that the jury needs to know about."  (R.

6

398.)

> "Generally, an accused may offer evidence that
> some other person committed the crime. See, e.g.,
> C. Gamble, McElroy's Alabama's Evidence, § 48.01(1)
> (4th ed. 1991). To be admissible, evidence of this
> kind must meet several requirements, one of which is
> that the evidence would have to be admissible if the
> third party was on trial. Lowrey v. State, 26
> Ala.App. 159, 155 So. 313 (1934); Green v. State,
> 258 Ala. 471, 64 So.2d 84 (1953); Morris v. State,
> 25 Ala.App. 175, 142 So. 685 (1932). Also, the
> proffered evidence must relate to the 'res gestae'
> of the crime--that is, it must be derived from and
> related to the facts and circumstances of the
> alleged crime. Toliver v. State, 142 Ala. 3, 38 So.
> 801 (1905); McDonald v. State, 165 Ala. 85, 51 So.
> 629 (1910). This kind of evidence is particularly
> important where the State's case rests primarily
> upon circumstantial evidence...."

Ex parte Walker, 623 So. 2d 281, 284 (Ala. 1992).

This Court has stated:

"In addition, Alabama courts have also recognized
the danger in confusing the jury with mere
speculation concerning the guilt of a third party:

> "'"It generally is agreed that
> the defense, in disproving the
> accused's own guilt, may prove
> that another person committed the
> crime for which the accused is
> being prosecuted.... The problem
> which arises in the application
> of this general rule, however, is
> the degree of strength that must
> be possessed by the exculpatory
> evidence to render it admissible.
> The task of determining the
> weight that must be possessed by
> such evidence of another's guilt
> is a difficult one."

7

"'Charles W. Gamble, McElroy's Alabama
Evidence § 48.01 (5th ed. 1996). To remove
this difficulty, this Court has set out a
test intended to ensure that any evidence
offered for this purpose is admissible only
when it is probative and not merely
speculative. Three elements must exist
before this evidence can be ruled
admissible: (1) the evidence "must relate
to the 'res gestae' of the crime"; (2) the
evidence must exclude the accused as a
perpetrator of the offense; and (3) the
evidence "would have to be admissible if
the third party was on trial." See Ex
parte Walker, 623 So. 2d at 284, and
Thomas[v. State, 539 So. 2d 375, 394-96
(Ala. Crim. App. 1988)]."

"[T]he admissibility of such evidence must rest within the
sound discretion of the trial judge. Baker v. State, 555 So.
2d 273 (Ala.Cr.App. 1989)." Id.

McLeod contends that evidence that J.J.'s mother no
longer had custody of her because of an accident some years
ago was relevant because it tended to prove that someone other
than McLeod injured J.J. The proffered evidence, however,
does not do so. The proffered evidence does not exclude
McLeod as the perpetrator; at best, it merely implicates
J.J.'s mother as a facilitator to the crime. Additionally,
the proffered evidence is not derived from and related to the
facts and circumstances of the rape and the attempted murder;
it does not connect J.J.'s mother to her rape or her attempted
murder or the circumstances surrounding the crimes.
Therefore, the findings of the trial court are correct, and
this argument is without merit.

III.

Third, McLeod argues that there was insufficient evidence
to convict him of attempted murder. Specifically, he
contends, that the jury should have found in his favor
because, "considering the fact that McLeod alerted the family
and neighbors that the child was missing, that he searched
diligently for her as well as the testimony of [one of the

8

witnesses] and the victim's mother concerning McLeod's concern for the missing child and the concern that was shown when she was found, ... a reasonable hypothesis other than guilt existed." (Appellant's brief, p. 24.)  He also puts forth another "reasonable alternative theory" for his fingerprints being on the wok, and he argues that the fact that the victim was "seen on another street[,] ... most certainly could provide an alternative theory that some other person had committed this crime." (Appellant's brief, p. 25.)  Finally, he argues that the State did not provide evidence that McLeod intended to kill J.J.

McLeod argued at trial at the close of the State's case-in-chief that the State had failed to prove that "this was more than an assault." (R. 613.)  The defense did not put on any witnesses.  McLeod argued in his motion for a new trial that the evidence was insufficient and that the verdict was against the great weight of the evidence.

