COURT OF CRIMINAL APPEALS NO. _____

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

FROM

CIRCUIT COURT OF _____HOUSTON_____ COUNTY, ALABAMA

CIRCUIT COURT NO. ___CC-2002-235 & 236___ Volume IV

CIRCUIT JUDGE _____Brad Mendheim_____

Type of Conviction / Order Appealed From: __Rape 1 and Attempted Murder__

Sentence Imposed: _99 Years $20,000.00 Fine, $5,000.00 Victime Compensation._

Defendant Indigent:    [X] YES    [ ] NO    99 years, $20,000.00 Fine $5,000.00 Victim Comp

__Freeshone Cornelius McLeod__

__Hon. Clark Parker    PAR 069__         __793-9009__          NAME OF APPELLANT
(Appellant's Attorney)                              (Telephone No.)
__401 N. Foster St.__
(Address)
__Dothan__          __Alabama__          __36303__
(City)          (State)          (Zip Code)

V.

STATE OF ALABAMA

(State represented by Attorney General)                    NAME OF APPELLEE
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

(For Court of Criminal Appeals Use Only)

Part 8 of 9

STATE'S
EXHIBIT
5

1    A    It would be the kitchen.

2    Q    The kitchen going down the hall, describe the

3         rooms.  Tell me what we have.

4    A    It was a room to the left.  You went by and there

5         was an area where a washer and dryer or laundry

6         area would have been.  On past it was the

7         bathroom, and then another bedroom in the south

8         end of the trailer.

9    Q    Now, Investigator Cook, I was looking for a

10        diagram, but I notice you told the ladies and

11        gentlemen of the jury there was a washer and

12        dryer.  Was there a washer and dryer in that

13        trailer?

14   A    No.  It was an area for one.

15   Q    So are you sure a hundred percent beyond all doubt

16        there was no washer and dryer in that trailer?

17   A    I'm sure.

18   Q    I want to show you a diagram that's been admitted,

19        State's Exhibit 38.  And I ask you about the

20        rooms.  Let you look at 38.  And ask you looking

21        at 38 that's been admitted, is that a rough

22        diagram -- I know it's been a long time -- in

23        reference to that trailer in Gordon, Alabama?

24   A    Yes.

25   Q    I ask you and you went in and you were going left

```
 1          and you described the rooms as you went down.  The
 2          last bedroom at the end of the trailer is what I
 3          want to ask you.  Just before that bedroom, okay,
 4          walking down the wall on the right, was there
 5          another door to exit that trailer or back in that
 6          location?
 7    A     Yes.
 8    Q     Tell the ladies and gentlemen of the jury, go back
 9          to the entrance wherever you came in.  You were
10          going left and describe.  Let's go right.  If I
11          went right, in other words, what rooms according
12          to the diagram that you have in that trailer, if
13          any?
14    A     You have another bedroom and rest room.
15    Q     Now, if I could, let's go to -- just go out that
16          back door or to the extreme right-hand corner.
17          Looking at the trailer stepping up on the wooden
18          porch and looking at that entrance, okay, right
19          angle of the trailer.  On that angle, was there
20          any structures close to that trailer?  Whose house?
21    A     If you are stepping on the porch?
22    Q     Step off the porch and go down to the left and go
23          down the end of the trailer where that last
24          bedroom is you said and you go around there, what
25          house or structure is behind that trailer close
```

1       to?

2   A   You go to the -- are you saying south end of the

3       house?

4   Q   I say south.  That's fine.  South.

5   A   There was a trailer adjacent to this trailer to

6       the left side of the trailer.

7   Q   Close or far away?

8   A   It's about a hundred -- hundred and fifty yards

9       probably.

10   Q   Anybody living in that trailer?

11   A   No.  It was empty.

12   Q   Any other houses out there?  When I say a house,

13       not a trailer, close to the trailer?  Actual

14       houses?

15   A   Yes.

16   Q   Whose house?

17   A   Mose McGriff's house.

18   Q   And what was that house made of?  Do you remember?

19   A   Brick.

20   Q   Now, tell the ladies and gentlemen of the jury,

21       the grandmother that kept Jonteria that day, what

22       kind of structure did she live in?  Was it a brick

23       house?

24   A   No.  It was vinyl-siding-type house.

25   Q   And if I use the trailer and I'm stepping off

1    under the wooden porch of Freeshone and Dinthea

2    Jones' trailer, which direction would that be?

3    I'm standing on the porch. Here's the door.

4    Where would that house have been if I'm in that

5    direction?

6   A    It would have been to the west.

7   Q    Back this way (indicating)?

8   A    Back of you.

9   Q    Back in this area, correct?

10   A    Right.

11   Q    Now, the approximate location of all these houses

12       and trailers except that one house that you said

13       was a hundred and fifty yards or whatever, are

14       those houses approximately close to each other?

15       Pretty close?

16   A    Pretty close.

17   Q    Take a baseball and almost hit them or whatever?

18   A    Correct.

19   Q    Looking at the diagram I asked you about the

20       porch. And I know it's been a while. Use that

21       diagram to refresh your memory if you can. I

22       asked you about the porch when you stepped up onto

23       it. Was there anything around the porch? Look at

24       that diagram.

25   A    Oh, there was a lot of debris.

1    Q    I believe there's two or three pages there of the

2          diagram itself. That's the page I want to ask you

3          about. Looking at -- do you see a porch there?

4    A    Right.

5    Q    What do you see on either side of the porch coming

6          out on the diagram?

7    A    There was a rail. I didn't remember there was a

8          rail.

9    Q    I understand. But that refreshes your memory,

10       correct?

11    A    Right.

12    Q    Tell the ladies and gentlemen of the jury when

13       you got down there was the victim, Jonteria Jones,

14       still there?

15    A    She was on the ambulance. She was leaving as I

16       was arriving.

17    Q    When you went into the trailer, I want to ask you,

18       tell the ladies and gentlemen of the jury, did you

19       go left or right? Freeshone or Dinthea Jones'

20       trailer? Just for identification purposes the

21       trailer in Gordon, Alabama, in Houston County.

22    A    I believe I went left.

23    Q    As you went left as an investigator with the

24       sheriff's department before October 6, 2001, did

25       you ever work cases with people, human beings, had

1      been injured, cut, shot, stabbed, assaulted?  Did

2      you work those cases?

3  A   Yes.

4  Q   Did you see any kind of substance in relationship

5      to those victims if that occurred to them what

6      would come out of their body?

7  A   Yes.

8  Q.  What was it?

9  A   Blood.

10 Q   Now, you yourself, have you ever been cut or

11     injured during your lifetime and see something

12     come out of your body?

13 A   Yes.

14 Q   A red substance?

15 A   Yes.

16 Q   What was it?

17 A   Blood.

18 Q   Now, as you went into the trailer, would you tell

19     the ladies and gentlemen of the jury, did you

20     notice any blood?

21 A   I noticed some blood, yes, sir.

22 Q   Help me a little bit.  Either yourself getting cut

23     or seeing blood in the past over a period of time

24     blood, in other words, fresh blood versus old

25     blood, is there a difference in the colors for the

1          period of time fresh blood versus old blood?

2   A   Yes, sir.

3   Q   When you were in the trailer and you went left,

4          the best you can recall -- let me show you some

5          exhibits if I could.  I know it's been a while.

6          State's Exhibit 42, 41, which are in evidence --

7          let's do 41 first.  Let me show you these others.

8          I will just place them up here.  And we'll go back

9          into those.  34 and 42.  But I'm asking you

10         particularly about State's Exhibit 41.  And then

11         there's 42 on the back.  Stick with 41.  Tell the

12         ladies and gentlemen of the jury, you recognize 41

13         for identification purposes?

14  A   Yes, sir.

15  Q   What is it?

16  A   It's a spot of blood on the door on the south end

17         of the door on the south bedroom door.

18  Q   I don't mean to be picky.  Is it a house or

19         trailer?

20  A   Trailer house.

21  Q   What was the number?  Do you recall?  The number

22         of the trailer on Depot Street?

23  A   76.

24  Q   Yes, sir.

25           Now, tell the ladies and gentlemen of the

1    jury, when you saw that blood what you observed
2    yourself, was it fresh?
3    A    Yes.
4    Q    When you went in the trailer, did you have any
5    difficulty yourself as you walked in that
6    direction seeing that blood?
7    A    No.
8    Q    Now, I want to ask you, do you recall
9    approximately what time you were down there?  Was
10   it six or seven o'clock, or was it early?
11   A    No.
12   Q    Jonteria had just left, correct?
13   A    Two or three o'clock in the afternoon.
14   Q    What I want to go back and ask you you yourself as
15   a human being, an investigator, when you've seen
16   blood except yourself when it's fresh versus when
17   it gets old, does it change colors in any way?
18   A    Yes, sir.
19   Q    The blood you saw, can you tell the ladies and
20   gentlemen of the jury, was it fresh?
21   A    It was fresh.
22   Q    Was it red?
23   A    It was red.
24   Q    Did you have any difficulty when you entered this
25   trailer walking down and observing it right away?

1    A    No, sir.

2    Q    Anything in that trailer that would have prevented

3         you from seeing that as you walked in there

4         yourself?

5    A    No, sir.

6    Q    Did you have to get a microscope get down or a

7         little magnifying glass to see it?

8    A    No, sir.

9    Q    Did it stand out?

10    A    Yes.

11    Q    Is that the way it looked when you found it on

12        State's 41?

13    A    Yes, sir.

14    Q    Whose foot is in the picture?  Do you know?   Is

15        that your foot, or is that another investigator's?

16    A    It would have been Sergeant Ducker's.

17    Q    And the picture, does it truly and accurately

18        depict the inside of 76 Depot Street at that

19        trailer that Freeshone and Dinthea Jones lived in

20        when you saw it the time shortly after the victim

21        had been taken off in the ambulance?

22    A    Yes, sir.

23    Q    Marked, altered, or changed in any way?

24    A    No, sir.

25    Q    Same substantial condition, correct?

1    A    Correct.

2         MR. VALESKA:  Offer 41 into evidence.  Just

3    the picture.  I understand there's some writings,

4    and we will take those off, Judge.

5         THE COURT:  Any objection to 41?

6         MR. BRANTLEY:  Let me see them for a second,

7    if I could.

8              With the stipulation he will take that

9    little sticker off.

10        MR. VALESKA:  Just identification sticker,

11   and we will do that.

12        MR. BRANTLEY:  And subject to cross

13   examination.

14        THE COURT:  41 is admitted.

15             (State's Exhibit No. 41 was admitted

16             into evidence.)

17   Q    Go to 42, if I could, Investigator Cook.  Tell us

18   what 42 is.

19   A    That's blood splatter.  It's on the wall in the

20   south end of the mobile home.

21   Q    And once again, is that 76 Depot Street, Gordon,

22   Alabama, Houston County, when Jonteria had just

23   left you walked in and saw it?

24   A    Yes.

25   Q    Was it fresh?

1    A    Yes, sir.

2    Q    Did you have any problems seeing it?

3    A    No, sir.

4    Q    Now, I notice on the picture if you'll tell the

5         jury, in other words, there's -- help me, but it's

6         on what?  What's the blood on?

7    A    It's on the wall.

8    Q    See the red substance, correct?

9    A    Yes.

10   Q    It's fresh?

11   A    Yes.

12   Q    Something circling around it.  Tell me what that

13        is.

14   A    I believe that's going to be the flashlight.

15   Q    Help me a little bit.  My experience a

16        flashlight, did you have to have a flashlight to

17        see it?

18   A    With a thirty-five millimeter camera, you have to

19        have certain amount of light for it to flash.

20   Q    With your naked eye what I'm asking, tell this

21        jury, could you see it without any difficulty

22        without using a flashlight to illuminate to take a

23        picture using that camera?

24   A    Yes.  I could see it without the flashlight.

25   Q    Is that the position you found it in in the

1     trailer at 76 Depot Street?

2  A  Yes.

3  Q  Marked, altered, or changed in any way?

4  A  No, sir.

5  Q  Same substantial condition?

6  A  Same.

7  Q  I believe you used the term blood splattering.

8     Is that how you described it?

9  A  Yes.

10        MR. VALESKA:  Offer that picture into

11    evidence.  Take off any sticker.

12        THE COURT:  What number is that?

13        MR. VALESKA:  42.

14        THE COURT:  Any objection to 42?

15        MR. BRANTLEY:  No, sir.

16        THE COURT:  Other than -- 42 is admitted,

17    again, with the sticker to be removed and covered

18    up.

19            (State's Exhibit No. 42 was admitted

20             into evidence.)

21  Q  Let me go to State's Exhibit No. 40 -- it's

22     already in, but I want to ask you about it,

23     Investigator Cook.  Tell the jury what 40 is.

24  A  It's blood splatter going to be on the north wall

25     of the trailer number 76 Depot Street.

1   Q   Once again, is that the same position or the same

2       as the other photographs?  Is that another

3       location?