Initially, we note that, with the exception of his argument regarding the alleged lack of proof of intent, all of McLeod's arguments concern the weighing of evidence, not the presentation of a prima facie case of attempted murder. Therefore, the following law applies:

> "'We have repeatedly held that it is not the province of this court to reweigh the evidence presented at trial. _E.g._, _Franklin v. State_, 405 So. 2d 963, 964 (Ala. Cr. App.), cert. denied, 405 So. 2d 966 (Ala. 1981); _Crumpton v. State_, 402 So. 2d 1081, 1085 (Ala. Cr. App.), cert. denied, 402 So. 2d 1088 (Ala. 1981); _Nobis v. State_, 401 So. 2d 191, 198 (Ala. Cr. App.), cert. denied, 401 So. 2d 204 (Ala. 1981).  "'[T]he credibility of witnesses and the weight or probative force of testimony is for the jury to judge and determine.'" _Harris v. State_, 513 So. 2d 79, 81 (Ala. Cr. App. 1987) (quoting _Byrd v. State_, 24 Ala. App. 451, 136 So. 431 (1931)).'

"...See _Smith v. State_, 604 So. 2d 434 (Ala. Cr.

9

App. 1992); <u>Pearson v. State</u>, 601 So. 2d 1119 (Ala.
Cr. App. 1992); <u>Curry v. State</u>, 601 So. 2d 157 (Ala.
Cr. App. 1992)."

<u>Zumbado v. State</u>, 615 So. 2d 1223, 1240-41 (Ala. Crim. App.
1993) (quoting <u>Johnson v. State</u>, 555 So. 2d 818, 819-20 (Ala.
Crim. App. 1989)). We will not second-guess the jury's
determinations regarding the weight of the evidence.
Therefore, these arguments are without merit.

As for McLeod's argument that the State failed to prove
that he intended to murder J.J., we note:

> "'"'Thus, as a general rule, the force or
> violence which was employed must be proven
> to have been intentional.... The intention
> to do great bodily harm, to murder or
> commit any other crime by means of an
> assault, may be inferred from the
> circumstances. Circumstantial evidence is
> usually the only available evidence of
> intention aside from the declarations of
> the accused. The intention may be inferred
> from the force or direction, or from the
> natural or contemplated result of the
> violence employed, from the weapon or
> implement used by the accused, from his
> threats or prior conduct towards the person
> assaulted, and generally from the extent
> and effect of the injury inflicted, or from
> any deliberate action which is naturally
> attempted and usually results in danger to
> the life of another.'"'

"<u>Long v. State</u>, 668 So. 2d 56, 60 (Ala.Cr.App.
1995)."

<u>Hutcherson v. State</u>, 727 So. 2d 846, 853 (Ala. Crim. App.
1997).

Based upon the circumstances surrounding the attack of
the victim, McLeod's use of the wok as a deadly weapon, and
the quality and quantity of victim's injuries, as set forth
above, we conclude that the evidence presented by the State

was sufficient to prove that McLeod had the specific intent to kill J.J.  Therefore, McLeod's argument is without merit.

IV.

Finally, McLeod argues that the evidence was insufficient to sustain the jury's guilty verdict against him on the rape charge.  Specifically, he argues that the jury erred in not finding credibility in his "reasonable alternative theory that the child's vaginal area and parts were bruised and injured during the time she was [dragged] into the woods and over the brush and sticks." (Appellant's brief, pp. 26-27.)  Again, as stated above in part III, although McLeod's argument is couched in terms of sufficiency, he is actually contesting the jury's weighing of the evidence.  For the same reasons stated in Part III, this weight-of-the-evidence argument is also without merit.  See Zumbado, supra.

For the reasons stated above, the judgment of the trial court is affirmed.

AFFIRMED.

McMillan, P.J., and Baschab, Shaw, and Wise, JJ., concur.

## APPLICATION FOR REHEARING

COMES NOW the Applicant, FREESHONE CORNELIUS McLEOD, in the above-styled cause, and makes application to this Honorable Court to rehear the above styled matter. Respectfully, the Applicant moves that upon rehearing this matter this Honorable Court reconsider, revise, reverse, and withdraw its judgment rendered on March 19th, 2004, affirming the judgment of the Circuit Court of Houston County, Alabama. Further, the Applicant moves this Honorable Court to enter an order reversing its March 19th, 2004 judgment and enter judgment and order in favor of the Applicant. Submitted herewith is a brief and argument in support of said application.