4   A   It's another location that was in the same

5       bedroom.

6   Q   Now, help me once again.  Go in the front door --

7       we got the diagram that's admitted into evidence.

8       We go in on the wooden porch what you refer to as

9       the living room on the diagram.  Which way, left

10      or right?

11  A   Left.

12  Q   Which bedroom?

13  A   South end bedroom.

14  Q   Just for identification purposes, is that the last

15      bedroom in the trailer?

16  A   Yes, it is.

17  Q   Did you have any problems seeing the blood on

18      State's Exhibit No. 40 that's in evidence?

19  A   No, sir.

20  Q   Once again, I notice -- if I'm wrong, correct

21      me -- but to the left of it, once again, you tell

22      me, but to the left, does it show flashlight or

23      light attempting to illuminate for purposes of the

24      picture?

25  A   Yes.

1   Q   Was that blood fresh?

2   A   Yes.

3   Q   Now, that picture as well as others, did you have

4        any difficulty with the naked eye when you walked

5        down there seeing that red fresh blood yourself in

6        that trailer shortly -- and I mean within a minute

7        or two -- after Jonteria had been taken off from

8        the scene?

9   A   No problem seeing it.

10   Q   Let me go to State's 39. It's in evidence. Ask

11       you -- and also 35. It's in evidence. Do you

12       recognize 35 and 39 as to what they are?

13   A   Yes.

14   Q   What are they?

15   A   Blood smears on the floor in the kitchen.

16   Q   Did you have any problems seeing that?

17   A   No, sir.

18   Q   Now, if I could, if you'd flip over. I believe

19       there's another picture I want to ask you about.

20       I'm sorry. State's 34 for identification

21       purposes. Just tell me, what is 34?

22   A   It was a shirt with blood stains on it that was

23       located in the bedroom.

24   Q   Is that the last bedroom, once again, referring to

25       the ladies and gentlemen of the jury?

1    A    Yes, sir.

2    Q    Would you tell the ladies and gentlemen of the

3         jury, when you saw it, in your opinion was it

4         fresh blood?

5    A    Yes, it was.

6    Q    Have any difficult seeing it in any way as you

7         walked in there?

8    A    No, sir.

9    Q    Did you have to illuminate that with a flashlight

10        to get a picture that you can tell from the

11        picture that you see?

12   A    I don't remember.  I don't think so.

13   Q    Compared to the other pictures where you can tell,

14        in other words, what I'm asking about, where

15        there's a circle of light you could see, is there

16        any circle of light on that picture that you

17        notice?

18   A    No, sir.

19   Q    Now, let me show you State's Exhibit 33 for

20        identification purposes.  33 for identification

21        purposes, what is that?

22   A    That was a radio located in the kitchen as you go

23        in the front door.

24   Q    Did you see any substances on that?

25   A    Yes, I did.

1    Q    What did you see?

2    A    Blood.

3    Q    Was it fresh or old?

4    A    It was fresh.

5    Q    Did you have any difficult seeing it when you went

6         in there without any artificial light in any

7         manner of fashion?

8    A    No, sir.

9    Q    Has it been marked, altered, or changed from the

10        time you saw it right after Jonteria had been

11        left, been a minute or two, you went in there and

12        saw it on that radio, correct?

13   A    No.

14   Q    Same -- it hadn't been changed?

15   A    No.

16   Q    Same substantial condition?

17   A    Same.

18            MR. VALESKA:  Let me show Mr. Brantley.  I

19        offer 33 without any stickers, Judge Mendheim.

20        I'm not publishing anything at this time, Judge.

21            THE COURT:  Any objection to 33, Mr.

22        Brantley?

23            MR. BRANTLEY:  No, sir.

24            THE COURT:  33 is admitted again with the

25        understanding that the sticker with investigator's

534

1          notes will be removed or covered up before sent to

2          the jury.

3                  (State's Exhibit No. 33 was admitted

4                  into evidence.)

5            THE COURT:  And I note that there's a lot --

6          nobody is trying to hide anything from you-all.

7          It's just that you need in this case to rely on

8          what you view of the picture, not what somebody

9          else may make notes of.  You can rely on his

10         testimony.  But, again, nobody is trying to hide

11         anything from you.  It's just necessary to do

12         that.

13   Q   Now, if I could, tell the ladies and gentlemen of

14         the jury -- State's Exhibit No. 6 for

15         identification purposes, Investigator Cook, it was

16         sealed and ripped open in open court with the

17         Judge's permission.  Take it out and stick it in

18         front of you.  Do you recognize State's 6?

19   A   Yes, I do.

20   Q   What is it?

21   A   It was a wok.

22   Q   Tell the ladies and gentlemen of the jury, did you

23         see any substances on the wok?

24   A   We discovered some type brown substance on the

25         wok.  We didn't know if it was blood at that time

1     when we recovered it.

2  Q  Could you tell the ladies and gentlemen of the

3     jury, what I want to ask you about, that substance

4     and you referred to brown, was it the same color

5     of all the other fresh blood that you saw on the

6     wall and the clothing -- that reddish color in

7     your opinion?

8  A  No.

9  Q  Or on the kitchen floor?

10  A  No, sir.

11  Q  Or the radio?

12  A  No, sir.

13  Q  The condition it's in now, in other words, I'm not

14     an expert on that kind of panware, but is that the

15     condition you found it in or were these handles

16     and these --

17  A  The handles were off. We recovered the handles.

18  Q  What about the pins? Were they in or out?

19  A  They were off. We recovered them on the floor.

20  Q  You see this wok. Do you see any -- is it

21     complete -- I'll use geometry. Three hundred and

22     sixty degrees or a hundred and eighty degrees

23     completely perfect shape the wok itself?

24  A  Yes, sir.

25  Q  Are there any indentions in it?

1  A  There's an indention in the bottom of it.

2  Q  When you found it, was there an indention in the

3     bottom of it?

4  A  Yes, sir.

5  Q  Besides having fingerprint powder or residue as

6     well as substances applied to it and any magic

7     markers you can see, or is that -- besides that

8     and the court's identification number and case

9     numbers and initials, is that the condition you

10    found it in?

11 A  Yes, sir.

12 Q  Tell me where you found it.

13 A  It was in the bedroom in the south end of the

14    trailer, which is the last bedroom on the left.

15 Q  That's where the shirt was found with blood?

16 A  Yes, sir.

17 Q  And the blood stains that went from the kitchen

18    floor -- if I'm wrong, correct me -- down I

19    referred to it the left end and you said south

20    end, correct?

21 A  That's correct.

22 Q  That's the path and on the walls and doors where

23    you found the red substances with fresh blood,

24    correct?

25 A  Correct.

1    Q    State's Exhibit 6, when you took it into your

2         custody, did you mark, alter, or change it in any

3         way?

4    A    No.

5    Q    Does it look different except what I've asked you

6         about, the fingerprint powder, the markings with

7         the magic marker or black writing, and initials,

8         and yellow substances on it now?  Besides that,

9         does it look to be the same?

10   A    Same.

11            MR. VALESKA:  Offer State's 6, the wok.

12            MR. BRANTLEY:  Judge, I would object.

13       Obviously they are trying to say this is the

14       murder weapon -- or the attempted murder weapon.

15       There's no -- there's an indentation in it.  We

16       don't know how the indentation got there.  It's

17       just circumspection.  There's no fingerprints on

18       it.  It was found in the bedroom.  But other than

19       that, I mean, it's just -- there's no -- I don't

20       think the relevance -- the quality of the

21       relevance is there, and I think the prejudice to

22       the Defendant to have that introduced as an

23       alleged murder weapon outweighs any probative

24       evidence.

25            MR. VALESKA:  They object.  I withdraw it and

1       offer it at a later point.

2           THE COURT:  Their offer to withdrawn at this

3       point.  Go ahead.

4  Q    Investigator Cook, did you have the opportunity

5       yourself to see Freeshone McLeod while he was down

6       there?

7  A    Yes, sir.

8  Q    Does he look the same today?

9  A    No, sir.

10  Q    What looks different today?

11  A    He looks a little heavier, and he has cut his

12      hair.

13  Q    Do you recall the color of clothing or what he was

14      wearing on that day?  I know it's been a while.

15  A    I know he had a T-shirt on and silky-type shirt

16      with some dark pants.

17              (State's Exhibit No. 56 was marked for

18              identification.)

19  Q    Let me show you State's Exhibit 56 for

20      identification purposes, Investigator Cook.  56,

21      what is 56?

22  A    Photograph of child's shoes.  It was located in

23      the living room as you go in the front door.

24  Q    And did you find any blood or red substances in

25      the living room on our diagram in that area?

| | | |
|---|---|---|
| 1 | A | No, sir. |
| 2 | Q | Was the kitchen connected to that area? |
| 3 | A | Yes, sir. |
| 4 | Q | There's no door that separate? |
| 5 | A | No, sir. |
| 6 | Q | In other words, doors like this? |
| 7 | A | It's an open area. |
| 8 | Q | And does that truly and accurately depict when you |
| 9 | | went in that door with the child's shoes with the |
| 10 | | furniture in that location as well as a mattress |
| 11 | | and other shoes in that location? |
| 12 | A | That's correct. |
| 13 | Q | Appear to be marked, altered, or changed in any |
| 14 | | way? |
| 15 | A | No, sir. |
| 16 | | MR. VALESKA:  Offer 56 with the same |
| 17 | | condition with removing the sticker. |
| 18 | | MR. BRANTLEY:  No objection, Your Honor. |
| 19 | | THE COURT:  56 is admitted, then, without the |
| 20 | | sticker on it. |
| 21 | | (State's Exhibit No. 56 was admitted |
| 22 | | into evidence.) |
| 23 | Q | Investigator Cook, did you get to look at |
| 24 | | Freeshone McLeod's hands yourself? |
| 25 | A | Yes, I did. |

1    Q    Now, let me ask you something.  In your lifetime
2         -- I don't mean to be personal, but how old are
3         you now?
4    A    Forty.
5    Q    During those forty years have you ever fallen down
6         and scraped your knuckles or cut your knuckles,
7         your hands, with any type of object, sharp object,
8         or anything in any manner or fashion?  Have you
9         done that?
10   A    Yes, sir.
11   Q    Now, when you looked at Freeshone McLeod's hands,
12        let me show you some pictures if I could.  State's
13        Exhibit 24 for identification purposes and State's
14        Exhibit 25 for identification purposes.  Take a
15        look at both of them.  Now, I want to ask you,
16        okay.  You had a lot of cases since then, right?
17   A    Yes, sir.
18   Q    Have you ever had a case dealing with a
19        six-year-old little girl, Jonteria Jones, with the
20        injuries of what allegedly occurred to her since
21        you've been an investigator, or is this the only
22        case you've had like this one?
23   A    Only one like this one, yes, sir.
24   Q    What I want to ask you about.  Have you had a
25        chance, tell the jury, in your experience to look

1          at a lot of defendants' hands?

2     A    Yes, sir.

3     Q    Have you seen cuts or marks on other defendants'

4          hands?  You have, haven't you?

5     A    Yes, sir.

6     Q    Tell the ladies and gentlemen of the jury, I've

7          shown you 24 and 25 for identification purposes.

8          Whose hand is that?

9     A    Freeshone McLeod's.

10    Q    Now, it's been a while since October 6 of 2001.

11         How do you remember that's his hand?

12    A    We took photographs of his hands, and we remember

13         that there was a laceration-type gouge in his

14         middle index finger.

15    Q    And flip over.  You've looked at both pictures,

16         right?

17    A    Yes, sir.

18    Q    They truly and accurately depict the injuries on

19         the finger;  in other words, the angle of the

20         camera that there was a injury on Freeshone

21         McLeod's hand?

22    A    Yes, sir.

23    Q    In your opinion as you looked at it, saw it, his

24         hand, was it fresh?

25    A    Yes, sir.

1    Q    The picture, does it appear to be marked, altered,

2         or changed in any way as you've looked at it as

3         well as looking at his hand that day?

4    A    No, sir.

5    Q    Same substantial condition?

6    A    Same.

7    Q    Hadn't been marked in any way?

8    A    No.

9         MR. VALESKA:  Offer 24 and 25 into evidence

10        once again --

11        MR. BRANTLEY:  Can I take him on voir dire

12        briefly?

13        THE COURT:  Go ahead.

14                    VOIR DIRE EXAMINATION

15   BY MR. BRANTLEY:

16   Q    On the pictures right there of the hands, Keith,

17        did you take those pictures?

18   A    I think I did.

19   Q    Well, you did or didn't?

20   A    I'm not sure.  It's been a year or so ago -- or a

21        couple of years.  I think I did.

22   Q    And when did you observe those hands in-person?

23   A    I believe when we were getting major case prints

24        on him at the time we noticed it, or it may have

25        been when I was scraping his fingernails.

1    Q    Have you looked at those pictures recently before

2         coming into trial?