Respectfully submitted this the _3/st_ day of March, 2004.

_Clark M Parker_

Clark M. Parker, Attorney at Law (PAR069)
Attorney For Applicant
Ala. State Bar # ASB-4728-A63C
Brantley & Parker, L.L.C.
401 North Foster St.
Dothan, Alabama 36303
(334) 793-9009 Telephone
(334) 793-2037 Facsimile

## STATEMENT OF POINTS OF LAW APPLICANT RESPECTFULLY BELIEVES THIS HONORABLE COURT OVERLOOKED OR MISAPPREHENDED

The Applicant respectfully submits that this Honorable Court overlooked or misapprehended the following points of law when initially reviewing the Appeal in this cause, to-wit:

Whether this Honorable Court misapprehended or overlooked the Trial Court's error in denying the Applicant's Motion for New Trial based on newly discovered evidence.

**Yes.**

Isom v. State, 497 So.2d 208, 212 (Ala.Crim.App.1986)

## MOTION TO ADOPT APPLICANT'S STATEMENT OF FACTS
## PURSUANT TO RULES 39(d)(5), 39(k) and 40(e)
## ALABAMA RULES OF APPELLATE PROCEDURE

COMES NOW the Applicant, FREESHONE CORNELIUS McLEOD, in the above-styled cause, by and through the undersigned counsel and hereby moves this Honorable Court pursuant to Rules 39(d)(5), 39(k) and 40(e) of the Alabama Rules of Appellate Procedure to adopt the Applicant's "Statement of Facts" as set out herein and substitute them in the stead of the statement of facts issued in its opinion and judgment of March 19th, 2004, in this matter.

Respectfully submitted this the 31st day of March, 2004.

Clark M. Parker, Attorney at Law (PAR069)
Attorney For Applicant
Ala. State Bar # ASB-4728-A63C
Brantley & Parker, L.L.C.
401 North Foster St.
Dothan, Alabama 36303
(334) 793-9009 Telephone
(334) 793-2037 Facsimile

## STATEMENT OF THE FACTS

This matter was tried before the Hon. Judge Bradley
Eutaw Mendheim, Acting Circuit Judge, on April 7 through
April 9,2003. The Hon. Douglas Valeska, District Attorney
for the 20th Judicial District represented the State. The
Hon. Thomas K. Brantley, Attorney at Law, Dothan,
represented the Defendant, Mr. McLeod.

Prior to opening statements to the jury by counsel, Mr.
Brantley moved to suppress Mr. McLeod statements made to
Houston County Sheriff's Department Investigator Adam
Robinson (R16). A hearing was conducted outside the
presence of the jury (R16).

The State called Investigator Adam Robinson to the
stand. The State questioned the witness of October 6, 2001
being in Gordon, Alabama, Houston County, 62 Gordon Street.
Robinson stated, "We received a call of a child bleeding
from the head." (R17). Investigator Robinson was further
questioned by the State and it was established that he was
present at the time when Jonteria Jones, the victim, was
talking or was lying on the concrete where her mother was
in close proximity to her. (R25). The State asked if
Robinson if he had heard the victim's mother ask her who

1

had done this and who had hurt her or caused her this injury. (R25). Mr. Brantley objected on relevance as to what others had said. The Court directed the State to "just go to the facts" and admitted it for purposes of the motion in limine.

Mr. McLeod was detained, but was not placed under arrest (R29). He was hand cuffed then placed in the back seat of Robinson's' patrol unit, at which time the Defendant asked if the child was ok. Robinson stated that the Defendant had no blood on him, nor did he appear to be under the influence of any intoxicants. The Defendant was taken to the Houston County Jail for questioning.

Upon Cross-Examination Mr. Brantley established the amount of time that Robinson was on the scene, and that during that time he did not see the victim point or hear her speak. Robinson was asked if McLeod was under arrest when he was placed in the backseat handcuffed. "No Sir, he was detained for questioning" (R40). Mr. Brantley asked if he was read his rights. "Yes Sir" (R40). Upon further questioning Robinson could not recall if he gave the Defendant a Waiver of rights, or if he asked him if he waived those rights. When asked if anyone else heard the

statements made by the Defendant, "No sir. I don't believe so" (R42).