3    A    I've looked at some.  I don't remember if I

4         actually looked at these.

5    Q    Is this the first time you've seen those pictures

6         in a year and a half?  Is that what you're saying?

7    A    I may have seen them prior to today.  I just don't

8         remember when.

9    Q    Are you're saying you saw them prior to today and

10        subsequent to the time this picture was taken,

11        correct?

12    A    I believe I did.

13    Q    And who did you look at them with?

14    A    By myself.  I was just looking through the case

15        file.

16    Q    And you're saying that those hands in that

17        photograph are the hands of this gentlemen, Mr.

18        McLeod?

19    A    Yes, sir.

20    Q    And you don't even remember when the picture was

21        taken?

22    A    Yeah.  They were taken the next day after the --

23        or the morning of the incident.

24          MR. BRANTLEY:  That's all, Judge.

25          MR. VALESKA:  Offer those into evidence.

544

1          THE COURT:  Any objection?

2          MR. BRANTLEY:  I object, Judge.  Because I

3     don't think that he has authenticated the

4     photographs.  I just don't see the relevance of

5     it.

6          MR. VALESKA:  He doesn't have to take the

7     photographs as long as he authenticates and says

8     whose hand it was, hadn't been marked, altered, or

9     changed.  He witnessed it.  He saw the pictures.

10     I can get it in.  It goes to its weight, not his

11     credibility of admission.

12          THE COURT:  I'm going to admit State's 24 and

13     25.  But, again, on this one there's not a

14     sticker.  It's just actually written on the

15     picture.  But at some point --

16          MR. VALESKA:  Scissors, Your Honor.

17     Scissors.

18          THE COURT:  So with the understanding that 24

19     and 25 will have the writings taken off it, just

20     leave the court report sticker, is admitted over

21     the Defendant's objection.

22               (State's Exhibits No. 24 and 25 were

23               admitted into evidence.)

24               (State's Exhibit No. 57 through 66 were

25               marked for identification.)

1          DIRECT EXAMINATION CONTINUED

2     BY MR. VALESKA:

3     Q    Investigator Cook, you saw Freeshone McLeod, the

4          clothing he was wearing?

5     A    Yes, sir.

6     Q    Can I show you some pictures?  State's Exhibit No.

7          41, State's Exhibit 42, 43, 57, 60, 39 -- I'm

8          sorry, 59.  Those exhibits, do you recognize whose

9          clothing?

10    A    They were Freeshone McLeod's.

11    Q    When you observed him, in other words, those --

12         did you take custody of his clothing?

13    A    Yes, I did.

14    Q    Those are pictures of the clothes, correct?

15    A    Yes.

16    Q    Do they truly and accurately depict the clothing

17         after it was taken off him?

18    A    Yes.

19    Q    Did you see yourself with the naked eye any kind

20         of stains or items on the clothing yourself when

21         you saw them on him as well as taken off when the

22         pictures were made?

23    A    They were the same as the one I took off of him.

24    Q    Did you see any stains with your own eyes, though,

25         when he had the clothes on?

| | | |
|---|---|---|
| 1 | A | On the shirt -- on the outer shirt -- |
| 2 | Q | You looking at an exhibit.  Give me the number |
| 3 | | when you say outer shirt.  Number on the exhibit? |
| 4 | A | 57. |
| 5 | Q | Keep it down for me, Keith, if you could. |
| 6 | | Let me refer to 61, 62, 63, and 59.  Is that |
| 7 | | the outer shirt or inner shirt? |
| 8 | A | That's the inner shirt. |
| 9 | Q | So you saw stains on the outer one, which is 57, |
| 10 | | correct? |
| 11 | A | Correct. |
| 12 | Q | And then you took custody of the inner shirt, the |
| 13 | | other numbers, in your possession as well as when |
| 14 | | the outer shirt was taken off you saw the inner |
| 15 | | shirt; is that correct? |
| 16 | A | That's correct. |
| 17 | Q | Did you mark, alter, or change them in any way? |
| 18 | A | No. |
| 19 | Q | Did you put any stains on them in any way? |
| 20 | A | No. |
| 21 | Q | Did you keep them in your care, custody, and |
| 22 | | control until they were taken to the lab in |
| 23 | | Montgomery? |
| 24 | A | Yes, sir. |
| 25 | Q | And they sealed in paper bags so there's no |

1            contamination?

2   A    Yes, sir.

3            MR. VALESKA:  Offer those pictures into

4        evidence, once again, with the limitation of no

5        stickers or writings.

6            MR. BRANTLEY:  What numbers?

7            MR. VALESKA:  61, 62, 63, 57, 60, 59.

8            THE COURT:  Mr. Brantley, any objection to

9        any or all of those?

10          MR. BRANTLEY:  No, sir.

11          THE COURT:  So 57, 59, 60, 61, and 62, and 63

12       are admitted.

13               (State's Exhibits No. 57, 59, 60, 61,

14               62, and 63 were admitted into evidence.)

15   Q    Showing you State's 58 for identification

16        purposes, Investigator Cook.  What is 58?

17   A    A pair of pants.

18   Q    Whose pants?

19   A    Belonging to Freeshone McLeod.

20   Q    And did you observe any colors or stains on them

21        in your opinion when you saw them on him?

22   A    Yes.

23   Q    Were they taken off in your custody and pictures

24        were made, any stains on the pants that you saw?

25   A    Yes.

1    Q    Did you place any stains on them?

2    A    No, sir.

3    Q    And then did you take the pictures and take the

4         pants as well as and keep them in your care,

5         custody, and control and sealed up until you took

6         them to Montgomery and turned over to the lab in a

7         sealed condition, correct?

8    A    Yes, I did.

9    Q    Offer -- was it marked, altered, or changed in any

10        way?

11   A    No.

12   Q    Same substantial condition?

13   A    Same condition.

14            MR. VALESKA:  Offer 58, the pants, a picture

15        of the pants.

16            MR. BRANTLEY:  No objection.

17            THE COURT:  58 is admitted.

18                (State's Exhibit No. 58 was admitted

19                into evidence.)

20   Q    Let me show you No. 65 and 66.  Do you recognize

21        what those are?

22   A    Yes, sir.

23   Q    Whose are they?

24   A    A pair of shoes belonging to Freeshone McLeod.

25   Q    Now, did you observe those on him?

1    A    Yes, sir.

2    Q    And were you present when they were taken off him

3         when you took custody of those shoes?

4    A    Yes, sir.

5    Q    Marked, altered, or changed in any way?

6    A    No, sir.

7    Q    Does that include the right shoe?  In other words,

8         I know there's two shoes.  Is that a right and

9         left shoe?

10   A    Yes, sir.

11   Q    And there's two pictures, just for the Record, the

12        two numbers that you gave me, 66 and 65.  66 is

13        the right shoe, correct?

14   A    Yes, sir.

15   Q    And then 65 is the picture of both of them, right

16        and left?

17   A    That's correct.

18   Q    Now, have the shoes been marked, altered, or

19        changed in any way from the time you took them off

20        Freeshone McLeod and you kept them in your care,

21        custody, and control in a sealed condition until

22        you took them into Montgomery and turned them over

23        in a sealed condition?

24   A    No, they haven't.

25   Q    Did you put any kind of stains on them?

1    A    No, sir.

2    Q    Are you sure?

3    A    I'm sure.

4    Q    And they remain sealed in your custody in paper

5         bags after they had air dried; is that correct?

6    A    That's correct.

7    Q    And looking at them now, the pictures is what I'm

8         asking about, including any writings, okay, we

9         agree, any writings, is that the way they looked

10        with the stains?

11   A    Yes, sir.

12            MR. VALESKA:  Offer 65 and 66, the pictures

13        of the shoes, Mr. Brantley.

14            MR. BRANTLEY:  No objection.

15            THE COURT:  65 and 66 are admitted.

16                (State's Exhibits No. 65 and 66 were

17                admitted into evidence.)

18   Q    I believe Mr. Brantley asked you a couple of

19        questions on voir dire about pictures of the

20        Defendant's hands.  When you saw the Defendant's

21        hands, you testified about the pictures and the

22        cut that he had.  Tell me what you saw on the

23        fingernails he asked you about on Freeshone McLeod

24        in your opinion.  What did you see?

25   A    A real dirty look to me -- looked like blood was

1    inside the fingernails.

2         MR. BRANTLEY:  Object.

3         MR. VALESKA:  Judge, Mr. Brantley on voir

4    dire asked him that emphatically, did he take any

5    clippings or find any blood under the clippings.

6         MR. BRANTLEY:  I did not ask him that on voir

7    dire.

8         THE COURT:  At this point I'm going to

9    sustain.  If you want to go back and try to lay a

10   foundation as to what leads him to that opinion.

11        MR. VALESKA:  Yes, sir.

12        THE COURT:  It's not hearsay what a lab or

13   somebody did.  If you want to lay that foundation.

14   Q    Once again, in your lifetime and experience have

15        you ever cut your hand around your fingernails or

16        pulled a fingernail off or bit the quick where it

17        opens up and bleeds?

18   A    Yes, sir.

19   Q    Have you ever seen on yourself after it's dried

20        what the color of the blood looks around the nail

21        or under the nail?

22   A    Yes.

23   Q    Have you done that many times?

24   A    Yes, sir.

25   Q    Have you seen another defendants you worked cases

1   about when you looked at their fingers in

2   relationship to an assault or murder or a rape or

3   any blood looking to see if you see anything on

4   their nails or fingernails?

5 A Yes, sir.

6 Q Have you done that many times?

7 A Yes, sir.

8 Q Let's go back and help me if you could.  When you

9   did it on yourself and immediately there was

10   blood, what color was the blood immediately?

11 A It was --

12 Q When it first happened.

13 A It was red, and then it turned.

14 Q Going back to the pictures of inside the trailer

15   that you testified to on the walls and the

16   splattering, what color was that?

17 A Red.

18 Q Was it the same color you saw on your finger,

19   fresh is what I'm asking?

20 A Yes, sir.

21 Q After a period of time on yourself personally

22   after that blood that came out of your body around

23   the nail or under started to dry, did it change

24   colors?

25 A Yes, sir.

1    Q    What color would it have been compared to when it
2         first came out and it was red?
3    A    Brownish color.  Dark brown.
4    Q    Now, would you tell the ladies and gentlemen of
5         the jury, seeing defendants in other cases before
6         this case on October 6 of 2001, have you seen
7         defendants where there's been a shooting, a
8         stabbing, a murder, or a rape where there was
9         blood on hands or fingernails?
10   A    Yes, sir.
11   Q    Did you form an opinion yourself as to what it
12        was?
13   A    Yes, sir.
14   Q    And what was it on those cases in your opinion?
15             MR. BRANTLEY:  Still object, Judge.  I mean,
16        there's still so many other things it could be
17        just based on color.
18             MR. VALESKA:  Goes --
19             MR. BRANTLEY:  There's too many things it
20        would be.
21             MR. VALESKA:  It goes to the weight, not the
22        credible.
23             MR. BRANTLEY:  But the prejudice to the
24        Defendant --
25             THE COURT:  Hang on just a minute.  What I'm

1    going to do is let him finish trying to lay his

2    foundation on that point and then if you want to

3    voir dire him on it I will give you a chance to be

4    heard.  Or give you an opportunity to try to and

5    establish what it is.

6         Mr. Valeska, anything else?

7         MR. VALESKA:  Yes, sir.  I'm sorry.

8    Q    So what I want to ask you then, Mr. Cook, on

9         October 6, 2001, when you saw Freeshone McLeod's

10        hands when pictures were taken for the injury on

11        finger that you indicated, did you look at the

12        fingernails?

13   A    Yes.

14   Q    Did you look at his hands?

15   A    Yes.

16   Q    Did you see anything in your opinion under the

17        nails, around the cuticles, under the fingertips

18        in any manner or fashion?

19   A    Yes.

20   Q    I want to go back and ask you, the clothing that

21        he was wearing; in other words, the outer clothing

22        on the shirt, did you see any substances on that?

23   A    Yes, sir.

24   Q    In your opinion, in other words, what did you see,

25        if anything, on Freeshone McLeod's nails and under

1   his nails if you have an opinion as to what it was?

2 A My opinion it was blood.

3 Q Now, I want to ask you about the shoes, pictures

4   64 and 65 admitted on the shoes as I recall the

5   numbers -- 65 and 66, the shoes is what I'm asking

6   you about. One picture shows two shoes and then

7   the other pictures shows the right shoe. Do you

8   recall looking at those pictures, Investigator

9   Cook?

10 A Yes.

11 Q Once again, I want to ask you on those pictures,

12   did you form an opinion as to whether you saw any

13   substances on those shoes?

14 A Yes.

15 Q What was it in your opinion?

16 A Look like blood.

17    MR. BRANTLEY: Object to that, Judge. Any

18   opinion he would give with regards to stains or

19   coloring --

20    MR. VALESKA: I'll withdraw and ask it this

21   way.