The State and the Defense rested on the Suppressed Issues. The Court found Robinson's statement admissible. The Court consolidated the cases without objection. "The two charges are, rape in the first and attempted murder." (R46).

The State called Tylena Wesley to the stand. Tylena was a 4 year old, and at the time of the incident she was age 3. The Court questioned her ability to understand. The State explained to Tylena to answer yes or no, she either did not understand or remember. Mr. Brantley requested to take the witness on Voire Dire. The court granted a Voire Dire Exam. " I would move at this point and time to exclude her as a witness for the lack of capacity because she is so young." (R90). The court determined the witness competent and allowed her testimony admitted. Tylena stated that Jonteria, the victim, left the house to go get some noodles and Freeshone followed her out. She further stated that when Freeshone came back in the house, Jonteria did not. Witness was then dismissed.

The State called Melissa Ann Lee to the stand. Ms. Lee testified that around one o'clock to one thirty, on October 6, 2001 she saw the Defendant outside of her kitchen window, looking around, she went to the door to see what he was doing. "He said he was looking for Jonteria." (R132). Her Brother, Larry Dixon, rode by, she went to talk to him and did not see the Defendant again until she went down to Mr. McGriff's. State passed the witness.

During Mr. Brantley's questioning the court learned of a sexual relationship that Jonteria's mother, Tunt, was having with Larry Dixon, the witness's brother, before and during the time she was with the Defendant. Witness was dismissed.

State called Mose McGriff. The State questioned Mr. McGriff about October 6, 2001, around two o'clock, and whether he recalled where he was. He stated that he was cooking when he noticed the Defendant outside walking back and forth on the road. He went out to talk to him and see what he was doing. "He asked me have I seen the daughter." (R263). "He said the little girl was lost." (R264). "I asked how long she been gone. He said about thirty-five to forty minutes." (R264). Mr. McGriff went with the Defendant

4

to look for Jonteria. Together Mr. McGriff and the Defendant found Jonteria in the bushes face down. Mr. McGriff stated, "I said do not touch the baby we are going to call 911." (R271). The State asked, "Who got her out of the bushes?" (R272). "I seen her momma toting her into my driveway."(R272). State passed the witness.

Mr. Brantley cross examines MR. McGriff and established that he had seen the defendant and Jonteria together quite often, and that he was always taking care of her. That he would be the only adult with her, he would be the grown-up person to take care of her. "Where did you look when Freeshone came up to you and asked you would you help look for Tera, that Tera was lost?"(R281). Tera was a nickname for the victim. He then stated they started looking in the ditch in front of his house. They looked around the trailer, and they found drag marks that were going toward the bushes. They followed the marks and found Jonteria in the bushes. "She was laying on top of them." (R283).

The State called Dinetha Jones, "Tunt", the mother of the victim. The State asked her, "If I could, On October 6, 2001, tell the Jury who had legal custody of Jonteria?" (R352). My sister, Mary Wesley." (R352).  She stated in her

testimony that she saw Jonteria that morning once. Later in the day she went to he mothers house, Jonteria was not there. She left her momma's and went to a friend's house. She further stated, "Somebody came up the road and said, Joneteria was on the next street." (R354). "Who went looking with you?" (R354). "He did", referring the Defendant.(R354). However, she stated she did not go with the Defendant to Mr. McGriff's. Yet, she stated that Freeshone told her he found the body and took her straight to it. She picked up her daughter and carried her to Mr. McGriff's driveway and laid her down.

Mr. Brantley cross-examined the witness. Mr. Brantley established that Mrs. Wesley has had custody of Jonteria for two years. When asked why she did not have custody of the child, the State objected on grounds of relevance. (R.378). The Court asked counsel to approach the bench. Proceedings were held at the bench outside of the hearing of the Jury. The Court asked Mr. Brantley, how the question was relevant? He explained that the evidence needed to come in because in the past she had physically abused the child. After argument of the council the court sent the jury out to examine the witness on this issue.