22    THE COURT: Hang on. Isn't there a picture

23   that's been admitted?

24    MR. VALESKA: There's two pictures admitted.

25   But I'll withdraw it and ask it this way.

1    Q    Investigator Cook, what I want to ask you, what

2         you saw on Freeshone McLeod's shoes in your

3         opinion, what was the color of the substance?

4    A    Red.

5    Q    And what was the color of the substance you found

6         inside the trailer on the walls that you've

7         testified as well as his shirt and in the back

8         bedroom and that color of those stains? What

9         color?

10   A    Red.

11   Q    What is the color that you saw on his

12        fingernails? Was it the same red or a different

13        color red?

14   A    It was a different color red.

15   Q    Now, what I want to ask you in your lifetime and

16        your experience as a human being, have you ever

17        cut your hand and had blood get on any parts of

18        your body and you actually watched it get on any

19        type of clothing or shoes yourself?

20   A    Yes, sir.

21   Q    That happen to you many times?

22   A    Yes.

23   Q    And when you watched it drop on your shoes or your

24        clothing, was there any doubt a hundred percent

25        beyond all doubt to a mathematical certainty when

1        you were cut you know it was your blood, correct?

2   A   That's correct.

3   Q   The substance you saw on his shoes, was it any

4        different color than what you had seen on the

5        clothing in the past?

6   A   No.

7   Q   When you saw where Jonteria had been lying when

8        she was moved by the ambulance off, the concrete

9        is what I want to ask you about, that location,

10       Mr. McGriff's driveway is what I'm referring to,

11       do you recall seeing any substances on that

12       driveway?

13   A   Yes, sir.

14   Q   What color were they?

15   A   Red.

16   Q   Were they different from the color you had seen

17       inside on the trailer?

18   A   No, sir.

19   Q   Any different what you had seen on the shoes?

20   A   No, sir.

21   Q   Do you have an opinion as to what was coming from

22       Jonteria when she was on the driveway?

23   A   No, sir.

24          Would you repeat that, please?

25   Q   Do you know what was on the driveway that came

558

```
1          from Jonteria?  Do you have an opinion as to what
2          it was?
3     A    In my opinion, yes, sir, it was blood.
4     Q    Tell the ladies and gentlemen of the jury, when
5          you saw Jonteria and you've seen her and you've
6          seen the Defendant, Freeshone McLeod, who was
7          taller?
8     A    Freeshone McLeod.
9     Q    Who was bigger?
10    A    Freeshone McLeod.
11             MR. VALESKA:  That's all.  Pass the witness.
12         Thank you, Judge Mendheim.
13                       CROSS EXAMINATION
14    BY MR. BRANTLEY:
15    Q    Keith, let's go back to that day October 6, 2001.
16         And how did you know to go out there?  Did you get
17         a dispatch call?
18    A    Yes, sir.  I was called at home.  Communications
19         called me.
20    Q    And was that in the late afternoon, early
21         afternoon, or what?
22    A    It was around two-thirty or three o'clock.
23    Q    And so did you go out there by yourself?
24    A    Yes, sir.
25    Q    What --
```

| | | |
|---|---|---|
| 1 | A | There were already units there. |
| 2 | Q | What did you say? |
| 3 | A | There were already units there when I arrived. |
| 4 | Q | How many people were there?  How many law |
| 5 | | enforcement people were there when you arrived? |
| 6 | | One or two -- |
| 7 | A | There was two or three.  Sergeant Forehand and |
| 8 | | Adam Robinson were there. |
| 9 | Q | What about Chief Roney? |
| 10 | A | He may have been there, too. |
| 11 | Q | Was there crime scene tape up when you got there? |
| 12 | A | Yes, sir, I believe there was. |
| 13 | Q | And what did you do when you got there? |
| 14 | A | I spoke with Sergeant Forehand after I observed |
| 15 | | the spot where Jonteria was lying. |
| 16 | Q | And what did you do after you talked with Mr. |
| 17 | | Forehand? |
| 18 | A | We -- |
| 19 | Q | Who was we, now? |
| 20 | A | Myself and Sergeant Forehand.  He showed me where |
| 21 | | they had found Jonteria. |
| 22 | Q | And then what did you do? |
| 23 | A | I believe I called Lieutenant Valenza, and he |
| 24 | | advised that he was en route.  And then I entered |
| 25 | | the trailer. |

| | | |
|---|---|---|
| 1 | Q | I would like to ask you about this trailer when |
| 2 | | you went in there, okay.  Was anyone else in there |
| 3 | | when you entered it? |
| 4 | A | No, sir. |
| 5 | Q | Had anyone been in there?  Had Forehand or Roney |
| 6 | | or anybody? |
| 7 | A | I don't know. |
| 8 | Q | You don't know if anyone had been in there or not, |
| 9 | | do you? |
| 10 | A | No, sir. |
| 11 | Q | So what did you do, Keith -- incidentally, how |
| 12 | | long had you been an investigator with the |
| 13 | | sheriff's office on this date? |
| 14 | A | Investigator with the department -- an |
| 15 | | investigator? |
| 16 | Q | Yes. |
| 17 | A | About four years. |
| 18 | Q | And prior to that time how long had you been a law |
| 19 | | enforcement officer? |
| 20 | A | Twelve -- thirteen years. |
| 21 | Q | Now, let's go to this day.  You go in the house, |
| 22 | | and what happens in the house? |
| 23 | A | I go in and -- front door.  Go to the left.  I see |
| 24 | | the radio.  See some blood smears on the floor of |
| 25 | | the kitchen.  And then I walk through the trailer. |

1 Q You walked into the bedroom, right?  You see that

2   wok; is that correct?

3 A Yes, sir.

4 Q You go into the kitchen.  And you see in the

5   kitchen other things; is that correct?  You see

6   kitchen utensils in the kitchen?

7 A I don't remember seeing any utensils, no, sir.

8 Q What do you see in the kitchen that looks like it

9   belongs in the kitchen?  Anything?

10 A No, sir.

11 Q How do you know it's a kitchen?  Got a stove and

12   refrigerator, right?

13 A I believe it had a refrigerator and I think it had

14   a stove, too.

15 Q Other than that, you don't see any pots and pans

16   or anything?

17 A No, sir.

18 Q I believe you testified there was an area where

19   there ought to be a washing machine?

20 A It looked like there may have been.  If I

21   remember.

22 Q That's what we're asking you to do is to remember.

23 A On the hallway.  Going down the hallway if I

24   remember it seemed like.

25 Q What do you mean it seems like it may have been.

```
 1          What does that mean?
 2     A    It looked like it was a -- if I can remember, an
 3          outlet for a plug for a washer or a dryer.
 4     Q    Well, what are you saying?  There was or there was
 5          not?
 6     A    I believe there were.
 7     Q    Does that mean there was?
 8     A    I don't know.  I don't remember.
 9     Q    You don't remember?
10     A    I don't remember.
11     Q    Now, you saw blood in the kitchen, correct?
12     A    Yes, sir.
13     Q    You saw blood in the bedroom; is that right, or
14          not?
15     A    Yes, sir.
16     Q    You saw what appeared to be blood under the
17          fingernails of Mr. Freeshone McLeod, correct?
18     A    Correct.
19     Q    Did you scrape any of that blood off and get
20          samples of it?
21     A    From his nails?
22     Q    Anywhere.
23     A    Well, I collected blood in the house, and I
24          scraped his nails, yes, sir.
25     Q    And did you send it off?
```

| | | |
|---|---|---|
| 1 | A | Yes, sir. |
| 2 | Q | And you have the results of those today, right? |
| 3 | A | Yes, sir.  They should be in. |
| 4 | Q | What type of blood did, if you know -- did you |
| 5 | | take samples of blood from Jonteria? |
| 6 | A | I didn't. |
| 7 | Q | With regards to the condition of the house when |
| 8 | | you went in there, was the house in -- had it been |
| 9 | | kept up?  Was everything in order?  Or what? |
| 10 | A | It was pretty dilapidated, but it was empty.  Most |
| 11 | | of the house was empty.  Other than what was in |
| 12 | | the living room there.  The bed. |
| 13 | Q | What do you mean by dilapidated? |
| 14 | A | The floors looked like they were falling in in |
| 15 | | different places. |
| 16 | Q | Did you see any two by fours or wood or planks |
| 17 | | around? |
| 18 | A | No, sir. |
| 19 | Q | You didn't see any wood? |
| 20 | A | Other than what -- |
| 21 | Q | You're looking at a dilapidated trailer? |
| 22 | A | There was carpet that was caved in, and it looked |
| 23 | | like -- it was rotted up under the carpet. |
| 24 | Q | And there was a rail around the porch? |
| 25 | A | I don't remember seeing -- |

564

1    MR. VALESKA:  I'll stipulate there was a rail

2  around the porch.

3 Q But you don't remember the rail around the porch?

4 A I don't remember seeing it.

5 Q Was the porch dilapidated like the house?

6 A Yes, sir.

7 Q How many people walked through the house as far as

8  investigators go?

9 A Four, I believe.

10 Q And who was that?  You?  Don Valenza?

11 A Sergeant Ducker and Sergeant Jenkins.

12 Q What's Jenkins' first name?

13 A Gary.

14 Q Gary was down there?

15 A Yes, sir.

16    MR. BRANTLEY:  That's all.

17     REDIRECT EXAMINATION

18 BY MR. VALESKA:

19 Q If I could, I want to ask you about the wok.  Who

20  did you turn it over to?

21 A Lieutenant Valenza.

22 Q And I want to ask you, if I could, Mr. Brantley

23  asked you whether you remembered or didn't

24  remember about any outlets for a washer and dryer

25  in that hall.  That is what I want to ask you

1    about what he asked you about, okay.  Any doubt in

2    your mind one hundred percent beyond all doubt,

3    was there any washer or dryer in that trailer?

4         MR. BRANTLEY:  Object.  This is asked and

5    answered.  He said he just doesn't remember.

6         MR. VALESKA:  No, sir.  He said he doesn't

7    remember about outlets.  I'm asking about a washer

8    and dryer.  There's a difference between outlet

9    what you plug them it into.

10        THE COURT:  Since this is redirect, I will

11   let you ask him one time.  But then after that

12   let's move on to something else.  But just for --

13        MR. VALESKA:  It's only in reference to the

14   question he asked about the outlets.

15        THE COURT:  If he can answer.

16   Q    Any doubt a hundred percent you're sure whether

17        there was a washer or dryer?

18   A    There was not.

19   Q    Now, Mr. Brantley asked you about the porch.

20        State's Exhibit 37, which is not in evidence.

21        Look at 37.  What is 37?

22   A    It's a piece of a nail that's coming out of the

23        board on the porch.

24   Q    Is that the porch how it looked and the condition

25        of the angle?

1    A    Yes.

2    Q    Hasn't been marked, altered, or changed in any

3         way?

4    A    No, sir.

5         MR. VALESKA:  Offer 37, the picture of the

6         porch.

7         THE COURT:  Any objection?

8         MR. BRANTLEY:  No objection.

9         THE COURT:  37 is admitted.

10             (State's Exhibit No. 37 admitted into

11             evidence.)

12   Q    I ask you about the Defendant's outer shirt, his

13        inner shirt, did you also collect his boxer shorts?

14   A    Yes, sir.

15   Q    You mark, alter, or change them in any way?

16   A    No.

17   Q    Mix them up with any other?

18   A    No, sir.

19   Q    Put his boxer shorts with any others or alleged

20        rape case investigation, any other cases within

21        the sheriff's department?

22   A    No, sir.

23   Q    Are you sure?

24   A    Sure.

25   Q    Kept them in a sealed condition when you turned

1      them over to forensic in Montgomery, correct?

2   A  That's correct.

3          MR. VALESKA:  That's all.

4          MR. BRANTLEY:  I don't have anything

5      further.  Thank you.

6          MR. VALESKA:  Call Shannon Fitzgerald.

7                    SHANNON FITZGERALD

8      having first been duly sworn, was examined and

9      testified as follows:

10                   DIRECT EXAMINATION

11  BY MR. VALESKA:

12  Q  Tell me your name, please, sir.

13  A  Shannon Fitzgerald.

14  Q  Tell the jury what your profession or occupation

15     is.

16  A  I'm a certified latent print examiner.

17  Q  Before becoming a latent print expert, what type

18     of training or education did you have in

19     relationship to going to work with the Alabama

20     Department of Forensic Science?  What's your

21     degree?

22  A  Received a bachelor of science from Auburn

23     University in criminal justice.  I've also

24     received certificates of completion from the

25     ABI -- Alabama Bureau of Investigation -- in crime

1     scene photography, nighttime crime scene

2     processing, classification of ink prints,

3     classification and comparison of latent prints;

4     and also received a certificate of completion from

5     the FBI -- the Federal Bureau of Investigation --

6     for crime scene photography; also certified

7     through the International Association for

8     Identification as a latent print examiner of which

9     there are less than two thousand members

10    worldwide.