The court learned that the witness, who is the mother of the victim, lost custody of the victim because DHR said she was not properly supervising the child. (R383). A judge determined the custody. (R382). The Court sustained the State's objection. (R383) With further argument Mr. Brantley continued to try and show the court the relevancy of this line of questioning. (R383-391)

While the jury remained out of the courtroom, Mr. Brantley produced a document of a conviction for domestic abuse against the witness' brother and offered it for admission. The State objected; "First of all that is not a certified copy." (R394). The court allowed Mr. Brantley to offer the facts substantiating the conviction. The witness admitted that she had plead guilty in Gordon, Alabama, Municipal court, in February of 2001, to assault 3rd degree. (R395). The Court, again, determined that the issue was not relevant. (R396).

Ms. Jones stated that after she got up on the morning of the incident she had gone to her mother's house, which was not far from where she lived; "you could just walk." (R406). The witness then provided confusing and contradicting testimony as to where she was that morning.

After saying that she had been at her mother's house she stated, "The same house I was at -- I mean, my momma -- I was over at Walt Lee's house. I was at Walt Lee's house. (R408). Ms. Jones stated that she first learned of her daughter missing when Mr. McLeod came and told her. She stated they both left together looking for her. (R410). Mr. McLeod and Ms. Jones both looked for the victim and Ms. Jones stated that Mr. McLeod appeared to be concerned about where she was. (R412). Ms. Jones stated that Mr. McLeod had an "evil look on his face" when he pointed out the victim to her. (R413). She stated that she was staring at his face even before she picked her daughter up. (R416).

On re-direct examination by the State, Ms. Jones stated that there were no other pots or pans in the trailer where she and Mr. McLeod lived, except the wok that was alleged to have been used to strike the victim. (R420). She stated that her mother's house was within about 20 feet of Mr. McGriff's house and that Mr. McGriff's house was not less than 20 feet from the trailer where she lived with Mr. McLeod. (R420-421).

The State next called Lieutenant Donald Valenza, Houston County Sheriff's Department Investigator as its

witness. (R.427). Lt. Valenza testified that he received the wok alleged to have been used in the incident from another deputy and transported it to Montgomery for fingerprint examination. (R432). He also told the court that he took the "major case prints" of Mr. McLeod. (R432).

The State called Peter Macchia, forensic scientist, Alabama Department of Forensic Science.(R453). After extensive questioning, and upon motion by the State, Mr. Macchia no objection was made to his being declared an expert in the field of DNA. (R468).

Mr. Macchia stated that he obtained evidence determined to be semen found on the clothing from the victim, which matched the DNA of Mr. McLeod. (R489-490). Mr. Macchia stated that he determined there was no semen on the swabs from the "rape kit" used to examine the victim. (R502). He stated that the semen from the clothing of the victim came from the hip area of the pants. (R508).

Investigating Officer, Houston County Sheriff's Department, Keith Cook, was examined by the State and generally described what he found at the scene. He stated that he saw blood in various places around the dwelling where the mother, Dinetha Jones, and Mr. McLeod lived.

9

(R527-534). Inv. Cook obtained a wok type fry pan that was suspected to be connected with the crime.

The State next called Shannon Fitzgerald, a certified latent print examiner for the Alabama Bureau of Investigation. (R 567). Mr. Fitzgerald testified that he obtained latent fingerprints from the inside of the wok, which were determined to be from Mr. McLeod.

After cross-examination and redirect were conducted several times, the State rested. Mr. McLeod decided not to testify.

After sentencing the Defendant, a motion for new trial based on newly discovered evidence was heard. (Vol. V, R12). Tana Coleman was called by the Defense. Ms. Coleman testified that she lived with the victim's mother, Denitha Jones. (Vol. V, R14). She stated that Denitha Jones would commingle her cloths with the clothes of her daughter, Jonteria and that the clothes were soiled and laying about the floor and in the closets. (Vol. V, R17). Ms. Coleman testified that she observed Denitha Jones take dirty underwear of her own and put them on her child, the victim, Jonteria Jones, and that ... "Jonteria hardly ever wore her own underwear. She basically wore her mom's underwear,

whatever she could just get out of the pile." (Vol. V, R17-18). Ms. Coleman further testified that she first time she talked to the Defendant's counsel, Hon. Thomas K. Brantly, regarding her knowledge of soiled laundry condition was after she heard about the conviction on television. (Vol. V, R25).