11  Q   Now, if I could, you use the term ink prints as I

12    refer to major case prints just terminology, is

13    that the same thing?  Major case prints versus

14    just regular prints?  Is there a difference?

15  A   No, sir.  Inked prints generally are done by

16    taking the first joint of each finger, placing a

17    thin coat of black printer's ink on a slate of

18    glass, or tile, and then rolling that joint

19    completely from nail to nail and then placing it

20    on a contrasting background such as a fingerprint

21    card.  Major case prints, they encompass the

22    entire palm, or surface, of the hand -- the

23    joints -- the first joints all the way down and

24    the palms and extreme sides.

25  Q   I guess this is a silly question.  Can you find

1      ridges, loops, swirls for identification off human

2      beings from their feet?

3  A   Yes, sir, you can.

4  Q   And have you had training on that also? In other

5      words, points of identification looking for those

6      for identification for feet marks and when I say

7      toes, I'm talking about underside if I could refer

8      to it that way, correct?

9  A   Right. The ridge characteristics or the ridge

10     detail that is on the undersides of the hands is

11     also present on the undersides of the feet.

12  Q   If I could, how many times have you yourself tried

13     to lift latent fingerprints by using powder or

14     Super Glue or apply any substances before October

15     6, 2001?

16  A   I would say thousands.

17  Q   How many times have you looked at known ink print

18     cards or major case file prints as well as looking

19     at them to see if you could make an examination to

20     get a match from a latent print that was submitted

21     on some kind of substance whether it's a wok, it's

22     glass, it's a door knob, wood itself, anything,

23     use Super Glue to try to raise it? How many times

24     have you done that before October 6, 2001?

25  A   I would say, again, several thousand times.

1    Q    I want to go back.  Once again, the training,

2         education you've had, how many times have you

3         working with the Alabama Department of Public

4         Safety, the fingerprint identification bureau,

5         worked under other experts before actually working

6         cases yourself with your training and come to

7         court?

8    A    Several times.

9    Q    Who have you worked under?  What individuals?

10        What names?

11   A    Marietta Prevos, Fulton Prevos, each retired from

12        the Alabama Bureau of Investigation.  Each with

13        combined fifty years of experience.  Carrol Curley

14        with thirty years of experience.

15   Q    Is she still there?

16   A    No, sir.  Gloria Walters, who is twenty-six years

17        of experience, who is still there.

18   Q    Who is head of the department?

19   A    The head of --

20   Q    Fingerprints identification bureau?

21   A    Gloria Walters.

22   Q    Can you tell the ladies and gentlemen of the

23        jury, can you always find fingerprints on human

24        beings if they are transferred to some type of

25        substance and every and each occasion a hundred

1        percent?

2    A    No, sir.

3    Q    What are smudges or smears?

4    A    On the undersides of the hands and soles of the

5        feet where these ridges appear there are tiny

6        sweat pores, and they naturally excrete sweat.

7        Some people sweat more than others.  Some not as

8        much.  Therefore, occasionally when a surface is

9        touched a print may or may not be left.  It

10       depends on the surface that's being touched and

11       also the individual touching the surface.

12   Q    What can effect the condition of a latent print

13       from a hand, a palm, a foot, the sides of a human

14       being?  In other words, what kind of conditions

15       can effect whether you can go back and lift it or

16       find it or Super Glue it or put the powder or take

17       pictures so you can take it and compare it to

18       known prints?  What would effect those conditions

19       of the print itself?

20   A    The environment.  Latent prints are ninety-eight

21       percent moisture; therefore, they are very fragile

22       by nature.  And they require some type of

23       processing in order to make visible; therefore,

24       several factors can influence whether a print is

25       left.  Since they are ninety-eight percent

1       moisture, they can be dried up.  They can be wiped

2       away.  And, again, the surface dictates a lot of

3       that.

4   Q   Now, the term latent fingerprints, what does that

5       mean just generally?

6   A   It means hidden or invisible.

7   Q   Now, if I take my finger or my thumb print -- my

8       finger tips, and I touch my glasses, as an expert

9       in fingerprint identification is that what you

10      call a latent fingerprint?

11  A   Yes, sir.

12  Q   Help me a little bit.  You just said it's

13      invisible.  If I touch my glasses and there's

14      moisture, in other words, good conditions, won't I

15      be with the naked eye able to see some possible

16      ridge, loop, swirl, or points of identification or

17      some kind of identification marks off my actual

18      tips or my palm print on my glasses with my naked

19      eye and see it?

20  A   Some in some instances you may be able to, yes,

21      sir.

22  Q   Now, use the term latent print.  If we can't see

23      it and it's on some kind of substance whether it's

24      a wok with metal, this kind of a table, Formica,

25      whatever that plastic top is, how do you try to

```
 1            raise it to find it if you can't see it?  What's

 2            the procedure you've been taught in the scientific

 3            community?

 4     A      On non-porous evidence, which would be glass,

 5            metal, iron, plastics, there are several ways that

 6            you can process evidence.  The two general ways

 7            that the Department of Public Safety that we

 8            process non-porous evidence would be first to

 9            Super Glue the evidence and then to actually

10            powder with black powder or a light colored

11            powder.

12     Q      And then when you do that, does it become visible

13            that you can see some kind of impression with the

14            naked eye or microscope or whatever it is?

15     A      Yes, sir.

16     Q      And then to attempt to take it off that substance

17            if you don't photograph it, in other words, you

18            want to take it off and put it on another card so

19            you can preserve it in case any known ink prints

20            come in or palm prints or identification prints

21            to see if you can make the comparison, is that

22            one of the ways it's done with tape?

23     A      Yes, sir.

24     Q      Now, what if you touch paper?  In other words, can

25            you Super Glue it to use fumes?  How do you get it
```

```
 1              off pieces of paper that you can't really see in
 2              whether it's on there or not?
 3      A       With porous evidence it's generally used -- a
 4              chemical is generally used which is called
 5              Ninhydrin, which reacts with the amino acids that
 6              are present in the latent prints.  Because on
 7              porous evidence generally the print has had time
 8              to soak down in like a sponge into the evidence.
 9              Therefore, a chemical is needed to bring out that
10              print, and that chemical we use is Ninhydrin.
11      Q       And then once you do that with the fumes and the
12              Ninhydrin, sometimes or a lot of times whether you
13              see some impression, in other words, from the
14              ridges or loops or swirls when you actually have a
15              full print, a partial print, or even possibly a
16              smear, will that come up sometimes?
17      A       Yes, sir, it does.
18      Q       Do you always find prints every time from crime
19              scenes a hundred percent when someone has actually
20              touched something beyond all doubt always?
21      A       No, sir.
22      Q       And if you find smears or smudges as an expert in
23              fingerprint identification and testifying, does
24              that mean that I definitely didn't touch it or
25              there's just not enough to make an identification?
```

575

1   A   It means there's not enough ridge detail in order

2       for us to make an identification.

3   Q   Now, the Federal Bureau of Investigation, the

4       FBI, have you had any training or been to any of

5       their courses?

6   A   Yes, sir.  Crime scene photography class.

7   Q   In addition have you yourself trained or helped to

8       educate prosecutors or law enforcement officers in

9       relationship to what to look for about

10      fingerprints, how to ask questions about making

11      comparison to known prints, to ink prints, to

12      latent prints?  Have you done that?

13   A   Yes, sir.

14   Q   Have you done that many times?

15   A   Yes, sir.

16   Q   Now, what I want to ask you, if I could, the

17      points of identification, if I refer to that to

18      make a match, does the Federal Bureau of

19      Investigation have a certain number of points that

20      it requires for them to make a match on a latent

21      print if I could use that term to known prints or

22      ink prints or major case prints different from the

23      number of points of identification that you have

24      to have working for the Alabama Department of

25      Public Safety for you to make an identification?

1       Different numbers?

2   A   From time to time, yes, in the past there has been

3       different numbers.  The required number of

4       characteristic points that the Department of

5       Public Safety has to have -- or nine

6       characteristic points.  I know from time to time

7       in the past the FBI has used seven or eight.

8   Q   Worldwide, in other words, you mentioned you

9       belong to an organization you're one of the only

10      two thousand that are certified worldwide in the

11      entire world, those other individuals you

12      mentioned, Curley and the others, are they also

13      members of that association?

14  A   Yes, sir.

15  Q   Worldwide, in other words, let's just jump over to

16      England, what's their investigative bureau?  What

17      are they called?

18  A   Not Interpol.  I'm not sure what they are called.

19  Q   Scotland Yard.  In other words, their department,

20      do they have a different number of points they are

21      required to make an identification?  In other

22      words, another part of the world?  Is it less than

23      what you use, if you know?

24  A   I'm not aware at this time.  Like I said, it does

25      change from time to time in other departments.

1        Ours has been the same for several years.  But our

2        different departments or different countries may

3        use different points of identity.

4    Q   Is there anything by any state statute, any law,

5        federal law, or state law that requires you to

6        have twelve points to make identification in the

7        fingerprint world?  Any legal --

8    A   No, sir.

9    Q   So the Alabama Department of Public Safety makes

10       their own determination how many points of

11       identification they have to have to make a match

12       from latent prints to known or major case prints,

13       correct?

14   A   Yes, sir.

15   Q   Can you make it with less than seven or nine?

16   A   Nine is what the Department of Public Safety uses.

17   Q   Would you make an identification if you find my

18       prints and you know and you watch me do it but

19       because of the condition you only get eight

20       identification marks, would you make a match?

21   A   No, sir.

22   Q   Now, what I want to ask you, if I could, have you

23       come into the trial courts in the State of Alabama

24       in front of juries and testified before based on

25       your training, education, and experience as to

1    looking for latent fingerprints, taking them off

2    physical evidence, lifting them yourself, and then

3    taking a comparison to major case prints or known

4    ink prints and to give your opinion whether you

5    could make identification with certain number of

6    points?  Have you done that many times?

7   A  Yes, sir.

8   Q  In those cases did the defense lawyer have the

9    opportunity to cross examine you on voir dire or

10   during the trial about your experience and your

11   criteria and what you found?

12  A  Yes.

13  Q  In the ordinary course of business do you publish

14   a report as to your findings?

15  A  Yes, sir.

16  Q  The entire workload that you do on a case, in

17   other words, your notes, every test, every

18   procedure you follow, anything you do, is that

19   kept in the case filed for that particular case?

20  A  Yes, sir, it is.

21  Q  Is that available under subpoena power for anybody

22   on the other side to examine, in other words, from

23   the Defense?

24  A  Yes, sir.

25  Q  And let me ask you, you have testified how many

1        times in front of trial judges?

2    A   Hundreds.

3    Q   At any time can you tell me identification marks

4        you have made, in other words, see if there was a

5        match or there was not a match, have there been

6        any other experts that have come in on the other

7        side for the defense that have shown that what you

8        testified to was incorrect or wrong?

9    A   There have been other experts to come in, but none

10       have never --

11   Q   To impeach your credibility is what I'm asking.

12   A   No.

13   Q   Now, worldwide, can you tell me based on your

14       training, education, experience the number of

15       tests you've done in the state of Alabama -- let

16       me ask you and withdraw that.

17           What is CODIS?

18   A   Excuse me?

19   Q   What is CODIS?  AFIS.  I'm sorry.

20   A   AFIS?  AFIS is the Automated Fingerprint

21       Identification System.

22   Q   What is that briefly?  Tell me.

23   A   It's a large mainframe computer in which inked

24       fingerprint cards that I spoke of earlier are

25       entered into this large mainframe database and

1   registered there for future searches with latent

2   prints and other inked prints.

3 Q Those known ink prints or major case prints, are

4   those the Alabama Department of Safety has entered

5   into AFIS, the computer, itself as well as hooked

6   up nationwide with the FBI computer if a crime

7   occurs and you get latent prints like let's say

8   you took something off this wok -- well, I'll just

9   say took something off this rail here, and you

10   have no suspects through that computer, with known

11   prints that have been submitted, can you run that

12   through and see if you get a match?

13 A Yes, sir.  We're only able to run the first joint,

14   you can't enter palm prints or joint prints.

15 Q And is that -- states that subscribe or allow or

16   hook up nationwide and gives you access to other

17   states, correct?

18 A Correct.

19 Q Now, have you done that, in other words, taken

20   prints, submitted them yourself into that computer

21   to see if you got a match?

22 A Yes, sir.

23 Q When you got a match, would you yourself as a

24   human being because you relied on a computer go

25   back and check it yourself if you're going to

1        testify or make a match yourself to make sure what

2        was entered into the computer was correct?

3  A   Yes, sir.

4  Q   Relying on your own credibility, your words, in

5        other words, what I'm asking you?

6  A   Yes, sir.

7  Q   Do you do that also?

8  A   Yes, sir.

9        MR. VALESKA:  Judge, at this time I ask you

10      to declare him to be an expert in his field as a

11      fingerprint examiner and to give his opinion as to

12      any prints he lifted and comparison to any known

13      or major case prints in this case.