BRIEF IN SUPPORT OF

APPLICATION FOR REHEARING

## TABLE OF CITATIONS

Isom v. State, 497 So.2d 208, 212 (Ala.Crim.App.1986)
...............................................iii, 14


Rules 39(d)(5), 39(k) and 40(e) of the Alabama Rules of
Appellate Procedure
..................................................iv

## ARGUMENT

To establish a right to a new trial based on newly discovered evidence, the petitioner must show the following: (1) that the evidence will probably change the result if a new trial is granted; (2) that the evidence has been discovered since the trial; (3) that it could not have been discovered before the trial by the exercise of due diligence; (4) that it is material to the issue; and (5) that it is not merely cumulative or impeaching.
Isom v. State, 497 So.2d 208, 212 (Ala.Crim.App.1986)

The newly discovered evidence that the Applicant argues provides a substantial foundation for a new trial is that evidence provided by Tana Coleman at the hearing on the motion for new trial. Her testimony provided the basis for an explanation as to why the Applicant's semen was found on the victim's clothing.

The probability that the newly discovered evidence would have effected a new result if the new trial had been granted is palpable and manifest. Defense counsel argued at the hearing on the motion for new trial that what would have been argued to the jury was that the Defendant's semen found on the underwear the child was wearing in fact got there through the mother's sexual activity with the Defendant. There was no answer for the question of how the Defendant's semen got on the clothing of the victim. This

14

evidence would have given them a reasonable alternative theory as to that question.

There was no question that, and no rebuttal, that the evidence was discovered since the trial. Ms. Coleman stated that she did not know of the issue until she heard it on the television reports of the Defendant's conviction. She further stated that she had never spoken with defense counsel prior to the trial and conviction.

To assume that defense counsel should have, would have or could have discovered this evidence before the trial by the exercise of due diligence is beyond fairness. This witness, Ms. Coleman, saw television news reports of the Defendant's conviction based on the semen evidence and, obviously, began to remember the situation that she testified to and *then* came forward to defense counsel. To impose upon the defense the burden of conceiving every theory of factual possibilities that would provide a viable defense is not within the realm of advocacy nor reality.

The fact that the newly discovered evidence is material to the issue is patent. The evidence of rape is fundamentally and crucially tied to the Defendant's semen found on the clothing of the victim and thus is germane and

the epitome materiality. The fact that the Defendant's semen was found on the underwear of the victim is critical to any logical conclusion that he committed the crime. The semen evidence was critical enough for the State to expend time and funds to test for DNA evidence. The Defendant, thus, should have the opportunity to rebut the evidence with a reasonable alternative theory as to how the semen was found in the proximity of the victim. Therefore, materiality of the Defendant's proffered evidence is patent.

There is no issue regarding cumulativeness of the Defendant's proffered evidence. The Defendant's theory of how the semen got onto the victim's clothing had no basis for conception prior to or during the trial, therefore, the Defendant could not and did not offer other evidence regarding the means or manner in which the semen got onto the victim's underwear and, by definition, could not be cumulative. The evidence was not offered to impeach any witness regarding the means or manner in which the semen got onto the victim's clothing.

## CONCLUSION

The Applicant respectfully submits that this Honorable Court overlooked and misapprehended the gravity and materiality of the Trial Court's denial of the motion for new trial and should have granted the Applicant's prayer for relief as set out in his Appeal to this Honorable Court. Therefore, the Applicant prays this Honorable Court will reconsider their opinion and judgment in this case and grant the relief prayed for in his Application for Rehearing submitted herewith.

Respectfully submitted this the 31st day of March, 2004.

Clark M. Parker, Attorney at Law (PAR069)
Attorney for Applicant
Ala. State Bar # ASB-4728-A63C
Brantley & Parker, L.L.C.
401 North Foster St.
Dothan, Alabama 36303
(334) 793-9009 Telephone
(334) 793-2037 Facsimile

17

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have served a copy of the above and foregoing Brief of Appellant upon the Attorney General for the State of Alabama, Alabama State House, 11 South Union Street, Montgomery, Alabama 36310, by placing a copy of same in the U. S. Mail, postage prepaid and properly addressed, on this the 31st day of March, 2004.

_Clark M. Parker_
Clark M. Parker, Attorney at Law