14      THE COURT:  Any objection?

15      MR. BRANTLEY:  No objection.

16      THE COURT:  No objection.

17  Q   What I want to ask you, State's Exhibit 6, did it

18       come into your identification?  I'll refer to it

19       right here.  This exhibit here as well as State's

20       Exhibit 44, the manila envelope with contents

21       inside?  Did they come into your custody?

22  A   Yes, sir, they did.

23  Q   State's 6, the metal wok, was that brought to you

24       and turned in to you by Investigator Valenza with

25       the sheriff's department?

1  A   Yes, sir, it was.

2  Q   The major or case prints referred to in the manila

3      envelope, if I could refer to you.  You took them

4      out.  44.  There were some different cards as well

5      as three white pieces of paper I refer to major

6      case prints.  What I'm asking, did you just look

7      at those pieces of paper, all of them?

8  A   Yes, sir.

9  Q   They were identified to you as major or case

10     prints, the white pieces of paper, identified as

11     coming from who?  Which individual?

12 A   The major case prints were submitted to me by

13     Investigator Rocco --

14 Q   Identified to be whose?

15 A   Identified to be -- the prints were identified to

16     be Freeshone McLeod.

17 Q   Now, taking State's 6, the wok, request the

18     D.A.'s office, the sheriff's department, did you

19     see if you could lift any latents off the wok

20     itself?

21 A   Yes, sir, I did.

22 Q   Were you able to do so?

23 A   Yes, sir, I was.

24 Q   How many latents were you able to lift off

25     State's Exhibit 6, the wok?

1  A  Three latent fingerprints and one latent
2     impression value were developed on the inside of
3     the wok.
4  Q  Did you then take and make a comparison to the
5     known ink prints which is State's Exhibit 45?
6     What I want to ask you about.  The identification
7     is just for the envelope.  But the three white
8     pieces of paper, State's 45, the major case prints
9     of Freeshone McLeod, did you make a comparison to
10    that on to State's Exhibit No. 6, the wok, the
11    latents you were taking off?
12 A  Yes, sir.  Comparisons were made with both
13    exhibits, 44 and 45.
14 Q  If I'm wrong, you published a report of your
15    findings, correct?
16 A  Yes, sir.
17 Q  If you could, tell me, latent one, two, three, and
18    four, did you match all four?
19 A  No, sir.
20 Q  Did you match one through three?
21 A  Yes, sir.
22 Q  Found number four was unidentified, correct?
23 A  Yes, sir.
24 Q  The latent you pulled off State's Exhibit 6, the
25    wok, you didn't have a print to compare that to;

584

1   is that correct?  Excuse me, you didn't have any

2   known prints or ink prints you could make a match

3   with, correct?

4  A That is correct.

5  Q What I want to ask you, if I could, latent one,

6   two, and three, taking State's 45, the three white

7   pieces of paper identified coming from Freeshone

8   McLeod, on latent one, were you able to make a

9   match?

10  A Yes, sir.

11  Q What did you find on latent one?

12  A The latent number one was identified with the

13   right little finger of the fingerprints on the

14   fingerprint card bearing the name Freeshone

15   McLeod.

16  Q Any doubt in your mind as a fingerprint expert

17   that was a match in your opinion?

18  A No, sir.

19  Q One hundred percent?

20  A Yes, sir.

21  Q Latent number two, could you tell us what you

22   found on two?

23  A It was identified with the left little finger of

24   the fingerprints on the fingerprint card bearing

25   the name Freeshone McLeod.

1   Q   Any doubt in your mind a hundred percent beyond

2       all doubt there was a match in your opinion?

3   A   No, sir.

4   Q   Latent number three, did you find a match?

5   A   Yes, sir.

6   Q   Did you compare it to 45, the major case prints?

7   A   Yes, sir.

8   Q   Freeshone McLeod, what did you find?

9   A   Latent number three was identified with the left

10      ring finger of the fingerprints on the fingerprint

11      card bearing the name Freeshone McLeod.

12   Q   Any doubt in your mind one hundred percent beyond

13      all doubt you had a match on all three of those

14      latents, correct?

15   A   That's correct.

16   Q   Now, if I could, did you then take State's Exhibit

17      6, the wok, and then seal it back up after you had

18      tested it and return it to the law enforcement

19      agency in this case?

20   A   Yes, sir.

21   Q   Now, looking at it today, in other words, I know

22      it was sealed up, did you see any writings or

23      markings on the back or evidence numbers or latent

24      numbers or case numbers from your department that

25      you placed on the bag yourself?  The paper bag is

1       what I'm asking about.

2   A   I saw my initials.

3   Q   No doubt about it those are your initials; is that

4       correct?

5   A   That's correct.

6   Q   Looking at the wok today, it's now out of the bag.

7       Under it was unsealed and in a sealed condition in

8       this courtroom, does it appear to be any different

9       in any manner or fashion?

10  A   No, sir.  Other than the processing of the powder,

11      no, sir.

12  Q   Can you tell me, if you can, once again, for my

13      experience where on the wok you found latents one,

14      two, and three?  Where they were on the wok?

15  A   They were on the inside portion inside side of the

16      wok.

17  Q   Now, can you tell the ladies and gentlemen of the

18      jury, of all the fingerprint identification you've

19      done using a computer doing latent prints to ink

20      print cards, major case cards yourself,

21      fingerprint cards, your training, education,

22      experience, the organizations you belong to,

23      certified, worldwide plus your training,

24      education, and history, still in the business

25      today, can you tell these ladies and gentlemen of

587

1    the jury anybody in this world have the same

2    fingerprints on their ridges, loops, swirls,

3    points of identification, or match another human

4    being?  In other words, mine and yours would

5    match?  Is that going to occur?

6  A   No, sir.  No two people have ever been known to

7      have the same ridge characteristics.  Even the

8      same person on each person or identical twins.

9         MR. VALESKA:  That's all -- I offer the wok,

10    State's Exhibit 6, into evidence.

11         MR. BRANTLEY:  No objection.

12         THE COURT:  State's Exhibit 6 is admitted.

13             (State's Exhibit No. 6 was admitted into

14             evidence.)

15         MR. VALESKA:  And I offer 45, the major case

16    prints.  I didn't offer the envelope.

17         THE COURT REPORTER:  They are in.

18         MR. VALESKA:  That's all.  Pass the witness.

19                  CROSS EXAMINATION

20  BY MR. BRANTLEY:

21  Q   Mr. Fitzgerald, you would agree that this article

22      up here is a -- what would you call it?  A wok?

23  A   Looks like a wok.  A pan.

24  Q   Cooking utensil?

25  A   Yes, sir.

1    Q    And how long have you been in the fingerprint

2           business?

3    A    A little over eight years.

4    Q    And have you ever been in law enforcement?  Are

5           you considered law enforcement now?

6    A    No, sir.  I'm a civilian employee.

7    Q    Have you ever been a law enforcement officer?

8    A    No, sir.

9    Q    Let me ask you this.  You've been a fingerprint

10         expert for eight years.  Does it astound you that

11         this cooking utensil will possess the fingerprints

12         of a person who owned it?

13    A    No, sir.

14           MR. BRANTLEY:  That's all.

15           THE COURT:  Mr. Valeska, anything else?

16                 REDIRECT EXAMINATION

17   BY MR. VALESKA:

18    Q    Looking at the wok, Mr. Brantley asked you about

19         if it astounded you the fingerprints could be on

20         the person who owned it.  Pick up the wok.  Pick

21         it up and hold it in your hand.

22    A    (Complied.)

23    Q    Look at the bottom and the top part.  Looking at

24         the wok itself -- I won't use the term astound

25         you -- but do you see any indentions in the wok?

589

1    A    Yes, sir, I do.

2    Q    Small or large?  Or the size is what I'm asking

3          you.  Is it real tiny?

4    A    No, sir.

5          MR. VALESKA:  That's all.

6            RECROSS EXAMINATION

7    BY MR. BRANTLEY:

8    Q    Let me ask you this.  You found how many sets of

9          fingerprints on there that you could not identify?

10    A    I found one latent of value that I could not

11         identify.

12    Q    Did you find some other prints not of value?

13    A    No, sir.

14    Q    Now, finding the fingerprints -- finding

15         fingerprints on that cooking utensil, does that

16         tell you who put the indentation on the bottom of

17         that cooking utensil?

18    A    No, sir.

19          FURTHER REDIRECT EXAMINATION

20    BY MR. VALESKA:

21    Q    Mr. Brantley asked you if it told you who put the

22         indention on that wok.  As a fingerprint expert,

23         does it tell you who touched that wok?

24    A    Yes, sir.

25    Q    And who was it?

1    A    The fingerprints were identified with Freeshone

2          McLeod.

3              MR. VALESKA:  That's all.

4                    FURTHER RECROSS EXAMINATION

5    BY MR. BRANTLEY:

6    Q    Once again, Freeshone McLeod, if I tell you he's

7          the owner of that wok, does that astound you --

8              MR. VALESKA:  I object.  Mr. Brantley is

9          testifying and telling him something.  There's no

10         evidence to that that's been introduced to this

11         jury.

12             MR. BRANTLEY:  Let me say it this way.

13   Q    If I tell you it was found in his house --

14             MR. VALESKA:  I'm going to object because he

15         wasn't -- no, I don't object to that.

16   Q    That it was found in his house and also that it

17         was the only cooking utensil found in his house,

18         there were no other pots and pans there, now

19         considering those facts, does that astound you

20         that Freeshone McLeod, that his fingerprints are

21         on that one cooking utensil found in his house?

22   A    No, sir.

23             MR. BRANTLEY:  Thank you.

24             THE COURT:  Mr. Valeska, anything else?

25             MR. VALESKA:  No more questions.  Ask that he

1    be excused and go back to Montgomery.  Thank you

2    very much.

3        THE COURT:  Thank you.  That's it.

4        MR. VALESKA:  Take a short recess?  I need an

5    attachment for a witness I think.

6        THE COURT:  Ladies and gentlemen, it's

7    probably a good point.  Let's just go ahead and

8    take what would be just short of a fifteen minute

9    mid-morning recess.  Just be back at ten-thirty.

10   Thank you.

11           (Jury not present.)

12           (Off the Record.)

13       THE COURT:  Mr. Valeska wants to ask for the

14   attachment of a witness.  He tells me they have

15   one other shorter witness, Mr. Adam Robinson.  I

16   want to know for scheduling.  I don't want to get

17   into trying the case.  Do we need to go ahead and

18   start talking about jury charges now?  Any

19   proposed charges you have ready or the State --

20       MR. BRANTLEY:  I was just going to let the

21   Court submit its standard jury charge.  But I

22   would want one.  I've got one, Judge, on -- do you

23   have a standard jury charge on circumstantial

24   evidence?

25       THE COURT:  There's one in here I can give.

1    I'll need to get it out and see.

2             Any others that you want given?

3         MR. BRANTLEY:  Well, I did have one, but --

4         THE COURT:  Do you have any charges, Mr.

5    Maxwell?

6         MR. MAXWELL:  Yes, sir.

7         THE COURT:  Have you shown Mr. Brantley?

8         MR. MAXWELL:  I've got them.

9         THE COURT:  We are sort of calling this our

10   charge conference.  The D.A. has submitted three

11   proposed instructions.  Have you looked at them?

12        MR. BRANTLEY:  No, sir.

13        THE COURT:  You don't have any objections to

14   the three proposed charges?

15        MR. BRANTLEY:  No, I don't, Your Honor.

16        THE COURT:  Without objection, we will give

17   the State's three proposed charges.

18             Stella is going to need whatever

19   information you want on that attachment.

20             Do you have any objection to these

21   three?

22        MR. BRANTLEY:  I don't.

23        THE COURT:  We will give those three

24   instructions.

25             For the Record he's asked for a charge

1    on circumstantial evidence.  And just for the

2    Record I'm going to give it as well at his request

3    the standards charge.

4          MR. BRANTLEY:  Thank you, Judge.

5              (Jury present.)

6          MR. VALESKA:  Call Mary Wesley to the stand.

7                     MARY WESLEY

8    having first been duly sworn, was examined and

9    testified as follows:

10                  DIRECT EXAMINATION

11   BY MR. VALESKA:

12   Q    Tell us your name, please, ma'am.

13   A    Mary Wesley.

14   Q    If I could, this young lady right here, do you

15        know her?

16   A    Yes.

17   Q    How do you know her?

18   A    That's my niece.

19   Q    What's her name?

20   A    Jonteria Jones.

21   Q    Now, let me take you back to about October 6 of

22        2001 and ask you, could you tell the ladies and

23        gentlemen of the jury, did you see her that

24        morning before she went somewhere?

25   A    Yes.

```
 1    Q    Her clothes, her underwear, her shirts, her

 2         T-shirt, shorts that she wore, her clothing, who

 3         washed her clothes for her?

 4    A    I did.

 5    Q    How did you wash her clothes?  Tell the jury.

 6    A    I washed them with the rest of the kids' clothes,

 7         separate from grown-up clothes.

 8    Q    Did you ever wash her clothes with any adult

 9         male's or female's clothing?

10    A    No.

11    Q    Now, if I could, I want to show you some underwear

12         and a shirt identified what she was wearing

13         October 6 of 2001.  I'm looking for a name brand

14         on here.  Keddie Creations, size medium.  Do you

15         recognize this is the type underwear consistent

16         that she wore that you washed or kept when she

17         lived in your home?

18    A    Yes.

19    Q    And the same with her shirt here with the flowers

20         on it?

21    A    Yes.

22    Q    Now, if I could, Freeshone McLeod, do you know him?

23    A    Yes.

24    Q    Do you see him in the courtroom?

25    A    Yes.
```

1    Q    Does he look different today than he did on

2         October 6, 2001?

3    A    He got a lower haircut.

4    Q    Can you tell the ladies and gentlemen of the jury,

5         before October 6 of 2001, have you ever been to 76

6         Depot Street, Gordon, Alabama, Houston County, the

7         trailer that Freeshone and Dinthea Jones -- I

8         mispronounced it; I apologize -- but Jonteria's

9         mother, they were living together in?

10    A    Yes.

11    Q    Been in that trailer many times before October 6,

12         2001?

13    A    Yes.

14    Q    In that trailer, was there a washer or dryer?

15    A    No.

16    Q    And did Jonteria's mother, did she wash her

17         clothes or handle her clothes in any manner or

18         fashion in October of 2001?

19    A    I washed all the clothes.

20    Q    Did you ever wash or take any of Freeshone

21         McLeod's clothes to wash with Jonteria's?

22    A    No.

23    Q    Did you take any of her mother's clothes,

24         undergarments, panties, underwear, pants, shirts,

25         T-shirt, jeans and wash them with Jonteria's

1     clothes?

2   A   No.

3        MR. VALESKA:   That's all.   Pass the witness.

4     Thank you very much.

5              CROSS EXAMINATION

6   BY MR. BRANTLEY:

7   Q   What is your name again?

8   A   Mary Wesley.

9   Q   Mary Wesley?

10  A   (Witness nodded.)

11  Q   And you are the sister to Jonteria's mother?

12  A   Yes.

13  Q   Are you-all in addition to being sisters, are you

14    friends?

15  A   Yes.

16  Q   You been friends with her your whole life

17    literally, haven't you?

18  A   Yes.

19  Q   You love Jonteria very much, don't you?

20  A   Yes.

21  Q   You're here to help her, aren't you?

22  A   Yes.

23        MR. BRANTLEY:   That's all.

24              REDIRECT EXAMINATION

25  BY MR. VALESKA:

1   Q   Mr. Brantley said you love her and here to help

2       her.  Would you tell a story or lie for her in any

3       way?

4   A   No.

5           MR. VALESKA:  That's all.  Thank you, ma'am.

6                     RECROSS EXAMINATION

7   BY MR. BRANTLEY:

8   Q   Have you ever told a story or lie before today?

9   A   I done told one, but not nothing like this.

10          MR. BRANTLEY:  That's all.

11          MR. VALESKA:  Ask that she step down and be

12      excused and stay in the courtroom.

13          THE COURT:  You can be excused.

14              Any other witnesses for the State?

15          MR. VALESKA:  Adam Robinson.

16              I need to make sure State's Exhibit 45,

17      the case prints -- 44, the three white pieces of

18      paper that Shannon Fitzgerald testified Valenza

19      took of the chain evidence, make sure they -- I

20      offer them into evidence.

21          MR. BRANTLEY:  What is 44?

22          MR. VALESKA:  The ink cards.

23          MR. BRANTLEY:  Okay.  That's fine.

24          THE COURT:  44 is admitted without

25      objection.

```
 1              (State's Exhibit No. 44 was admitted
 2              into evidence.)
 3                  ADAM ROBINSON
 4       having first been duly sworn, was examined and
 5       testified as follows:
 6                  DIRECT EXAMINATION
 7  BY MR. VALESKA:
 8   Q    Tell us your name.
 9   A    Investigator Adam Robinson.
10   Q    Tell the jury where you're employed, please, sir.
11   A    Houston County Sheriff's Department.
12   Q    You work with which department?
13   A    Houston County Sheriff's Department.
14   Q    Still investigator today with the sheriff's
15        department?
16   A    Yes.
17   Q    Let me take you back to October 6 of 2001 and ask
18        were you working with the sheriff's department on
19        that occasion?
20   A    Yes, sir.
21   Q    Did you have the opportunity or request to go down
22        into Gordon, Alabama, 76 Depot Street, Gordon
23        Alabama, Houston County, October 6, 2001?
24   A    Yes, I did.
25   Q    Let me step back here and ask.  Do you see anybody
```

```
 1            in the courtroom today that you had the occasion
 2            to see out there on that day?  How many people?
 3      A     I see about three people I recognize.
 4      Q     Do you recognize who I got my hand on right here?
 5            This lovely young lady?
 6      A     Yes, sir.
 7      Q     Did you see her?
 8      A     Yes, sir, I did.
 9      Q     What was her condition that you saw?
10      A     That I saw when I arrived?
11      Q     Yes, sir.
12      A     When I arrived, the female was in a fetal position
13            almost convulsing, what appeared to be convulsing.
14            Her mouth was open bleeding profusely from the
15            head.
16      Q     If I could, let me show you these pictures.
17            State's Exhibit 1, 2, and 3.  Would you hold them?
18      A     (Witness complied.)
19      Q     Ask you, Investigator Robinson, did you take
20            those pictures of Jonteria while she was on the
21            concrete bleeding with those injuries that you
22            just described for the jury?
23      A     Yes, sir.
24      Q     Now, do you see anybody if I say from this part of
25            the courtroom from the rail and the jury box and
```

```
 1            the rail and the attorneys forward, anybody else
 2            you see out there that day?
 3     A      Yes, sir.
 4     Q      Man or a woman?
 5     A      Man.
 6     Q      White male or black male?
 7     A      Black male.
 8     Q      Point him out.
 9     A      (Witness complied.)
10            MR. VALESKA:  Let the Record reflect he
11            pointed out Freeshone McLeod.
12     Q      Would you tell the ladies and gentlemen of the
13            jury, did you take Freeshone McLeod into your
14            custody?
15     A      I placed him in his police car, yes, sir.
16     Q      Were you questioning him yourself asking him any
17            specific questions as a law enforcement officer
18            about the case in any way?
19     A      No, sir, I did not.
20     Q      Were any other police officers in your hearing or
21            presence at that time questioning Freeshone McLeod?
22     A      Not that I know of.
23     Q      In your presence or hearing were they?
24     A      No.
25     Q      Did you give him his Miranda rights?
```

```
 1    A    I read him of rights.
 2              MR. BRANTLEY:  Can I approach the bench?
 3                   (At which time the following proceedings
 4                   were held at the bench outside of the
 5                   hearing of the jury:)
 6              MR. BRANTLEY:  I guess where we're headed is
 7    another statement.  Doug told me there was just
 8    one statement.  And if we're going to have
 9    another, I want to do a motion to suppress.
10              MR. VALESKA:  First of all, I say, if I told
11    Mr. Brantley something, that's what I'm going to
12    do.  We've already been in his statement if you
13    want to recall.  We took this up Monday.
14              MR. BRANTLEY:  This has already come in,
15    hasn't it?
16              THE COURT:  Just in the motion to suppress.
17    He's not testified in front of the jury.
18              MR. BRANTLEY:  Okay.
19              THE COURT:  I assume if we're going by the
20    rules?
21              MR. VALESKA:  That's it.
22                   (At which time the following proceedings
23                   were held in open court:)
24    Q    You gave him his Miranda rights; is that correct?
25    A    Yes, sir.
```

| | | |
|---|---|---|
| 1 | Q | You said he had the right to remain silent, |
| 2 | | anything he said could or would be used against |
| 3 | | him in a court of law? |
| 4 | A | Yes, sir. |
| 5 | Q | You told him if he could not afford a lawyer, |
| 6 | | couldn't hire his own lawyer, the Court would |
| 7 | | appoint one for him? |
| 8 | A | No, sir. |
| 9 | Q | No questions would be asked if he didn't agree to |
| 10 | | talk or gave his Miranda rights or if he wanted a |
| 11 | | lawyer present? |
| 12 | A | Correct. |
| 13 | Q | You didn't threaten him or offer him -- any |
| 14 | | coercion in order to get him to talk to you? |
| 15 | A | No, sir. |
| 16 | Q | Didn't tell him it would be better or worse for |
| 17 | | him if he would or would not talk to you? |
| 18 | A | No, sir, I did not. |
| 19 | Q | Did you offer any hopes, enumeration, probation, |
| 20 | | reward in order to get him to talk to you? |
| 21 | A | No, sir, I did not. |
| 22 | Q | Did he appear to be under the influence of any |
| 23 | | drugs or alcohol that you could tell based on your |
| 24 | | training, education, experience in arresting |
| 25 | | people who are under the influence of alcohol or |

| | | |
|---|---|---|
| 1 | | drugs in your opinion? |
| 2 | A | No, sir, he did not. |
| 3 | Q | And once again, did you ask him any questions |
| 4 | | after you gave him his rights? |
| 5 | A | No, sir, I asked him nothing. |
| 6 | Q | And you gave him his rights, if I could ask you, |
| 7 | | just as a precautionary matter? |
| 8 | A | I was told by my lieutenant to go ahead and advise |
| 9 | | him of his rights, and that's what I did. |
| 10 | Q | But your lieutenant or any other officers or |
| 11 | | deputies or anybody yourself did not ask him any |
| 12 | | questions about what had occurred in any manner or |
| 13 | | fashion? |
| 14 | A | No, sir. |
| 15 | Q | Placed him where? |
| 16 | A | In the back seat of my police car. |
| 17 | Q | Was he handcuffed? |
| 18 | A | I do not recall. |
| 19 | Q | Was there anybody else in the back? |
| 20 | A | No, sir. No one else was in the back. |
| 21 | Q | Did you get back into the car with him or stand? |
| 22 | A | I stood at the door, yes, sir. |
| 23 | Q | Now, did you ask him any questions at that time? |
| 24 | A | No, sir, I did not. |
| 25 | Q | Did he make a voluntary, spontaneous statement or |

```
 1            ask you a question?

 2   A    Yes, he did.

 3   Q    Tell the jury what he asked you.

 4   A    He asked --

 5            MR. BRANTLEY:  I object.

 6            THE COURT:  Same as before?

 7            MR. BRANTLEY:  Yes, sir.

 8            THE COURT:  And note the objection, and it's

 9        overruled.  All that is on the Record.  Thank

10        you.

11   Q    Tell the jury what he asked you.

12   A    He asked me if she was okay.

13   Q    And did you respond?

14   A    Yes, sir, I did.

15   Q    And what did you say?

16   A    I stated, no, she's probably got a fractured

17        skull.

18   Q    And did you ask him any other questions then?

19   A    No, sir, I did not.

20   Q    And let me go back.  Of all the people that were

21        around you before you put Freeshone McLeod in the

22        car, were there numerous people?

23   A    Yes, sir.

24   Q    Did anybody, anybody out there up to this time ask

25        you in any manner or fashion if the victim,
```

1         Jonteria Jones, would have any memory or remember

2         what happened to her?

3   A   No, sir.

4           MR. BRANTLEY:  Object.  This is just

5         irrelevant.  If anybody asked her that.

6           THE COURT:  Anybody asked Jonteria --

7           MR. VALESKA:  Asked him.

8           MR. BRANTLEY:  If he wants to say what the

9         Defendant said.  But since -- you know, he's

10        asking did anybody out there.

11          MR. VALESKA:  I'm trying to ask what the

12        Defendant said.  If anybody else asked him

13        anything.

14          THE COURT:  Anything or the lack of anything

15        between the Defendant and this officer.  But as

16        far as anyone else out there, I sustain.  I don't

17        know that there is anybody else out there.

18   Q   What -- when you told the Defendant she had -- her

19         skull was probably fractured, what did the

20         Defendant, Freeshone McLeod, say to you?

21   A   Once I advised him her skull was possibly

22         fractured, he asked me, does that effect her

23         memory.  I stated, I don't know.

24   Q   And point out the man that asked you about whether

25         or not that would effect her memory in this

1        courtroom.  Do you see him?

2   A   (Pointing.)

3          MR. VALESKA:  Let the Record reflect he

4        pointed out Freeshone McLeod.

5   Q   Can you tell the jury in your opinion when you saw

6        Jonteria Jones, any doubt in your mind one hundred

7        percent beyond all doubt that you could tell she

8        was under twelve years of age in your opinion?

9   A   Yes, sir, I could tell she was young.  Very young.

10  Q   Looking at Freeshone McLeod, could you tell in

11       your opinion once again whether he was older than

12       eighteen years of age in your opinion?

13         MR. BRANTLEY:  The way you prove age is with

14       a certified copy of birth certificate.  That's the

15       best proof.

16         MR. VALESKA:  No, sir, Judge.

17         MR. BRANTLEY:  To give opinion evidence on

18       age when it's an element of the offense I think is

19       impermissible.

20         MR. VALESKA:  The case law in this state says

21       anybody can give their opinion about age.  That

22       goes to, once again, its weight, not its

23       admissibility.

24         THE COURT:  For the Record, I think he can

25       give his opinion.  So with that, overrule the

1     objection.  It is an element of the offense they

2     have to try and prove.

3   Q   Now, tell the ladies and gentlemen of the jury,

4     did you get the biographical birthday when you got

5     information from Freeshone McLeod?

6   A   Yes, sir.

7   Q   What was it?

8   A   Birthday I have for Freeshone was 10-13 of '77.

9   Q   And what was the birthday of Jonteria Jones that

10    you had?

11        MR. BRANTLEY:  Object.  Hearsay.

12        MR. VALESKA:  Judge, if he knows he can

13    testify.

14        MR. BRANTLEY:  He's reading from notes that

15    are hearsay notes.

16        MR. VALESKA:  Those are notes he took and

17    made.

18        MR. BRANTLEY:  That's what I'm saying --

19        THE COURT:  You-all can address me.

20            He can give his opinion just like he did

21    the Defendant's age.  I think it's -- everybody

22    has seen her.  But he can give his opinion.  But

23    as far as the specific date, if it's hearsay, it's

24    hearsay.  I sustain on that point unless you can

25    establish it's not hearsay.  He can give his

608

1    opinion.

2    Q    Was she under twelve years of age?

3    A    My opinion she appeared to be under twelve years

4         of age.

5              MR. VALESKA:  That's all.  Pass the witness.

6              MR. BRANTLEY:  No questions.

7              THE COURT:  Thank you.

8                   Anything else from the State, Mr.

9    Valeska?

10             MR. VALESKA:  Recall Mary Wesley.

11             MR. BRANTLEY:  Judge, I've asked for the Rule

12   to be invoked, and she has been sitting in here

13   listening to this testimony, and I would ask that

14   the -- the Court to exclude her.  She should have

15   gone to the witness room.

16             THE COURT:  I assume based on what happened,

17   tell me if I'm wrong, you're offering her for the

18   child --

19             MR. VALESKA:  Age only.  She's the guardian.

20             THE COURT:  And I'm going to overrule because

21   my understanding the deputy did not give that

22   answer and may have had it in his records.  I

23   don't see how her being in here on that point.  If

24   there's some other testimony, I will let you renew

25   that objection.

1          MARY WESLEY  (Recalled)

2     having previously been sworn, was examined and

3     testified as follows:

4                DIRECT EXAMINATION

5   BY MR. VALESKA:

6   Q   Ms. Wesley, I want to recall you to the stand.

7       Understand you're still under oath.

8       Jonteria's birthday?

9   A   June 9, 1995.

10  Q   1995, correct?

11  A   (Witness nodded.)

12          MR. VALESKA:  Thank you very much.  That's

13      all I have.

14                CROSS EXAMINATION

15  BY MR. BRANTLEY:

16  Q   Ma'am, were you present at the hospital when she

17      was born?

18  A   Huh-uh.

19          MR. BRANTLEY:  That's all.

20                REDIRECT EXAMINATION

21  BY MR. VALESKA:

22  Q   Are you her guardian; in other words,

23      court-appointed guardian and legal papers that you

24      have?

25  A   Yes.

610

1    Q    Do you know when she was born?

2    A    (Witness nodded.)

3    Q    Did you see her in the hospital when she was born?

4    A    (Witness nodded.)

5          MR. VALESKA:  That's all.

6          THE COURT:  Mr. Brantley, anything else?

7          MR. BRANTLEY:  Nothing further.

8          THE COURT:  Does she need to step out?

9          MR. VALESKA:  No, sir.

10         THE COURT:  Anything else?

11         MR. VALESKA:  The State of Alabama rests at

12   this time, Judge Mendheim.

13         THE COURT:  The State rests.

14             Anything from the Defense?

15         MR. BRANTLEY:  Judge, I have some motions to

16   make.

17         THE COURT:  Can we just come up here and do

18   it?

19         MR. BRANTLEY:  Yes, sir.

20             (At which time the following proceedings

21             were held at the bench outside of the

22             hearing of the jury:)

23         MR. BRANTLEY:  Judge, if I could submit

24   that.  If you can give that in lieu of the other

25   one.

1        THE COURT: You say the other one, Mr.

2  Brantley. This one? Is that what you're talking

3  about?

4        MR. BRANTLEY: Yes. Give my requested number

5  one in lieu of that one.

6        THE COURT: Any objection?

7        MR. VALESKA: No.

8        THE COURT: I think it's basically --

9        MR. BRANTLEY: It's real close. It's real

10  close.

11        THE COURT: I'm going to take that one out.

12  And for the Record I will give Defendant's charge

13  number one on circumstantial evidence without

14  objection from the D.A.

15        MR. VALESKA: No objection, Your Honor.

16        THE COURT: Anything else from the Defense?

17        MR. BRANTLEY: Judge, I move for a judgment

18  of acquittal, number one, on the rape case for

19  failure of the State to prove prima facie case.

20  In support of that motion let me point out that

21  the State has not proved -- they have not given us

22  any evidence that the, quote, blunt-force object

23  used to arguably penetrate, and we're not even

24  going to say penetration, but even if we conceded

25  penetration, which we're not, there still is no

1   proof that the object that did the penetration was

2   a penis.  The doctor testified it could have been

3   any blunt-force object.  He said a sexual

4   assault.  And this Court well knows there is a

5   statute covering use of objects to place in female

6   vagina it's a lesser degree felony than rape.

7        THE COURT:  Actually, for the Record, I was

8   checking earlier.  It's not.  It's sexual torture

9   is what you're referring to.  Sexual torture is

10  Class A.  But that's what you're referring to.

11       MR. BRANTLEY:  Of course.  A finger is a

12  blunt-force object, and that would be sexual

13  abuse.

14       THE COURT:  Are you asking for a charge on

15  that?

16       MR. BRANTLEY:  Well, right now I would ask

17  for a judgment of acquittal on the rape charge

18  because there's been no evidence presented, no

19  evidence, that the object used was a penis.  And

20  that is -- that is a fundamental requirement of

21  rape is that it be a penis.  And there's just --

22  there's no evidence.

23       THE COURT:  I'm going to deny that.  I think

24  that the evidence viewed most favorably to the

25  State, particularly Dr. Salna's testimony.  He

1  testified without any doubt in his opinion based

2  on the location of the vagina around the hymenal

3  area that in his opinion it could be nothing

4  other than a penis anatomically between a male and

5  female.  That presents a jury question.  Obviously

6  the jury doesn't have to agree with that finding.

7  Second, there's been evidence presented by the

8  State of semen, sperm found in the victim's

9  panties.  And those are enough to give the rape

10  charge to the jury over an objection.  And the

11  jury can make any factual determination from

12  there.

13      MR. BRANTLEY:  Judge, also on the attempted

14  murder charge, I would move for a judgment of

15  acquittal on the grounds that the State has failed

16  to prove a prime facie case.  One of the things

17  that the State has got to prove is this was more

18  than an assault, it was an attempted murder.  They

19  have not met that burden of proof that it was --

20  that whoever the assailant was attempted to take

21  -- kill this person.  Now, I point out to the

22  testimony of Dr. Salna, I believe that was the one

23  -- yes, stating that although he gave the -- that

24  scale -- that fifteen scale, and I really forget

25  the title of it, a three, one on each one, there

1    were three categories, he still stated that a

2    person who was unconscious, who was unconscious,

3    Judge, would still get a three. And, of course,

4    being unconscious is not being dead.

5        THE COURT: I think that the evidence creates

6    a jury issue to attempted murder. The jury could

7    well agree with you and find him not guilty. But

8    there is I think substantial evidence to let a

9    jury decide that point. So I will deny that

10   motion as well.

11           Any other motions?

12       MR. BRANTLEY: That's all.

13       THE COURT: Anything from the D.A.?

14       MR. VALESKA: No, sir.

15       THE COURT: Mr. Brantley, do you plan to

16   offer any evidence at this point?

17       MR. BRANTLEY: No, sir.

18       THE COURT: Go straight to argument --

19       MR. BRANTLEY: Can I put on the Record that

20   my client does not want to testify?

21       THE COURT: Yes.

22           (At which time the following

23           proceedings were held in open court:)

24       THE COURT: Ladies and gentlemen, I

25   apologize. We're working to get this case where

1    you can deliberate after lunch. We're getting

2    toward the end of it. I do need for you if you

3    can just step back into the jury room. Hopefully

4    for no more than a couple of minutes or so at the

5    most. And we will bring you back out and start

6    the final part of the trial at that time.

7                (Jury not present.)

8        MR. BRANTLEY: Freeshone, what I want to ask

9    you here outside the presence of the jury, we've

10   discussed your case over and over, and we've

11   discussed strategy of it. And you understand that

12   you have the right to get on the stand and testify

13   if you want to; is that correct?

14       THE DEFENDANT: (Nodded.)

15       MR. BRANTLEY: And you understand if you

16   don't get on the stand and testify, no one can

17   comment to the jury that you didn't take the stand

18   and testify? Do you understand that?

19       THE DEFENDANT: (Nodded.)

20       MR. BRANTLEY: Would you say yes or no?

21       THE DEFENDANT: Yes.

22       MR. BRANTLEY: Now, we have discussed just a

23   few minutes ago whether or not you wanted to get

24   on the stand and testify. And I said that

25   decision basically is yours; is that correct?

1           THE DEFENDANT:  Yes.

2           MR. BRANTLEY:  You told me you did not want

3    to testify; is that correct?

4           THE DEFENDANT:  Yes.

5           MR. BRANTLEY:  Have you changed your mind

6    since then?

7           THE DEFENDANT:  No.

8           MR. BRANTLEY:  That's all.

9              (Jury present.)

10         THE COURT:  Ladies and gentlemen, we have

11   completed all of the testimony that you will hear

12   in this case.  We're about to go into the final

13   phase of it where the attorneys give you their

14   closing arguments.  As I told you when we started,

15   and I will tell you again before we finish, the

16   burden of proof in this case is on the State of

17   Alabama to prove the case to you beyond a

18   reasonable doubt.  For that reason the District

19   Attorney will get to address you first with his

20   closing argument.  Then Mr. Brantley on behalf of

21   the Defendant will address you.  And then the

22   State will have a final opportunity, once again,

23   to address you when Mr. Brantley finishes because

24   the burden of proof is on them.

25         I do want to caution you that what the

1    attorneys say and what I may have said by way of
2    rulings during the trial, none of that is
3    evidence.  You're to consider as evidence what
4    you've heard from the witness stand and any of the
5    exhibits that have been introduced to you.  The
6    argument is simply the attorneys' view of the
7    evidence in this case for you to consider.
8           When they finish, I will go over with
9    you specifically the law that you are to apply in
10   this case when you begin your deliberations.  We
11   will break for lunch.  I have put the attorneys --
12   the District Attorney and Mr. Brantley will each
13   have fifteen minutes to argue their case.  The
14   D.A., since he gets to go twice, can break up his
15   time however he chooses.  After that, I hope to go
16   ahead and begin my oral charge to you as to the
17   law in this case.  Hopefully finish it and not
18   have to break in the middle of it for lunch.  As I
19   told you, I have a small child in day care and
20   it's my personal problems kind of interfere.  So
21   at a certain point I'm going to have to break if
22   I'm not finished with the oral charge and come
23   back after lunch.  But I hope to avoid that if at
24   all possible.  If we do finish the oral charge, we
25   will go ahead and break for lunch, and then when

1    you come back you can just go straight into your

2    deliberations.  You won't have to come back in

3    here and listen to me or anyone else.

4         So with that, Mr. Valeska, are you ready

5    to address the Court?

6         MR. VALESKA:  I'm ready.  Thank you very

7    much.

8              (At which time closing arguments were

9              made by Mr. Valeska.)

10        THE COURT:  Mr. Brantley.

11             (At which time closing arguments were

12             made by Mr. Brantley.)

13        THE COURT:  There is to be no laughing or

14   nothing while court is in session or while the

15   attorneys are talking.  Any more outbursts, any

16   problems by anybody, the deputies will take you

17   outside and over to the county jail.  So there's

18   absolutely not to be any of that.

19             (At which time closing arguments were

20             continued by Mr. Brantley.)

21        MR. VALESKA:  Objection.  That is not the law

22   in the state of Alabama.

23        MR. BRANTLEY:  It's their own jury charge.

24        MR. VALESKA:  It's incorrect what he's

25   arguing.